# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of Labor,

Plaintiff,

v.

Reliance Trust Company, et al.,

Defendants.

Case No. 2:19-cv-03178-JJT

**DECLARATION OF RANDALL SMALLEY**

Pursuant to 28 U.S.C. § 1746, I, Randall Smalley, declare under penalty of perjury and state the following:

1.      I am over the age of 18, of sound mind, and capable of making this Declaration.  The facts stated in this Declaration are within my personal knowledge and are true and correct.  If called upon as a witness, I could and would testify as to the truth of the facts below.  I give this Declaration freely without payment or coercion of any kind.

2.      RVR, Inc., which does business as Cruise America and Cruise Canada, is a recreational vehicle rental company founded by myself; my brother, Robert Smalley, Jr. ("Robert"); and our father in 1972.  RVR, Inc. ("RVR" or the "Company") is a Florida corporation.

3.      In 1993, I became the Company's Chief Executive Officer and Robert became the Company's President.

4.      In 2000, Robert and I became the sole shareholders and sole directors of RVR.  I put the stock I acquired in family trusts for which I am the trustee.  As members of RVR's Board of Directors, Robert and I understood that we were both subject to and required to comply with the fiduciary duties and requirements of the Florida Business Corporations Act and the requirements of RVR's Bylaws and Articles of Incorporation.

5.      As a reward for Eric Bensen's ("Eric's") long-term commitment to RVR, Eric, who served at the time as RVR's Chief Financial Officer, was allowed to acquire 3.3% of

RVR's stock from my brother and I in 2011. Eric joined the RVR Board for the first time and became its third member on May 28, 2014. Eric currently serves as RVR's Chief Executive Officer.

6.      Starting in late 2013, my brother and I, who were 64 and 65 years old at the time, respectively, began considering succession planning and the possible transfer of RVR's ownership to RVR's employees. Based on a referral from our Company's corporate bank, Wells Fargo, Eric, Robert, and I met with Greg Fresh and Ted Margarit of Chartwell Financial Services, Inc. (a/k/a Chartwell Business Valuation, LLC) ("Chartwell") and Jim Griffin of Wells Fargo Advisors on January 27, 2014 at RVR's corporate office. Chartwell is an financial advisory firm that provides investment banking, valuation, and other financial services to private companies.

7.      During this January 27, 2014 meeting, Chartwell (Greg Fresh and Ted Margarit) discussed with me, Robert, and Eric some of the tax and other benefits of employee stock ownership plans ("ESOPs"), including succession planning, tax incentives, and the provision of additional retirement benefits to employees. Chartwell also discussed its qualifications for serving as the Company's financial advisor in connection with a possible ESOP formation transaction and highlighted its experience representing and advising dozens of parties in over 45 ESOP transactions during the prior eighteen months.

8.      Based on some preliminary information provided to Chartwell and with the assumption of a sale of 100% of RVR's stock to an ESOP, Chartwell informed me, Robert and Eric on January 27, 2014 that a preliminary fair market value range for 100% of RVR's stock as of December 31, 2013 was between $100.7 million and $143.9 million.

9.      Chartwell used the low end of the preliminary fair market value range, $100.7 million, to illustrate for me, Robert, and Eric how a potential ESOP transaction could be financed and structured at that low-end price and how much cash RVR's shareholders might receive if shareholders sold 100% of RVR's stock to the ESOP at that low-end price.

2

10.    Chartwell's Greg Fresh and Ted Margarit were clear in the meeting that the preliminary fair market value estimate provided to us was not a true valuation of RVR's stock.  Instead, Chartwell was intending to show us how a transaction might be structured if the parties came to an agreement at the very low end of the estimated fair market value range.  Chartwell also explained to me, Robert, and Eric that it was trying to estimate the low end of the valuation range because that is where they thought the ESOP trustee would likely start negotiations if RVR ultimately decided to explore the possibility of forming an ESOP, and if I (as trustee of my family trusts), Robert, and Eric all agreed to sell 100% of RVR's stock to the ESOP.

11.    Chartwell explained to us what "adequate consideration" meant (which I understood to mean fair market value as determined by the ESOP trustee with the assistance of its independent financial advisor) and why the ESOP could not lawfully pay more than fair market value for employer stock.  Chartwell also explained the responsibilities of an ESOP trustee, the ESOP trustee's financial advisor, and the ESOP trustee's legal counsel.  Chartwell further explained during this same January 27, 2014 meeting how Chartwell would represent RVR in negotiations with the ESOP trustee and the importance of the negotiations with the trustee being conducted at "arms-length."

12.    After conferring with Eric and Greenberg Traurig ("Greenberg"), RVR's long-time corporate counsel which had a number of lawyers who specialize in ESOPs, my brother and I decided that RVR should retain Chartwell to serve as RVR's financial advisor in connection with the exploration and potential execution of an ESOP formation transaction.  We felt the retention of Chartwell, an experienced, professional financial advisor, was important because Robert, Eric, and I had little to no knowledge about the concept of an ESOP, the process involved in forming an ESOP, the valuation of private company stock, including RVR's stock or the financing of a potential ESOP transaction.

13.    On February 27, 2014, RVR retained Chartwell to serve as its financial advisor in connection with the potential creation of an ESOP and a potential sale of 100%

3

of RVR's stock to an ESOP.  Once retained, Chartwell began directing us to secure anticipated due diligence materials so that the information could be promptly shared with the to-be-selected independent trustee and its advisors.  Robert and I designated Eric to serve as the "point person" for due diligence given that he was RVR's Chief Financial Officer at the time and the RVR employee with the most knowledge of RVR's finances. Eric, in turn, asked several other RVR employees to help him gather the due diligence requested by Chartwell and to organize the due diligence materials into an electronic data room for easy access and review.  The RVR employees who helped Eric included Kevin Bensen, the then-current Financial Analyst; Michael Marcine, Vice-President; and Cory Kauffmann, the then-current Manager of Finance, Marketing and Administration. Other RVR employees were also asked to assist Eric as the need arose.

14.    In March 2014, Kevin Bensen, Cory Kauffmann, Robert, Eric, and I started reviewing the credentials of several potential ESOP trustee candidates who had been recommended to us by Chartwell and Greenberg.  The three trustee candidates were Reliance Trust Company, Alerus Financial, and GreatBanc Trust and all three were invited to interview with us after confirming that they were interested in representing the to-be-formed ESOP and that they had no conflicts of interest which would preclude them from doing so.

15.    On March 31 and April 1, 2014, Eric, Robert and I, along with Greg Fresh and Ted Margarit of Chartwell and Marc Baluda of Greenberg, conducted in-person interviews with all three trustee candidates.  During these meetings, we provided the candidates with additional information regarding RVR, its business, its finances, and its history.

16.    During these interviews, we asked the candidates detailed questions, including: (a) the trustee's experience in ESOP transactions, (b) the trustee's working relationship with the Department of Labor, (c) how long due diligence would likely take and what type of information the trustee candidate would like to see as part of its due

diligence, (d) whether the trustee candidate would retain an outside financial advisor and/or legal advisor to assist it, and (e) whether the trustee candidate had sufficient capacity and resources to evaluate, negotiate, and close (or reject) a potential ESOP transaction by the proposed closing date of May 27, 2014.

17.    The proposed May 27, 2014 transaction closing date was not a hard deadline and we did not advise the trustee candidates or anyone else that it was a "hard deadline." We did indicate to all three trustee candidates, though, that the Summer was RVR's busy season and that RVR was interested in closing any ESOP transaction by the end of May, if possible, so that the financial benefits associated with the busy Summer season would flow to the ESOP.

18.    All three trustee candidates stated in their interview meetings they thought the proposed May 27, 2014 proposed closing was realistic and achievable.  Reliance's representative, Steve Martin, indicated that the proposed timing was "perfect."  All three candidates also indicated that they would retain outside financial advisors and legal advisors to assist them to fulfill their duties to the ESOP.  All three candidates also identified Stout Risius Ross ("SRR") as a preferred financial advisor.  Reliance also later identified three preferred legal advisors that it would consider engaging for the ESOP exploration process: K&L Gates, McDermott, Will & Emery, and Bryan Cave.

19.    After consulting with Eric, Chartwell, Greenberg, and BDO (RVR's outside accountant and auditor), Robert and I, as the sole members of RVR's Board of Directors, decided that RVR would retain Reliance to act as the ESOP's independent, discretionary trustee to represent the to-be-formed ESOP and, if deemed appropriate by Reliance, negotiate the terms by which the ESOP would purchase 100% of RVR's stock from RVR's stockholders.

20.    Neither the RVR Board of Directors nor the Cruise America, Inc. Board of Directors delegated to Eric the discretionary authority to engage Reliance as the trustee of the to-be-formed RVR, Inc. Employee Stock Ownership Plan (the "RVR ESOP"); rather,

5

the RVR Board only delegated to Eric the power to sign the Reliance Engagement Letter and Trust Agreement on behalf of the Company.

21.    Both the Reliance Engagement Letter and the May 22, 2014 Trust Agreement, which superseded and replaced the Reliance Engagement Letter, provided that Reliance had the exclusive responsibility for representing the ESOP and the sole authority to negotiate and execute any potential purchase of RVR stock on behalf of the ESOP. This was important to us and encouraged by our advisors so that we could ensure the ESOP exploration process and any negotiations over the potential ESOP transaction terms were conducted at arm's-length.

22.    After Reliance was notified of its selection on April 4, 2014, Reliance (through Chartwell) informed me, Robert and Eric that Reliance had selected SRR to serve as its financial advisor and K&L Gates as its legal advisor.  Robert, Eric, and I did additional due diligence on SRR and K&L Gates, including consulting with Chartwell and Greenberg, and concluded both SRR and K&L Gates were qualified to serve as Reliance's advisors and both were independent of RVR and its stockholders.  SRR and K&L Gates also represented to Reliance and RVR, including in their engagement letters, that they were qualified and independent advisors to Reliance as the trustee of the to-be-form RVR ESOP.

23.    Among other things, K&L Gates represented in its engagement letter that it had conducted a conflicts check and that it would provide independent professional judgment when providing advice to Reliance.  SRR's engagement letter stated, among other things, that (a) SRR's "services will be performed with reasonable care in a diligent and competent manner," and (b) "[n]one of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach."

24.    On April 16, 2014, RVR and Chartwell held an in-person management presentation with Reliance and its advisors.  Robert, Eric, and I attended the presentation on behalf of RVR; Greg Fresh, Ted Margarit and Stephanie Geerdes attended the meeting

6

on behalf of Chartwell; Mark Baluda and Mark Aguirre attended the meeting on behalf of Greenberg; Steve Martin and Bucky Wright attended the meeting on behalf of Reliance; Erin Turley and Allison Wilkersen attended the meeting on behalf of K&L Gates; and Bob Socol and Mark Fournier attended the meeting on behalf of SRR.  Reliance and its advisors asked dozens of questions regarding RVR, its business, and its financial performance, and RVR and Chartwell answered those questions during the meeting.  Following the meeting, we also provided Reliance and its advisors with a tour of RVR's main facility in Mesa, Arizona, including its reservation center.

25.    On April 17, 2014, Chartwell made the pre-populated, electronic due diligence data room containing RVR business information, including audited financials and financial projections, available to Reliance's advisors, K&L Gates and SRR.   Robert, Eric and I also provided Reliance and Reliance's advisors with direct access to Chartwell, Greenberg Traurig, Owen Bird (RVR's Canadian legal counsel), and BDO (RVR's auditor) to facilitate due diligence, answer outstanding inquiries, and to negotiate potential transaction terms.  Reliance and its advisors were also able to communicate with and discuss any issues or concerns with Weiss Brown, who had been engaged to serve as personal legal counsel to me and Robert.

26.    At RVR's request and direction, on April 21, 2014, Chartwell provided Reliance and its advisors the initial transaction proposal and term sheet and explained the proposal through a 46-page presentation discussed during a conference call. The primary purpose of the call was to explain RVR's goals in potentially forming an ESOP, which included the following:  (a) to establish a sustainable ESOP that provides a meaningful benefit to RVR's employees; (b) to provide some liquidity to the Selling Shareholders (Robert, Eric, and my family trusts), while creating a lasting legacy for the employees; (c) to create a tax benefit for RVR and the ESOP by forming an S-Corporation ESOP which, as explained to me, is essentially a tax-free business structure which provides additional benefits to both RVR and the to-be-formed ESOP (and, therefore, to RVR's employees);

7

and (d) to create a stock appreciation rights ("SARs") plan to incentivize the future management team to continue to grow the business for the benefit and success of the ESOP and RVR's employees. The second goal was to clearly communicate the initial ESOP transaction proposal and the rationale for the initial proposal to Reliance and its advisors.

27.     The financial terms of the April 21, 2014 initial transaction proposal included the following terms, among others: (a) a purchase price of $143.9 million for 100% of RVR's stock; (b) financing in the form of a bridge loan from Wells Fargo which would be promptly paid off with stock sale proceeds to be loaned to RVR by Robert and my family trusts; and (c) a loan to the ESOP by RVR at an interest rate of 3.75% over a 40-year period. In exchange for the loan from Robert and my family trusts to RVR, Robert and my family trusts would receive (1) promissory notes ("Seller Notes") from RVR with a 15-year term and 4% cash interest and 6% paid in kind ("PIK") interest; and (2) warrants.  The Seller Notes would be subordinated to all of RVR's other debt, principally with Wells Fargo (the "Senior Debt").  Importantly, to set off the significantly below market interest rates on the deeply subordinated Seller Notes, the initial proposal included warrants to purchase 32.49% of RVR's equity on a fully-diluted basis.  The initial proposal also included a SARs plan pursuant to which stock appreciation rights could be issued to key employees, up to 17.49% of RVR's equity on a fully diluted basis.  Key non-financial terms included in the initial proposal included adding Eric to the RVR Board and no "material changes in compensation arrangements or terms" to Robert's, Eric's, and my pre-existing employment agreements.

28.     Following the April 21, 2014 presentation of the initial proposal, Chartwell provided regular (at least weekly and, often, daily) updates to RVR (principally me, Robert, and/or Eric) on Reliance's due diligence requests, follow up questions asked by SRR, K&L Gates, and Reliance, and the status of the negotiations, among other things.  Chartwell also advised us about key meetings being held by Reliance and its advisors, including the May 5, 2014 and May 23, 2014 meetings between Reliance and its advisors and information

8

regarding the offers and counter-offers and other proposed deal terms. Although we were aware of Reliance's meetings with its advisors, and any counter-proposals made by Reliance to RVR, we were obviously not privy to any of the confidential conversations Reliance had with its advisors, including any conversations Reliance had with its advisors regarding the value of RVR's stock, proposed transaction terms, or legal and financial due diligence.

29.     On May 5, 2014, Chartwell received Reliance's first counter-offer. After Chartwell discussed Reliance's first counter-offer with RVR (Robert, Eric and I) and Greenberg (Marc Baluda), RVR authorized Chartwell to make RVR's first counter-offer to Reliance on May 8, 2014. Reliance made its second counter-offer to RVR the next day, on May 9, 2014. Negotiations over deal terms and additional financial and legal due diligence continued to take place through May 27, 2014 and the final agreement was executed on May 28, 2014. A chart accurately reflecting the negotiations over select proposed financial terms is below:

| SUMMARY OF NEGOTIATION OVER SELECT FINANCIAL TERMS | | | | |
|---|---|---|---|---|
| Offer/Counter-Offer | Equity Purchase Price | Warrants Attached to Seller Notes | SARs | Interest Rate on Seller Notes |
| RVR Initial Proposal | $143.9 million | 32.49% | 17.49% | 4% cash/6% PIK |
| Trustee First Counter-Offer | $100 million | 25% | 10% | N/A |
| RVR First Counter-Offer | $115 million | 35% | 12.5% | 3% cash/5% PIK |
| Trustee Second Counter-Offer | $105 million | 35% | Up to 12.5% | 3% cash/5% PIK |
| Final Agreement | $105 million | 35% | Up to 12.5% | 2.5% cash, PIK interest at 1.05% (compounding) and 2.15% (non-compounding) |

30.     The proposal for the number of warrants increased over the course of the negotiations because Robert and I agreed to lower the cash and PIK interest rates on the proposed Seller Notes.  Chartwell advised us that the expected rate of return on the financing Robert and I were to provide to RVR—the warrants, cash interest on the Seller Notes, and PIK interest on the Seller Notes—was likely below market return rates on similar deeply subordinated debt.  Information produced in discovery confirmed that SRR had determined that the expected rate of return on the Seller financing, including the interest rates on the Seller Notes and the expected return on the warrants, was below fair market value for similar deeply subordinated financing.     During the course of the negotiations, my brother and I agreed that we would not participate in the SARs plan.

31.     Prior to this litigation, I was not provided with any copies of SRR's draft or final valuation reports which I understand Reliance used to negotiate the proposed ESOP transaction deal terms, including the price to be paid for the RVR stock purchased by the RVR ESOP.  I was also unaware of the valuation methodologies or assumptions used by SRR in its valuations.  For example, prior to this litigation, I had no knowledge of whether SRR's valuations of RVR's stock were conducted on a controlling interest basis (or included any alleged control premium).

32.     Robert, Eric, and I did not participate directly in the negotiations with Reliance or its advisors.  Instead, the negotiations on behalf of RVR were handled by RVR's advisors, including Chartwell and Greenberg.  During the course of this litigation, I was shown two emails purportedly sent by Steve Martin of Reliance to Chartwell on May 22 and May 23, 2014.  Prior to this litigation, I had not seen, nor was I aware of, these emails or the contents of the emails.  The two emails, which have been designated as Plaintiff's Trial Exhibits 168 and 182, were not forwarded to me or, to my knowledge, anyone else at RVR.  Prior to this litigation, no one from Chartwell (or anyone else) discussed the substance of these two emails with me.

10

33.     Regardless of whether Mr. Martin's statements in these purported emails were intended to be accurate at the time or were simply a negotiating tactic, RVR and the Selling Shareholders (Robert, Eric, and my family trusts) made significant, additional concessions between the dates of the emails and the closing of the RVR ESOP Transaction on May 28, 2014.  With respect to executive compensation, the concessions included, among other things, the elimination of Eric's, my brother's and my right to unilaterally trigger severance payments, the addition of a requirement that a release be executed in exchange for receipt of any severance, and a provision that prohibited increases in our compensation without the approval of the ESOP Trustee.  Additionally, the Parties agreed to eliminate the warrant holders' proposed blocking right of any potential sale of RVR, to establish a specific procedure for evaluating potential mergers and acquisitions, and to establish a process for the RVR Board to nominate candidates for Board positions and for the ESOP Trustee to vote on the slate of nominees.

34.     In connection with the proposed RVR ESOP transaction and prior to anyone executing the Stock Purchase Agreement, Reliance and its advisors made several important representations to RVR, the RVR Board, and the Selling Shareholders.   These representations were important to RVR and me.  We would not have executed the Stock Purchase Agreement or closed the RVR ESOP Transaction without them.   The representations include the following:

a.      Reliance's representation in the Stock Purchase Agreement that "the [RVR ESOP] Trust has received an opinion from its independent financial advisors reflecting that: (i) the consideration paid for the shares of the Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of [ERISA]";

b.      Reliance's representation in the Stock Purchase Agreement that "the Trust has received an opinion from its independent financial advisors reflecting that … (vi) the

11

terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view";

c.      Reliance's representation in the Stock Purchase Agreement that Reliance had analyzed, reviewed and approved the Fairness Opinion and accompanying report prepared by SRR and that SRR is an "Independent Financial Advisor";

d.      Reliance's representation in the Stock Purchase Agreement that "[n]either the execution nor the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any Laws to which the ESOP is subject or any provision of the trust documents of the ESOP . . .";

e.      SRR's representations in its May 28, 2014 fairness opinion that: (1) "the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares"; (2) "the interest rate on the ESOP Loan is not in excess of a reasonable interest rate"; (3) "the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arms-length negotiations between independent parties"; and (4) "the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view";

f.      SRR's representations in its May 28, 2014 fairness opinion that: "SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the [DOL] and section 401(a)(28)(C) of the Internal Revenue Code of 1986";

g.      Reliance's certification in the Trustee Certificate that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill, prudence and diligence that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms";  and

12

h.    K&L Gates' representation in a May 28, 2014 written opinion that the "acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code".

35.    Additionally, prior to executing the Stock Purchase Agreement, I reviewed Greenberg's representation in a written opinion letter dated May 28, 2014 that the "execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties [defined as RVR, Cruise America, and Cruise Canada] will not violate any applicable law, rule or regulation affecting such Opinion Party." This representation as well as the ones set forth in Paragraph 34 provided me with assurance that the ESOP transaction was fair, lawful, and was in the best interest of the RVR ESOP and its participants and beneficiaries.

36.    On May 22, 2014, the RVR Board of Directors —which, at the time, was solely Robert and me—caused RVR to adopt and sign the RVR, Inc. Employee Stock Ownership Plan and the Trust Agreement with Reliance. The May 22, 2014 RVR Board meeting minutes expressly provided, among other things, that the RVR Board resolved that (a) Reliance be appointed by RVR as the RVR ESOP Trustee, effective as of April 15, 2014, with all the powers set forth in the Trust Agreement, and (b) RVR enter into the Trust Agreement with Reliance which superseded and replaced the RVR Engagement Letter. Robert, Eric, and I were the initial members of the ESOP Committee. In 2019, Robert, Eric and I stepped off the ESOP Committee and five other RVR executives replaced us. The ESOP Committee is now comprised of Kevin Bensen, Michael Marcine, Michael Smalley, Douglas Doan, and Cory Kaufmann.

37.    In January 2018, my brother and I stepped out of our respective officer positions with RVR and Eric was appointed RVR's Chief Executive Officer. My brother and I both continue to work at RVR.

13

38.    On January 16, 2018, with the permission of Argent Trust (the then-current Trustee of the ESOP), the RVR Board was expanded from 3 members to 7 members. The four persons added to the Board are Kevin Bensen, Michael Marcine, Michael Smalley, and Douglas Doan. Argent Trust became the successor trustee to the RVR ESOP when Reliance sold part of its business to Argent Trust on or about June 30, 2014. Steve Martin is now an employee of Argent and continues to serve as the principal Trustee contact for the RVR ESOP. SRR also continues to serve as the financial advisor to the ESOP Trustee and SRR has conducted every annual valuation of the RVR stock held by the RVR ESOP since its inception. As I understand it, SRR continues to value the RVR stock held by the ESOP using the same methodologies as SRR used to value the RVR stock in connection with the ESOP Transaction. RVR ESOP participant distributions are based on the SRR valuations.

39.    By the end of January 2018, RVR paid off all of the Seller Notes and redeemed all of the warrants issued to Robert and my family trusts. RVR was able to do this, in part, because Eric, Robert and I waived a significant amounts of our guaranteed compensation. In fact, as of March 2022, I have personally voluntarily waived more than $20 million in guaranteed compensation since the close of the ESOP Transaction.

40.    In particular, and starting in the fourth quarter of 2014, Robert and I voluntarily waived our guaranteed annual bonuses of $1.6 million per year ($400,000 per quarter). Beginning on January 1, 2018, Robert and I also voluntarily reduced our guaranteed base salaries from $1.6 million per year to $400,000 per year. Between Robert, Eric, and I, we have collectively voluntarily waived over $45 million in guaranteed compensation. All of this guaranteed compensation was included in the 10-year financial projections provided to SRR in connection with the ESOP Transaction and its inclusion in the financial projections necessarily lowered the purchase price paid to the Selling Shareholders. Had the guaranteed compensation that we waived been excluded from the

14

financial projections, it is my understanding the Selling Shareholders would have received a significantly higher purchase price for their shares of RVR stock.

41.    I am confident that the $105 million the ESOP paid to purchase 100% of RVR's stock was at or below fair market value for that stock.  First, the $105 million number fell at the very low end of Chartwell's estimated range, and this estimated range was stale and too low because it did not take into account the Company's updated and improved financial performance data, which was distributed on April 30, 2014.  Second, RVR had provided Chartwell and SRR with very conservative financial projections even though doing so underestimated RVR's cash flow by a couple of million dollars per year. RVR declined the invitation to revise the financial projections upward even though we knew the use of the conservative projections would result in a lower purchase price for the Selling Shareholders' RVR stock.  Finally, my belief that the ESOP paid at or below fair market value for the RVR stock it purchased was confirmed by the "as of" May 31, 2014 valuation of the ESOP's RVR stock which came in at $8.3 million.  That valuation was performed as of May 31, 2014, just three days after the ESOP Transaction closed.  Given that the ESOP Transaction was an almost 100-percent leveraged transaction, I would have expected the as of May 31, 2014 stock valuation to be at or near $0.  The fact that it was not at or near $0 tells me the ESOP and its participants got a good deal.

42.    I am proud of the performance RVR, the RVR ESOP, and the RVR stock held by the ESOP since it was purchased by the ESOP.  As mentioned above, the RVR stock held by the ESOP was appraised at $8.3 million as of May 31, 2014.  The most recent appraisal of the stock, which was conducted as of May 31, 2021, is $121.8 million.  The RVR management team expects that the as of May 31, 2022 annual appraisal of the RVR stock held by the ESOP will be even higher.  I understand that RVR's expert witness in this case, Ed Wilusz, has calculated the compounded annual growth rate on the ESOP's RVR stock to be 46.8%.  That is a far higher return than I have earned on any of my investments.

15

43.     I understand that Plaintiff has identified a purported expert who has asserted that the value of 100% of RVR's stock as of May 28, 2014 was approximately $13.7 million. This same individual assumes that I would have agreed to sell the RVR stock held by my family trusts for this amount and that either RVR or Robert and my family trusts would then loan more than $90 million to the ESOP so the ESOP could invest those loaned funds in an S&P 500 Index Fund. That is absurd. I would never have agreed to sell the RVR stock held by my family trusts based on a $13.7 million valuation of RVR's stock - a valuation that is only a fraction of the book value of the Company's assets – which means we could have dissolved RVR, sold its assets and paid its liabilities, and the Selling Shareholders would have walked away with *far more* than $13.7 million. Indeed, as of May 28, 2014, the Company had more than $16 million in cash on hand. As the majority stockholders and sole directors at the time, Robert and I could have simply caused RVR to make a distribution of that cash as a dividend and the Selling Shareholders would have received more than $13.7 million while still retaining 100% ownership of RVR.

44.     Moreover, neither I nor my family trusts would have been in a position to loan the ESOP millions of dollars had my family trusts sold the RVR stock based on a $13.7 million valuation. I am also confident that Wells Fargo would not have loaned the Company more than $90 million to then loan to the ESOP so that the ESOP could invest in the stock market. In fact, in order to secure the financing used to fund the ESOP Transaction, my brother and I were each required to personally guarantee $15 million of the Wells Fargo loan. I would not have been willing to personally guarantee any loan where the loan proceeds would be used by the ESOP to invest in the stock market.

45.     I have not been indemnified for the costs and expenses associated with this litigation from the ESOP nor have I requested to be indemnified under the terms of the Plan.

16

I declare under penalty of perjury that I have read this Declaration and it is true and correct.

Executed on March 23, 2022.

_____
Randall Smalley

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, | Case No. 2:19-cv-03178-JJT |
| Plaintiff, | **DECLARATION OF ERIC BENSEN** |
| v. | |
| Reliance Trust Company, et al., | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Eric Bensen, declare under penalty of perjury and state the following:

1.    I am over the age of 18, of sound mind, and capable of making this Declaration.  The facts stated in this Declaration are within my personal knowledge and are true and correct.  If called upon as a witness, I could and would testify as to the truth of the facts below.  I give this Declaration freely without payment or coercion of any kind.

2.    I am the current Chief Executive Officer of RVR, Inc. ("RVR" or the "Company") and a member of RVR's Board of Directors ("Board").  In 2014, I served as RVR's Chief Financial Officer.  On May 28, 2014, I was appointed for the first time to RVR's Board where I became its third member.  I understood that as a Board member I owed corporate fiduciary duties to RVR shareholder(s) and needed to comply with the Florida Business Corporations Act and the requirements of RVR's Bylaws and Articles of Incorporation.

3.    On January 27, 2014, I along with Robert Smalley, Jr. and Randall Smalley (the "Smalleys") met with Greg Fresh and Ted Margarit of Chartwell Financial Services, Inc. (a/k/a Chartwell Business Valuation, LLC) ("Chartwell") and Jim Griffin of Wells Fargo Advisors on January 27, 2014 at RVR's corporate office to discuss employee stock ownership plans ("ESOPs") and the benefits associated with ESOPs.

4.     Chartwell, which is an financial advisory firm that provides investment banking, valuation, and other financial services to private companies, discussed its qualifications for serving as the Company's financial advisor in connection with a possible ESOP formation transaction and highlighted its experience representing and advising dozens of parties in over 45 ESOP transactions during the prior eighteen months.

5.     Based on some preliminary information provided to Chartwell and with the assumption of a sale of 100% of RVR's stock to an ESOP, Chartwell informed me and the Smalleys on January 27, 2014 that a preliminary fair market value range for 100% of RVR's stock as of December 31, 2013 was between $100.7 million and $143.9 million.

6.     Chartwell used the low end of the preliminary fair market value range, $100.7 million, to illustrate for us how a potential ESOP transaction could be financed and structured at that low-end price and how much cash RVR's shareholders, which included me, Robert, and Randall's family trusts (the "Selling Shareholders"), might receive if the Selling Shareholders agreed to sell 100% of RVR's stock to the ESOP at that low-end price.

7.     Chartwell's Greg Fresh and Ted Margarit were clear in the January 27, 2014 meeting that the preliminary fair market value estimate provided to us was not a true valuation of RVR's stock.  Instead, Chartwell was intending to show us how a transaction might be structured if the parties came to an agreement at the very low end of the estimated fair market value range.  Chartwell also explained to us that it was trying to estimate the low end of the valuation range because that is where they thought the ESOP trustee would likely start negotiations if RVR ultimately decided to explore the possibility of forming an ESOP, and the Selling Shareholders all agreed to sell 100% of RVR's stock to the ESOP.

8.     Chartwell explained to me and the Smalleys what "adequate consideration" meant (which I understood to mean fair market value as determined by the ESOP trustee with the assistance of its independent financial advisor) and why the ESOP could not lawfully pay more than fair market value for employer stock.  Chartwell also explained the responsibilities of an ESOP trustee, the ESOP trustee's financial advisor, and the ESOP

2

trustee's legal counsel.  Chartwell further explained during this same January 27, 2014 meeting how Chartwell would represent RVR in negotiations with the ESOP trustee and the importance of the negotiations with the trustee being conducted at "arms-length."

9.     After conferring with me and Greenberg Traurig ("Greenberg"), the Smalleys decided that RVR should retain Chartwell to serve as RVR's financial advisor in connection with the exploration and potential execution of an ESOP formation transaction. We felt the retention of Chartwell, an experienced, professional financial advisor, was important given that we had little to no knowledge about the concept of an ESOP, the process involved in forming an ESOP, the valuation of private company stock, including RVR's stock or the financing of a potential ESOP transaction.

10.     On February 27, 2014, RVR retained Chartwell to serve as its financial advisor in connection with the potential creation of an ESOP and a potential sale of 100% of RVR's stock to an ESOP.  Once retained, Chartwell began directing us to secure anticipated due diligence materials so that the information could be promptly shared with the to-be-selected independent trustee and its advisors, including financial information, projections, business plans, and data on employees and fixed assets.  Robert and Randall designated me to serve as the "point person" for due diligence given my position and knowledge of RVR's finances.  I, in turn, asked several other RVR employees to help gather the due diligence requested by Chartwell, including audited financials, balance sheets, and financial projections, and to organize the due diligence materials into an electronic data room for easy access and review.  The RVR employees who assisted me included Kevin Bensen, the then-current Financial Analyst; Michael Marcine, Vice-President; and Cory Kauffmann, the then-current Manager of Finance, Marketing and Administration. I asked other RVR employees to assist with the collection of due diligence as the need arose.

11.     In March 2014, me, Kevin Bensen, Cory Kauffmann, and the Smalleys started reviewing the credentials of several potential ESOP trustee candidates who had

been recommended to us by Chartwell and Greenberg. The three trustee candidates, Reliance Trust Company, Alerus Financial, and GreatBanc Trust, were all invited to interview with us after confirming that they were interested in representing the to-be-formed ESOP and that they had no conflicts of interest which would preclude them from doing so.

12.     On March 31 and April 1, 2014, Greg Fresh and Ted Margarit of Chartwell, Marc Baluda of Greenberg, myself and the Smalleys conducted in-person interviews with all three trustee candidates. During these meetings, we provided the candidates with additional information regarding RVR, its business, its finances, and its history.

13.     During these interviews, we asked the candidates detailed questions, including: (a) the trustee's experience in ESOP transactions, (b) the trustee's working relationship with the Department of Labor, (c) how long due diligence would likely take and what type of information the trustee candidate would like to see as part of its due diligence, (d) whether the trustee candidate would retain an outside financial advisor and/or legal advisor to assist it, and (e) whether the trustee candidate had sufficient capacity and resources to evaluate, negotiate, and close (or reject) a potential ESOP transaction by the proposed closing date of May 27, 2014.

14.     The proposed May 27, 2014 transaction closing date was not a hard deadline and we did not advise the trustee candidates or anyone else that it was a "hard deadline." We did indicate to all three trustee candidates, though, that the Summer was RVR's busy season and that RVR was interested in closing any ESOP transaction by the end of May, if possible, so that the financial benefits associated with the busy Summer season would flow to the ESOP.

15.     All three trustee candidates stated in their interview meetings they thought the proposed May 27, 2014 proposed closing was realistic and achievable. Reliance's representative, Steve Martin, indicated that the proposed timing was "perfect." All three candidates also indicated that they would retain outside financial advisors and legal

4

advisors to assist them to fulfill their duties to the ESOP.  All three candidates also identified Stout Risius Ross ("SRR") as a preferred financial advisor.  Reliance also later identified three preferred legal advisors that it would consider engaging for the ESOP exploration process: K&L Gates, McDermott, Will & Emery, and Bryan Cave.

16.    After consulting with me, Chartwell, Greenberg, and BDO (RVR's outside accountant and auditor), Robert and Randall, as the sole members of RVR's Board of Directors, decided that RVR would retain Reliance to act as the ESOP's independent, discretionary trustee to represent the to-be-formed ESOP and, if deemed appropriate by Reliance, negotiate the terms by which the ESOP would purchase 100% of RVR's stock from RVR's stockholders.

17.    Neither the RVR Board of Directors nor the Cruise America, Inc. Board of Directors delegated to me the discretionary authority to engage Reliance as the trustee of the to-be-formed RVR, Inc. Employee Stock Ownership Plan (the "RVR ESOP"); rather, the RVR Board only delegated to me the power to sign the Reliance Engagement Letter and Trust Agreement on behalf of the Company.

18.    Both the Reliance Engagement Letter and the May 22, 2014 Trust Agreement, which superseded and replaced the Reliance Engagement Letter, provided that Reliance had the exclusive responsibility for representing the ESOP and the sole authority to negotiate and execute any potential purchase of RVR stock on behalf of the ESOP. This was important to us and encouraged by our advisors so that we could ensure the ESOP exploration process and any negotiations over the potential ESOP transaction terms were conducted at arm's-length.

19.    After Reliance was notified of its selection on April 4, 2014, Reliance (through Chartwell) informed me and the Smalleys that Reliance had selected SRR to serve as its financial advisor and K&L Gates as its legal advisor.  We conducted additional due diligence on SRR and K&L Gates, including consulting with Chartwell and Greenberg, and concluded both SRR and K&L Gates were qualified to serve as Reliance's advisors

and both were independent of RVR and its stockholders. SRR and K&L Gates also represented to Reliance and RVR, including in their engagement letters, that they were qualified and independent advisors to Reliance as the trustee of the to-be-form RVR ESOP.

20. Among other things, K&L Gates represented in its engagement letter that it had conducted a conflicts check and that it would provide independent professional judgment when providing advice to Reliance. SRR's engagement letter stated, among other things, that (a) SRR's "services will be performed with reasonable care in a diligent and competent manner," and (b) "[n]one of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach."

21. On April 16, 2014, RVR and Chartwell held an in-person management presentation with Reliance and its advisors. The Smalleys and I attended the presentation on behalf of RVR; Greg Fresh, Ted Margarit and Stephanie Geerdes attended the meeting on behalf of Chartwell; Mark Baluda and Mark Aguirre attended the meeting on behalf of Greenberg; Steve Martin and Bucky Wright attended the meeting on behalf of Reliance; Erin Turley and Allison Wilkersen attended the meeting on behalf of K&L Gates; and Bob Socol and Mark Fournier attended the meeting on behalf of SRR. Reliance and its advisors asked dozens of questions regarding RVR, its business, and its financial performance, and RVR and Chartwell answered those questions during the meeting. Following the meeting, we also provided Reliance and its advisors with a tour of RVR's main facility in Mesa, Arizona, including its reservation center.

22. On April 17, 2014, Chartwell made the pre-populated, electronic due diligence data room containing RVR business information, including audited financials and financial projections, available to Reliance's advisors, K&L Gates and SRR. Reliance and Reliance's advisors were also provided with direct access to Chartwell, Greenberg Traurig, Owen Bird (RVR's Canadian legal counsel), and BDO (RVR's auditor) to facilitate due diligence, answer outstanding inquiries, and to negotiate potential transaction terms.

6

23.    At RVR's request and direction, on April 21, 2014, Chartwell provided Reliance and its advisors the initial transaction proposal and term sheet and explained the proposal through a 46-page presentation discussed during a conference call. The primary purpose of the call was to explain RVR's goals in potentially forming an ESOP, which included the following:  (a) to establish a sustainable ESOP that provides a meaningful benefit to RVR's employees; (b) to provide some liquidity to the Selling Shareholders, while creating a lasting legacy for the employees; (c) to create a tax benefit for RVR and the ESOP by forming an S-Corporation ESOP which, as explained to me, is essentially a tax-free business structure which provides additional benefits to both RVR and the to-be-formed ESOP (and, therefore, to RVR's employees); and (d) to create a stock appreciation rights ("SARs") plan to incentivize the future management team to continue to grow the business for the benefit and success of the ESOP and RVR's employees. The second goal was to clearly communicate the initial ESOP transaction proposal and the rationale for the initial proposal to Reliance and its advisors.

24.    The financial terms of the April 21, 2014 initial transaction proposal included the following terms, among others: (a) a purchase price of $143.9 million for 100% of RVR's stock; (b) financing in the form of a bridge loan from Wells Fargo which would be promptly paid off with stock sale proceeds to be loaned to RVR by Robert and Randall's family trusts; and (c) a loan to the ESOP by RVR at an interest rate of 3.75% over a 40-year period.  In exchange for the loan from Robert and Randall's family trusts to RVR, they would receive (1) promissory notes ("Seller Notes") from RVR with a 15-year term and 4% cash interest and 6% paid in kind ("PIK") interest; and (2) warrants.  The Seller Notes would be subordinated to all of RVR's other debt, principally with Wells Fargo (the "Senior Debt").  To set off the significantly below market interest rates on the deeply subordinated Seller Notes, the initial proposal included warrants to purchase 32.49% of RVR's equity on a fully-diluted basis.  The initial proposal also included a SARs plan pursuant to which stock appreciation rights could be issued to key employees, up to 17.49%

7

of RVR's equity on a fully diluted basis.  Key non-financial terms included in the initial proposal included adding me to the RVR Board and no "material changes in compensation arrangements or terms" to the Smalleys' and my pre-existing employment agreements.

25.    Following the April 21, 2014 presentation of the initial proposal, Chartwell provided regular (at least weekly and, often, daily) updates to RVR (principally to me, and/or the Smalleys) on Reliance's due diligence requests, follow up questions asked by SRR, K&L Gates, and Reliance, and the status of the negotiations, among other things. Chartwell also advised us about key meetings being held by Reliance and its advisors, including the May 5, 2014 and May 23, 2014 meetings between Reliance and its advisors and information regarding the offers and counter-offers and other proposed deal terms. Although we were aware of Reliance's meetings with its advisors, and any counter-proposals made by Reliance to RVR, we were obviously not privy to any of the confidential conversations Reliance had with its advisors, including any conversations Reliance had with its advisors regarding the value of RVR's stock, proposed transaction terms, or legal and financial due diligence.

29.    On May 5, 2014, Chartwell received Reliance's first counter-offer.  After Chartwell discussed Reliance's first counter-offer with RVR (me and the Smalleys) and Greenberg (Marc Baluda), RVR authorized Chartwell to make RVR's first counter-offer to Reliance on May 8, 2014.  Reliance made its second counter-offer to RVR the next day, on May 9, 2014.  Negotiations over deal terms and additional financial and legal due diligence continued to take place through May 27, 2014 and the final agreement was executed on May 28, 2014.  A chart accurately reflecting the negotiations over select proposed financial terms is below:

| SUMMARY OF NEGOTIATION OVER SELECT FINANCIAL TERMS | | | | |
|---|---|---|---|---|
| Offer/Counter-Offer | Equity Purchase Price | Warrants Attached to Seller Notes | SARs | Interest Rate on Seller Notes |
| RVR Initial Proposal | $143.9 million | 32.49% | 17.49% | 4% cash/6% PIK |
| Trustee First Counter-Offer | $100 million | 25% | 10% | N/A |
| RVR First Counter-Offer | $115 million | 35% | 12.5% | 3% cash/5% PIK |
| Trustee Second Counter-Offer | $105 million | 35% | Up to 12.5% | 3% cash/5% PIK |
| Final Agreement | $105 million | 35% | Up to 12.5% | 2.5% cash, PIK interest at 1.05% (compounding) and 2.15% (non-compounding) |

30.    The proposal for the number of warrants increased over the course of the negotiations because the Smalleys agreed to lower the cash and PIK interest rates on the proposed Seller Notes.  The Smalleys also agreed to exclude themselves from the SARs plan during the course of the negotiations.

31.    Prior to this litigation, I was not provided with any copies of SRR's draft or final valuation reports which I understand Reliance used to negotiate the proposed ESOP transaction deal terms, including the price to be paid for the RVR stock purchased by the RVR ESOP.  I was also unaware of the valuation methodologies or assumptions used by SRR in its valuations.  For example, prior to this litigation, I had no knowledge of whether SRR's valuations of RVR's stock were conducted on a controlling interest basis (or included any alleged control premium).

32.    Neither I nor the Smalleys participated directly in the negotiations with Reliance or its advisors.  Instead, the negotiations on behalf of RVR were handled by RVR's advisors, including Chartwell and Greenberg.  During the course of this litigation, I was shown two emails purportedly sent by Steve Martin of Reliance to Chartwell on May

9

22 and May 23, 2014.  Prior to this litigation, I had not seen, nor was I aware of, these emails or the contents of the emails.  The two emails, which have been designated as Plaintiff's Trial Exhibits 168 and 182, were not forwarded to me or, to my knowledge, anyone else at RVR.  Prior to this litigation, no one from Chartwell (or anyone else) discussed the substance of these two emails with me.

33.    Regardless of whether Mr. Martin's statements in these purported emails were intended to be accurate at the time or were simply a negotiating tactic, RVR and the Selling Shareholders made significant, additional concessions between the dates of the emails and the closing of the RVR ESOP Transaction on May 28, 2014.  With respect to executive compensation, the concessions included, among other things, the elimination of my and the Smalleys' right to unilaterally trigger severance payments, the addition of a requirement that a release be executed in exchange for receipt of any severance, and a provision that prohibited increases in our compensation without the approval of the ESOP Trustee. Additionally, the Parties agreed to eliminate the warrant holders' proposed blocking right of any potential sale of RVR, to establish a specific procedure for evaluating potential mergers and acquisitions, and to establish a process for the RVR Board to nominate candidates for Board positions and for the ESOP Trustee to vote on the slate of nominees.

34.    In connection with the proposed RVR ESOP Transaction and prior to anyone executing the Stock Purchase Agreement, Reliance and its advisors made several important representations to RVR, the RVR Board, and the Selling Shareholders. These representations were important to RVR and me.  We would not have executed the Stock Purchase Agreement or closed the RVR ESOP Transaction without them.    The representations include the following:

a.    Reliance's representation in the Stock Purchase Agreement that "the [RVR ESOP] Trust has received an opinion from its independent financial advisors reflecting that: (i) the consideration paid for the shares of the Common Stock under the terms of this

10

Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of [ERISA]";

b.      Reliance's representation in the Stock Purchase Agreement that "the Trust has received an opinion from its independent financial advisors reflecting that … (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view";

c.      Reliance's representation in the Stock Purchase Agreement that Reliance had analyzed, reviewed and approved the Fairness Opinion and accompanying report prepared by SRR and that SRR is an "Independent Financial Advisor";

d.      Reliance's representation in the Stock Purchase Agreement that "[n]either the execution nor the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any Laws to which the ESOP is subject or any provision of the trust documents of the ESOP . . .";

e.      SRR's representations in its May 28, 2014 fairness opinion that: (1) "the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares"; (2) "the interest rate on the ESOP Loan is not in excess of a reasonable interest rate"; (3) "the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arms-length negotiations between independent parties"; and (4) "the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view";

f.      SRR's representations in its May 28, 2014 fairness opinion that: "SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the [DOL] and section 401(a)(28)(C) of the Internal Revenue Code of 1986";

g.      Reliance's certification in the Trustee Certificate that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for

11

the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill, prudence and diligence that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms"; and

h.    K&L Gates' representation in a May 28, 2014 written opinion that the "acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code".

35.    Additionally, prior to executing the Stock Purchase Agreement, I reviewed Greenberg's representation in a written opinion letter dated May 28, 2014 that the "execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties [defined as RVR, Cruise America, and Cruise Canada] will not violate any applicable law, rule or regulation affecting such Opinion Party."  This representation as well as the ones set forth in Paragraph 34 provided me with assurance that the ESOP transaction was fair, lawful, and was in the best interest of the RVR ESOP and its participants and beneficiaries.

36.    In January 2018, I was appointed RVR's Chief Executive Officer. On January 16, 2018, with the permission of Argent Trust (the then-current Trustee of the ESOP), the RVR Board was expanded from 3 members to 7 members.  The four persons added to the Board are Kevin Bensen, Michael Marcine, Michael Smalley, and Douglas Doan.  Argent Trust became the successor trustee to the RVR ESOP when Reliance sold part of its business to Argent Trust on or about June 30, 2014.  Steve Martin is now an employee of Argent and continues to serve as the principal Trustee contact for the RVR ESOP.  SRR also continues to serve as the financial advisor to the ESOP Trustee and SRR has conducted every annual valuation of the RVR stock held by the RVR ESOP since its inception.  As I understand it, SRR continues to value the RVR stock held by the ESOP

12

using the same methodologies as SRR used to value the RVR stock in connection with the ESOP Transaction.  RVR ESOP participant distributions are based on the SRR valuations.

37.    By the end of January 2018, RVR paid off all of the Seller Notes and redeemed all of the warrants issued to Robert and Randall's family trusts.  RVR was able to do this, in part, because the Smalleys and I waived a significant amount of our guaranteed compensation. In fact, as of March 2022, I have personally voluntarily waived more than $5 million in guaranteed compensation since the close of the ESOP Transaction. Between myself and the Smalleys we have collectively voluntarily waived over $ 45 million in guaranteed compensation.  All of this guaranteed compensation was included in the 10-year financial projections provided to SRR in connection with the ESOP Transaction and its inclusion in the financial projections necessarily lowered the purchase price paid to the Selling Shareholders.  Had the guaranteed compensation that we waived been excluded from the financial projections, it is my understanding the Selling Shareholders would have received a significantly higher purchase price for their shares of RVR stock.

38.    I am confident that the $105 million the ESOP paid to purchase 100% of RVR's stock was at or below fair market value for that stock.  First, the $105 million number fell at the very low end of Chartwell's estimated range, and this estimated range was stale and too low because it did not take into account the Company's updated and improved financial performance data, which was distributed on April 30, 2014.  Second, RVR had provided Chartwell and SRR with very conservative financial projections even though doing so underestimated RVR's cash flow by approximately $3 million dollars per year.  RVR declined the invitation to revise the financial projections upward even though we knew the use of the conservative projections would result in a lower purchase price for the Selling Shareholders' RVR stock.  Finally, my belief that the ESOP paid at or below fair market value for the RVR stock it purchased was confirmed by the "as of" May 31, 2014 valuation of the ESOP's RVR stock which came in at $8.3 million.  That valuation was performed as of May 31, 2014, just three days after the ESOP Transaction closed.

Given that the ESOP Transaction was an almost 100-percent leveraged transaction, I would have expected the as of May 31, 2014 stock valuation to be at or near $0. The fact that it was not at or near $0 tells me the ESOP and its participants got a good deal.

39.     I am proud of the performance RVR, the RVR ESOP, and the RVR stock held by the ESOP since it was purchased by the ESOP. As mentioned above, the RVR stock held by the ESOP was appraised at $8.3 million as of May 31, 2014. The most recent appraisal of the stock, which was conducted as of May 31, 2021, is $121.8 million. The RVR management team expects that the as of May 31, 2022 annual appraisal of the RVR stock held by the ESOP will be even higher. I understand that RVR's expert witness in this case, Ed Wilusz, has calculated the compounded annual growth rate on the ESOP's RVR stock to be 46.8%. That is a far higher return than I have earned on any of my investments.

40.     I understand that Plaintiff has identified a purported expert who has asserted that the value of 100% of RVR's stock as of May 28, 2014 was approximately $13.7 million. This same individual assumes that I would have agreed to sell the 3.3% of RVR stock that I held by based on this value. I would never have agreed to sell my RVR stock based on a $13.7 million valuation of RVR's stock - a valuation that is only a fraction of the book value of the Company's assets – which means we could have dissolved RVR, sold its assets and paid its liabilities, and the Selling Shareholders would have walked away with *far more* than $13.7 million. Indeed, as of May 28, 2014, the Company had more than $16 million in cash on hand. As the majority stockholders and sole directors, the Smalleys could have simply caused RVR to make a distribution of that cash as a dividend and the Selling Shareholders would have received more than $13.7 million while still retaining 100% ownership of RVR.

14

41.    I have not been indemnified for the costs and expenses associated with this litigation from the ESOP nor have I requested to be indemnified under the terms of the Plan.

I declare under penalty of perjury that I have read this Declaration and it is true and correct.

Executed on March 22, 2022.

Eric Bensen

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, | Case No. 2:19-cv-03178-JJT |
| Plaintiff, | **DECLARATION OF GREGORY A. FRESH** |
| v. | |
| Reliance Trust Company, et al., | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Gregory A. Fresh, declare and state the following under penalty of perjury:

1. I am over the age of 18, of sound mind, and capable of making this declaration. The facts stated in this Declaration are within my personal knowledge and are true and correct. If called upon as a witness, I could and would testify as to the truth of the facts below. I give this Declaration freely without payment or coercion of any kind.

2. I have been employed with Chartwell Financial Advisory, Inc. since 2010 and am currently a Managing Director and Shareholder of Chartwell Financial Advisory, Inc. For purposes of clarity and ease of reference, I will refer to Chartwell Financial Advisory, Inc. and its affiliates, Chartwell Business Valuation, LLC and Chartwell Capital Solutions, as "Chartwell," "we" or "our."

3. On, or about, January 27, 2014, I along with Ted Margarit, a Vice President with Chartwell, met in-person with Randall Smalley, Robert Smalley, Jr. and Eric Bensen to discuss Chartwell's capabilities as a financial advisor. Jim Griffin of Wells Fargo Advisors also attended this meeting in-person.

4. During this meeting with the Smalleys and Mr. Bensen, Mr. Margarit and I discussed some of the benefits of employee stock ownership plans (also known as ESOPs), including succession planning, tax benefits, and providing a retirement benefit for

employees. We also highlighted Chartwell's experience representing and advising parties in numerous ESOP transactions in the prior years.

5.      During this meeting, Mr. Margarit and I also provided Mr. Bensen and the Smalleys with an overview of the mechanics of an ESOP transaction, explained the concept of "adequate consideration" and fair market value and the reason why an ESOP Trustee cannot lawfully pay more than fair market value for the stock. Mr. Margarit and I also explained to Mr. Bensen and the Smalleys the responsibilities of the ESOP trustee, the ESOP trustee's financial advisor, and the ESOP trustee's legal counsel, as well as how Chartwell would represent RVR in negotiations with the ESOP trustee.

6.      Based on preliminary information provided to Chartwell and with the assumption of a sale of 100% of RVR's stock to an ESOP, Mr. Margarit and I advised Mr. Bensen and the Smalleys that we had made a preliminary estimate of the fair market value range for 100% of RVR's stock as of December 31, 2013, of $100.7 million on the lower end of fair market value, and of $143.9 million at the higher end of fair market value.  We explained that this preliminary estimate of the range of value for 100% of RVR's stock was done on a controlling interest basis because of the assumption that more than 50 percent of the stock would be sold to the ESOP.

7.      For illustrative purposes only, Mr. Margarit and I selected the low end of the preliminary range, which was $100.7 million, to analyze how much RVR's shareholders might expect to receive under various scenarios and how a potential transaction could be financed and structured at that low-end price.  Our intent in doing so was to provide Mr. Bensen and the Smalleys with an illustration of how a transaction might be structured if a deal was struck at the low end of the estimated fair market value range.  We also advised Mr. Bensen and the Smalleys that we expected that the ESOP trustee would likely open negotiations at the low-end of our estimated preliminary fair market valuation range.

8.      On, or about, February 27, 2014, RVR retained Chartwell to serve as its financial advisor in connection with the potential creation of an ESOP and a potential sale

2

of 100% of RVR's stock to an ESOP. A true and accurate copy of Chartwell's engagement letter with RVR is attached as Exhibit 1.

9. Once formally retained by RVR, Chartwell began working with RVR to secure anticipated due diligence materials so that the information could be promptly shared with the trustee and its advisors, once selected. We also prepared a proposed timeline of tentative deadlines so that the evaluation of any potential transaction continued to move forward. Ultimately, we identified May 27, 2014 as a tentative transaction closing date. This was not considered a hard deadline.

10. In addition to gathering anticipated due diligence, Mr. Margarit and I began vetting potential ESOP trustee candidates. In early March 2014, we conferred with three different candidates (Reliance Trust Company, Alerus Financial, and GreatBanc Trust) to inquire whether they had the capability and interest to serve as the ESOP Trustee and that they were free of any potential conflicts. All three trustee candidates confirmed that they were interested in being interviewed by RVR and that they were not aware of any conflicts.

11. In advance of the interviews, all three trustee candidates were provided with information regarding RVR and its business, as well as a multi-page list of questions that the candidates should be prepared to answer.

12. Between on or about March 31 and April 1, 2014, I along with Mr. Margarit, Mr. Bensen, the Smalleys, and Marc Baluda of Greenberg Traurig, conducted in-person interviews with all three trustee candidates. During these meetings, we provided the candidates with additional information regarding RVR, its business, and its history. We asked the candidates detailed questions, including: (a) the trustee's experience in ESOP transactions, (b) the trustee's working relationship with the Department of Labor, (c) how long due diligence would likely take and what type of information the trustee candidate would like to see as part of its diligence, (d) whether the trustee candidate would retain an outside financial advisor and/or legal advisor to assist it, and (e) whether the trustee candidate had sufficient capacity and resources to evaluate, negotiate, and close (or reject)

3

a potential ESOP transaction by the proposed date of May 27, 2014. All three trustee candidates stated in the meetings they thought the proposed May 27, 2014 proposed closing was achievable. All three candidates also indicated that they would retain outside financial advisors and legal advisors to assist in the fulfillment of its duties, and all three candidates identified Stout Risius Ross ("SRR") as a preferred financial advisor.

13. On or about April 4, 2014, RVR had selected Reliance Trust Company ("Reliance") by RVR to act as the ESOP's independent, discretionary trustee to represent the ESOP and, if appropriate, negotiate the terms by which the ESOP would purchase 100% of RVR's stock from the RVR stockholders. We notified Reliance of its selection on or around April 4, 2014. Reliance subsequently notified us that it had selected SRR to serve as its financial advisor and K&L Gates as its legal advisor. We felt comfortable that they were both qualified to serve as Reliance's advisors and independent of RVR.

14. On April 16, 2014, we held an in-person management presentation with Reliance and its advisors. The Smalleys and Mr. Bensen attended the presentation and presenters including members of RVR management, myself, and Mr. Margarit. Reliance and its advisors asked multiple questions regarding RVR and its business and those questions were answered during the meeting. Following the meeting, Reliance and its advisors were given a tour of RVR's facility.

15. Chartwell subsequently made a pre-populated due diligence data room containing RVR business information. Information and materials were made available to Reliance's advisors on April 17, 2014, and included RVR's audited financial statements and projections, key components in valuing a privately-held company. Reliance and Reliance's advisors were also provided with direct access to Chartwell, Greenberg Traurig (RVR's US outside counsel), Owen Bird (RVR's Canadian counsel), BDO (RVR's auditor) and Seller's counsel, Weiss Brown, to facilitate due diligence, answer outstanding inquiries, and to negotiate outstanding deal terms.

16.    Chartwell provided Reliance and its advisors the initial transaction proposal and term sheet on April 21, 2014 and explained the proposal through a 46-page presentation discussed during a conference call. In particular, Mr. Margarit and I explained to Reliance and its advisors that the key ESOP transaction goals were as follows: (a) to establish a sustainable ESOP that provides a meaningful benefit to the employees; (b) to provide liquidity to the Selling Shareholders, while creating a lasting legacy; (c) to create a tax benefit for RVR and the ESOP by forming an S-Corporation ESOP; and (d) to create a stock appreciation rights ("SARs") plan to incentivize the management to continue to grow the business for the benefit of all stakeholders.

17.    The financial terms of the initial April 21, 2014 proposal included the following terms, among others: (a) a purchase price of $143.9 million for 100% of RVR's stock; (b) financing in the form of a bridge loan from Wells Fargo which would be promptly paid off with proceeds loaned to RVR by the Smalleys; and (c) a loan to the ESOP by RVR at an interest rate of 3.75% over a 40 year period.  In exchange for the loan from the Smalleys, the Smalleys would receive from RVR Seller Notes with a 15-year term and 4% cash interest and 6% paid in kind ("PIK") interest.  To account for the below market interest rates on the deeply subordinated seller notes, we proposed that the Smalleys would be issued warrants, which, if exercised, would equate to 32.49% of RVR's equity appreciation. We also proposed a SARs plan pursuant to which stock appreciation rights could be issued to key employees, up to 17.49% of RVR's equity appreciation. Key non-financial terms included in the initial proposal included adding Bensen to the RVR Board and no "material changes in compensation arrangements or terms" to the Smalleys' and Mr. Bensen's pre-existing employment agreements.

18.    Following the presentation of the initial April 21, 2014 proposal, Chartwell provided Mr. Bensen and the Smalleys with regular (at least weekly and, often, daily) updates on Reliance's due diligence requests, follow up questions asked by SRR, K&L Gates, and Reliance, and the status of the negotiations, among other things.  We also

5

provided Mr. Bensen and the Smalleys with information about key meetings being held by Reliance and its advisors, including the May 5, 2014 and May 23, 2014 meetings between Reliance and its advisors and information regarding the terms of the offers and counter-offers.

19. On May 5, 2014, Chartwell received Reliance's counter-offer. Chartwell made its first counter-offer on May 8, 2014, and Reliance made its second counter offer the next day. Negotiations over deal terms and additional due diligence took place through May 27, 2014 and the final agreement was executed on May 28, 2014. A chart accurately reflecting the parties' negotiations over select financial terms is below:

| SUMMARY OF NEGOTIATION OVER SELECT FINANCIAL TERMS | | | | |
|---|---|---|---|---|
| Offer/Counter-Offer | Equity Purchase Price | Warrants Attached to Seller Notes | SARs | Interest Rate on Seller Notes |
| RVR Initial Proposal | $143.9 million | 32.49% | 17.49% | 4% cash/6% PIK |
| Trustee Counter-Offer | $100 million | 25% | 10% | N/A |
| RVR First Counter-Offer | $115 million | 35% | 12.5% | 3% cash/5% PIK |
| Trustee Second Counter-Offer | $105 million | 35% | Up to 12.5% | 3% cash/5% PIK |
| Final Agreement | $105 million | 35% | Up to 12.5% | 2.5% cash, PIK interest at 1.05% (compounding) and 2.15% (non-compounding) |

The number of warrants increased over the course of the negotiations due to the reduction of the interest rates on the proposed seller notes.

20. In addition to negotiating over financial terms, we negotiated vigorously with Reliance over changes to key corporate organization documents, including amending the Company's bylaws, adding an investor rights agreement, and adding certain ESOP rights to the stock purchase agreement. Mr. Margarit and I did not share all communications

between Chartwell and Reliance with the Smalleys, Mr. Bensen, or other RVR employees. For example, I do not believe that any Chartwell representative shared Steve Martin's emails dated May 22 and May 23, 2014, which were Deposition Exhibits 36 and 52 and which I understand have been identified as Plaintiff's Trial Exhibits 168 and 182. Chartwell believed that the statements contained in these two Steve Martin emails were negotiating tactics designed to achieve additional concessions from Mr. Bensen and/or the Smalleys. Ultimately, after certain additional changes to the transaction documents, I understand that all parties were comfortable that the deal was lawful, fair, and in the interests of the ESOP and its participants.

I declare under penalty of perjury that I have read this Declaration and it is true and correct to the best of my knowledge and belief.

Executed on March 23, 2022.    _____

Gregory A. Fresh

7

# Exhibit 1

# CHARTWELL
## CAPITAL SOLUTIONS
Corporate Finance  |  Strategic Advisory  |  Valuation Services

February 27, 2014                                               Agreement: P13-1878

Mr. Eric Bensen
Chief Financial Officer
RVR, Inc.
11 West Hampton Avenue
Mesa, AZ 85210

Dear Mr. Bensen:

Chartwell Business Valuation, LLC ("Chartwell") is pleased to set forth the terms of this engagement letter agreement (the "Agreement") relating to its exclusive retention by RVR, Inc. (d/b/a Cruise America) and its consolidated subsidiaries (collectively, the "Company") for the performance of financial advisory and investment banking services.

1.    **Description of Engagement.**  This is to confirm the engagement of Chartwell by the Company to provide financial advisory and investment banking services with respect to the potential sale of the Company's equity currently held by Randall Smalley, Robert Smalley, and yourself (collectively the "Sellers"), in a transaction whereby the Company would establish an Employee Stock Ownership Plan ("ESOP") that, in one or a series of transactions, acquires the Sellers' shares (collectively, the "Transaction").

The term of this Agreement (the "Term") shall extend from the date of this Agreement and will automatically extend on a month-to-month basis unless either party delivers 30 day's written notice of termination.

2.    **Advisory Services.**  In connection with the Transaction described in Section 1 above, Chartwell will direct and/or assist in the coordination of the Transaction, including:

- Verify the Company's corporate finance and the Sellers' goals regarding cash flow and capital allocation to fund growth and acquisitions and to sustain competitive advantages;

- Recommend a Transaction structure, or structures, to support the corporate finance goals of the Company and Sellers.  Specifically, Chartwell will create financial cash flow models to incorporate a reasonable range of ESOP ownership scenarios; complete the foregoing analysis under different capital structure alternatives and under other reasonable Transaction forms that would support the Company's corporate finance and shareholder goals and objectives, as reasonably directed for consideration by the Company or as deemed appropriate by Chartwell;

- Estimate the equity value from the perspective of an ESOP Trustee's Financial Advisor (as  the  purchaser of shares or equity, including pro forma terms and conditions);

MINNEAPOLIS              CHICAGO              PORTLAND              SAN FRANCISCO

**FOIA Confidential Treatment Requested**                                    **RVR07756**

- Estimate and present total consideration paid to the Sellers in terms of cash at closing, retained and/or invested capital at post-closing, and the estimated returns on retained and/or invested capital;

- Quantify the impact, benefits, and consequences of a potential 1042 election on the Sellers, ESOP, and Company;

- Analyze the post-closing capitalization of the Company and its ability to service all financial instruments and securities post-closing;

- Assist in review of the initial analysis of repurchase liability forecast and financial modeling and IRC 409(p) testing;

- Assist in the Company's engagement of the ESOP Trustee (ESOP Trustee will engage its own ESOP Financial Advisor and ESOP Legal Counsel);

- Complete a strategy for approaching and conducting discussions and negotiations with the ESOP Trustee;

- Prepare final presentation materials, as appropriate, which present the business and prospects of the Transaction to the ESOP Trustee;

- Present the Company's business and the Transaction to the ESOP Trustee which will include equity price, capital structure, third-party and Seller's financing terms and conditions, as applicable, and prospective returns;

- Coordinate and assist in due diligence meetings with the ESOP Trustee;

- Assist in the negotiations and execution of a letter of intent and definitive purchase agreement and other documentation, as appropriate, pursuant to the Transaction;

- Coordinate and assist in review of final legal documentation, including Credit Agreement(s), Seller note agreement(s), ESOP Plan and ERISA Documents, and Equity Purchase Agreement; and,

- Provide assistance, as directed by the Company and/or as deemed appropriate by Chartwell, for additional financial advisory services related to the Transaction.

The duties and responsibilities of Chartwell under this Agreement shall be limited to those expressly set forth herein and in particular shall not include:

- Arrange, or place any debt capital outside of the credit facilities to be provided by the incumbent lender, Wells Fargo Bank, NA;

- Rendering tax, legal, accounting, or other specialist or technical advice or services (including, without limitation, ERISA, DOL, IRS and/or securities advice) other than expressly set out in this Agreement.

The Company confirms that it will rely on its own legal counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

3.    **Compensation.** In consideration for Chartwell providing, or standing ready to provide, the financial advisory services described in Section 2 above, the Company agrees to pay to Chartwell the following:

A.    **Work Fee Retainer.** A "Work Fee" of seventy-five thousand dollars ($75,000)payable at the signing of this Agreement.  After 120 days, if the Company has not terminated this

FOIA Confidential Treatment Requested

RVR07757

Agreement, the Company will pay Chartwell its hourly rates for work performed thereafter upon receipt of a monthly invoice for such subsequent services.  Any and all paid Work Fees (prior or future) will be fully credited towards a Transaction Completion Fee.

B.    **Transaction Completion Fee.** Upon closing of the Transaction, a  project completion fee ("Transaction Completion Fee") equal to $600,000, the amount of which represents Chartwell's total compensation.

C.    **Method and Timing.**  The Transaction Completion Fee is contingent upon closing of a Transaction and shall be paid by wire transfer on the closing date of the Transaction regardless of whether such closing occurs during the Term, or if the definitive agreement governing the Transaction is executed during the Term and is closed after the Term or as provided in Section 9 below.

4.    **Expenses.**   Only in the event the Transaction does not close, the Company will promptly reimburse Chartwell, upon request, for all reasonable out-of-pocket expenses incurred in performing the financial advisory services herein in an amount not to exceed $17,500. All fees, expenses and other sums will be billed and payable in United States dollars.

5.    **Company Representations.**  The Company represents that any and all information about the Company including financial statements, feasibility reports, market studies, and business plans on a confidential basis furnished to Chartwell, or the ESOP Trustee, by officers and employees of the Company for use by the ESOP Trustee in deciding whether or not to acquire the Company shall be true, complete, and correct in all material respects, and will not contain any untrue statement of a material fact or omit to state any material fact required to make the statements contained therein not misleading.  The Company agrees to inform Chartwell immediately of the occurrence of any event or any other change known to it which results in any of the information provided to Chartwell containing an untrue statement of a material fact or omission of a material fact.

The Company agrees to extend full cooperation to Chartwell and all other parties to this project in its fulfillment of this Agreement.

6.    **Persons Entitled to Reliance.**  This Agreement does not create, and will not be construed as creating, rights enforceable by any person or entity other than the Company and the Sellers. The Company acknowledges and agrees that:

A.    Chartwell will act as an independent contractor and is being retained solely to assist the Company in its efforts to effect a possible Transaction;

B.    Neither Chartwell nor any affiliate of Chartwell will be construed as a fiduciary of the Company or any affiliate thereof (including the ESOP) and, except for those duties owed the Company hereunder, will not have duties or liabilities to the Company's creditors or any other person (including the ESOP) by virtue of this Agreement and the retention of Chartwell hereunder; and

C.    Any advice rendered by Chartwell does not constitute a recommendation to discount or disregard any advice on the possible Transaction provided by tax, legal or other advisors to the Company or the Sellers in connection with any equity holder's course of action in a possible Transaction.

FOIA Confidential Treatment Requested                                    RVR07758

7.    **Indemnification.**  The Company, its successors and assigns agree to indemnify and hold harmless, and to release and discharge Chartwell, its affiliates, and their respective managers/officers, governors/directors, controlling persons, employees, and agents (each, an "Indemnified Person"), from any and all obligations, charges, claims, losses, expenses or costs of any nature whatsoever, including, without limitation, reasonable investigation and attorneys' fees (collectively, "Loss"), which relate to or arise out of or are incurred in connection with the performance and delivery of services under this Agreement, unless such Loss is determined by a court of competent jurisdiction to have resulted from the negligence or willful misconduct of Chartwell or such Indemnified Person.

The indemnification obligations described in this Section shall survive the termination of this Agreement or the completion of services provided under this Agreement or any single addendum hereto, and shall inure to the benefit of the heirs, personal representatives, and permitted successors and assigns of each Indemnified Person.

Whenever an Indemnified Person receives notice of the assertion of any claim or the commencement of any action or proceeding which it believes would entitle it or any other person to indemnification, it shall promptly give written notice thereof to the Company.  Unless the claim results from the negligence or willful misconduct of Chartwell, the Company will assume the defense thereof, will employ counsel reasonably satisfactory to Chartwell, and will pay the fees and expenses of such counsel.  In addition, the Company will be billed and agrees to pay for any and all services performed and costs incurred by an Indemnified Person in accordance with Sections 3 and 4 (Compensation and Expenses) in defending its/his/her services, unless it is determined by a court of competent jurisdiction that the Loss at issue resulted from the negligence or willful misconduct of Chartwell or such Indemnified Person. The Company agrees to promptly notify Chartwell of the commencement of any litigation or proceeding against it or any of its officers, directors, agents, or employees in connection with the Transaction.

8.    **Confidentiality.**

A.    **Company Confidentiality.**  Chartwell agrees to keep confidential all material non-public information which it receives from the Company concerning the Company and the Transaction, and to disclose that information only with the consent of the Company or as required by regulation, law, or legal process.  At no time shall Chartwell disclose the Company's confidential non-public information to any third party or use said confidential non-public information for its own benefit.  Upon the Company's request, Chartwell shall destroy or return to the Company all physical, written, graphical and electronic materials and media containing or disclosing the Company's confidential non-public information.

B.    **Financial Advisor Confidentiality.**  The Company agrees to keep confidential all material non-public information which it receives from Chartwell (including, without limitation, opinions and advice) and to disclose that information only with the consent of Chartwell or as required by regulation, law or legal process; provided that the Company may disclose the fact that it has retained Chartwell as an advisor. However, the Company may use valuation materials provided by Chartwell in connection with the Transaction process for estate planning and/or other due diligence investigation without the expressed consent of Chartwell.

FOIA Confidential Treatment Requested    RVR07759

9.    **Termination.**  This Agreement shall terminate upon receipt by Chartwell of the Company's 30-day written intent to terminate this Agreement, or upon closing of a Transaction.

The Company will continue to be liable for any Transaction Completion Fees due Chartwell if the Company engages in any transaction that results in the Company being majority owned by an ESOP within one year of the termination of the Agreement; provided that the Company shall not be liable to Chartwell for any Transaction Completion Fees in the event that (i) Chartwell terminates this Agreement prior to closing of the Transaction, or (ii) the Company terminates this Agreement prior to closing of the Transaction due to the breach or non-performance by Chartwell of its obligations and duties under this Agreement.

Sections 6, 7, 8, 11, and 12 of this Agreement shall survive the termination of this Agreement.

10.    **Other Brokers.** The Company represents that it will be solely responsible for the Compensation earned by Chartwell under Section 3.

In addition, the Company agrees that it will not engage any other party for the investment banking services in connection with the Transaction contemplated herein unless the Agreement has expired or the Company has first terminated this Agreement as set forth in the Termination clause of this Agreement.  Regardless of any such termination, the Company shall remain liable for the Transaction Completion Fee as outlined in Section 9 hereof.

11.    **Miscellaneous.**

A.    This Agreement is solely for the benefit of and shall be binding upon the Company and Chartwell and their respective permitted successors and assigns.  This Agreement may not be assigned without the prior written consent of the other party to this Agreement and any attempted assignment in violation of this Agreement shall be null and void *ab initio*.

B.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, written or oral, with respect to the subject matter hereof.

C.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.

D.    This Agreement may be amended only in writing, signed by Chartwell and the Company. Any determination that any provision of this Agreement may be or is unenforceable shall not affect the enforceability of the remaining provisions.

E.    This Agreement is governed by the laws of the State of Arizona without regard to principles of conflicts of laws.  No party shall object to venue for any litigation arising out of or relating to this Agreement or the services performed pursuant hereto if in the federal or state courts located in Maricopa County,  Arizona.

F.    The section headings in this Agreement are for convenience of reference and are not to be deemed to be a part of this Agreement.

12.    **Proposal Notices.**  Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered to the Company at the address shown above or to Chartwell at the address on this letterhead. This proposal will expire if not executed within 30 days of receipt.

**FOIA Confidential Treatment Requested**                                                      **RVR07760**

If the terms set forth in this Agreement are acceptable to you, please sign the enclosed copy of this letter and return it to Chartwell.


**Chartwell Business Valuation, LLC**

By: Gregory A. Fresh,
     Managing Director

27 FEB 2014
Date

**RVR, Inc. (d/b/a Cruise America)**

By:   Eric Bensen,
      Chief Financial Officer

2-27-14
Date

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance  Strategic Advisory  Valuation Services
Page 6

FOIA Confidential Treatment Requested

RVR07761

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, | Case No. 2:19-cv-03178-JJT |
| Plaintiff, | **DECLARATION OF ROBERT SMALLEY, JR.** |
| v. | |
| Reliance Trust Company, et al., | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Robert Smalley, Jr., declare under penalty of perjury and state the following:

1.    I am over the age of 18, of sound mind, and capable of making this Declaration.  The facts stated in this Declaration are within my personal knowledge and are true and correct.  If called upon as a witness, I could and would testify as to the truth of the facts below.  I give this Declaration freely without payment or coercion of any kind.

2.    RVR, Inc., which does business as Cruise America and Cruise Canada, is a recreational vehicle rental company founded by myself; my brother, Randall Smalley ("Randall"); and our father in 1972.  RVR, Inc. ("RVR" or the "Company") is a Florida corporation.

3.    In 1993, I became the Company's President and Randall became the Company's Chief Executive Officer.

4.    In 2000, Randall and I became the sole shareholders and sole directors of RVR.  As members of RVR's Board of Directors, Randall and I understood that we were both required to comply with the fiduciary duties and requirements of the Florida Business Corporations Act and the requirements of RVR's Bylaws and Articles of Incorporation.

5.    Starting in late 2013, my brother and I began considering succession planning and the possible transfer of RVR's ownership to RVR's employees.  Based on a referral from our Company's corporate bank, Wells Fargo, Eric, Randall, and I met with

Greg Fresh and Ted Margarit of Chartwell Financial Services, Inc. (a/k/a Chartwell Business Valuation, LLC) ("Chartwell") and Jim Griffin of Wells Fargo Advisors on January 27, 2014 at RVR's corporate office.

6.      During this January 27, 2014 meeting, Chartwell (Greg Fresh and Ted Margarit) discussed with me, Randall, and Eric some of the tax and other benefits of employee stock ownership plans ("ESOPs"), including succession planning, tax incentives, and the provision of additional retirement benefits to employees. Based on some preliminary information provided to Chartwell and with the assumption of a sale of 100% of RVR's stock to an ESOP, Chartwell informed me, Randall and Eric on January 27, 2014 that a preliminary fair market value range for 100% of RVR's stock as of December 31, 2013 was between $100.7 million and $143.9 million.

7.      Chartwell used the low end of the preliminary fair market value range, $100.7 million, to illustrate for me, Randall, and Eric how a potential ESOP transaction could be financed and structured at that low-end price and how much cash RVR's shareholders might receive if the shareholders sold 100% of RVR's stock to the ESOP at that low-end price.

8.      Chartwell's Greg Fresh and Ted Margarit were clear in the meeting that the preliminary fair market value estimate provided to us was not a true valuation of RVR's stock.  Instead, Chartwell was intending to show us how a transaction might be structured if the parties came to an agreement at the very low end of the estimated fair market value range.  Chartwell also explained to me, Randall, and Eric that it was trying to estimate the low end of the valuation range because that is where they thought the ESOP trustee would likely start negotiations if RVR ultimately decided to explore the possibility of forming an ESOP, and if we all agreed to sell 100% of RVR's stock to the ESOP.

9.      Chartwell explained to us what "adequate consideration" meant (which I understood to mean fair market value as determined by the ESOP trustee with the assistance of its independent financial advisor) and why the ESOP could not lawfully pay

2

more than fair market value for employer stock. Chartwell also explained the responsibilities of an ESOP trustee, the ESOP trustee's financial advisor, and the ESOP trustee's legal counsel. Chartwell further explained during this same January 27, 2014 meeting how Chartwell would represent RVR in negotiations with the ESOP trustee and the importance of the negotiations with the trustee being conducted at "arms-length."

10.    After conferring with Greenberg Traurig ("Greenberg") and Eric, my brother and I decided that RVR should retain Chartwell to serve as RVR's financial advisor in connection with the exploration and potential execution of an ESOP formation transaction. We felt the retention of Chartwell, an experienced, professional financial advisor, was important because Randall, Eric, and I had little to no knowledge about the concept of an ESOP, the process involved in forming an ESOP, the valuation of private company stock, including RVR's stock or the financing of a potential ESOP transaction.

11.    On February 27, 2014, RVR retained Chartwell to serve as its financial advisor in connection with the potential creation of an ESOP and a potential sale of 100% of RVR's stock to an ESOP. Once retained, Chartwell began directing us to secure anticipated due diligence materials so that the information could be promptly shared with the to-be-selected independent trustee and its advisors. Randall and I designated Eric to serve as the "point person" for due diligence given that he was RVR's Chief Financial Officer at the time and the RVR employee with the most knowledge of RVR's finances. Eric, in turn, asked several other RVR employees to help him gather the due diligence requested by Chartwell and to organize the due diligence materials into an electronic data room for easy access and review.

12.    In March 2014, I along with Randall, Eric, Cory Kauffmann, and Kevin Bensen started reviewing the credentials of several potential ESOP trustee candidates who had been recommended to us by Chartwell and Greenberg. The three trustee candidates were Reliance Trust Company, Alerus Financial, and GreatBanc Trust and all three were invited to interview with us after confirming that they were interested in representing the

3

to-be-formed ESOP and that they had no conflicts of interest which would preclude them from doing so.

13.    On March 31 and April 1, 2014, Eric, Randall and I, along with Greg Fresh and Ted Margarit of Chartwell and Marc Baluda of Greenberg, conducted in-person interviews with all three trustee candidates.  During these meetings, we provided the candidates with additional information regarding RVR, its business, its finances, and its history.

14.    During these interviews, we asked the candidates detailed questions, including: (a) the trustee's experience in ESOP transactions, (b) the trustee's working relationship with the Department of Labor, (c) how long due diligence would likely take and what type of information the trustee candidate would like to see as part of its due diligence, (d) whether the trustee candidate would retain an outside financial advisor and/or legal advisor to assist it, and (e) whether the trustee candidate had sufficient capacity and resources to evaluate, negotiate, and close (or reject) a potential ESOP transaction by the proposed closing date of May 27, 2014.

15.    The proposed May 27, 2014 transaction closing date was not a hard deadline and we did not advise the trustee candidates or anyone else that it was a "hard deadline." We did indicate to all three trustee candidates, though, that the Summer was RVR's busy season and that RVR was interested in closing any ESOP transaction by the end of May, if possible, so that the financial benefits associated with the busy Summer season would flow to the ESOP.

16.    All three trustee candidates stated in their interview meetings they thought the proposed May 27, 2014 proposed closing was realistic and achievable.  All three candidates also indicated that they would retain outside financial advisors and legal advisors to assist them to fulfill their duties to the ESOP.  All three candidates also identified Stout Risius Ross ("SRR") as a preferred financial advisor.  Reliance also later

4

identified three preferred legal advisors that it would consider engaging for the ESOP exploration process: K&L Gates, McDermott, Will & Emery, and Bryan Cave.

17.    After consulting with Eric, Chartwell, Greenberg, and BDO (RVR's outside accountant and auditor), Randall and I, as the sole members of RVR's Board of Directors, decided that RVR would retain Reliance to act as the ESOP's independent, discretionary trustee to represent the to-be-formed ESOP and, if deemed appropriate by Reliance, negotiate the terms by which the ESOP would purchase 100% of RVR's stock from RVR's stockholders.

18.    Neither the RVR Board of Directors nor the Cruise America, Inc. Board of Directors delegated to Eric the discretionary authority to engage Reliance as the trustee of the to-be-formed RVR, Inc. Employee Stock Ownership Plan (the "RVR ESOP"); rather, the RVR Board only delegated to Eric the power to sign the Reliance Engagement Letter and Trust Agreement on behalf of the Company.

19.    Both the Reliance Engagement Letter and the May 22, 2014 Trust Agreement, which superseded and replaced the Reliance Engagement Letter, provided that Reliance had the exclusive responsibility for representing the ESOP and the sole authority to negotiate and execute any potential purchase of RVR stock on behalf of the ESOP. This was important to us and encouraged by our advisors so that we could ensure the ESOP exploration process and any negotiations over the potential ESOP transaction terms were conducted at arm's-length.

20.    After Reliance was notified of its selection on April 4, 2014, Reliance (through Chartwell) informed me, Randall and Eric that Reliance had selected SRR to serve as its financial advisor and K&L Gates as its legal advisor.  Randall, Eric, and I did additional due diligence on SRR and K&L Gates, including consulting with Chartwell and Greenberg, and concluded both SRR and K&L Gates were qualified to serve as Reliance's advisors and both were independent of RVR and its stockholders.  SRR and K&L Gates

5

also represented to Reliance and RVR, including in their engagement letters, that they were qualified and independent advisors to Reliance as the trustee of the to-be-form RVR ESOP.

21.    Among other things, K&L Gates represented in its engagement letter that it had conducted a conflicts check and that it would provide independent professional judgment when providing advice to Reliance. SRR's engagement letter stated, among other things, that (a) SRR's "services will be performed with reasonable care in a diligent and competent manner," and (b) "[n]one of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach."

22.    On April 16, 2014, RVR management (including myself, Eric, and Randall) and Chartwell held an in-person management presentation with Reliance and its advisors. Reliance and its advisors asked dozens of questions regarding RVR, its business, and its financial performance, and RVR and Chartwell answered those questions during the meeting.  Following the meeting, we also provided Reliance and its advisors with a tour of RVR's main facility in Mesa, Arizona, including its reservation center.

23.    On April 17, 2014, Chartwell made the pre-populated, electronic due diligence data room containing RVR business information available to Reliance's advisors, K&L Gates and SRR.   Randall, Eric and I also provided Reliance and Reliance's advisors with direct access to Chartwell, Greenberg, Owen Bird (RVR's Canadian legal counsel), and BDO (RVR's auditor) to facilitate due diligence, answer outstanding inquiries, and to negotiate potential transaction terms.   Reliance and its advisors were also able to communicate with and discuss any issues or concerns with Weiss Brown, who had been engaged to serve as personal legal counsel to me and Randall.

24.    At RVR's request and direction, on April 21, 2014, Chartwell provided Reliance and its advisors the initial transaction proposal and term sheet and explained the proposal through a 46-page presentation discussed during a conference call.

25.     The financial terms of the April 21, 2014 initial transaction proposal included the following terms, among others: (a) a purchase price of $143.9 million for 100% of RVR's stock; (b) financing in the form of a bridge loan from Wells Fargo which would be promptly paid off with stock sale proceeds to be loaned to RVR by me and Randall's family trusts; and (c) a loan to the ESOP by RVR at an interest rate of 3.75% over a 40-year period. In exchange for the loan from me and Randall's family trusts to RVR, Randall's family trusts and I would receive (1) promissory notes ("Seller Notes") from RVR with a 15-year term and 4% cash interest and 6% paid in kind ("PIK") interest; and (2) warrants. The Seller Notes would be subordinated to all of RVR's other debt, principally with Wells Fargo (the "Senior Debt"). Importantly, to set off the significantly below market interest rates on the deeply subordinated Seller Notes, the initial proposal included warrants to purchase 32.49% of RVR's equity on a fully-diluted basis. The initial proposal also included a SARs plan pursuant to which stock appreciation rights could be issued to key employees, up to 17.49% of RVR's equity on a fully diluted basis. Key non-financial terms included in the initial proposal included adding Eric to the RVR Board and no "material changes in compensation arrangements or terms" to Randall's, Eric's, and my pre-existing employment agreements.

26.     Following the April 21, 2014 presentation of the initial proposal, Chartwell provided regular (at least weekly and, often, daily) updates to RVR (principally me, Randall, and/or Eric) on Reliance's due diligence requests, follow up questions asked by SRR, K&L Gates, and Reliance, and the status of the negotiations, among other things. Chartwell also advised us about key meetings being held by Reliance and its advisors, including the May 5, 2014 and May 23, 2014 meetings between Reliance and its advisors and information regarding the offers and counter-offers and other proposed deal terms. Although we were aware of Reliance's meetings with its advisors, and any counter-proposals made by Reliance to RVR, we were obviously not privy to any of the confidential conversations Reliance had with its advisors, including any conversations Reliance had

7

with its advisors regarding the value of RVR's stock, proposed transaction terms, or legal and financial due diligence.

27.    On May 5, 2014, Chartwell received Reliance's first counter-offer.  After Chartwell discussed Reliance's first counter-offer with RVR (Randall, Eric and I) and Greenberg (Marc Baluda), RVR authorized Chartwell to make RVR's first counter-offer to Reliance on May 8, 2014.  Reliance made its second counter-offer to RVR the next day, on May 9, 2014.  Negotiations over deal terms and additional financial and legal due diligence continued to take place through May 27, 2014 and the final agreement was executed on May 28, 2014.

28.    Prior to this litigation, I was not provided with any copies of SRR's draft or final valuation reports which I understand Reliance used to negotiate the proposed ESOP transaction deal terms, including the price to be paid for the RVR stock purchased by the RVR ESOP.  I was also unaware of the valuation methodologies or assumptions used by SRR in its valuations.  For example, prior to this litigation, I had no knowledge of whether SRR's valuations of RVR's stock were conducted on a controlling interest basis (or included any alleged control premium).

29.    Randall, Eric, and I did not participate directly in the negotiations with Reliance or its advisors.  Instead, the negotiations on behalf of RVR were handled by RVR's advisors, including Chartwell and Greenberg.  During the course of this litigation, I was shown two emails purportedly sent by Steve Martin of Reliance to Chartwell on May 22 and May 23, 2014.  Prior to this litigation, I had not seen, nor was I aware of, these emails or the contents of the emails.  The two emails, which have been designated as Plaintiff's Trial Exhibits 168 and 182, were not forwarded to me or, to my knowledge, anyone else at RVR.  Prior to this litigation, no one from Chartwell (or anyone else) discussed the substance of these two emails with me.

30.    Regardless of whether Mr. Martin's statements in these purported emails were intended to be accurate at the time or were simply a negotiating tactic, RVR and the

8

Selling Shareholders (me, Eric, and Randall's family trusts) made significant, additional concessions between the dates of the emails and the closing of the RVR ESOP Transaction on May 28, 2014. With respect to executive compensation, the concessions included, among other things, the elimination of Eric's, my brother's and my right to unilaterally trigger severance payments, the addition of a requirement that a release be executed in exchange for receipt of any severance, and a provision that prohibited increases in our compensation without the approval of the ESOP Trustee. Additionally, the Parties agreed to eliminate the warrant holders' proposed blocking right of any potential sale of RVR, to establish a specific procedure for evaluating potential mergers and acquisitions; and to establish a process for the RVR Board to nominate candidates for Board positions and for the ESOP Trustee to vote on the slate of nominees.

31.    In connection with the proposed RVR ESOP Transaction and prior to anyone executing the Stock Purchase Agreement, Reliance and its advisors made several important representations to RVR, the RVR Board, and the Selling Shareholders (me, Eric, and Randall's family trusts). These representations were important to RVR and me. We would not have executed the Stock Purchase Agreement or closed the RVR ESOP Transaction without them. The representations include the following:

a.    Reliance's representation in the Stock Purchase Agreement that "the [RVR ESOP] Trust has received an opinion from its independent financial advisors reflecting that: (i) the consideration paid for the shares of the Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of [ERISA]";

b.    Reliance's representation in the Stock Purchase Agreement that "the Trust has received an opinion from its independent financial advisors reflecting that … (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view";

c.       Reliance's representation in the Stock Purchase Agreement that Reliance had analyzed, reviewed and approved the Fairness Opinion and accompanying report prepared by SRR and that SRR is an "Independent Financial Advisor";

d.       Reliance's representation in the Stock Purchase Agreement that "[n]either the execution nor the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any Laws to which the ESOP is subject or any provision of the trust documents of the ESOP . . .";

e.       SRR's representations in its May 28, 2014 fairness opinion that: (1) "the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares"; (2) "the interest rate on the ESOP Loan is not in excess of a reasonable interest rate"; (3) "the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arms-length negotiations between independent parties"; and (4) "the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view";

f.       SRR's representations in its May 28, 2014 fairness opinion that: "SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the [DOL] and section 401(a)(28)(C) of the Internal Revenue Code of 1986";

g.       Reliance's certification in the Trustee Certificate that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill, prudence and diligence that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms";  and

h.       K&L Gates' representation in a May 28, 2014 written opinion that the "acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is

10

exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code".

32.    Additionally, prior to executing the Stock Purchase Agreement, I reviewed Greenberg's representation in a written opinion letter dated May 28, 2014 that the "execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties [defined as RVR, Cruise America, and Cruise Canada] will not violate any applicable law, rule or regulation affecting such Opinion Party."  This representation as well as the ones set forth in Paragraph 31 provided me with assurance that the ESOP transaction was fair, lawful, and was in the best interest of the RVR ESOP and its participants and beneficiaries.

33.    On May 28, 2014, the RVR ESOP acquired 100% of RVR's stock from the Selling Shareholders, pursuant to the Stock Purchase Agreement, for a total price of $105 million.  The RVR ESOP financed the stock purchase with a $104,401,014.94 loan from RVR ("ESOP Loan") and a $598,985.06 contribution from RVR.  RVR funded the ESOP Loan using existing cash, a draw from RVR's revolving line of credit with Wells Fargo Bank, and proceeds from a bridge term loan of $87 million from Wells Fargo Bank.

34.    Following the close of the ESOP Transaction, my brother's family trusts and I loaned $95 million to RVR in exchange for the Seller Notes and warrants.  The Seller Notes had a cash interest rate of 2.5% per year, PIK compounding interest at 1.05% per year, non-compounding PIK interest at 2.15% per year, and included attached warrants to purchase 666,667 shares of RVR stock at an exercise price of $7.50 per share.

35.    The Seller Notes were subordinate to RVR's other debt with Wells Fargo and were unsecured.  The warrants were an integral part of the Transaction financing and were used to partially offset the below market interest rates on the deeply subordinated Seller

11

Notes.  The $95 million loan provided to RVR was used to pay off the bridge term loan from Wells Fargo and to pay down the revolving line of credit.

36.    By the end of January 2018, RVR paid off all of the Seller Notes and redeemed all of the warrants issued to me and Randall's family trusts.  RVR was able to do this, in part, because Eric, Randall and I waived a significant amount of our guaranteed compensation. In fact, as of March 2022, I have personally voluntarily waived more than $20 million in guaranteed compensation since the close of the ESOP Transaction.

37.    In particular, and starting in the fourth quarter of 2014, Randall and I voluntarily waived our guaranteed annual bonuses of $1.6 million per year ($400,000 per quarter).  Beginning on January 1, 2018, Randall and I also voluntarily reduced our guaranteed base salaries from $1.6 million per year to $400,000 per year.  Between Randall, Eric, and I, we have collectively voluntarily waived over $45 million in guaranteed compensation.  All of this guaranteed compensation was included in the 10-year financial projections provided to SRR in connection with the ESOP Transaction and its inclusion in the financial projections necessarily lowered the purchase price paid to the Selling Shareholders.  Had the guaranteed compensation that we waived been excluded from the financial projections, it is my understanding the Selling Shareholders would have received a significantly higher purchase price for their shares of RVR stock.

38.    I am confident that the $105 million the ESOP paid to purchase 100% of RVR's stock was at or below fair market value for that stock.  First, the $105 million number fell at the very low end of Chartwell's estimated range, and this estimated range was stale and too low because it did not take into account the Company's updated and improved financial performance data, which was distributed on April 30, 2014.  Second, RVR had provided Chartwell and SRR with very conservative financial projections even though doing so underestimated RVR's cash flow by a couple of million dollars per year. RVR declined the invitation to revise the financial projections upward even though we knew the use of the conservative projections would result in a lower purchase price for the

12

Selling Shareholders' RVR stock. Finally, my belief that the ESOP paid at or below fair market value for the RVR stock it purchased was confirmed by the "as of" May 31, 2014 valuation of the ESOP's RVR stock which came in at $8.3 million. That valuation was performed as of May 31, 2014, just three days after the ESOP Transaction closed. Given that the ESOP Transaction was an almost 100-percent leveraged transaction, I would have expected the as of May 31, 2014 stock valuation to be at or near $0. The fact that it was not at or near $0 tells me the ESOP and its participants got a good deal.

39.    The performance RVR, the RVR ESOP, and the RVR stock held by the ESOP since it was purchased by the ESOP has been wonderful. As mentioned above, the RVR stock held by the ESOP was appraised at $8.3 million as of May 31, 2014. The most recent appraisal of the stock, which was conducted as of May 31, 2021, is $121.8 million. The RVR management team expects that the as of May 31, 2022 annual appraisal of the RVR stock held by the ESOP will be even higher. I understand that RVR's expert witness in this case, Ed Wilusz, has calculated the compounded annual growth rate on the ESOP's RVR stock to be 46.8%. That is a far higher return than I have earned on any of my investments.

40.    I understand that Plaintiff has identified a purported expert who has asserted that the value of 100% of RVR's stock as of May 28, 2014 was approximately $13.7 million. This same individual assumes that I would have agreed to sell my RVR stock held for this amount and that either I, RVR, or Randall's family trusts would then loan more than $90 million to the ESOP so the ESOP could invest those loaned funds in an S&P 500 Index Fund. That is absurd. I would never have agreed to sell my RVR stock based on a $13.7 million valuation of RVR's stock - a valuation that is only a fraction of the book value of the Company's assets – which means we could have dissolved RVR, sold its assets and paid its liabilities, and the Selling Shareholders would have walked away with *far more* than $13.7 million. Indeed, as of May 28, 2014, RVR had more than $16 million in cash on hand. As the majority stockholders and sole directors, Randall and I could have simply

13

caused RVR to make a distribution of that cash as a dividend and the Selling Shareholders would have received more than $13.7 million while still retaining 100% ownership of RVR.

41.     Moreover, I would not have been in a position to loan the ESOP millions of dollars had I sold my RVR stock based on a $13.7 million valuation. I am also confident that Wells Fargo would not have loaned the Company more than $90 million to then loan to the ESOP so that the ESOP could invest in the stock market. In fact, in order to secure the financing used to fund the ESOP Transaction, my brother and I were each required to personally guarantee $15 million of the Wells Fargo loan. I would not have been willing to personally guarantee any loan where the loan proceeds would be used by the ESOP to invest in the stock market.

42.     I have not been indemnified for the costs and expenses associated with this litigation from the ESOP nor have I requested to be indemnified under the terms of the Plan.

I declare under penalty of perjury that I have read this Declaration and it is true and correct.

Executed on March 23, 2022.          _____
                                      Robert Smalley, Jr.

14

# Exhibit 5

BRYAN CAVE LEIGHTON PAISNER LLP (No. 00145700)
Jessica R. Maziarz (No. 027353) (jessica.maziarz@bclplaw.com)
Gregory B. Iannelli (No. 026549) (gregory.iannelli@bclplaw.com)
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
Telephone:  (602) 364-7000

BRYAN CAVE LEIGHTON PAISNER LLP
W. Bard Brockman (Admitted *Pro Hac Vice*) (bard.brockman@bclplaw.com)
1201 West Peachtree Street, N.W., 14th Floor
Atlanta, Georgia 30309
Telephone:  (404) 572-6600

BRYAN CAVE LEIGHTON PAISNER LLP
Meredith Jacobowitz (Admitted *Pro Hac Vice*) (meredith.jacobowitz@bclplaw.com)
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone:  (314) 259-2000

Attorneys for Defendant Reliance Trust Company

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA  85004-4406
(602) 364-7000

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene Scalia, United States Secretary of Labor,<br><br>Plaintiff,<br><br>vs.<br><br>Reliance Trust Company, Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, RVR, Inc., and RVR Employee Stock Ownership Plan,<br><br>Defendants. | No. CV-19-03178-PHX-JJT<br><br><br>**DEFENDANT RELIANCE TRUST COMPANY'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |

Defendant Reliance Trust Company ("Reliance"), by and through undersigned counsel, hereby responds to Plaintiff Eugene Scalia, Secretary of Labor's First Set of Interrogatories Directed to Defendant Reliance Trust Company ("Interrogatories"), dated June 29, 2020.

**PRELIMINARY STATEMENT**

1.      Reliance's responses and objections are made in good faith and based on information presently available to it and its counsel.  Plaintiff should not construe these responses and objections to prejudice Reliance's right to conduct further investigation.  Nor should Plaintiff construe these responses and objections to waive Reliance's right to modify and/or supplement its response to any Interrogatory.

2.      Reliance sold the assets of its ESOP trustee services business to Argent Trust Company ("Argent") on or about June 30, 2014.  The employees with the most knowledge of the transaction at issue in this lawsuit left Reliance in connection with that asset sale over six years ago.  Other employees of Reliance who may have had knowledge of the 2014 transaction have left Reliance, either due to retirement or other career opportunities.

3.      The prefatory instructions and definitions in the Interrogatories seek to impose duties upon Reliance which are greater than the obligations as set forth in the Federal Rules of Civil Procedure.  In all matters governing these responses, Reliance will be guided by the Federal Rules of Civil Procedure.

4.      Reliance objects to Instruction No. 2 in the Interrogatories, and specifically to the purported temporal scope as overly broad, unduly burdensome, not calculated to lead to the discovery of admissible evidence, not relevant to any party's claim or defense, and not proportionate to the needs of the case.

5.      Reliance objects to the definition of the term "Reliance" on the grounds that it is overly broad, vague and ambiguous with respect to the phrase "other persons acting or purporting to act on behalf of Reliance."  Similarly, Reliance objects to the definitions of the terms "Bensen," "Defendant Trusts," "Plan," "RVR," "Smalley," and "Smalley Jr." on the grounds that they are overly broad, vague and ambiguous with respect to the phrase "or other persons acting [or purporting to act] on [his, their, RVR's] behalf."

6.      Reliance objects to the definition of the terms "Plan" and "RVR ESOP" in that it purports to combine: (i) the RVR Inc. Employee Stock Ownership Plan; and (ii) the RVR Employee Stock Ownership Trust.  The purported combination of those two entities is

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

2

inaccurate and misleading.

7. Reliance objects to the definition of the term "Transaction" as inaccurate and misleading. The Plan did not purchase 100% of the shares of RVR on or about May 28, 2014. The RVR Employee Stock Ownership Trust (the "Trust") purchased 100% of the shares of RVR on or about May 28, 2014. In these responses, when Reliance uses the term "Transaction" it is referring to the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all employee stock ownership plan stock purchase transactions in which Reliance participated in the capacity of "independent fiduciary" or in any other capacity both before and after the Transaction, and of that number, what number were approved.

**RESPONSE:** Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014. Reliance objects to Interrogatory No. 1 on the grounds that it is overly broad, unduly burdensome, harassing, not calculated to lead to the discovery of admissible evidence, not relevant to a party's claim or defense, and not proportional to the needs of this case and is not proportional to the needs of this case because it seeks information from an undefined period of time that has no bearing on the claims or defenses in this case.

**INTERROGATORY NO. 2:**

Describe Reliance's complete decision making process in approving the Transaction on behalf of the Plan, including:

a.    who at Reliance made the decision and how;

b.    the initial decision to accept its selection as a fiduciary for the Transaction;

c.    the decision to agree to the Transaction process and timeline;

d.    and any and all due diligence Reliance undertook or was part of in connection with the Transaction, including any assessment of the qualifications of SRR; and

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

3

e.    the negotiation and approval of the Transaction's price per share of RVR stock.

**RESPONSE:**  Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014.  Reliance notes that Interrogatory No. 2 contains five sub-parts.  Reliance is treating each sub-part as a separate interrogatory consistent with Fed. R. Civ. P. 33 and the Court's Amended Rule 16 Scheduling Order (Dkt. 49).  Reliance objects to Interrogatory No. 2 and each of its sub-parts on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single action it took in 2014 with respect to its decision making process in approving the transaction at issue.  Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Secretary of Labor's First Requests for Production of Documents Directed to Reliance Trust Company, and documents produced by Argent Trust Company.

**RESPONSE TO INTERROGATORY 2(a):**  Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance states that the decision to approve the proposed transaction was made by Reliance's Committee after reviewing materials from, and conferring with, Reliance's financial and legal advisors.  The Committee gave preliminary approval for Reliance's participation in negotiations at a meeting on May 5, 2014, and authorized Steve Martin to continue negotiations.  The Committee gave final approval for a transaction at a meeting on May 23, 2014.

**RESPONSE TO INTERROGATORY 2(b):**  Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance states that after it was interviewed by RVR, Inc. ("the Company") but before it was selected, Steve Martin presented the possible engagement to a small group of senior managers at Reliance.  That senior management team met on April 3, 2014 to discuss the Company, the proposed transaction, and the possible engagement.  The senior management team approved the possible engagement in the event the Company ultimately selected

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

Reliance over the other trustee candidates it interviewed. The Company notified Reliance on or about April 4, 2014 that it intended to appoint Reliance as the ESOP trustee for the proposed transaction. Reliance forwarded a proposed engagement letter, which the Company counter-signed on or about April 16, 2014.

**RESPONSE TO INTERROGATORY 2(c):** Reliance objects to Interrogatory No. 2(c) on the grounds that it is argumentative, assumes facts not in evidence, and mischaracterizes facts. Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance did not agree to any particular "process" or "timeline" as part of the transaction.

**RESPONSE TO INTERROGATORY 2(d):** Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance offers this general overview of the due diligence process:

In late March 2014, before it was selected as trustee for the proposed transaction, it requested and reviewed a high-level Company overview from the sell-side advisor Chartwell Capital Solutions ("Chartwell"). [March 27, 2014 slide deck from Chartwell: "Company Introduction."] Reliance also reviewed a high-level overview of the proposed transaction from Chartwell in late March. [March 2014 slide deck from Chartwell: "Potential ESOP Trustee Introduction Materials."] On March 31, as part of the trustee interview process, Reliance's representatives met with the Company's CFO Eric Bensen, as well as representatives from Chartwell and the Company's counsel Greenberg Traurig, to learn more about the Company and the proposed transaction.

After Reliance learned that it would be selected as the trustee for the proposed transaction, it approached Stout Risius Ross, Inc. ("SRR") about being its financial advisor for the transaction. Reliance was very familiar with SRR's experience and capabilities. It had retained SRR as financial advisor on prior ESOP transactions, and SRR was one of Reliance's preferred financial advisors for ESOP transactions and annual updates. Reliance also had vetted SRR, along with other valuation firms, as part of a request-for-proposal process in 2011.

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

5

Once Reliance was retained as trustee, on or about April 15, 2014, its selected counsel at K&L Gates, Inc. ("K&L Gates") submitted a comprehensive combined due diligence request to Chartwell. [April 15, 2014 "Project Byway – Due Diligence Request."] Later that same day Reliance and representatives from both SRR and K&L Gates met with the Company's senior management and representatives of Chartwell at a working dinner. The following day, on April 16, 2014, Reliance and representatives from both SRR and K&L Gates attended an on-site meeting at the Company's headquarters in Mesa. The Company's management team made a comprehensive presentation, including but not limited to information about: (i) the Company and its history; (ii) the Company's locations and markets; (iii) the Company's products and services; (iv) the Company's customer base and mix; (v) the Company's marketing strategy; (vi) the Company's suppliers; (vii) the Company's customized technology for reservations; (viii) the Company's pricing management; (ix) the Company's reservation trends; (x) the Company's management team; (xi) the Company's employee base; (xii) the RV rental industry; (xiii) the Company's competitors; (xiv) the Company's historical financial performance; (xv) the Company's projected financial performance; (xvi) the seasonal nature of the Company's business and the industry; and (xvii) the Company's capital expenditures. [April 16, 2014 "Project Byway – Management Presentation to Reliance Trust Company as Trustee of the to-be-formed ESOP."] Reliance and the trustee team (SRR, K&L Gates) interviewed the Company's senior management and other key employees and toured the Company's facility.

On April 21, 2014, Reliance and the trustee team attended a telephone conference with Chartwell at which Chartwell presented terms of the proposed transaction, as well as additional information about the Company itself. [April 21, 2014 Chartwell slide deck – "Project Byway – Presentation to Reliance Trust Company as Trustee of the to be formed ESOP".]

Also on April 21, 2014, Chartwell provided Reliance and the trustee team with access to an on-line data room that housed all of the due diligence documents. Reliance reviewed documents in the data room, and directed SRR and K&L Gates to examine the due diligence

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

items in the data room within the scope of their respective assignments. The data room was updated regularly to include the documents and information requested by Reliance and the trustee team, and as new information became available. Reliance, SRR and K&L Gates received notifications when new material had been uploaded to the data room, and they each reviewed the new items within the scope of their respective roles and assignments. On or about April 30, 2014, Chartwell provided the trustee team with updated management projections. [April 30, 2014 slide deck from Chartwell: " Project Byway – Updated Income Statement Projection – April 30, 2014."]   SRR discussed the updated management projections with Chartwell.

Reliance's advisors at SRR and K&L Gates had direct contact with Chartwell to ask questions about the due diligence materials, and to make follow-up requests for documents or other information. Reliance was copied on at least some of those communications with Chartwell. [Example: April 25, 2014 email from Matt Hricko (SRR) to Ted Margarit (Chartwell), and Chartwell responses dated April 25, 2014 and April 30, 2014.]   On information and belief, SRR and K&L Gates had direct telephone communications with Chartwell in which Reliance did not participate, and SRR and K&L Gates had email communications with Chartwell on which Reliance was not copied.

On May 2, 2014, SRR provided Reliance with a draft report reflecting SRR's determination of the range of fair market value for the RVR shares. [SRR Draft Report: "Project Byway – Analysis of Transaction Fairness as of May __, 2014.] Steve Martin and Bucky Wright of Reliance made an initial review of SRR's draft valuation report. Reliance circulated that draft report to the members of its Committee, which met on May 5, 2014 to consider the SRR draft report and the proposed transaction. Representatives of SRR and K&L Gates also attended that meeting by telephone. The SRR representatives explained SRR's valuation report, and the Committee asked questions. The K&L Gates representatives also provided a status report on the ongoing legal due diligence. Based upon the information presented, the Committee affirmed Reliance's participation in continued negotiations and authorized Steve Martin to negotiate terms consistent with the range of fair market value in

SRR's valuation report. [May 5, 2014 Committee minutes; May 5, 2014 Steve Martin handwritten notes.]

On May 21, 2014, SRR forwarded an updated draft valuation report to Reliance. [SRR Draft Report: "Project Byway – Analysis of Transaction Fairness as of May __, 2014."] That updated report was circulated to Reliance's Committee, which met again on May 23, 2014. The Committee also received a comprehensive legal due diligence memo from K&L Gates in advance of the meeting. [May 23, 2014 K&L Gates memorandum re "Acquisition of the Company Stock of RVR, Inc." (circulated May 22, 2014).] Once again, representatives of SRR and K&L Gates attended the Committee meeting by telephone. SRR reviewed its updated valuation report with the Committee, which asked questions. And K&L Gates reviewed the proposed transaction terms and legal due diligence for the Committee. The Committee approved the updated valuation report and approved the proposed transaction, subject to a few revisions in some transaction documents, which were negotiated and agreed-to prior to closing on May 28, 2014. [May 23, 2014 Committee minutes (incorrectly dated May 22, 2014).]

**RESPONSE TO INTERROGATORY 2(e):** Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance states that Chartwell, on behalf of the Company and the Sellers proposed an equity purchase price for the Seller's shares of $143.9 million (or $143.90/share). On May 5, 2014, Reliance's Committee authorized Steve Martin to negotiate the purchase consistent with the range of fair market value as determined by Reliance's financial advisor SRR. Mr. Martin extended Reliance's counterproposal of $100 million (or $100.00/share) to the sell-side advisor Chartwell later on May 5, 2014, subject to the Committee's final approval of the transaction. Chartwell responded on or about May 8, 2014 with a counter-proposal, including an equity purchase price of $115 million (or $115.00/share). Mr. Martin extended a counter-proposal to Chartwell on or about May 9, 2014 that included an equity purchase price of $105 million (or $105.00/share), subject to the Committee's final approval of the transaction. On May 13, 2014, Chartwell, on behalf of the Company and the Sellers

8

extended another counter-proposal that included an equity purchase price at $105 million (or $105.00/share). Reliance's Committee gave final approval for the transaction at an equity purchase price of $105 million (or $105/share) subject to certain revisions to other deal terms, which were accomplished prior to the closing on May 28, 2014.

**INTERROGATORY NO. 3:**

Identify and describe all of Reliance's internal policies, processes, and procedures relating to the evaluation and/or approval of an ESOP transaction, including those relating to conflicts of interest, from May 28, 2010 through May 28, 2015.

**RESPONSE:** Reliance objects to Interrogatory No. 3 on the grounds that it is overly broad and unduly burdensome because it would require Reliance to identify and describe all versions of any internal policies, processes, and procedures relating to the evaluation and/or approval of an ESOP transaction in effect for a period of five years and any internal policies, processes, and procedures relating to the evaluation and/or approval of an ESOP transaction not in effect at the time of the May 28, 2014 transaction are irrelevant to this litigation. The policies relating to the evaluation and/or approval of an ESOP transaction are contained in Reliance's policy manual. Reliance will produce another copy of the policy manual in effect at the time of the May 28, 2014 transaction.

**INTERROGATORY NO. 4:**

Describe the Transaction documents and terms of the Transaction that were negotiated and/or finalized between May 22, 2014 and May 28, 2014, including when each was negotiated and finalized.

**RESPONSE:** Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014. Reliance objects to the phrase "Transaction documents" as vague, ambiguous and undefined. Reliance further objects to Interrogatory No. 4 on the grounds that it is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every change or revision in a document to be executed or adopted as part of the transaction at issue, regardless of the

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

9

materiality of the change or revision. Reliance further objects to Interrogatory 4 on the grounds that the term "finalized" is vague and ambiguous. To the extent that any document requires one or more signatures, then the document is arguably not "finalized" until it is executed by all relevant parties. Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance responds to Interrogatory No. 4 as follows:

Amendments to Existing Employment Agreements. On May 22, 2014, Sellers' counsel dropped the prior demand for severance upon "termination for cause" or "voluntary resignation," as well as the prior demand that a "change in control" constitute a "good reason" for termination. K&L Gates reported these revisions to the Reliance Committee at its meeting on May 23, 2014, as reflected in its legal due diligence memorandum. Additionally, on May 24, 2014, Reliance successfully negotiated a covenant that the senior management team's compensation shall not be increased without the prior approval of the ESOP trustee. K&L Gates confirmed these favorable changes to the Committee prior to the closing on May 28, 2014, as reflected in the May 23rd minutes (incorrectly dated May 22, 2014).

Stock Purchase Agreement. On May 22, 2014, Reliance successfully negotiated parameters on the Sellers' indemnification obligations under Article VI of the Stock Purchase Agreement. K&L Gates reported this revision to the Committee at its meeting on May 23, 2014, as reflected in its legal due diligence memorandum.

Investor Rights Agreement / Amended Bylaws. The draft Investor Rights Agreement ("IRA") contained terms that were later negotiated and revised. First, the IRA gave the Warrantholders the right to confirm any sale of the Company and restricted any such sale in the absence of such confirmation. On May 22, 2014, Reliance successfully negotiated a change in principle to the IRA that the Warrantholders' consent to any sale of the Company shall not be unreasonably withheld. That revision was reported to the Committee at its May 23, 2014 meeting, as reflected in K&L Gates legal due diligence memorandum. On May 24, 2014, the parties replaced that concept with a "policy" to be incorporated in the Amended

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

Bylaws (at Article III, Section 14) that governed the board's review and response to any bona fide offer to purchase the Company, including notification to the ESOP trustee. K&L Gates confirmed this favorable change to the Committee prior to the closing on May 28, 2014, as reflected in the May 23rd minutes.

Second, an early draft of the IRA provided that the board of directors shall be limited to Messrs. Smalley, Smalley and Bensen, and that for so long as the Warrants have not been exercised or terminated, the holders of the outstanding Warrants shall have the right to nominate and consent to any replacement or new member of the board. On May 24, 2014, this provision was removed and replaced in concept in two places: (i) an amendment to the Bylaws (at Article III, Section 11) that established a nominating committee comprised of the board to nominate directors, and that permitted the ESOP trustee (as long as the ESOP Trust is a shareholder) to vote the Trust's shares on the slate proposed by the nominating committee; and (ii) a corresponding change to the IRA that provides, among other things, that the ESOP trustee may vote the ESOP Trust's shares for the election of directors, in accordance with the Bylaws, and that the trustee shall not amend, alter, or repeal the Bylaws in any respect without first obtaining the approval of the board. K&L Gates confirmed these favorable changes to the Committee prior to the closing on May 28, 2014, as reflected in the May 23 minutes.

Further responding to Interrogatory No. 4, Reliance states that the various items noted above were all shared with Reliance's financial advisor SRR in advance of the closing, and that SRR reviewed and considered the documents in connection with the issuance of its fairness opinion on May 28, 2014.

**INTERROGATORY NO. 5:**

Describe any and all actions Reliance took to become familiar with RVR's business, its industry, and its competitors.

**RESPONSE:** Reliance objects to Interrogatory No. 5 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single action it took in 2014 with respect to efforts to become familiar with RVR's business,

11

its industry, and its competitors. Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Plaintiff's First Request for Production, and documents produced by Argent Trust Company. Subject to and without waiver of the objections stated above, Reliance hereby incorporates its response to Interrogatory 2(d) above.

**INTERROGATORY NO. 6:**

Describe any and all actions Reliance took to review, question, and analyze the valuations of RVR performed by SRR, including, but not limited to, the fair market value of RVR's stock and SRR's use of a control premium.

**RESPONSE:**  Reliance objects to Interrogatory No. 6 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single action it took in 2014 with respect to its review, questioning and analysis of SRR's valuations of RVR.  Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Secretary of Labor's First Requests for Production of Documents Directed to Reliance Trust Company, and documents produced by Argent Trust Company.  Subject to and without waiver of the objections stated above, Reliance incorporates its response to Interrogatory No. 2(d), above, with respect to the draft valuation reports that SRR forwarded on May 2, 2014 and May 21, 2014.  Further, SRR explained its valuations with Reliance's Committee in great detail on May 5, 2014 and May 23, 2014.  The details of SRR's review of the valuations, as well as the questions from and exchanges with the Committee, are set forth in the May 5 and May 23 minutes, as well as Steve Martin's handwritten notes from both meetings.

**INTERROGATORY NO. 7:**

Describe all of your efforts to obtain valuations of RVR or offers to buy RVR before the Transaction, and to the extent any valuations or offers were obtained, describe Reliance's review and analysis of these valuations and offers, including, but not limited to the valuations done or presented by Chartwell.

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

12

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

**RESPONSE:**   Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014.  Reliance objects to Interrogatory No. 7 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single action it took in 2014 with respect to its efforts to obtain valuations of RVR or offers to buy RVR before the transaction at issue.  Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Plaintiff's First Request for Production, and documents produced by Argent Trust Company.  Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance states that its counsel at K&L Gates submitted a comprehensive combined due diligence request to the Company and its advisors on or about April 15, 2014.  That comprehensive due diligence request sought an exhaustive list of financial and legal documents, including the following:

- Details of any prior transactions involving interests of the Company;
- Copies of any reports concerning the Company rendered by marketing consultants, appraisers, management consultants, investment bankers, etc.
- Any letter of intent signed or received during the past 5 years.

No prior valuations or offers to buy the Company were provided in response to these requests.

**INTERROGATORY NO. 8:**

Describe any and all actions Reliance took to analyze whether there were any conflicts of interest for any entity or party that did any work on the Transaction, and if any conflicts were found, explain why Reliance decided to continue working with the entity or party during the Transaction despite the conflict.

**RESPONSE:**   Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of 100% of the shares of RVR on or about May 28, 2014.  Subject to and without waiver of the

objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance requested its legal counsel K&L Gates and its financial advisor SRR to conduct conflict checks prior to their respective engagements. Neither K&L Gates nor SRR advised Reliance that they had any conflicts of interest that would prevent them working on the proposed transaction.

**INTERROGATORY NO. 9:**

Identify and describe all transactions or other business Reliance conducted in which Chartwell also was involved during the period May 28, 2009 through May 28, 2015.

**RESPONSE:** Reliance objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, harassing, not calculated to lead to the discovery of admissible evidence, not relevant to a party's claim or defense, and not proportional to the needs of this case, specifically because it would require an unreasonable amount of information from a six-year period that has no relationship to or bearing on the claims or defenses in this case. Reliance further objects to Interrogatory No. 9 on the grounds that the phrases "all transaction or other business" and "in which Chartwell also was involved" are vague and ambiguous. Reliance further objects to Interrogatory No. 9 on the grounds that it seeks sensitive financial information of entities or persons to whom Reliance owes an obligation of confidentiality or non-disclosure and who are not parties to this lawsuit.

**INTERROGATORY NO. 10:**

Identify and describe all transactions or other business Reliance conducted in which SRR also was involved during the period May 28, 2009 through May 28, 2015.

**RESPONSE:** Reliance objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome, harassing, not calculated to lead to the discovery of admissible evidence, not relevant to a party's claim or defense, and not proportional to the needs of this case, specifically because it would require an unreasonable amount of information from a six-year period that has no relationship to or bearing on the claims or defenses in this case. Reliance further objects to Interrogatory No. 10 on the grounds that the phrases "all transaction or other business" and "in which SRR also was involved" are vague

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

14

and ambiguous.  Reliance further objects to Interrogatory No. 10 on the grounds that it seeks sensitive financial information of entities or persons to whom Reliance owes an obligation of confidentiality or non-disclosure and who are not parties to this lawsuit.

**INTERROGATORY NO. 11:**

Describe any marketing, referral, or business development arrangements, opportunities, or efforts between, concerning, or among Reliance, SRR, and/or Chartwell during the period May 28, 2009 through May 28, 2015.

**RESPONSE:**  Reliance objects to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome, harassing, not calculated to lead to the discovery of admissible evidence, not relevant to a party's claim or defense, and not proportional to the needs of this case, specifically because it would require an unreasonable amount of information from a six-year period that has no relationship to or bearing on the claims or defenses in this case.

**INTERROGATORY NO. 12:**

State all facts and identify all documents that support your statement in your MIDR, page 5, lines 13-14, that "Reliance Trust made sure that SRR and K&L Gates had access to Chartwell Capital Solution's online data room," including, without limitation, how and when such access was given to SRR and K&L Gates.

**RESPONSE:**  The on-line data room that housed all of the due diligence documents was made available to Reliance, SRR and K&L Gates on or about April 21, 2014.  [See April 21, 2014 email from Stephanie Geerdes (Chartwell) to Steve Martin and Bucky Wright re: "Byway data room."]  The data room was updated regularly to include the documents and information requested by Reliance and the trustee team, and as new information became available.  Reliance, SRR and K&L Gates received notifications when new material had been uploaded to the data room.  By way of example only, see April 25, 2014 email notification from Stephanie Geerdes to Steve Martin re "Stephanie Geerdes Has Created a New Item in ShareFile."

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

**INTERROGATORY NO. 13:**

State all facts and identify all documents that support your statement in your MIDR, page 5, lines 15-16, that: "Reliance Trust made sure that SRR and K&L Gates had access to RVR, Inc.'s financial and other information" including, without limitation, the date of each and every insurance you "made sure that SRR and K&L Gates had access" to such information and the specific information associated with each such instance.

**RESPONSE:**  See response to Interrogatory No. 12.

**INTERROGATORY NO. 14:**

State all facts and identify all documents that support your statement in your MIDR, page 5, lines 17-18, that: "Reliance Trust and its advisors made several follow-up inquiries for additional information and due diligence materials," including, without limitation, the date of each inquiry, the person(s) making each request, the person(s) to whom each request was made, the information and materials sought, the response received to each request, the person(s) responding to each request, the date and substance of each response, and all follow-up inquiries made to each inquiry.

**RESPONSE:**  Reliance objects to Interrogatory No. 14 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every instance that in which or its advisors made follow-up inquiries.  Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Secretary of Labor's First Requests for Production of Documents Directed to Reliance Trust Company, and documents produced by Argent Trust Company.  The actions of SRR and K&L Gates should be reflected in the documents produced by SRR, Chartwell, and perhaps others.  Subject to and without waiver of the objections stated above, Reliance states that SRR and K&L Gates communicated directly with the sell-side advisor Chartwell, and that Reliance was not always involved in, or copied on, those communications.  For instances in which it was copied Reliance cites the following documents by way of example only:

- April 26, 2014 email from Matt Hricko (SRR) to Ted Margarit (Chartwell) and

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

16

responses from Stephanie Geerdes (Chartwell) dated April 25, 2014 and April 30, 2014.

- May 2, 2014 email from Erin Turley (K&L Gates) to Ted Margarit and Stephanie Geerdes (Chartwell), and responses dated May 2, 2014 and May 6, 2014.

**INTERROGATORY NO. 15:**

State all facts and identify all documents that support your statement in your MIDR, page 5, lines 19-20, that: "Reliance Trust conducted its own review and due diligence of RVR, Inc. and its financial performance," including without limitation, the date, substance, and person(s) involved in each and every element of such review and due diligence.

**RESPONSE:** Reliance objects to Interrogatory No. 15 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single action it took in 2014 with respect to its review and due diligence of RVR, Inc. and its financial performance. Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Plaintiff's First Request for Production, and documents produced by Argent Trust Company. Subject to and without waiver of the objections stated above, Reliance hereby incorporates its response to Interrogatory 2(d) above.

**INTERROGATORY NO. 16:**

State all facts and identify all documents that support your statement in your MIDR, page 5, lines 21-22, that: "Reliance Trust involved an in-house valuation professional to review RVR, Inc.'s information as well as SRR's valuation reports," including without limitation, the identity of the "in-house valuation professional," what information was reviewed on what specific dates, and what SRR valuation reports were reviewed on what specific dates.

**RESPONSE:** Reliance objects to Interrogatory No. 16 on the grounds that is overly broad and unduly burdensome, particularly as it purports to require Reliance to recount every single piece of information that its in-house valuation professional reviewed in 2014, and the

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

17

dates of those reviews. Reliance's actions are reflected in the documents that it has already produced to Plaintiff, any additional documents that it may produce in response to Secretary of Labor's First Requests for Production of Documents Directed to Reliance Trust Company, and documents produced by Argent Trust Company. Subject to and without waiver of the objections stated above, Reliance states that one of the persons involved in its review and approval of the proposed transaction was Kelly "Bucky" Wright, who was a trained valuation professional. Mr. Wright had been a valuation analyst and manager at Willamette Management Associates for more than 8½ years prior to joining Reliance in January 2012.

Mr. Wright had access to Chartwell's on-line data room, which contained all of the due diligence documents for the proposed transaction. In addition, Mr. Wright's review of information included, but was not limited to the following items:

- March 27, 2014 slide deck from Chartwell: "Company Introduction"
- March 2014 slide deck from Chartwell: "Potential ESOP Trustee Introduction Materials"
- April 16, 2014 Management Presentation to Reliance Trust Company
- April 21, 2014 slide deck from Chartwell: "Presentation to Reliance Trust Company as Trustee of the to be formed ESOP"
- April 30, 2014 slide deck from Chartwell: "Updated Income Statement Projection"
- SRR draft valuation report (received May 2, 2014)
- SRR draft valuation report (received May 21, 2014)

**INTERROGATORY NO. 17:**

Set forth any and all payments that have been made on your behalf by the Plan or RVR related to the costs and expenses of defending this litigation or the Department's investigation of the Transaction, including the amount, date, payor, and document or agreement which was the basis for each payment.

**RESPONSE:** Reliance objects to the inaccurate and misleading definition of the term "Transaction" and interprets the term "Transaction" to mean the Trust's purchase of

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA  85004-4406
(602) 364-7000

100% of the shares of RVR on or about May 28, 2014. Subject to and without waiver of the objections stated above and subject to Reliance's interpretation of the term "Transaction," Reliance states there were none.

**INTERROGATORY NO. 18:**

State all facts and identify all documents on which you base your denial of paragraph 46 of the Complaint in your Answer.

**RESPONSE:**  Reliance's Committee met on May 23, 2014, and not on May 22, 2014, as Plaintiff has alleged. The May 22, 2014 date on the Committee meeting minutes is incorrect. [See Steve Martin's May 23, 2014 handwritten notes; May 23, 2014 email from David Williams to Bucky Wright and Steve Martin.] Further responding, Reliance hereby incorporates its response to Interrogatory No. 4 above.

**INTERROGATORY NO. 19:**

Identify all persons consulted when responding to these Interrogatories and all persons who provided information contained with the responses to these Interrogatories.

**RESPONSE:**  These Interrogatory responses were prepared by Reliance's counsel. No other persons provided information, or were consulted, for the purpose of the preparation of these responses.

DATED this 12th day of August, 2020.

<div style="margin-left:40%">

BRYAN CAVE LEIGHTON PAISNER LLP

By  s/ W. Bard Brockman
     W. Bard Brockman
     1201 West Peachtree Street, NW, 14th Floor
     Atlanta, Georgia 30309

     Jessica R. Maziarz
     Gregory B. Iannelli
     BRYAN CAVE LEIGHTON PAISNER LLP
     Two North Central Avenue, Suite 2100
     Phoenix, Arizona 85004-4406

     Meredith Jacobowitz
     BRYAN CAVE LEIGHTON PAISNER LLP
     211 North Broadway, Suite 3600
     St. Louis, Missouri 63102

Attorneys for Defendant Reliance Trust Company

</div>

BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
(602) 364-7000

19

BRYAN CAVE LEIGHTON PAISNER LLP
TWO NORTH CENTRAL AVENUE, SUITE 2100
PHOENIX, ARIZONA 85004-4406
(602) 364-7000

COPIES of the foregoing sent by e-mail transmission this 12th day of August, 2020, to:

Eric Carl Lund
G. Brendan Ballard
Isidro Mariscal
U.S. DEPARTMENT OF LABOR
200 Constitution Avenue, NW, Room N-4611
Washington, D.C. 20210

Attorneys for Plaintiff

Lindsey R. Camp
HOLLAND & KNIGHT LLP
West Tower, 777 S Flagler Dr.
West Palm Beach, Florida 33401

Todd D. Wozniak
HOLLAND & KNIGHT LLP
1180 W Peachtree St., NW Suite 1800
Atlanta, Georgia 30309

Aaron T. Lloyd
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016

Attorneys for Defendants Eric Bensen, Randall Smalley; Robert Smalley, Jr.; Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004; Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004; Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004; RVR, Inc.; and RVR Employee Stock Ownership

 s/ Meredith Jacobowitz

602191138

20

## VERIFICATION

I, Christopher J. Pitrof, verify that I have reviewed Defendant Reliance Trust Company's Objections and Responses to Plaintiff's First Set of Interrogatories and that based upon information provided to me the responses therein appear to be true and correct.

DATED this 25 day of July, 2020.

CHRISTOPHER J. PITROF

Sworn to and subscribed before me this 28th day of July 2020.

Notary Public

HAROLD DAVID MELTON
MY COMMISSION EXPIRES
FEBRUARY 13, 2024

# Exhibit 6

Adrianna Griego Gorton, SBN 031836
gortona@gtlaw.com
Greenberg Traurig, LLP
2375 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 445-8000
Facsimile: (602) 445-8100

Todd D. Wozniak (*pro hac vice*)
todd.wozniak@hklaw.com
Holland & Knight LLP
1180 West Peachtree Street, NW, Suite 1800
Atlanta, GA 30309
Telephone: (404) 817-8500
Facsimile: (404) 881-0470

Lindsey R. Camp (*pro hac vice*)
lindsey.camp@hklaw.com
Holland & Knight LLP
777 South Flagler Drive, Suite 1900, West Tower
West Palm Beach, FL 33401
Telephone: (561) 833-2000
Facsimile: (561) 650-8399

*Attorneys for Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor,<br><br>Plaintiff,<br><br>v.<br><br>Reliance Trust Company, et al.,<br><br>Defendants. | Case No. 2:19-cv-03178-JJT<br><br>**DEFENDANTS ERIC BENSEN, RANDALL SMALLEY, ROBERT SMALLEY, JR., FAMILY TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004, MARITAL TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004, SURVIVOR'S TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004, AND RVR, INC.'S SECOND AMENDED MANDATORY INITIAL DISCOVERY RESPONSES** |

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc. ("RVR" or the "Company") (collectively referred to as "Defendants") hereby serve their second amended mandatory initial discovery responses pursuant to General Order 17-08. Defendants reserve the right to supplement and amend these disclosures upon further discovery in this action. By providing these responses, Defendants do not waive their right to object to the disclosure of any information or documents on any grounds.

## PREFATORY REMARKS

1. Defendants' disclosures are made without waiver of any applicable or potentially applicable privilege or work-product protection.

2. Defendants hereby reserve any and all objections to the use in this case or in any other case of the information or material contained in their responses.

3. By producing information or material in connection with their responses, Defendants make no representations or concessions as to the relevance or admissibility of any of the information or material contained therein.

4. Defendants reserve the right to modify, amend and/or supplement each of their responses based upon facts and information obtained through formal and informal discovery.

5. Representations of fact and law herein are made in good faith, and are based on information currently known and reasonably believed to be relevant. Defendants reserve the right to supplement, amend, or change these responses as additional information becomes known as a result of ongoing discovery or otherwise. Moreover, if any portion of these responses are read to a jury, fairness requires that the jury be read this preliminary statement or be told that, at the time this statement was prepared, the case was in the early stages of discovery.

## INITIAL DISCLOSURES

I.    **STATE THE NAMES AND, IF KNOWN, THE ADDRESSES AND TELEPHONE NUMBERS OF ALL PERSONS WHO YOU BELIEVE ARE LIKELY TO HAVE DISCOVERABLE INFORMATION RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES, AND PROVIDE A FAIR DESCRIPTION OF THE NATURE OF THE INFORMATION EACH SUCH PERSON IS BELIEVED TO POSSESS.**

1.    **Eric Bensen**
      c/o Todd D. Wozniak
      Holland & Knight LLP
      1180 West Peachtree Street, NW, Suite 1800
      Atlanta, GA 30309
      Telephone: (404) 817-8500

Eric Bensen, who served as the Company's Chief Financial Officer at the time of the transaction at issue in the Complaint ("Transaction"), has knowledge as to his personal purchase of RVR stock, the formation of the RVR, Inc. Employee Stock Ownership Plan ("ESOP" or "Plan"), the retention of Reliance Trust Company ("Reliance") by the Company to serve as the independent trustee of the ESOP, the terms of the Transaction, the events leading up to the Transaction, the proceeds he received as a result of the Transaction, the performance of RVR following the Transaction, the compensation and bonuses he received following the Transaction, and the claims and defenses asserted in this matter.

2.    **Randall Smalley**
      c/o Todd D. Wozniak
      Holland & Knight LLP
      1180 West Peachtree Street, NW, Suite 1800
      Atlanta, GA 30309
      Telephone: (404) 817-8500

Randall Smalley, who served as the Company's Chief Executive Officer at the time of the Transaction, has knowledge as to the formation of the ESOP, the retention of Reliance to serve as the independent trustee of the ESOP, the terms of the Transaction, the events leading up to the Transaction, the proceeds he received as a result of the

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

3

Transaction, the performance of RVR following the Transaction, the compensation and bonuses he received following the Transaction, and the claims and defenses asserted in this matter.

**3.**    **Robert Smalley, Jr.**
c/o Todd D. Wozniak
Holland & Knight LLP
1180 West Peachtree Street, NW, Suite 1800
Atlanta, GA 30309
Telephone: (404) 817-8500

Robert Smalley, Jr., who served as the Company's President at the time of the Transaction, has knowledge as to the formation of the ESOP, the retention of Reliance to serve as the independent trustee of the ESOP, the terms of the Transaction, the events leading up to the Transaction, the proceeds he received as a result of the Transaction, the performance of RVR following the Transaction, the compensation and bonuses he received following the Transaction, and the claims and defenses asserted in this matter.

**4.**    **RVR ESOP Committee Members**
c/o Todd D. Wozniak
Holland & Knight LLP
1180 West Peachtree Street, NW, Suite 1800
Atlanta, GA 30309
Telephone: (404) 817-8500

Members of the RVR ESOP Committee, including Michael Marcine, Michael Smalley, Kevin Bensen, Douglas Doan, and Cory Kauffmann, are likely have knowledge regarding the administration of the ESOP and the performance of RVR post-Transaction. Kevin Bensen and Cory Kauffmann also have additional information regarding due diligence conducted in connection with the potential Transaction.

**5.**    **Representatives of Chartwell Capital Solutions**
c/o Kirsten Schubert
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 492-6755

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

4

Representatives of Chartwell Capital Solutions ("Chartwell"), including Greg Fresh, Will Bloom, and Ted Margarit, are likely to have knowledge as to the financial advisory services it provided to the Company, the Transaction, and due diligence performed in connection with the consideration and then negotiation of a potential Transaction.

**6.    Current and Former Representatives of Reliance Trust Company**
c/o William B. Brockman
Bryan Cave Leighton Paisner LLP
One Atlantic Center
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, GA 30309
Telephone: (404) 572-6600

Current and former representatives of Reliance, including Steve Martin, David Williams, Chris Pitrof, and Bucky Wright, are likely to have knowledge as to the services provided on behalf of the RVR Employee Stock Ownership Plan and Trust under the terms of the Reliance Trust Company April 15, 2014 Engagement Letter and Trust Agreement in connection with the consideration and negotiation of the potential Transaction and the due diligence performed in connection with the same. They also have knowledge of the reasons Reliance selected Stout Risius Ross, Inc. and K&L Gates to serve as its advisors in connection with the potential Transaction and the reasons for same.

**7.    Current and former Representatives of Stout Risius Ross, Inc.**
c/o J. Christian Nemeth
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, Illinois 60606
Telephone: (312) 984-3292

Current and former representatives of Stout Risius Ross, Inc. ("SRR"), including Bob Socol, Matthew Hricko, and Mark Fournier, are likely to have knowledge as to the services provided to Reliance as Trustee of the RVR ESOP and Trust under the terms of the SRR April 15, 2014 Engagement Letter in connection with the potential Transaction, due diligence performed in connection with the same, and the annual valuations of RVR

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

common stock that it performed following the Transaction.

**8.    Representatives of Crowe Horwath**
10 West Broad Street, Suite 1700
Columbus, OH 43215-3454
Telephone: (614) 469-0001

Representatives of Crowe Horwath, including Pete Schuler and Michelle Bowman, are likely to have knowledge as to the potential Transaction and due diligence performed in connection with the same, including pre-Transaction testing.

**9.    Representatives of Wells Fargo Bank and Wells Fargo Advisors, LLC**
2141 Rosecrans Ave., Suite 4100
El Segundo, CA 90245
Telephone: (310) 426-3854

Representatives of Wells Fargo Bank and Wells Fargo Advisors, including James T. Griffin, are likely to have knowledge as to the potential Transaction, due diligence performed in connection with the same, and the financing of the Transaction.

10.    Any non-objectionable witness listed by other parties to this action, including in a party's pre-trial disclosures.

11.    Any individuals identified in any party's responses to written discovery.

Defendants reserve the right to supplement this disclosure as appropriate.

**II.    STATE THE NAMES AND, IF KNOWN, THE ADDRESSES AND TELEPHONE NUMBERS OF ALL PERSONS WHO YOU BELIEVE HAVE GIVEN WRITTEN OR RECORDED STATEMENTS RELEVANT TO ANY PARTY'S CLAMS OR DEFENSES.**

With the exception of notes of witness interviews produced by Plaintiff, the declaration of Charles Curley, Corporate Secretary at Reliance Trust Company, and transcripts of depositions taken in this case, Defendants are not aware of any written or recorded statements.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

6

**III.    LIST THE DOCUMENTS, ELECTRONICALLY STORED INFORMATION ("ESI"), TANGIBLE THINGS, LAND, OR OTHER PROPERTY KNOWN BY YOU TO EXIST, WHETHER OR NOT IN YOUR POSSESSION, CUSTODY OR CONTROL, THAT YOU BELIEVE MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.**

1.  Defendants possess, and Plaintiff has in its possession, the documents produced to the Department of Labor ("DOL") on June 17, 2016 and July 14, 2016 in response to the DOL's request for information regarding the RVR, Inc. ESOP.

2.  Defendants possess, and Plaintiff has in its possession, the bates-labeled documents, RVR000001 – RVR18524, produced to Plaintiff in response to its October 5, 2018 Subpoenas.

3.  All document productions and testimony produced to Plaintiff in connection with its pre-litigation investigation of the Transaction and the ESOP, including any productions by Reliance, Argent Trust, Crowe Horwath, SRR, K&L Gates, McDermott, Will & Emory ("McDermott"), and/or Chartwell.

4.  The ESOP plan document, ESOP Summary Plan Description, and all annual appraisals of the RVR common stock held by the ESOP.

5.  All documents and electronic information produced by the Parties and all non-parties and third-parties in the course of the instant litigation, including but not limited to the productions by Reliance, Chartwell, Argent Trust, SRR, K&L Gates, McDermott, and the Parties' identified expert witnesses.

7

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

IV.    **FOR EACH OF YOUR CLAIMS OR DEFENSES, STATE THE FACTS RELEVANT TO IT AND THE LEGAL THEORIES UPON WHICH IT IS BASED.**

The facts relevant to Defendants' defenses in this action, and the legal theories upon which they are based, include the following:

A.    **Factual Basis of Defenses**

Prior to the Transaction, Defendants Randall Smalley, Robert Smalley, Jr., and Eric Bensen were the sole shareholders of RVR.  Prior to May 28, 2014, Randall Smalley and Robert Smalley, Jr. were the sole members of RVR's Board of Directors ("Board"). On May 22, 2014, the Board (1) approved a resolution to establish the RVR, Inc. ESOP, with an effective date of June 1, 2013, (2) appointed Reliance as the ESOP Trustee, and (3) adopted the ESOP Plan and Trust Agreement.[1]   Bensen joined the Board thereafter on May 28, 2014.[2]

On January 27, 2014, Randall Smalley, Robert Smalley, Jr. and Eric Bensen attended a presentation with Chartwell in which Chartwell provided an overview of its experience and a preliminary pro forma ESOP transaction illustration.   During this meeting, Randall Smalley, Robert Smalley, Jr. and Eric Bensen were advised that Chartwell (1) had "[b]road M&A, ESOP, and Capital Market transaction expertise: 500+ transactions completed"; (2) was a "[l]eading national ESOP and non-ESOP valuation firm" and had more than 400 annual valuation engagements; and (3) had experience representing the sellers, plan sponsor, or the trustee in ESOP transactions and had completed 47 ESOP-related transactions over the last 18 months.   Chartwell also

---

[1]    Pursuant to the Action By Written Consent of the Board of Directors of RVR, Inc. dated May 28, 2014,  the ESOP Committee was designated as the ESOP's Administrator.  The original three members of the ESOP Committee were Randall Smalley, Robert Smalley, Jr. and Eric Bensen.  The ESOP Committee Charter incorrectly states that it was adopted on May 28, 2013 (rather than the correct date of May 28, 2014).

[2]    For ease of reference only, the "Director Defendants" shall mean Randall Smalley, Robert Smalley, Jr. and Eric Bensen.  As stated above, Bensen did not join the RVR, Inc. Board of Directors until May 28, 2014.

8

discussed with Randall Smalley, Robert Smalley, Jr. and Eric Bensen the potential benefits of sponsoring an ESOP.

During this same January 27, 2014 meeting, Chartwell provided Randall Smalley, Robert Smalley, Jr. and Eric Bensen with a preliminary pro forma valuation illustration range. For purposes of illustration and planning purposes only, Chartwell illustrated what a pro forma 100% S-Corp ESOP might look like using an enterprise value of $140 million and an equity value of $100.7 million. Chartwell advised Randall Smalley, Robert Smalley, Jr. and Eric Bensen that the $100.7 million equity value represented a conservative number at the very low end of the fair market equity valuation range (with the high end of the range at $149.3 million) and that the trustee could easily determine a higher equity valuation range.

After educating themselves on ESOPs and the potential benefits associated with ESOPs, including providing additional retirement benefits to employees, increasing morale, and improving the ability to attract and retain talent, the Company determined that it would be appropriate to consider forming an ESOP. Accordingly, the Company decided to retain Chartwell to provide advisory services in connection with the possible formation of an ESOP, among other things, in February 2014.

Based on information provided to them by Chartwell, RVR's outside legal counsel, Greenberg Traurig, and others, RVR and its management team, including Randall Smalley, Robert Smalley, Jr. and Eric Bensen, gained an understanding of the various roles and responsibilities associated with the consideration of a potential ESOP transaction. For example, to ensure an arms-length negotiation and that the interests of the potential ESOP participants were protected, RVR needed to interview and retain an experienced and independent Trustee to negotiate on behalf of the potential ESOP. RVR and its management team, including Randall Smalley, Robert Smalley, Jr. and Eric Bensen, relied on the Company's advisors to identify three qualified independent trustee candidates. Randall Smalley, Robert Smalley, Jr. and Eric Bensen participated in the in-person interviews with all three trustee candidates between March 31 and April 1, 2014.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

9

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

The Company's legal counsel, Greenberg Traurig, and Chartwell also attended these in-person interviews.

During the meetings, the trustee candidates were provided with information regarding the Company and the proposed transaction structure. The trustee candidates were also asked a series of questions relating to their background and experience, experience with transactions similar to the one being considered by RVR, expected due diligence, the process for evaluating the fairness of transactions, how the trustee selects its financial and legal advisors for a transaction and what factors impact the selection, and whether the candidate had sufficient capacity and resources to promptly and timely serve the needs of the ESOP in connection with the potential Transaction.[3]

After careful consideration, RVR (through its Board of Directors) selected Reliance to serve as the ESOP's Trustee on April 4, 2014. Pursuant to an engagement letter dated April 15, 2014, Reliance agreed to perform certain services on behalf of the ESOP in connection with the potential Transaction between the ESOP, RVR, and the Selling Shareholders.[4] To assist it fulfill its responsibilities, Reliance selected and engaged experienced legal counsel, K&L Gates, and an experienced financial advisor, SRR. Randall Smalley, Robert Smalley, Jr. and Eric Bensen did not have any concerns regarding Reliance's selection of these particular advisors and the selection of SRR was

---

[3]    A suggested closing date of May 27, 2014 was discussed with all of the trustee candidates. All of trustee candidates indicated that the proposed time frame would provide them with sufficient time to fully consider, evaluate, diligence, negotiate, and, if appropriate, close the proposed transaction by this proposed close date. Contrary to the DOL's arguments, this was not a hard closing date that was dictated by the Selling Shareholders or the Director Defendants.

[4]    The "Selling Shareholders" are: (1) the Family Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Family Trust"), (2) the Marital Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Marital Trust"), (3) the Survivor's Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Survivor's Trust") (collectively, the "Smalley Trust Defendants"), (4) Robert Smalley, Jr.; and (5) Eric Bensen. Randall Smalley was not a Selling Shareholder.

not surprising given that all three trustee candidates indicated that SRR was an experienced and qualified financial advisor during their respective interviews.[5]

RVR and its management team, including Randall Smalley, Robert Smalley, Jr. and Eric Bensen, had every reason to believe that Reliance fulfilled its responsibilities under the April 15, 2014 Engagement Letter because, among other things: (1) Reliance retained experienced legal counsel and an experienced financial advisor to assist it evaluate the potential Transaction; (2) Reliance, Reliance's counsel and Reliance's financial advisor engaged in extensive due diligence in connection with the potential Transaction; (3) Reliance and its advisors repeatedly asked questions about the information contained in the due diligence data room, which reflected that the information and documents were being reviewed, analyzed and scrutinized; (4) Reliance engaged in multiple rounds of negotiations on behalf of the ESOP before Reliance, acting as Trustee of the ESOP, RVR, and the Selling Shareholders agreed to the terms of the Stock Purchase Agreement; and (5) although they did not have copies of the valuations prepared by SRR for the benefit of Reliance, they knew that the agreed upon purchase price was at the low end of the preliminary fair market value range illustration prepared by Chartwell (a range which, itself, was known to be too low because, among other things, it did not include the updated April 30, 2014 income statement projections and because the projections were by everyone's account very conservative).

The purchase price paid by the Trust for the RVR stock was at or below the stock's fair market value. As a result, Reliance did not cause the Plan or the Trust to pay more than adequate consideration for the RVR stock at issue. Additionally, none of the

---

[5] Immediately upon being retained, Reliance, through its advisors, sent a 25 page list of requested due diligence on the Company to Chartwell on April 15, 2014. Additional information regarding the Company was shared with Reliance and Reliance's advisors during the April 15 and April 16, 2014 in-person meetings with RVR and Chartwell. The due diligence data room was made available to Reliance's legal counsel and Reliance's financial advisor on April 17, 2014. Additional information regarding the due diligence conducted is available in the documents produced by RVR, Chartwell, SRR, and K&L Gates, including the entire contents of the due diligence data room. Additional information regarding due diligence is set forth on the attached Exhibit A.

11

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Director Defendants nor Selling Shareholders had any reason to believe that to be the case and none of them had any actual or constructive knowledge of any alleged breach of fiduciary duty or prohibited transaction. To the contrary, the Director Defendants and Selling Shareholders (a) relied on the advice of professionals experienced in ESOP transactions, including Chartwell and Company counsel, Greenberg Traurig, to ensure that the potential transaction followed a legally-complaint process, (b) knew that Reliance was a qualified and experienced independent trustee that had not ever been sued by the Department of Labor, (c) knew that Reliance had retained qualified and experienced advisors, and (d) were aware that Reliance and its advisors conducted significant due diligence prior to engaging in multiple rounds of negotiations that led to the ESOP Trust buying 100% of RVR's stock at or below fair market value.

Moreover, prior to signing the closing documents, the Director Defendants and the Selling Shareholders were aware that SRR had determined that the purchase price paid by the Trust for the RVR stock was at or below the stock's fair market value and the Transaction was fair to the Plan from a financial point of view. Indeed, the Stock Purchase Agreement itself provides on page one, among other things, that "the Trust has received an opinion from its independent financial advisors reflecting that: (i) the consideration paid for the shares of the Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")….and (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view." Additionally, in the Trustee Certificate, Reliance certified that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill prudence and diligence that a prudent person, acting in a like capacity and familiar with

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

12

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms."

K&L Gates also provided a written opinion dated May 28, 2014 that stated that the "acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code." K&L Gates' opinion letter on the Transaction's compliance with the law is consistent the written opinion provided by Greenberg Traurig. (*See* May 28, 2014 Letter from Greenberg Traurig to Wells Fargo Bank, National Association and Reliance Trust Company which stated, among other things, that the "execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties [defined as RVR, Cruise America, and Cruise Canada] will not violate any applicable law, rule or regulation affecting such Opinion Party."). Additional representations and certifications provided in connection with the ESOP Transaction are set forth on pages 18-19 of the Expert Report of Edward Wilusz, dated September 17, 2021.

In addition to the foregoing, Defendants incorporate by reference their Responses to Plaintiff's Interrogatories and any amendments and supplements to the same, as well as the Expert Report of Edward Wilusz dated September 17, 2021, Mr. Wilusz's Rebuttals to Dr. Wazzan and Charles Wert dated October 15, 2021, the Expert Report of Jeffrey S. Tarbell, ASA, CFA dated September 17, 2021, the Rebuttal Report of Jeffrey S. Tarbell, ASA, CFA dated October 15, 2021, the Expert Report of Paul Trost dated September 17, 2021 and the Rebuttal Reports of Paul Trost dated October 15, 2021.

**B.     Legal Basis of Defenses**

As Defendants understand it, Plaintiff is asserting the following ERISA claims against the Director Defendants: (1) breach of fiduciary duty to monitor Reliance in violation of ERISA §§ 404(a)(1)(A), (B), and (D); and (2) breach of co-fiduciary duties due to the Director Defendants' alleged (a) knowing participation in Reliance's breach

13

of its fiduciary duty in violation of ERISA § 405(a)(1), (b) enabling of Reliance to breach its fiduciary duties to the ESOP in violation of ERISA § 405(a)(2), and (c) failure to make reasonable efforts to remedy Reliance's alleged breach of fiduciary duty in violation of ERISA § 405(a)(3).  Additionally, Plaintiff is asserting a claim for non-fiduciary liability against the Selling Shareholders for knowingly participating in Reliance's alleged non-exempt prohibited transaction.[6]

All of these derivative claims fail as a matter of law because Reliance did not cause the RVR Employee Stock Ownership Plan Trust ("Trust") to pay more than adequate consideration for the RVR stock and Reliance did not otherwise violate its fiduciary duties in connection with the Transaction.  *See, e.g., White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137, at *22 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (duty to monitor claim is derivative of fiduciary duty claim); *In re Disney ERISA Litig.*, No. CV 16-2251 PA (JCX), 2016 WL 8192945, at *4 (C.D. Cal. Nov. 14, 2016) (co-fiduciary liability claim is derivative of fiduciary duty claim); *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (claim against non-fiduciary requires, among other things, establishment of a non-exempt prohibited transaction by a fiduciary).

Plaintiff's claims also fail because the Director Defendants were not on notice of any facts that would suggest that Reliance failed to perform its responsibilities or acted in any manner that would violate ERISA.  *See, e.g.*, *Mellot v. ChoicePoint, Inc.*, 561 F. Supp. 2d 1305, 1316 (N.D. Ga. 2007) (dismissing failure to monitor claim where complaint failed to allege that "Defendants had notice of any appointee conduct that would warrant removal"); *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 904 (S.D. Tex. 2004) (same); *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind.

_____

[6] In the Complaint, Plaintiff describes the claims in Count V as ones for knowing participation in Reliance's breaches of fiduciary duty.  Such claims are not recognized under the law.  *See, e.g.*, *Reich v. Rowe*, 20 F.3d 25, 31 (1st Cir. 1994); *Reich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994); *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 322 (2d Cir. 2003).  As such, Defendants treat the claims against the Selling Shareholders as being based on their alleged knowing participation in Reliance's alleged non-exempt prohibited transaction.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

14

1991) (liability for a failure of the duty to monitor arises only where an appointing fiduciary was on notice of "possible misadventure by their appointees"). Moreover, Bensen was not a Board member until May 28, 2014. As such, he cannot be liable for any alleged fiduciary breach occurring prior to May 28, 2014.

Robert Smalley, Randall Smalley, and Eric Bensen had every reason to believe that Reliance – a professional trustee hired to bring independence to the proposed Transaction – complied with all of its fiduciary obligations. Among other things, Robert Smalley, Randall Smalley, and Eric Bensen (1) were aware that Reliance had experience acting as an independent fiduciary in circumstances similar to those at issue here before the Company retained Reliance to act as an independent Trustee for the ESOP; (2) knew that Reliance engaged SRR as an experienced, independent appraiser and financial advisor to assist Reliance in determining the fair market value of the RVR stock being purchased by the Plan and the overall fairness of the Transaction to the Plan; (3) knew that Reliance engaged experienced, independent legal counsel, K&L Gates, to advise it in connection with the potential Transaction; (4) participated in face-to-face and/or telephonic meetings with Reliance and/or SRR in which RVR's operations, past performance and future outlook were discussed; (5) caused Chartwell, the Company's financial advisor, and Company employees to provide all relevant information to Reliance, K&L Gates, and SRR; (6) maintained regular contact with Chartwell and Company employees to ensure that Reliance was following appropriate processes and that any questions that Reliance or its advisors had were being timely answered; (7) knew that Chartwell and other Company advisors were participating in multiple rounds of negotiations with Reliance before reaching a deal; and (8) knew that Reliance had represented, among other things, that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill prudence and diligence that a prudent person, acting in a like capacity and familiar

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

15

with such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms."

Additionally, the DOL requires that the trustee negotiating an ESOP transaction be independent of the selling shareholders and the employer sponsoring the plan, and engage in good faith, arms-length negotiations with the selling shareholders.  *See, e.g.,* Prop. DOL Reg. § 2510.3-18, 53 Fed. Reg. 17632, 17637 (May 17, 1988) ("In considering all relevant facts and circumstances, the Department will not view a fiduciary as having acted in good faith unless (A) The fiduciary has arrived at a determination of fair market value by way of a prudent investigation of circumstances prevailing at the time of the valuation, and the application of sound business principles of evaluation; and (B) The fiduciary making the valuation … is independent of all parties to the transaction"); *Solis v. Webb,* 931 F. Supp. 2d 936, 947 (N.D. Cal. 2012) (*citing Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002) (holding that during an initial acquisition of employer stock, "ERISA explicitly requires the plan's fiduciaries to ensure that the stock is purchased for 'adequate consideration' by conducting an independent investigation to determine the fair market value of the to-be-acquired securities")); *see also M & R Inv. Co., Inc. v. Fitzsimmons,* 685 F.2d 283, 287 (9th Cir. 1982) ("The party-in-interest prohibitions act to insure arm's-length transactions by fiduciaries of funds subject to ERISA"). Given these requirements, it is not surprising that Robert Smalley, Jr., Randall Smalley, and Eric Bensen did not have intimate knowledge of all of the internal work being performed by Reliance (or Reliance's advisors) in connection with its engagement.

Plaintiff's co-fiduciary liability claims against Robert Smalley, Randall Smalley, and Eric Bensen also fail for the separate reason that they could not have participated as a fiduciary in Reliance's breach of its duty of loyalty or prudence because Reliance had the exclusive responsibility of representing the ESOP and the authority to negotiate and execute a stock transaction of behalf of the ESOP and ESOP Trust.  Robert Smalley, Randall Smalley, and Eric Bensen had no authority to, and did not, represent the ESOP

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

16

or ESOP Trust in connection with the Transaction at issue and, as such, are not properly considered to be co-fiduciaries with Reliance. *See, e.g.*, *Pegram v. Hedrich*, 530 U.S. 221, 226 (2000) ("[T]he threshold question [of the functional fiduciary approach] is . . . whether [the] person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint."). Plaintiff's co-fiduciary liability claims against Robert Smalley, Randall Smalley, and Eric Bensen also fail because there is no evidence to support Plaintiff's contention that any of these Defendants had the requisite knowledge to be held liable for any purported breach by Reliance and did not participate in, conceal, any violation of ERISA or take any action to enable a breach by Reliance.

Plaintiff's claim that the Selling Shareholders are liable as non-fiduciaries for knowingly participating in Reliance's alleged prohibited transactions fares no better as there is no evidence to support Plaintiff's contention that any of the Selling Shareholders knew or should have known that Reliance engaged in a prohibited transaction for which no exemption exists under ERISA. The failure to establish the requisite knowledge is fatal to Plaintiff's non-fiduciary claims against the Selling Shareholders. *See Harris Tr.*, 530 U.S. at 251 (non-fiduciary liability requires a showing that the non-fiduciary knew or should have known of the circumstances that rendered the transaction unlawful); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, No. 17-cv-07243-BLF, 2019 U.S. Dist. LEXIS 216085, at *18-20 (N.D. Cal. Dec. 16, 2019) (dismissing claims against non-fiduciary where plaintiff failed to allege facts sufficient to show defendant's knowledge of the alleged non-exempt prohibited transaction); *Kalan v. Farmers & Merchants Tr. Co. of Chambersburg*, No. CV 15-1435, 2016 U.S. Dist. LEXIS 72135, at *1 (E.D. Pa. June 2, 2016) (dismissing claim against non-fiduciary because alleging that defendant "knew" the actions were wrongful is insufficient and the "Court cannot speculate or supply facts that would have put [defendant] on notice of the wrongfulness of the payment," which allegedly resulted in a non-exempt prohibited transaction). Additionally, this claim fails as a matter of law against Randall Smalley as Randall

17

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Smalley was not a Selling Shareholder and, as such, he cannot be held liable as a non-fiduciary for knowingly participating in an allegedly non-exempt prohibited transaction. The claims against the Selling Shareholders also fail for the separate reason that Plaintiff is not seeking "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3). *See, e.g.*, *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 665 (9th Cir. 2019) (judgment in favor of selling shareholders on knowing participation in a prohibited transaction claim where plaintiff cannot trace plan assets to the selling shareholders).

Finally, the request for a declaration that the indemnification provisions of the Plan are void as to the Director Defendants should be denied because the Director Defendants did not engage in any violations of ERISA and will not be reimbursed for any established violations of ERISA from Plan assets. *See* 29 U.S.C. § 1110 (indemnification provisions are only void to the extent they cause the plan to indemnify breaching fiduciaries out of plan assets); *Harris v. GreatBanc Trust Co.*, No. EDCV12–1648–R (DTBx), 2013 WL 1136558, *2-4 (C.D. Cal. Mar. 15, 2013) (granting motion to dismiss claim to void agreement indemnifying fiduciaries); 29 C.F.R. § 2510.3–101(h)(3) (establishing that corporate assets are not plan assets where the plan is an ESOP). Indeed, the Plan precludes any indemnification to the extent it would violate the law. *See* Plan at §§ 12.6, 12.14. Moreover, no Defendant has received indemnification under the terms of the Plan so declaratory relief is both unnecessary and unavailable.

Finally, to the extent that Plaintiff had actual knowledge of the facts supporting its ERISA breach of fiduciary duty claims more than three years prior to the initiation of this litigation, Plaintiff's claims are time-barred by 29 U.S.C. § 1113(2). Plaintiff's other claims may also be barred by the applicable statute of limitations and/or repose.

**V.    PROVIDE A COMPUTATION OF EACH CATEGORY OF DAMAGES CLAIMED BY YOU, AND A DESCRIPTION OF THE DOCUMENTS OR OTHER EVIDENTIARY MATERIAL ON WHICH IT IS BASED, INCLUDING MATERIALS BEARING ON THE NATURE AND EXTENT OF THE INJURIES SUFFERED.**

Defendants are not currently seeking damages in this case. However, Defendants will seek recoverable costs pursuant to Federal Rules of Civil Procedure 54(d) and attorneys' fees pursuant to 28 U.S.C. § 2412(d)(1)(A).

## VI.   **SPECIFICALLY IDENTIFY AND DESCRIBE ANY INSURANCE OR OTHER AGREEMENT UNDER WHICH AN INSURANCE BUSINESS OR OTHER PERSON OR ENTITY MAY BE LIABLE TO SATISFY ALL OR PART OF A POSSIBLE JUDGMENT IN THE ACTION OR TO INDEMNIFY OR REIMBURSE A PARTY FOR PAYMENTS MADE BY THE PARTY TO SATISFY THE JUDGMENT.**

With the exception of indemnification agreements, Defendants are not aware of any insurance or other agreements under which a non-party may be liable in this action.

Defendants reserve the right to supplement this response as appropriate.

RESPECTFULLY SUBMITTED this 11th day of January, 2022.

By:   */s/ Todd D. Wozniak*
Todd D. Wozniak (*pro hac vice*)
Lindsey R. Camp (*pro hac vice*)
Adrianna Griego Gorton

*Attorneys for Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc.*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

19

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

## CERTIFICATE OF SERVICE

☒   I hereby certify that on January 11, 2022, I served the attached document by E-Mail to the following:

Isidro Mariscal
Eric C. Lund
Brendan Ballard
U.S. Dept. of Labor, Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
mariscal.isidro@dol.gov
lund.eric@dol.gov
ballard.brendan@dol.gov
*Attorneys for Plaintiff*

Jessica R. Maziarz
Gregory B. Ianelli
Bryan Cave Leighton Paisner LLP – Phoenix, AZ
1 N. Central Avenue, Suite 2100
Phoenix, AZ 85004
Jessica.maziarz@bclplaw.com
Gregory.ianelli@bclplaw.com

William B. Brockman
Bryan Cave Leighton Paisner LLP – Atlanta, GA
One Atlantic Center
1201 W. Peachtree Street, NW, 14th Floor
Atlanta, GA 30309
Bard.brockman@bclplaw.com

Meredith P. Jacobowitz (*pro hac vice*)
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102
meredith.jacobowitz@bclplaw.com

*Attorneys for Defendant Reliance Trust Company*

By: */s/ Lindsey R. Camp*

20

**Exhibit A: Non-Exhaustive Summary of RVR's Due Diligence[1]**

| Date | Event |
| --- | --- |
| 1/13/14 | Conference call with Eric Bensen ("Bensen"), Chartwell (including Will Bloom, Greg Fresh, Stephanie Geerdes, and Ted Margarit), Wells Fargo Advisors (Jim Griffin) and Wells Fargo Bank (Ivan Ferraz and Jennifer Clack) discussing Chartwell's services, experience, and capabilities; some of the reasons why companies sponsor ESOPs; succession planning; and an overview of RVR's business. |
| 1/15/14 | Conference call with Bensen, Chartwell and Wells Fargo discussing RVR's business and the RV industry. |
| 1/22/14 | Conference call with Bensen and Ivan Ferraz with Wells Fargo Bank to walk through pro forma transaction assumptions and potential loan terms. |
| 1/27/14 | Chartwell makes an in-person presentation about its services, experience, and capabilities to Bensen, Randall Smalley ("Smalley"), and Robert Smalley, Jr. ("Smalley, Jr."). |
| 2/5/14 | Bensen participates in follow-up phone call with Chartwell (including Greg Fresh, Stephanie Geerdes, and Ted Margarit), Wells Fargo Advisors (Jim Griffin) and Wells Fargo Bank (Ivan Ferraz and Jennifer Clack) to discuss ESOP transaction process overview, negotiation process, regulatory process, and pro forma illustration assumptions. |
| 2/12/14 | Bensen notifies Chartwell of RVR's decision to move forward with exploring a potential ESOP formation transaction and discusses the proposed process and estimated timeline. Bensen receives engagement letter and preliminary due diligence list from Chartwell. |
| 2/14/14 | Following a call between Chartwell and Bensen on February 13, 2014, the draft process calendar was revised to allow for additional time for the ESOP trustee to conduct due diligence and negotiate any agreements or documents. |
| 2/18/14 | Kevin Bensen and Bensen attend an in-person organizational kick-off meeting with Chartwell.  Chartwell recommends that RVR interview three well-qualified, independent, professional ESOP trustees to represent the proposed ESOP Trust in connection with a potential ESOP transaction. Chartwell identifies three such trustee candidates for RVR to consider. |

---

[1]    This is a non-exhaustive summary of communications and meetings in which RVR or its advisors participated, or about which RVR had contemporaneous knowledge, in connection with the ESOP exploration process.

| Date | Event |
|---|---|
| 2/20/14 | Conference call between Bensen and Chartwell to discuss due diligence and logistics and to approve Chartwell coordinating its efforts with RVR's outside legal counsel, Greenberg Traurig ("GT"), and RVR's auditor, BDO. Calendar of upcoming process steps shared with Smalley, Smalley, Jr. and Bensen. |
| 2/24/14 | Bensen sends previously created 2012 and 2013 RVR financial forecasts to Chartwell and Wells Fargo. |
| 2/26/14 | Conference call with Bensen and Kevin Bensen as well as Chartwell (including Greg Fresh, Stephanie Geerdes, Lindsey Guillickson, and Ted Margarit) and Wells Fargo Advisors (Jim Griffin) regarding due diligence, ESOP trustee candidates (Reliance, GreatBanc, and Alerus Financial), and high priority diligence items. Bensen provides Wells Fargo and Chartwell with data relating to RVR's forecasting and bookings and receives an update on potential loan terms. |
| 2/27/14 | As Chief Financial Officer of RVR, Bensen executes engagement letter with Chartwell on behalf of RVR. |
| 2/28/14 | Chartwell confers with Bensen regarding employee workforce due diligence. |
| 3/3/14 | Chartwell provides Kevin Bensen and Bensen profiles of three potential ESOP trustee candidates: Reliance (Steven Martin), Alerus Financial (Richard Joseph), and GreatBanc (Kevin Kolb). |
| 3/4/14 | Chartwell provides updated preliminary pro forma illustration and transaction structure to Kevin Bensen and Bensen that includes their feedback and changes proposed by Wells Fargo. |
| 3/5/14 | Bensen participates in due diligence conference call with Chartwell (including Greg Fresh, Stephanie Geerdes, and Ted Margarit), which includes a discussion of professional trustee interviews and high priority due diligence items. At Bensen's request, Chartwell sends profiles of the ESOP trustee candidates to Andrew Gibson at BDO for feedback, which Gibson provides the next day. RVR also discusses the three trustee candidates with its other advisors, including Marc Baluda of GT. |
| 3/6/14 | Conference call between Greg Fresh and Stephanie Geerdes of Chartwell, Shane Orr and Andy Gibson of BDO, and Marc Baluda of GT regarding structures of a potential transaction. |

| Date | Event |
|---|---|
| 3/7/14 | RVR signs services agreement with Crowe Horwath for ESOP design structuring and pre-transaction testing services.  All three ESOP trustee candidates execute mutual non-disclosure agreements with Chartwell regarding the ESOP exploration process. |
| 3/5/14 – 3/11/14 | Chartwell has meetings with all three ESOP trustee candidates regarding RVR and its business. |
| 3/10/14 | Conference call between Chartwell (Stephanie Geerdes), BDO (Shane Orr and Andy Gibson), and GT (Marc Baluda) regarding financing options for a potential transaction and due diligence; Chartwell emails Kevin Bensen and Bensen additional due diligence requests to populate a data room. |
| 3/11/14 | Cory Kauffmann ("Kauffmann") provides 401(k) due diligence to Stephanie Geerdes of Chartwell and copies Bensen and Kevin Bensen on the email correspondence; conference call between Chartwell (Stephanie Geerdes, Greg Fresh and Crowe Horwath (Pete Schuler and Hugh Reynolds) discussing potential Plan design and potential transaction structures and loan structure. |
| 3/12/14 | Conference call with Bensen, Kauffmann and Chartwell (Stephanie Geerdes, Ted Margarit, and Greg Fresh) regarding trustee interview logistics and Chartwell's due diligence requests, including business updates, projections, and employment contracts.  Bensen also provides update on his call with Shane Orr of BDO regarding vehicle tax consideration and financing arrangements with certain Company vendors, including Ford and Thor. |
| 3/13/14 | Conference call between Greg Fresh and Stephanie Geerdes of Chartwell, Shane Orr and Andy Gibson of BDO, and Marc Baluda of GT regarding potential financing and structures of potential ESOP formation transaction and additional due diligence questions for ESOP trustee candidates. |
| 3/14/14 | Bensen emails Greg Fresh of Chartwell information regarding audited financial records and financial forecasts. |
| 3/17/14 | Conference call between Stephanie Geerdes and Greg Fresh of Chartwell, Jim Griffin of Wells Fargo Advisory and Jennifer Clack and Ivan Ferraz of Wells Fargo Bank regarding potential transaction structures and financing options. |
| 3/19/14 | Conference call between Chartwell and Bensen, Kevin Bensen, and Kauffmann regarding outstanding due diligence requests, projections, business updates, and upcoming interviews of potential ESOP trustee candidates; following call, Ted Margarit of Chartwell emails Kauffmann, |

3

| Date | Event |
|---|---|
|  | Kevin Bensen, and Bensen draft list of questions for proposed trustee interviews. |
| 3/20/14 | Bensen emails Greg Fresh of Chartwell and Ivan Ferraz of Wells Fargo Bank updated financial forecasts, balance sheets and projections and copies Kevin Bensen and Kauffmann.  Kevin Bensen sends Greg Fresh 2013 audited financial statement and copies Bensen on same. |
| 3/23/14 | Bensen requests and receives from Stephanie Geerdes of Chartwell additional biographies of the ESOP trustee candidates. |
| 3/24/14 | Bensen receives and comments on a draft presentation sent by Ted Margarit of Chartwell to RVR's Board of Directors; call with BDO (Shane Orr) and Stephanie Geerdes and Greg Fresh of Chartwell regarding payroll and tax due diligence. |
| 3/25/14 | Stephanie Geerdes of Chartwell has call with Hugh Reynolds of Crowe Horwath regarding possible Plan structures; conference call with Bensen and Stephanie Geerdes regarding financing and Canadian due diligence; Bensen forwards latest draft management presentation to Kevin Bensen and Kauffmann for review and comment. |
| 3/26/14 | Chartwell presentation to Smalley, Smalley, Jr. and Bensen regarding status of ESOP exploration process, proposed transaction structure, status of due diligence requests for data room to be made available to trustee, and anticipated next steps. |
| 3/27/14 | ESOP trustee candidates provided with additional information regarding RVR and questions that the candidates should be prepared to answer during upcoming interviews. |
| 3/28/14 | Bensen requests and receives from Stephanie Geerdes of Chartwell the biographies of the ESOP trustee candidates and firm profiles and forwards to Smalley, Smalley, Jr., Kauffmann, and Kevin Bensen. Stephanie Geerdes provides Bensen with an updated due diligence list identifying items provided to date and the next highest priority items to provide for data room, Bensen forwards the list to Kauffmann and Kevin Bensen. |
| 3/31/14 | Bensen, Smalley, Smalley, Jr., Chartwell, including Stephanie Geerdes, and Mark Baluda of GT conduct in-person interviews of Steve Martin and Bucky Wright of Reliance and Richard Joseph and Nels Carlson of Alerus Financial. Among other things, Reliance describes its 30 years of experience performing ESOP Trustee work, its fiduciary committee experience, and advises that it conducts more than 20 ESOP transactions per year. |

4

| Date | Event |
|---|---|
| 4/1/14 | Bensen, Smalley, Smalley, Jr., Chartwell and Marc Baluda of GT conduct an in-person interview of Kevin Kolb of GreatBanc; Kauffmann provides Stephanie Geerdes with information regarding corporate owned and leased facilities. |
| 4/2/14 | Conference call with Chartwell (Lindsey Guillickson, Ted Margarit, and Stephanie Geerdes), Kauffmann, Bensen, and Kevin Bensen regarding due diligence, including RVR's financials, benefit plans, fleet management, customer targets, trends and marketing, and company organization, and strengths of company; Kevin Bensen provides Bensen with additional information requested by Chartwell on its due diligence list; Kauffmann provides Stephanie Geerdes with a list of key competitors with estimated market share and copies Kevin Bensen on the same; Kauffmann also provides Stephanie Geerdes with information relating to RVR's 401(k) plan. |
| 4/3/14 | Ted Margarit of Chartwell emails Bensen the proposals received from Reliance, Alerus Financial and GreatBanc for review and Bensen forwards to Smalley and Smalley, Jr.  Stephanie Geerdes and Ted Margarit of Chartwell have conference call with Crowe (Pete Schuler and Hugh Reynolds) regarding possible deal financing and Plan structure. |
| 4/4/14 | Conference call with Bensen and Chartwell (Ted Margarit and Stephanie Geerdes) and Marc Baluda of GT discussing Smalley's, Smalley, Jr.'s and Bensen's opinions of the ESOP trustee candidates and basis for same and Chartwell and GT's thoughts regarding the same as well as proposed engagement letters.  The parties also discussed the fact that all three of the ESOP trustee candidates indicated that, if selected, they would want to engage one of the same two valuation firms, one of which was SRR.  RVR selects Reiance to serve as the ESOP Trustee. Steve Martin of Reliance is notified of Reliance's selection as trustee to represent the soon-to-be-formed Trust for the potential ESOP transaction; Kauffmann advises Chartwell that he has added files to the data room, including documents relating to rental revenue by location and vehicle class for the years 2008-2013 and Form 10K. |
| 4/7/14 | Ted Margarit of Chartwell sends Bensen a summary of the advisors Reliance indicated it planned to engage to advise it, along with Chartwell's view of the proposed advisors.  RVR discusses the proposed advisors with its advisors and later informs Reliance it has no concerns with the advisors Reliance proposes to engage to assist it evaluate and negotiation a potential ESOP transaction. |
| 4/10/14 | Lindsey Guillickson sends in-person trustee meeting agenda to Steve Martin and Bucky Wright of Reliance, Mark Fournier and Bob Socol of SRR, and Allison Wilkerson and Erin Turley of K&L Gates. |

5

| Date | Event |
|------|-------|
| 4/11/14 | Conference call with Stephanie Geerdes and Ted Margarit of Chartwell, Marc Baluda of GT and Shane Orr of BDO regarding potential transaction financing; Greg Fresh, Stephanie Geerdes, Will Bloom and Ted Margarit of Chartwell have conference call with Marc Baluda and Michael Aguirre of GT regarding Wells Fargo loan term sheet and commitment letter; Kevin Bensen provides Chartwell with additional information regarding fleet size and copies Bensen and Kauffmann; Kauffman provides Bensen with 2013 Reservations by Country and Bensen forwards the same to Stephanie Geerdes. |
| 4/14/14 | Stephanie Geerdes and Ted Margarit of Chartwell have a conference call with Shane Orr of BDO regarding financial due diligence; Bensen has conference call with Chartwell and Wells Fargo regarding financing; draft management presentation emailed to Bensen, Kauffmann, and Kevin Bensen for review and comment; Bensen forwards to Smalley and Smalley, Jr. for additional review and comment. Kevin Bensen provides Bensen with comments on the presentation the same day. |
| 4/15/14 | Erin Turley of K&L Gates provides Ted Margarit and Greg Fresh of Chartwell with combined due diligence list on behalf of SRR and Reliance; RVR has working dinner with Reliance, Chartwell, and K&L Gates. |
| 4/16/14 | In-person management presentation made to Reliance, K&L Gates, and SRR by Chartwell and RVR management; Stephanie Geerdes of Chartwell send a copy of the presentation slide deck to Michael Poteracki of SRR the following day. |
| 4/17/14 | Chartwell gives K&L Gates and SRR access to due diligence data room; SRR begins downloading documents from the due diligence data room the same day. |
| 4/21/14 | Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell present initial offer with proposed ESOP formation transaction term sheet to Steve Martin and Bucky Wright of Reliance, Erin Turley and Allison Wilkerson of K&L Gates, Bob Socol of SRR and Marc Baluda of GT; Ted Margarit emails the term sheet to Steve Martin, Erin Turley, Allison Wilkerson, Bob Socol, Mark Fournier, Matthew Hricko, Marc Baluda and Michael Aguirre; Chartwell opens populated due diligence data room to Reliance; Kevin Bensen sends first quarter financials to Greg Fresh and copies Bensen on same. Stephanie Geerdes provides an updated Trustee due diligence request to Bensen which gets forwarded to Kevin Bensen and Kauffmann. |

6

| Date | Event |
|------|-------|
| 4/22/14 | Bensen provides additional due diligence materials to Chartwell, including shareholder notes, corporate organization documents, and employment agreements, for addition to the data room; Steve Martin of Reliance begins reviewing due diligence by this date; Kevin Bensen provides Stephanie Geerdes with additional information for due diligence room, including, information regarding CAT joint venture, information on revenue and fleet counts by region, and a summary of pending of threatened disputes/litigation involving RVR and amounts in excess of $50,000; Kauffmann provides Stephanie Geerdes with documents relating to Cruise Canada corporate formation. |
| 4/23/14 | Conference call with Stephanie Geerdes and Ted Margarit of Chartwell, Kauffmann, Bensen and Kevin Bensen discussing reaction to initial term sheet, potential structure of ESOP formation transaction and Plan; Kauffmann uploads information into the data room and Hricko and other members of Trustee advisors are advised of the same. |
| 4/24/14 | Kevin Bensen provides Chartwell with additional information regarding RVR's accounts receivable and payable. |
| 4/25/14 | Following its review of items in the date room, SRR provides Stephanie Geerdes of Chartwell with additional due diligence questions regarding RVR's expenses, accrued liabilities, 2013 and 2014 financials and tax withholdings; these questions are forwarded by Stephanie Geerdes to Bensen, Kevin Bensen, and Cory Kauffman; Bensen provides response to same; Marc Baluda of GT emails Betsy Purdue of Morgan Lewis and Bensen comments on Wells Fargo loan commitment letters; Kauffmann advised that Stephanie Geerdes posted an updated due diligence list; Kauffmann advises Stephanie Geerdes in response to additional due diligence questions that there are no agreements for rights to sell or purchase facilities and no zoning compliance issues. |
| 4/28/14 | Matthew Hricko of SRR emails Greg Fresh of Chartwell additional questions regarding historical performance of Cruise America; conference call between Marc Baluda and Michael Aguirre of GT, Erin Turley and Allison Wilkerson of K&L Gates, and Ted Margarit and Stephanie Geerdes of Chartwell regarding legal due diligence, including potential plan structure, employment agreements, and amendment of articles of incorporation. |

7

| Date | Event |
|------|-------|
| 4/29/14 | Conference call between Bensen, Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell, and Marc Baluda of GT regarding SARs plan and employment contracts; Ted Margarit of Chartwell emails Bensen draft SARS plan and employment contract amendments for review; Bensen, Kevin Bensen, and Kauffmann are advised SRR has additional follow up questions following SRR's review of due diligence materials. |
| 4/30/14 | Conference call with Stephanie Geerdes and Ted Margarit of Chartwell and Bensen discussing, among other things, Crowe's benefit plan analysis, potential transaction financing and management incentive plan (SARs). Chartwell provides SRR requested due diligence regarding RVR's Canadian fleet history, ten year projections as to fleet size, rental rates history for five years, utilization data, and property sale in 2010.  Reliance also provided with updated Income Statement Projection; SRR and Reliance notified that Bensen is working on responding to follow up diligence requests. |
| 5/1/14 | Stephanie Geerdes of Chartwell emails Kauffmann, Bensen, and Kevin Bensen with updated due diligence request list sent by K&L Gates with notes as to documents provided and potentially outstanding.  Stephanie Geerdes of Chartwell provides Matthew Hricko, Mark Fournier and Michael Poteracki of SRR with a revised income statement projection based on the strength of the year-to-date reservations and WACC buildup model. Chartwell and SRR have a call on the same day to discuss the revised projection. Reliance asks Chartwell questions regarding the potential management incentive (SARs) plan; conference call between Chartwell and SRR regarding DCF valuation assumptions and inputs; conference call with Ted Margarit of Chartwell, Bensen, Pete Schuler of Crowe, and Brandon Feingold of GT regarding plan design. |
| 5/2/14 | Communications between Ted Margarit of Chartwell and Steve Martin Reliance regarding potential management incentive (SARs) plan. K&L Gates, SRR, Reliance and Chartwell exchange correspondence regarding additional due diligence; Kevin Bensen provides Chartwell with additional information on trademarks and intellectual property and copies Bensen and Kauffmann. Kevin Bensen requested and received this information from Michael Smalley. |
| 5/3/14 | Kevin Bensen emails Chartwell information regarding fleet utilization and rental revenue and copies Kauffmann and Bensen on same in response to SRR request for additional information on those topics; the next day, , Stephanie Geerdes notifies Kevin Bensen, Kauffmann, and Bensen that this information has been uploaded to the data room. |

8

| Date | Event |
|---|---|
| 5/4/14 | Stephanie Geerdes emails Bensen, Kevin Bensen, and Kauffmann a list of high-priority legal diligence from K&L Gates, including copies of insurance policies and information regarding benefit plans; benefit plan information, insurance policies, and environmental disclosure posted to data room the next day. |
| 5/5/14 | Conference call between Stephanie Geerdes of Chartwell, Michael Aguirre and Jane Kim of GT and Erin Turley and Allison Wilkerson of K&L Gates regarding due diligence, financing, and potential transaction counter-offer. Reliance makes a counter-proposal to Chartwell.  Chartwell advised that SRR's analysis was discussed with Reliance and K&L Gates and issues regarding differences in depreciation between Chartwell's and SRR's forecast were laid out.  Stephanie Geerdes provides Marc Baluda, Michael Aguirre and Jane Kim of GT additional information regarding Reliance's counter-proposal; Stephanie Geerdes of Chartwell advises Bensen, Kevin Bensen, and Kauffmann that SRR had additional RVR due diligence questions following a review of the information regarding rental revenue uploaded over the weekend relating to reconciliation of fleet inventory summaries with annual capex and monthly balance sheet projection for 2014. Kevin Bensen responded to the questions later the same day and copied Bensen and Kauffmann on the responses. Stephanie Geerdes forwards this information to Michael Poteracki of SRR. |
| 5/6/14 | Chartwell communicates with Reliance regarding counter-offer and understanding the differences in accounting treatment and valuation methodology that SRR used for counter-offer.  Chartwell prepares summary of the initial offer and Reliance's counter-offer for RVR.  Kevin Bensen provides Chartwell with additional due diligence materials regarding trademarks. |
| 5/7/14 | Conference call with Chartwell, Bensen, Kauffmann, and Kevin Bensen discussing Reliance's counter-offer and potential response to same, status of due diligence, financing and RVR business update.  Conference call with Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell, Bob Socol of SRR, and Erin Turley and Allison Wilkerson of K&L Gates regarding management incentive plan, depreciation, internal loan and upcoming steps. Michael Aguirre of GT sends Erin Turley and Allison Wilkerson of K&L Gates proposed Plan documents and warrants for review and consideration. |

| Date | Event |
|---|---|
| 5/8/14 | Steve Martin of Reliance and Greg Fresh and Ted Margarit of Chartwell communicate regarding management incentive plan.  Greg Fresh of Chartwell responds to Reliance's counter-offer and indicates, among other things, that the Company is "willing to exchange equity purchase price" for more flexibility on management incentive plan and bonuses; Kauffmann provides Dealer Agency Agreement he obtained from Sean Dickason of Cruise America, Inc. to Stephanie Geerdes. |
| 5/9/14 | Steve Martin of Reliance emails Greg Fresh and Ted Margarit of Chartwell the Trustee's second counter-offer; Ted Margarit of Chartwell emails Steve Martin regarding potential terms to SARs plan; Matthew Hricko of SRR emails Ted Margarit of Chartwell regarding accrued interest calculations. |
| 5/12/14 | Greg Fresh of Chartwell emails Bensen the Trustee's second counter-offer and proposed response regarding same.  RVR discusses the second counter-offer and potential response internally; Allison Wilkerson sends its comments on the Stock Purchase Agreement, ESOP Loan and Pledge Agreement, ESOP Note, Warrant and Subordinated Note, and a chart reflecting suggested changes to the RVR employment agreements to RVR counsel, GT, Seller's Counsel, Weiss Brown, Chartwell, Reliance, and SRR; Jane Kim of GT sends K&L Gates, Seller's Counsel, Weiss Brown, Chartwell, Reliance, and SRR the draft Investor Rights Agreement. |
| 5/13/14 | Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell have call with Bensen regarding the Trustee's second counter-offer and proposed response regarding same.  Chartwell provides response to Trustee's second counter-offer to Reliance and K&L Gates. Reliance agrees to the proposal subject to SRR approval and negotiation of the few remaining items, including employment agreements and advises Ted Margarit of the same. |
| 5/15/14 | Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell have call with Marc Baluda, Michael Aguirre and Jane Kim of GT, Weiss Brown, Morgan Lewis, Shane Orr of BDO, and Allison Wilkerson and Erin Turley of K&L Gates regarding legal matters relating to proposed transaction and financing of the same; Bensen receives draft Investor Rights Agreement from Chartwell via an email (the email reflected that the Investor Rights Agreement had already been sent to Reliance, SRR, and K&L Gates for review and that K&L Gates had provided comments on the Stock Purchase Agreement, ESOP Loan and Pledge Agreement, ESOP Note, Warrant and Subordinated Note) and forwards the same for additional review by Kevin Bensen and Kauffmann; Kauffmann provides comments on draft Investor Rights Agreement to Bensen; Kevin Bensen sends comments on draft ESOP documents to Bensen; Allison Wilkerson's comments and questions regarding the Employee Stock Ownership Plan document and ESOP Trust |

10

| Date | Event |
|---|---|
| | Agreement are forwarded to Bensen from Ted Margarit; Bensen forwards the same to Kevin Bensen and Kauffmann for review. |
| 5/19/14 | Kauffmann provides comments on the draft ESOP Trust Agreement to Bensen. |
| 5/20/14 | Conference call with Chartwell, K&L Gates, Scott Weiss of Weiss Brown, and Marc Baluda, Michael Aguirre, Jane Kim, and Bruce Macdonough of GT regarding legal documents, including stock purchase agreement, warrants, and flow of funds. Stephanie Geerdes of Chartwell circulates an updated term sheet for review by Reliance and K&L Gates; conference call with Stephanie Geerdes and Ted Margarit of Chartwell with Lou Joseph of Morgan Lewis, Marc Baluda and Brandon Feingold of GT regarding seller notes, subordination agreements, and warrants; Kevin Bensen provides comments on ESOP document to Bensen for consideration. |
| 5/21/14 | Greg Fresh, Stephanie Geerdes, and Ted Margarit of Chartwell hold conference call with Marc Baluda and Michael Aguirre of GT, Bensen, Kauffmann, and Kevin Bensen regarding negotiation over deal terms, employment agreements, updated pro forma based on revised April 30 forecast (contained in the agenda), and financing; Chartwell emails Crowe and GT regarding prefunding contributions to plan and flow of funds. |
| 5/21/14 | Ted Margarit of Chartwell requests a copy of SRR's valuation report, this request is denied by Bob Socol of SRR. Steve Martin confirms SRR's position in an email to Ted Margarit. Chartwell provides SRR with current draft commitment letter. Conference call between Reliance, K&L Gates and Chartwell regarding employment agreements. SRR requests Chartwell provide updated model illustrating the expected repayment of Seller notes and related interest calculations. |
| 5/22/14 | K&L Gates has conference call with Greg Fresh of Chartwell regarding employment agreement negotiations; Chartwell provides SRR's position on employment agreements to Bensen, who discusses internally with other members of RVR's management team; Marc Baluda of GT confers with K&L Gates regarding two concessions in employment agreements; all advisors call with K&L Gates, BDO, Chartwell, GT, and Wells Fargo counsel, Morgan Lewis to discuss transaction documents and bank financing. |
| 5/23/14 | Jane Kim of GT provides updated drafts of select transaction documents, including the Investor Rights Agreement, Stock Purchase Agreement, Warrants and Notes to Reliance's team. Reliance communicates with Chartwell regarding preliminary approval of transaction, as negotiated. K&L Gates negotiates with Chartwell and Weiss Brown regarding revisions to employment contracts and future compensation of senior executives; |

| Date | Event |
|------|-------|
|  | conference call with Greg Fresh of Chartwell with Marc Baluda of GT regarding revisions to employment agreements; Bensen participates in conference call with Chartwell and Crowe Horwath regarding SARs and plan testing and analysis; Marc Baluda of GT forwards communication regarding compensation from K&L Gates to Bensen for review and verification; Kevin Bensen provides comments on revised Investor Rights Agreements to Bensen for consideration. |
| 5/24/14 | Multiple communications between GT, Weiss Brown, K&L Gates, and Reliance regarding revisions to Investor Rights Agreement, by-law amendments, shareholder approval and board approval. |
| 5/27/14 | Calls and emails between RVR and Reliance advisors to review final comments to documents and confirm all steps in preparation to close have been completed or will be completed that day; Bensen participates in conference call with Chartwell, including Stephanie Geerdes, and SRR, including Matt Hricko and Bob Socol, regarding RVR's business performance and updated financials and projections. All advisors also have a call in preparation of closing. |
| 5/28/14 | ESOP Transaction closes |

12

**VERIFICATION**

I, Robert Smalley, Jr., certify that:

1. I am a Defendant in this action;

2. I have read Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, And RVR, Inc.'s Second Amended Mandatory Initial Discovery Responses; and

3. I declare under penalty of perjury that the facts contained in the foregoing are true and correct to the best of my knowledge, information, and belief, and as to those facts stated upon information and belief, I believe such facts to be true.

Executed this _11_ day of January, 2022.

BY: _____

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

# VERIFICATION

I, Randall Smalley, certify that:

1. I am a Defendant in this action and I also serve as the trustee for the three trusts named as Defendants in this action;

2. I have read Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, And RVR, Inc.'s Second Amended Mandatory Initial Discovery Responses; and

3. On behalf of myself and the Trust Defendants, I declare under penalty of perjury that the facts contained in the foregoing are true and correct to the best of my knowledge, information, and belief, and as to those facts stated upon information and belief, I believe such facts to be true.

Executed this _11_ day of January, 2022.

BY: _____

**VERIFICATION**

I, Eric Bensen, certify that:

1.  I am a Defendant in this action and am also an officer and director of RVR, Inc.;

2.  I have read Defendants Eric Bensen, Randall Smalley, Robert Smalley, Jr., Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, And RVR, Inc.'s Second Amended Mandatory Initial Discovery Responses; and

3.  On behalf of myself and RVR, Inc., I declare under penalty of perjury that the facts contained in the foregoing are true and correct to the best of my knowledge, information, and belief, and as to those facts stated upon information and belief, I believe such facts to be true.

Executed this __11__ day of January, 2022.

BY: _Eric R. Bensen_

# Exhibit 7

ERIC C. LUND, D.C. Bar No. 450982
BRENDAN BALLARD, D.C. Bar No. 978631
ISIDRO MARISCAL, CA Bar No. 298139
KATRINA LIU, PA Bar No. 318630
U.S. Dept. of Labor, Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
Telephone: (202) 693-5600, Facsimile: (202) 693-5610
Email: lund.eric@dol.gov; ballard.brendan@dol.gov; mariscal.isidro@dol.gov;
liu.katrina.t@dol.gov

Attorneys for Milton Al Stewart,
Acting Secretary of Labor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Milton Al Stewart, Acting Secretary of Labor, | Civil Action No. 2:19-cv-03178-JJT |
| Plaintiff, | |
| v. | |
| Reliance Trust Company, <u>et al.</u>, | |
| Defendants. | |

**PLAINTIFF'S AMENDED RESPONSES TO DEFENDANT ERIC BENSEN'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff Milton Al Stewart, Acting Secretary of the United States Department of Labor ("Secretary"), hereby amends his responses to Defendant Eric Bensen's ("Bensen") First Set of Requests for Admission to Plaintiff as follows:

**Request for Admission No. 27:**

Plaintiff requires that the trustee negotiating the purchase of stock on behalf of an

1

employee stock ownership plan be independent of the selling shareholder(s) and the plan sponsor.

**Amended Response:**

The Secretary objects to this Request because the terms "requires" and "be independent" are vague.  Subject to this objection, the Secretary admits that a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan must exercise its own judgment independently of the selling shareholder(s) and the plan sponsor, but that the fiduciary appointing the trustee also has a duty to monitor the trustee's performance.  The Secretary otherwise denies this request.

**Request for Admission No. 28:**

The law requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership plan be independent of the selling shareholder(s) and the plan sponsor.

**Amended Response:**

The Secretary objects to this Request because the terms "the law" and "be independent" are vague.  Subject to this objection, the Secretary admits that ERISA requires a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan to exercise its own judgment independently of the selling shareholder(s) and the plan sponsor, but that the fiduciary appointing the trustee also has a duty to monitor the trustee's performance.  The Secretary otherwise denies this request.

**Request for Admission No. 29:**

Plaintiff requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership plan engage in good faith, arms-length negations [sic] with the selling shareholder(s).

**Amended Response:**

The Secretary objects to this Request because the terms "negations" and "requires" are

vague.  Subject to this objection, the Secretary admits that a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan must exercise its own judgment independently of the selling shareholder(s) and engage in a good faith, arms-length negotiation. The Secretary otherwise denies this request.

**Request for Admission No. 30:**

The law requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership engage in good faith, arms-length negations [sic] with the selling shareholder(s).

**Amended Response:**

The Secretary objects to this Request because the term "negations" is vague.  Subject to this objection, the Secretary admits that ERISA requires a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan to exercise its own judgment independently of the selling shareholder(s) and engage in a good faith, arms-length negotiation.  The Secretary otherwise denies this request.

**Request for Admission No. 32:**

The ESOP owned more than fifty percent (50%) of RVR's stock as a result of the Transaction.

**Amended Response:**

Admitted.

**Request for Admission No. 33:**

The ESOP owned one hundred percent (100%) of RVR's stock as a result of the Transaction.

**Amended Response:**

Admitted.

3

**Request for Admission No. 35:**

RVR did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 36:**

The Director Defendants did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 37:**

The Selling Shareholders did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 38:**

RVR's Transaction Advisors did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 39:**

The Director Defendants did not receive or review copies of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729–DOL0003775 and DOL0084795-DOL 0084907, respectively, until after this Action was filed.

4

**Amended Response:**

Admitted.

**Request for Admission No. 40:**

RVR did not receive or review copies of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729 – DOL0003775 and DOL0084795-DOL0084907, respectively, until after this Action was filed.

**Amended Response:**

Admitted.

**Request for Admission No. 41:**

The Selling Shareholders did not receive or review a copy of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729– DOL0003775 and DOL0084795-DOL 0084907, until after this Action was filed.

**Amended Response:**

Admitted.

**Request for Admission No. 48:**

Plaintiff is not alleging in this Action that RVR learned, or could have learned, of internal discussions among and between Reliance and/or Reliance's advisors relating to the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 60:**

The Director Defendants did not make any misstatements of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Amended Response:**

Denied.

5

**Request for Admission No. 61:**

The Director Defendants did not make any omissions of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 62:**

The Selling Shareholders did not make any misstatements of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Amended Response:**

Denied.

**Request for Admission No. 63:**

The Selling Shareholders did not make any omissions of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Amended Response:**

Denied.

Dated: February 26, 2021                    Respectfully Submitted,

                                            ELENA S. GOLDSTEIN
                                            Deputy Solicitor of Labor

                                            G. WILLIAM SCOTT
                                            Associate Solicitor
                                             for Plan Benefits Security

                                            WAYNE R. BERRY
                                            Counsel for Litigation

                                            /s/ Eric C. Lund
                                            ERIC C. LUND
                                            Senior Trial Attorney

                                            BRENDAN BALLARD

6

Senior Trial Attorney

ISIDRO MARISCAL
KATRINA LIU
Trial Attorneys

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
ballard.brendan@dol.gov
lund.eric@dol.gov
mariscal.isidro@dol.gov
liu.katrina.t@dol.gov
Direct:  (202) 693-5600
Facsimile:  (202) 693-5610

Attorneys for Plaintiff Milton Al
Stewart, Acting Secretary of Labor

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Amended Responses to Defendant Eric Bensen's First Set of Requests for Admission to Plaintiff was served in the above-captioned case on counsel of record via e-mail.

/s/ Brendan Ballard
BRENDAN BALLARD
Senior Trial Attorney

7

# Exhibit 8

ERIC C. LUND, D.C. Bar No. 450982
BRENDAN BALLARD, D.C. Bar No. 978631
ISIDRO MARISCAL, CA Bar No. 298139
KATRINA LIU, PA Bar No. 318630
U.S. Dept. of Labor, Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
Telephone: (202) 693-5600, Facsimile: (202) 693-5610
Email: lund.eric@dol.gov; ballard.brendan@dol.gov; mariscal.isidro@dol.gov;
liu.katrina.t@dol.gov

Attorneys for Plaintiff Eugene Scalia,
Secretary of Labor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eugene Scalia, Secretary of Labor, | Civil Action No. 2:19-cv-03178-JJT |
| Plaintiff, | |
| v. | |
| Reliance Trust Company, <u>et al.</u>, | |
| Defendants. | |

**SECRETARY OF LABOR'S RESPONSES TO DEFENDANT ERIC BENSEN'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff Eugene Scalia, Secretary of the United States Department of Labor ("Secretary"), hereby responds to Defendant Eric Bensen's ("Bensen") First Set of Requests for Admission to Plaintiff as follows:

**PRELIMINARY STATEMENT**

The following responses are based on information currently available to the Secretary following the exercise of reasonable diligence to discover all information available to the Secretary that is responsive to the Requests for Admission. The Secretary's responses are

1

limited to the U.S. Department of Labor, Employee Benefits Security Administration's ("EBSA") investigative files and all other documents reviewed and/or relied upon by the Secretary in connection with the investigation or litigation of the matters discussed in the Secretary's Complaint (Doc. 5). No persons currently or formerly employed by the Secretary were personally involved in any manner with the fiduciary conduct or transactions upon which the Secretary's claims are predicated. Consequently, no persons currently or formerly employed by the Secretary have firsthand knowledge of any facts relating to such fiduciary conduct or transactions. The only sources for the Secretary's knowledge of such facts have been the Defendants, their employees and agents, associated parties, third-party fact witnesses, documents obtained in the course of the investigation and litigation, and information that is publicly available.

The Secretary has commenced and will continue to conduct discovery from Defendants, as well as from non-parties in this action. The Secretary reserves the right to amend, modify, and/or supplement these responses as may be required by events and discovery subsequent hereto. In responding to these Requests for Admission, the Secretary incorporates by reference all pleadings, Mandatory Initial Discovery Responses, and supporting briefs filed in this action. Unless otherwise noted, capitalized terms in the Secretary's responses have the meanings ascribed to them in the Secretary's Complaint.

Unless otherwise admitted, nothing contained in the Secretary's responses shall be construed as an admission, agreement, or acquiescence by the Secretary with respect to any facts, matters, or characterizations alleged, assumed, or set forth in the Requests for Admission. The inadvertent disclosure or failure to object to disclosure of any privileged documents or exempt documents shall not be deemed a waiver of any applicable privilege or exemption with respect to that disclosure or any other disclosure of documents.

## **OBJECTIONS TO DEFINITIONS**

A.    **Plaintiff, You, or Your**: The terms "Plaintiff," "you," or "your" means Plaintiff, Eugene Scalia, the Secretary of Labor, as well as all employees, agents, representatives,

attorneys, and other persons or entities acting for, or on behalf of, Plaintiff or under Plaintiff's authority.

**Objection**:

The Secretary objects to this definition as overly broad, unduly burdensome, and not proportional to the needs of the case because the U.S. Department of Labor ("Department") has more than 17,000 employees and innumerable contractors. Unless otherwise noted, the Secretary will respond on behalf of EBSA and the Solicitor of Labor's Plan Benefits Security Division ("PBSD"). The Secretary further objects to this definition to the extent that it includes attorneys and thus may seek documents protected by the work product doctrine, the attorney client privilege, and other applicable protections.

**M.    Director Defendants**: The phrase "Director Defendants" means Smalley and Smalley, Jr. prior to May 28, 2014 and Smalley, Smalley, Jr. and Bensen on and after May 28, 2014.

**Objection**:

The Secretary objects to this definition to the extent that it excludes Bensen as a member of the RVR Board of Directors prior to May 28, 2014, which has not been conclusively established by the evidence at this time. Unless otherwise noted, for purposes of responding to these Requests for Admission, the Secretary will construe "Director Defendants" to mean Smalley, Smalley Jr., and Bensen, individually and/or collectively.

**P.    Defendants**: The term "Defendants" means Bensen, Smalley, Smalley, Jr., the Smalley Trusts, Reliance, and RVR, individually and/or collectively.

**Objection**:

The Secretary objects to this definition to the extent it includes nominal defendant RVR when referring to the named defendants in the Secretary's Complaint. The Secretary has alleged no claims against RVR. Unless otherwise noted, for purposes of responding to these Requests for Admission, the Secretary will construe "Defendants" to mean Smalley, Smalley Jr., Bensen,

3

the Smalley Trusts, and Reliance, individually and/or collectively.

**V.    Transaction Closing**: The phrase "Transaction Closing" means the latest time by which all of the conditions to closing set forth in the Stock Purchase Agreement that is referenced in the Complaint were satisfied, which is no earlier than May 28, 2014.

**Objection**:

The Secretary objects to this definition as vague.  The Secretary construes "Transaction Closing" as the date May 28, 2014, unless the Secretary states otherwise in his responses.

**W.    Person**: The term "Person", in singular or plural form, is defined as any natural person or legal entity, including, without limitation, any business or governmental entity or association.

**Objection**:

To the extent this definition includes the Department, the Secretary objects to this definition as overly broad, unduly burdensome, and not proportional to the needs of the case because the Department has more than 17,000 employees and innumerable contractors.  Unless otherwise noted, the Secretary will respond on behalf of EBSA and PBSD.  The Secretary further objects to this definition to the extent that it includes attorneys and thus may seek documents protected by the work product doctrine, the attorney client privilege, and other applicable protections.

### RESPONSES TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Plaintiff's investigation of the Transaction commenced no later than November 9, 2015.

**Response:**

The Secretary objects to this Request because the terms "investigation" and "commenced" are vague.  Subject to this objection, the Secretary admits that EBSA opened an investigation into the Transaction and the Plan on November 9, 2015.

4

**Request for Admission No. 2:**

Plaintiff had in its possession the SRR valuation report referenced in Paragraph 77 of the Complaint, a copy of which is bates-labeled DOL0084795-DOL84907, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 3:**

Plaintiff read the SRR valuation report referenced in Paragraph 77 of the Complaint, a copy of which is bates-labeled DOL0084795-DOL84907, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 4:**

Plaintiff had in its possession a copy of Chartwell's March 26, 2014 presentation slide deck labeled "Phase One ESOP Transaction Summary," a copy of which is bates-labeled DOL0050726-DOL0050775, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 5:**

Plaintiff read Chartwell's March 26, 2014 presentation slide deck labeled "Phase One ESOP Transaction Summary," a copy of which is bates-labeled DOL0050726-DOL0050775, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 6:**

Plaintiff had in its possession Chartwell's January 27, 2014 presentation slide deck labeled "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration," a copy of which is bates-labeled DOL0101454-DOL0101515, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 7:**

Plaintiff read Chartwell's January 27, 2014 presentation slide deck labeled "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration," a copy of which is bates-labeled DOL0101454-DOL0101515, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 8:**

Plaintiff had in its possession the Stock Purchase Agreement referenced in Paragraph 32 of the Complaint, a copy of which is bates-labeled RVR34080–RVR34126, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 9:**

Plaintiff read the Stock Purchase Agreement referenced in Paragraph 32 of the Complaint, a copy of which is bates-labeled RVR34080–RVR34126, before May 15, 2016.

**Response:**

Denied.

6

**Request for Admission No. 10:**

Plaintiff knew before May 15, 2016 that Chartwell, Reliance, and SRR had worked together on multiple other ESOP transactions prior to the Transaction.

**Response:**

The Secretary objects to this Request because the terms "knew" and "multiple" are vague.  Subject to this objection, the Request is admitted.

**Request for Admission No. 11:**

Plaintiff had in its possession the Plan and Trust Agreement referenced in Paragraph 31 of the Complaint, copies of which are bates-labeled as RVR33517-RVR 33594 and RVR33595–RVR33624, respectively, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 12:**

Plaintiff read the Plan and Trust Agreement referenced in Paragraph 31 of the Complaint, copies of which are bates-labeled as RVR33517-RVR33595 and RVR33595-RVR 33624, respectively, before May 15, 2016.

**Response:**

Denied.

**Request for Admission No. 13:**

Plaintiff knew before May 15, 2016 that the final negotiation of the Transaction's price and terms was completed 26 days from the initial meeting on April 16, 2014 between RVR and Reliance that is referenced in Paragraph 43 of the Complaint.

**Response:**

Denied.

**Request for Admission No. 14:**

Plaintiff knew before May 15, 2016 that the Transaction Closing occurred less than six weeks from the initial meeting on April 16, 2014 between RVR and Reliance that is referenced in Paragraph 43 of the Complaint.

**Response:**

Denied.

**Request for Admission No. 15:**

Plaintiff knew before May 15, 2016 that Reliance had selected SRR to serve as its valuation advisor in connection with the Transaction.

**Response:**

Denied.

**Request for Admission No. 16:**

Prior to the Transaction Closing, Plaintiff had not previously asserted in any lawsuit or other legal action that Reliance failed to fulfill its duties as an independent trustee to an employee stock ownership plan.

**Response:**

The Secretary objects to this Request because the term "other legal action" is vague. Subject to this objection, the Secretary admits that he did not file a lawsuit pursuant to ERISA before May 28, 2014 against Reliance in its capacity as an independent trustee to an employee stock ownership plan.

**Request for Admission No. 17:**

Bensen was not a member of RVR's Board of Directors prior to May 28, 2014.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing. Subject to this objection, the Request is denied.

8

**Request for Admission No. 18:**

Prior to May 28, 2014, Smalley and Smalley, Jr. were the only members of RVR's Board of Directors.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 19:**

Bensen owed no ERISA fiduciary duties to the Plan or its Participants prior to the Transaction Closing.

**Response:**

Denied.

**Request for Admission No. 20:**

The ESOP Committee did not owe any ERISA fiduciary duties to the Plan prior to the Transaction Closing.

**Response:**

Denied.

**Request for Admission No. 21:**

The ESOP Committee did not owe any ERISA fiduciary duties to the Plan until the Plan acquired assets.

**Response:**

Denied.

**Request for Admission No. 22:**

The Plan did not hold any assets prior to May 28, 2014.

9

**Response:**

Admit.

**Request for Admission No. 23:**

RVR has never served as the Plan Administrator.

**Response:**

Denied.

**Request for Admission No. 24:**

At no point in time has RVR been an ERISA fiduciary of the Plan.

**Response:**

Denied.

**Request for Admission No. 25:**

The severance benefits provided for in Bensen's, Smalley's, and Smalley, Jr.'s Amended and Restated Employment Agreements were reduced in connection with the Transaction.

**Response:**

The Secretary objects to this Request because the terms "severance benefits" and "reduced" are vague.  Subject to this objection, the Secretary admits that, as part of the Transaction, termination for cause or upon a voluntary resignation were removed as bases for severance payments under Bensen's, Smalley's, and Smalley, Jr.'s Amended and Restated Employment Agreements.  The Secretary otherwise denies this Request.

**Request for Admission No. 26:**

The First Amendment to the Amended and Restated Employment Agreement for Bensen, a copy of which is bates-labeled, RVR32929–RVR32933, eliminated Bensen's right to severance upon termination for cause or upon voluntary resignation that was expressly provided for in

10

Bensen's Amended and Restated Employment Agreement, a copy of which is bates-labeled RVR21740-RVR 21749.

**Response:**

Admit.

**Request for Admission No. 27:**

Plaintiff requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership plan be independent of the selling shareholder(s) and the plan sponsor.

**Response:**

The Secretary objects to this Request because the terms "requires" and "be independent" are vague. Subject to this objection, the Secretary admits that a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan must exercise its own judgment independently of the selling shareholder(s) and the plan sponsor, but that the fiduciary appointing the trustee also has a duty to monitor the trustee's performance.

**Request for Admission No. 28:**

The law requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership plan be independent of the selling shareholder(s) and the plan sponsor.

**Response:**

The Secretary objects to this Request because the terms "the law" and "be independent" are vague. Subject to this objection, the Secretary admits that ERISA requires a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan to exercise its own judgment independently of the selling shareholder(s) and the plan sponsor, but that the fiduciary appointing the trustee also has a duty to monitor the trustee's performance.

11

**Request for Admission No. 29:**

Plaintiff requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership plan engage in good faith, arms-length negations [sic] with the selling shareholder(s).

**Response:**

The Secretary objects to this Request because the terms "negations" and "requires" are vague.  Subject to this objection, the Secretary admits that a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan must exercise its own judgment independently of the selling shareholder(s) and engage in a good faith, arms-length negotiation.

**Request for Admission No. 30:**

The law requires that the trustee negotiating the purchase of stock on behalf of an employee stock ownership engage in good faith, arms-length negations [sic] with the selling shareholder(s).

**Response:**

The Secretary objects to this Request because the term "negations" is vague.  Subject to this objection, the Secretary admits that ERISA requires a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan to exercise its own judgment independently of the selling shareholder(s) and engage in a good faith, arms-length negotiation.

**Request for Admission No. 31:**

A shareholder has a controlling interest in a company when the shareholder owns more than fifty percent (50%) of that company's stock.

**Response:**

The Secretary objects to this Request because the term "controlling interest" is vague. Subject to this objection, the Request is denied.

12

**Request for Admission No. 32:**

The ESOP owned more than fifty percent (50%) of RVR's stock as a result of the Transaction.

**Response:**

The Secretary objects to this Request because the term "owned" is vague. Subject to this objection, the Secretary admits that the ESOP purchased 100% of RVR's common stock as a result of the Transaction.


**Request for Admission No. 33:**

The ESOP owned one hundred percent (100%) of RVR's stock as a result of the Transaction.

**Response:**

The Secretary objects to this Request because the term "owned" is vague. Subject to this objection, the Secretary admits that the ESOP purchased 100% of RVR's common stock as a result of the Transaction.


**Request for Admission No. 34:**

The ESOP acquired a controlling interest in RVR, Inc. as a result of the Transaction.

**Response:**

The Secretary objects to this Request because the term "controlling interest" is vague. Subject to this objection, the Request is denied.


**Request for Admission No. 35:**

RVR did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Response:**

The Secretary objects to this because the term "select" is vague. Subject to this objection, the Request is denied.

13

**Request for Admission No. 36:**

The Director Defendants did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Response:**

The Secretary objects to this because the term "select" is vague. Subject to this objection, the Request is denied.

**Request for Admission No. 37:**

The Selling Shareholders did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Response:**

The Secretary objects to this because the term "select" is vague. Subject to this objection, the Request is denied.

**Request for Admission No. 38:**

RVR's Transaction Advisors did not select SRR to serve as Reliance's financial advisor in connection with the Transaction.

**Response:**

The Secretary objects to this because the term "select" is vague. Subject to this objection, the Request is denied.

**Request for Admission No. 39:**

The Director Defendants did not receive or review copies of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729–DOL0003775 and DOL0084795-DOL 0084907, respectively, until after this Action was filed.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing. Subject to this objection, the Request is denied.

14

**Request for Admission No. 40:**

RVR did not receive or review copies of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729 – DOL0003775 and DOL0084795-DOL0084907, respectively, until after this Action was filed.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 41:**

The Selling Shareholders did not receive or review a copy of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729– DOL0003775 and DOL0084795-DOL 0084907, until after this Action was filed.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 42:**

The Director Defendants did not have knowledge of the contents of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729 – DOL0003775 and DOL0084795-DOL0084907, until after this Action was filed.

**Response:**

Denied.

**Request for Admission No. 43:**

The Selling Shareholders did not have knowledge of the contents of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729–DOL0003775 and DOL0084795-DOL0084907, until after this Action was filed.

**Response:**

Denied.

**Request for Admission No. 44:**

RVR did not have knowledge of the contents of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL 0003729 – DOL0003775 and DOL0084795-DOL0084907, until after this Action was filed.

**Response:**

Denied.

**Request for Admission No. 45:**

RVR's Transaction Advisors did not have knowledge of the contents of the valuations referenced in paragraphs 41 and 46 of the Complaint, copies of which are bates-labeled as DOL0003729–DOL0003775 and DOL0084795-DOL0084907, until after this Action was filed.

**Response:**

Denied.

**Request for Admission No. 46:**

Plaintiff is not alleging in this Action that RVR had actual or constructive knowledge of a breach of fiduciary duty and/or violation of law in connection with the Plan or Transaction.

**Response:**

Denied as stated.  The Secretary admits it has not brought claims in this action against RVR for actual or constructive knowledge of fiduciary breach or for any ERISA violations.

**Request for Admission No. 47:**

Plaintiff is not alleging in this Action that RVR made any misstatement or omission of an important fact in connection with the Transaction.

**Response:**

Denied as stated. The Secretary admits it has not brought claims in this action against RVR for any misstatement or omission of an important fact in connection with the Transaction.

**Request for Admission No. 48:**

Plaintiff is not alleging in this Action that RVR learned, or could have learned, of internal discussions among and between Reliance and/or Reliance's advisors relating to the Transaction.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing. Subject to this objection, the Request is denied.

**Request for Admission No. 49:**

Plaintiff is not alleging in this Action that RVR failed to adhere to the Plan documents.

**Response:**

Denied as stated. The Secretary admits it has not brought claims in this action against RVR for failure to adhere to Plan documents.

**Request for Admission No. 50:**

Reliance served as the Plan's discretionary Trustee until the Transaction Closing.

**Response:**

Denied as stated. The Secretary admits that Reliance served as ESOP's Trustee with discretionary authority to approve the ESOP's purchase of stock in the Transaction.

**Request for Admission No. 51:**

At the time of the Transaction, SRR was independent of the parties to the Transaction within the meaning of proposed regulation 29 CFR § 2510.3-18(b) issued by the U.S. Department of Labor and Section 401(a)(28)(C) of the Internal Revenue Code of 1986, as amended ("Code").

17

**Response:**

Denied.

**Request for Admission No. 52:**

At the time of the Transaction, SRR was a qualified appraiser within the meaning of Code Section 170(f)(11)(E)(ii).

**Response:**

The Secretary objects to this Request because the term "qualified appraiser" is vague. Subject to this objection, the Secretary admits that a Code Section 170(f)(11)(E)(ii) indicates that an "individual" may be a qualified appraiser. The Secretary further states that, after a reasonable inquiry, the information the Secretary has obtained is insufficient to enable him to admit or deny that SRR meets the requirement of Code Section 170(f)(11)(E)(ii).

**Request for Admission No. 53:**

At the time of the Transaction, SRR was a qualified appraiser within the meaning of Code Section 401(a)(28)(C).

**Response:**

The Secretary objects to this Request because the term "qualified appraiser" is vague. Further, Code Section 401(a)(28)(C) uses the term "independent appraiser," not "qualified appraiser." Subject to these objections, the Secretary states that, after a reasonable inquiry, the information the Secretary has obtained is insufficient to enable him to admit or deny that SRR meets the requirement of Code Section 401(a)(28)(C).

**Request for Admission No. 54:**

At the time of the Transaction, Reliance was independent of, and unrelated to, any party in interest engaging in the Transaction and their affiliates.

**Response:**

Denied.

**Request for Admission No. 55:**

At the time of the Transaction, Reliance was independent of the parties to the Transaction within the meaning of proposed regulation 29 CFR § 2510.3-18(b) issued by the U.S. Department of Labor.

**Response:**

Denied.

**Request for Admission No. 56:**

In relation to the Transaction, Reliance was qualified to serve as a discretionary trustee.

**Response:**

The Secretary objects to this Request because the term "qualified" is vague.  Subject to this objection, the Secretary admits that Reliance had the credentials to serve as a discretionary trustee to the Plan.

**Request for Admission No. 57:**

At the time of the Transaction, K&L Gates was independent of, and unrelated to, any party in interest engaging in the Transaction and their affiliates.

**Response:**

Denied.

**Request for Admission No. 58:**

At the time of the Transaction, Greenberg Traurig was independent of, and unrelated to, any party in interest engaging in the Transaction and their affiliates.

**Response:**

Denied.

19

**Request for Admission No. 59:**

At the time of the Transaction, Chartwell was independent of, and unrelated to, any party in interest engaging in the Transaction and their affiliates.

**Response:**

Denied.

**Request for Admission No. 60:**

The Director Defendants did not make any misstatements of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 61:**

The Director Defendants did not make any omissions of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 62:**

The Selling Shareholders did not make any misstatements of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 63:**

The Selling Shareholders did not make any omissions of fact relating to RVR, RVR's business, or RVR's financial history or performance in connection with the Transaction.

**Response:**

The Secretary objects to this Request because fact discovery is ongoing.  Subject to this objection, the Request is denied.

**Request for Admission No. 64:**

No Plan participant or beneficiary has made any complaint or raised any concerns to Plaintiff relating to the Transaction.

**Response:**

Admit.

**Request for Admission No. 65:**

No Plan participant or beneficiary has made any complaint or raised any concerns to Plaintiff relating to the administration of the ESOP.

**Response:**

Admit.

**Request for Admission No. 66:**

No Plan participant or beneficiary has made any complaint or raised any concerns to Plaintiff relating to the valuations of the RVR stock held by the ESOP.

**Response:**

Admit.

**Request for Admission No. 67:**

Reliance ceased being the trustee and ceased being an ERISA fiduciary to the Plan as of June 30, 2014.

21

**Response:**

    Admit.

**Request for Admission No. 68:**

    Argent Trust Company became the trustee to the Plan as of July 1, 2014.

**Response:**

    Admit.

**Request for Admission No. 69:**

    Argent has engaged SRR to conduct annual valuations of the RVR stock held by the Plan every year since Argent was appointed trustee.

**Response:**

    Admit.

Dated: December 22, 2020                    Respectfully Submitted,

                                            KATE S. O'SCANNLAIN
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor
 for Plan Benefits Security

WAYNE R. BERRY
Counsel for Litigation

/s/ Eric C. Lund
ERIC C. LUND
Senior Trial Attorney

BRENDAN BALLARD
Senior Trial Attorney

ISIDRO MARISCAL
KATRINA LIU
Trial Attorneys

22

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
ballard.brendan@dol.gov
lund.eric@dol.gov
mariscal.isidro@dol.gov
liu.katrina.t@dol.gov
Direct:  (202) 693-5600
Facsimile:  (202) 693-5610

Attorneys for Plaintiff Eugene
Scalia, Secretary of Labor

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Secretary of Labor's

Responses to Defendant Eric Bensen's First Set of Requests for Admission to Plaintiff was

served in the above-captioned case on counsel of record via e-mail.

/s/ Eric C. Lund
ERIC C. LUND
Senior Trial Attorney

23

# Exhibit 9

ERIC C. LUND, D.C. Bar No. 450982
BRENDAN BALLARD, D.C. Bar No. 978631
ISIDRO MARISCAL, CA Bar No. 298139
KATRINA LIU, PA Bar No. 318630
U.S. Department of Labor, Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, DC  20013
Telephone: (202) 693-5600, Facsimile: (202) 693-5610
Email: lund.eric@dol.gov; ballard.brendan@dol.gov; mariscal.isidro@dol.gov;
liu.katrina.t@dol.gov

Attorneys for Plaintiff Martin J. Walsh
Secretary of Labor

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, | Civil Action No. 2:19-cv-03178-JJT |
| Plaintiff, | |
| v. | |
| Reliance Trust Company, et al., | |
| Defendants. | |

**SECRETARY OF LABOR'S RESPONSES TO DEFENDANTS' JOINT SET OF CONTENTION INTERROGATORIES TO PLAINTIFF**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Court's July 15, 2021 Order, Plaintiff Martin J. Walsh, Secretary of the United States Department of Labor, by and through his undersigned counsel, hereby responds to Defendants' Joint Set of Contention Interrogatories to Plaintiff as follows:

**PRELIMINARY STATEMENT**

The following responses are based on information currently available to the Secretary following the exercise of reasonable diligence to discover all information available to the

1

Secretary that is responsive to the Interrogatories. The Secretary's responses are limited to the U.S. Department of Labor, Employee Benefits Security Administration's ("EBSA") investigative files and all other documents reviewed and/or relied upon by the Secretary in connection with the investigation or litigation of the matters discussed in the Secretary's Complaint (Doc. 5). No persons currently or formerly employed by the Secretary were personally involved in any manner with the fiduciary conduct or transactions upon which the Secretary's claims are predicated. Consequently, no persons currently or formerly employed by the Secretary have firsthand knowledge of any facts relating to such fiduciary conduct or transactions. The only sources for the Secretary's knowledge of such facts have been the Defendants, their employees and agents, associated parties, third-party fact witnesses, documents obtained in the course of the investigation and litigation, and information that is publicly available.

The Secretary reserves the right to amend, modify, and/or supplement these responses as may be required by events and discovery subsequent hereto. In responding to these Interrogatories, the Secretary incorporates by reference all pleadings, Mandatory Initial Discovery Responses, expert reports, and supporting briefs filed in this action. While the undersigned has made a good faith effort to give Defendants the principal facts and primary evidentiary basis on which the Secretary's contentions are based, Defendants' requests for "each and every" basis or fact are overbroad, unduly burdensome, and impermissibly seek protected attorney work product. See e.g., Quality Off. Furnishings, Inc. v. Allsteel, Inc., No. 3:17-CV-41-JEG-HCA, 2018 WL 7076747, at *12–13 (S.D. Iowa Sept. 26, 2018); Wilcox v. Changala, No. CV-10-3048-RHW, 2012 WL 12844083, at *2 (E.D. Wash. Jan. 18, 2012). Unless otherwise noted, capitalized terms in the Secretary's responses have the meanings ascribed to them in the Secretary's Complaint.

Nothing contained in the Secretary's responses shall be construed as an admission, agreement, or acquiescence by the Secretary with respect to any facts, matters, or characterizations alleged, assumed, or set forth in the Interrogatories. The inadvertent disclosure or failure to object to disclosure of any privileged documents or exempt documents shall not be

2

deemed a waiver of any applicable privilege or exemption with respect to that disclosure or any other disclosure of documents.

<center>**OBJECTIONS TO DEFINITIONS**</center>

    **A.   Plaintiff, You, or Your**: The terms "Plaintiff," "you," or "your" means Plaintiff, Martin J. Walsh, the Secretary of Labor, as well as all employees, agents, representatives, attorneys, and other persons or entities acting for, or on behalf of, Plaintiff or under Plaintiff's authority, including the Employee Benefits Securities [sic] Administration.

**Objection**:

    The Secretary objects to this definition as overly broad, unduly burdensome, and not proportional to the needs of the case because the U.S. Department of Labor ("Department") has more than 17,000 employees and innumerable contractors. Unless otherwise noted, the Secretary will respond on behalf of EBSA and the Solicitor of Labor's Plan Benefits Security Division ("PBSD"). The Secretary further objects to this definition to the extent that it includes attorneys and thus may seek documents protected by the work product doctrine, the attorney client privilege, and other applicable protections.

    **L.   RVR Defendants**: The term "RVR Defendants" means Bensen, Smalley, Smalley, Jr., the Smalley Trusts, and RVR, individually and/or collectively.

**Objection**:

    The Secretary objects to this definition to the extent it includes nominal defendant RVR when referring to the named defendants in the Secretary's Complaint. The Secretary has alleged no claims against RVR. Unless otherwise noted, for purposes of responding to these Interrogatories, the Secretary will construe "RVR Defendants" to mean Smalley, Smalley Jr., Bensen, and the Smalley Trusts, individually and/or collectively.

    **Q.   Transaction Closing**: The phrase "Transaction Closing" means the latest time by which all of the conditions to closing set forth in the Stock Purchase Agreement that is referenced in the Complaint were satisfied, which is no earlier than May 28, 2014.

**Objection**:

    The Secretary objects to this definition as vague.  The Secretary construes "Transaction

<center>3</center>

Closing" as the date May 28, 2014, unless the Secretary states otherwise in his responses.

Z.    **Material Fact**: The phrase "material fact" means an important or significant fact as distinguished from an insignificant, trivial, or unimportant fact.

**Objection:**

The Secretary objects to this definition because the phrase "important or significant" is vague and ambiguous. Unless otherwise noted, for purposes of responding to these Interrogatories, the Secretary will construe "material fact" to mean facts significant to the claims alleged in the Complaint.

## OBJECTIONS TO INSTRUCTIONS

A.   In each of your answers to these Interrogatories, you are requested to provide not only such information as is in your possession, but also all information as is reasonably available, whether or not it is in your possession. In the event you are able to provide only part of the information called for by any particular Interrogatory, provide all of the information you are able to provide, and state the reason for your inability to state the remainder.

**Objection**:

The Secretary objects to this instruction to the extent that it seeks documents protected by the attorney client privilege, work product doctrine, investigative file privilege, deliberative process privilege, or other applicable privilege. The Secretary objects to this instruction as overly broad, unduly burdensome, and not proportional to the needs of the case because it does not define a timeframe for the information sought by the Interrogatories. The Secretary objects to this instruction to the extent it seeks the production of documents created after this litigation commenced, i.e., after the Complaint in this matter was filed on May 16, 2019.

## INTERROGATORIES

### INTERROGATORY NO. 1

If it is your contention that Reliance or any its advisors, K&L Gates LLP and SRR, failed to discover or understand any material fact or information about RVR as the result of their due diligence, state each and every basis for that contention, including a detailed description of the material facts or information that you contend Reliance and/or its advisors failed to discover or

4

understand and how those material facts or information impacted the fair market value of RVR stock or the fairness of the ESOP Transaction.

**Response:**

The Secretary objects to this Interrogatory because the request for "each and every basis" of a contention is overbroad, unduly burdensome, and impermissibly seeks protected attorney work product. The Secretary further objects because the phrase "failed to discover or understand any material fact or information about RVR as a result of their due diligence" is vague and ambiguous. Subject to and without waiving the foregoing objections, the Secretary states that, as more fully set forth in the Secretary's August 13, 2021 expert reports, Reliance, along with its advisors K&L Gates and SRR, failed to discover or understand the effect of a variety of material facts and information about RVR as a result of their due diligence, especially if that due diligence is deemed to include SRR's May 21 Valuation and Analysis of Transaction Fairness ("May 21 Valuation Report").

For example, Reliance and/or SRR failed to understand that the Transaction documents gave Smalley, Smalley Jr., and Bensen ("Director Defendants") control of the RVR Board of Directors, voting, mergers and acquisitions, and the ESOP Committee. (See August 13, 2021 Expert Opinion of Charles E. Wert ("Wert Report") at 20-22.) If SRR had been aware that the Plan would not receive the right to control RVR as a result of the Transaction, it should not have applied a 10% control premium in its May 21 Valuation Report, and should, instead, have applied a discount for lack of control. (See August 13, 2021 Expert Report of C. Paul Wazzan Ph.D. ("Wazzan Report") ¶¶ 61-69, 107-10.)

Reliance and SRR failed to discover and/or understand that there were no good comparable companies to RVR, and, thus, failed to understand that it was inappropriate for SRR to use the Guideline Company Method ("GCM") and multiples therefrom for the Discounted Cash Flow ("DCF") analysis in its May 21 Valuation Report. (Wazzan Report ¶¶ 27-33, 51-52, 89-106, 111-13.) As more fully set forth in the Wazzan Report, SRR's use of the GCM and multiples therefrom for its DCF analysis, improperly inflated the value it assigned to RVR.

5

Reliance and SRR failed to discover and/or understand the significant restrictions on liquidity of participants' stock, including the Plan's ability to delay redemption for up to 5 and even 10 years. (Wazzan Report ¶¶ 70-79, 114-15.) In light of this information, SRR should have applied a discount for lack of marketability of at least 10% to its valuation of RVR.

Reliance and SRR failed to understand that RVR's line of credit "must be considered as long term-term debt since (a) [as of 2014] RVR ha[d] not fully paid down its line of credit in recent years, and (b) the projected cash flows are not adjusted downward to pay the line of credit off." (Wazzan Report ¶¶ 54-56, 116-20.) As a result, Reliance/SRR failed to subtract the line of credit from RVR's enterprise value when calculating RVR's equity value.

Reliance and SRR failed to understand the dilutive effects of the Warrants on the value of RVR and their drain on the Company's cash flow. (See Wazzan Report ¶¶ 80-83, 121-23.) As a result, Reliance/SRR failed to subtract the value of the Warrants from RVR's enterprise value when calculating RVR's equity value.

Reliance failed to discover and understand the effects of the Employment Agreements between RVR and the Director Defendants on the value of RVR and the fairness of the Transaction to the Plan. Specifically, Reliance failed to investigate whether the Agreements' above-market compensation, loan forgiveness, and severance payment terms were so favorable to the Director Defendants that they should have been treated as additional consideration for the sale. (See Wert Report at 14, 25-27.)

**INTERROGATORY NO. 2**

Describe in detail any misrepresentation of a material fact that you contend was made by any of the Defendants in connection with the Transaction and, for each such alleged misrepresentation, describe in detail how that misrepresentation impacted the fair market value of the RVR stock sold to the ESOP and/or impacted the fairness of the Transaction to the ESOP.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. The Secretary further objects because the phrase "any misrepresentation

6

of a material fact that you contend was made by any of the Defendants in connection with the Transaction" is vague and ambiguous. Subject to and without waiving the foregoing objections, the Secretary states that he is not contending that any of the Defendants made a misrepresentation of material fact in connection with the Transaction that impacted the fair market value of the RVR stock sold to the Plan and/or impacted the fairness of the Transaction to the Plan.

**INTERROGATORY NO. 3**

Describe in detail any omission of a material fact that you contend was made by any of the Defendants in connection with the Transaction and, for each such omission, describe in detail how that omission impacted the fair market value of the RVR stock sold to the ESOP and/or impacted the fairness of the Transaction to the ESOP.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. The Secretary further objects because the phrase "any omission of a material fact that you contend was made by any of the Defendants in connection with the Transaction" is vague and ambiguous. Subject to and without waiving the foregoing objections, the Secretary states as follows:

Reliance "failed to inform SRR that Reliance had not obtained basic elements of control, and instead permitted SRR's analysis to assume that the ESOP would receive attributes for control." (Wert Report at 21.) This material omission was the result of Reliance's failure to provide SRR—prior to its May 21 Valuation Report—with the final terms of a number of documents, including the Trust Agreement, ESOP Committee Charter, Action By Written Consent of the Board of Directors of RVR, Inc. dated as of May 28, 2014, Action By Written Consent of Sole Shareholder of RVR, Inc. dated as of May 28, 2014, Investor Rights Agreement ("IRA"), and First Amendment to the Bylaws of RVR, Inc. ("Amended Bylaws"). These documents impacted the issue of control and the fair market value of the RVR stock. For example, the Amended Bylaws curtailed the Plan's rights with respect to control of the Board of

Directors, voting, and mergers and acquisitions. If SRR had been aware that the Plan would not receive the right to control RVR as a result of the Transaction, it should not have applied a 10% control premium in its May 21 Valuation Report, and should, instead, have applied a discount for lack of control. (See Wazzan Report ¶¶ 61-69, 107-10.)

Reliance appears to have failed to inform SRR prior to its May 21 Valuation Report that the Director Defendants' Employment Agreements would remain five-year contracts that automatically renewed annually and there would be no non-compete requirement post-termination. (See Pl. Dep. Ex. 75, SRR May 21 Valuation Report at 11, stating that the duration of the Employment Agreements "will be set at [three years] from the Transaction Date and noncompetition clauses will extend for 18 months at the end of the agreement.".) Accordingly, SRR's May 21 Valuation Report was based on incorrect information.

The Secretary does not contend that Smalley, Smalley Jr., or Bensen omitted any material facts in connection with the Transaction that impacted the fair market value of the RVR stock sold to the Plan and/or impacted the fairness of the Transaction to the Plan.

**INTERROGATORY NO. 4**

Describe in detail the factual basis for Plaintiff's contention that the RVR Defendants knew or should have known that Reliance's investigation of the fair market value of RVR's equity was flawed.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. Subject to and without waiving the foregoing objection, the Secretary states as follows:

Smalley, Smalley Jr., Bensen, and the Smalley Trusts ("Sellers") each knew or should have known that, by imposing a rushed timeline, Reliance and SRR could not give adequate

review and consideration to the Transaction.[1]  RVR management's April 16, 2014 presentation to Reliance and SRR included a pre-determined timeline for the Transaction.  (Pl. Dep. Ex. 19, Project Byway, Management Presentation to Reliance Trust Company as Trustee to the to-be-formed ESOP, dated April 16, 2014.)  From the initial meeting on April 16 to final negotiation of price and terms scheduled for May 12 was 26 days, and the entire Transaction was set to close in less than six weeks.  (See, e.g., Pl. Dep. Ex. 115, April 3, 2014 email from K. Buckles to B. Harlowe stating, "here is a big transaction that is on a fast track. $120k and will close by the end of May."; Pl. Dep. Ex. 55 at 9, March 2014 Chartwell "Potential ESOP Trustee Introduction Materials" stating that timeline for the Transaction was "abbreviated.")  The Sellers made clear that May 27, 2014, was a "hard close date" for the Transaction.  (Pl. Dep. Ex. 92, April 16, 2014 e-mail from M. Fournier re: Potential Comps – Project Byway.)  Rather than question the speed of the process, Reliance stated that it was "fully committed" to the Sellers' deadlines.  (May 8, 2014 e-mail from E. Turley re: Project Byway, DOL 0122306.)  The Sellers knew or should have known that the only way Reliance could heed their rushed timeline would be to truncate its review process.  And the Sellers were aware of several facts that indicated that Reliance's review process was indeed truncated.  It was not until April 24 that the Sellers began sending to Reliance and SRR the documents necessary for a due diligence review and initial valuation. (April 24, 2014 e-mail from S. Geerdes, DOL 0083622 – DOL 0083623.)  Moreover, the essential documents were sent to Reliance and SRR on a rolling basis through May 1.  (May 1, 2014 e-mail forward from M. Hricko with "Byway Projection – Updated 4.30.14" attached, DOL 0083653 – DOL 83656; May 1, 2014 e-mail from T. Margarit with "Byway SARs Plan Proposed Terms (5.1.14)" attached, DOL 0083648 – DOL 0083652.)  Nonetheless, SRR issued a valuation report on Friday night, May 2 (Pl. Dep. Ex. 67, May 2, 2014 e-mail from M. Hricko with "Draft Project Byway Material 5.5.14" attached), and Reliance made a counteroffer of $100 million to the Sellers on Monday, May 5.  (May 5, 2014 e-mail chain from S. Martin re: Reliance counter

---

[1]For more details on the rushed timeline, see the Secretary's Response to Joint Contention Interrogatory No. 10.

9

proposal, DOL 0122302 – DOL 0122305, DOL 0122305.)  The Sellers knew that Reliance did not receive the due diligence memorandum from K&L Gates until late on the night of May 22, 2014, and that Reliance did not have time to review the memorandum before the Friday May 23, 2014 meeting.  (Pl. Dep. Ex. 36, May 23, 2014 e-mail from S. Martin to G. Fresh.)  Reliance specifically informed Chartwell, the Sellers' representative and agent in the Transaction, that it had not received K&L Gates' legal memorandum regarding the Transaction in time to review it before the May 23, 2014 Subcommittee meeting and that there would probably be discussions "through the weekend."  (Id.).

The Sellers knew that Reliance did not have all of the information necessary for Reliance to make a fully informed and prudent counteroffer on May 5 because several key terms of the Transaction were still being negotiated.  For example, the Plan provisions, Trust Agreement, IRA, Amended Bylaws, and Employment Agreements were still not settled as of May 5.  (See Pl. Dep. Ex. 67 at 3-4.)  And despite Reliance, Chartwell, and the Sellers agreeing to a purchase price of $105 million for the Transaction on May 13, 2014 (Pl. Dep. Ex. 136, May 14, 2014 e-mail chain between T. Margarit and S. Martin re: Byway Proposal Response; May 13, 2014 e-mail from T. Margarit re: Byway Proposal Response with Chartwell May 13, 2104 Response to Trustee's Second Counter-Proposal attached, DOL 0062308 – DOL 0062312), the Sellers knew that the IRA, Amended Bylaws, Employment Agreements, and details relating to the Warrants (such as the strike price) and Management Incentive Plan ("MIP") were still not finalized.  (Pl. Dep. Ex. 36, May 22-23, 2014 e-mail chain between S. Martin and G. Fresh re: unresolved transaction provisions.)  In fact, these terms and documents were not finalized until a day or two before the May 28 Transaction closing date.  (Pl. Dep. Ex. 110, May 25, 2014 e-mail from A. Wilkerson with draft Amended Bylaws attached.)  These facts were known to the Sellers, and should have been red flags that their rushed timeline undermined Reliance's ability to carry out its fiduciary and ERISA obligations in the Transaction.

Finally, as set forth in response to Joint Contention Interrogatory No. 5(b) below, the Sellers knew or should have known that Reliance's investigation of the fair market value of RVR's equity was flawed based on Reliance's conduct in the negotiations and ultimate

10

agreement to purchase RVR stock above fair market value and on terms that were not fair to the Plan.

**INTERROGATORY NO. 5**

Describe in detail the factual basis for Plaintiff's contention that "Smalley, Smalley, Jr. and Bensen, individually and through their agent, Chartwell, [a] selected 'counter-parties' that they knew would approve the Transaction on terms favorable to them, . . . and [b] failed to negotiate in good faith on terms affecting the value of the Transaction that ultimately caused the Plan to pay more than fair market value for the RVR stock."

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. Subject to and without waiving the foregoing objection, the Secretary states as follows:

(a) In the presentation materials for both the February 4, 2014 Chartwell Corporate ESOP Advisory & Transaction Process Overview (Pl. Dep. Ex. 6) and the February 18, 2014 Project Byway Organization Kick-Off meeting (Pl. Dep. Ex. 10), Chartwell recommended to the Director Defendants that Reliance act as the Plan Trustee and that SRR act as Reliance's financial advisor for the RVR Transaction. (See also Pl. Dep. Ex. 8.) Chartwell, Reliance, and SRR had previously worked together on other ESOP transactions. (Pl. Dep. Ex. 42, November 21, 2018 e-mail from K. Schubert with chart.) In fact, prior to the RVR Transaction, SRR had recently closed another ESOP transaction in which Greg Fresh and Ted Margarit of Chartwell were counterparties. (Pl. Dep. Ex. 108; Hricko Dep. at 42-43 (authenticating e-mail); Margarit Dep. at 83-85.) Greg Fresh and Ted Margarit of Chartwell also had a close business relationship with Steve Martin of Reliance. Fresh had referred business to Reliance and Martin prior to the Transaction, and continued to do so during the Transaction. (Fresh Dep. at 193.) In February of 2014, Margarit exchanged an e-mail with Martin in which Margarit suggested that Martin would be hired as the Plan trustee for the RVR Transaction, referred to as "Project Byway." (Pl. Dep. Ex. 44; Margarit Dep. at 77-80.) During the RVR Transaction, Martin and Fresh participated in

11

an e-mail chain in which they discussed both the RVR Transaction and another business opportunity, "Project Spear," for which Chartwell's client ultimately hired Reliance to be the plan trustee. (Pl. Dep. Ex. 25; Fresh Dep. at 188-92.)  Greg Fresh described the number of trustees and financial advisors "who advertise services in the ESOP community" as "probably a handful."  (Fresh Dep. at 98.)

(b) Smalley, Smalley Jr., and Bensen, individually and through their agent Chartwell, knew that the RVR stock was worth far less than the $105 million purchase price to which Reliance agreed.  During a January 27, 2014 meeting between Chartwell, Smalley, Smalley Jr., and Bensen, Chartwell presented a "controlling interest equity value of $100.7 million" for RVR. (Pl. Dep. Ex. 3, "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration" at 28.)  In addition to the oral presentation, Chartwell sent Smalley, Smalley Jr., and Bensen a copy of the presentation containing the $100.7 million valuation on January 28, 2014. (Pl. Dep. Ex. 3 (cover e-mail).)  Chartwell itself questioned whether they could even credibly assign to RVR a $100.7 million equity value.  Stephanie Geerdes of Chartwell sent an e-mail to her colleague stating: "One thing that would really help all of the analysis is lowering the value. Ted and I aren't sure the company can support an E[nterprise] V[alue] of 140 but we are basically stuck with that number because Greg told the CFO that's the number we were getting in our valuation analysis when we had a call with him to talk about the projections."  (Pl. Dep. Ex. 43, January 26, 2014 e-mail from S. Geerdes to W. Bloom.)  On March 26, 2014, Chartwell presented an "updated valuation analysis" to Smalley, Smalley Jr., and Bensen in which it stated that the "fair market value" for all of the outstanding equity of RVR was $100.7 million, confirming its controlling interest equity valuation of $100.7 million from January 27, 2014. (Pl. Dep. Ex. 15, "Phase One ESOP Transaction Summary – Board of Directors Presentation" at 12.)

Not only were Smalley, Smalley Jr., and Bensen aware that the RVR stock was worth millions less than the $105 million Reliance agreed to pay, but they also knew or should have known that the $100.7 million figure included a control premium that increased the purchase price. (Pl. Dep. Ex. 3 at 19, 21).  Steve Martin testified on behalf of Reliance that it was the "intent" of Smalley, Smalley Jr., and Bensen, as well as Chartwell, "to have a controlling interest

12

transaction from the start." (Reliance 30(b)(6) (Martin) Dep. at 221:10-17.)  And Randall Smalley testified that, "In my mind, as a businessman, somebody says they want to buy your stock at 51 percent, they run the show. 100 percent, they really run the show[.]" (Smalley Dep. at 89:25-90:2.)

Despite understanding that the Plan was paying more for a controlling interest in RVR, Smalley, Smalley Jr., and Bensen also knew that the Plan would not be receiving control in fact. The January 27, 2014 presentation noted that the Sellers' ability to maintain of control of the Company and Board of Directors was a benefit of forming an ESOP (Pl. Dep. Ex. 3 at 16); the Sellers (and their agents) fought hard during the negotiations for terms that would allow them to maintain control of RVR (Pl. Dep. Ex. 73, May 22, 2014 e-mail for A. Wilkerson to B. Wright and S. Martin; Pl. Dep. Ex 34, Geerdes May 21, 2014 notes of weekly call with Bensen); and Smalley, Smalley Jr., and Bensen executed the Transaction documents that ultimately gave them, not the Plan, control of RVR.  Yet, in an e-mail to Chartwell, Martin noted that, "If the company has a blocking right then the ESOP should not pay control according to the DOL and Bob [Socol of SRR] also raised this point." (Pl. Dep. Ex. 36, May 23, 2014 e mail from S. Martin to G. Fresh.)

Smalley, Smalley Jr., and Bensen maintained control over RVR through their control of the Board of Directors, the ESOP Committee, the voting process, the Board member nomination process, and all mergers and acquisition activity.  (Pl. Dep. Ex. 150, IRA § 3.4; Pl. Dep. Ex. 151, Amended Bylaws (attached to Bylaws); Pl. Dep. Ex. 143, Trust Agreement §§ 2.3, 5.2, 7.3; Pl. Dep. Ex. 164, Action by Written Consent of the Board of Directors of RVR dated as of May 28, 2014, Inc. with ESOP Committee Charter attached as Exhibit B.)  As part of the terms of the Transaction, Smalley, Smalley Jr., and Bensen would be the sole members of RVR's Board of Directors.  (Pl. Dep. Ex. 53, Stock Purchase Agreement § 4.3(f) (requiring that the Plan Trustee execute a shareholder consent effective immediately at closing, confirming the election of Smalley, Smalley Jr., and Bensen to serve on RVR's Board of Directors); Pl. Dep. Ex. 152, Action by Written Consent of Sole Shareholder of RVR dated May 28, 2014.)  Despite initially requesting that the Trustee have a representative on the Board, Reliance agreed to drop this

13

request when the Sellers resisted. (Pl. Dep. Ex. 76, May 23, 2014 Memorandum from A. Wilkerson of K&L Gates to Reliance re: Acquisition of the Company Stock of RVR, Inc. ("K&L Gates Memo") at 15.)  Similarly, although Reliance declined to accept a requirement in the IRA that would dictate that the Board consist of Smalley, Smalley Jr., and Bensen for the duration of the Warrants (Aug. 18, 2014 e-mail from A. Wilkerson to S. Martin attaching committee minutes and revised K&L Gates Memo, MCD 00006912 – MCD 00006951, at MCD 00006941), through the Amended Bylaws and IRA, Reliance gave Smalley, Smalley, Jr., and Bensen control over the Board's nominations process and agreed that it would vote for whomever Smalley, Smalley Jr., and Bensen nominated to the Board. (Pl. Dep. Ex. 151, Amended Bylaws ¶ 2; Pl. Dep. Ex. 150, IRA §§ 3.2(b), 3.4; Pl. Dep. Ex. 120, May 23, 2014 e-mail from Martin to Chartwell stating "as a directed trustee, we would follow the direction to vote for the board's proposed director . . .") Moreover, the Bylaws could not be amended without Board approval. (Pl. Dep. Ex. 151, RVR Bylaws, Article VII.)

The Amended Bylaws also provided that the RVR Board, comprised solely of Smalley, Smalley Jr., and Bensen, would be responsible for all mergers and acquisitions activity involving RVR's stock or assets. (Pl. Dep. Ex. 151, Amended Bylaws, Article III, Section 14.)  They would review and respond to unsolicited offers and could unilaterally determine if the offer was not bona fide or in the best interests of the shareholders. The only obligation the RVR Board had to the ESOP was, prior to the execution of any agreement with a party whom they determined had made a bona fide offer, to inform the Plan Trustee of the receipt of such offer and provide a copy of the offer.  It was totally within Smalley, Smalley Jr., and Bensen's control to disregard an offer, which was tantamount to a "blocking right."  As stated by Reliance's Steve Martin in an e-mail to Chartwell's Greg Fresh, "[i]t puts the control of sell decisions firmly in the board[']s court and not individual shareholders." (Pl. Dep. Ex. 123, May 23, 2014 e-mail chain between S. Martin of Reliance and G. Fresh re: Board Review of Offer Procedure.)

As the sole members of the RVR Board of Directors, Smalley, Smalley Jr., and Bensen had the authority to appoint and remove the Plan Trustee.  (Pl. Dep. Ex. 143, Trust Agreement § 7.1).  Smalley, Smalley Jr., and Bensen also appointed themselves as the sole members of the

14

ESOP Committee, which was responsible for administering the ESOP and directing the trustee. (Pl. Dep. Ex. 164, Action by Written Consent of the Board of Directors of RVR dated as of May 28, 2014 with ESOP Committee Charter attached as Exhibit B.)  The Board of Directors controlled who was appointed to the ESOP Committee.  Only the ESOP Committee was given the right to interpret the Plan and Trust documents and its decisions are binding on the Trustee. (Pl. Dep. Ex. 164 at Exhibit B, ESOP Committee Charter § 4.08).

In addition to giving up control, Reliance also failed to secure any major concessions on terms that would have justified the inflated purchase price.  At one point in the negotiations, Reliance's counsel specifically stated that the Sellers had not made any concessions. (Pl. Dep. Ex. 73, May 22, 2014 e-mail from A. Wilkerson re: Draft Project Byway Presentation.)  The unusually long 40-year ESOP Loan term was not in the best interests of participants because it delayed participants' ability to receive their share of all the stock that the Plan purchased.  (See Wert Report at 27.)  For example, RVR could be sold before the stock is allocated to the individual participants' accounts.  But, it was a necessary term of the Transaction because, as Chartwell acknowledged, RVR had "very little free cash flow," and would not be able to pay off such a large amount of debt any sooner.  (Pl. Dep. Ex. 43, January 26, 2014 e-mail from S. Geerdes of Chartwell to W. Bloom of Chartwell.)

Reliance gave up millions of dollars in Warrants between Chartwell's initial offer and the final Transaction without receiving an appropriate reduction to the purchase price.  Moreover, the Warrants were immediately exercisable at a post-Transaction strike price ($7.50 per share) that was significantly lower than the price the Plan paid for its stock ($105 per share).  As a further benefit to Smalley and Smalley Jr., the Warrants were not subject to any performance hurdles or vesting and they were taxable at long term capital gains rates.  All parties involved knew that exercise of the Warrants would dilute the ESOP's 100% equity ownership and its ability to fully participate in the potential upside of RVR's success by as much as 35%, yet this dilutive value was not taken into consideration in either Chartwell's or SRR's valuations of RVR.  (Pl. Dep. Ex. 31, May 8, 2014 e-mail from G. Fresh to S. Martin stating "we are willing to exchange equity purchase price for more incentive/return based on the future performance" and

15

proposing "Warrants equal to 35.0% of the fully diluted equity, in exchange of the reduction in purchase price"; SRR 30(b)(6) Dep. at 204-07).

Reliance also acquiesced to Employment Agreements (Pl. Dep. Ex. 112) that paid Smalley, Smalley Jr., and Bensen above market salaries for renewing five-year terms with eligibility for increases in compensation and bonuses, as well as loan forgiveness and severance payments through the end of their terms. (Pl. Dep. Ex. 72, Wilkerson chart; Pl. Dep. Ex. 21, March 4, 2014 e-mail from E. Bensen to S. Geerdes with "Byway Management Compensation" attached; Reliance 30(b)(6) (Martin) Dep. at 120, stating it was "pretty clear to us . . .they were not interested in negotiating the salary agreements.")  Reliance did not even attempt to negotiate the salaries.  Although Reliance requested to limit the employment terms, restrict some of the severance terms, and add non-compete clauses in the amended Employment Agreements, it ultimately conceded to the terms demanded by the Director Defendants. (Pl. Dep. Ex. 76, K&L Gates Memo at 17.)

Although Smalley, Smalley Jr., and Bensen agreed that they would not increase their compensation without Reliance's approval (Pl. Dep. Ex. 150, IRA § 3.1(a)), they knew that their compensation was already far above market rates and that Reliance was aware of this. (Pl. Dep. Ex. 114; Pl. Dep. Ex. 73, 98, May 21, 2014 e-mail from S. Martin referring to "rich agreements.")  In addition, as the sole members of the Board, Smalley, Smalley, Jr., and Bensen knew they could direct Reliance to approve their request for increased compensation and/or terminate Reliance if it did not agree to such compensation increases.  (Pl. Dep. Ex. 34.)  Finally, although Smalley, Smalley Jr., and Bensen agreed to remove certain triggers for severance payments, such as termination for cause, change of control,[2] and voluntary resignation without

---

[2] While "change in control" was removed from the definition of "good reason," this removal appears meaningless because "good reason" continued to include: "any action by RVR which results in a diminution in the nature or status of the Executive's position, authority, duties or responsibilities (*which shall include Executive reporting to a Board of Directors comprised of individuals, the majority of whom are different than the individuals comprising the Board of Directors as of May 28, 2014*) (Pl. Dep. Ex. 112, Employment Agreements § 8.4 (emphasis added).)

16

good reason, they controlled each and every one of these triggers. (Pl. Dep. Ex. 76, K&L Gates Memo at 17.) And, involuntary termination or voluntary resignation for good reason still resulted in at least four years of severance (including benefits) if before a change in control and five years of severance (including benefits) after a change in control. (Pl. Dep. Ex. 158, 2000 Employment Agreements § 9.4.1-.2.) In addition, K&L Gates suggested that Reliance eliminate from the Employment Agreements the provision that, upon termination for any reason (except cause), the Company would forgive any outstanding loans made by RVR to the executive, not to exceed 75% of base salary. (Pl. Dep. Ex. 72, K&L Gates chart.) K&L Gates recommended that future loans be made at arm's length, if at all, and repaid in their entirety. It is unclear whether Reliance ever asked the Director Defendants for this change to the Employment Agreements, but, regardless, the change was never made. (Pl. Dep. Ex. 158, 2000 Employment Agreements § 9.4.4.)

Section 7.1 of the Stock Purchase Agreement provided that the Company shall pay all of the Sellers' expenses as part of the Transaction, including, without limitation, all fees and expenses of agents, representatives, counsel, accountants and consultants. (Pl. Dep. Ex. 53, Stock Purchase Agreement § 7.1.) According to the Flow of Funds Memorandum, $1,313,108.56 in fees were paid out of the proceeds of the purchase. From this amount, $550,000 was used to pay Chartwell, who represented both the Sellers and RVR. (Flow of Funds Memorandum, DOL 0010265). At the very least, Reliance should have negotiated to remove the portion of Chartwell's fees associated with its representation of the Sellers, who were counterparties to the Plan. (See Wert Report at 29.)

By virtue of participating in the Transaction, including executing the final Transaction documents, Smalley, Smalley Jr., and Bensen were aware of the aforementioned terms of the Transaction that unreasonably favored them and were aware that Reliance did not even attempt to negotiate most of them and quickly gave in on the others. (Pl. Dep. Ex. 164, Action by Written Consent of the Board of Directors of RVR, dated as of May 28, 2014.) Steve Martin even specifically stated to Smalley, Smalley Jr., and Bensen's agent, Chartwell, just days before the Transaction closed: "They have gotten almost everything they asked for so far and to keep at

17

the comp plan is only creating heartburn which I rarely get over transactions.  I still believe at the end of the day when this deal is audited by DOL, they will be required to modify some of these provisions or risk an action. Pigs get fat and Hogs get slaughtered[.]" (Pl. Dep. Ex. 52, May 23, 2014 e-mail from S. Martin to T. Margarit.)

**INTERROGATORY NO. 6**

Describe in detail the factual basis for any contention by Plaintiff that any of the RVR Defendants knew or should have known of the alleged flaws in SRR's valuations referenced in the Complaint, including that one or more of the SRR valuations relied upon by Reliance allegedly contained a control premium.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product.  Subject to and without waiving the foregoing objection, the Secretary states as follows:

The Sellers knew or should have known about several flaws in SRR's valuations.  On January 27, 2014, Chartwell presented an illustration to the Sellers that demonstrated how a valuation advisor for an ESOP trustee would perform a valuation of RVR for purposes of the proposed Transaction.  (Pl. Dep. Ex. 3, "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration" at 21.)  Based on Chartwell's January 27 presentation, the Sellers knew that selling a majority of shares to an ESOP resulted in a "control value" that included a control premium, which increased the calculated value of the RVR stock they would sell to the Plan through the Transaction.  (Pl. Dep. Ex. 3 at 19.)  Chartwell's January 27 and March 26, 2014 valuations both calculated a controlling-interest equity value of $100.7 million for all of RVR's stock.  (Pl. Dep. Ex. 3 at 28; Pl. Dep. Ex. 15, "Phase One ESOP Transaction Summary – Board of Directors Presentation" at 12.)  Moreover, Chartwell did not subtract the value of the Warrants outlined in the terms of the proposed Transaction in arriving at $100.7 million as the "fair market value" of RVR.  (Pl. Dep. Ex. 3 at 28, 31; Pl. Dep. Ex. 15 at 12, 14.)  Furthermore, Chartwell applied only a 5% discount for lack of marketability on the basis that "[i]n both

18

minority and majority sale transactions, it is typical to assume a discount for lack of marketability between 0% and 10%, with a 5% discount being expected on average." (Pl. Dep Ex. 3 at 19, 28; Pl. Dep. Ex. 15 at 12.)  Therefore, based on Chartwell's valuations, the Sellers knew or should have known that SRR's valuations also improperly included a control premium, did not properly account for the value of the Warrants, and did not include a high enough discount for lack of marketability.

The Sellers also knew that SRR's valuations were flawed because SRR failed to subtract the line of credit from RVR's enterprise value when calculating RVR's equity value.  On May 7, 2014, Chartwell held a phone call with RVR management, including Bensen, to discuss Reliance's May 5 counter-offer and SRR's valuation report underlying that counter.  (Pl. Dep. Ex. 30 S. Geerdes "Byway weekly call 5-7-14" call notes.)  On the call, Chartwell explained that SRR was "ignoring the line of credit in their valuation," and not treating it as long term debt, i.e., "not a contra to equity."  (Pl. Dep. Ex. 30.)  Therefore, Chartwell explained, SRR was not subtracting the line of credit in their valuation:  "Instead of enterprise value minus debt outstanding" from the line of credit, SRR is "doing just the value of the equity."  (Pl. Dep. Ex. 30.)  However, the Sellers knew or should have known that, in the case of RVR, treating the line of credit as "revolver . . . floor plan debt, really part of the business," was an error.  (Pl. Dep. Ex. 30.)  The Sellers knew and supplied historical balance sheets to Reliance and SRR showing that RVR never came anywhere close to paying off the line of credit in the previous several years. (See Pl. Dep. Ex. 67 May 2, 2014 SRR Valuation Report, with RVR-provided balance sheets at Exhibit B-2; Pl. Dep. Ex. 75 May 21, 2014 SRR Valuation Report, with RVR-provided balance sheets at 68; Wazzan Report at Exhibits 2 and 6A.)  The Sellers also knew and provided projected cash flows to Reliance and SRR that did not adjust downward to project paying off the line of credit.  (See Wazzan Report ¶¶ 55, 117.)  Therefore, the Sellers knew or should have known that the line of credit should have been treated as long term debt.  In turn, the Sellers knew or should have known that SRR erred by not subtracting the line of credit from RVR's enterprise value when calculating RVR's equity value in their valuation reports.

19

**INTERROGATORY NO. 7**

Describe in detail the factual basis for the allegation contained in subparagraph (7) of Paragraph 41 of the Complaint that SRR's valuation report overstated RVR's cash balance prior to the Transaction closing, including by describing in detail who was responsible for the alleged overstatement, if any.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product.  Subject to and without waiving the foregoing objection, the Secretary states as follows:

The April 16, 2014 Management Presentation forecasted that RVR's cash and cash equivalents would be $16,618,000 as of May 31, 2014.  (Pl. Dep. Ex. 19, Project Byway, Management Presentation to Reliance Trust Company as Trustee to the to-be-formed ESOP, dated April 16, 2014, at 34.)  This amount is higher than the amounts shown for 2012 and 2013 in the April 16, 2014 Management Presentation.  (Pl. Dep. Ex. 19, at 34.)  This information was presented by Smalley, Smalley, Jr., and Bensen to Reliance, SRR, and K&L Gates on April 16, 2014.  (Pl. Dep. Ex. 19 at 5; Fournier Dep. at 27-28; Reliance 30(b)(6) (Martin) Dep. at 297.)  The March 31, 2014 balance for RVR's cash and cash equivalents was $11,243,000.  (Pl. Dep. Ex. 67, May 2, 2014 e-mail from M. Hricko with "Draft Project Byway Material 5.5.14" attached, at Exhibit B-2; Pl. Ex. 75, May 21, 2014 e-mail from M. Hricko with "Project Byway ESOP Transaction Presentation DRAFT 5.21.2014.pdf" attached, at 68.)  The increase in cash and cash equivalents from 2012 and 2013 to May 2014, as set forth in the April 16, 2014 Management Presentation, was in excess of RVR's historical figures.  SRR used the April 16, 2014 Management Presentation forecast of RVR's cash and cash equivalents for May 31, 2014 in its May 2 and 21, 2014 valuations of RVR.  (Pl. Dep. Ex. 67 at Exhibit A-1; Pl. Dep. Ex. 75, May 21, 2014 e-mail from M. Hricko with SRR May 21 Valuation Report attached, at 56.)  Reliance reviewed the valuations, but failed to question SRR's use of $16,618,000 for cash and cash equivalents in its valuations.

20

**INTERROGATORY NO. 8**

Describe in detail the factual bases for any contention by Plaintiff that any of the RVR Defendants knew or should have known about the content of any discussions and meetings that Reliance had with its own employees and/or its advisors regarding the proposed Transaction. For purposes of this Interrogatory only, "discussions and/or meetings" shall not include any discussion or meeting in which the RVR Defendants, Chartwell, or Greenberg Traurig participated or attended.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. Subject to and without waiving the foregoing objection, the Secretary states as follows:

Reliance and its advisors communicated to the Sellers and their agents the contents of many discussions Reliance had internally and with Reliance's advisors. For example, Steve Martin discussed Reliance's position on several Transaction terms with Greg Fresh in the midst of negotiating back and forth offers and counter-offers. (Pl. Dep. Ex. 31, May 8, 2014 Sellers' Response to Trustee Counter; Pl. Dep. Ex. 32, May 12, 2014 Trustee Second Counter.) Martin and K&L Gates also relayed to Fresh and other Sellers' agents Reliance's concerns about the Sellers' Employment Agreements, compensation, and ability to block the sale of the Company. (Pl. Dep. Ex. 36, May 23, 2014 e-mail chain, Martin stating to Fresh, "If the company has a blocking right then the ESOP should not pay control according to the DOL and Bob [Socol of SRR] also raised this point"; Pl. Dep. Ex. 114, May 23, 2014 e-mail chain; Pl. Dep. Ex. 120, May 23, 2014 e-mail chain between Martin and Fresh; Pl. Dep. Ex. 121, May 23, 2014 e-mail; Pl. Dep. Ex. 136, May 13 e-mail chain; Pl. Dep. Ex. 141, May 24 e-mail chain; Pl. Dep. Ex. 142, May 24 e-mail chain.) Further, the Sellers knew details about SRR's valuation reports, including knowing that SRR failed to treat RVR's line of credit as long term debt in their valuations, as described more fully in response to Interrogatory No. 6 above. (See Pl. Dep. Ex. 30; Pl. Dep. Ex. 28, May 6, 2014 email chain setting up call between Chartwell and SRR to discuss differences between SRR's valuation and the valuation in Chartwell's April 21, 2014 "Ask Presentation.")

21

**INTERROGATORY NO. 9**

Describe in detail the factual basis for the allegations set forth in Paragraph 77 of the Complaint, including but not limited to, describing in detail how Smalley, Smalley, Jr. and Bensen each "knew" that Reliance (a) "failed to hire an independent appraiser"; (b) "failed to provide SRR with complete information", and (c) "failed to adequately investigate SRR's valuation report."

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. Subject to and without waiving the foregoing objection, the Secretary incorporates herein his responses to Interrogatory Nos. 4, 5, 6, and 10, and further states as follows:

(a) The Sellers knew that by hiring Chartwell for the Transaction they would be matched with a Plan trustee, trustee's appraiser, and trustee's attorney that would work together to close the Transaction at a price and on terms favorable to the Sellers. Chartwell, Reliance, and SRR had previously worked together on other ESOP transactions. (Pl. Dep. Ex. 42, November 21, 2018 e-mail from K. Schubert with chart.) On April 10, 2014, before RVR had even retained a Plan trustee for the Transaction, Chartwell sent to Reliance and SRR an agenda for an April 16, 2014 meeting with the Sellers. (Pl. Dep. Ex. 17, April 10, 2014 e-mail from L. Gullickson with "Byway Management Presentation Agenda" attached.) Matthew Hricko of SRR noted that he had "just closed a deal with Greg [Fresh] and Ted [Margarit] from Chartwell," when asking his supervisor if he could reach out to them to get more information about the RVR ESOP Transaction in advance of the April 16, 2014 meeting. (Pl. Dep. Ex. 108, April 11, 2014 e-mail from M. Hricko re: Byway Management Presentation Agenda.) During the April 16 meeting, the Sellers gave a timeline for the Transaction with a closing date of May 27, 2014. (Pl. Dep. Ex. 19, April 16, 2014 Project Byway, Management Presentation to Reliance Trust Company as Trustee to the to-be-formed ESOP, at 45.) The timeline contemplated that the Plan Trustee would provide a formal response to price, terms, and conditions by May 5, 2014, and that negotiations on price, terms, and conditions would be finalized by May 12, 2014. (Pl. Dep. Ex.

22

19 at 45.)  Chartwell gave a follow-up presentation to Reliance and SRR that included the Sellers' $143.9 million equity valuation of the Company and proposed terms for the Transaction. (Pl. Dep. Ex. 46, April 21, 2014 e-mail from T. Margarit with "Project Byway Proposed Term Sheet" attached; Pl. Dep. Ex. 22, April 21, 2014 E-mail from L. Gullickson with "Byway Trustee Presentation" attached.)  These information-sharing and deadline-setting meetings between the Trustee and Sellers (and their representatives) occurred before the Trustee undertook its due diligence review.  As the Sellers knew, the interdependence and mutual retention of Chartwell, Reliance, and SRR meant that SRR was never truly independent.

Moreover, Chartwell's January 27, 2014 "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration," presented to the Sellers, stated that Chartwell had "[l]ong-term relationships with the leading ESOP trustees, lawyers, financial advisors, consultants, administrators, fiduciaries, and related professionals."  (Pl. Dep. Ex. 3, "Project Byway Chartwell Introduction & Pro Forma ESOP Transaction Illustration," at 7).  Chartwell's February 4 and 18, 2014 presentations to the Sellers recommended SRR to be the Trustee's financial advisor for the Transaction.  (Pl. Dep. Ex. 6, Feb. 4, 2014 Project Byway – Transaction Process Overview, at 12; Pl. Dep. Ex. 10, Feb. 18, 2014 Project Byway – Organizational Kick-Off Meeting, at 13.)  Chartwell's March 26, 2014 "Phase One ESOP Transaction Summary," presented to the Sellers, stated that Chartwell "scheduled three potential ESOP Trustee interviews for next Monday and Tuesday, March 31 and April 1" and "will present the Company and the contemplated transaction to the ESOP Trustee and their advisors on April 16."  (Pl. Dep. Ex. 15, "Phase One ESOP Transaction Summary – Board of Directors Presentation" at 8.)

(b) The Sellers knew, through their agent Chartwell, that Reliance's May 5 counter-offer and May 13 agreement to the $105 million purchase price were based on an SRR valuation,[3] but, as more fully set forth in section 9(c) below, they also knew that key terms of the Transaction affecting the equity value of RVR were still being negotiated.  Similarly, the Sellers knew that,

---

[3] (See Pl. Dep. Ex. 28, May 6, 2014 email chain setting up call between Chartwell and SRR to discuss differences between SRR's valuation and the valuation in Chartwell's April 21, 2014 "Ask Presentation.")

23

on May 23, 2014, Reliance and its advisors, including SRR, met to review and approve SRR's Valuation Report and the entire Transaction. (Pl. Dep. Ex. 36, May 23, 2014 e-mail chain.) Yet, the Sellers also knew that important Transaction terms that affected the value of the stock being purchased by the Plan were negotiated throughout the weekend after Reliance and its advisors met and approved the Transaction. (Pl. Dep. Ex. 36, May 23, 2014 e-mail chain; Pl. Dep. Ex. 114, May 23, 2014 e-mail chain; Pl. Dep. Ex. 120, May 23, 2014 e-mail chain; Pl. Dep. Ex. 121, May 23, 2014 e-mail; Pl. Dep. Ex. 141, May 24 e-mail chain; Pl. Dep. Ex. 142, May 24 e-mail chain.) Therefore, the Sellers knew that Reliance had not provided complete information to SRR, which affected SRR's valuation of the Company and assessment of the fairness of the Transaction.

(c) Smalley, Smalley, Jr. and Bensen each knew that Reliance failed to adequately investigate SRR's valuation reports. As discussed thoroughly in the Secretary's response to Interrogatory No. 10 below, Smalley, Smalley, Jr. and Bensen each knew that the timeline for the Transaction was "abbreviated" when, at the outset, there were 53 days until closing, (Pl. Dep. Ex. 55 at 9), and was made more abbreviated after Reliance was engaged as the Plan's Trustee and there were only 42 days until closing (Pl. Dep. Ex. 19 at 45). Smalley, Smalley, Jr. and Bensen made clear that May 27, 2014, was a "hard close date" for the Transaction. (Pl. Dep. Ex. 92, April 16, 2014 e-mail from M. Fournier re: Potential Comps – Project Byway.) Smalley, Smalley, Jr. and Bensen knew that the only way Reliance could meet their rushed timeline was to truncate its review process.

Smalley, Smalley Jr., and Bensen knew that Reliance responded to their initial offer on May 5, 2014, and that the parties agreed to the $105 million purchase price on May 13, 2014. (May 5, 2014 e-mail chain from S. Martin re: Reliance counter proposal, DOL 0122302 – DOL 0122305, DOL 0122305; Pl. Dep. Ex. 136, May 14, 2014 e-mail chain between T. Margarit and S. Martin re: Byway Proposal Response; May 13, 2104 e-mail from T. Margarit re: Byway Proposal Response with Chartwell May 13, 2104 Response to Trustee's Second Counter-Proposal attached, DOL 0062308 – DOL 0062312.) These dates aligned with the rushed timeline that Smalley, Smalley Jr., and Bensen set out for Reliance and its advisors. (Pl. Dep.

24

Ex. 19 at 45.) Smalley, Smalley Jr., and Bensen also knew that Reliance responded to their initial offer and agreed to the purchase price on the basis of SRR's initial valuation report, which SRR provided to Reliance on May 2, 2014. (See Pl. Dep. Ex. 28, May 6, 2014 email chain setting up call between Chartwell and SRR to discuss differences between SRR's valuation and the valuation in Chartwell's April 21, 2014 "Ask Presentation.") Importantly, Smalley, Smalley Jr., and Bensen further knew that when Reliance responded to their initial offer and then agreed on the purchase price, most Transaction documents were still being created, revised, or negotiated.

For example, the Plan, Trust Agreement, IRA, Amended Bylaws, and amendments to the Employment Agreements either did not yet exist or were still being negotiated and drafted as of May 2, 2014. (Pl. Dep. Ex. 67, May 2, 2014 e-mail from M. Hricko with "Draft Project Byway Material 5.5.14" attached, at 3-4.) And Smalley, Smalley Jr., and Bensen knew that the IRA, Amended Bylaws, Employment Agreements, and details relating to the Warrants (such as the strike price) and MIP were being negotiated and still not finalized as of May 13, 2014, when Reliance and the Sellers agreed to the $105 million purchase price for the Transaction. (Pl. Dep. Ex. 136, May 14, 2014 e-mail chain between T. Margarit and S. Martin re: Byway Proposal Response; May 13, 2104 e-mail from T. Margarit re: Byway Proposal Response with Chartwell May 13, 2104 Response to Trustee's Second Counter-Proposal attached, DOL 0062308 – DOL 0062312; Pl. Dep. Ex. 36 May 22-23, 2014 e-mail chain between S. Martin and G. Fresh re: unresolved transaction provisions.) Indeed, the draft IRA was sent to K&L Gates by Greenberg Traurig on May 12, 2014, and the full terms of the Transaction were not finalized until a day or two before the May 28, 2014 Transaction closing date. (Pl. Dep. Ex. 148 May 12, 2014 e-mail from J. Kim attaching draft IRA; Pl. Dep. Ex. 110, May 25, 2014 e-mail from A. Wilkerson with draft Amended Bylaws attached.) With the terms of these Transaction documents still being either created or negotiated, Smalley, Smalley Jr., and Bensen knew or should have known that Reliance did not adequately investigate SRR's May 2, 2014 Valuation Report that Reliance relied on to respond to the Sellers' initial offer and agree to the final purchase price on May 13, 2014.

For the same reasons stated in (b) above, Smalley, Smalley Jr., and Bensen also knew that Reliance failed to adequately investigate SRR's May 21, 2014 Valuation Report because they knew that Reliance and the Sellers were negotiating numerous Transaction terms and documents after May 23, 2014.  For example, Reliance and Sellers negotiated amendments to the IRA, RVR's Bylaws, and the Director Defendants' Employment Agreements after May 23, 2014.  (Pl. Dep. Exs. 52, 141, 142.)  Scott Weiss of Weiss Brown, counsel for the Sellers, sent, on May 24, 2014, comments and changes to the IRA and the amendments to the RVR Bylaws.  (Pl. Dep. Ex. 142, May 24 e-mail chain.)  On May 24, 2014, Greenberg Traurig circulated additional draft documents, including the IRA, Amended Bylaws, and Shareholder and Board Consents.  (Pl. Dep. Ex. 50, May 24, 2014 e-mail from J. Kim attaching revised Transaction documents.)  On May 25, 2014, Greenberg Traurig again circulated revised drafts of "various ESOP transaction documents," including the IRA, Stock Purchase Agreement, Warrants, Amended Bylaws, and Board Consent.  (Pl. Dep. Ex. 51, May 25, 2014 e-mail from J. Kim attached revised Transaction documents.)  Greenberg Traurig attached a Closing Checklist to its May 25, 2014 email showing that numerous Transaction documents were still in draft status.  (Pl. Dep. Ex. 51.)

Smalley, Smalley, Jr., and Bensen also knew that Reliance did not receive the due diligence memorandum from K&L Gates until late on the night of May 22, 2014, and that Reliance did not have time to review the memorandum before the Thursday May 23, 2014 meeting of Reliance's Investment Policy Subcommittee.  (Pl. Dep. Ex. 36.)  Reliance specifically informed Chartwell that it had not received K&L Gates' legal memorandum regarding the Transaction in time to review it before the May 23, 2014 Subcommittee meeting and that there would probably be discussions "through the weekend."  (Pl. Dep. Ex. 36.)

The Sellers further knew of Reliance's failure to adequately investigate SRR's valuation report because Reliance agreed to the final $105 million purchase price on a controlling-interest basis even though the Sellers knew that the Plan would not have control of RVR post-Transaction.

**INTERROGATORY NO. 10**

Describe in detail the factual basis for Plaintiff's contention that one or more RVR Defendants "knew or should have known that the only way Reliance could heed their rushed timeline was to truncate its review process," including by describing in detail why Plaintiff contends the alleged timeline was "rushed" and why Reliance and it advisors could not assign additional resources, if necessary, to meet the alleged timeline.

**Response:**

The Secretary objects to this Interrogatory to the extent it impermissibly seeks protected attorney work product. Subject to and without waiving the foregoing objection, the Secretary states as follows:

The Sellers each knew or should have known that by imposing a rushed timeline, Reliance and its advisors could not give adequate review and consideration to the Transaction. On March 26, 2014, Chartwell presented a Phase One ESOP Transaction Summary to Smalley, Smalley Jr., and Bensen. (Pl. Dep. Ex. 15, "Phase One ESOP Transaction Summary – Board of Directors Presentation.") Therein, Chartwell proposed a transaction timeline that included:

- April 4, 2014 formally engage ESOP Trustee
- April 16, 2014 formal presentation of proposed equity valuation and transaction structure, terms, and conditions to the Plan trustee
- April 30, 2014 ESOP Trustee counter proposal
- May 7, 2014 finalize negotiations on price, terms, and conditions
- May 27, 2014 closing

(Pl. Dep. Ex. 15 at 26.)

From the date of the Plan Trustee's formal engagement, the Transaction timeline contemplated a period of 33 days until the negotiations on price, terms, and conditions were finalized, and 53 days until the deal closed.

In a March 2014 document entitled "Potential ESOP Trustee Introduction Materials" that Chartwell sent to Reliance, the timeline for the Transaction was described as "abbreviated." (Pl. Dep. Ex. 55 at 9.)

27

Although the Transaction timeline Chartwell set forth in its presentations to Smalley, Smalley Jr., and Bensen had stated that the Plan Trustee would be "formally" engaged by April 4, 2014, Reliance was not formally engaged until April 15, 2014.  (Pl. Dep. Ex. 144, April 15, 2014 Reliance Engagement Letter.)  SRR and K&L Gates were also not formally engaged until April 15, 2014.  (Pl. Dep. Ex. 97, April 15, 2014 SRR Engagement Letter; April 15, 2014 K&L Gates Engagement Letter, DOL 0009999 – DOL 0010012.)

The April 16, 2014 Management Presentation, made by Smalley, Smalley Jr., and Bensen to Reliance, SRR, and K&L Gates, set forth a timeline for the Transaction, which included:

- April 16 - Management presentation to the Trustee
- Week of April 21 - Chartwell to deliver term sheet presentation to ESOP Trustee
- May 5 - Trustee team provides formal response on price, terms and conditions
- May 12 - Finalize negotiations with Trustee on price, terms, and conditions
- May 27 - Transaction closes

(Pl. Dep. Ex. 19, Project Byway, Management Presentation to Reliance Trust Company as Trustee to the to-be-formed ESOP, dated April 16, 2014, at 45.)

The period from the formal engagement of Reliance on April 15, 2014 to the final negotiation of price, terms, and conditions set for May 12, 2014 was reduced to 27 days, and the entire Transaction was set to close in just 42 days.  (Pl. Dep. Ex. 19 at 45.)  The Sellers made clear that May 27, 2014 was a "hard close date" for the Transaction.  (Pl. Dep. Ex. 92, April 16, 2014 e-mail from M. Fournier re: Potential Comps – Project Byway.)  Thus, the timeline for the Transaction became even more abbreviated.

The Sellers knew or should have known that the only way Reliance could meet the unilaterally-imposed and abbreviated timeline would be to rush and truncate its review process. The Sellers were aware of several facts that indicated that Reliance's review process was indeed rushed and truncated.  For example, the April 16, 2014 meeting at RVR was the first and only time SRR and Reliance was on-site at RVR's offices and met in-person with RVR's management team.  It was not until April 24, 2014 that the Sellers began sending to Reliance and SRR the documents necessary for a due diligence review and initial valuation.  (April 24, 2014 e-mail

28

from S. Geerdes, DOL 0083622 – DOL 0083623.)  Moreover, the due diligence documents were sent to Reliance and SRR on a rolling basis through May 1, 2014.  (May 1, 2014 e-mail forward from M. Hricko with "Byway Projection – Updated 4.30.14" attached, DOL 0083653 – DOL 83656; May 1, 2014 e-mail from T. Margarit with "Byway SARs Plan Proposed Terms (5.1.14)" attached, DOL 0083648 – DOL 0083652.)  Nonetheless, SRR issued a valuation report on Friday night, May 2, 2014 (Pl. Dep. Ex. 67, May 2, 2014 e-mail with "Draft Project Byway Material 5.5.14" attached), and Reliance made a counteroffer of $100 million to the Sellers on Monday, May 5, 2014.  (May 5, 2014 e-mail chain from S. Martin re: Reliance counter proposal, DOL 0122302 – DOL 0122305, DOL 0122305.)

The Sellers also knew or should have known that Reliance and its advisors did not have all of the information necessary for Reliance to make a fully informed and prudent counteroffer on May 5, 2014, because several key terms of the Transaction were still being negotiated.  For example, the Plan, Trust Agreement, IRA, Amended Bylaws, and amendments to the Employment Agreements either did not yet exist or were still being negotiated and drafted as of May 5, 2014.  (Pl. Dep. Ex. 67, May 2, 2014 e-mail from M. Hricko with "Draft Project Byway Material 5.5.14" attached, at 3-4.)  And the Sellers knew or should have known that the IRA, Amended Bylaws, Employment Agreements, and details relating to the Warrants (such as the strike price) and MIP were being negotiated and still not finalized as of May 13, 2014, despite Reliance, Chartwell, and the Sellers agreeing to a purchase price of $105 million for the Transaction.  (Pl. Dep. Ex. 136, May 14, 2014 e-mail chain between T. Margarit and S. Martin re: Byway Proposal Response; May 13, 2104 e-mail from T. Margarit re: Byway Proposal Response with Chartwell May 13, 2104 Response to Trustee's Second Counter-Proposal attached, DOL 0062308 – DOL 0062312; Pl. Dep. Ex. 36 May 22-23, 2014 e-mail chain between S. Martin and G. Fresh re: unresolved transaction provisions.)  In fact, the full terms of the Transaction were not finalized until a day or two before the May 28, 2014 Transaction closing date.  (Pl. Dep. Ex. 110, May 25, 2014 e-mail from A. Wilkerson with draft Amended Bylaws attached.)

On May 13, 2014, eight days after its first counteroffer and before SRR's second valuation, Reliance stated that the parties had "a deal" at $105 million. (Pl. Dep. Ex. 136, May 13, 2104 e-mail from T. Margarit re: Byway Proposal Response with Chartwell May 13, 2014 Response to Trustee's Second Counter-Proposal attached, DOL 0062308 – DOL 0062312.) The Sellers, however, knew or should have known that Reliance and its advisors did not have all of the information necessary for Reliance to make a fully informed and prudent agreement to a purchase price and other terms on May 13, 2014, or to approve the Transaction price and terms on May 23, 2014, because several key documents and terms of the Transaction were still being negotiated. (Pl. Dep. Ex. 36.) Indeed, many of these documents were created, negotiated, or finalized after the May 23 meeting and one or two days before the closing of the Transaction. For example, Greenberg Traurig sent the draft IRA to K&L Gates on May 12, 2014. (Pl. Dep. Ex. 148 May 12, 2014 e-mail from J. Kim attaching draft IRA.) On May 24, 2014, Scott Weiss of Weiss Brown, counsel for the Sellers, sent comments and changes to the IRA and the amendments to the RVR Bylaws. (Pl. Dep. Ex. 142, May 24 e-mail chain.) Also on May 24, 2014, Greenberg Traurig circulated additional draft documents, including the IRA, First Amendment to the Bylaws of RVR, Inc., and Shareholder and Board Consents. (Pl. Dep. Ex. 50, May 24, 2014 e-mail from J. Kim attaching revised Transaction documents.) On May 25, 2014, Greenberg Traurig again circulated revised drafts of "various ESOP transaction documents", including the IRA, Stock Purchase Agreement, warrants, First Amendment to the Bylaws of RVR, Inc., and Board Consent. (Pl. Dep. Ex. 51, May 25, 2014 e-mail from J. Kim attached revised Transaction documents.) Greenberg Traurig attached a Closing Checklist to its May 25, 2014 email showing that numerous Transaction documents were still in draft status. (Pl. Dep. Ex. 51.) These draft documents were circulated by and among a number of law firms, including Greenberg Traurig, Morgan Lewis, Weiss Brown, and K&L Gates and multiple attorneys within each law firm, as well as other entities, including Chartwell, Reliance, and BDO.

In addition, the Sellers knew or should have known that Reliance did not receive the due diligence memorandum from K&L Gates until late on the night of May 22, 2014, and that Reliance did not have time to review the legal due diligence memorandum before the Friday

30

May 23, 2014 meeting of Reliance's Investment Policy Subcommittee. (Pl. Dep. Ex. 36.) Reliance specifically informed Chartwell that it had not received K&L Gates' legal memorandum regarding the Transaction in time to review it before the May 23, 2014 Subcommittee meeting and that there would probably be discussions "through the weekend." (Pl. Dep. Ex. 36.) The May 24-26, 2014 weekend was Memorial Day weekend.

These facts were known, or should have been known, to the Sellers and should have been red flags that their rushed timeline undermined Reliance's ability to carry out its fiduciary and ERISA obligations in the Transaction. Indeed, given the artificial time constraints imposed by the Sellers, Reliance's review was necessarily rushed and truncated. The time for the review shrank from 53 days to 42 days—more than a 20% reduction—because of the Sellers. Important documents necessary for a reasonable, prudent review did not exist or were still being drafted and negotiated at the time Reliance and its advisors were reviewing and negotiating the Transaction. These documents were circulated among, reviewed, and edited by numerous attorneys and persons other than Reliance and its advisors. Even if Reliance and its advisors assigned additional resources to the project, they could not review and analyze documents or amended documents that did not exist or otherwise speed up negotiations with the Sellers, their representatives, and others involved in the Transaction. Accordingly, the Sellers knew or should have known that the only way Reliance could heed their rushed timeline was to truncate its review process.

Dated: August 23, 2021

Respectfully submitted,

s/ Eric Lund
Eric Lund
Senior Trial Attorney

SEEMA NANDA
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor
 for Plan Benefits Security

31

WAYNE R. BERRY
Counsel for Litigation

Brendan Ballard
Senior Trial Attorney

ISIDRO MARISCAL
KATRINA LIU
Trial Attorneys

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013

Attorneys for Plaintiff, Martin J. Walsh
Secretary of Labor

32

**VERIFICATION**

I, Eric Lund, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing Responses to Joint Contention Interrogatories were prepared by the Secretary's counsel from documents presently in the Secretary's possession, as there are no persons now or previously employed by the Secretary who were involved in or otherwise have personal knowledge of the events on which the Secretary's claims are based, and on such basis, are true and correct according to my best information and belief.

/s/ Eric C. Lund
ERIC C. LUND
Senior Trial Attorney

# Exhibit 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor,<br><br>Plaintiff,<br><br>v.<br><br>Reliance Trust Company, *et al.*,<br><br>Defendants. | Action No. 2:19-cv-03178-JJT |

**EXPERT REPORT OF EDWARD A. WILUSZ**

**TABLE OF CONTENTS**

**PAGE**

I.    EXPERT QUALIFICATIONS ................................................................. 1

II.   RELEVANT BACKGROUND ............................................................... 2

    A.    Overview of ESOPs ................................................................... 2

    B.    Summary of the Transaction ...................................................... 4

    C.    Secretary of Labor's Allegations .............................................. 5

III.  OPINIONS ........................................................................................ 5

    A.    Industry Best Practices For ESOP Fiduciaries Are Designed To Meet Or Exceed An ESOP Fiduciary's Legal Obligations ......................... 6

    B.    The RVR Defendants' Conduct In Connection With the Evaluation, Negotiation, And/Or Execution of the ESOP Transaction Was Consistent with Industry Best Practices ........................ 8

        1.    RVR's retention of advisors, including Chartwell to serve as its financial advisor and as its representative in negotiating the terms of the RVR ESOP Transaction, is consistent with industry best practices. ............................ 9

        2.    RVR's Board ran a reasonable process that was consistent with industry best practices when it evaluated and selected a well-qualified, independent and experienced trustee, Reliance, to represent the ESOP in connection with the proposed ESOP Transaction. ....................... 12

        3.    The RVR Board's monitoring of the trustee, Reliance, was consistent with industry best practices and minimized the risk of any misadventure on the part of the trustee going unnoticed. ................................................................. 15

        4.    There were no "red-flags" that would have suggested to the RVR Defendants that Reliance was not fulfilling its fiduciary duties or that the RVR ESOP was paying more than fair market value for its RVR stock. ....................... 20

            a.    Transaction timing ........................................... 21

            b.    Alleged flaws in SRR's valuation(s) .................. 24

            c.    The RVR Defendants received multiple indications that the RVR ESOP paid at or below fair market value for the RVR stock it purchased ................ 26

                i     The purchase price was at the low end of the fair market value range estimated by Chartwell ...................................................... 26

i

ii      The RVR Defendants provided Chartwell and SRR conservative financials even though doing so underestimated RVR's free cash flow and decreased the fair market valueconclusions of RVR's stock ............................ 27

iii     The May 31, 2014 valuation of the RVR stock held by the ESOP provided further evidence that the Transaction was more than fair to the ESOP. .............................................. 28

IV.    CONCLUSION ................................................................................ 30

My name is Edward A. Wilusz and I am the Managing Director of Value Management Inc. I have been retained by Holland & Knight, counsel to Eric Bensen ("Bensen"), Randall Smalley ("Smalley"), Robert Smalley, Jr. ("Smalley, Jr."), the Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc. (collectively, the "RVR Defendants"), to opine on a number of issues related to RVR's exploration and ultimate decision to sponsor an employee stock ownership plan ("ESOP") and related actions by the RVR Defendants, including:

- whether the RVR Board of Directors' actions in connection with the selection and retention of Reliance Trust Company ("Reliance") to serve as the trustee for the RVR, Inc. Employee Stock Ownership Plan ("RVR Plan") were consistent with industry best practices,

- whether the RVR Board of Directors' monitoring of Reliance's conduct as Reliance evaluated and negotiated the sale of 100% of RVR's stock to the RVR Employee Stock Ownership Trust ("RVR ESOT")[1] on May 28, 2014 was consistent with industry best practices, and

- whether Reliance's conduct, as observable by the RVR Defendants, was consistent with industry best practices.

I will also provide a separate rebuttal report to the opinions offered by Plaintiff's identified expert witnesses on October 15, 2021 in accordance with the Court's Amended Scheduling Order.

I reserve the right to revise my opinions and/or this Report based on the receipt of additional documents, information, or instructions. I may prepare additional or supplemental demonstrative exhibits to explain the information and opinions offered in this Report or my to-be-issued rebuttal report.

## I.    EXPERT QUALIFICATIONS

I have a Bachelor of Science in Business Administration with a concentration in Accounting and Finance and an MBA with a concentration in Financial Management. I am a Chartered Financial Analyst ("CFA") and an Accredited Senior Member ("ASA") in the American Society of Appraisers. I am Founder and Managing Director of Value Management Inc., a firm specializing in business valuations, mergers & acquisitions and ESOP advisory services.

---

[1] The RVR ESOT and the RVR Plan will be collectively referred to in my report as the "RVR ESOP."

I have participated in the ESOP community for over 40 years. I have acted as financial advisor to plan sponsors, selling shareholders, trustees, and independent fiduciaries in more than 150 ESOP transactions. I was a member of the Valuation Advisory Committee of the ESOP Association for over 15 years and Chairperson of the Subcommittee responsible for updating the booklet "Valuing ESOP Shares." I have attended or spoken at over 100 national and local ESOP-related conferences, including on the subject of the ERISA duties and responsibilities of board members.

Additionally, I have provided business valuation and/or merger and acquisition services to thousands of closely held business stockholders and/or board members. My analyses and valuations have been used for, among other purposes, ESOP transactions, ESOP administration, estate planning, gift and income tax, and litigation.

I have been hired by, among others, the Internal Revenue Service, the Commonwealth of Pennsylvania, and the City of Philadelphia on various valuation or economic damage related cases. I have served as a director on various professional associations and non-profit boards. I am currently the Chairperson of a non-profit board and serve on the Strategic Planning Committee of another non-profit board.

Presented in Exhibit A is the list of the documents reviewed in connection with my analysis and opinions. I also interviewed Bensen, Smalley, and Smalley, Jr. in connection with my work on this matter.

Presented in Exhibit B is my CV, including a list of my publications from the last ten years and a list of cases in which I have provided testimony over the last four years.

My hourly rate for consulting in this matter is $550. My fees in this case are in no way contingent upon the opinions expressed by me.

## II.      RELEVANT BACKGROUND

### A.      Overview of ESOPs

It is my understanding that an employee stock ownership plan, or ESOP, is a defined contribution pension benefit plan that is designed to invest primarily or exclusively in the qualified securities of the sponsoring company. In addition to providing benefits to employees, ESOPs are a corporate finance tool and a means to encourage employees' beneficial ownership of their employer's stock. *See* ERISA-LH 30-C, 1972 WL 136948 (A.&P.L.H.), at 104, 107; *Employee Stock Ownership Plans: An Employer Handbook,* Committee on Finance, United States Senate (April 1980) ("Employer Handbook"), at p. 26; 129 Cong. Rec. S16629 at S16637, 132 Cong. Rec. S7934-01, 1986 WL 776250 (in addition to providing employee benefits, ESOPs provide "an incentive for corporations to structure their financing in such a way that employees can gain an ownership stake in the company for which they work").

A newly established ESOP has no assets of its own to purchase stock in the plan sponsoring company. As such, ESOPs are permitted to borrow money to invest in the

2

employer's stock. In a typical arrangement, the employer or selling shareholder(s) loan the ESOP the money to purchase the sponsoring company's stock. The ESOP debt does not burden the plan participants themselves because the plan participants are not personally liable for the debt.  Instead, it is the sponsoring company that ultimately bears the debt burden because it is the one responsible for making periodic contributions to the ESOP to allow the ESOP to repay the debt obligation.  As these contributions are made and the debt is gradually retired, shares of stock are released from the encumbrance of the debt and are allocated to the ESOP participants' accounts, where the value may rise and fall as it would for any stockholder.[2]

Congress appreciated the importance of succession planning in connection with ESOP-owned companies and understood that the founders of the subject business might remain active in the business even as they divested themselves of company stock.  In fact, the Department of Labor's ("DOL") Proposed Regulation on Adequate Consideration makes clear that a plan does not "fail to receive control merely because individuals who were previously officers, directors, or shareholders of the corporation continue as plan fiduciaries or corporate officers after the plan has acquired the securities."

Given the nature of ESOP financing and the relationship between the seller(s) and buyer, it is my understanding that ESOP transactions are generally subject to ERISA's prohibited transaction rules. This includes compliance with ERISA § 406(a)(1), which provides "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect - (A) sale or exchange, or leasing, of any property between the plan and a party in interest[] . . . [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1).

ERISA's broad prohibited transaction rules appear, on their face, to prohibit any ESOP transaction because the plan is transacting with the plan sponsor or its shareholders (*i.e.*, parties in interest).  Recognizing that such a prohibition would prevent the creation of ESOPs, Congress included a set of exemptions to work in tandem with the prohibited transaction rules.  Under ERISA § 408(e), for example, a plan may purchase employer securities so long as it does so for no more than "adequate consideration." 29 U.S.C. § 1108(e)(1).[3]  "Adequate consideration" in the context of a closely held corporation

---

[2]See, for example, The ESOP Association, Brief No. 1, *What Is An ESOP*?.

[3]See, for example, The National Center of Employee Ownership, Ackerman, David, *Questions and Answers on the Duties of ESOP Fiduciaries*, at Q. 70-71 (explaining prohibited transactions and statutory exceptions to the prohibited transaction provisions).

essentially means the fair market value of the corporation's stock as determined in good faith by the trustee or other named fiduciary.[4]

### B.    Summary of the Transaction

On May 28, 2014, the RVR ESOP acquired one hundred percent of RVR, Inc.'s ("RVR's" or the "Company's") stock from Bensen, Smalley, Jr., the Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and the Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004 (collectively, the "Selling Shareholders"), pursuant to the Stock Purchase Agreement, for a total price of $105 million (the "Transaction"). The RVR ESOP financed the stock purchase with a $104,401,014.94 loan from RVR ("ESOP Loan") and a $598,985.06 contribution from RVR.

RVR funded the ESOP Loan using existing cash, a draw from RVR's revolving line of credit with Wells Fargo Bank, and proceeds from a bridge term loan of $87 million from Wells Fargo Bank.

RVR's Transaction advisors were Chartwell Financial Services ("Chartwell"), Greenberg Traurig (U.S. Counsel), Crowe Horwath (Plan record keeper), BDO (accountants), and Owen Bird (Canadian counsel).

Randall Smalley and Robert Smalley, Jr. (collectively, "the Smalleys") were represented in their individual capacities by Weiss Brown and received advisory services from Jim Griffin of Wells Fargo Advisors. (Pl. Ex. 39).

Reliance's Transaction advisors were Stout Risius Ross, Inc. ("SRR") and K&L Gates.

Wells Fargo Bank was represented in the Transaction by the law firms of Morgan, Lewis & Bockius (U.S. Counsel) and Blake, Cassels & Graydon (Canadian counsel). (Pl. Ex. 39).

Following the close of the Transaction, the Smalleys loaned $95 million to RVR in exchange for junior subordinated notes ("Seller Notes"). The Seller Notes provided for a cash interest rate of 2.5 percent per year, payment-in-kind ("PIK") compounding interest at 1.0 percent per year, non-compounding PIK interest at 2.15 percent per year and warrants to purchase 666,667 shares of RVR stock at an exercise price of $7.50 per share. The Smalleys were also each responsible for guaranteeing $15 million of the Wells Fargo line of credit.

---

[4]Although the DOL proposed a regulation defining "adequate consideration" in 1988, Prop. DOL Reg. 29 CFR § 2510.3-18(b)), the regulation has never been adopted.

4

### C.    Secretary of Labor's Allegations

On May 16, 2019, the Secretary of Labor ("Plaintiff") filed a complaint alleging that Reliance:

- hired SRR as the "independent appraiser and financial advisor" for the Transaction, even though SRR was not truly independent,

- rushed its investigation of the Transaction,

- failed to provide SRR with complete information necessary to produce a reliable valuation report,

- did not adequately scrutinize and critically question SRR's valuation reports, which allegedly included several "red-flags," including: (1) failing to sufficiently account for lack of market comparability in SRR's guideline company method, (2) applying an inappropriate discount rate, (3) failing to account for the RVR ESOP's lack of control over RVR, and (4) failing to discount the fair market value of RVR's stock to account for the dilutive impact of the warrants and stock appreciation rights ("SARs"), and

- failed to negotiate the stock purchase price and other terms of the Transaction in good faith.

Plaintiff also alleges that Smalley, Smalley Jr., and Bensen knew or should have known about the circumstances that rendered the Transaction illegal under ERISA, including that: Reliance's investigation of RVR's fair market value was flawed, Reliance failed to hire an independent appraiser, Reliance rushed its investigation of the Transaction, Reliance failed to provide SRR with complete information, Reliance failed to adequately investigate SRR's valuation report, Reliance failed to negotiate in good faith, and Reliance caused the RVR ESOP to purchase RVR stock for more than fair market value.

Plaintiff further alleges that by failing in their duty to monitor Reliance in violation of ERISA, Bensen and the Smalleys, as Reliance's co-fiduciaries, enabled Reliance to engage in a prohibited transaction and breach its fiduciary duties to the ESOP. Finally, Plaintiff alleges that the Selling Shareholders knew or should have known that the RVR stock was acquired for more than adequate consideration (fair market value) in violation of the prohibited transaction rules.

## III.    OPINIONS

Based on my understanding of the foregoing and my review of the documents listed on Exhibit A and/or discussed in my report, my knowledge and my experience in advising and counseling many clients, including, but not limited to, plan sponsors, selling

5

shareholders, trustees, and independent fiduciaries regarding their respective ESOP transactions, the following are my opinions:[5]

### A.    Industry Best Practices For ESOP Fiduciaries Are Designed To Meet Or Exceed An ESOP Fiduciary's Legal Obligations

It is my understanding that the individuals and entities who administer an ERISA-governed ESOP, manage its assets, or otherwise exercise discretion or control over an ESOP's operation are fiduciaries.[6] ERISA sets forth specific requirements and standards of conduct for ESOP fiduciaries. Because fiduciary conduct is heavily regulated and the consequences of a breach of fiduciary duty can be severe, industry best practices are intended to meet or exceed the requirements set forth in ERISA.

It is important to note that industry best practices exist notwithstanding the absence of any meaningful guidance from the DOL.[7] Indeed, to date, the DOL has still not finalized the rules for how fair market value/adequate consideration is to be determined, even though the proposed regulation relating to the definition of adequate consideration was issued by the DOL in 1988 and repeated requests by the ESOP community for guidance. Given the lack of any clear, published standard, the ESOP community has developed a set of industry best practices over time that are designed to meet or exceed a fiduciary's legal obligations when negotiating and agreeing to an ESOP formation transaction and executing a stock purchase agreement with an ESOP.

The industry best practices that are relevant to my opinions in this case are as follows:

*First,* if the company's board lacks business valuation experience, the board should engage a financial advisor familiar with ESOPs to assist it to structure and evaluate the proposed ESOP transaction.

---

[5]In addition to my education, training, and experience, my opinions are also informed by my review of industry publications, including materials prepared by the ESOP Association and the National Center for Employee Ownership, the legislative history of ESOPs, and my participation in numerous ESOP industry conferences and panels, among other things.

[6]*See, e.g.*, The National Center of Employee Ownership, Ackerman, David, *Questions and Answers on the Duties of ESOP Fiduciaries*, at Q. 1 (explaining who is an ERISA fiduciary).

[7]While process agreements entered into between the DOL and various trustees over the last few years provide some insight as to the DOL's expectations, Plaintiff admits that it had not entered into any process agreements at the time of the May 28, 2014 RVR ESOP Transaction. (Pl.'s Response to Smalley, Jr.'s First Set of Interr. No. 7).

6

***Second***, where a company's board includes selling shareholders or others with possible conflicts of interest, the board should take steps to mitigate the possible conflicts. One way to do this is to hire a qualified independent trustee to represent the ESOP's interests and to negotiate on behalf of the ESOP because this, among other things, mitigates the risk of self-dealing by allowing an independent fiduciary to determine the company stock's fair market value free from the influence of the company's shareholders.[8] According to Plaintiff's allegations, if a company's board does appoint an independent trustee to represent the ESOP, the board becomes an "appointing fiduciary" with limited fiduciary responsibilities for monitoring the trustee. For purposes of my opinions, I have accepted this allegation as true.[9]

***Third,*** if an independent trustee is hired, the company's board (as appointing fiduciary) should inquire as to whether the independent trustee will be assisted by any advisors, including whether the trustee will retain a qualified and independent appraiser to conduct the requisite valuation of the stock at issue.[10]

***Fourth***, the company's board (as appointing fiduciary) should ensure that the independent trustee is provided with accurate information regarding the company; ideally, the due diligence would also include an on-site visit to the company's headquarters and the opportunity for the independent trustee and its advisors to discuss the company, its history, and its future expectations with one or more members of the company's management team.

***Fifth,*** the company's board should allow the trustee to engage in arms-length negotiations on behalf of the ESOP.[11] This does not (and should not) involve day-to-day supervision

---

[8]See, for example, The ESOP Association, Brief No. 2*, How To Establish An ESOP.*

[9] For purposes of my opinions, I have been asked to assume that the RVR Board (*i.e.*, the Smalleys) are the fiduciaries who appointed Reliance. Should the Court determine that Bensen is also an appointing fiduciary, my opinions would apply equally to him.

[10]The independent fiduciary representing the ESOP's interests in the proposed transaction should evaluate whether it has the experience, resources, and expertise to conduct the requisite valuation of the subject company's stock itself or whether it should retain an independent appraiser to serve as its financial advisor and to conduct the requisite valuation of stock at issue. An independent trustee is not required to retain a financial advisor to assist it to value the subject company's stock. However, it is a best practice for an independent trustee to do so. Regardless of the decision made, appointing fiduciaries should be aware of what person or entity is conducting the appraisal of stock and be comfortable that the person or entity is qualified and independent.

[11]Plaintiff admits that "a trustee negotiating the purchase of stock on behalf of an employee stock ownership plan must exercise its own judgment independently of the

7

of the independent trustee.  Instead, the board (as appointing fiduciary) must balance the need to observe the performance of the independent trustee with the need to preserve the trustee's independence by not meddling with the independent trustee's fulfillment of its duties.[12]  Day-to-day supervision of the independent trustee could adversely impact the goal of having an arms-length negotiation.  Thus, in my experience, monitoring of an independent trustee normally involves periodic observations of the independent trustee and the activities it is performing to fulfill its duties and responsibilities.

**Finally**, the company's board (as appointing fiduciary) is expected to address any "red-flags" associated with the work being performed by the independent trustee.[13]  Examples of "red-flags" could include: (1) a failure to interview the company's management regarding the business, (2) a failure to request due diligence regarding key aspects of the company, including its financial statements, or (3) acceptance of a high initial proposal without making any counter-proposal.

### B.   The RVR Defendants' Conduct In Connection With the Evaluation, Negotiation, And/Or Execution of the ESOP Transaction Was Consistent with Industry Best Practices

Based on my education and my 41 years of experience working with ESOPs, including participating in over 150 ESOP transactions in various capacities and participating in over 100 ESOP industry conferences, it is my opinion that the RVR Defendants' conduct in connection with the evaluation, negotiation, and/or execution of the RVR ESOP Transaction was consistent with industry best practices.  My more specific opinions are set forth below.

---

selling shareholders and engage in a good faith, arms-length negotiation."  (Pl.'s Am. Response to Bensen's First Set of Interr. No. 29).

[12]As explained by one court, "requiring defendants to inject themselves into [the independent trustee's] decision-making process to satisfy ERISA's duty to monitor is contrary to the very reason an ESOP sponsor should hire an independent fiduciary." *Fish v. GreatBanc Trust Co.*, No. 09-cv-1668, 2016 WL 5923448 at ¶ 350 (N.D. Ill. Sept. 1, 2016).

[13]Although not developed to address this specific situation, it is worth noting that this industry best practice is consistent with 29 C.F.R. § 2509.75-8(FR-17), which provides that "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure."

8

1.    **RVR's retention of advisors, including Chartwell to serve as its financial advisor and as its representative in negotiating the terms of the RVR ESOP Transaction, is consistent with industry best practices.**

Starting in late 2013 and early 2014, Bensen and the Smalleys began considering transitioning the ownership of RVR to RVR's employees through an employee stock ownership plan. (Bensen Dep. at 48, 51; Smalley, Jr. Dep. at 31-35; Smalley Dep. at 39-40).  Based on a referral from RVR's corporate bank, Wells Fargo, the Smalleys and Bensen had an in-person meeting on January 27, 2014 with Greg Fresh and Ted Margarit from Chartwell and Jim Griffin of Wells Fargo Advisors. (Smalley Dep. at 40-41; Bensen at 39-41; Pl. Exs. 3, 6).

During this January 27, 2014 meeting, Chartwell discussed the benefits of ESOPs, including succession planning, tax incentives, and providing an additional retirement benefit for employees.  Chartwell highlighted its experience representing various parties in the 75 ESOP transactions on which it had worked during the prior three years. Chartwell noted that it had "business relationships with all of the other leading professionals in the ESOP community."[14]  Chartwell testified that it shared this information with Bensen and the Smalleys because Chartwell believed that it "was important to establish Chartwell's credibility and knowledge of how ESOP transactions are executed." (Fresh Dep. at 45).

Based on preliminary information provided to Chartwell and with the assumption of a sale of one hundred percent of RVR's stock to the ESOP, Chartwell advised Bensen and the Smalleys that a preliminary fair market value range for 100 percent of RVR's stock as of December 31, 2013 was between $100.7 million and $143.9 million. (Fresh Dep. at 180-182; Margarit Dep. at 120; Pl. Ex. 3; Smalley Dep. at 93-94).  For illustrative purposes only, Chartwell used the low end of the range, $100.7 million, to analyze how much the Selling Shareholders might expect to receive under various scenarios and how a potential transaction could be financed and structured at that low-end price.[15] (Bensen Dep. at 54,

---

[14]Identifying members of the ESOP community with whom a service provider has experience is not uncommon in the industry.  Indeed, one of the trustee candidates interviewed by RVR, Alerus Financial, submitted materials to RVR which reflected that it had worked with law firms K&L Gates and McDermott, Will & Emery LLP, and financial advisory firms SRR and Prairie Capital Advisors, among others. (Pl. Ex. 162 at RVR40132).  It is worth noting that Reliance received proposals from all four of these advisors to assist it in evaluating the Transaction.  Ultimately, Reliance selected K&L Gates and SRR to serve as its advisors.   The fact that these entities may have worked together before is not surprising given that the ESOP community is a relatively specialized and niche community and Reliance and Chartwell had each engaged in dozens of transactions in the years leading up to the RVR ESOP Transaction.

[15]The Chartwell presentations make clear that the $100.7 million number was not **"the"** fair market value of 100 percent of RVR's stock.  Rather, it represented the low end of the

9

59, 80-82). This pro forma illustration was prepared approximately one month prior to RVR even engaging Chartwell. (Pl. Ex. 41).

Chartwell representatives explained to Bensen and the Smalleys that it was not conducting a true valuation of RVR stock; but, rather, it was merely providing an illustration of how a transaction might be structured assuming a deal was struck at the low end of the estimated fair market value range. (Smalley, Jr. Dep. at 62; Fresh Dep. at 56, Margarit Dep. at 57; Geerdes Dep. at 70-71). Chartwell was trying to estimate the low end of the valuation range because that is where Chartwell told Bensen and the Smalleys that the ESOP trustee would likely start negotiations. (Bensen Dep. at 80, 136; Smalley Dep. at 93-94, 101; Smalley, Jr. Dep. at 53-54, 76-77, 80,166; Fresh Dep. at 180-182; Margarit Dep. at 120; Pl. Exs. 3, 22).[16]

Chartwell explained the concept of "adequate consideration" (fair market value) and how the ESOP could not pay more than fair market value for the stock. (Smalley, Jr. Dep. at 94-95; Fresh Dep. at 51-52). Chartwell also explained the responsibilities of the ESOP trustee, the ESOP trustee's financial advisor, and the ESOP trustee's legal counsel, as well as how Chartwell would represent RVR in negotiations with the ESOP trustee. (Pl. Exs. 6, 10, 15 and 16; Bensen Dep. at 208; Smalley Dep. at 46).

By late February 2014, RVR had made the decision to explore a potential ESOP transaction and, on February 27, 2014, RVR retained Chartwell to serve as its financial advisor. (Pl. Ex. 41; Smalley, Jr. Dep. at 74-75). Among other things, Chartwell agreed to: (1) [r]ecommend a Transaction structure, or structures, to support the corporate financial goals of the Company…", (2) "[a]ssist in the Company's engagement of the ESOP Trustee (the ESOP Trustee will engage its own ESOP Financial Advisor and ESOP Legal Counsel)", (3) "[c]omplete a strategy for approaching and conducting discussions and negotiations with the ESOP Trustee", (4) "[c]oordinate and assist in due diligence

---

fair market value range estimated by Chatwell, with the upper end of the range being $143.9 million. (Pl. Ex. 15 at 7; Pl. Ex. 3 at CW-RVR_0027578). Chartwell's corporate representative, the Smalleys, and Bensen all testified that Chartwell advised RVR and its board of directors that $100.7 million reflected the low end of the fair market value range and that the upper end of the range was $143.9 million. (Fresh Dep. at 56, 180-82; Bensen Dep. at 80, 136; Smalley Dep. at 93-94, 101; Smalley, Jr. Dep. at 53-54, 76-77, 80,166; Margarit Dep. at 120; Pl. Exs. 3, 22). The DOL's assertion that $100.7 million was **"the"** one and only fair market value of the RVR stock ignores the uniform and uncontradicted testimony to the contrary.

[16]This testimony is consistent with the Chartwell engagement letter, which states that Chartwell will "[e]stimate the equity value from the perspective of an ESOP Trustee's Financial Advisor (as the purchaser of shares or equity, including pro forma terms and conditions)." (Pl. Ex. 41).

10

meetings with the ESOP Trustee", and (5) "[a]ssit in the negotiation and execution of a … definitive purchase agreement…".  (Pl. Ex. 41 at 1-2).

Chartwell was not the only advisor retained to advise RVR in connection with the potential ESOP Transaction.  Greenberg Traurig was retained to serve as the Company's legal counsel to ensure that the process being followed and any transaction ultimately executed was legally compliant and appropriately documented, BDO was retained to provide accounting and tax analysis for RVR's U.S. operations, Owen Bird was retained to address Canadian tax issues, and Crowe Horwath was retained to assist in plan design and to analyze RVR's future ability to repurchase shares of stock from retiring employees if an ESOP was adopted.  (Pl. Ex. 39; Smalley, Jr. at 75; Smalley Dep. at 43; Pl. Ex. 12, Crowe Engagement Letter).  The Smalleys also retained Wells Fargo Advisory and the law firm of Weiss Brown to advise them individually.

The "exploratory stage" in the ESOP process described above is typical.  Stockholders who are actively involved in their business are highly knowledgeable about their business operations, marketing, performance, industry, etc.  It is my experience, however, that they generally have little to no knowledge about the concept of an ESOP, the process involved in forming an ESOP, or the valuation of private company stock.

RVR's engagement of Chartwell and its other advisors to evaluate a possible ESOP transaction is also consistent with industry best practices.  It allowed Bensen and the Smalleys to learn about the benefits and requirements of ESOPs.  It also gave them an illustration of the low end of the fair market value range of the Company's stock.

Chartwell's provision of a potential range of value for RVR's stock is consistent with industry standards.  The DOL's proposed regulation relating to the Definition of Adequate Consideration recognizes this industry standard and provides that the "Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure…."  It is not unusual for a financial advisor to advise the selling shareholders to focus on the low-end of the range to manage expectations and ensure the selling shareholders and the company are prepared for the magnitude of likely initial offers from the independent trustee.

The engagement of experienced advisors also ensured that the RVR Board would be assisted by experienced professionals as it moved through the ESOP formation process, including when it selected a trustee to represent the ESOP, and negotiated and executed a stock purchase agreement.

11

2. **RVR's Board ran a reasonable process that was consistent with industry best practices when it evaluated and selected a well-qualified, independent, and experienced trustee, Reliance, to represent the ESOP in connection with the proposed ESOP Transaction.**

Following their engagements by RVR, Chartwell and Greenberg Traurig identified three well-qualified, independent trustee candidates for RVR's Board to consider retaining to represent the RVR ESOP: Reliance Trust (represented by Steve Martin and Bucky Wright), Alerus Financial (represented by Richard Joseph), and GreatBanc Trust (represented by Kevin Kolb). By early March 2014, Greenberg Traurig and Chartwell met with each of the candidates and ensured that they were each independent of RVR and the selling shareholders, there was no conflict of interest with RVR or the selling shareholders, and that the trustee candidates were interested in being interviewed by RVR. (*See, e.g.*, Pl. Ex. 11; Defs.' Am. Initial Discl. at Ex. A).

Several Company executives, including the Smalleys, Bensen, Cory Kauffmann, and Kevin Bensen, reviewed the trustee candidates' credentials in advance of the interviews. (Defs.' Amended Initial Discl. at Ex. A; Pl. Ex. 161). Each trustee candidate, including Reliance, was also provided with information regarding RVR and its business in advance of the interview along with a multi-page list of questions that the candidates should be prepared to answer. (Pl. Ex. 57; Smalley Dep. at 48). Reliance and the other trustee candidates also received materials entitled "Project Byway Company Introduction" in advance of the meeting. (Pl. Ex. 57). These materials provided information regarding RVR's history, rental and sale center numbers, and RV fleet, among other things.[17]

Chartwell (Ted Margarit), Greenberg Traurig (Marc Baluda), Bensen, and the Smalleys all participated in each of the trustee interviews and asked the trustee candidates detailed questions, including the following:

- the trustee's experience in ESOP transactions,

- whether the trustee has a fiduciary committee and the purpose of the fiduciary committee,

- the trustee's working relationship with the DOL, including lawsuits and audits,

- how long due diligence would take and what type of information the trustee would like to see,

---

[17]Reliance was aware that RVR was vetting several trustee candidates (Martin 5/18/21 Dep. at 282) and, based on the "Potential ESOP Trustee Introduction Materials," knew that the potential transaction being proposed involved a sale of 100 percentof RVR's stock to the RVR ESOP, initial financing from Wells Fargo, seller notes, warrants, a SARs pool and a proposed close date of May 27, 2014. (Pl. Ex. 55 at p. 4; Pl. Ex. 132).

- whether the trustee would retain a financial advisor and legal advisor to assist with the possible transaction, and

- whether the trustee had sufficient capacity and resources to evaluate, negotiate, and close an ESOP transaction by the proposed date of May 27, 2014.

(Pl. Ex. 55; Smalley, Jr. Dep. at 81-86; Bensen Dep. at 208; Smalley Dep. at 45-46; Martin 5/18/21 Dep. at 291-292).

Reliance and the other trustee candidates also learned additional information about RVR during the interview, including information regarding RVR, its history, its management, and the proposed deal structure. (Pl. Exs. 55, 56, 130-132; Smalley Dep. at 47).

During the interview of Reliance and relevant to my opinions, Reliance advised the RVR Board and its advisors that:

- it had served as trustee for more than 200 ESOP transactions since 2007,

- it utilized a fiduciary committee to review and approve transaction terms,

- it had not had any issues or lawsuits with the DOL, and

- the proposed time frame for evaluating, negotiating, and closing a deal was "perfect."

(Pl. Ex. 131 at 9; Pl. Ex. 132; Martin 5/18/21 Dep. at 283-284). Reliance also indicated that it would retain legal and financial advisors to assist it to evaluate and negotiate a potential transaction. Reliance testified that it advised RVR that it typically considers two or three financial advisors and identified SRR as being a preferred financial advisor by Steve Martin and Bucky Wright and also by Reliance's fiduciary committee. (Pl. Ex. 131 at 8; Martin 5/18/21 Dep. at 284). Reliance also identified three potential legal advisors: K&L Gates, McDermott, Will & Emery, and Bryan Cave. (Pl. Ex. 131 at 8).

After receiving input and guidance from Bensen, Chartwell, and Greenberg Traurig, the RVR Board (the Smalleys) selected Reliance because it found Reliance to be well qualified, well resourced (including by having an in-house valuation expert and in-house ESOP legal counsel), professional, and independent.[18] (Bensen Dep. at 208; Smalley, Jr. Dep. at 91; Smalley Dep. at 51-52). The RVR Board also liked the fact that, at the time, Reliance had never been sued by the DOL. (Smalley Dep. at 51; Smalley, Jr. Dep. at 91). Additionally, the fee proposed by Reliance was slightly lower than the fee proposals of the other two trustee candidates. (Pl. Ex. 162).

---

[18] Plaintiff admits that "Reliance had the credentials to serve as a discretionary trustee to the Plan." (Pl.'s Resp. to Bensen's First Request for Admission No. 55).

13

Reliance was notified that it was selected by the RVR Board to serve as the trustee for the RVR ESOP on April 4, 2014 and promptly began soliciting proposals from potential legal and financial advisors. (Defs.' Am. Initial Discl. at 10). After receiving proposals from two law firms and two valuation firms, Reliance selected SRR and K&L Gates as its advisors. (Martin 5/18/21 Dep. at 285). SRR had been previously and thoroughly vetted by Reliance and was on Reliance's pre-approved list of advisors. (Reliance Resp. to Pl. Interr. No. 2(d)). Additionally, prior to being selected, Reliance requested that both SRR and K&L Gates run a conflict check prior to their engagement. Neither SRR or K&L Gates advised Reliance of any conflicts of interest that would prevent them from working on the proposed transaction. (Reliance Resp. to Pl. Interr. No. 8).

When Reliance indicated its desired advisors, RVR conducted additional diligence and determined SRR and K&L Gates to be experienced and well-qualified. It is noteworthy that all three trustee candidates mentioned SRR as a preferred financial advisor during their interviews. (Defs.' Am. Initial Discl. at 10).

By April 10, 2014, SRR and K&L Gates had been notified of their selection by Reliance and were already considering due diligence for the potential ESOP transaction. (*See, e.g.*, DOL 0051464-65; DOL 0122224-25; Pl. Ex. 108).

In its engagement letter dated April 15, 2014, Reliance agreed "to serve as trustee under the ESOP with respect to fiduciary duties allocated to the trustee [under the] terms of the ESOP, this letter agreement, and applicable law." (Pl. Ex. 144 at 1). Reliance also agreed to "assume the fiduciary responsibility for determining, in consultation with its advisors, whether the price proposed to be paid for the stock in the Proposed Transaction is not more than the fair market value, and whether the Proposed Transaction, including any future management incentive plan adopted at the time of the Transaction is fair from a financial viewpoint to the ESOP and its participants. Reliance's determinations will be based upon such factors and information as it considers relevant including the appraisal by the independent appraiser and financial advisor of the stock." (Pl. Ex. 144). Reliance's engagement letter also represented that SRR would serve "as an independent appraiser and financial advisor," and the law firm of K&L Gates would serve as its legal counsel. (Pl. Ex. 144). Notably, Reliance's receipt of fees and expenses was not conditioned on the consummation of the ESOP Transaction. (Pl. Ex. 144 at 1-2).

The K&L Gates engagement letter confirmed that it had conducted a conflicts check and that it would provide independent professional judgment when providing advice to Reliance. (KLG000011-14). Additionally, the SRR engagement letter represented both that (1) SRR's "services will be performed with reasonable care in a diligent and competent manner", and (2) "[n]one of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach." (Pl. Ex. 37 at 7-8; SRR Dep. at 148-149).

Based on the above, it is my opinion that RVR's Board ran a reasonable process that was consistent with industry best practices in selecting a trustee to represent the RVR ESOP. It interviewed three qualified and independent trustee candidates and selected a well-

14

qualified, independent, and experienced trustee, Reliance, to represent the ESOP. Reliance's selection was based on its experience in representing ESOPs, its in-house valuation and legal experience, its lack of litigation, and apparent professionalism.

The retention of Reliance to serve as the ESOP's representative mitigated any potential conflicts of interest by allowing the independent fiduciary (with the assistance of separate and independent financial and legal advisors) to determine the fair market value of RVR's stock free from the influence of RVR or any of the Selling Shareholders.

Additionally, it is my opinion that the RVR Board satisfied industry best practices by ensuring that Reliance selected qualified advisors to advise it in connection with Reliance's representation of the ESOP. The representation in the engagement letter that SRR would serve as an "independent appraiser and financial advisor" as well as the representations made in the SRR and K&L Gates engagement letters provided the RVR Board with additional assurances that Reliance was aware of the need to select independent and qualified advisors and that Reliance had, in fact, done so.

3.      **The RVR Board's monitoring of the trustee, Reliance, was consistent with industry best practices and minimized the risk of any misadventure on the part of the trustee going unnoticed.**

Following Reliance's engagement, at the direction of the RVR Board and with the guidance and assistance of Chartwell and Greenberg Traurig, RVR began providing Reliance and its advisors information regarding RVR and its business. RVR's Chief Financial Officer, Bensen, was appointed by the Board to serve as the "lead person" and principal point of contact for Chartwell, Reliance and Reliance's advisors. (Smalley, Jr. Dep. at 69; Smalley Dep. at 44; Martin 5/18/21 Dep. at 290). Bensen, in turn, provided updates to the Smalleys multiple times per week. (Smalley, Jr. Dep. at 69; Smalley Dep. at 44, 60). Identification of a "point person" to handle due diligence and communicate with the trustee and its advisors is a best practice because it centralizes the process, helps to avoid confusion, allows for the efficient flow of data and quicker responses to requests, and minimizes potential delays.

Less than two weeks after being advised of its selection to serve as the RVR ESOP trustee, Reliance and its advisors flew to Mesa, Arizona on April 15, 2014 to meet with members of RVR's senior management and to tour RVR's facilities. That same day, Erin Turley of K&L Gates provided Chartwell with a comprehensive (25 page) consolidated due diligence request list on behalf of itself, SRR, and Reliance. (Pl. Ex. 18; Martin 5/18/21 Dep. at 38-39).

On April 16, 2014, Chartwell, Greenberg Traurig, Bensen, and the Smalleys made a management presentation to Reliance and Reliance's advisors. (Pl. Exs. 17, 19). The presentation lasted several hours, involved a detailed review of RVR and its business, and included a question-and-answer session. The presentation was followed by a tour of RVR's facilities, including its reservation center. (Martin 5/18/21 Dep. at 108, 288).

15

The day after the management presentation, on April 17, 2014, Chartwell made the due diligence data room available to Reliance's advisors, K&L Gates and SRR. (Fournier Dep. at 63-64; Pl. Ex. 65; Defs.' Am. Initial Disc. at Ex. A; KLG0000653). Materials immediately made available to Reliance's advisors on April 17, 2014 included audited financial statements, a key component in valuing a company.[19] (Fournier Dep. at 63-64).

Chartwell, Greenberg Traurig, Wells Fargo Advisors, and BDO provided the RVR Board and management team with regular (at least weekly and, often, daily) updates on due diligence requests, follow up questions asked by SRR and Reliance, and the status of the negotiations, among other things. (See, for example, Pl. Ex. 109; Smalley, Jr. Dep. at 95-96; Martin 5/18/21 Dep. at 289-290). The RVR Board and management team also provided Reliance and Reliance's advisors with direct access to Chartwell, Greenberg Traurig and Owen Bird, BDO and Seller's counsel, Weiss Brown, to facilitate due diligence, answer outstanding inquiries, and to negotiate outstanding deal terms. Reliance confirmed that "across all the parties, there was almost some daily contact regarding the transaction." (Martin 5/18/21 Dep. at 290). Reliance also testified that "Stout and K&L Gates communicated that they had received everything they were looking for in terms of information" from RVR. (Martin 5/18/21 Dep. at 289).

Significantly, Plaintiff does **not** allege that the RVR Defendants "made a misrepresentation of material fact in connection with the Transaction that impacted the fair market value of the RVR stock sold to the Plan and/or impacted the fairness of the Transaction to the Plan." (Pl.'s Resp. to Joint Set of Contention Interr. No. 2). Plaintiff also does not allege that the RVR Defendants withheld any material information from Reliance or its advisors in connection with the Transaction. (Pl.'s Resp. to Joint Set of Contention Interr. No. 3).

In addition to ensuring that Reliance and its advisors had the requisite due diligence, the RVR Board was kept informed as to key meetings being held by Reliance and its advisors. For example, through Chartwell and Bensen, the RVR Board knew that Reliance was having its Investment Policy Subcommittee ("Subcommittee") meeting on May 5, 2014 to discuss RVR's ESOP Transaction proposal. (CW-RVR-00049104). The RVR Board was also aware that Reliance's proposed counter-offer would be reviewed and discussed with SRR and Reliance's Subcommittee before being presented to RVR. (CW-RVR-00049104). The RVR Board was also notified of a second meeting with SRR and Reliance's Subcommittee on May 23, 2014 (Pl. Ex. 36, 49; Reliance Resp. to Pl. Interr.

---

[19] In late February 2014, and at the direction of the RVR Board, members of RVR's senior management began collecting due diligence on RVR. (Defs.' Am. Initial Discl. at Ex. A). Chartwell helped guide the process and provided RVR with a seven-page list of due diligence items to be gathered, including "high priority" items, such as financial records and forecasts, corporate formation documents, business and marketing plans, employee census data, fixed assets and schedules, and information regarding anticipated capital expenditures. (Pl. Ex. 10 at 32-37). For this reason, it is not surprising that the data room was populated with key information just two days after receipt of the K&L Gates due diligence request list.

16

No. 18).  Thus, the RVR Board was aware of the fact that SRR's valuation(s) were being considered and vetted by the Subcommittee on at least two separate occasions.

The RVR Board also observed Reliance and its advisors engaging in negotiations.  The RVR Board did not participate directly in the negotiations.  Rather, consistent with industry best practices, Chartwell presented the original offer and subsequent counter-offers to Reliance and its advisors.  A summary of the financial negotiations is presented below.

| SUMMARY OF NEGOTIATION OVER SELECT FINANCIAL TERMS | | | | |
|---|---|---|---|---|
| Offer/Counter-Offer | Equity Purchase Price | Warrants Attached to Seller Notes[20] | SARs | Interest Rate on Seller Notes |
| RVR Initial Proposal | $143.9 million | 32.49% | 17.49% | 4% cash/6% PIK |
| Trustee Counter-Offer | $100 million | 25% | 10% | N/A |
| RVR First Counter-Offer | $115 million | 35% | 12.5% | 3% cash/5% PIK |
| Trustee Second Counter-Offer | $105 million | 35% | 12.5% | 3% cash/5% PIK |
| Final Agreement | $105 million | 35% | Up to 12.5% | Cash interest at 2.5%, PIK compounding interest at 1.05% and non-compounding interest at 2.15% |

(See Pl. Exs. 29-31, 53, 61, 149; Bensen Dep. at 133-137, 140-141; Smalley, Jr. Dep. at 153-155; Smalley Dep. at 113, 151, 155).

The trustee's initial counter-offer included a purchase price for RVR's stock that was just below the low end of the fair market value range that Chartwell had initially estimated.  The initial counter-offer was over 30 percent below the amount set forth in RVR's initial proposal.

The RVR Board was also aware that Reliance and its advisors engaged in serious, arm's-length negotiations to change various corporate organization documents and the terms of Bensen's and the Smalleys' pre-existing employment agreements, bylaws, proposed SARs plan, investor rights agreement, and the stock purchase agreement.  Drafts of these

---

[20]That the number of warrants increased over the course of the negotiations is not unusual as they commonly increase when the interest rates on the seller notes are reduced.

documents started to be circulated among the parties no later than May 12, 2014. (Defs.' Am. Initial Discl. at Ex. A).

Additionally, the RVR Defendants were aware that due diligence was being confirmed until the day before the Transaction closed to ensure that there had been no material changes to RVR's business before the ESOP agreed to purchase the RVR stock.  Bensen participated in the final due diligence call with SRR on May 27, 2014 and the transaction advisors participated in an all-advisors call on May 27, 2014 to confirm that all outstanding matters had been resolved and that the transaction could close. (Pl. Ex. 101; Pl. Ex. 157; CW-RVR_00035357).

Significantly, prior to completing the Transaction on May 28, 2014, the RVR Board was aware that a number of representations were made, and opinions issued, that relate directly to the fairness of the transaction to the RVR ESOP and the legality of the ESOP Transaction.  These representations and opinions include:

- The representation on page one of the Stock Purchase Agreement that "the Trust has received an opinion from its independent financial advisors reflecting that: (i) the consideration paid for the shares of the Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")….and (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view." (Pl. Ex. 53 at 1; Bensen Dep. at 220-221).

- The representation on page 19 of the Stock Purchase Agreement that Reliance had analyzed, reviewed and approved the Fairness Opinion and accompanying report prepared by SRR and that SRR was an "Independent Financial Advisor." (Pl. Ex. 53 at 19).

- The representation on page 19 of the Stock Purchase Agreement that "[n]either the execution nor the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any Laws to which the ESOP is subject or any provision of the trust documents of the ESOP…" (Pl. Ex. 53 at 19).

- SRR's representation in a written fairness opinion dated May 28, 2014 that: (1) "the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares"; (2) "the interest rate on the ESOP Loan is not in excess of a reasonable interest rate"; (3) "the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arms-length negotiations between independent parties"; and (4) "the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view."  (Pl. Ex. 102; Bensen Dep. at 220; Smalley, Jr. Dep. at 98-99).

- SRR's representation in its written fairness opinion dated May 28, 2014 that: (1) "SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the U.S. Department of Labor and section 401(a)(28)(C) of the Internal Revenue Code of 1986, as amended"; and (2) "neither SRR nor any of its employees has a present or intended financial relationship with or interest in the Company." (Pl. Ex. 102 at 2, 4).

- Reliance's certification in the Trustee Certificate that the "Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill, prudence and diligence that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like a[i]ms." (Pl. Ex. 125; Bensen Dep. at 220-221, 223).

- Reliance's certification in an attachment to the Trustee Certificate that the Reliance Trust Company ESOP Trust Committee had reviewed and approved the proposed transaction. (Pl. Ex. 125 at Ex. A).

- K&L Gates' representation in a written opinion dated May 28, 2014 that the "acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code." (Pl. Ex. 79; Bensen Dep. at 220; Smalley Dep. at 98-99).

- Greenberg Traurig's representation in a written opinion letter dated May 28, 2014 to Wells Fargo Bank and Reliance that the "execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties [defined as RVR, Cruise America, and Cruise Canada] will not violate any applicable law, rule or regulation affecting such Opinion Party." (Smalley, Jr. Dep. at 98-100; Bensen Dep. at 225-226; RVR34895 - RVR34906).

As discussed above, in my experience, monitoring of an independent trustee normally involves periodic observations of the independent trustee and the activities it is performing to fulfill its duties and responsibilities. The RVR Board satisfied industry best practices in monitoring Reliance and confirming that Reliance was engaging in the type of conduct that would indicate that it was fulfilling its obligations to the ESOP.

For example, with the help of its advisor team, RVR developed a presentation and due diligence package that any potential buyer, including an ESOP, would request. The RVR Board, with and through its advisors, prepared for and participated in an in-person management presentation in which Reliance and its advisors had the opportunity to learn about the business, ask questions of senior management, and tour RVR's facilities. The parties created a system that fostered communications between RVR and its advisors, on the one hand, and Reliance and its advisors, on the other. The RVR Board was kept

19

abreast of the ongoing due diligence, the review of data by Reliance and its advisors and their follow-up questions regarding the information provided. The RVR Board was also aware that confirmatory due diligence was occurring up to the date of closing and that Reliance had secured a number of certifications from the Company regarding its business and financial projections.

Additionally, the RVR Board knew that Reliance had secured a valuation of the RVR stock from a qualified and independent financial advisor and that the valuation was discussed repeatedly by Reliance's Subcommittee and its advisors. As one would expect with any party negotiating a sale of stock, Reliance engaged in multiple rounds of negotiations over price, transaction terms, and changes to organization documents. The RVR Board was aware of these negotiations and knew that the ultimate purchase price agreed upon by the parties fell within the fair market value range identified by Chartwell. In fact, the purchase price was on the low end of the fair market value range identified by Chartwell.

As a final example, there is no evidence that Chartwell or any of the RVR Defendants' other advisers suggested to the RVR Board (or the RVR Defendants) that Reliance was not doing the types of things that would be expected of an independent trustee. To the contrary, before executing the transaction documents, the RVR Defendants received multiple assurances and representations that indicated that Reliance had fulfilled its obligations, the RVR ESOP was not paying more than fair market value for the RVR stock, and the ESOP Transaction was legally-compliant in all respects.

4.    **There were no "red-flags" that would have suggested to the RVR Defendants that Reliance was not fulfilling its fiduciary duties or that the RVR ESOP was paying more than fair market value for 100 percent of RVR's stock.**

As discussed above, an appointing fiduciary would not be in compliance with industry best practices if he or she ignored observable conduct that would indicate that the ESOP trustee was not fulfilling its responsibilities to the ESOP. Examples of trustee "red-flags" that might be observable (knowable) to the RVR Board could include: (1) a failure to interview the company's management regarding the business, (2) a failure to request due diligence regarding key aspects of the company, including its financial statements, or (3) acceptance of a high initial proposal without making any counter proposal.

None of these "red-flags" exist here. Instead, Plaintiff alleges that Smalley, Smalley Jr., and Bensen knew or should have known about the circumstances that rendered the Transaction illegal under ERISA because they knew or should have known that: (a) Reliance rushed its investigation of the Transaction, (b) Reliance failed to provide SRR with complete information and failed to adequately investigate SRR's valuation report and/or that SRR's valuation report was flawed, and (c) Reliance caused the RVR ESOP to purchase RVR stock for more than fair market value. I will address each of these alleged "red-flags" below.

20

### a.    Transaction timing

As Plaintiff itself concedes, there is no set amount of time it should take for a trustee to conduct due diligence, negotiate the terms of a transaction, and close that transaction.[21] A requirement that a trustee spend a certain number of days evaluating, negotiating, and closing an ESOP transaction would be arbitrary and meaningless.  The timing, as it relates to the evaluation and closing of a transaction, is impacted by, among other things:

- the company's preparation and collection of due diligence in advance of any trustee engagement,

- the time it takes for the trustee to engage its own financial and legal advisors,

- the timing of the management presentation and initial offer,

- the resources of the trustee and its advisors,

- the willingness of the selling shareholders and the trustee to agree on price and terms, and

- the complexity of the business at issue (i.e., significant intellectual property, number of lines of business, countries of operation, existence of audited financial statements, and a history of creating financial projections).

In this case, there was a proposed period of April 16 to May 27, 2014 (i.e., 42 days) from formal engagement of the trustee through the closing of the transaction. The RVR Defendants and Reliance all understood that the proposed period was simply a goal and not a hard deadline.[22]  Had the trustee required additional time, the RVR Defendants expected that Reliance would request that time given its responsibilities to the ESOP. Ultimately, the deal closed on May 28, 2014, one day after the proposed deadline.  In my experience, it was not uncommon for ESOP transactions to close within 30 days where the parties were motivated and committed to evaluating a deal quickly, due diligence was readily available, and the parties devoted the necessary resources to evaluate and negotiate the terms of the transaction.

---

[21] *See* DOL letter dated August 6, 2021.

[22] Defendants did not select the proposed May 27, 2014 closing date and did not consider it to be a hard deadline.  (Smalley, Jr. Dep. at 67-68, 70; Smalley Dep. at 147).  Smalley, Jr. testified that "[t]hese things, to me, are more yardsticks than anything, you know, not cast in stone.  They move.  It's a best guess.  So not really that important." (Smalley, Jr. Dep. at 68).

21

In my opinion, the fact that the Transaction closed 43 days after Reliance's official engagement was reasonable and would not have presented a red-flag to the RVR Board (or the Selling Shareholders) regarding Reliance's conduct because:

- all three trustee candidates interviewed by the RVR Board indicated they had the resources and time to properly review and either close or pull the plug on the proposed transaction by May 27, 2014,

- Chartwell advised the RVR Board that closing a deal by May 27, 2014 was reasonable and achievable,[23]

- the in-person management presentation took place on April 16, 2014,

- the amount and type of due diligence that was made available to Reliance's advisors through an electronic data room on April 17, 2014,

- the presentation of a detailed ask and term sheet on April 21, 2014,

- Reliance's statement that it was already making good progress on due diligence ten days after the management presentation,

- the participation of multiple representatives of SRR, K&L Gates, and Reliance in due diligence,

- the near daily communication between representatives/advisors of RVR and representatives/advisors of Reliance,

- SRR's provision of a draft valuation report and the consideration of the draft valuation report by Reliance's Subcommittee on May 5, 2014,

- the responsiveness of the parties to offers and counter-offers, and

- the nature of RVR's business (which was limited to conducting business in two countries, did not have multiple lines of business, did not have significant intellectual property, and had a long history of preparing conservative financial projections and obtaining audited financial statements).

To the extent Plaintiff claims that the timing of Reliance's counter-offers and tentative agreement on price is a "red-flag," I disagree.[24]  The timing of Reliance's counter-offers

---

[23] Chartwell's March 26, 2014 presentation to the RVR Board stated that "[b]ased on our current timeline, we believe a closing on May 27 is achievable." (Pl. Ex. 15).

[24] I also disagree with any suggestion that Reliance's receipt of the K&L Gates memorandum the night before the May 23, 2014 Subcommittee meeting to discuss the memorandum is something that would have served as a "red-flag" or put the RVR

22

and the timing of the tentative agreement on price is not unusual or surprising.  The initial ask and term sheet were provided on April 21, 2014 and explained over a conference call by way of a 46-page presentation. (Pl. Exs. 22, 46).  Chartwell had already gathered the vast majority of the diligence materials from RVR in February and March and populated it in a data room made available to Reliance's advisors K&L Gates and SRR on April 17, 2014. The additional data requests were promptly responded to by adding the materials to the data room.

With access to the required information and proper resources (SRR employees billed more than 143 hours to this matter between April 15, 2014 and May 2, 2014 (Pl. Ex. 95 at 1527236)), it is reasonable that SRR could render its initial, draft report by May 2 (16 days after starting its analysis and receiving financial information from RVR).  That SRR devoted so much time to the project immediately is not surprising given that it represented in its engagement letter that "[w]e are prepared to begin our work immediately."  (Pl. Ex. 97 at 2).

Plaintiff complains that "Reliance agreed to a purchase price of $105 million on May 13, 2014" despite knowing that "legal due diligence was ongoing" and before the terms of the Investor Rights Agreement, Bylaws, and Employment Agreements etc. had been agreed upon…"  This misrepresents the nature of the purported agreement.  The "deal" on price was expressly "subject to: 1) SRR being comfortable; and 2) Reasonable agreement on our requested changes to all documents including the employment agreements…"  (Pl. Ex. 137).  It also ignores that transactions are usually run on duel paths and are not linear; stated differently, the parties can negotiate deal terms and financial terms at the same time without compromising any aspect of the deal.

Here, the tentative agreement on price was based on certain assumptions being met and all parties getting comfortable with the overall fairness of the deal.  There were assumptions made that the parties would come to terms on the outstanding governance and compensation issues.[25]  If they could not come to terms, then either Reliance would reject the deal or the parties would have to revisit the purchase price.  Ultimately, Reliance

_____

Defendants on notice that the ESOP Transaction was rushed.  There is no set amount of time a valuation or due diligence memorandum should be provided in advance of a meeting - especially when the purpose of the meeting is to discuss that very valuation or memorandum. It was not uncommon for draft valuations or memorandums to be circulated during the meeting itself.  Thus, the fact that the SRR valuations and K&L Gates memorandum were circulated before the date of the scheduled meeting is consistent with a good industry practice.

[25] For example, the $105 million valuation already took into account the compensation of the executives and the terms of the pre-existing employment agreements for the Smalleys and Bensen.  Any changes negotiated by Reliance to the employment agreements, or limitation on future compensation, would potentially result in increased cash flow to the buyer and make the $105 million valuation even more attractive to the buyer.  Ultimately, Reliance negotiated an agreement that prohibited increases in the Selling Shareholders' compensation without prior approval from the ESOP trustee, among other concessions.

and its advisors became comfortable with the terms of the deal as reflected in the opinion letters discussed above and Reliance's decision to execute the transaction documents. The timing of this process simply does not represent a "red-flag" that would have triggered any concerns as to Reliance's performance or fulfillment of its responsibilities.

### b.     Alleged flaws in SRR's valuation(s)

Plaintiff complains that the RVR Defendants knew or should have known that Reliance failed to provide SRR with complete information, Reliance failed to adequately investigate SRR's valuation report, and/or that SRR's valuation was flawed.

As an initial matter, it would be inconsistent with industry best practices for the RVR Defendants to be aware of communications between the trustee and its advisors or the specific information being exchanged between the trustee and its advisors. The sharing of this type of information would also be inconsistent with the need for the parties to negotiate at arms-length. Plaintiff's allegation also seems to ignore the fact that Reliance and its advisors were all provided with access to the same information in the due diligence database and all had access to RVR's advisors. Given that Plaintiff admits that the RVR Defendants made no misrepresentation or omission of a material fact to Reliance or its advisors, it is difficult to see how Reliance failed to provide SRR with complete information or how the RVR Defendants should have been aware of any such failure.

As to the issue of the alleged flaws in SRR's valuation, Plaintiff has already admitted that the RVR Defendants did not receive a copy of the valuation until after Plaintiff commenced the instant litigation. (See Pl.'s Am. Responses to Bensen's First Request for Admission Nos. 39-41). Regardless, Bensen and the Smalleys could not have been aware of alleged flaws in SRR's valuation(s) as they did not have access to the valuation(s). Trustees generally do not allow the subject company or selling shareholders to see their financial advisor's valuation reports. This is done to ensure the transaction is conducted at "arm's-length," as required by the DOL.

The evidence in this case indicates that Reliance and its advisors acted consistently with the industry practice as the RVR Defendants' request for a copy of SRR's valuation was denied by both Reliance and SRR. (5/21/14 S. Martin Email, CW-RVR-00033549-50). SRR representatives Mark Fournier and Bob Socol also affirmatively represented that they "have had no conversations [with Chartwell] about the valuation analysis and conclusion." (Pl. Ex. 68 at 6).

Although the RVR Defendants did not have access to the SRR valuations, Plaintiff suggests that the RVR Defendants necessarily knew that SRR valued the stock on a controlling interest basis and that valuing the RVR stock on a controlling interest basis was improper.

In my experience, it is unusual for board members to have experience as to how private company stock is valued or what valuation methodologies, premiums, and discounts should be considered, if any, when valuing such stock. Prior to the Transaction, Bensen and the Smalleys did not have an understanding of how private company stock is valued.

24

(Bensen Dep. at 22-25; Smalley Dep. at 23, 97; Smalley, Jr. Dep. at 60). For this reason, RVR retained a financial advisor experienced in valuing private company stock for ESOP purposes, Chartwell, to assist it evaluate the fairness of the transaction.

Chartwell and Chartwell's materials advised the RVR Defendants that it is appropriate to value stock on a controlling interest basis whenever "more than 50 percent of the equity is being sold." (Margarit Dep. at 51). Chartwell's explanation was consistent with Randall Smalley's understanding: "We sold 100 percent of the stock. They had control. Plain and simple.... you know, 51 percent is control." (Smalley Dep. at 89).

It would be extremely unusual and inconsistent with my own experience for a company's board, senior management, and/or stockholders to question the appropriateness of a controlling interest valuation in the context of a sale of 100 percent of the company's stock, especially when the financial advisor has indicated that a controlling interest valuation was appropriate.

In fact, the DOL's proposed Regulation Relating to the Definition of Adequate Consideration states that "a plan would not fail to receive control merely because individuals who were previously officers, directors, or shareholders of the corporation continue as plan fiduciaries or corporate officers after the plan has acquired the securities."

Even valuation experts recognize that "[c]ontrol or minority is not a black and white concept with a bright dividing line. Control, or lack of it, covers a broad spectrum." Shannon P. Pratt & Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, at 385-386 (5th ed. 2008) (also providing that "[w]hen a holder has a majority of the voting shares that holder has control").

Given the lack of guidance provided on the issue of the appropriateness of a controlling interest valuation by the DOL and disagreement among the valuation community, a company and its stockholders would not be in a position to independently determine whether a controlling interest valuation is appropriate in connection with a 100 percent sale of private company stock.

For the same reasons set forth above, I also disagree with Plaintiff's contention that the RVR Defendants should have known that SRR used an inappropriate discount rate for the RVR stock's lack of marketability or allegedly mishandled the treatment of RVR's line of credit. These are discrete valuation issues on which reasonable valuation professionals can disagree. There is little chance a plan sponsor's board or selling shareholders would be familiar with these issues.

25

> **c.** **The RVR Defendants received multiple indications that the amount paid by the RVR ESOP for 100 percent of RVR's stock was at or below fair market value.**
>
> > **i** **The stock purchase price was at the low end of the fair market value range estimated by Chartwell.**

During the ESOP evaluation process, Chartwell advised Bensen and the Smalleys that the fair market value of 100 percent of RVR's stock ranged, in its estimate, between $100.7 million and $143.9 million. (Bensen Dep. at 80, 136; Smalley Dep. at 93-94, 101, 109; Smalley, Jr. Dep. at 166; Fresh Dep. at 180-182; Pl. Exs. 3, 22).[26]  Fair market value of private company stock is most commonly expressed as a range and Chartwell doing so in this instance is consistent with industry standards.

It is well-established that the valuation of private company stock is not an exact science and "necessarily leaves much room for subjectivity and disagreement."  Shannon P. Pratt & Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, at 639 (5th ed. 2008).  As long as the price ultimately paid for a private company's stock falls within the estimated range of fair market value, it is accepted in the ESOP industry that the stock has been bought for fair market value.

The DOL's Proposed Regulation Relating to the Definition of Adequate Consideration recognizes this industry standard and provides that the "Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure.  It is not the Department's intention that only one valuation figure will be acceptable as the fair market value of a specified asset.  Rather, this proposal would require that the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset."

The RVR Defendants were also aware that Chartwell's pro forma range of $100.7 million to $143.9 million did not take into account the Company's updated and improved financial data, which was distributed on April 30, 2014.  (Pl. Ex. 66).   If Chartwell had taken this data into account, Chartwell's estimated low end of the fair market value range of $100.7 million would have been $114.0 million,[27] approximately $9.0 million higher than the Transaction price of $105 million.  (See Exhibit C).

---

[26] This preliminary illustration was based on a number of valuation methods, including the merger and acquisitions method, and also included an analysis of the transactions in which the Budget Group previously bought and later sold RVR.

[27] This calculation uses Chartwell's discounted cash flow analysis set forth in their Phase One ESOP Transaction Summary – Board of Directors Presentation dated March 24, 2014 and leaves all other factors unchanged.

In light of the foregoing, it is not surprising that Smalley, Jr. testified that the agreed upon $105 million purchase price represented "the low side of the [fair market value] range." (Smalley, Jr. Dep. at 166).

<div align="center">

**ii**     **The RVR Defendants provided Chartwell and SRR conservative financial projections even though doing so underestimated RVR's free cash flow and decreased the fair market value conclusions of RVR's stock.**

</div>

Bensen and the Smalleys provided Chartwell and SRR with financial projections that they knew were conservative even though doing so underestimated RVR's free cash flow by approximately $3 million per year. This resulted in lowering the fair market value range of RVR's stock. SRR had requested that RVR revise its financial projections after properly determining that RVR was projecting capital expenditures higher than the historical levels. RVR rejected the opportunity to modify the projections despite the fact that doing so would have impacted the cash flow analysis and, ultimately, increased the purchase price.

As noted in Reliance's Investment Policy Subcommittee's May 5, 2014 meeting minutes:

- "Discussions with the Chief Financial Office[r] [Bensen] indicates that the provided projections are **very conservative and are viewed as absolutely attainable**. Such projections are predominately prepared in connection with the Company's banking relationship. **The Company has never missed attainment of the projections."** (Pl. Ex. 68 at 5) (emphasis added).

- "Chartwell adjusted the Company's projections to reduce the predicted capital expenditures in future years, freeing up cash flow. SRR believes this is a reasonable adjustment. However, SRR does not feel it is appropriate to modify management's projections to the extent they are reasonable or have been prepared in favor of the ESOP. **SRR did note that they had conversations with the Company and gave them an opportunity to modify the projections in light of historical evidence to the contrary. The Company declined**." (Pl. Ex. 68 at 5) (emphasis added).

The conservative nature of RVR's projections and its impact on the valuation was also discussed during Reliance's May 23, 2014 Subcommittee meeting: "SRR again noted to the committee that the cash flow analysis was conducted on the projections provided by the Company. As reviewed carefully in the prior meeting, **these projections are very conservative given historical activity…. [and, as a result,] the range of value provided by the discounted cash flow method is likely low."** (Pl. Ex. 77 at 3; *see also id.* at 4-5 (providing that the projections are conservative and explaining how SRR determined that the numbers were conservative).

SRR determined that the Company likely underestimated its free cash flow by $3 million per year. (Pl. Ex. 68 at 5). If that additional free cash flow had been taken into account in SRR's discounted cash flow model and leaving all other factors unchanged, the enterprise

<div align="center">27</div>

value conclusion reached by this model would have increased by at least $9.3 million. (See Exhibit D).

### iii    The May 31, 2014 valuation of the RVR stock held by the ESOP provided further evidence that the Transaction was more than fair to the ESOP.

An additional reason that Bensen and the Smalleys would not have had any concerns regarding the $105 million purchase price was the May 31, 2014 valuation of the ESOP stock, which was done for Plan administration purposes. (Pl. Ex. 105).

With an almost 100 percent leveraged ESOP Transaction, the expected fair market equity value of the RVR stock held by the ESOP as of May 31, 2014 would be near $0. This is because there is always a decline in a company's equity value following a leveraged ESOP transaction given the debt an ESOP takes on at its formation to finance the transaction.  This is no different than when a home buyer takes out a mortgage to purchase a house.  Assume the fair market value of the house is $200,000.  If the buyer puts $20,000 in cash toward the purchase price and borrows $180,000 to finance the remainder of the purchase, the buyer's equity in the house is $20,000—but the house is still valued at $200,000.  As the buyer pays down the principal on the mortgage loan, the buyer's equity in the house increases proportionately.  Similar logic applies to ESOPs that purchase company equity through debt financing.

Here, the "as of" May 31, 2014 valuation of the total equity of the ESOP's RVR stock was $8.3 million or $8.30 per share.[28]  From the RVR Defendants' standpoint, the May 31, 2014 valuation would indicate that the Transaction price was *below* fair market value and that the RVR ESOP and its participants received a significant wind fall from the Transaction.

And while subsequent events may not have been known or knowable at the time of the Transaction, they may be informative in examining the reasonableness of some of the Plaintiff's allegations.  Hence, I examined RVR's equity value trend since the Transaction, which is presented in the below graph.

---

[28] It is industry best practice to assume that the ESOP is a tax paying entity.  Hence, the post transaction value is increased by the present value of the tax savings on the ESOP principal payments.  Excluding the impact of the tax savings, the fair market equity value of the RVR stock would still be approximately $3.1 million, again suggesting the ESOP and its participants received a wind fall.

28



The equity value increased annually through May 31, 2021.  From May 31, 2014 through May 31, 2021, the total equity value of the RVR stock held by the ESOP increased from $8.3 million to $121.8 million or at a compound annual rate ("CAR") of 46.8 percent.  This large increase occurred despite RVR's business being impacted by COVID in the last two years.[29]  Notably, these post-Transaction valuations, which have been used by the Plan to pay the retirement benefits of retiring RVR employees.

To put RVR's performance in perspective, I compared the increase in RVR's equity value to the Standard & Poor's ("S&P") 500 index over the same period.  This is presented in the graph below.

---

[29]The increase in stock price was also driven, in part, by Bensen's and the Smalleys' decisions to voluntary decrease their contractually guaranteed compensation.  Since October 2014, the Smalleys have each waived more than $14 million in bonuses and other compensation to which they were otherwise entitled. Bensen also waived more than $4 million in guaranteed compensation since the ESOP Transaction.  These savings have inured to the benefit of the ESOP and its participants (i.e., RVR employees).

29



Over the 2014 through 2021 period, the S&P 500 index grew at a CAR of 11.8 percent while the RVR equity and stock price grew at a CAR of 46.8 percent during that same period. To illustrate this point, a $1 investment in the S&P 500 on May 31, 2014 would had grown to $2.19 by May 31, 2021. In contrast, the same $1 investment in RVR stock would have grown to $14.67 as of May 31, 2021 - a return of almost 7 times that of the S&P 500.

Based on the above, the RVR Defendants would have no reason at any time to believe that the RVR ESOP paid more than fair market value for the RVR stock purchased on May 28, 2014.

## IV.    CONCLUSION

Based on my education, 40 plus years of experience, my review of the cited material, my interview with Bensen and the Smalleys, and my discussion above, it is my opinion that the members of the RVR Board (and Bensen, if he is determined to be an appointing fiduciary) engaged in conduct that was consistent with industry best practices when

30

appointing and monitoring Reliance in connection with the ESOP Transaction, that the RVR Defendants had no reason to believe (and still have no reason to believe) that the RVR ESOP paid more than fair market value for the RVR stock purchased on May 28, 2014, and that there were no "red-flags" that would have put the RVR Defendants on notice that Reliance was not fulfilling its duties to the RVR ESOP or that the RVR ESOP Transaction was unfair to the ESOP.

Date:  September 17, 2021

_____
Edward A. Wilusz

## LIST OF DOCUMENTS REVIEWED

| **Pleadings** |
|---|
| Complaint for ERISA Violations filed May 16, 2019 [Docket No. 5] |
| Defendant's RTC's Answer to Plaintiff's Complaint filed July 30, 2019 [Docket No. 24] |
| Order Denying Motion to Dismiss filed February 18, 2020 [Docket No. 30] |
| Answer and Defenses by RVR, Eric Bensen, Randall Smalley, Robert Smalley, Jr. and the Family Turst, Marital Trust and Survivor's Trust Created Under the Smalley Revocable Trust dated July 8, 2004 filed March 3, 2020 [Docket No. 35] |
| Joint Rule 26(f) Report – Proposed Case Management Plan filed April 30, 2020 [Docket No. 42] |
| Order on Joint Motion for Entry of Stipulated Protective Order filed May 4, 2020 [Docket No. 44] |
| Rule 16 Scheduling Order filed May 7, 2020 [Docket No. 46] |
| Amended Rule 16 Scheduling Order (Amending ¶ 6 and ¶8; adding ¶18) filed May 13, 2020 [Docket No. 49] |
| Order on Joint Motion for Entry of Stipulated Order on Protocol for Remote Depositions filed January 26, 2021 [Docket No. 85] |
| **Mandatory Initial Disclosures** |
| Mandatory Initial Discovery Responses of Defendants RVR, Eric Bensen, Randall Smalley, Robert Smalley, Jr. and the Family Turst, Marital Trust and Survivor's Trust Created Under the Smalley Revocable Trust dated July 8, 2004 dated April 2, 2020 |
| Mandatory Initial Discovery Responses of Secretary of Labor dated April 2, 2020 |
| Frist Supplemental Mandatory Initial Discovery Response by RTR dated November 16, 2020 |
| SOL's First Supplemental Mandatory Initial Discovery Responses dated January 26, 2021 |
| Defendants' Amended Mandatory Initial Discovery Responses dated April 28, 2021 |
| SOL's Second Supplemental Mandatory Initial Discovery Responses dated July 14, 2021 |
| **Discovery** |

### LIST OF DOCUMENTS REVIEWED

| |
|---|
| **RVR, Eric Bensen, Randall Smalley, Robert Smalley, Jr. and the Family Turst, Marital Trust and Survivor's Trust Created Under the Smalley Revocable Trust dated July 8, 2004** |
| RVR's Responses to Plaintiff's First Request for Production of Documents dated August 14, 2020 |
| Bensen's Responses to Plaintiff's First Request for Production of Documents dated August 14, 2020 |
| Randall Smalley's Responses to Plaintiff's First Request for Production of Documents dated August 14, 2020 |
| Robert Smalley Jr.'s Responses to Plaintiff's First Request for Production of Documents dated August 14, 2020 |
| Trust Defendants' Responses to Plaintiff's First Request for Production of Documents dated August 14, 2020 |
| RVR's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Bensen's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Randall Smalley's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Robert Smalley Jr.'s Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Family Trust's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Marital Trust's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Survivor's Trust's Responses to Plaintiff's First Interrogatories dated August 24, 2020 |
| Bensen's Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Randall Smalley's Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Robert Smalley Jr.'s Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Family Trust's Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Marital Trust's Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Survivor's Trust's Responses to Plaintiff's First Request for Admissions dated August 24, 2020 |
| Robert Smalley's Amended Responses to Plaintiff's First Request for Admissions dated September 28, 2020 |
| Bensen's Amended Responses to Plaintiff's First Request for Admission dated November 2, 2020 |
| Bensen's Amended Responses to Plaintiff's First Interrogatories dated November 2, 2020 |
| Randall Smalley's Amended Responses to Plaintiff's First Request for Admission dated November 2, 2020 |
| Randall Smalley's Amended Responses to Plaintiff's First Interrogatories dated November 2, 2020 |
| Robert Smalley Jr.'s Amended Responses to Plaintiff's First Request for Admission dated November 2, 2020 |
| Robert Smalley Jr.'s Amended Responses to Plaintiff's First Interrogatories dated November 2, 2020 |

## *LIST OF DOCUMENTS REVIEWED*

| |
|---|
| Robert Smalley's Response to Plaintiff's Second Requests for Admissions dated January 4, 2021 |
| Robert Smalley's Response to Plaintiff's Second Requests for Production of Documents dated January 4, 2021 |
| RVR's Response to Plaintiff's Second Set of Interrogatories dated January 4, 2021 |
| RVR's Response to Plaintiff's Second Requests for Production of Documents dated January 4, 2021 |
| Robert Smalley, Jr.'s Response to Plaintiff's Second Set of Interrogatories dated January 4, 2021 |
| Robert Smalley, Jr.'s Response to Plaintiff's Second Request for Admissions dated January 4, 2021 |
| Robert Smalley, Jr.'s Response to Plaintiff's Requests for Production of Documents dated January 4, 2021 |
| Survivor's Trust's Response to Plaintiff's Second Requests for Admissions dated January 4, 2021 |
| Bensen's Response to Plaintiff's Second Request for Admissions dated January 4, 2021 |
| Bensen's Response to Plaintiff's Second Set of Interrogatories dated January 4, 2021 |
| Bensen's Response to Plaintiff's Second Requests for Production of Documents January 4, 2021 |
| Family Trust's Response to Plaintiff's Second Requests for Admissions dated January 4, 2021 |
| Marital Trust's Response to Plaintiff's Second Requests for Admissions dated January 4, 2021 |
| Randall Smalley's Responses to Plaintiff's Second Set of Interrogatories dated January 4, 2021 |
| **Secretary of Labor** |
| SOL's Objections to RVR's First Set of Interrogatories dated July 22, 2020 |
| SOL's Responses to Bensen's First Set Interrogatories dated August 24, 2020 |
| SOL's Supplemental Responses to Bensen's First Set of Interrogatories dated October 19. 2020 |
| SOL's Responses to RTC's 1st Request for Production of Documents dated August 14, 2020 |
| SOL's Responses to RTC's 1st Set of Interrogatories dated August 12, 2020 |
| SOL's Responses to Randall Smalley's First Set of Interrogatories dated December 22, 2020 |
| SOL's Responses to Randall Smalley Jr.'s First Set of Interrogatories dated December 22, 2020 |
| SOL's Responses to Eric Bensen's First Set of Request for Admissions dated December 22, 2020 |
| SOL's Amended Response to RTC's First Set of Request for Admissions dated January 14, 2021 |
| SOL's Response to Randall Smalley's Second Set of Interrogatories dated March 8, 2021 |
| SOL's Responses to Family Trust Created Under the Smalley Revocable Trust's First Set of Interrogatories dated April 29, 2021 |
| SOL's Second Amended Responses to Defendant Smalley Family Trust's Interrogatories dated July 1, 2021 |
| SOL's Second Amended Responses to Defendant Eric Bensen's First Requests for Admission dated July 1, 2021 |

## LIST OF DOCUMENTS REVIEWED

| |
|---|
| SOL's Second Amended Responses to Defendant Randall Smalley's First Set of Interrogatories dated July 1, 2021 |
| Email Chain between Brendan Ballard and Lindsey Camp - Supplementation of Discovery dated July 1, 2021 |
| Plaintiff's Amended Responses to Bensen's First Set of Requests for Admission to Plaintiff dated February 26, 2021 |
| Plaintiff's Amended Response to Randall Smalley's First Set of Interrogatories to Plaintiff dated February 26, 2021 |
| Email Chain between Brendan Ballard and Lindsey Camp - Supplementation of Discovery with Attachment dated August 2, 2021 |
| Email Chain between Brendan Ballard and Lindsey Camp - Supplementation of Discovery with Attachment dated August 6, 2021 |
| SOL's Responses to Defendants' Joint Set of Contention Interrogatories to Plaintiff dated August 23, 2021 |
| SOL's Supplement to February 26, 2021 Amended Responses to Interrogatory No. 3 and 4 of Defendant Randall Smalley's First Set of Interrogatories to Plaintiff dated August 23, 2021 |
| **Reliance Trust Company** |
| RTC's Response to Plaintiff's First Interrogatories dated August 12, 2020 |
| RTC's Response to Plaintiff's First Request for Production of Documents dated August 12, 2020 |
| RTC's Response to Plaintiff's First Request for Admission dated August 12, 2020 |
| RTC's Supplemental Response to SOL's First Set of Interrogatories dated November 11, 2020 |
| RTC's Second Supplemental Response to SOL's 1st Rogs dated December 4, 2020 |
| RTC's Response to Plaintiff's Second Request for Production of Documents dated December 7, 2020 |
| RTC's Response to Plaintiff's Second Interrogatories dated December 7, 2020 |
| RTC's Supplemental Response to SOL's 1st Interrogatories dated November 9, 2020 |
| RTC's Supplemental Response to SOL's First Request for Production of Documents dated January 22. 2021 |
| RTC's Objections and Responses to Plaintiff's Second Request for Admissions dated February 18, 2021 |
| RTC's Supplemental Response to Plaintiff's Second Request for Production of Documents dated March 9, 2021 |

## LIST OF DOCUMENTS REVIEWED

| |
|---|
| RTC's Objections and Response to Plaintiff's Third Request for Production of Documents dated March 31, 2021 |

| **Other Documents** |
|---|
| RVR Stout 2014 Opinion Letter on Valuation with Financials |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2015 Issued on August 24, 2015 |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2016 Issued on August 22, 2016 |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2017 Issued on August 18, 2017 |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2018 Issued on August 31, 2018 |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2019 Issued on August 20, 2019 |
| RVR, Inc. d/b/a Cruise America – Valuation of Common Stock as of May 31, 2020 Issued on August 10, 2020 |
| 2014 Balance Sheet Year To Date through February 2014 |
| 2014 Income Sheet Year To Date through February 2014 |
| 2009 RVR Audited Financial Statements as of December 31, 2009 |
| 2010 RVR Audited Financial Statements as of December 31, 2010 |
| 2011 RVR Audited Financial Statements as of December 31, 2011 |
| 2012 RVR Audited Financial Statements as of December 31, 2012 |
| 2013 RVR Audited Financial Statements as of December 31, 2013 |
| Stock Purchase Agreement among RVR Employee Stock Ownership Trust, RVR, Inc. and Robert Smalley, Jr., Eric Bensen, The Family Trust, The Martial Trust, and The Survivor's Trust dated May 28, 2014 (RVR32533) |
| Email dated January 28, 2014 from Ted Margarit to Eric Bensen regarding Project Byway Presentation Materials (DOL 0101454) |

## *LIST OF DOCUMENTS REVIEWED*

| |
|---|
| Email dated March 25, 2014 from Ted Margarit to Eric Bensen regarding Chartwell Project Byway Presentation (DOL 0050726) |
| Project Byway Management Presentation to RTC as Trustee to the to-be-formed ESOP dated April 16, 2014 (DOL 0120485) |
| Email dated April 21, 2014 from Ted Margarit to Steve Martin, Erin Turley, Allison Wilkerson, Bob Socol, Mark Fournier, Matthew Hricko regarding Summary of Proposed Byway Terms (DOL 0083596) |
| Email dated April 21, 2014 from Linsey Gullickson to Steve Martin, Bob Socol, Mark Fournier, Matthew Hricko, Eric Turley, Allison Wilkerson regarding Byway Trustee Presentation (DOL 0083499) |
| Email dated May 1, 2014 from Matthew Hricko to Steve Martin regarding Byway (DOL 0083653) |
| Email dated May 2, 2014 from Matthew Hricko to Steve Martin and Bucky Wright regarding Draft Project Byway Material 5.5.2014 (DOL 0003729) |
| RTC's Trust Committee Meeting Minutes for May 5, 2014 (DOL 0012853) |
| Email dated May 21, 2021 from Matthew Hricko to Steve Martin and Bucky Wright regarding Draft Project Byway Presentation (DOL 0084795) |
| RTC's Trust Committee Meeting Minutes for May 22, 2014 (DOL 0012838) |
| Electronic Binder of RVR Valuation Documents |
| Stout Opinion Letter dated October 31, 2014 (DOL 0013300) |
| Stout 2014 Valuation Support (DOL 0008318) |
| RVR, Inc. and Subsidiaries – Consolidated Financial Statement as of                May 31, 2014 |
| Project Byway Management Presentation (DOL0011733 – DOL 0011809) |
| Email from Steve Martin to Bob Socol and Ted Margarit regarding BDO Request – Project Byway (CW-RVR_00033549 – CW-RVR_0033550) |
| ESOPs – An Explanation for Employees dated March 1978 |
| Employee Stock Ownership Plans, An Employer Handbook dated April 1980 |
| ESOP Information prepared by Rick Pearl dated February 23, 2021 |

## LIST OF DOCUMENTS REVIEWED

| |
|---|
| Letter to Wells Fargo and Reliance Trust Company from Greenberg Traurig dated May 28, 2014 regarding GT Opinion |
| ESOP Brief Number 1 – What is an ESOP? |
| ESOP Brief Number 2 – How to Establish an ESOP |
| ESOP Brief Number 19 – ESOP Fiduciary Rules |
| RVR 1997 Form 10K |
| **Deposition Transcripts and Exhibits** |
| Deposition Transcript of Gregory Alan Fresh dated February 16, 2021 |
| Deposition Exhibits of Gregory Alan Fresh dated February 16, 2021 |
| Deposition Transcript of 30(b)(6) Chartwell Financial – Gregory Fresh dated February 17, 2021 |
| Deposition Exhibits of 30(b)(6) Chartwell Financial – Gregory Fresh dated February 17, 2021 |
| Deposition Transcript of Edward Joseph Margarit dated February 18, 2021 |
| Deposition Exhibits of Edward Joseph Margarit dated February 18, 2021 |
| Deposition Transcript of Kelly Ryan Bucky Wright dated March 25, 2021 |
| Deposition Exhibits of Kelly Ryan Bucky Wright dated March 25, 2021 |
| Deposition Transcript of 30(b)(6) of Reliance Trust Company – Christopher James Pitrof dated April 9, 2021 |
| Deposition Exhibits of 30(b)(6) of Reliance Trust Company – Christopher James Pitrof dated April 9, 2021 |
| Deposition Transcript of Mark Richard Fournier dated April 20, 2021 |
| Deposition Exhibits of Mark Richard Fournier dated April 20, 2021 |
| Deposition Transcript of 30(b)(6) of Stout Risius Ross – Mark Richard Fournier dated April 21, 2021 |
| Deposition Exhibits of 30(b)(6) of Stout Risius Ross – Mark Richard Fournier dated April 21, 2021 |
| Deposition Transcript of Matthew J. Hricko dated April 22, 2021 |

## *LIST OF DOCUMENTS REVIEWED*

| |
|---|
| Deposition Exhibits of Matthew J. Hricko dated April 22, 2021 |
| Deposition Transcript of David Williams dated May 6, 2021 |
| Deposition Exhibits of David Williams dated May 6, 2021 |
| Deposition Transcript of Stephen Allen Martin dated May 13, 2021 |
| Deposition Exhibits of Stephen Allen Martin dated May 13, 2021 |
| Deposition Transcript of 30(b)(6) of Reliance Trust Company – Stephen Allen Martin dated May 18, 2021 |
| Deposition Exhibits of 30(b)(6) of Reliance Trust Company – Stephen Allen Martin dated May 18, 2021 |
| Deposition Transcript of Eric Robert Bensen dated June 8, 2021 |
| Deposition Exhibits of Eric Robert Bensen dated June 8, 2021 |
| Deposition Transcript of Robert Arthur Smalley, Jr. dated June 10, 2021 |
| Deposition Exhibits of Robert Arthur Smalley, Jr. dated June 10, 2021 |
| Deposition Transcript of Randall Steven Smalley dated June 11, 2021 |
| Deposition Exhibits of Randall Steven Smalley dated June 11, 2021 |
| Deposition Transcript of Stephanie Ann Geerdes dated July 16, 2021 |
| Deposition Exhibits of Stephanie Ann Geerdes dated July 16, 2021 |
| **Experts** |
| Expert Report of C. Paul Wazzan, PH.D. dated August 13, 2021 |
| Opinion of Charles E. Wert Fiduciary Resolutions, Inc. dated August 13, 2021 |

*EXHIBIT B*
*PAGE 1 of 4*

## PROFESSIONAL QUALIFICATIONS

**EDWARD A. WILUSZ, CFA, ASA, MBA**

PRESENT POSITION: Edward A. Wilusz is Managing Director of Value Management Inc. In this capacity, he functions as a project manager responsible for financial analysis, economic analysis and valuation of closely held enterprises, professional practices, intangible assets and publicly traded securities. Mr. Wilusz has also prepared economic loss studies, fair value analyses for financial reporting purposes, and served as an adviser in the purchase and sale of business enterprises.

EXPERIENCE: Mr. Wilusz has been actively engaged in the appraisal profession since 1980. He has specialized in the valuation of business enterprises. His appraisals have been used for financial reporting purposes, estate planning, ESOPs, mergers and acquisitions, marital dissolutions, recapitalizations, dissenting stockholders' actions, estate and gift tax and fairness opinions.

EMPLOYMENT: Prior to forming Value Management Inc., Mr. Wilusz was Vice President at Financial Research, Inc., a business valuation firm specializing in marital dissolutions.

Previously, Mr. Wilusz was a Vice President and Principal at Hempstead & Co., a firm specializing in business valuations and mergers and acquisitions.

Mr. Wilusz was also employed as a financial analyst for Remington Rand Corporation where he prepared and interpreted financial plans and analyzed potential product lines and possible acquisitions.

EDUCATION: Mr. Wilusz has a Master of Business Administration degree from Drexel University. Mr. Wilusz received a Bachelor of Science degree presented Magna Cum Laude in Accounting and Finance from LaSalle University. He has also participated in various seminars for continuing appraisal education.

EXPERT TESTIMONY
EXPERIENCE: Mr. Wilusz has qualified as an expert witness and provided testimony in the following states: Pennsylvania, New Jersey, New York, and Ohio.

PROFESSIONAL
SOCIETIES: American Society of Appraisers (Senior Member-Business

Valuation); Chartered Financial Analyst (CFA); Member of the Charter Financial Analyst Institute; Member of CFA Society of Philadelphia, Inc.; Served as Member for 19 years- ESOP Association's Valuation Advisory Committee and Past Chairman of Sub-Committee to update Valuing ESOP Shares; Past-President of Bucks County Estate Planning Council; Past-President of Philadelphia Chapter of American Society of Appraisers.

SEMINARS:            Mr. Wilusz has been invited to address numerous legal, accounting, ESOP and estate planning organizations on the topic of business valuation.

PUBLICATIONS:      Mr. Wilusz has authored various articles in Value Management Inc.'s newsletters, *Value Added and Issues and Updates*.  He has also authored the following chapters in the book *Valuing Specific Assets in Divorce* (Aspen Law & Business): High-Tech and Other High-Growth Companies, Construction Companies, and Printing Companies.  He also authored "The Valuation of Marcellus Shale Natural Gas Royalty Rights" published in the PA Bar Associations Probate & Trust Law Section Newsletter.

OTHER:                Past Chairman of Pearl S. Buck International; Past Board Member of the Bucks County Community College Foundation; Chairperson of Mother of Mercy House.

*EXHIBIT B*
*PAGE 3 of 4*

**Edward A. Wilusz, ASA, CFA**
RECENT TESTIMONY

| CASE | MATTER | COURT | TESTIMONY | CASE NUMBER |
|------|--------|-------|-----------|-------------|
| Amo-Simon v. Simon | Divorce | Court of Common Pleas, Bucks County, PA Family Division | Arbitration – September 20, 2017 | Julia A. Amo-Simon v. Adam J. Simon A06-15-62141-D-26 |
| Robert A. Mariotti, Sr. v. Mariotti Building Products, Inc.; Robert A. Mariotti, Sr. v. Eugene L. Mariotti, Louis C. Mariotti, III, et al. | Shareholder Action | Court of Common Pleas of Lackawanna County, PA | Arbitration – August 15, 2018 | Robert A. Mariotti, Sr. v. Mariotti Building Products, Inc. No. 12 CV 545 and No. 12 CV 1406 |
| Body Transit, Inc. D/B/A Rascals Fitness | Cram Down in a Chapter 11 Bankruptcy | United States Bankruptcy Court for the Eastern District of Pennsylvania | June 18, 2020 | Case No. 20-10014 |
| Grace Land II, LLC and New Freedom Behavioral Helath, LLC v. Bristol Township et al | Civil Action | United States District Court Eastern District of Pennsylvania | Deposition – July 23, 2020 | No. 18-cv-05413-JS |

**Publications in the last ten year by Edward A. Wilusz, ASA, CFA**

Editor of Value Management Inc.'s Newsletters - "The M&A Resource" and "Issues & Updates."

***EXHIBIT C***
## RECALCULATION OF CHARTWELL'S DISCOUNTED CASH FLOW ANALYSIS USING REVISED PROJECTIONS

*U.S. Dollars in Thousands*

| | 7 mos ending 12/31/2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| ***EBITDA - Revised Projection dated 4/30/14*** | $ ***34,915*** | $ ***34,344*** | $ ***34,937*** | $ ***35,534*** | $ ***36,135*** |
| Less: Chartwell Depreciation | 12,098 | 19,332 | 19,443 | 19,554 | 19,665 |
| Chartwell Revised EBIT | 22,817 | 15,012 | 15,494 | 15,980 | 16,470 |
| Less Taxes at 40% | (9,127) | (6,005) | (6,198) | (6,392) | (6,588) |
| Chartwell Revised Net Inc | 13,690 | 9,007 | 9,296 | 9,588 | 9,882 |
| Plus: Dep - Vehicles | 11,688 | 18,882 | 18,993 | 19,104 | 19,215 |
| Plus: Dep - non vehicles | 263 | 450 | 450 | 450 | 450 |
| Less Capital Expenditures | (8,350) | (28,506) | (29,012) | (29,523) | (30,039) |
| Plus Non-cash Exp.from sale of vehicles | 4,106 | 7,975 | 8,250 | 8,525 | 8,800 |
| Less Working capital requirements | (9,600) | 130 | 130 | 130 | 130 |
| Adj. Cash Flow | 11,797 | 7,938 | 8,107 | 8,274 | 8,438 |
| | | | | | |
| Time period | 0.29167 | 1.08333 | 2.0833 | 3.0833 | 4.0833 |
| PV Factor | 0.97258 | 0.90190 | 0.81991 | 0.74537 | 0.67761 |
| PV | $ 11,474 | $ 7,159 | $ 6,647 | $ 6,167 | $ 5,718 |
| Total PV | ***37,165.4*** | | | | |
| Increase in cash flow vs. Original Analysis | $ 4,171 | $ 686 | $ 638 | $ 590 | $ 548 |

| Terminal Value Determination | |
|---|---|
| EBITDA | $ 36,135 |
| EBITDA multiple | 5.0 |
| Value at the end of 2018 | $ 180,675 |
| Present Value Factor | 0.64608 |
| PV of Terminal Value | $ 116,730 |
| PV of 2014-2018 | 37,165 |
| Total Present Value | $ 153,895 |

Using debt and cash in Chartwell analysis (normalized level)

| | |
|---|---|
| Rounded Average | $ 154,000 |
| Plus Cash | 11,578 |
| Less Debt | (47,280) |
| Plus S/H loans | 1,725 |
| Total Equity Value | 120,023 |
| Less: 5% DLOM | (6,001) |
| ***Revised Equity Value after DLOM*** | $ ***114,022*** |

*Source: The Discounted Cash Flow Analysis set forth in Chartwell's Phase One ESOP Transaction Summary - Board of Directors Presentation dated March 24, 2014 and the revised projected income statements dated 4/30/2014.*

*EXHIBIT D*

**CALCULATION OF INCREMENTAL VALUE USING SRR'S DISCOUNTED CASH FLOW METHOD AND NORMALIZED CAPITAL EXPENDITURES**

*U.S. Dollars in Thousands*

| | For the Period Ending | | | | |
|---|---|---|---|---|---|
| | 7-months 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
| SRR Capital Expenditures | $ 8,350 | $ 30,400 | $ 31,400 | $ 32,400 | $ 33,400 |
| Normalized Capital Expenditures | 7,002 | 28,056 | 29,012 | 29,523 | 30,039 |
| Potential Additional Cash Flow | 1,348 | 2,344 | 2,388 | 2,877 | 3,361 |
| **PV Factor at 12.5%** | 0.96623 | 0.88021 | 0.78241 | 0.69547 | 0.61820 |
| Present Value | $ 1,302.48 | $ 2,063.20 | $ 1,868.39 | $ 2,000.87 | $ 2,077.76 |
| ***Increase in Present Value*** | **$ 9,313** | | | | |
| | | | | | |
| SRR Capital Expenditures | $ 8,350 | $ 30,400 | $ 31,400 | $ 32,400 | $ 33,400 |
| Normalized Capital Expenditures | 7,002 | 28,056 | 29,012 | 29,523 | 30,039 |
| Potential Additional Cash Flow | 1,348 | 2,344 | 2,388 | 2,877 | 3,361 |
| **PV Factor at 11.5%** | 0.96875 | 0.88876 | 0.79710 | 0.71488 | 0.64115 |
| Present Value | $ 1,305.87 | $ 2,083.26 | $ 1,903.47 | $ 2,056.72 | $ 2,154.91 |
| ***Increase in Present Value*** | **$ 9,504** | | | | |

Source for SRR Capital Expenditures:  SRR Analysis sent to Reliance on 5/21/2014, DOL 0084851.
Source for Normalized Capital Expenditures:  April 21, 2014 Presentation to Reliance Trust Company as Trustee of the to be formed ESOP, DOL 0083519.

# Exhibit 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of Labor,

                                    Plaintiff,

v.

Reliance Trust Company, *et al.*,

                                    Defendants.

Action No. 2:19-cv-03178-JJT

**EDWARD A. WILUSZ'S REBUTTAL TO CERTAIN OPINIONS OFFERED
BY C. PAUL WAZZAN**

**TABLE OF CONTENTS**

PAGE

I.   EXPERT QUALIFICATIONS ................................................................. 1

II.  SUMMARY OF THE RELEVANT OPINIONS OFFERED BY WAZZAN .............. 1

III. REBUTTAL OPINIONS TO WAZZAN REPORT ..................................... 2

  A.  Wazzan's "Valuation" Fails To Comply With Fundamental
      Valuation Industry Standards ................................................. 2

    1.  Wazzan did not perform an independent valuation of the
        RVR stock bought by the ESOP ....................................... 3

    2.  Numerous errors in Wazzan's "valuation" renders it
        unreliable ...................................................................... 4

        a.  Wazzan's haphazard modification of various inputs
            in SRR's DCF model renders the valuation
            conclusion unreliable .......................................... 4

        b.  Wazzan's DCF "valuation" conclusion is further
            flawed by his misunderstanding of control and the
            application of a discount for lack of control .......... 6

        c.  Wazzan erred when he failed to take into account
            the market prices of securities of companies
            engaged in lines of business similar to RVR's
            business .......................................................... 8

        d.  Wazzan's consideration of the warrants when
            valuing the fair market value of 100% of RVR's
            stock violates valuation standards and the
            definition of fair market value ............................. 9

        e.  Wazzan failed to conduct a "sanity check" of his
            work leading to his significant errors going
            unnoticed by him .............................................. 10

  C.  Wazzan's "Lost Opportunity Cost" Calculation Is Based On
      Flawed Assumptions ............................................................ 12

IV.  CONCLUSION ............................................................................ 13

My name is Edward A. Wilusz and I am the Managing Director of Value Management Inc. I have been retained by Holland & Knight, counsel to Eric Bensen ("Bensen"), Randall Smalley ("Smalley"), Robert Smalley, Jr. ("Smalley, Jr."), the Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc. (collectively, the "RVR Defendants"), to offer my opinions on select aspects of the report prepared by Plaintiff's identified expert witness C. Paul Wazzan ("Wazzan" and the "Wazzan Report").

I reserve the right to revise these rebuttal opinions and/or this Rebuttal Report based on the receipt of additional documents, information, or instructions. I may prepare additional or supplemental demonstrative exhibits to explain the information and opinions offered in this Rebuttal Report.

As was the case with the opinions set forth in my expert report dated September 17, 2021 ("Expert Report"), my opinions set forth herein are impartial, unbiased, and are intended to be limited only by the assumptions and limitations discussed in this Report.

## I.    EXPERT QUALIFICATIONS

My expert qualifications are set forth in my Expert Report and are incorporated herein by reference. My valuation-related certifications include ASA (Accredited Senior Appraiser in the business valuation discipline, a designation from the American Society of Appraisers) and CFA (Chartered Financial Analyst, a certification provided by the CFA Institute).

Exhibit B to my Expert Report contains my CV, including a list of my publications from the last ten years and a list of cases in which I have provided testimony over the last four years.

My hourly rate for consulting in this matter is $550. My fees in this case are in no way contingent upon the opinions expressed by me.

## II.    SUMMARY OF THE RELEVANT OPINIONS OFFERED BY WAZZAN

Wazzan, who appears to lack any ESOP valuation experience or any valuation-related certifications, offers an opinion that the fair market value of 100 percent of RVR's stock as of May 28, 2014 was $12.9 million. (Wazzan Report at 32). Based on this opinion, Wazzan concludes that the ESOP overpaid by $92.1 million for the RVR stock it acquired on May 28, 2014 (the "Transaction"). (Wazzan Report at 33).

Wazzan also purports to "calculate the lost opportunity cost on the [alleged] overpayment by the Plan for the Company's equity." Wazzan opines that the ESOP would have earned $122.4 million on the alleged overpayment since May 28, 2014 based on the assumptions that (1) "the [almost $105 million] loan [made by the Company to the ESOP] was still made in full," and (2) the ESOP would have invested the $92.1 million excess loan amount

in a S&P 500 Index fund.   Based on those assumptions, Wazzan calculates the total damage to the ESOP resulting from the alleged overpayment for 100 percent of RVR's stock on May 28, 2014 to be $214.5 million.  (Wazzan Report at 33).

Wazzan also offers various criticisms of the Analysis of Transaction Fairness dated May 21, 2014 conducted by Stout, Risius and Ross ("SRR") for the benefit of Reliance Trust Company ("Reliance"). (Wazzan Report at 6, 33-45).

My critique of, and rebuttal to, certain of Wazzan's opinions are set forth below.

## III.    REBUTTAL OPINIONS TO WAZZAN REPORT

Based on my understanding of the facts set forth in my Report, my review of the documents listed on Exhibit A to my Report and/or discussed in this Rebuttal Report, my knowledge and my experience in advising and counseling many clients, including, but not limited to, plan sponsors, selling shareholders, trustees, and independent fiduciaries regarding their respective ESOP transactions, and providing business valuation and/or merger and acquisition services to thousands of closely held business stockholders and/or board members, it is my opinion that Wazzan's "valuation" fails to comply with industry standards and fundamental valuation methodologies, his damages analysis assumes an illegal loan by the Company to the ESOP, and his valuation and damages opinions are flawed and unreliable.  My more specific opinions are set forth below.

### A.    Wazzan's "Valuation" Fails To Comply With Fundamental Valuation Industry Standards

There are a number of published standards providing insight as to the requirements of an independent valuation.  It is my understanding that courts generally expect appraisers to follow the Uniform Standards of Professional Appraisal Practice ("USPAP"), the American Society of Appraiser's Business Valuation Standards, IRS Revenue Ruling 59-60, and/or the DOL's own Proposed Regulation on Adequate Consideration, before giving any weight to the proffered appraisal.  *See, e.g.,* Shannon P. Pratt & Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, at 5, n.1 (5th ed. 2008) (citing *Kohler v. Commissioner of Internal Revenue Service*, 2006 Tax Ct. Memo LEXIS 156 (July 25, 2006)); *see also Walsh v. Bowers*, No. 18-00155 SOM-WRP, 2021 WL 4240365, *13 (D. Haw. Sept. 19, 2021) (finding the DOL expert's valuation opinion unreliable where the expert ignored the USPAP standards in appraising the company's stock).

Wazzan's "valuation" fails to comply with these established standards in several ways, including (1) he failed to perform an independent valuation of the RVR stock at issue; (2) he made haphazard adjustments to SRR's valuation that resulted in unreliable (and unreasonable low) valuation conclusion; (3) he made erroneous assumptions relating to control and improperly applied a median discount for lack of control; (4) he failed to take into account the objective market prices of the securities of publicly traded companies similar to RVR; (5) he failed to conduct a "sanity check" of his valuation conclusion; and

2

(6) he erroneously took into account the specific financing obtained by the ESOP in offering an opinion on the value of RVR's stock, in violation of the definition of "fair market value" and well-established valuation industry standards.  Each of these observable errors are discussed below and all of them result in Wazzan's valuation conclusion being unreliable.

### 1. Wazzan did not perform an independent valuation of the RVR stock bought by the ESOP

When performing an independent valuation of private company stock, industry standards require that the appraiser consider, among other things: (a) the nature of the business and the history of the enterprise from its inception; (b) the economic outlook in general and the condition and outlook of the specific industry in particular; (c) the size of the block of stock to be valued; and (d) the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.  *See, e.g.*, IRS Rev. Rul. 59-60, § 4; DOL Prop. Reg. 29 C.F.R. § 2150.3-18(b)(4).

Management interviews and site visits are an important step in business valuations.  They allow the appraiser to understand the stability of a company's earnings, its growth rate, and other factors needed to form a reasoned and professional opinion of the degree of risk involved in the business. *See, e.g.*, IRS Rev. Rul. 59-60, § 4.02(a); Pratt, Ch. 5. The management interview also allows the valuation professional to better understand and analyze the company's financial statements and projections. Pratt, *Valuing a Business*, at 130 ("The purpose of analyzing income statements is to better understand and interpret the earning power of the subject company, since earning power is usually the most important element of the value of a business.").

A reliable business valuation requires that the valuation professional critically analyze all of the information he or she gathers from the company and others to ensure that the financial projections for the company are realistic and the risks associated with attaining those projections are appropriately taken into account.  *See, e.g.*, USPAP Advisory Opinion No. 33 (the use of a discounted cash flow (DCF) analysis "requires specialized knowledge and experience" and its "application requires a high degree of diligence."). The exercise of professional judgment by the valuator is critical because of the interplay between various assumptions and variables that go into a business or stock valuation. For example, if the valuator determines that management's projections are aggressive or conservative, the valuator may adjust those projections or make adjustments to the required returns to reflect the risk of achieving them.

Here, Wazzan did not interview management and did not visit the Company's facilities. Based on the information contained in his Report and the list of documents reviewed, it also appears that Wazzan did not review all of the deposition testimony of RVR's and SRR's representatives to gain an understanding of the basis for their own projections. The above steps are necessary for a proper assessment of value.

3

Instead of preparing his own independent stock valuation, Wazzan adopted major portions of SRR's DCF valuation methodology, changed a few variables, and thereby significantly reduced the valuation conclusion. The adopted forecasts from the SRR DCF valuation include: (1) the revenue forecasts; (2) the expense forecasts; (3) the net income forecasts; and (4) additional forecasts, including the forecasts for additional line items which affect free cash flows, including (a) proceeds from the sale of vehicles, (b) non-cash gain on sale of vehicles, (c) changes in net working capital, and (d) net change in deferred income tax. (Wazzan Report at 18-19). Additionally, Wazzan adopted SRR's Weighted Average Cost of Capital ("WACC") of 12%. (Wazzan Report at 20).

Neither Wazzan's wholesale adoption of another appraiser's numbers nor his haphazard modification of another appraiser's numbers is how valuation professionals appraise stock. As discussed above, in order to conduct an independent valuation, an appraiser must, among other things, have a detailed understanding of the subject company, its financial performance, its expected performance, and the economic outlook in general and the condition and outlook of the specific industry in particular. Once an appraiser has gained the requisite understanding of the company and the industry, the appraiser will exercise his or her judgment to select the valuation methodology and the necessary inputs into the valuation models. The reason one particular number may be selected as opposed to another is often a function of the professional's judgment and these valuation related decisions are often interconnected and related. For this reason, it is virtually impossible to cherry-pick and modify certain numbers from one appraisal and obtain a reliable valuation or valuation conclusion. Wazzan failed to conduct an independent valuation and his modification of select elements of SRR's valuation renders his valuation conclusion unreliable.

### 2. Numerous errors in Wazzan's "valuation" renders it unreliable

#### a. Wazzan's haphazard modification of various inputs in the SRR DCF model renders the valuation conclusion unreliable

As discussed above, it is my opinion that Wazzan did not conduct an independent valuation of RVR's stock. It is also my opinion that his haphazard modification of various inputs from SRR's valuation results in an unreliable valuation conclusion. Some of Wazzan's changes to SRR's DCF valuation model are discussed below.

In its valuation, SRR elected to use a 12% WACC based on SRR's weighting of RVR's capital structure to include 40% debt and 60% equity. Wazzan adopted SRR's 12% WACC. Wazzan's blind acceptance of the 12% WACC ignores the assumed debt and equity weighting, among other things. This is improper and not how an independent valuation of stock is performed.

The selection of the weighting between debt and equity is an iterative process. Had Wazzan actually attempted to perform an independent valuation of RVR's stock, he would have realized that the 12% WACC was improper (and much too high) in light of other

4

faulty assumptions made by Wazzan. This error results in a significant undervaluation of RVR's stock by Wazzan.

In particular, Wazzan's conclusion of value of $69,948,000 implies a Company debt level of $27,971,000. The Company's actual debt was $45,952,000. Adjusting the debt percentage upward to at least reflect the Company's actual debt reduces the WACC and, ultimately, increases the value of the Company and its stock. Had Wazzan engaged in the requisite iterative process to adjust the debt and equity weighting, he would have determined that a lower WACC of 9.9% was appropriate. Replacing the 12% WACC with a WACC of 9.9% - and leaving all other factors unchanged - increases Wazzan's enterprise valuation conclusion by more than $15.1 million.

The selection of the required return on equity ("ROE") is also impacted by the assumptions used in the DCF calculation. SRR's selection of its ROE considers the application of a terminal multiple. Wazzan changes the calculation of the terminal value without any of the necessary adjustment to the ROE and the WACC. Wazzan's actions, again, result in a reduction in the enterprise valuation and renders the valuation conclusion unreliable.

Wazzan's terminal year free cash flow also unrealistically assumes that capital expenditures will exceed depreciation by over $13.7 million into perpetuity. The Wazzan Report ignores the impact of "the conservatively projected levels of capital expenditures that are in excess of what is required to maintain its fleet over the long-term, given the assumed modest increase in rental revenue." (SRR Analysis of Transaction Fairness, p 50). By comparison, projected cash flow for the seven months ended December 31, 2014 and for the projected year ended December 31, 2015 was $12,248,000 and $7,134,000, respectively, in Wazzan's analysis. This compares to $6,309,000 for the year ended December 31, 2018 used by Wazzan in calculating the terminal value. His assumption greatly reduces cash flow expectations in the terminal year and into perpetuity. It also significantly reduces Wazzan's valuation conclusion.

Wazzan also elects to ignore SRR's projections showing EBITDA growing at a growth rate of 4%. Instead, Wazzan uses an unexplained terminal growth rate of 1.9%. Yet again, Wazzan's tweaks to SRR's valuation serves to reduce Wazzan's valuation conclusion. Replacing the 1.9% terminal growth rate with a growth rate of 4% - and leaving all other factors unchanged - increases Wazzan's enterprise valuation conclusion by nearly $11 million.[1]

As illustrated above, the assumptions used to calculate the terminal period in a DCF valuation are critical as the terminal period often accounts for a majority of the DCF's valuation conclusion. *See* Pratt, *Valuing a Business*, at 243-244. Wazzan's failure to conduct an independent valuation resulted in the selection of unwarranted and faulty

---

[1] Note, I am not offering an opinion as to the propriety of Wazzan's use of the Gordon Growth model in this case. I am simply commenting on his observable error in using an unacceptably low terminal growth rate of 1.9%.

5

terminal year inputs and drastically reduces the valuation conclusion and renders it unreliable.

**b.    Wazzan's DCF "valuation" conclusion is further flawed by his misunderstanding of control and the application of a discount for lack of control**

In Wazzan's Report, he states that the DCF approach "is implicitly a control-based model. In other words, it is understood that the owner controls the cash flows and has control of the firm when determining its value.  If, for example, one wanted to value a minority interest in a firm using a DCF approach, one would typically apply a discount which reflects a lack of control." (Wazzan Report at 9-10).  I disagree.  As set forth in the ESOP Association's ESOP Brief No. 24, which is prepared by the ESOP Association's Valuation Advisory Committee:

> …if the company's modeled financial performance is expected to be realized by the ESOP after the transaction, then a lack of control discount is not required or appropriate to reflect the fact that the subject transaction involves a non-controlling ownership interest.  In keeping with the recommended norms of negotiated and thoroughly documented transactions, many cash flow adjustments may not constitute control adjustments *per se*, nor do they require hedging by way of a valuation discount. Such adjustments simply recognize the negotiated facts and circumstances of the transaction. Accordingly, such a valuation at its core is a simple acknowledgement of economic reality. That such a valuation may be labeled as a control value does not indicate a control premium is used or oblige the trustee or the valuation advisor to apply a discount for lack of control due to the abstract notion that the ESOP will not enjoy or exercise absolute control. The pivotal consideration is whether the ESOP will enjoy the financial benefits included in the valuation, which serve to service transaction related debt and thereafter to perpetuate and sustain the ESOP benefit.

The above applies to RVR.  The RVR ESOP will (and did) enjoy the financial benefits (and more) included in the projections.  No control premium was applied to the DCF valuation performed by SRR and no discount for lack of control is appropriate "due to the abstract notion that the ESOP will not enjoy or exercise absolute control."

Pratt also explains that the DCF model "can produce either a control value **or** a minority value."  If the economic income projections merely reflect the continuation of present policies, then the model would be expected to produce a minority value."  *See* Pratt, *Valuing a Business*, at 228.  My understanding is that Wazzan did not modify the Company's projections and, as such, a discount for lack of control is inappropriate.

Wazzan's misapplication of control is not just limited to his DCF analysis as Wazzan apparently defines enterprise value as the "measure of a firm's total value - not just its equity value - and incorporates all ownership and asset claims from both debt and equity holders.  It also assumes control of the firm." (Wazzan Report at 21).  Again, I disagree.  In common parlance, and as used by SRR, "enterprise value" means the sum of the value

6

of a company's equity value plus its interest-bearing debt.  The value of the company's equity can be measured on a minority or controlling interest basis and is often dependent on the cash flows and the assumptions utilized.  *See also* Pratt, *Valuing a Business*, at 37 ("enterprise value could mean aggregate value of minority stock, value of either all common equity or all equity on a control basis, value of all invested capital, value of some portion (or all) of the assets, or something else.").

Wazzan's errors are compounded by the use of a median to determine the DLOC. An appraiser acting consistent with industry standards does not simply calculate and apply medians for purposes of his or her analysis.

Here, Wazzan explains his application of a 17% DLOC as follows: "[f]rom 2004 to 2013, the median control premium for financial transactions ranged from approximately 12% to 27%.  The average of the annual medians during this 10-year period was roughly 20%. This corresponds to (or imputes) a DLOC of approximately 17%."

An appraiser acting consistent with industry standards does not simply calculate and apply medians for purposes of his or her analysis.  In fact, as explained by Pratt, reliance on a median multiple without further analysis or explanation is a "common error" and  the use of the average acquisition premium "is a flawed approach" which is "biased upward." Pratt, *Valuing a Business*, at 305, 391.  Similarly, Revenue Ruling 59-60 provides that "no useful purpose is served by taking an average of several factors…and basing the valuation on the result.  Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance."  IRS Rev. Rul. 59-60, § 7.

Additionally, as set forth in the ESOP Association's ESOP Brief  No. 24:

> [p]erhaps most importantly, the observed control premiums are consequential measures of value after a transaction (whether announced or consummated).  Common sense and informed judgment clearly indicate that a control premium [or a DLOC] is the distillation of a potentially complicated set of considerations that likely do not lend themselves to expression through a singular direct input, such as a discrete control premium [or DLOC] adjustment, in the development of fair market value. The real task for the valuation professional and other ESOP stakeholders is to understand whether the modeled economics of a specific transaction are reasonably available and achievable. Do the economics and agreed-upon terms of a transaction actually deliver the modeled economic benefits to the ESOP?"  It further states "If there is significant uncertainty concerning the application of an explicit control premium, how then can the source data on control premiums be appropriate for the quantification of a discount for lack of control?"

Considered together, these errors result in an erroneous finding that the equity value of RVR is $12.9 million.

        **c.**      **Wazzan erred when he failed to take into account the market prices of securities of companies engaged in lines of business similar to RVR's business**

In his Report, Wazzan explains that the guideline public company valuation methodology "involves examining the values of publicly traded companies (i.e., guideline companies) which are comparable to the subject company, and normalizing such prices by some standard variable such as revenue or income." (Wazzan Report at 8).

The guideline public company method ("GPCM") is a widely used method for valuing both public and private companies. One of the reasons for that is its objectivity. The GPCM is also not as susceptible to manipulation or to the subjectivity inherent in a discounted cash flow valuation methodology, which is based on management projections. For these reasons, both the Proposed DOL Regulation and Revenue Ruling 59-60 indicate that market information for similar public companies should be considered. *See* IRS Rev. Rul. 59-60, § 3.03 ("In many instances, the next best measure [of value in the absence of a liquid stock market] may be found in the prices at which the stocks of companies engaged in the same or a similar line of business are selling in a free and open market."); DOL Prop. Reg. § 2150.3-18(b)(4) (fair market valuation "must include" an assessment of "[t]he market price of securities of corporations engaged in the same or a similar line of business, which are actively traded in a free and open market, either on an exchange or over-the-counter."); Pratt, *Valuing A Business*, at 262 ("The use of comparable publicly held corporations as a guide to valuation, as a practical matter, may be the most important and appropriate technique for valuing a privately held operating business."); USPAP, Standards Rule 9–4(b)(v) (an appraiser should collect and analyze all information necessary for credible assignment results, including "the effect on value, if any, of... sales of capital stock or other ownership interests in similar business enterprises").

There is never a perfect or completely comparable guideline public company ("GPC"). That does not mean, however, that the GPCM is irrelevant or unusable. Rather, "[t]he standard sought is usually one of reasonable and justifiable similarity. This degree of likeness is attainable in most cases." Pratt, *Valuing A Business*, at 262. The use of the term "similarity" gives the valuation professional "latitude to exercise reasonable judgment in selecting companies from related industries if unable to find guideline companies in the subject company's industry group or companies with adequate trading volume." Pratt, *Valuing A Business*, at 272.

In this case, SRR and Reliance's valuation expert, Jeff Tarbell, both identified companies that are sufficiently similar from a financial perspective to RVR to utilize the guideline public company method in the valuation. Those include, among others, Avis Budget Group, Inc., Hertz Global Holdings, Inc., AMERCO, and Ryder System, Inc. While Wazzan lists a number of reasons while the above companies are not proper guideline public companies, he ignores the fact that the Company was once acquired and owned by Budget, now Avis Budget. Budget had seen enough commonalities to undertake this acquisition. Hence, it and similar companies can provide insight as to values and valuation multiples for RVR's stock.

At a minimum, Wazzan should have used the guideline companies as a "sanity check" by comparing his valuation conclusion and the implied valuation multiples derived therefrom to the implied valuation multiples of the stocks of the GPCs engaged in similar lines of business to RVR. Had Wazzan done so, he would have realized his valuation conclusion was grossly understated. For example, the Price/Earnings ("P/E") multiple implied by Wazzan's valuation of RVR's stock is 1.8x. This compares to the P/E multiple of the S&P 500 as of May 30, 2014 of 17.9 - almost 10 times Wazzan's P/E multiple for RVR. Avis Budget (94x P/E multiple), Hertz Global (39x P/E multiple), AMERICO (16x P/E multiple) and Ryder Systems (16x P/E multiple) also had P/E multiples greatly exceeding Wazzan's implied P/E multiple for RVR's stock. Similarly, the Price/Book Value ("P/BV") multiple implied by Wazzan's valuation of RVR's stock is 0.32x. This compares to the S&P 500 P/BV of 2.68x.

Wazzan's implied valuation multiples for RVR's stock are almost 90% below the general market and the GPCs. The magnitude of this deviation should raise a "red flag" that the results of his analysis are grossly and significantly below any objective indications of fair market value.

Even if Wazzan's decision to not use the GPCM was appropriate, which it is not, he still should have used the market data to assess the reasonableness of his valuation conclusion. *See* Pratt, *Valuing A Business*, at 220. Had he done so, Wazzan would have realized that his DCF valuation conclusion was unreasonably and unrealistically low.

> **d.     Wazzan's consideration of the warrants when valuing the fair market value of 100% of RVR's stock violates valuation standards and the definition of fair market value**

Wazzan's valuation purports to calculate the fair market value of RVR's stock as of May 28, 2014. Fair market value is the value at which the subject property would change hands between a hypothetical willing seller and a hypothetical willing buyer, both being reasonably informed and neither having an obligation to act. The definition of fair market value does not take into account the specific financing needs of a specific buyer, like the ESOP. Instead, it seeks to measure the value of the asset to a hypothetical buyer who might pay all cash for the asset, might finance the purchase with a combination of cash and bank debt, or might finance the purchase in some other way. Just as the fair market value of a house is unaffected by the buyer's choice of financing, the fair market value of stock is unaffected by the unique financing of a specific buyer.

The warrants at issue in this case were issued as part of the financing for the ESOP Transaction. Warrants are a mezzanine financing tool - a way to boost returns to compensate subordinated debt holders for the extra risk they bear. They were part of the ESOP's specific financing needs and are part of the seller notes. Instead of warrants, the transaction could have included notes with much higher interest rates that would have given the note holder a similar return. However, higher interest rates would place an additional burden on the Company. Warrants enable the note holder to earn the appropriate return without the current interest burden. Since they are part of the seller notes, they should not be taken into account when determining fair market value of the

RVR stock.  By taking the warrants into account when assessing the value of RVR's stock, Wazzan ceased measuring fair market value in violation of appraisal standards.

Wazzan's handling of the warrants is also flawed because Wazzan assumes that the warrants will expire in 15 years when calculating the value of the warrants.  (Wazzan Report at 32).  Wazzan's assumption is based on the fact that he had not seen any "evidence which suggests that these notes would be paid off prior to the 15-year term expiration." (Wazzan Report at 32). Had Wazzan interviewed management, like I did, he would have known that RVR intended to pay off the seller notes and redeem the warrants as quickly as possible and, in fact, did so within four years of the Transaction close date. Wazzan's erroneous assumption, which caused his conclusion of value to drop by 58%, renders his valuation conclusion unreliable and unreasonably low.

> ### e.  Wazzan failed to conduct a "sanity check" of his work leading to his significant errors going unnoticed by him

Valuation professionals often perform a "sanity check" on their valuation conclusions by reference to other known data points. Failure to do so can result in inaccurate conclusions of value. *See*, for example, USPAP Advisory Opinion No. 33. ("The results of DCF analysis should be tested and checked for errors and reasonableness.").  One reason for this is because a DCF analysis "is dependent on the analysis of future events, it is vulnerable to misuse or misapplication."  USPAP Advisory Opinion No. 33.

Wazzan failed to do conduct the requisite "sanity check" in this case.  Had he done so, he would have realized that his valuation conclusion cannot be reconciled with other known data points.  These data points include: (1) the market multiples of companies in similar lines of business (as discussed above); (2) the multiples associated with the Budget purchase of RVR and Budget's later sale of RVR to the Smalleys; (3) the Chartwell pro forma illustrations; (4) SRR's valuation conclusions; and (5) the accounting book value of the Company.

As previously discussed and presented in the Chartwell illustration to the Company, the Company was once publicly traded and was sold to Budget in 1998.  While the passage of time and growth of RVR's business makes the Budget purchase an inexact comparison, the transaction nonetheless provides an arms-length, directional indication of value and can provide a "sanity check."  Presented below is a comparison between the Budget transaction and Wazzan's conclusions.  One would expect Wazzan's valuation of RVR's stock to be significantly higher than the price Budget paid to purchase RVR given the growth in RVR's business since 1998.

10

## COMPARISON BETWEEN ACTUAL SALE OF THE COMPANY TO BUDGET AND WAZZAN'S CONCLUSION (Dollars in thousands)

| | Budget Transaction | Wazzan's Conclusion | Difference |
|---|---|---|---|
| Enterprise Value | $    133,340 | $    69,948 | -47.5% |
| LTM Financials | | | |
| Revenue | $    107,280 | $    92,852 | -13.4% |
| EBITDA | $    26,420 | $    32,558 | 23.2% |
| EBIT | $    12,260 | $    13,397 | 9.3% |
| | | | |
| *IMPLIED VALUATION MULTIPLES* | | | |
| EV/LTM Revenue | 1.2x | 0.8x | -39.4% |
| EV/LTM EBITDA (1) | 5.0x | 2.1x | -57.4% |
| EV/LTM EBIT | 10.9x | 5.2x | -52.0% |

(1) As defined in the Chartwell analysis.

The comparison shows that even though EBITDA and EBIT grew with the passage of time, Wazzan's valuation conclusion results in the enterprise value declining by over 47%. His implied valuation multiples are also significantly below (39% to 57%) those implied by the Budget transaction.  These comparisons should have raised serious "red flags" to Wazzan.

Additionally, the 2000 management buyout of the Company at an EV of $131.0 million also provides an indication of value that was not considered by Wazzan.  Wazzan's EV was almost 47% below the buyout value.

Also, Wazzan's equity conclusion of $12.9 million is 87% below the equity conclusion in the Chartwell illustration and 88% to 89% below the equity range in the SRR analysis. These substantial deviations should also have raised serious "red flags" to Wazzan.

As previously stated, Wazzan's implied P/E multiples are almost 90% below the general market and the GPCs.  The magnitude of these deviations should also have raised serious "red flags" that the results of Wazzan's analysis are grossly and significantly below any objective indication of value. It is unrealistic to assume that a willing and knowledgeable seller would sell their stock at such a massive discount to these objective measures of fair market value.

At a bare minimum, Wazzan should have compared his valuation conclusion to RVR's accounting book value.  RVR's accounting book value as of May 31, 2014 was $40.35 million.  Typically, a stable company's book value of equity significantly understates its fair market value of equity as the book value does not consider intangible assets, among

11

other things.  With that said, it can be used as a sanity check to ensure that any valuation conclusion is not unreasonably low.   Here, Wazzan's $12.9 million equity valuation conclusion is approximately 70% less than RVR's book value. No appraiser, acting in compliance with USPAP and other valuation industry standards, would adopt a valuation conclusion of RVR's stock that is over 70% less than its accounting book value.  *See*, for example, USPAP Standard Rule 9–1(c).

Wazzan's failure to make any attempt to reconcile his valuation conclusion with any known objective data suggests that his conclusion is litigation-driven rather than the result of an independent and objective valuation.  Indeed, his final valuation conclusion of $12.9 million represents less than one times RVR's forecasted 2015 EBITDA.   Offering a litigation driven valuation and valuation conclusion violates the requirement set forth in USPAP Standard Rule 9–2(b) that an "appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased."

## C.    Wazzan's "Lost Opportunity Cost" Calculation Is Based On Flawed Assumptions

In addition to determining that the RVR ESOP allegedly overpaid by $92.1 million for the RVR stock on May 28, 2014, Wazzan purports to calculate "the lost opportunity cost on the overpayment by the Plan for the Company's equity."  (Wazzan Report at 33).   In doing so, Wazzan assumes (1) that the Selling Shareholders would have agreed to sell their RVR stock for a total of $12.9 million; and (2) "that the [almost $105 million] loan was still made in full, rather than overpaying for the equity of RVR, [and, as such] the ESOP would have had the option of investing the money elsewhere."  These assumptions are flawed and based on the assumption of an illegal loan.

As an initial matter, it is unreasonable to assume that the Selling Shareholders would have sold their 100% interest in RVR stock for $12.9 million.  This is especially true as the $12.9 million represents only a fraction of the RVR accounting book value and less than one times RVR's forecasted 2015 EBITDA (i.e., less than one year of profits).  Fair market value assumes a "willing seller." Indeed, the standard for fair market value requires equal consideration be given to the perspective of the hypothetical willing buyer and the hypothetical willing seller and one perspective cannot be favored over the other or ignored. See, for example, Proposed DOL Regulation, Supplementary Information, Part B(2); IRS Revenue Ruling 59–60, § 2.02.

No "willing seller" would agree to sell a 100% ownership stake in a company for an amount significantly less than (a) the amount the seller would receive if he or she simply liquidated the company's assets, or (b) less than one year of profits.

The assumption that the approximately $105 million loan would still be made in full is also an unreasonable and improper assumption.  There is no evidence that the loan would "still [be] made in full."  If, indeed, the RVR stock was really only worth $12.9 million, it is unlikely that the Selling Shareholders would have had the funds necessary to make an almost $105 million loan to the ESOP or the Company.  It is also unlikely that any bank would lend the Selling Shareholders (or the Company or ESOP) the funds to do so given

that any such loan would be unsecured.  Indeed, the evidence indicates that Wells Fargo was only willing to finance the initial loan because, among other things, (1) the loan was secured with RVR stock that had been deemed to be worth $105 million; (2) the loan was made pursuant to various conditions and requirements set forth in the ESOP loan documents; and (3) the vast majority of the loan proceeds never left the bank and remained in pledged bank accounts during the five day period of the bridge loan.

More significantly, however, I have never seen a loan made to an ESOP for the purpose of allowing the ESOP to invest in the S&P 500 Index (or any other publicly available offering).  Not only would this be inconsistent with the purpose of ESOPs (which is to primarily invest in the sponsoring company's stock), it would appear to be an illegal loan that would violate the terms of the Plan and result in disqualification of the plan's tax qualified status.  *See*, for example, 29 CFR § 2550.408b-3(d) ("the proceeds of an exempt loan must be used, within a reasonable time after their receipt, by the borrowing ESOP only for any or all of the following purposes: (1) To acquire qualifying employer securities, (2) To repay such loan, [or] (3) To repay a prior exempt loan.")  It would also appear to be contrary to the Plan's terms.  For example, Section 1.32 of the Plan provides that the "proceeds of an Exempt Loan can only be used (a) to purchase Employer Securities; (b) to repay such Exempt Loan; or (c) to repay a prior Exempt Loan."  *See also* Plan at § 7.3(f) ("The proceeds of an Exempt Loan must be used within a reasonable time to acquire Employer Securities, to repay the Exempt Loan, or to repay prior Exempt Loans.").  Additionally, Section 7.3 of the Plan provides that "[a]ll loans to the Plan made or guaranteed by a disqualified person must satisfy all requirements applicable to Exempt Loans under Regulation §54.4975-7(b)(4) to §54.4975-7(b)(7), Regulation §54.4975-7(b)(13), Department of Labor Regulation §2550.408b-3, and all provisions of those regulations applicable to Employer Securities purchased with the proceeds of an Exempt Loan…".  It would also appear to conflict with the terms of the ESOP Trust Agreement, which provides that the "Trust shall be invested primarily in employer securities."  Trust at § 4.1(b).

## IV.    CONCLUSION

Based on my education, 40 plus years of experience, my review of the cited material, my interview with Bensen and the Smalleys, the findings in my Report, and my discussion above, it is my opinion that the valuation and damage related opinions offered by Wazzan fail to conform with industry standards and, as such, are unreliable.


Date:  October 15, 2021                    _____
                                            Edward A. Wilusz, ASA, CFA

13

# Exhibit 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of Labor,

                       Plaintiff,

v.

Reliance Trust Company, *et al.*,

                       Defendants.

Action No. 2:19-cv-03178-JJT

**EDWARD A. WILUSZ'S REBUTTAL TO THE OPINIONS OFFERED BY
CHARLES E. WERT**

**TABLE OF CONTENTS**

**Page**

I. EXPERT QUALIFICATIONS ................................................................. 1

II. SUMMARY OF THE RELEVANT OPINIONS OFFERED BY PLAINTIFF'S
IDENTIFIED EXPERT, CHARLES E. WERT....................................... 1

III. REBUTTAL OPINIONS TO WERT REPORT ...................................... 3

    A. Several Key Assumptions In Wert's Report Are Contradicted By
The Undisputed Evidence........................................................... 4

    B. Wert's Primary Opinion Ignores Important Industry Practices.................. 8

    C. ESOP Transactions Should Be Evaluated On A Case-By-Case
Basis ....................................................................................... 9

    D. Wert's Opinion That The Director Defendants Failed To Properly
Monitor Reliance Is Incorrect Because It Is Based On A Number
Of Incorrect And Demonstrably False Assumptions ................................ 10

IV. CONCLUSION................................................................................ 10

i

My name is Edward A. Wilusz and I am the Managing Director of Value Management Inc. I have been retained by Holland & Knight, counsel to Eric Bensen ("Bensen"), Randall Smalley ("Smalley"), Robert Smalley, Jr. ("Smalley, Jr."), the Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and RVR, Inc. (collectively, the "RVR Defendants"), to offer my opinions on select aspects of the August 13, 2021 report prepared by Plaintiff's identified expert witness Charles E. Wert ("Wert" and the "Wert Report").

I reserve the right to revise these rebuttal opinions and/or this Rebuttal Report based on the receipt of additional documents, information, or instructions. I may prepare additional or supplemental demonstrative exhibits to explain the information and opinions offered in this Rebuttal Report.

## I.    EXPERT QUALIFICATIONS

My expert qualifications are set forth in my expert report dated September 17, 2021 ("Expert Report") and are incorporated herein by reference. Exhibit B to my Expert Report contains my CV, including a list of my publications from the last ten years and a list of cases in which I have provided testimony over the last four years.

My hourly rate for consulting in this matter is $550. My fees in this case are in no way contingent upon the opinions expressed by me.

## II.    SUMMARY OF THE RELEVANT OPINIONS OFFERED BY PLAINTIFF'S IDENTIFIED EXPERT, CHARLES E. WERT

The Wert Report offers the opinion that "the Director Defendants [whom Wert defines as Smalley, Smalley, Jr., and Bensen], as the fiduciaries appointing the ESOP Trustee, did not adhere to their responsibility to monitor Reliance's actions on behalf of the ESOP." (Wert Report at 20). In Wert's opinion:

> It was obvious on the face of the Transaction[1] documents that the ESOP paid more than fair market value for the RVR stock. For example, the Director Defendants knew that the price the ESOP paid to them for the stock included a control premium which was not justified since the ESOP did not obtain meaningful control of RVR. As the facts indicate, the ESOP obtained

---

[1] The "Transaction" refers to the RVR, Inc. Employee Stock Ownership Trust's acquisition of 100% of RVR's stock on May 28, 2014 from Robert Smalley, Jr., Eric Bensen, the Family Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, the Marital Trust Created Under The Smalley Revocable Trust Dated July 8, 2004, and the Survivor's Trust Created Under The Smalley Revocable Trust Dated July 8, 2004 (collectively, the "Selling Shareholders").

no real attributes of control. Under the circumstances, the Director Defendants should have either reduced the ESOP's purchase price to remove the control premium, adjusted the Transaction terms to provide the ESOP with meaningful control attributes, or removed and replaced Reliance with a different trustee.

(Wert Report at 20). Notably, Wert cites **no** evidence to support his conclusory statements that the "Director Defendants" (1) "knew that the price the ESOP paid to them for the stock included a control premium"; (2) knew that the inclusion of a "control premium" in the stock purchase price was unjustified; or (3) knew "the ESOP did not obtain meaningful control of RVR." Although I disagree with Wert's substantive conclusions, Wert's opinions suffer from even a more fundamental flaw--they are all premised on the assumption that the "Director Defendants" (Bensen, Smalley, and Smalley, Jr.)[2] are stock valuation and corporate governance experts who are well versed in the valuation of private company stock, including (a) knowing when it is and is not appropriate to apply a control premium to a valuation conclusion, and (b) knowing the various elements of corporate control and how many of those elements must pass to a buyer to justify the use of a control premium. The undisputed record evidence is that Bensen and the Smalleys possessed no such expertise, which is precisely why RVR engaged Chartwell, Greenberg Traurig, and other advisors to advise the Company and its Board with respect to the exploration and formation of the ESOP.

Although he is not a lawyer or stock valuation expert, and the evidence does not fully support his assumptions, Wert assumes for purposes of his opinions that Bensen and the Smalleys "appointed Reliance to be the ESOP Trustee" and, as such, were "functional fiduciaries" with an ERISA duty to "monitor the trustee to make sure the trustee satisfies its duties." (Wert Report at 31 & n. 51). Additional assumptions made by Wert include the following[3]:

- During 2014, Bensen and the Smalleys were well versed in the valuation of private company stock including the circumstances under which the application of a

---

[2] Smalley and Smalley, Jr. (collectively, the "Smalleys") were the only members of RVR's Board of Directors prior to May 28, 2014. Bensen joined the RVR Board of Directors on May 28, 2014. With that caveat, I will use the term "the Director Defendants" to refer to Bensen and the Smalleys in this Rebuttal Report to line up my rebuttal opinions to those offered by Wert. I will also assume, for purposes of my Rebuttal Report only, that board members have an ERISA duty to monitor their appointees.

[3] Although Wert disclaims offering any legal opinions (Wert Report at 1), and his Report reflects no stock valuation expertise, many of the statements in his report appear to be legal or stock valuation expert opinions. Given that Wert appears unqualified to offer legal or stock valuation opinions, I must assume for purposes of my rebuttal opinions that Wert was asked by Plaintiff's counsel to (erroneously) accept these legal and stock valuation opinions as true.

2

control premium to a valuation conclusion is (and is not) appropriate.  (Wert Report at 31).

- Chartwell informed Bensen and the Smalleys that "**the** [one and only] fair market value of a controlling interest of RVR's equity… was $100.7 million."  (Wert Report at 4, 7) (emphasis added).

- As a result of the Transaction, Bensen and the Smalleys "would remain in control of all aspects of the Company" and that the "ESOP obtained no real attributes of control." (Wert Report at 4, 20).

- Following the Transaction, the RVR Board could "disregard and not investigate any unsolicited M&A offer.  The RVR Board agreed to bring offers to buy the Company to the Trustee, for information only, and only if the Board was going to accept an offer to buy…..It was totally within the Director Defendants' control to disregard an offer."  (Wert Report at 11, 16).

- The purchase price for the RVR stock was increased to allow for the payment of Chartwell's $550,000 fee by RVR and this fee was not incurred on behalf of RVR or the ESOP.  (Wert Report at 29).

Based on these various assumptions, Wert offers the conclusory opinion that Bensen and the Smalleys "had in their possession all the information to alert them to the fact that Reliance was not meeting the standard of care in carrying out its responsibilities….. the Director Defendants should have known from the Transaction terms themselves, including purchase price, percentage of Warrants, and Employment Agreements, that the sale was not fair to the ESOP, and that Reliance was not acting in the interests of the ESOP." (Wert Report at 31).

As discussed in detail in Section III below, I disagree with Wert's opinions.  For the reasons stated in my September 17, 2021 Report, it is my opinion that the RVR Board of Directors (and Bensen if Bensen is deemed to be an appointing fiduciary) acted consistent with industry best practices with respect to both the selection and monitoring of Reliance.  Moreover, there were no "red-flags" that would have suggested to the RVR Board (or any of the RVR Defendants) that (1) Reliance was not fulfilling its duties and obligations to the ESOP; or (2) the ESOP Trust was paying more than adequate consideration for the RVR stock it purchased.

## III.    REBUTTAL OPINIONS TO WERT REPORT

Based on my understanding of the facts as set forth in my Report, my review of the documents listed on Exhibit A to my Report and/or discussed in this Rebuttal Report, my knowledge and my experience in advising and counseling many clients, including, but not limited to, plan sponsors, selling shareholders, trustees, and independent fiduciaries

regarding their respective ESOP transactions, the following are my rebuttal opinions to those opinions Wert offers regarding Bensen and the Smalleys:[4]

### A.     Several Key Assumptions In Wert's Report Are Contradicted By The Undisputed Evidence

Wert's opinions as to Bensen's and the Smalleys' conduct are based on key assumptions which are inconsistent with the evidence.  For this reason alone, I disagree with Wert's opinions.  Some of the key assumptions at issue in Wert's Report are set forth and discussed below.

### 1.     *Wert's incorrect assumptions regarding Bensen's and the Smalleys' knowledge of stock valuation methodology*

Wert assumes that Bensen and the Smalleys knew that the $105 million purchase price the ESOP paid for 100 percent of RVR's stock included a "control premium."  As Plaintiff has admitted, however, the RVR Defendants did not receive a copy of the Stout Risius Ross ("SRR") valuation conducted on behalf of Reliance until after Plaintiff commenced this litigation and all of the RVR Defendants have denied having any knowledge of how SRR valued the RVR stock purchased by the ESOP. (*See* Pl.'s Am. Responses to Bensen's First Request for Admission Nos. 39-41; Bensen Dep. at 22-25; Smalley Dep. at 23, 97; Smalley, Jr. Dep. at 60).  Trustees do not allow the subject company or selling shareholders to see their financial advisor's valuation reports.  This is done to ensure the transaction is conducted at "arm's-length," as required by the DOL.  It is undisputed that when the RVR Defendants requested a copy of SRR's valuation, their request was denied. (5/21/14 S. Martin Email, CW-RVR-00033549-50).  It is also undisputed that SRR did not share with RVR's advisors its valuation analysis or conclusion.  (Pl. Ex. 68 at 6).  In short, Bensen and the Smalleys would have had no idea whether SRR's valuation analysis for Reliance did or did not include a control premium.

Moreover, Chartwell's estimation that $100.7 million represented the low-end of the fair market valuation range for RVR's stock did not include a control premium.  Although Chartwell's estimate was made on a controlling interest basis, a controlling interest valuation does not typically include a "control premium" and a controlling interest valuation may yield the same valuation conclusion as a minority interest valuation if the company's management is already maximizing free cash flows.  In short, I have seen no evidence to support Wert's assumption that Bensen and the Smalleys knew "the price the ESOP paid to them for the stock included a control premium."

---

[4]In addition to my education, training, and experience, my opinions are also informed by my review of industry publications, including materials prepared by the ESOP Association and the National Center for Employee Ownership, the legislative history of ESOPs, and my participation in numerous ESOP industry conferences and panels, among other things.

4

The Wert Report also assumes that Bensen and the Smalleys knew that valuing the RVR stock on a controlling interest basis was somehow improper.  Yet, Bensen and the Smalleys all testified (and informed me during my interview) that, prior to the Transaction, they did not understand how private company stock is valued.  (Bensen Dep. at 22-25; Smalley Dep. at 23, 97; Smalley, Jr. Dep. at 60).  For this reason, RVR retained a financial advisor experienced in valuing private company stock, Chartwell, to assist RVR in evaluating the fairness of the RVR ESOP Transaction.

Chartwell and Chartwell's materials advised Bensen and the Smalleys that it is appropriate to value stock on a controlling interest basis whenever "more than 50 percent of the equity is being sold." (Margarit Dep. at 51).  Chartwell's explanation was consistent with Randall Smalley's basic understanding: "We sold 100 percent of the stock.  They had control. Plain and simple…. you know, 51 percent is control."  (Smalley Dep. at 89).

In my experience, it is unusual for board members to have experience as to how private company stock is valued or what valuation methodologies, premiums, and discounts should be considered, if any, when valuing such stock.  As Bensen and the Smalleys testified, that certainly was the case for them.

It would be extremely unusual and inconsistent with my own experience for a company's board, senior management, and/or stockholders to question the appropriateness of a controlling interest valuation (or inclusion of a control premium) in the context of a sale of 100 percent of the company's stock, especially when the financial advisor has indicated that a controlling interest valuation is appropriate.  In fact, the DOL's proposed Regulation Relating to the Definition of Adequate Consideration states that "a plan would not fail to receive control merely because individuals who were previously officers, directors, or shareholders of the corporation continue as plan fiduciaries or corporate officers after the plan has acquired the securities."

Even valuation experts recognize that "[c]ontrol or minority is not a black and white concept with a bright dividing line.  Control, or lack of it, covers a broad spectrum." Shannon P. Pratt & Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, at 385-386 (5th ed. 2008) (also providing that "[w]hen a holder has a majority of the voting shares that holder has control").

Given the complete lack of guidance by the DOL on the issue of when a controlling interest valuation (or the use of a control premium) is and is not appropriate, lay persons who lack stock valuation expertise are not in a position to independently determine whether a controlling interest valuation (or the use of a control premium) is appropriate in connection with a 100 percent sale of private company stock.

Given Wert's lack of experience, training and education in the valuation of private company stock, I question his ability to render an opinion on whether a controlling interest valuation (or the use of a control premium) is appropriate under the facts of this case.  In my opinion, the use of a controlling interest valuation was appropriate in this case given the significant elements of control which were transferred to the ESOP, as discussed further below.  However, it is also my opinion that there is likely little difference between

5

a controlling interest valuation and minority interest valuation of the RVR stock purchased by the ESOP given that the valuation performed by SRR assumed that management was already maximizing the Company's free cash flows.

### 2.    *Wert's incorrect assumptions regarding Chartwell's pro forma illustration*

During the ESOP evaluation process, Chartwell advised RVR, including Bensen and the Smalleys, that a preliminary fair market value range for 100 percent of RVR's stock was between $100.7 million and $143.9 million.  (Fresh Dep. at 56, 180-182; Bensen Dep. at 80, 136; Smalley Dep. at 93-94, 101; Smalley, Jr. Dep. at 53-54, 76-77, 80,166; Margarit Dep. at 120; Pl. Exs. 3, 22).  For illustrative purposes only, Chartwell used the low end of the range, $100.7 million, to analyze how much the Selling Shareholders might expect to receive under various scenarios and how a potential transaction could be financed and structured at that low-end price.[5]  (Bensen Dep. at 54, 59, 80-82).

Chartwell made clear that the $100.7 million number was **not** "**the**" (one and only) fair market value of 100 percent of RVR's stock; but, rather, was "**a**" fair market value for illustrative purposes.  The $100.7 million number represented the low end of the fair market value range estimated by Chartwell, with the upper end of the range being $143.9 million. (Pl. Ex. 15 at 7; Pl. Ex. 3 at CW-RVR_0027578).  Wert's assumption that $100.7 million was **"the"** one and only fair market value of the RVR stock ignores the uniform and un-contradicted testimony to the contrary.

Fair market value of private company stock is commonly expressed as a range and Chartwell doing so in this instance is consistent with industry practices.  The DOL's Proposed Regulation Relating to the Definition of Adequate Consideration recognizes this industry practice and provides that the "Department is aware that the fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure.  It is not the Department's intention that only one valuation figure will be acceptable as the fair market value of a specified asset.  Rather, this proposal would require that the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for that asset."

As long as the price ultimately paid for a private company's stock falls within the estimated range of fair market value, it is accepted in the industry that the stock has been bought for fair market value.  Wert's assumption that $100.7 million is the one and only fair market

---

[5] Chartwell was trying to estimate the low end of the valuation range because that is where Chartwell told Bensen and the Smalleys that the ESOP trustee would likely start negotiations. (Bensen Dep. at 80, 136; Smalley Dep. at 93-94, 101; Smalley, Jr. Dep. at 53-54, 76-77, 80,166; Fresh Dep. at 180-182; Margarit Dep. at 120; Pl. Exs. 3, 22).  This testimony is consistent with the Chartwell engagement letter, which states that Chartwell will "[e]stimate the equity value from the perspective of an ESOP Trustee's Financial Advisor (as the purchaser of shares or equity, including pro forma terms and conditions)." (Pl. Ex. 41).

value for RVR's stock is inconsistent with the evidence, inconsistent with industry practices, and inconsistent with the DOL's Proposed Regulation Relating to the Definition of Adequate Consideration.

### 3. *Wert's incorrect assumptions regarding control*

Throughout his Report, Wert makes assumptions regarding control of RVR, including that "the Director Defendants would remain in control of all aspects of the Company following the sale" and that the "ESOP obtained no real attributes of control" in connection with the Transaction. As an example, Wert claims that the RVR Board could "disregard and not investigate any unsolicited M&A offer."[6]

These assumptions ignore the plain language of various corporate documents. For example, the First Amendment To The By-Laws of RVR, Inc. provides that an unsolicited M&A offer may only be disregarded if, "in the Board of Director's judgment, [it] is not a bona fide offer or is not in the best interests of the shareholders of the Corporation." (Pl. Ex. 150 at ARGENT_0000704).

Additionally, Wert's assumptions ignore the common obligations that company directors owe to the corporation and its shareholders. In my experience having advised boards of directors, board members simply cannot "disregard and not investigate any unsolicited M&A offer" without risking shareholder lawsuits, including a lawsuit brought by the ESOP Trustee in its capacity as shareholder representative. And while the Director Defendants had the right to terminate the ESOP Trustee, they could not do so for improper reasons such as the Trustee's decision to refuse to follow an imprudent direction.[7] In my experience, if a board of directors were to terminate an ESOP trustee following the trustee's refusal to follow an imprudent direction, the trustee would likely either sue the directors or report the directors to the Department of Labor for enforcement action.

Additionally, it is my understanding that even a directed ESOP trustee has a duty to ensure any direction it receives is legal and it is required to refuse to follow any direction that the ESOP trustee deems to be imprudent or illegal.[8] This could include a direction that the ESOP trustee vote for a director candidate that the trustee deems to be unqualified. (See, for example, Pl. Ex. 151, Investor Rights Agreement at Section 3.2(b), providing that "[s]ubject to the Trustee's fiduciary obligations under ERISA or as otherwise

---

[6] Given that Wert is neither a lawyer nor a stock valuation expert, it would appear that he lacks the education, training, and experience to offer opinions regarding these important topics. Instead, it appears he has simply assumed these assertions to be true and does not intend them to be his opinions.

[7] In fact, the Plan provides that "[t]he Sponsoring Employer warrants that all directions issued to the Trustees by it or the Administrator will be in accordance with the terms of the Plan." (Plan at § 9.9(b)).

[8] In fact, the RVR ESOP Trust Agreement provides that "that the Trustee shall only be subject to proper directions which are made in accordance with the terms of this Agreement and are not contrary to ERISA." (Trust Agreement at § 2.3(a)).

required by law, [the] Trustee will take all actions necessary and vote its shares as necessary to comply with Section 3.4").

Other indicia of control that passed to the RVR ESOP in this case include the ESOP Trustee's (1) right to call a special meeting of the RVR Board of Directors if it deems it necessary or desirable to do so (Pl. Ex. 150 at ARGENT_0000693); (2) right to receive financial information from the Company, including information regarding financial performance and projections (Pl. Ex. 151 at Section 3.1(b)); (3) right to bar the Company from amending or modifying the Management Incentive Program or from adopting any other incentive plan (Pl. Ex. 151 at Section 3.1(a)); (4) right to preclude any compensation increase for the Smalleys and Bensen (Pl. Ex. 122 at 1); (5) right to veto any sale of the Company or its assets that the Trustee determined was not in the best interests of the ESOP or its participants; and (6) the right to receive a controlling interest price for its stock in the event of a sale of the Company or its assets.

### 4. *Wert's incorrect assumptions regarding Chartwell's fee*

Wert assumes that the RVR stock purchase price was increased to allow for payment of Chartwell's $550,000 fee. I have not seen any evidence to support that assumption. To the contrary, the purchase price was agreed upon prior to the finalization of the Stock Purchase Agreement. Chartwell's fee was paid by RVR, and not the ESOP, as part of the transaction expenses incurred by RVR in establishing the ESOP. In my experience, it is perfectly appropriate for a company to pay its advisors for helping to establish a benefit plan intended to benefit the company's employees. That is all that happened here. (Pl. Ex. 41 at 1-2).

### B. Wert's Primary Opinion Ignores Important Industry Practices

I disagree with Wert's opinion that Bensen and the Smalleys knew that the RVR stock was sold at more than fair market value because they were allegedly advised by Chartwell that "the" fair market value of 100 percent of RVR's stock was $100.7 million whereas the agreed-upon purchase price was $105 million.

As discussed above, the uniform and undisputed testimony in this case is that (1) Bensen and the Smalleys lacked any experience with valuing private company stock; (2) RVR engaged Chartwell to advise the Company on, among other things, the value of 100 percent of RVR's stock; and (3) Chartwell advised RVR, including Bensen and the Smalleys, that the range for the fair market value of 100 percent of RVR's stock was between $100.7 million and $143.9 million. Bensen and the Smalleys knew that the ultimate purchase price agreed upon by the parties fell within the fair market value range identified by Chartwell. In fact, the purchase price was on the low end of the fair market value range identified by Chartwell.

As discussed above, fair market value of private company stock is commonly expressed as a range and Chartwell doing so in this instance is consistent with industry practices. As long as the price ultimately paid for a private company's stock falls within the estimated range of fair market value, it is accepted that the stock has been bought for fair market

8

value.  Wert's opinion ignores this industry practice, as well as the DOL's Proposed Regulation Relating to the Definition of Adequate Consideration which adopts that industry practice.

### C.  ESOP Transactions Should Be Evaluated On A Case-By-Case Basis

I also disagree with Wert's opinion that Bensen and the Smalleys "knew that Reliance had agreed to everything they wanted, and [as a result, knew that] the ESOP was paying a higher price than it should have … at the expense of the ESOP."  (Wert Report at 32-33).  This opinion ignores the significant negotiations over (1) financial terms, including stock purchase price, number of warrants and strike price, management incentive plan, interest rate on Seller Notes, and executive compensation; and (2) non-financial terms, including the nominating process for board members, the process for handling merger and acquisition activity, etc.  Wert ignores the significant concessions the Trustee negotiated on all of these issues.  (See Wilusz Report at 17-18).  Moreover, even if a trustee does agree to "everything" a selling shareholder requests, it does not necessarily mean that the transaction is unfair to the ESOP.

An evaluation of transaction fairness requires an analysis of the terms of the actual deal at issue.[9]  In my opinion, Bensen and the Smalleys had every reason to believe that the Transaction was more than fair to the ESOP. In fact, every indication is that the Selling Shareholders sold their stock to the ESOP at a price at or below the fair market value range.  (See Wilusz Report at 18-19, 26-30).  RVR provided financial projections to the Trustee that were very conservative and viewed as "absolutely attainable."  RVR also rejected the opportunity to modify the projections despite that doing so would have impacted the cash flow analysis and, ultimately, increased the purchase price.  The Transaction was negotiated and included multiple offers and counter-offers involving the price and the terms. Multiple parties evaluated the specifics of the ESOP Transaction and deemed it to be fair.  (See Wilusz Report at 18-19 (citing various opinions and certifications)).  Additionally, the subsequent valuation of the ESOP stock for Plan administrative purposes would have provided Bensen and the Smalleys additional assurances that the transaction was more than fair to the ESOP.

---

[9] As one example, Bensen and the Smalleys were guaranteed certain compensation in their pre-existing employment agreements and this compensation was included in the financial projections.  Had their compensation been reduced, the purchase price would have likely been higher given the reduction in projected expenditures.  As another example, Wert claims that the combined number of warrants and SARs increased over the course of the negotiations and that the ESOP "did not receive any consideration in return for increasing the post-Transaction equity interests of the Smalley Trusts and Smalley, Jr." (Wert Report at 28).  This is incorrect. The interest rates for the Seller notes were reduced during the course of the negotiation which resulted in significant savings for the ESOP. The proposed SARs pool was also significantly reduced.

9

**D.    Wert's Opinion That The Director Defendants Failed To Properly Monitor Reliance Is Incorrect Because It Is Based On A Number Of Incorrect And Demonstrably False Assumptions**

As discussed throughout this Rebuttal Report, Wert's opinion that the Director Defendants failed to properly monitor Reliance is invalid and unreliable because it is based on the following  incorrect and demonstrably false assumptions:

- During 2014, Bensen and the Smalleys were well versed in the valuation of private company stock including the circumstances under which the application of a control premium to a valuation conclusion is (and is not) appropriate.  (Wert Report at 31).

- Chartwell informed Bensen and the Smalleys that "**the** [one and only] fair market value of a controlling interest of RVR's equity… was $100.7 million."  (Wert Report at 4, 7) (emphasis added).

- As a result of the Transaction, Bensen and the Smalleys "would remain in control of all aspects of the Company" and that the "ESOP obtained no real attributes of control." (Wert Report at 4, 20).

- Following the Transaction, the RVR Board could "disregard and not investigate any unsolicited M&A offer.  The RVR Board agreed to bring offers to buy the Company to the Trustee, for information only, and only if the Board was going to accept an offer to buy…..It was totally within the Director Defendants' control to disregard an offer."  (Wert Report at 11, 16).

- The purchase price for the RVR stock was increased to allow for the payment of Chartwell's $550,000 fee by RVR and this fee was not incurred on behalf of RVR or the ESOP.  (Wert Report at 29).

Each one of these assumptions is contradicted by the record evidence in this case.  As a result, it is no surprise that Wert reaches an incorrect conclusion.

## IV.    CONCLUSION

Based on my education, 40 plus years of experience, my review of the cited material, my interview with Bensen and the Smalleys, the findings in my Report, and my discussion above, it is my opinion that the members of the RVR Board (and Bensen if Bensen is determined to be an appointing fiduciary) engaged in conduct that was consistent with industry best practices when appointing and monitoring Reliance in connection with the ESOP Transaction, that the RVR Defendants had no reason to believe (and still have no reason to believe) that the RVR ESOP paid more than fair market value for the RVR stock purchased on May 28, 2014, and that there were no "red-flags" that would have put the Smalleys or Bensen (or any of the RVR Defendants) on notice that Reliance was not

10

11

fulfilling its duties to the RVR ESOP or that the RVR ESOP Transaction was unfair to the ESOP.   I disagree with the opinions asserted by Wert to the contrary.


Date:  October 15, 2021                          _____

                                                 Edward A. Wilusz, ASA, CFA

# Exhibit 13

Confidential

DOL 0048975

# Sale to an ESOP under IRC 1042

Discussion Materials for Project Byway

STRICTLY PRIVATE & CONFIDENTIAL
JANUARY 27, 2014

CW-RVR_00027542

DOL 0048976

Confidential

# Project Byway Pro Forma 1042 Illustration

*To evaluate whether a 1042 election is beneficial for Byway, we used the following assumptions:*

| 1042 – Defer Capital Gains Taxes |
|---|

- Sellers elect a margined investment strategy, using the maximum available **margin of 90.0%**

- Of the $35.8 million in pre-tax cash proceeds, sellers use **$10.1 million as collateral to borrow** $100.7 million of floating rate notes (FRN)

  - This illustration assumes the cost to margin FRN is LIBOR + 75 bps, and the annual yield on FRN is LIBOR - 25 bps, resulting in a net cost

- After the collateral investment of $10.1 million, sellers invest their remaining cash proceeds of **$25.8 million in a securities portfolio**

  - This illustration assumes the **securities portfolio earns an 8.0% annual return**

| Summary of Cash Proceeds from Transaction | | | |
|---|---|---|---|
| | | **Non-1042** | |
| *$ in millions* | **1042** | Non-Installment | Installment |
| **Pre-Tax Cash Proceeds** | **$35.8** | **$35.8** | **$35.8** |
| Capital Gains Taxes Paid at Close | $0.0 | ($27.2) | ($9.9) |
| **After-Tax Cash For Reinvestment** | **$35.8** | **$8.7** | **$25.9** |
| Cash Used as Collateral for FRN | $10.1 | NA | NA |
| Cash Invested in Securities Portfolio | $25.8 | $8.7 | $25.9 |

| Non-1042 – Pay the Capital Gains Taxes |
|---|

**Non-Installment Sale**

- Sellers **pay all capital gains taxes of $27.2 million** at closing

- After paying capital gains taxes, sellers invest their remaining after-tax cash proceeds of **$8.7 million in a securities portfolio**

  - This illustration assumes the **securities portfolio earns an 8.0% annual return**

**Installment Sale**

- Sellers **pay capital gains taxes of $9.9 million at closing only on the cash received at closing**

- After paying capital gains taxes, sellers invest their remaining after-tax cash proceeds of **$25.9 million in a securities portfolio**

  - This illustration assumes the **securities portfolio earns an 8.0% annual return**

- Sellers must **pay an annual imputed tax** on the deferred capital gains taxes at a cost of AFR + 300 bps

DOL 0048977

Confidential

# Future Value of Portfolio with 1042 and without 1042, Assuming Installment Sale



Future Value of Equity Portfolio - 1042 vs. No 1042

$ in millions

■ 1042 - Equity Portfolio + Equity in FRN    ■ No 1042 - Equity Portfolio

DOL 0048978

Confidential

# Summary of Invested Value Appreciation with 1042



Summary of Invested Value Appreciation - 1042

$ in millions

Net Cumulative Appreciation    ▪ Cumulative After-Tax Carrying Cost

CW-RVR_ 00027545

DOL 0048979

Confidential

# Summary of Value Appreciation without 1042, Assuming Installment Sale



**Summary of Invested Value Appreciation - No 1042**

*$ in millions*    Net Cumulative Appreciation    ▪ Cumulative Imputed Taxes Paid

CW-RVR_ 00027546

DOL 0048980

Confidential

# Future Value of Portfolio with 1042 and without 1042, Assuming No Installment Sale



DOL 0048981

Confidential

# Summary of Value Appreciation without 1042, Assuming No Installment Sale



**Summary of Invested Value Appreciation - No 1042**

*$ in millions*

Net Cumulative Appreciation    ▨ Cumulative Imputed Taxes Paid

CW-RVR_ 0027548

Confidential

## Comparison of Tax-Affected Portfolio Values in 15, 30, and 45 Years



Note: 1042 values represent the sellers' after-tax proceeds if only their securities portfolio is sold

DOL 0048983

Confidential

# Comparison of Tax-Affected Portfolio Values in 15 Years



In all three scenarios the seller note becomes due in 2028, providing $63.9 million to the shareholders. However, if the shareholders choose the installment sale method, they will owe a tax payment of $23.9 million at that time.

Note: 1042 value represents the sellers' after-tax proceeds if only their securities portfolio is sold

CW-RVR_00027550

DOL 0048984

Confidential

CW-RVR_00027551



# CHARTWELL CAPITAL SOLUTIONS

Corporate Finance | Strategic Advisory | Valuation Services

# Project Byway

## CHARTWELL INTRODUCTION & PRO FORMA ESOP TRANSACTION ILLUSTRATION

STRICTLY PRIVATE & CONFIDENTIAL
JANUARY 27, 2014

Confidential

# Notice to Recipient

These materials have been prepared by Chartwell Business Valuation, LLC (also known as "Chartwell") for a Chartwell client or potential client to whom materials are directly addressed and delivered (the "Company") in connection with an actual or potential engagement, and may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Chartwell. These materials are based on information which Chartwell considers to be reliable. Chartwell assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company, other potential transaction participants or obtained from public sources, Chartwell has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management (or, with respect to estimates and forecasts obtained from public sources, represent reasonable estimates). No representation or warranty, express or implied, is made as to the accuracy or completeness of such information; and nothing contained herein is, or may be relied upon as, a representation, whether as to the past, the present, or the future.

These materials were designed for use by specific persons familiar with the business and affairs of the Company and are being furnished and should be considered only in connection with other information, oral or written, being provided by Chartwell in connection herewith. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Chartwell (or any affiliate) to provide or arrange any financing for any transaction or to purchase any security in connection therewith. Chartwell assumes no obligation to update or otherwise revise these materials. These materials have not been prepared with a view toward public disclosure under state or federal securities laws or otherwise, are intended for the benefit and use of the Company, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Chartwell. All materials herein are copyright protected. Upon the request of Chartwell, these materials, and any distributed copies thereof, are to be returned to Chartwell.

Chartwell and its affiliates do not provide tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Chartwell or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. Tax treatment is subject to change by law in the future and may have retroactive effect. You are strongly urged to consult with your tax advisors regarding any potential strategy, investment, or transaction. All securities affected and offered through Chartwell affiliate CCS Transactions, LLC, a FINRA member.

CW-RVR_00027552

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page **2**

DOL 0048986

Confidential

# Executive Summary

- Chartwell Capital Solutions ("Chartwell") is pleased to meet with the shareholders of Cruise America ("Byway" or "the Company") to provide an introduction to ESOPs and the 100% S-Corp ESOP structure

- Specifically, we look forward to discussing the following topics:

  - Shareholder considerations, goals, and objectives

  - An introduction to ESOP ownership and how it may meet those goals and objectives

  - Methods employed to provide a preliminary pro forma estimate of Byway's equity value

  - A pro forma illustration of a 100% sale to a newly formed S-Corp ESOP

  - An illustration of 1042 tax deferral on the gain on the sale of the business

  - Discussion of next steps

CW-RVR_00027553

DOL 0048987

Confidential

# Table of Contents

I.    Introduction to Chartwell

II.   Discussion of Shareholder Objectives

III.  Introduction to ESOPs

IV.  Pro Forma Equity Valuation

V.   Pro Forma 100% S-Corp ESOP Illustration

VI.  Introduction to 1042 Deferrals and Related Analysis

VII. Next Steps

**Appendix:**

A.    Additional ESOP Materials

B.    Internal Revenue Code Section 1042

C.    Chartwell Team Biographies

CW-RVR_00027554

DOL 0048988

Confidential

# I. Introduction to Chartwell

CW-RVR_00027555

DOL 0048989

Confidential

CW-RVR_00027556

# Comprehensive Financial Advisory Experience

*Chartwell provides financial advisory solutions to the middle market; areas of expertise include corporate finance, strategic advisory, and valuation services*

- **Founded in 1995** | 37 employees | Offices in Chicago, Minneapolis, Portland, and San Francisco
- Broad M&A, ESOP, and Capital Markets transaction expertise: **500+ transactions completed**
- Leading national ESOP and non-ESOP valuation firm: **400+ annual valuation engagements**



CHARTWELL CAPITAL SOLUTIONS

| Strategic Advisory Services | **Corporate Finance Group** | Valuation Services |

| **Corporate ESOP Advisory Services** | **M&A Advisory Services** | **Capital Markets Advisory Services** |
| --- | --- | --- |
| - Equity sales to newly created and/or existing ESOPs<br>- Tax-free sales, 1042 election<br>- Complex ESOP structures involving multi-layered capital structures<br>- ESOP diversification, equity buy-downs, and restructurings<br>- Sale of ESOP-owned companies | - Full sell-side capabilities:<br>  · Majority, control sell-side<br>  · Minority, non-control sell-side<br>- Management-sponsored leveraged buyouts (MBO)<br>- Buy-side transactions<br>- Divestitures | - Act as placement agent in connection with a transaction advisory mandate:<br>  · ESOPs<br>  · Mergers and acquisitions<br>  · Recapitalizations<br>- Broad investor base:<br>  · Senior/Mezzanine debt<br>  · Preferred/Common equity |

DOL 0048990

Confidential

CW-RVR_00027557

# Leading National ESOP Advisory Firm

*Our professionals have comprehensive experience in ESOP-related engagements, having represented both shareholders and trustees:*

▪ Nationally recognized market leaders with significant experience advising on a variety of complex ESOP-related projects and transactions

▪ Long-term relationships with the leading ESOP trustees, lawyers, financial advisors, consultants, administrators, fiduciaries, and related professionals

▪ Demonstrated commitment to ESOPs since 1986

| ESOP Advisory Services | Chartwell Involvement |
|---|---|
| ▪ **Equity sales to new and existing ESOPs** | ▪ Frequent speakers at ESOP conferences |
| ▪ Annual valuation and advisory services | ▪ Current Advisory Committee members of ESCA |
| ▪ Financing or refinancing of ESOP-owned companies | ▪ Current members of The ESOP Association Finance, Legal & Regulatory, Ownership Culture, and Valuation committees |
| ▪ Recapitalizations of existing ESOP companies | |
| ▪ Acquisitions of ESOP companies | ▪ Chapter Officers of The ESOP Association |
| ▪ Transaction structuring | |
| ▪ Fairness opinions | ▪ Active members of the National Center for Employee Ownership |
| ▪ Sale and termination of ESOPs | |

## SELECT TRANSACTIONS

| Shareholder | Trustee |
|---|---|
| <br>Complete Sale<br>to an ESOP<br>**Sell-Side Advisor** | <br>Newly formed ESOP<br>acquired 100% interest<br>**Trustee Advisor** |
| <br>Minority Sale<br>to an ESOP<br>**Sell-Side Advisor** | <br>ESOP acquired<br>minority interest<br>**Trustee Advisor** |
| <br>Complete Sale<br>to an ESOP<br>**Sell-Side Advisor** | <br>Newly formed ESOP<br>acquired minority interest<br>**Trustee Advisor** |
| <br>Minority Sale<br>to an ESOP<br>**Sell-Side Advisor** | <br>ESOP acquired minority<br>interest to become<br>100% ESOP owned<br>**Trustee Advisor** |

Confidential

# Extensive ESOP Transaction Expertise: Deal Activity

*Over the past year and a half, Chartwell has closed 47 ESOP-related transactions and has a number currently in process*

| Industry Sector | Closed | Industry Sector | Closed |
|---|---|---|---|
| Business Services | January 2014 | Architecture & Engineering | December 2012 |
| Consumer Products & Retail | December 2013 | Architecture & Engineering | December 2012 |
| Industrials | December 2013 | Healthcare & Life Sciences | December 2012 |
| Industrials | November 2013 | Consumer Products & Retail | December 2012 |
| Building Products & Construction | September 2013 | Consumer Products & Retail | December 2012 |
| Industrials | September 2013 | Industrials | December 2012 |
| Building Products & Construction | September 2013 | Industrials | December 2012 |
| Consumer Services | September 2013 | Consumer Products & Retail | December 2012 |
| Business Services | August 2013 | Consumer Services | December 2012 |
| Accounting, Finance & Insurance | August 2013 | Business Services | December 2012 |
| Business Services | August 2013 | Business Services | December 2012 |
| Architecture & Engineering | May 2013 | Healthcare & Life Sciences | September 2012 |
| Accounting, Finance & Insurance | April 2013 | Business Services | September 2012 |
| Business Services | April 2013 | Consumer Products & Retail | July 2012 |
| Architecture, Engineering, Consulting | December 2012 | Building Products & Construction | July 2012 |
| Consumer Products & Retail | December 2012 | Business Services | July 2012 |
| Consumer Services | December 2012 | Business Services | July 2012 |
| Transportation | December 2012 | Industrials | July 2012 |
| Building Products & Construction | December 2012 | Industrials | June 2012 |
| Industrials | December 2012 | Industrials | June 2012 |
| Industrials | December 2012 | Business Services | June 2012 |
| Industrials | December 2012 | Business Services | June 2012 |
| Business Services | December 2012 | Consumer Services | June 2012 |
| Architecture & Engineering | December 2012 | | |

CW-RVR_00027558

## CHARTWELL CAPITAL SOLUTIONS

Corporate Finance | Strategic Advisory | Valuation Services

DOL 0048992

Confidential

# II. Discussion of Shareholder Objectives

CW-RVR_00027559

DOL 0048993

Confidential

# Universe of Shareholder Considerations



CW-RVR_00027560

DOL 0048994

Confidential

# Project Byway Situation Overview

***Below is a summary of the shareholders' current situation and future goals as Chartwell understands them:***

- The founders of Byway, who together own 96.7% of the Company, are nearing retirement age and are exploring their ownership transition alternatives for the Company

- The ideal ownership transition plan would:

  - Keep the Company intact

  - Allow for partial liquidity in the near future (minimum of $20.0 million), with full liquidity at a point in the future

  - Facilitate a tax-advantaged sale for the shareholders

  - Create a tax-advantaged Company post-closing

  - Not over-burden the Company with aggressive debt leverage

- Chartwell understands the shareholders are interested in understanding how an Employee Stock Ownership Plan (ESOP) may be used as a vehicle for ownership transition, and how a 100% sale to an S-Corp ESOP may achieve the shareholders' liquidity objectives

| Byway Ownership | | | |
|---|---|---|---|
| Shareholder | Title | Shares | % |
| Robert Smalley | CEO/Founder | 483.5 | 48.35% |
| Randall Smalley | COO/Founder | 483.5 | 48.35% |
| Eric Bensen | CFO | 33.0 | 3.30% |
| | | 1,000.0 | 100.00% |

CW-RVR_0002756I

DOL 0048995

Confidential

# III. Introduction to ESOPs

CW-RVR_00027562

DOL 0048996

Confidential

# What is an ESOP?

*An ESOP (Employee Stock Ownership Plan) allows employees to become beneficial owners of the stock in their Company – private business owners often use ESOPs as their exit vehicle*

- **ESOPs are defined contribution plans that primarily invest in employer stock**

  - The Employee Retirement Income Security Act (ERISA) of 1974 is the primary governing law regulating ESOPs

  - Congress passed a number of tax laws to encourage business owners to establish ESOPs, including several tax advantages

  - Congress's intent was to create ownership and retirement assets for working-class Americans

- **ESOPs are trusts that acquire the Company's stock for the benefit of employees**

  - The Company borrows money from lenders, investors, and/or selling shareholders

  - The Company loans the ESOP money for the purpose of acquiring shares – a levered ESOP

  - Owners can sell from 1% to 100% of their stock to the newly created ESOP in exchange for cash and/or promissory notes or new securities

  - Shares are allocated to employee accounts annually (generally proportional to their annual compensation)

  - Employees receive cash in exchange for their shares upon retirement, termination, disability, or death

CW-RVR_0002763

Confidential

# ESOP History

**ESOPs compared to other forms of ownership:**

- 9,500 U.S. publicly traded companies
- 9,800 companies owned by private equity firms




Employee Retirement Income Security Act (ERISA) **1974**

Approx. 4,000 ESOPs **1980**

Approx. 8,000 ESOPs **1990**

S-Corp ESOPs grow due to change in legislation

Approx. 11,000 ESOPs covering 10 million employees **2013**

**1950's**      **1970's**      **1990's**      **Today**

ESOP concept developed

**1975** Approx. 1,600 ESOPs

ESOPs used as a hostile takeover defense – selling or contributing equity to an ESOP

3,700 S-Corp ESOPs 57% of S-Corp ESOPs are majority owned



- Companies were initially slow to adopt ESOPs primarily because rules did not clearly permit leverage
- Nonetheless, employee ownership concept gained momentum
- Attorney/Investment Banker, Louis Kelso, developed the modern day ESOP structure

- Congress passes Employee Retirement Income Security Act of 1974, which governs employee benefit plans, establishing a clear statutory framework for ESOPs
- ESOPs were used primarily as a hostile takeover defense (e.g., Polaroid, Continental Airlines, Criton Corp., etc.)
- Also used as an exit strategy (e.g., Avis, Simmons Mattress, private companies, etc.)

- Congress continues to modify laws governing ESOPs (e.g., Economic Growth and Tax Relief Reconciliation Act of 2001 provides clarity in structuring rules for 100% ESOP-owned S-Corp companies)
- ESOPs are found in publicly traded and closely held companies of every size

DOL 0048998

Confidential

CW-RVR_00027565

# What are the Tax Advantages Unique to ESOPs?

*ESOPs provide multiple benefits to both the selling shareholders and the Company*

- **For the Company, the combination of an S-Corp and ESOP can be used to create "tax-free" entities**

  - An S-Corp is a pass-through entity and incurs no federal and, in most cases, no state income tax liability at the corporate level, as income tax liability is passed to the shareholders

  - An ESOP entity (as a shareholder) does not pay income taxes, hence the combination of the S-Corp structure and ESOP creates a company that is fully exempt from federal and most state income taxes

  - The tax-free ESOP structure increases the Company's cash flow and in turn pays off debt more quickly, allowing for more leverage due to enhanced coverage ratios

- **For the selling shareholders, the election of 1042 tax treatment means that a sale to an ESOP can be tax free**

  - Under IRC Section 1042, an owner of C-Corp stock can defer capital gains taxation on stock sold to an ESOP if the seller reinvests ("rolls over") the sale proceeds into Qualified Replacement Property ("QRP")

  - If the replacement property is held until death of the selling shareholder, the property transfers to heirs on a stepped-up, fair market value cost basis

    - No capital gains tax paid as long as QRP is not sold

    - Can limit ability to actively manage investment portfolio without triggering tax if not structured properly

---

*Jim Griffin from Wells Fargo Advisors will cover 1042 elections in more detail momentarily*

---

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page **15**

DOL 0048999

Confidential

# Why do Business Owners Choose an ESOP – Summary of Benefits

| | |
|---|---|
| **Management and Governance Continuity** | ▪ ESOP transaction process offers superior timing, confidentiality, certainty of close, and ease in negotiating terms and conditions relative to third-party sales<br>▪ Selling shareholders maintain control of the Company and Board of Directors<br>   • Employees are not granted operating or strategic control<br>   • Financial and strategic information kept confidential and not shared with employees<br>▪ Members of management retain their positions, allowing for a smooth transition<br>▪ Interests of owners, management, and employees are aligned for success<br>▪ SARs programs offer significant incentives to management<br>▪ Company culture remains intact |
| **Continued Growth and Pursuit of Strategic Initiatives** | ▪ Company can aggressively pursue growth or strategic initiatives:<br>   • Significant tax savings expedite debt repayment and free up cash for growth<br>   • Offers a superior platform for acquisitions<br>▪ Flexibility to structure with responsible levels of debt, allowing continued growth |
| **Employee Advantages** | ▪ Improves further the Company's ability to attract and retain top talent<br>▪ Increases productivity by incentivizing employees to increase profits<br>▪ Reduces greatly employee turnover<br>▪ Excellent recruiting tool at all levels<br>▪ Significant retirement benefits for all employees |
| **Tax Benefits** | ▪ Reduces (or eliminates) income tax obligation to the federal government<br>   • Increases net earnings, debt repayment, and equity appreciation<br>▪ Increases borrowing capacity for ESOP companies due to tax-advantaged cash flow<br>▪ Provides selling shareholders with the potential of deferring capital gains tax indefinitely (1042 election) |

CW-RVR_00027566

DOL 0049000

Confidential

# IV. Pro Forma Equity Valuation

CW-RVR_00027567

DOL 0049001

Confidential

# Standard of Value – ESOP Equity Valuations

| Two Regulatory Agencies |
|---|

**Internal Revenue Service**

- Revenue Ruling 59-60

- IRS Standard of Value is Fair Market Value (FMV)

**Department of Labor (DOL)**

- DOL Standard of Value is adequate consideration (generally FMV determined in good faith)

- Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i))

- The term **"fair market value"** is defined as the price at which an asset would change hands under the following conditions:

    - **Between a willing buyer and willing seller**, when the former is not under any compulsion to sell

    - Both parties are able and willing to trade and are **well informed** about the asset and the market for the asset

| Factors to Consider in Estimating Fair Market Value |
|---|

- Nature of the business and history of the business enterprise

- General economic outlook and the specific industry condition and outlook

- Book value of the stock and the financial condition of the Company

- Whether the enterprise has goodwill or other intangible value

- Earnings capacity of the Company

- Dividend-paying capacity **(Discounted Cash Flow Analysis, or "DCF")** of the Company

- Sales of stock and the size of the block to be valued **(Comparable M&A Transaction Analysis)**

- The market price of corporate common stocks for companies engaged in the same or similar lines of business **(Comparable Public Company Analysis)**

- **Minority Interest Value** compared to **Controlling Interest Value**

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 18

DOL 0049002

Confidential

# Relative Levels of Value – ESOP Valuation Guidelines



**In both minority and majority sale transactions, it is typical to assume a discount for lack of marketability between 0% and 10%, with a 5% discount being expected on average**

CW-RVR_0002756x

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services

Confidential

# Valuation Fairness – "Fairness"

| Absolute Fairness | Relative Fairness |
|---|---|
| ▪ The ESOP may not pay more than fair market value for its stock | ▪ The ESOP must receive terms that are fair in relation to the terms given to other investors |
| ▪ Similarly, the ESOP must receive fair market value when selling shares | ▪ Must consider what the ESOP is contributing and what it is receiving, relative to others |
| ▪ Premiums or discounts are factored in based on type of transaction | ▪ Should address the risk as well as the return on the ESOP's investment |
| | ▪ Is the transaction structured on "market" terms? |

DOL 0049004

Confidential

# Note on the Pro Forma ESOP Valuation

- Chartwell has prepared the following (preliminary) pro forma ESOP valuation analysis for initial planning and discussion purposes

- Our preliminary pro forma valuation analysis is not final and represents what may be possible in a negotiated transaction

- The ESOP trustee's financial advisor would apply similar valuation methods; accordingly, we are presenting value on a preliminary basis that is comparable to what that advisor would likely present to the trustee

- For planning and discussion purposes, Chartwell has used an enterprise value of $140.0 million in our pro forma transaction modeling

  - This enterprise value equates to a controlling interest equity value of $100.7 million

DOL 0049005

Confidential

# Summary of ESOP Valuation Methodologies



While not a standard ESOP valuation methodology, Chartwell also estimated the value a private equity buyer might pay for the Company; this range of enterprise value was $90.0 million to $120.0 million

Confidential

# Discounted Cash Flow Analysis

*The discounted cash flow method is based on a projection of Company performance and is designed to estimate the present value of all future cash flows generated by Byway*

- Chartwell utilized an estimated terminal EBITDA multiple range of 5.5x to 6.5x and an estimated weighted average cost of capital (WACC) range of 12.0% to 14.0%

- Based on the DCF methodology, the midpoint enterprise value indication for Byway was $137.1 million

**Byway**

| | | | Forecasted | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Adjusted EBIT** | 13,590 | 13,541 | 13,907 | 14,274 | 14,641 |
| Income Taxes | (3,880) | (3,877) | (4,023) | (4,164) | (4,304) |
| **Net Operating Profit After Tax** | 9,710 | 9,664 | 9,884 | 10,110 | 10,337 |
| Depreciation & Amortization | 19,207 | 19,484 | 19,595 | 19,706 | 19,817 |
| Capital Expenditures | (33,400) | (30,400) | (31,400) | (32,400) | (33,400) |
| Net Working Capital Change | 1,092 | 1,095 | 1,134 | 1,172 | 1,210 |
| Proceeds from Sale of Vehicles, Net of Gain | 7,975 | 7,975 | 8,250 | 8,525 | 8,800 |
| **Total Debt-Free Cash Flow** | 4,584 | 7,818 | 7,463 | 7,113 | 6,764 |
| PV of Debt-Free Cash Flow at 13% | 4,312 | 6,508 | 5,498 | 4,637 | 3,903 |
| [a] **Sum of PV: Period Cash Flow** | 24,859 | | | | |

| Terminal Value | |
|---|---|
| Terminal EBITDA | 34,458 |
| Terminal Multiple | 6.0x |
| **Terminal Value** | 206,748 |
| [b] **PV of Terminal Value at 13%** | 112,215 |

| Enterprise Value Calculation | |
|---|---|
| [a] Sum of PV: Period Cash Flow | 24,859 |
| [b] PV of Terminal Value | 112,215 |
| **Enterprise Value Indication** | 137,073 |

| Distribution of Value | |
|---|---|
| Period Cash Flow | 18.1% |
| Terminal Cash Flow | 81.9% |
| **Total** | 100.0% |

| | | WACC Range | | |
|---|---|---|---|---|
| | | 14.0% | 13.0% | 12.0% |
| **Terminal EBITDA Multiple Range** | 6.5x | 140,669 | 146,425 | 152,485 |
| | 6.0x | 131,721 | 137,073 | 142,709 |
| | 5.5x | 122,772 | 127,722 | 132,933 |

| **Indicated Enterprise Value Range** | **$123,000** | **to** | **$152,000** |
|---|---|---|---|

$ in thousands

CW-RVR_0002757573

DOL 0049007

Confidential

# Comparable Public Company Analysis Summary

*The comparable public company analysis methodology estimates the value of a company by comparing it to similar public companies*

- Chartwell identified seven publicly traded companies in **related lines of business** to Byway:

| Car & Truck Rental Companies | |
|---|---|
| **Company** | **LTM EV/ EBITDA** |
| Hertz Global Holdings, Inc. | 14.1x |
| Avis Budget Group, Inc. | 16.0x |
| Ryder System, Inc. | 4.8x |
| AMERCO (U-Haul) | 5.7x |
| **Mean** | **10.2x** |
| **Median** | **9.9x** |

| RV Manufacturers | |
|---|---|
| **Company** | **LTM EV/ EBITDA** |
| Brunswick Corporation | 9.2x |
| Thor Industries Inc. | 11.2x |
| Winnebago Industries, Inc. | 14.5x |
| **Mean** | **11.6x** |
| **Median** | **11.2x** |

- However, in our analysis, Chartwell determined there were no publicly traded companies that were truly comparable to Byway (as an RV rental company):

  - Similar to the car and truck rental public peers, Byway's fixed asset base is essential to its operations; however the public peers generate more incremental revenue through increased asset turnover, as their businesses are less seasonal

  - While the RV manufacturers' multiples provide a useful indication of the recreational vehicle industry, the operations of manufacturers are very different from Byway, and we do not believe this peer group serves as a good basis for comparison

Confidential

# Comparable Public Company Comparison

*Because Byway's fleet of vehicles is essential to the ongoing operations of the business, Chartwell compared the Company's key metrics to its peers*

- The EBIT to EBITDA conversion ratio is a useful proxy for free cash flow before reinvestment; Byway's ratio is approximately half that of its peers, indicating it reinvests more of its cash flow into the business than its public peers

- The fixed asset turnover ratio is calculated by dividing annual revenues by the average fixed assets for the year; Byway's fixed asset turnover is significantly lower than the public peers, implying that the Company does not utilize its fixed assets to generate revenue as frequently as the public peers

**EBIT to EBITDA Conversion**

| Company | EBITDA | EBIT | EBIT/ EBITDA |
|---|---|---|---|
| **Car Rental Companies** | | | |
| Hertz Global Holdings, Inc. | $1,849 | $1,538 | 83.2% |
| Avis Budget Group, Inc. | 963 | 851 | 88.4% |
| Ryder System, Inc. | 1,438 | 493 | 34.3% |
| AMERCO | 816 | 596 | 73.1% |
| **RV Manufacturers** | | | |
| Brunswick Corporation | $407 | $320 | 78.6% |
| Thor Industries Inc. | 255 | 230 | 90.4% |
| Winnebago Industries, Inc. | 55 | 50 | 91.6% |
| **Byway** | **$32** | **$13** | **40.6%** |

$ in millions

**Capital Expenditures as a % of Revenue**

| Company | Capital Expenditures | Revenue | Capex as % of Revenue |
|---|---|---|---|
| **Car Rental Companies** | | | |
| Hertz Global Holdings, Inc. | $3,631 | $10,539 | 34.4% |
| Avis Budget Group, Inc. | 1,659 | 7,785 | 21.3% |
| Ryder System, Inc. | 1,529 | 6,385 | 23.9% |
| AMERCO | 833 | 2,730 | 30.5% |
| **RV Manufacturers** | | | |
| Brunswick Corporation | $146 | $3,816 | 3.8% |
| Thor Industries Inc. | 24 | 3,280 | 0.7% |
| Winnebago Industries, Inc. | 5 | 832 | 0.6% |
| **Byway** | **$35** | **$99** | **35.6%** |

$ in millions

**Fixed Asset Turnover**

| Company | Fixed Asset Turnover |
|---|---|
| **Car Rental Companies** | |
| Hertz Global Holdings, Inc. | 7.6x |
| Avis Budget Group, Inc. | 14.6x |
| Ryder System, Inc. | 10.2x |
| AMERCO | 8.8x |
| **RV Manufacturers** | |
| Brunswick Corporation | 6.5x |
| Thor Industries Inc. | 20.9x |
| Winnebago Industries, Inc. | 40.4x |
| **Byway** | **0.9x** |

$ in millions

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

DOL 0049009

Confidential

# Comparable M&A Analysis Summary

*The comparable merger & acquisition analysis methodology estimates the value of a company by applying multiples from relevant transactions in similar industries*

- In our analysis, Chartwell identified five strategic acquisitions since 2009 with disclosed financial details that involved companies in related lines of business to Byway:

  - Avis Budget Group's acquisition of Payless Car Rental System (2013)

  - Avis Budget Group's acquisition of Zipcar (2013)

  - Hertz's acquisition of Dollar Thrifty Automotive Group (2012)

  - Hertz's acquisition of Donlen Corporation (2011)

  - Hertz's acquisition of Southwest Texas Leasing (2009)

- All of the transactions identified involved car rental companies which, as discussed in the public company analysis, are not truly comparable to Byway

CW-RVR_00027576

Confidential

# Comparable M&A Analysis: Byway's Previous Publicly Disclosed Transactions

*The most relevant comparable transactions for Project Byway are transactions involving the subject company; Chartwell analyzed publicly disclosed data for the Company's acquisition by Budget Group in 1997 and Management's buyout of the Company from Budget in 2000*

- In 1997, Budget Group acquired Cruise America in a stock merger

  - Transaction rationale included expanding Budget's network of transportation companies and achieving synergies for both companies via cross-selling opportunities and a reduction of Cruise America's fleet financing costs

  - Shareholders of Cruise America received ~0.28 shares of Budget in exchange for each share of the Company, representing a 9.1% premium over Cruise America's share price one month prior

- In 1999, Budget announced plans to divest its non-core operations, which included Cruise America, in order to focus on its core car and truck rental business

- In 2000, an investor group that included the management team and founders purchased 80.1% of Cruise America from Budget Group in exchange for cash and notes

- Budget sold the remaining 19.9% of Cruise America in January of 2002

**Byway Historical Valuation Summary**

| | Budget Acquisition 1997 | Management Buyout 2000 | Pro Forma ESOP Sale 2013 |
|---|---|---|---|
| Enterprise Value | $133,340 | $131,000 | $140,000 |
| **LTM Financials:** | | | |
| Revenue | 107,280 | NA | 99,333 |
| EBITDA | 26,420 | NA | 31,688 |
| EBIT | 12,260 | NA | 12,864 |
| **Transaction Multiples:** | | | |
| EV/LTM Revenue | 1.2x | NA | 1.4x |
| EV/LTM EBITDA | 5.0x | NA | 4.4x |
| EV/LTM EBIT | 10.9x | NA | 10.9x |

$ in thousands

*The Company's size and profitability metrics have not changed significantly since 1997; as such, we believe similar transaction multiples can be applied to the Company's 2013 revenue, EBITDA, and EBIT*

DOL 0049011

Confidential

# Preliminary Pro Forma Valuation Summary

*For illustration and planning purposes, Chartwell has used a controlling interest enterprise value of $140.0 million, primarily based on the DCF analysis*

*This enterprise value equates to a controlling interest equity value of $100.7 million, which is the equity purchase price we have used in our pro forma 100% S-Corp ESOP sale illustration*

| Preliminary Pro Forma Valuation Summary | |
|---|---|
| **Byway** | **Value Reconciliation** **December 31, 2013** |
| **Selected Enterprise Value** | **$140,000** |
| Add: Cash and Marketable Securities | 12,000 |
| Subtract: Interest Bearing Debt | (47,000) |
| Control Value From Operations | $105,000 |
| Add: Shareholder Note Receivable | 950 |
| Control Equity Value | $105,950 |
| Subtract: Discount for Lack of Marketability at 5% | (5,298) |
| **Fair Market Value** | **$100,653** |
| | approximately |
| | **$100,700** |
| Shares Outstanding | 1,000 |
| **Per Share Fair Market Value** | **$100,700.00** |

$ in thousands, except per share values

CW-RVR_0002757B

DOL 0049012

Confidential

# V. Pro Forma 100% S-Corp ESOP Illustration

CW-RVR_00027579

Confidential

# Introduction to the Pro Forma 100% S-Corp ESOP Illustration Analysis

*At the request of Byway, Chartwell has conducted a preliminary analysis of a complete sale of the Company to a newly formed ESOP, immediately followed by an S-Corp election*

- **Purpose of Analysis:**
  - The purpose of the analysis prepared herein is to illustrate the most likely outcome and expected financial results to the shareholders, following a 100% sale of RVR to an ESOP with a subsequent S-Corp election

- **Assumptions:**
  - To prepare our pro forma transaction analysis, Chartwell based our illustration on the Company's projections, as provided to us by Wells Fargo
    - While 100% S-Corp ESOPs are generally tax-free entities, we understand the Company would likely pay approximately $15.0 million in deferred income taxes over the first five years of the projection, and we have included these taxes in our pro forma analysis
  - Our pro forma transaction illustration utilizes the valuation analysis included herein
  - In our preliminary analysis, Chartwell assumed the ESOP would acquire all shares of RVR, Inc.
    - We have not assigned specific equity values to the Company's subsidiaries, Cruise America, Cruise Canada, American Land Cruisers of California, or ALC Properties

- **Key Findings:**
  - In this pro forma 100% S-Corp ESOP illustration, the selling shareholders receive partial liquidity for their holdings and receive interest income and equity upside through seller notes and warrants
  - Through the responsible use of leverage, the ESOP is able to achieve 100% ownership, which will provide a meaningful benefit to employees

> *This analysis is designed to serve as a preliminary overview of the potential options before the shareholders, and Chartwell looks forward to further refining this work with the shareholders as they weigh their options*

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 30

DOL 0049014

Confidential

# ESOP Transaction Overview

*The pro forma leveraged ESOP transaction structure provides partial liquidity to shareholders and achieves 100% employee ownership without requiring employee investment; sellers retain subordinated seller notes, which provide a cash interest stream and accumulating PIK interest and warrant value to provide an equity-like return*

- A portion of the transaction is funded with Company cash ($6.0 million)

- The balance of the transaction is funded through two sources of financing:

  - **Senior Debt:**

    - Revolving credit facility of $90.0 million, with $67.5 million drawn at close; interest rate of LIBOR + 175 bps on 50% of the outstanding balance and 3.91% on the remaining 50%

    - Senior term loan of $12.5 million; interest rate of 5.28%; annual amortization of 15.0% with a bullet in year five

  - **Seller Notes:**

    - $63.9 million, cash interest of 2.5%, paid-in-kind (PIK) of 3.0%, attached warrants totaling 35.0% of the Company's fully diluted equity value

    - 15-year term, with a bullet in the final year (no annual amortization); Chartwell assumed a refinancing transaction in 2018, which would provide shareholders an additional $15.0 million in cash in that year

- The Company would flip to S-Corp tax status following the sale to the ESOP, resulting in tax savings that can be used to service the debt associated with the transaction

- Selling shareholders are able to elect 1042 tax treatment on the sale to the ESOP, allowing them to defer capital gains taxes potentially indefinitely

- To properly incentivize management, a Stock Appreciation Rights (SARs) plan is also included, equal to 10.0% of the fully diluted share count

CW-RVR_0002758

Confidential

# Pro Forma Transaction Sources and Uses

*For illustration purposes, below is the proposed capital structure we used to finance our pro forma ESOP transaction*

| Sources | | | | | | Uses | | |
|---|---|---|---|---|---|---|---|---|
| Scenario: 100% S-Corp ESOP | | | | | | | | |
| | | | EBITDA Multiples[1] | | | | | |
| Detail | Amount | % | 2013 | 2014 | | Detail | Amount | % |
| Revolving Credit Facility | $67,500 | 45.0% | 2.13x | 2.06x | | Equity Sale | $100,653 | 67.2% |
| Senior Term Loan | 12,500 | 8.3% | 0.39x | 0.38x | | Refinance Existing Debt | 47,000 | 31.4% |
| Seller Notes | 63,868 | 42.6% | 2.02x | 1.95x | | Transaction Costs | 1,940 | 1.3% |
| Excess Cash on Hand | 6,000 | 4.0% | 0.19x | 0.18x | | Financing Fees | 275 | 0.2% |
| Total Transaction Sources | $149,868 | 100.0% | 4.73x | 4.57x | | Total Transaction Uses | $149,868 | 100.0% |

$ in thousands

1. Based on 2013 and 2014 Adj. EBITDA of $31.7 million and $32.8 million, respectively

| Cash to Selling Shareholders | |
|---|---|
| Equity Sale | $100,653 |
| Less: Note Payable to Company | (950) |
| Less: Seller Notes | (63,868) |
| Cash at Close | $35,835 |

*The selling shareholders would retain $63.9 million in the form of seller notes and receive $35.8 million in pre-tax cash at closing in this pro forma illustration*

*Selling shareholders do not have to pay taxes on their proceeds from the ESOP sale, as they could elect 1042 tax treatment and defer capital gains taxes potentially indefinitely*

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 32

Confidential

# Economics to the Selling Shareholders on Seller Notes (Pre-Tax)

*In addition to $35.8 million in tax-free cash at close, selling shareholders would also receive interest income and appreciation in warrant value associated with their seller notes*

*At the end of the 10-year period, selling shareholders have received pre-tax cash interest income of $15.4 million and return of $15.0 million of the principal on their seller notes; the remaining principal, PIK interest, and warrant value will be received at the end of the 15-year period, in 2028*



$ in millions

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 33

CW-RVR_0027583

DOL 0049017

Confidential

# Cumulative Company Tax Savings Illustration

*Under the 100% S-Corp ESOP scenario, the Company retains $28.8 million in cumulative tax savings as a result of its tax-exempt status; the Company must pay approximately $15.0 million in deferred income taxes from 2014 to 2018; thereafter, the Company becomes entirely tax-free*

### Cumulative Company 100% S-Corp ESOP Tax Savings

| | Status Quo | 100% S-Corp ESOP Sale |
|---|---|---|
| Cumulative 10-Year Status Quo Taxes | $43,775 | $43,775 |
| Less: Interest Tax Shield | NA | (29,169) |
| Less: ESOP Compensation Tax Shield | NA | (6,004) |
| Less: 100% S-Corp ESOP Tax Status Benefit | NA | (8,602) |
| Plus: Deferred Income Taxes Payable | NA | 15,000 |
| **Cumulative Tax Shield** | **-** | **(28,775)** |
| | | |
| Cumulative 10-Year Status Quo Taxes | $43,775 | $43,775 |
| Less: Net Cumulative Tax Liability | (43,775) | (15,000) |
| **Cumulative Tax Shield** | **-** | **28,775** |

$ in thousands

CW-RVR_00027584

DOL 0049018

Confidential

# Credit Statistics from ESOP Transaction

*The pro forma ESOP transaction scenario illustrated herein is architected to provide the Company with sufficient liquidity for the ongoing management of the business; the Company's credit ratios are expected to be well within compliance over the 10-year period*

| Credit Statistics from ESOP Transaction | | | | |
|---|---|---|---|---|
| | **Pro Forma 100% S-Corp ESOP Sale** | | | |
| | **2014** | **2018**[1] | **2019** | **2023** |
| **Leverage Statistics** | | | | |
| Modified Fixed Charge Coverage[2] | 2.07x | 2.29x | 1.82x | 2.26x |
| Senior Debt/EBITDA | 2.39x | 1.96x | 2.28x | 1.83x |
| Total Debt/EBITDA | 4.44x | 4.17x | 4.08x | 3.76x |
| Liquidity (Cash + Remaining Debt Capacity) | $35,485 | $49,203 | $53,833 | $78,432 |
| | | | | |
| **Free Cash Flow Before Debt Amortization** | | | | |
| Annual Free Cash Flow | $1,778 | $2,107 | $3,364 | $2,676 |
| Cumulative Free Cash Flow | 1,778 | 12,820 | 16,184 | 28,027 |

$ in thousands
1. Pre-refinancing transaction
2. Based on Wells Fargo calculation methodology on existing revolving credit facility

DOL 0049019

Confidential

CW-RVR_00027586

# ESOP Transaction from the Perspectives of the Employees and Management

*While the ESOP owns 100% of the Company's common shares, by the end of 2023 the ESOP owns 65.1% of the Company's fully diluted equity, as management's SARs pool and the seller note warrants accrete in value*

### Summary of ESOP Transaction from the Perspectives of the Employees and Management

| | 100% S-Corp ESOP Sale | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2018[1] | 2019 | 2023 |
| ESOP Fully Diluted Equity Ownership | 75.5% | 74.1% | 70.9% | 65.1% |
| ESOP Equity Value | 5,751 | 12,619 | 14,469 | 21,025 |
| Value of Management SARs Pool | $228 | $1,478 | $1,814 | $3,008 |

$ in thousands
1. Pre-refinancing transaction

DOL 0049020

Confidential

# 2023 Pro Forma Fully Diluted Equity Breakdown

Post-strike price of $4,500.00 per unit, management's SARs pool represents 9.3% of the Company's fully diluted equity, while the warrants (with a higher strike price per unit of $8,000.00), represent 25.6%

The ESOP owns the remaining 65.1% of the Company's fully diluted equity

### 2023 Fully Diluted Equity Ownership

| | | |
|---|---|---|
| SARs Pool | $3,008 | 9.3% |
| Warrant - Seller Notes | 8,284 | 25.6% |
| ESOP | 21,025 | 65.1% |
| **Total** | **$32,316** | **100.0%** |

$ in thousands

### 2023 Fully Diluted Equity Breakdown



CHARTWELL CAPITAL SOLUTIONS
**Corporate Finance   Strategic Advisory   Valuation Services**
37

Confidential

# VI. Introduction to 1042 Deferrals and Related Analysis

CW-RVR_00027588

Confidential



# Sale to an ESOP under IRC 1042

Discussion Materials

James T. Griffin CFP* CRPS*
ESOP Specialist
(213) 700-1597
James.t.griffin@wellsfargo.com

STRICTLY PRIVATE & CONFIDENTIAL
JANUARY 24, 2014

CW-RVR_00027589

Confidential

# What is a 1042 Election and how is it Tax Deferred?

Under Internal Revenue Code Section 1042, an owner of C-Corp stock can defer capital gains taxation on stock sold to an ESOP if the seller reinvests ("rolls over") the sale proceeds into Qualified Replacement Property ("QRP"), which means no capital gains taxes are paid as long as the QRP is not sold. Some pros and cons include:

**Pro: Tax Deferral**

- Capital gains can be deferred indefinitely if, for example, the QRP is
  - held until the death of the selling shareholder or
  - gifted or
  - donated to a charitable remainder trust

**Pro: Liquidity**

- Provided certain rules are followed, the selling shareholder can gain liquidity without incurring capital gains taxes, which can then be used for other investments or activities

**Pro & Con: Investments**

- Though the QRP acquired is of very high quality, there are limitations on the assets that can be purchased

**Con: Complexity**

- 1042 transactions and the subsequent acquisition of QRP is complex and requires careful management by an expert

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC)Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

CW-RVR_00027590

Confidential

# What Types of Equity will Qualify for 1042 Treatment when Sold?

***In an ESOP Transaction the senior most stock must be sold…***

| Preferred Shares | Common Shares | Incentive Stock Options |
|---|---|---|

- Eligible only if convertible into the highest class of common stock

- Eligible to individuals, trusts, estates, partnerships or S corporations

- Seller must be subject to US income tax

- Seller must have held the stock for a minimum of three years

  - If preferred stock is converted into common, the required three-year holding period would "tack" onto the common shares (rather than start over)

- Eligible to individuals, trusts, estates, partnerships or S corporations

- Seller must be subject to US income tax

- Seller must have held the stock for a minimum of three years

- Depends on how seller acquired the common shares (different treatment if, for example, shares are acquired through incentive stock options)

- Not 1042 eligible

CW-RVR_00027591

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Farga & Company. Life Insurance products are available through Wells Farga Advisors, LLC (Califarnia license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Farga Advisars , LLC (member SIPC)Wells Fargo Advisars, LLC cannot provide tax advice. Please see yaur tax advisor ta determine haw this infarmatian may apply ta yawn situation.*

DOL 0049025

Confidential

CW-RVR_00027592

# What is Qualified Replacement Property?

*In order for a security to qualify as Qualified Replacement Property, it must be a purchased security of a domestic operating corporation*

**Purchased**: The Qualified Replacement Property must be acquired by purchase, not by gift or inheritance, within a 15 month period beginning three months before the sale to the ESOP and within 12 months after the sale to the ESOP

**Domestic**:  The Qualified Replacement Property must be securities of a corporation that is incorporated in the U.S.

**Operating Corporation**: The Qualified Replacement Property must be securities of a corporation that uses more than 50% of its assets in the active conduct of its business. The corporation cannot have passive income that exceeds 25% of its gross receipts per year

Common 1042 investment strategies typically include one or more of the following eligible securities:

| Eligible | Non-eligible |
|---|---|
| <ul><li>Common stock</li><li>Corporate fixed rate bonds</li><li>Corporate floating rate notes (FRN)</li></ul> | <ul><li>Municipal bonds</li><li>U.S. government bonds</li><li>Mutual funds</li><li>Foreign securities</li><li>REITs</li><li>Bank CDs</li><li>Partnership Interests</li></ul> |

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC)Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

DOL 0049026

Confidential

# What are Common 1042 Strategies?

### All Cash Purchased Strategy

- Buy and hold selected (qualifying) high-quality stocks and/or corporate bonds
- Simplest, yet least flexible strategy
- Requires cash from the transaction equal to the full amount of the QRP to be purchased
- Unless seller has other cash sources, this strategy cannot be used for seller-financed transactions

### Levered/Margined Strategy

- Cash and/or levered purchased high-quality Floating Rate Notes (FRN)
- Monetize (borrow) against the value of the FRNs (does not trigger tax)
- Use loan proceeds to support an actively managed portfolio or for any other purpose, including real estate, private investments or general expenses
- Used in seller-financed transactions and provides the most flexibility

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC)Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

CW-RVR_0027593

DOL 0049027

Confidential

# VII. Next Steps

CW-RVR_00027594

DOL 0049028

Confidential

# Next Steps

- Solicit feedback from shareholders

- Engage Chartwell to assist and advise the Company in further understanding its ESOP ownership alternatives, including a complete valuation analysis and more refined transaction structuring and pro forma analysis with the assistance of Wells Fargo

- Well Fargo to continue its credit approval process with the assistance of Chartwell

- Facilitate further discussion and analysis on the 1042 election with Wells Fargo's 1042 expert, Jim Griffin

CW-RVR_00027595

DOL 0049029

Confidential

# Appendix A:
# Additional ESOP Materials

CW-RVR_00027596

DOL 0049030

Confidential

# Levered ESOP Transaction Steps (1042 Structure)



**Transaction Overview**

**Summary of Steps**

Step ❶ Company borrows funds from Wells Fargo

Step ❷ Company lends funds to the newly formed ESOP Trust ("Internal Loan")

— The internal loan and external loan can have different maturities and interest rates

Step ❸ ESOP Trust acquires shares from selling shareholders in exchange for cash and/or a seller note/warrants

CW-RVR_00027597

CHARTWELL CAPITAL SOLUTIONS

**Corporate Finance   Strategic Advisory   Valuation Services**

47

Confidential

# Complete Sale to an ESOP (100% S-Corp ESOP with a 1042 Election)

**Description**

- Shareholders sell 100% of their equity interest in a leveraged transaction to a newly formed ESOP, and the Company achieves 100% S-Corp ESOP status following an S-Corp election post-closing

- Shareholders receive a combination of cash, notes, and warrants (notes can be tranched into various securities)

- ESOP's fully diluted equity would be no less than 51%, while the selling shareholders and management would hold a maximum of 49%, subject to 409(p) considerations

**Benefits**

- The Company achieves a tax efficient ownership transition solution, providing management and employees with equity participation (to achieve increasing productivity and Company cash flows for reinvestment)

- The Company and the ESOP would be exempt from federal and most state income taxes

- Selling shareholders could defer capital gains taxes through a 1042 election

- Shareholders would achieve partial liquidity with the ability for continued equity participation (the future and net present values would likely exceed a hold strategy)

- Returns on acquisitions or capital investments under this structure are enhanced due to a lower cost of capital

**Considerations**

- The Company would have to take on either senior debt and/or seller notes; or use cash on hand

- Careful ESOP structuring is required to manage the future repurchase liability while maximizing cash flow, without limiting the Company's financial flexibility

- ESOP transactions need to be highly negotiated to ensure the best possible price premiums, rate of return on retained capital, and contractual terms

CW-RVR_00027598

DOL 0049032

Confidential

# Overview of S-Corps and ESOPs

| | |
|---|---|
| **S-Corps** | ▪ No tax liability at the corporate level; taxable income is passed through to the shareholders (with the exception of a few state and local taxes)<br><br>▪ Under S-Corp rules, the equity structure is limited to a single class of common stock |
| **ESOP Overview** | ▪ Employee Stock Ownership Plans (ESOPs) are tax-qualified retirement benefit plans<br><br>▪ S-Corp distributed income to the ESOT is exempt from paying federal and most state income tax<br><br>▪ These distributions paid to the ESOT can be used to pay an inside loan (balance remaining on levered ESOP) or used to purchase additional shares from retirees or non-ESOP selling shareholders<br><br>▪ Distributions to the ESOT are deemed dividend payments to plan participants and considered plan assets; in effect, distributions can result in over-compensating employees |
| **S-Corp ESOP Economics** | ▪ As a result of the structure advantages (and limitations) described above, many S-Corp ESOPs eventually "go 100%" to maximize the cash flow benefit of being fully exempt from federal and most state income taxes<br><br>▪ Typically, these 100% ESOP structures utilize the Company's debt capacity to fund the desired liquidity and use seller notes to fund the remaining balance<br><br>▪ Seller financing can be structured at market terms (interest rate, tenor, etc.) relative to the security position and receives a form of synthetic equity to generate appropriate returns<br><br>▪ S-Corp ESOPs require compliance with IRC section 409(p), essentially not allowing the ESOP to be diluted below 50% of the economic value of the total equity<br><br>▪ Management may also participate in the economics outside of the ESOP via Stock Appreciation Rights (SARs) or phantom stock options within 409(p) requirements; typically these are in accordance with comparable industry incentive programs |

CW-RVR_0002759

Confidential

# Warrant Overview

## General Characteristics

- Enhances a debt offering by compensating the holder of a note for the inherent risk associated with being subordinated to the senior debt holders

- Warrants are an option to buy a stated number of shares of stock at a specific price over a given time period (a long-term option to buy stock)

- May be detachable from the debt issue

- Has potential for large appreciation if the value of the Company increases:

  - Earnings increases

  - De-levering the debt

## Specific Features (to be discussed and negotiated)

- Holders of debt will receive warrants, representing a percentage of equity, that can be exercised in a specified number of years from the anniversary closing

- Warrants may be called by the Company if:

  - The warrant holder is deemed ineligible for S-Corp purposes

  - The Company pays all or a portion of the notes pursuant to a noteholder's exercise of its demand rights

- Warrant holders will enter into an Investors Rights Agreement with the Company and ESOP Trustee, which will provide multiple rights and obligations

- Overall target must meet "relative fairness" standard

CW-RVR_00027600

DOL 0049034

Confidential

# Executive Compensation Program

## Stock Appreciation Rights (SARs)

- SARs represent a non-tax qualified synthetic equity plan limited to IRC 409(p) in ESOP ownership structures

- A SAR affords the holder a potential reward in the form of an appreciation in value of a set number of shares of Company stock over a set period of time

- The valuation of a SAR operates like a stock option in that the employee benefits from any increases in stock price above the price set in the award; however, unlike an option, the employee is not required to pay an exercise price to exercise them but simply receives the net amount of the increase in the stock price in either cash or shares of company stock, depending on plan rules

    - One of the benefits of SARs is that no money is required to exercise them for cash; an employee automatically receives the proceeds from an exercise without having to pay for the cost of the shares

    - SARs are similar to stock options in that they are granted at a set price, and they generally have a vesting period and an expiration date; once a SAR vests, an employee can exercise it at any time prior to its expiration

    - The employee is subject to ordinary income tax on the value of the SAR as the employee becomes vested in the award and is eligible to receive the benefit, unless the employee elects to defer receipt until a specified date; the election to defer the receipt must be made before the year in which the award is earned

    - Payments may be made in a lump sum, installments, or may be deferred until a later date; the employer is entitled to a deduction on the amount it pays for the awards

DOL 0049035

Confidential

# ESOP Ownership & Company Performance Studies

| ESOP Study Examples |
| --- |

| | |
| --- | --- |
| **2012**<br>**Douglas Kruse**<br>**Joseph Blasi** | ▪ ESOPs, equity compensation plans, and profit sharing are associated with lower employee turnover intention and higher ROE |
| **2012**<br>**General Social Survey**<br>**Employee Ownership Project** | ▪ 2.6% of employee-owners reported being laid off in the past 12 months, compared to 12.1% of non-employee-owners<br><br>▪ 12.9% of employee-owners reported they intend to look for a different job soon, compared to 24.3% of non-employee-owners |
| **2008**<br>**University of Pennsylvania** | ▪ Increased company productivity and significantly greater retirement assets by employees were key factors in the findings<br><br>▪ The study found S-Corp ESOP companies are a net contributor to the economy |
| **2007**<br>**Brent Kramer Study** | ▪ The study found ESOP companies have sales per employee 8.8% greater than comparable non-ESOP companies |
| **2000**<br>**Rutgers Study** | ▪ The study found ESOPs increase sales, employment, and sales per employee by approximately 2.3% to 2.4% per year absent an ESOP |

Source: NCEO Website Research on Employee Ownership, Corporate Performance, and Employee Compensation

**CHARTWELL CAPITAL SOLUTIONS**
**Corporate Finance | Strategic Advisory | Valuation Services**
Page **52**

CW-RVR_00027602

DOL 0049036

Confidential

# What are the Requirements Post-Closing?

***There are several requirements that need to be completed after a transaction has been completed:***

- Valuation

    - Performed annually

    - Typically completed when draft financial statements become available

- Recordkeeping/Third-party administration

    - Performed annually

    - Participant statements

    - IRS Form 5500 filing

    - Share allocations

    - Compliance testing

    - Plan audit/financial statements

- Legal

    - Update plan document/amendments as needed

- Other management incentives

    - Design, implement non-ESOP long-term compensation

CW-RVR_00027603

DOL 0049037

Confidential

# Appendix B:
# Internal Revenue Code Section 1042

CW-RVR_00027604

DOL 0049038

Confidential

# More Details about Internal Revenue Code Section 1042

*Under IRC Section 1042, when shares of a C-Corp are sold to an employee stock ownership plan ("ESOP"), the seller can defer capital gains taxes (federal and state) on the sale as long as the company and the seller complies with all of the IRC Section 1042 requirements (a "1042 Sale or 1042 Transaction"):*

- The company sponsoring the ESOP must be a privately held corporation, not a publicly traded company

- The ESOP must own at least 30% of the equity (or equity value) of the company after the 1042 Sale

- The selling shareholder must be an individual, trust, estate, partnership, or S-Corp; they cannot be a C-Corp

- The stock sold to the ESOP must have been held by the seller for at least three (3) years before the 1042 Sale

- The stock sold to the ESOP must *not* have been acquired through a qualified retirement plan or through a stock option, or other employer sponsored benefit plan or employee stock purchase arrangement

- The stock sold to the ESOP in a 1042 transaction must be common stock with the greatest voting and dividend rights, or preferred stock convertible into such common stock

- With certain exceptions, if the ESOP disposes of any stock acquired in a 1042 Transaction within three (3) years after the sale, the company must pay a 10% excise tax on the amount of the disposition

- During a period starting three months before the sale and ending 12 months after the sale, the seller must reinvest ("roll over") the proceeds or an equivalent sum of money (in any amount up to the amount of sale) in Qualified Replacement Property ("QRP") (broadly defined as stocks, bonds or notes of U.S. operating companies)

- The 1042 seller(s) (and certain relatives) of the seller cannot receive an allocation of those shares acquired by the ESOP in a 1042 Transaction

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC)Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

CW-RVR_00027605

DOL 0049039

# Floating Rate Notes ( FRNs) Characteristics

**High Credit Quality:**

- AAA/Aaa or AA/Aa  rating from S&P and Moody's

**Principal Stability**:

- Interest rates adjust monthly or quarterly, principal value remains stable

**Interest Rate**:

- Resets monthly or quarterly based upon a short term index, typically one month or three month LIBOR

**Limited Margin Call Risk:**

- The bond value does not fluctuate with changes in interest rates investors can maximize their margin/loan privileges

**Limited Maturation Risk:**

- Issued with maturities ranging from 30-50 years

**Limited Call Risk:**

- The first call is usually in 30 years at a premium

**Limited Liquidity Risk:**

- Typically structured to allow investors the option to put notes back to the issuer in the tenth year and every three years after that. Some recently issued notes have options to put back to the issuer at 98% of principal in first year and at 99% in years 2-10

**Tax Free Access to Capital:**

- The holder may monetize by borrowing, subject to any lender margin restrictions, in some cases up to 80-90% of the market value of the note without triggering capital gains taxes

**Helps Segregate the Tax Deferral Decision From the Investment Decision:**

- Most investors that monetize the notes reinvest the proceeds in an actively managed portfolio allowing the portfolio to be managed without the concerns of Section 1042 restrictions

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC)Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

CW-RVR_00027606

Confidential

DOL 0049040

Confidential

# What Documents Must be Filed?

*After the sale, the following three documents must be attached to the seller's income tax return for the year in which the sale occurs:*

- A "Statement of Election" under which the seller elects IRC Section 1042 tax-deferred treatment

- A verified statement from the company ("Company Consent") consenting to the imposition of the 10% and 50% excise taxes referred to above if the ESOP disposes of the 1042 stock within three years after the sale or makes a prohibited allocation

- A notarized "Statement of Purchase," which must be notarized within the year that identifies and describes the Qualified Replacement Property purchased

**Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value**

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Fargo & Company. Life Insurance products are available through Wells Fargo Advisors, LLC (California license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Fargo Advisors , LLC (member SIPC) Wells Fargo Advisors, LLC cannot provide tax advice. Please see your tax advisor to determine how this information may apply to your own situation.*

CW-RVR_00027607

Confidential



# James T. Griffin CFP® CRPS® - Senior Financial Advisor

Jim Griffin has been working with the owners of closely held businesses and their families for over 23 years, focusing on business succession, estate planning and retirement plan design. He is a CERTIFIED FINANCIAL PLANNER ® professional and has also obtained the Chartered Retirement Plan Specialist ® designation

Jim is part of an experienced wealth management team working with business owners on the structure and sale of their privately held business to an Employee Stock Ownership Plan (ESOP). Through a consultative approach, the team focuses on creating liquidity and diversification for owners while enhancing the solutions available to the company and employees

The team has experience with IRC § 1042 tax deferral, family wealth management, 401(k) plan investments, ESOP cash and investment management for fiduciaries and trustees, and ESOP repurchase liability funding strategies

Jim has setup and serviced all types of Qualified and Non Qualified Retirement plans, including 401k, 403b, 457, Profit Sharing, ESOP's, Defined Benefit, Cash Balance, Stock Appreciation and Phantom Stock programs

He is a member of the National Center for Employee Ownership, the National ESOP Association, the Financial Planning Association and the Western Pension & Benefits Conference

Jim is a frequent speaker on the topics of business succession, retirement, estate planning and employee ownership to industry and professional groups, including the NCEO/Beyster Institute's National Conference, the National ESOP Association, and the National Center for Employee Ownership

**James T. Griffin CFP® CRPS®    (213) 700-1596    james.t.griffin@wellsfargo.com**

*Investment and insurance products:*

### NOT FDIC - Insured                    NO Bank Guarantee                    MAY Lose Value

*Wells Fargo Advisors, LLC is a registered broker-dealer and a separate non-bank affiliate of Wells Fargo & Company.  Insurance products are offered through nonbank insurance agency affiliates of Wells Fargo & Company and are underwritten by unaffiliated insurance companies.  Wells Fargo Advisors is not a legal or tax advisor.  CAR-1013-03807*

Investment and Insurance Products | NOT FDIC Insured | NO Bank Guarantee | MAY Lose Value

*Investment products available through Wells Fargo Advisors, LLC (member SIPC), a non-bank affiliate of Wells Farga & Company. Life Insurance products are available through Wells Farga Advisors, LLC (Califarnia license #OD26865) or its affiliated agencies. Financial Advisors are registered representatives of Wells Farga Advisars , LLC (member SIPC)Wells Fargo Advisars, LLC cannot provide tax advice. Please see yaur tax advisor ta determine haw this infarmatian may apply ta yaur awn situation.*

CW-RVR_00027608

58

DOL 0049042

Confidential

# Appendix C:
# Chartwell Team Biographies

CW-RVR_00027609

DOL 0049043

Confidential

# Biographies



**Lindsey A. Gullickson** | Administration | lindsey.gullickson@chartwellcapitalsolutions.com   612-230-3137

Lindsey is a member of Chartwell's Corporate Finance practice. Her primary responsibilities include project coordination, preparation of client proposals and presentations, and business development. She also is responsible for all administrative duties for the group, which include, managing schedules, database management, and conference, seminar, meeting and event preparation. Along with her Corporate Finance responsibilities, Lindsey is a key contributor to Chartwell's overall marketing group. Prior to joining Chartwell, Lindsey worked as an event specialist for an event planning company in the Twin Cities. Her responsibilities included acting as a liaison between clients and vendors, on-site event execution, and managing the company's marketing efforts.



**Stephanie A. Geerdes** | Analyst | stephanie.geerdes@chartwellcapitalsolutions.com   612-230-3135

Stephanie is a member of Chartwell's Corporate Finance practice and supports senior professionals with preparation of marketing materials, offering memoranda, management presentations, industry research, cash flow modeling, and valuation analysis. Her experience in corporate finance engagements includes ESOP transactions, sell-side M&A processes, and capital structure assessments. Stephanie also assists in the management of transaction timing, roles and responsibilities.  Prior to joining Chartwell, Stephanie worked as a project director at Strategic Resource Partners (SRP), a small integrated marketing and strategic planning consulting firm in Minneapolis, Minnesota.



**Edward J. Margarit (Ted)** | Vice President    ted.margarit@chartwellcapitalsolutions.com | 612-230-3126

Ted is a member of Chartwell's Corporate Finance practice.  His M&A experience spans the business services, consumer products, food and beverage, industrial, restaurant and retail, and transportation and logistics industries. Prior to Chartwell, Ted was an investment banker in the Consumer Group at Harris Williams & Company where he advised companies in the consumer products and services, food and beverage, and restaurant and retail sectors on their sale.  Furthermore, Ted also has experience in the Middle Market M&A Group at Lazard, Ltd. Ted practiced law in the areas of M&A and tax, with a particular emphasis on the creation, maintenance, and termination of ESOPs.  Included in his ESOP practice were transactions involving both the purchase and sale of sponsoring employers, as well as general ESOP operational issues, IRS/DOL compliance reviews and corrective actions, and plan document drafting.

CW-RVR_00027610

DOL 0049044

Confidential

# Biographies (continued)



**William S. Bloom (Will)** | Principal, Head of Capital Markets    will.bloom@chartwellcapitalsolutions.com    312-803-4820

Will is an investment banker for Chartwell's Corporate Finance practice.   Will has worked on transactions within the industrial, business services, consumer products, oil and gas, surface transportation, and aerospace industries and has helped execute high profile ESOP buyouts, terminations, and restructurings.  Prior to joining Chartwell, Will was an investment banker with Bank of America Merrill Lynch's (BAML) Transaction Development group, where he focused on executing sell-side, buy-side, and ESOP transactions for middle market clients between $200 million and $1 billion in enterprise value.



**Pamela D. Steverango, CFA**    Managing Director    pamela.steverango@chartwellcapitalsolutions.com | 415-293-8200

Pamela has provided financial advisory services to privately held companies since 1986.  She is recognized as a leading authority on business valuation, particularly with respect to Employee Stock Ownership Plans and other qualified ERISA plans. Pamela is a nationally recognized speaker on ESOP business valuations.  She has been a featured speaker for The ESOP Association, the National Center for Employee Ownership, the AICPA, and for individual organizations on ESOP valuations and fiduciary issues as they relate to ESOP valuations. Pamela is an active member of The ESOP Association's Ownership Culture Committee, the National Center for Employee Ownership, The ESOP Association - California/Western States Chapter, the CFA Institute and Security Analysts of San Francisco.



**Gregory A. Fresh (Greg)**    Managing Director    greg.fresh@chartwellcapitalsolutions.com | 612-230-3125

Greg has an extensive background in mergers and acquisitions and corporate finance. During the course of his 25+ year career, he has been involved in both sell-side, buy-side, and capital markets transactions in a variety of settings, both as an advisor and as a principal investor.  Prior to leading Chartwell's corporate finance group, Greg was Managing Director at Bank of America Merrill Lynch (BAML) Middle-Market M&A advisory group, where he was responsible for covering diversified industrial clients and ESOP advisory for the investment bank.  Prior to BAML, Greg was a Managing Director at ABN AMRO's North American Mid-Market Corporate Finance group (ABN), where he was responsible for M&A and general corporate finance and established the ESOP Advisory practice for the investment bank.  In addition, with the Financial Sponsors group, he initiated a public-to-private practice for mid-cap companies.

CW-RVR_00027611

# Exhibit 14

Message
_____

| | |
|---|---|
| **From:** | Mark Fournier [/O=SRR/OU=DETROIT/CN=RECIPIENTS/CN=MFOURNIER] |
| **Sent:** | 4/11/2014 5:09:40 PM |
| **To:** | Matthew Hricko [/O=SRR/OU=DETROIT/cn=Recipients/cn=mhricko] |
| **Subject:** | Re: Byway Management Presentation Agenda |

Please do

Mark R. Fournier, CFA
Managing Director | Valuation & Financial Opinions
Stout Risius Ross, Inc.
8270 Greensboro Drive, Suite 900, McLean, VA 22102
Direct 703.848.4946 | Mobile 248.321.4436 | mfournier@srr.com
www.srr.com

On Apr 11, 2014, at 5:08 PM, "Matthew Hricko" <mhricko@srr.com> wrote:

Thanks. I just closed a deal with Greg and Ted from Chartwell. Is it ok if I reach out to them to see if we can get anything in advance of the meeting?

Matthew J. Hricko
Vice President | Valuation & Financial Opinions
Stout Risius Ross, Inc.
Office +1.312.857.9000 | Direct +1.216.373.2960 | Mobile +1.312.566.8185
mhricko@srr.com | www.SRR.com
Investment Banking | Valuation & Financial Opinions | Dispute Advisory & Forensic Services

*Ranked as a Top 3 Fairness Opinion Advisor in the U.S. by Thomson Reuters for the second year in a row.*

*Connect with me on LinkedIn*
_____

**From:** Mark Fournier
**Sent:** Friday, April 11, 2014 4:51 PM
**To:** Matthew Hricko
**Subject:** FW: Byway Management Presentation Agenda

This is all that I've received.

Regards,

Mark R. Fournier, CFA
Managing Director | Valuation & Financial Opinions
Stout Risius Ross, Inc.
8270 Greensboro Drive, Suite 900, McLean, VA 22102
D  +1.703.848.4946 | M  +1.248.321.4436 | mfournier@srr.com
www.SRR.com

Investment Banking | Valuation & Financial Opinions | Dispute Advisory & Forensic Services

*Ranked as a Top 3 Fairness Opinion Advisor in the U.S. by Thomson Reuters for the second year in a row.*
_____

**From:** Lindsey Gullickson [mailto:Lindsey.Gullickson@chartwellcapitalsolutions.com]
**Sent:** Thursday, April 10, 2014 6:06 PM
**To:** Mr. Steve Martin; bwright@relico.com; Bob Socol; Mark Fournier; erin.turley@klgates.com; allison.wilkerson@klgates.com
**Cc:** Greg Fresh; Ted Margarit; Stephanie Geerdes
**Subject:** Byway Management Presentation Agenda



**EXHIBIT**

PI 108 - (M. Hricko 04/22/21)

All,

Attached, please find an agenda for the Project Byway Management Presentation next week. Ground transportation will be provided to and from dinner and the meeting, however, to simplify logistics, we recommend that you stay at the Hilton Phoenix/Mesa (address and phone number included in attached agenda).

Please let me know if you have any questions.

Thank you,


**Lindsey Gullickson** | Corporate Finance, Administration
Chartwell Capital Solutions | **Corporate Finance ⬥ Strategic Advisory ⬥ Valuation Services**
33 S. 6th Street | Suite 4750 | Minneapolis, MN 55402
Direct:  612.230.3137 | Office:  612.230.3100

# Exhibit 15



**RELIANCE TRUST**

April 15, 2014

Mr. Eric Benson
Chief Financial Officer
Cruise America, Inc.
11 West Hampton Avenue
Mesa, AZ  85210

    Re:    <u>Cruise America, Inc. Employee Stock Ownership Plan</u>

Dear Mr. Benson:

        This letter will confirm the conditions and terms under which Reliance Trust Company ("RELIANCE") has agreed to serve as a trustee under the to-be-formed Cruise America, Inc. Employee Stock ownership Plan and related trust agreement (collectively the "ESOP") that Cruise America Inc., ("COMPANY") will sponsor in connection with a transaction whereby the ESOP will borrow funds to finance its purchase of all of the COMPANY's issued and outstanding stock from the current selling shareholders, which will be financed by senior bank debt borrowed by the COMPANY and lent by the COMPANY to the ESOP, and the COMPANY and the selling shareholders may enter into a financing arrangement related thereto, the ("Proposed Transaction)

        1.    In connection with the Proposed Transaction, RELIANCE hereby agrees to serve as trustee under the ESOP with respect to fiduciary duties allocated to the trustee e terms of the ESOP, this letter agreement, and applicable law.

        2.    RELIANCE will assume the fiduciary responsibility for determining, in consultation with its advisors, whether the price proposed to be paid for the stock in the Proposed Transaction is not more than the fair market value thereof, and whether the Proposed Transaction, including any future management incentive plan adopted at the time of the time of the transaction is fair from a financial viewpoint to the ESOP and its participants. Reliance's determinations will be based upon such factors and information as it considers relevant including the appraisal by the independent appraiser and financial advisor of the stock. However, at all times RELIANCE shall have discretionary authority in investigating and evaluating the Proposed Transaction. If RELIANCE concludes upon completion of its due diligence that the Proposed Transaction is prudent and in compliance with applicable law, RELIANCE will agree to the terms of the Proposed Transaction. However, nothing contained herein shall be construed to constitute a representation, warranty, or commitment that RELIANCE will approve or disapprove the Proposed Transaction.

        3.    For its services as ESOP trustee, COMPANY will pay RELIANCE a $ 120,000 transaction fee, of which $75,000 is payable at the execution of this letter. The second installment $45,000 will be due no later than closing of this transaction or May 27, 2014.

DA-3332926 v2

> **EXHIBIT**
>
> PI 144 - (RTC 30(b)(6) 05/18/21)

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

Mr. Eric Benson
Cruise America, Inc.
Page 2 of 2

COMPANY will also pay RELIANCE the reasonable out-of-pocket expenses incurred in connection with the services RELIANCE performs relating to the Proposed Transaction, such as private express mail deliveries, and travel expenses, based on customary rates that commercial air carriers, hotels, and other service providers charge.

4.      To advise RELIANCE in connection with its duties as ESOP trustee, RELIANCE will engage Stout Risius Ross, Inc. as an independent appraiser and financial advisor, and the law firm of K&L Gates, LLP as its legal counsel. COMPANY will pay the reasonable expenses and fees of such independent appraiser and financial advisor and legal counsel as they relate to Reliance's services as ESOP trustee within 30 days of the presentation of their invoices and such supporting documentation as COMPANY shall reasonably require. The expenses and fees of the independent appraiser and financial advisor, and legal counsel, may also be subject to separate letter agreements among COMPANY, the independent appraiser and financial advisor, legal counsel, and Reliance.

5.      COMPANY shall pay all expenses and fees payable hereunder whether or not the Proposed Transaction is consummated.

6.      Recognizing that transactions of the type contemplated in this letter agreement can result in government investigations, litigation, or other proceedings, COMPANY agrees, to the fullest extent federal law permits, to indemnify and hold RELIANCE and its directors, employees, and officers (individually an "Indemnitee" and collectively the "Indemnitees") harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing, or defending any government investigations, litigation, or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to the Proposed Transaction or Reliance's duties as ESOP trustee (including all events that occurred prior to RELIANCE becoming the trustee under the ESOP). However, any such indemnification or agreement to hold the Indemnitees harmless shall not apply to any claim, damage, expense, liability, or loss that is attributable to their bad faith, breach of fiduciary duty under ERISA, gross negligence, willful misconduct, or a material breach of the terms of this letter or any subsequent agreement. If an Indemnitee receives notice of any government agency action or legal proceeding with respect to which indemnification may be sought from COMPANY pursuant to this paragraph 6 (a "Proceeding"), the Indemnitee shall notify COMPANY of the Proceeding in writing within 30 days of its receipt of notice of the commencement of the Proceeding. However, the failure by the Indemnitee to so notify COMPANY shall not relieve COMPANY from any liability, except to the extent that the failure to notify COMPANY shall actually have prejudiced COMPANY's defense of any Proceeding. COMPANY will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to the Indemnitee or to otherwise participate in the Proceeding. If COMPANY elects to assume the defense of the Proceeding, it then shall pay all costs of defense.

The Indemnitees shall have the right to employ their own counsel in any Proceeding, if any one or more of the following conditions are satisfied:

DA-33329262DA-3332926 v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000391

Mr. Eric Benson
Cruise America, Inc.
Page 3 of 3

(a)    COMPANY shall authorize the employment by the Indemnitees of their own legal counsel;

(b)    legal counsel to the Indemnitees shall advise the Indemnitees that there may be one or more legal defenses available to them that are in addition to or different from defenses available to COMPANY and counsel for COMPANY declines to assert such defenses (in which case COMPANY shall not have the right to assume the defense of the Proceeding on behalf of the Indemnitees); or

(c)    legal counsel to the Indemnitees shall inform the Indemnitees that a direct conflict of interest exists between COMPANY and the Indemnitees.

COMPANY shall reimburse the Indemnitees for all reasonable expenses and fees as and when the Indemnitees incur them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with COMPANY or its advisors and attorneys, and for the reasonable expenses and fees of the experts and legal counsel whom the Indemnitees engage for any Proceeding. Reliance t shall return to the company the amount of such reimbursements that Reliance receives if a court holds that Reliance violated its duties described in paragraphs 1 and 2 above, or otherwise that indemnification would be unavailable under the terms of Section 6

7.    Regardless of the cancellation or termination of this letter agreement, the covenants of COMPANY contained in this letter agreement shall remain in full force and effect before, during, and after any period during which RELIANCE serves as trustee under the ESOP. The covenants of COMPANY shall be binding upon any successors and assigns of COMPANY.

8.    The purpose of this letter agreement is to outline in general terms the duties that RELIANCE is to perform and its remuneration therefor. RELIANCE's actual duties may be governed by additional written agreements, including those that the parties may execute from time to time, and by applicable law and regulations. However, no verbal or other agreements of the parties shall be legally binding unless and until such agreements are reduced to writing and the party against whom enforcement thereof is sought signs them.

9.    For so long as RELIANCE serves as trustee of the ESOP, COMPANY shall upon request promptly furnish RELIANCE minutes of the meetings of COMPANY's board of directors.

10.    Any payments required hereunder should be paid by wire transfer. Attached are our wire transfer instructions.

If the foregoing accurately sets forth the agreement between RELIANCE and COMPANY, please have COMPANY indicate its acceptance and approval by executing a copy of this letter agreement at the place provided below and returning it to Reliance, whereupon it will become a binding agreement.

DA-33329262DA-3332926 v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000392

Mr. Eric Benson
Cruise America, Inc.
Page 4 of 4

Very truly yours,

RELIANCE TRUST COMPANY

By: _____
Stephen A. Martin
Senior Vice President

ACCEPTED AND AGREED TO effective as
of the _____16_____ day of ___April___, 2014

CRUISE AMERICA INC.

By: _____
Titled: Chief Financial Officer

DA-33329262DA-3332926 v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000393

Mr. Eric Benson
Cruise America, Inc.
Page 5 of 5

## DELIVERY INSTRUCTIONS

### Fed Wire Instruction for Cash

ABA # 061000104.  SUNTRUST BANK

A/C # [ PII ], RELIANCETRUST COMPANY

ATTN:  FIDUCIARY ADMINISTRATION

FBO:  WAREHOUSE HOME FURNISHINGS DISTRIBUTORS INC. ESOP

DA-33329262DA-3332926 v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000394

# Exhibit 16

ST00009777.xlsx

| Date | Name / Invoice Number | Description | | Hours | Amount |
|------|----------------------|-------------|--|-------|--------|
| 4/14/2014 | Mark R. Fournier | REDACTED | | 1.50 | REDACTED |
| 4/15/2014 | Matthew Hricko | | | 1.00 | |
| 4/15/2014 | Robert Socol | | | 4.00 | |
| 4/16/2014 | Robert Socol | | | 8.00 | |
| 4/16/2014 | Mark R. Fournier | | | 4.00 | |
| 4/16/2014 | Mark R. Fournier | | | 5.00 | |
| 4/16/2014 | Michael R. Poteracki | | | 6.00 | |
| 4/17/2014 | Michael R. Poteracki | | | 10.00 | |
| 4/18/2014 | Matthew Hricko | | | 1.00 | |
| 4/20/2014 | Michael R. Poteracki | | | 3.00 | |
| 4/21/2014 | Michael R. Poteracki | | | 7.50 | |
| 4/21/2014 | Matthew Hricko | | | 3.00 | |
| 4/21/2014 | Robert Socol | | | 1.00 | |
| 4/21/2014 | Robert Socol | | | 1.00 | |
| 4/22/2014 | Robert Socol | | | 2.00 | |
| 4/22/2014 | Mark R. Fournier | | | 1.50 | |
| 4/22/2014 | Michael R. Poteracki | | | 12.00 | |
| 4/23/2014 | Michael R. Poteracki | | | 12.75 | |
| 4/23/2014 | Mark R. Fournier | | | 1.00 | |
| 4/24/2014 | Michael R. Poteracki | | | 8.00 | |
| 4/24/2014 | Matthew Hricko | | | 3.00 | |
| 4/24/2014 | Mark R. Fournier | | | 1.00 | |
| 4/25/2014 | Matthew Hricko | | | 4.00 | |
| 4/25/2014 | Michael R. Poteracki | | | 6.00 | |

1527236

ST00009777.xlsx

REDACTED                              REDACTED

| Date | Name | Hours |
|---|---|---|
| 4/25/2014 | Robert Socol | 0.50 |
| 4/26/2014 | Mark R. Fournier | 2.00 |
| 4/27/2014 | Michael R. Poteracki | 6.00 |
| 4/27/2014 | Matthew Hricko | 1.00 |
| 4/28/2014 | Mark R. Fournier | 2.00 |
| 4/28/2014 | Michael R. Poteracki | 7.50 |
| 4/28/2014 | Matthew Hricko | 6.00 |
| 4/28/2014 | Robert Socol | 1.00 |
| 4/29/2014 | Mark R. Fournier | 2.00 |
| 4/29/2014 | Michael R. Poteracki | 4.50 |
| 4/30/2014 | Matthew Hricko | 2.00 |
| 4/30/2014 | Matthew Hricko | 3.00 |
| 4/30/2014 | Michael R. Poteracki | 7.00 |
| 5/1/2014 | Mark R. Fournier | 2.50 |
| 5/1/2014 | Michael R. Poteracki | 7.50 |
| 5/1/2014 | Matthew Hricko | 4.00 |
| 5/1/2014 | Robert Socol | 2.00 |
| 5/2/2014 | Robert Socol | 1.00 |
| 5/2/2014 | Mark R. Fournier | 2.75 |
| 5/2/2014 | Matthew Hricko | 4.00 |
| 5/2/2014 | Michael R. Poteracki | 5.00 |
| 5/4/2014 | Mark R. Fournier | 1.00 |
| 5/5/2014 | Michael R. Poteracki | 4.00 |
| 5/5/2014 | Matthew Hricko | 2.00 |
| 5/5/2014 | Mark R. Fournier | 2.00 |
| 5/5/2014 | Robert Socol | 1.00 |
| 5/6/2014 | Mark R. Fournier | 1.00 |
| 5/6/2014 | Michael R. Poteracki | 4.00 |

1527236

# Exhibit 17

**SRR**
STOUT | RISIUS | ROSS

April 15, 2014

Reliance Trust Company, as Trustee
    of the Cruise America, Inc.
    Employee Stock Ownership Plan
1100 Abernathy Road
500 Northpark, Suite 400
Atlanta, Georgia 30328

Dear Trustee:

On behalf of Stout Risius Ross, Inc. ("SRR"), I am pleased to confirm the arrangement under which we will provide certain financial advisory services to Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee (the "Trustee") of the Cruise America, Inc. ("Cruise America" or the "Company") Employee Stock Ownership Plan ("ESOP").

## Objectives and Scope

We understand that the Company is considering a transaction in which the ESOP will purchase all of the outstanding shares of Cruise America in a leveraged transaction. The ESOP will finance the purchase of stock through a loan from the Company ("ESOP Loan"). The Company will finance the transaction through a combination of bank financing and possible seller subordinated notes ("Seller Notes") with attached warrants ("Warrants"). The above referenced transactions, together with any related transactions, are referred to collectively as the "Transaction."

We will report solely to the Trustee, notwithstanding the fact that the Company will pay all fees for our work.

In connection with the Transaction, the Trustee has requested us to render a written opinion (the "Opinion"), as of the Transaction date, that:

1. the consideration to be paid by the ESOP for the shares of Company stock purchased pursuant to the terms of the Transaction is not greater than the fair market value of such shares;
2. the interest rate on the loan from the Company to the ESOP is not in excess of a reasonable interest rate;
3. the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;
4. the exercise price of the Warrants is equal to at least 90% of the Fair Market Value of the underlying common stock;
5. the interest rate on the Seller Notes between the Company and the note holder is not in excess of a reasonable rate; and
6. the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view.

*One South Wacker Drive, 38th Floor*
*Chicago, IL 60606*
*ph. +1.312.857.9000 fax +1.312.857.9001*
*www.srr.com*

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**

**RVR04087**

Reliance Trust Company, as Trustee
   of the Cruise America, Inc.
   Employee Stock Ownership Plan
April 11, 2014
Page 2



In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

Our work is only to be used by the Trustee as one factor to consider in the process of analyzing the contemplated Transaction. Our Opinion will not, in any manner, address the ESOP's underlying business decision to proceed with or effect the Transaction.

Our Opinion will be delivered from a financial point of view. Our Opinion will not cover the procedural fairness or prudence of the Transaction. There are many investment risks, including but not limited to, whether the Company is able to attract enough financing to fund current and future operations and any planned expansions of the Company. Our analysis will assume, after some financial due diligence, such financing will be available to the Company. However, in no way should our fairness opinion and valuation analysis be interpreted to be a "solvency opinion." Further, our Opinion will be restricted to the aspects of the overall contemplated Transaction.

## Approach

Given our preliminary understanding of the Company, we will consider forms of the two traditional approaches to valuation, including the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use the approach or approaches that in our experience and judgment will provide the most supportable valuation. After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

We will deliver a presentation and supporting written analysis of the final valuation of both the Company and its capital stock prior to the closing of the Transaction and the Opinion as of the closing of the Transaction. A narrative report meeting the requirements of the DOL's Proposed Regulations under Section 3(18) of ERISA will be delivered as promptly thereafter as possible.

We are prepared to begin our work immediately, subject to receipt of all requested information. Our work requires extensive cooperation from the Company and its representatives, as described under Responsibilities.

Our analysis will be solely for the purposes stated herein, and should not be referred to or distributed for any other purposes, in whole or in part, without our express, prior written consent. Notwithstanding the preceding, legal counsel for the Trustee may rely on our Opinion in rendering their legal opinions related to the Transaction, and the Trustee committee may rely on the Opinion.

## Your Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us to be provided with information we request from the Company promptly. Additionally, if the

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**      **RVR04088**

Reliance Trust Company, as Trustee
  of the Cruise America, Inc.
  Employee Stock Ownership Plan
April 11, 2014
Page 3



Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

### Fees and Expenses

Our fees for the services described in this letter will be a fixed fee of <sup>REDACTED</sup>plus out-of-pocket expenses, and will be paid by the Company. This fee estimate includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

The full fees set forth above shall become due and payable upon our delivery of the Opinion, but we will be entitled to full payment on June 15, 2014 even if we have not delivered the Opinion, provided we have notified the Trustee and the Company in writing that we have completed our investigation and review with respect to the Opinion and that we are prepared (subject to our final review of documents) to deliver the Opinion.

For all work performed by us subsequent to June 15, 2014, the Company agrees to pay for the time incurred by our staff members at our hourly rates, which currently range from <sup>REDACTED</sup> per hour to<sup>REDACTED</sup> per hour.

If for any reason the Transaction is terminated prior to its consummation and we are requested to terminate work prior to our having delivered the Opinion as set forth above, our fees shall be mutually agreed upon by the Company and us, but shall not be less than the greater of<sup>REDACTED</sup>or our total professional fees and reasonable out-of-pocket expenses incurred as of the date of termination. No portion of our fee is contingent upon the consummation of the Transaction or the conclusions reached in our Opinion.

Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, research charges, copying, etc.) will be billed at the actual amounts incurred. There will be a flat <sup>REDACTED</sup>research charge for the necessary use of fee-based databases and subscription services. In addition, there will be a flat <sup>REDACTED</sup>administrative charge for administrative personnel support. Our invoices are due upon presentation. Amounts remaining overdue for more than 30 days will be subject to a late charge of 1.5% per month from the date of invoice. We reserve the right to suspend services if invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss, damage or expense connected with such suspension.

We understand that the Company will pay our fees for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

### Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of <sup>REDACTED</sup>before commencing work. The retainer may be applied to any invoice at our discretion or to our final invoice at the conclusion of the engagement. Any unused portion of the retainer will be

DA-3332706-v4 7070001-00001

Reliance Trust Company, as Trustee
   of the Cruise America, Inc.
   Employee Stock Ownership Plan
April 11, 2014
Page 4



promptly refunded to you at the end of our engagement. This retainer is not intended to be an estimate for the total cost of work to be performed. An invoice for the retainer is enclosed.

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer. Below are our fund transfer instructions:

Stout Risius Ross, Inc. Fifth Third Bank
Wire ABA Number REDACTED
ACH ABA Number REDACTED
Account Number REDACTED

## Professional Terms

The attached Professional Terms apply to this engagement. Please sign below and return the enclosed copy of this letter to us. Please note that the terms of this offer will expire 30 days from the date of the letter. By signing as Trustee, you are indicating your agreement to all of these terms except Sections 3 (Fees and Expenses), 8 (Liability and Indemnification), and 11(c) (Payment in the Event of Termination). By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, including Sections 3, 8 and 11(c).

*    *    *    *    *    *

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**                                                          **RVR04090**

Reliance Trust Company, as Trustee
    of the Cruise America, Inc.
    Employee Stock Ownership Plan
April 11, 2014
Page 5

**SRR**
STOUT | RISIUS | ROSS

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, INC.**

By: _____
     Robert S. Socol
     Managing Director

Attachments:   Professional Terms

Acknowledged and Accepted:

**RELIANCE TRUST COMPANY**, not in its corporate, but solely in its capacity as Trustee of the Cruise America, Inc. ESOP

Signed: _____

Name: _____Stephen A. Martin_____

Title: _____Senior Vice President_____

Date: _____4/15/14_____

Acknowledged and Accepted:

**CRUISE AMERICA, INC.**

Signed: _____

Name: _____Eric R. Bensen_____

Title: _____CFO_____

Date: _____4-16.14_____

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**

**RVR04091**

**STOUT RISIUS ROSS, INC.
PROFESSIONAL TERMS**

1.    **Our Services** We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

2.    **Independent Contractor** We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

3.    **Fees and Expenses** Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include taxes. The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services, excluding taxes on our income generally.

4.    **Confidentiality** With respect to any information supplied in connection with this engagement and designated by any party as confidential, or which the other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, the other party(s) agree to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order. We may also mention the name of the Company and/or use the Company logo and provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement. (Any such disclosure document is defined herein as a "Filing".) Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

5.    **Use of Financial & Other Information/GAAS** In performing our analysis, we shall use various financial and other information provided to us by management or obtained from other private and public sources, and shall rely on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with generally accepted auditing standards known as GAAS. Accordingly, we will not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we shall exercise our independent judgment in evaluating the information that we receive from the Company and/or its representatives, and we shall not rely on information that we know to be inadequate or incomplete.

6.    **Our Work Product and Your License** Upon full payment of all amounts due us in connection with this engagement, the work product prepared by us for you in connection with our services will become your property, except as set forth below. Our work papers will not constitute work product and will remain our sole and exclusive property. We will retain sole and exclusive ownership of all right, title and interest in our proprietary information which will not constitute work product, including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**                    **RVR04092**

SRR
STOUT | RISIUS | ROSS

services for you. To the extent our deliverables to you contain our proprietary information, we grant you a non-exclusive, non-assignable, royalty-free license to use the proprietary information provided by us in the work product and the subject of the engagement and for no other or further use without our express, prior written consent.

7.    **Our Warranty** We warrant that our services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 60 days after the services are performed or, if applicable, deliverables are delivered. The notice will specify and detail the non-conformance and, if you and we agree that a non-conformance exists, we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

8.    **Liability and Indemnification** (a) The Company will to the fullest extent allowable by law, indemnify us, our owners, employees, contractors and agents against all costs, fees, expenses, damages and liabilities (including reasonable attorneys' fees and costs) associated with any third party claim, relating to or arising as a result of the services or our engagement except to the extent caused by the negligence or willful acts or omissions of our employees, contractors or agents in performing the services.

(b)    Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

9.    **Response to Subpoena** In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice you at our standard hourly rates applicable at the time such services are rendered. We will also invoice you for our related out-of- pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees.

10.    **Non-Solicitation** During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

11.    **Termination** (a) Any party may terminate our engagement at any time upon 10 days written notice.

(b)    Stout Risius Ross, Inc. may suspend or terminate this engagement immediately and without notice in the event of non-payment of amounts due us.

(c)    The Company will pay us for all services rendered, expenses incurred or commitments made by us to the effective date of termination, and will reimburse us for all reasonable costs associated with any termination.

12.    **Our Financial Interest / Compensation** None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**

**RVR04093**

**SRR**
STOUT | RISIUS | ROSS

contingent upon the conclusions we reach. We do not warrant or predict results or final developments in this matter. For purposes of this agreement, "negligence" means a material departure from the standard of ordinary care applicable to an experienced ESOP valuation firm taking into consideration customary and reasonable assumptions used to determine the valuation of the Company's stock.

**13. Staffing** While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14. General** (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire understanding and agreement between us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by all parties. If there is a conflict between these Professional Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)    No term of this agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)    The terms of this agreement which by their nature are to survive this agreement will survive its expiration or termination.

(d)    We will retain files related to this engagement in accordance with our document retention policy.

(e)    We each acknowledge that we may correspond or convey documentation via Internet e-mail and that none of the parties has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(f)    All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of the State of Arizona.

\* \* \* \* \* \*

DA-3332706 v4 7070001-00001

**FOIA Confidential Treatment Requested**

**RVR04094**