# Exhibit 19

DOL 0009679

Execution Version

# RVR EMPLOYEE STOCK OWNERSHIP TRUST

**Reliance Trust Company**
**Trustee**
**1100 Abernathy Road NE, Suite 400**
**Atlanta, GA  30328-5634**
**404-965-7200**

**EXHIBIT**

**PI 143 - (S. Martin 05/13/21)**

exhibitsticker.com

*PHX 331153527v1*

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ......................................................................................................2
    1.1    Administrator ................................................................................................2
    1.2    Beneficiary ...................................................................................................2
    1.3    Code..............................................................................................................2
    1.4    Custodian......................................................................................................2
    1.5    Company ......................................................................................................2
    1.6    ERISA ..........................................................................................................2
    1.7    Investment Committee..................................................................................2
    1.8    Investment Manager ....................................................................................2
    1.9    Participant....................................................................................................2
    1.10    Participating Company ................................................................................2
    1.11    Plan..............................................................................................................2
    1.12    Recordkeeper ...............................................................................................3
    1.13    Registration-Type Class of Securities.........................................................3
    1.14    Trust.............................................................................................................3
    1.15    Trust Fund ...................................................................................................3
    1.16    Trustee.........................................................................................................3

ARTICLE II ESTABLISHMENT OF THE TRUST .................................................................4
    2.1    Trust Established...........................................................................................4
    2.2    Limit of Participating Companies' Interests ...............................................4
        (a)    No Right To Reversion...................................................................4
        (b)    Return of Contributions.................................................................4
    2.3    Trustee's Conditional Acceptance ...............................................................4
        (a)    Directed Trustee ............................................................................4
        (b)    Compensation................................................................................5

ARTICLE III DUTIES OF TRUSTEE ......................................................................................6
    3.1    Duties...........................................................................................................6
        (a)    Receipt of Contributions ...............................................................6
        (b)    Management of Funds ....................................................................6
        (c)    Distributions .................................................................................6
        (d)    Records ........................................................................................7
        (e)    Authorized Acts.............................................................................7
        (f)    Acceptance of Rollovers ...............................................................7
    3.2    Maintenance of Participant Accounts ..........................................................7

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000084

ARTICLE IV INVESTMENT OF TRUST ASSETS ...................................................8
    4.1        General Investment Power .................................................................8
        (a)      Authority of Investment Committee ...................................8
        (b)      Funding Policy ....................................................................8
        (c)      Trustee Discretion and Responsibility ...............................8
        (d)      Registration of Employer Securities ..................................8
    4.2        Investment Managers...........................................................................8
        (a)      Appointment .......................................................................8
        (b)      Contractual Arrangement....................................................9
        (c)      Trustee's Duties..................................................................9
        (d)      Failure to Direct.................................................................9
        (e)      Termination of Appointment ..............................................9
    4.3        Authorized Investments......................................................................9
    4.4        Responsibility for Compliance .........................................................10
    4.5        Manner and Effect of Directions......................................................10
        (a)      Delegation of Authority to Custodian...............................10
        (b)      Manner of Direction..........................................................10
        (c)      Liability for Authorized Acts............................................11
    4.6        Authorization of Designee(s) ...........................................................11


ARTICLE V POWERS OF TRUSTEE ...................................................................12
    5.1        General Authority ............................................................................12
    5.2        Specific Powers................................................................................12
        (a)      Purchase of Property.........................................................12
        (b)      Disposition of Property.....................................................12
        (c)      Retention of Cash..............................................................12
        (d)      Exercise of Owner's Rights...............................................12
        (e)      Voting Employer Securities...............................................13
        (f)      Non-Voting Decisions Affecting Employer Securities ......14
        (g)      Registration of Investments ..............................................14
        (h)      Borrowing .........................................................................14
        (i)      Qualified Pooled Investments...........................................14
        (j)      Purchase of Contracts .......................................................15
        (k)      Execution of Instruments ..................................................15
        (l)      Settlement of Claims and Debts.........................................15
        (m)      Employment of Agents, Advisers and Counsel .................15
        (n)      Power to do any Necessary Act .........................................15
    5.3        Specific Powers - Discretionary Acts by the Trustee.........................15
        (a)      Investment in Employer Securities.....................................15
        (b)      Sales of Employer Securities .............................................15
        (c)      Borrowing 15
    5.4        Prohibited Transactions ...................................................................16
    5.5        Participant Loans .............................................................................16

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000085

ARTICLE VI ADMINISTRATION ...................................................................................... 17
    6.1        Accounting by Trustee ............................................................................ 17
            (a)    Books and Records ..................................................................... 17
            (b)    Accounting ................................................................................. 17
            (c)    Release ....................................................................................... 17
            (d)    Valuations .................................................................................. 18
            (e)    Reliance on Recordkeeper ......................................................... 18
    6.2        Expenses ................................................................................................ 18
    6.3        Notice ..................................................................................................... 18
    6.4        Authorization to Direct .......................................................................... 18

ARTICLE VII REMOVAL AND RESIGNATION OF TRUSTEE; SUCCESSOR
                  TRUSTEE; DISCRETIONARY TRUSTEE ....................................... 19
    7.1        Removal and Resignation ....................................................................... 19
    7.2        Final Accounting .................................................................................... 19
    7.3        Discretionary Fiduciary ......................................................................... 19

ARTICLE VIII AMENDMENT OF TRUST; TERMINATION OF PLAN ...................................... 20
    8.1        Amendment of Trust ............................................................................... 20
            (a)    Right to Amend ......................................................................... 20
            (b)    Exclusive Benefit ...................................................................... 20
    8.2        Termination of Plan ............................................................................... 20

ARTICLE IX MISCELLANEOUS .......................................................................................... 21
    9.1        Nonalienation of Benefits ...................................................................... 21
    9.2        Exclusive Benefit ................................................................................... 21
    9.3        Effect of Plan ......................................................................................... 21
    9.4        Entire Agreement ................................................................................... 21
    9.5        Approval of the Company ....................................................................... 21
    9.6        Notices ................................................................................................... 22
    9.7        Liability for Predecessor or Successor ................................................... 22
    9.8        Liability for Acts of Others .................................................................... 22
    9.9        Indemnification ...................................................................................... 22
    9.10      Controlling Law ..................................................................................... 24
    9.11      Effective Date ........................................................................................ 24

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000086

# TRUST AGREEMENT

**THIS RVR EMPLOYEE STOCK OWNERSHIP TRUST** (this "Agreement") is entered into as of the 15th day of April, 2014 by and between RVR, Inc. (the "Company") and Reliance Trust Company (the "Trustee") with the Trust to be effective as of June 1, 2013.

## WITNESSETH:

**WHEREAS,** the Company maintains, for the benefit of its eligible employees and those of its participating affiliate companies, the RVR Employee Stock Ownership Plan (the "Plan"), which is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and is intended to qualify as an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code;

**WHEREAS,** the Company desires to appoint the Trustee as a directed trustee to hold and administer the assets of the Plan in accordance with this Agreement, provided, that the Trustee shall be a discretionary trustee with respect to the decision to invest in, or remain invested in, Employer Securities, as well as pursuant to Section 5.3 of this Agreement and any decision to enter into an Exempt Loan for the purpose of purchasing Employer Securities;

**WHEREAS,** the Plan is intended to invest primarily in Employer Securities; and

**WHEREAS,** the Trustee has agreed to serve as directed trustee of the trust established under this Agreement effective as of April 15, 2014 and pursuant to the terms herein;

**NOW, THEREFORE,** the Company and the Trustee hereby mutually covenant and agree as follows:

- 1 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY      ARGENT_0000087

# ARTICLE I
# DEFINITIONS

The following words and phrases, when used herein with an initial capital letter, shall have the meanings set forth below unless a different meaning plainly is required by the context. Any reference to a section number shall refer to a section of this Agreement unless otherwise specified. Notwithstanding the preceding, any capitalized term used but not defined herein shall have the meaning provided for in the Plan.

1.1    **Administrator** means the person, committee or entity appointed by the Company to serve as plan administrator of the Plan within the meaning of Code Section 414(g). Unless the Company notifies the Trustee in writing of the appointment of an Administrator, the Company shall be deemed to be the Administrator.

1.2    **Beneficiary** means any person designated under the terms of the Plan to receive benefits payable upon the death of a Participant.

1.3    **Code** means the Internal Revenue Code of 1986, as amended.

1.4    **Custodian** means Reliance Trust Company, which shall also serve as custodian for the Trust Fund. To the extent any assets are held by any custodian other than Reliance Trust, such party shall also be considered a Custodian for the Trust.

1.5    **Company** means RVR, Inc. and its successors that adopt the Plan.

1.6    **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

1.7    **Investment Committee** means the person, committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust. Unless the Company notifies the Trustee in writing of the appointment of an Investment Committee, the Administrator shall be deemed to be the Investment Committee.

1.8    **Investment Manager** means any person, corporation or other organization or association appointed by the Investment Committee pursuant to the terms of Section 4.2 to manage, acquire or dispose of all or a portion of the assets of the Trust.

1.9    **Participant** means an employee or former employee of a Participating Company who has an account balance under the Plan.

1.10   **Participating Company** means the Company and any of its affiliates that has adopted or hereafter may adopt the Plan for the benefit of its employees and which continue to participate in the Plan.

1.11   **Plan** means RVR Employee Stock Ownership Plan, as such Plan may be amended from time to time.

- 2 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000088

DOL 0009685

1.12    **Recordkeeper** means the Plan's duly appointed recordkeeper and any of their respective agents or assigns, including processing agents.  The Administrator shall notify the Trustee of the identity of the Recordkeeper and shall promptly notify the Trustee of any change in the identity of the Recordkeeper.

1.13    **Registration-Type Class of Securities** means a class of securities that is required to be registered under Section 12 of the Securities Exchange Act of 1934 or would be required to be so registered except for the exemption from registration provided in Section 12(g)(2)(H) of the Securities Exchange Act of 1934.

1.14    **Trust** means the trust established by this Agreement.

1.15    **Trust Fund** means the total amount of cash and other property held from time to time under this Agreement.

1.16    **Trustee** means Reliance Trust Company.

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000089

# ARTICLE II
# ESTABLISHMENT OF THE TRUST

2.1     **Trust Established.**

The Company hereby establishes with the Trustee, as a funding medium for the Plan, a Trust consisting of the Trust Fund and such earnings, profits, increments, additions and appreciation thereto and thereon as may accrue from time to time.

2.2     **Limit of Participating Companies' Interests.**

(a)     **No Right To Reversion.**  Except as provided in subsection (b) hereof and except as provided by ERISA, the Participating Companies shall not have any right, title, interest, claim or demand whatsoever in or to the funds held by the Trustee, other than the right to a proper application thereof and accounting therefor by the Trustee as provided herein, nor shall any funds revert to any Participating Company, except as permitted by ERISA or required by the Code for qualification of the Plan.

(b)     **Return of Contributions.**  Any other provisions of this Agreement or the Plan notwithstanding, if and to the extent permitted by the Code, ERISA and other applicable laws and regulations thereunder, upon the Company's request, a contribution (i) made to the Plan that initially fails to satisfy the requirements of Code Section 401(a) or (ii) made by a mistake in fact, including a good faith mistake in determining the deductibility of the contribution under Code Section 404, shall be returned to the specified Participating Company within 1 year after the mistaken payment of the contribution or the disallowance of the deduction (to the extent disallowed), whichever is applicable.

2.3     **Trustee's Conditional Acceptance.**

The Trustee accepts the Trust hereby created and agrees to perform the duties hereby required of the Trustee, subject, however, to the following conditions:

(a)     **Directed Trustee.**  Except as otherwise provided for in this Agreement, the parties expressly acknowledge and agree that the Trustee is a directed trustee as described in ERISA Section 403(a).  In the management and control of the Trust Fund, the Trustee shall be subject to the direction of the Administrator, the Investment Committee, and any Investment Managers that may be appointed by the Investment Committee; provided, however, that the Trustee shall only be subject to proper directions which are made in accordance with the terms of this Agreement and are not contrary to ERISA. The Trustee shall be under no obligation to determine if such directions are made in accordance with the terms of the Plan and may rely on the Company, the Administrator, or Investment Manager, to make such determinations.  Except as provided in Section 5.3, the Trustee shall not make any investment review of, consider the propriety of

- 4 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT  0000090

holding or selling, or, except as provided in Section 5.2(e), vote any assets held in the Trust Fund. The Trustee shall have no responsibility to review or make recommendations regarding investments made at the direction of the Administrator, Investment Committee, Participant or an Investment Manager. The Administrator, Investment Manager and Investment Committee shall not issue any directions to the Trustee that are in violation of the terms of the Plan or this Agreement or prohibited by ERISA.

(b)    **Compensation.** The Trustee shall be entitled to compensation for its services under this Agreement at such rates as from time to time the Trustee and the Company shall agree in writing.

The Trustee shall retain for its own account, as additional compensation under this Agreement, earnings (i.e., "float") on amounts received from the Trust Fund before such amounts are invested pursuant to this Agreement and on amounts held pending distribution.

(i)    Contributions and Purchases: The timing of cash investment is dependent upon the Recordkeeper and their reconciliation of funds received into the Trust. If Trustee receives payroll contributions by performing an ACH (Automated Clearing House) debit to Company's bank account, this cash will generally be invested within 24 hours. If funds are sent to Trustee via wire, ACH or check, the investment of these funds will generally occur within 36 hours of receipt. Company may review the service contract with the Recordkeeper to identify specific standards concerning the timing of investment purchases. Trustee will earn Fed Funds income on money received from the date of deposit at Trustee until the date the monies are wired in payment of investment purchases in the account, or settlement date. Company may monitor and compute the amount of income earned by Trustee by reviewing the date of deposit (as reported on the account statements) versus the settlement date of the purchase(s).

(ii)    Distributions and Sales: Generally, Trustee will wire funds within 24 hours of the funds becoming available as a result of sale settlements. In the case of distribution checks or other Trust checks, the Trustee earns income from the date cash is made available in the trust account until the date a check is cashed. Trustee will generally issue checks within 48 hours of receipt of both cash and complete payment instructions. Company may compute the amount of interest income Trustee earns on cash awaiting distribution by reviewing the trust account and participant distribution activity, i.e., date cash received or made available for distribution, date wired out of the trust or otherwise the date each participant check was cashed, times the per-diem Fed Funds rate.

(iii)    Rate: The Fed Funds target rate is published in the Wall Street Journal.

- 5 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000091

# ARTICLE III
# DUTIES OF TRUSTEE

3.1   **Duties.**

It shall be the duty of the Trustee hereunder:

(a)   **Receipt of Contributions.**   To receive any contributions paid to it under this Agreement in cash, Employer Securities or in other property acceptable to the Trustee. The Trustee shall not be responsible for the calculation or collection of any contribution required to be paid by a Participating Company to the Trustee under the Plan, but shall be responsible only for property actually received by it pursuant to this Agreement;

(b)   **Management of Funds.**   In accordance with directions received under the terms of this Agreement, to hold, invest, reinvest, manage and administer (except as otherwise provided herein) all contributions so received, together with the income therefrom and any other increment thereon, for the exclusive benefit of Participants and their Beneficiaries in accordance with the terms of this Agreement;

(c)   **Distributions.**   From time to time, on the written direction of the Administrator, or such other means of direction as mutually agreed upon by the Trustee and the Administrator, to make payments or distributions out of the Trust Fund to persons in the manner and amounts as may be specified in the directions of the Administrator, and upon any payments being made, the amount thereof shall no longer constitute a part of the Trust Fund. The Administrator assumes all responsibility with respect to all directions and the application of payments or distributions. The Trustee is under no duty to enforce payments of any contributions to the Trust Fund and is not responsible for the adequacy of the Trust Fund to meet and discharge any or all liabilities arising in connection with the Plan or the Trust.

(i)   Missing Participant: In the event that any payment ordered by the Administrator is mailed by the Trustee to a Participant or his Beneficiary specified in such order to the last known address of such person filed with the Administrator and is then returned to the Trustee because such person cannot be located at such address, the Trustee shall promptly notify the Administrator. Upon the expiration of sixty (60) days after such notification the order shall become void and, unless and until a further order is received from the Administrator by the Trustee with respect to such payment, the Trustee shall thereafter continue to administer the Trust Fund as if the order had not been made by the Administrator. The Trustee shall not be obligated to search for or ascertain the whereabouts of any Participant or his Beneficiary.

- 6 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000092

(ii)    Dispute: In the event that any dispute arises as to the persons to whom the payment of any funds or delivery of any assets shall be made by the Trustee, the Trustee may withhold payment or delivery until the dispute has been determined by a court of competent jurisdiction or has been settled by the parties concerned and may, in its sole discretion, submit the dispute to a court of competent jurisdiction.

(d)    **Records.** To keep such accounts and records and make such reports and disclosures as shall be required under this Agreement;

(e)    **Authorized Acts.** To take any action directed by the Investment Committee, an Investment Manager, the Administrator, or their authorized designee(s). The Trustee may rely on any such direction without question and shall not be liable for any failure to act pending receipt of any such direction;

(f)    **Acceptance of Rollovers.** The Plan does not permit Participants to make rollover contributions to this Plan.

3.2    **Maintenance of Participant Accounts.**

The Administrator shall maintain accounts and appropriate subaccounts in accordance with the Plan.

-7-

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000093

DOL 0009690

# ARTICLE IV
# INVESTMENT OF TRUST ASSETS

4.1    **General Investment Power.**

(a)    **Authority of Investment Committee.**    Except as provided in Section 4.2 and Section 5.3, the Investment Committee shall have all authority and responsibility for the management, disposition and investment of the Trust Fund, and the Trustee shall comply with directions of the Investment Committee.  The Investment Committee shall not issue any directions that are in violation of the terms of the Plan or this Agreement or prohibited by ERISA.

(b)    **Funding Policy.**  The Trust shall be invested primarily in Employer Securities, to the extent Employer Securities is available; otherwise, the Investment Committee shall establish and carry out a funding policy and method as required under ERISA Section 402(b)(1), consistent with the objectives of the Plan and the requirements of ERISA.

(c)    **Trustee Discretion and Responsibility.**  Except as provided under Section 5.3, the Trustee shall have no discretion with respect to the investment or reinvestment of the Trust Fund and shall not be liable for the assets invested under the direction of the Investment Committee, Administrator, Recordkeeper, Investment Manager (to the extent applicable), Discretionary Fiduciary, or their delegates, or for taking or refraining from taking any action at the direction of the Investment Committee, Administrator, Recordkeeper, Investment Manager (to the extent applicable), Discretionary Fiduciary, or their delegates.  Except as provided under Section 5.3 of this Agreement, the Trustee is not responsible for the prudence of and under no duty to make any review of investments acquired for the Plan at the direction or order of the Investment Committee, the Administrator, the Recordkeeper, Discretionary Fiduciary, or their delegates, or, to the extent applicable, the Investment Managers, or to make any recommendation with respect to disposing of or continuing to retain any such investment.

(d)    **Registration of Employer Securities.**  If the Trustee is directed to dispose of Employer Securities held in the Trust Fund under circumstances which require registration of such securities under applicable federal or state securities or banking laws, the Company, at its own expense, will take or cause to be taken any and all such action as may be necessary or appropriate to effect such registration.

4.2    **Investment Managers.**

(a)    **Appointment.**  The Investment Committee may, but shall not be required to, appoint one or more Investment Managers to manage all or a portion of the assets of the Trust Fund.  Each such Investment Manager shall be either (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) a bank, as defined in such Act; or (iii) an insurance company qualified to perform the services of Investment Manager

- 8 -

*PHX 331153527v1*

ARGENT_0000094

under the laws of more than one state. The Investment Committee shall obtain from any Investment Manager so appointed by it a written statement (i) acknowledging that such Investment Manager is or on the effective date of its appointment will become a fiduciary within the meaning of ERISA Section 3(21)(A) with respect to the Trust assets under its management; (ii) certifying that such Investment Manager has the power to manage, acquire or dispose of Trust assets in the manner contemplated by the contract or other written instrument by which its appointment is or will be effected; and (iii) certifying that it is either an investment adviser, a bank or an insurance company which is qualified to be appointed as an Investment Manager under this Agreement.

(b)    **Contractual Arrangement.** The Investment Committee shall enter into a written contract or agreement with each such Investment Manager in connection with its appointment as such, and such contract shall be subject to such terms and conditions and shall grant to the Investment Manager such authority and responsibilities in the management of the applicable assets of the Trust as the Investment Committee deems appropriate under the circumstances. Without limiting the generality of the foregoing, such contract may establish investment objectives for the assets of the Trust under the management of the Investment Manager and may limit the types of investments that may be acquired with such Trust assets.

(c)    **Trustee's Duties.** With respect to the Trust assets the management of which has been delegated to an Investment Manager, the Trustee shall follow and carry out the instructions of the appointed Investment Manager with respect to the acquisition, disposition and reinvestment of such Trust assets, including instructions relating to the exercise of all ownership rights in such assets, and the Trustee shall not be under any obligation to invest or otherwise manage any assets under the management of the Investment Manager.

(d)    **Failure to Direct.** In the event that an appointed Investment Manager shall fail to direct the Trustee with respect to the investment of all or any portion of the assets under its management, the Trustee shall invest such cash only when and as directed by the Investment Committee.

(e)    **Termination of Appointment.** Upon the termination of the appointment of an Investment Manager, the Investment Committee shall (i) appoint a successor Investment Manager with respect to the assets formerly under the management of the terminated Investment Manager, (ii) direct the Trustee to merge or combine such assets with other assets managed by another Investment Manager, or (iii) direct the Trustee to invest such assets as the Investment Committee deems appropriate in accordance with the existing funding policy.

4.3    **Authorized Investments.**

"Authorized investment" as used in this Agreement shall mean bonds, debentures, notes or other evidences of indebtedness; stocks (regardless of class) or other evidences of ownership, in any corporation mutual investment fund, investment company, association or business trust;

- 9 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000095

DOL 0009692

annuity contracts (other than life annuity contracts), guaranteed income contracts, and savings accounts and certificates and interest-bearing deposits in any depository institution (including the Trustee or any affiliate of the Trustee); group trusts or collective investment funds permitted for any retirement plans qualified under Code Section 401(a) (including those maintained by the Trustee or its affiliates); any single trust or group trust or collective investment fund which may hold securities issued by the Company or its affiliates; covered call options, put options, and financial futures contracts, irrespective of whether the securities or property are of a character authorized from time to time by applicable state law for trust investments. "Authorized investment" shall include Employer Securities. Notwithstanding the foregoing, "authorized investment" shall not include any securities issued by a Participating Company or any affiliate of a Participating Company unless the securities are "qualifying employer securities" within the meaning of ERISA Section 407(d)(5), nor shall it include any real property leased to or used by a Participating Company or any affiliate of a Participating Company unless the real property is "qualifying employer real property" within the meaning of ERISA Section 407(d)(4).

4.4    **Responsibility for Compliance.**

Except as provided in Section 5.3, the responsibility for determining whether any investment of Trust assets complies with the terms of this Agreement and applicable law shall lie solely with the Investment Committee, and the Trustee shall have no responsibility to ascertain whether any investment made at the direction of the Investment Committee or other authorized person complies with the terms of this Agreement or applicable law.

4.5    **Manner and Effect of Directions.**

(a)    **Delegation of Authority to Custodian.** The Trustee is authorized and directed to serve as the Custodian with the authority and responsibility for receiving and carrying out the directions of the Company, Administrator, the Investment Committee, and any Investment Manager, or their designees. With respect to any assets held by a party other than the Trustee, the Trustee is authorized and directed to delegate to the Custodian the authority and responsibility for receiving and carrying out the directions of the Company, Administrator, the Investment Committee, an Investment Manager, or their designees. The Trustee is authorized and directed to enter into such agreements with another Custodian as are deemed necessary or appropriate to effect such delegation. The Company represents that all directions given by it in any capacity under this Agreement, whether to the Trustee or the Custodian, shall comply with the terms of the Plan, this Agreement, ERISA and other applicable law.

(b)    **Manner of Direction.** Any direction, request or approval of the Company, the Administrator, the Investment Committee, an Investment Manager, or any other party to whom authority to give such directions, requests or approvals is delegated under the powers conferred under this Agreement (including, without limitation, the Recordkeeper and its designees) shall be provided to the Trustee or the Custodian in writing, by automated telephone response system, electronic data transmission (including internet communications) or such other means as is acceptable to the Trustee or the Custodian, as applicable. The Trustee may rely upon the notice and the

- 10 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000096

DOL 0009693

authenticity and genuineness of the notice and the signatures on such notice, and the authority of the person or persons executing and delivering it, without making inquiry in regard thereto.

(c)  **Liability for Authorized Acts.**  The Trustee shall incur no liability to anyone for any action that it or the Custodian as its delegate takes pursuant to a direction, request or approval given by the Company, the Investment Committee, an Investment Manager, the Administrator, or by any other party (including, without limitation, the Recordkeeper and any of its agents) to whom authority to give such directions, requests or approvals is delegated under the powers conferred upon the Company, the Investment Committee, an Investment Manager, the Administrator, and any of its agents, or such other party under this Agreement.

4.6  **Authorization of Designee(s).**

The Administrator and the Investment Committee may each appoint one or more designees to act on their behalf.  If a designee (or designees) is appointed, the appropriate committee shall furnish the Trustee with written documentation of the appointment and a specimen signature of each designee.  The Trustee shall be entitled to rely upon such documentation until the Trustee is notified otherwise in writing.

- 11 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000097

DOL 0009694

# ARTICLE V
# POWERS OF TRUSTEE

5.1  **General Authority.**

In accordance with the directions of the Investment Committee and any Investment Managers as provided in Article IV, the Trustee shall receive, hold, manage, convert, sell, exchange, invest, reinvest, disburse and otherwise deal with the assets of the Trust, including contributions to the Trust and the income and profits therefrom, without distinction between principal and income and in the manner and for the uses and purposes set forth in the Plan and as hereinafter provided.

5.2  **Specific Powers.**

In the management of the Trust, the Trustee shall have the following powers in addition to the powers customarily vested in trustees by law and in no way in derogation thereof; provided, all such powers shall be exercised only upon and in accordance with the directions of the Investment Committee, the Administrator and, to the extent applicable, any duly appointed Investment Managers:

(a)  **Purchase of Property.**  With any cash at any time held by it, to purchase or subscribe for any authorized investment (as defined in Section 4.3) and to retain the same in trust;

(b)  **Disposition of Property.**  To sell, exchange, transfer or otherwise dispose of any property at any time held by it;

(c)  **Retention of Cash.**  To hold cash without interest in administrative accounts for contribution and distribution processing in such amounts as may be reasonable and necessary for the proper operation of the Plan and the Trust;

(d)  **Exercise of Owner's Rights.**  Except as otherwise provided in Subsection (e) below, the Company acknowledges and agrees that the Trustee shall not have the right or power to vote proxies appurtenant to securities that the Trustee holds. The Company acknowledges and agrees that the Trustee shall not make any review of, or consider the propriety of, holding or selling any assets held in the Trust Fund in response to any tender offer, conversion privilege, rights offering, merger, exchange, public offering and/or any proxy action for any such assets. The Company agrees not to issue any directions to the Trustee relating to any corporate event, proxy votes or holding or selling of assets held in the Trust Fund that are contrary to or in violation of the terms of the Plan document or this Agreement or that are prohibited by ERISA or the Code. The Company acknowledges and agrees that, except as provided in Subsection (e) below, the Company hereby designates the Investment Committee, a fiduciary, to (i) vote proxies and decide whether or not to hold or sell assets in the Trust Fund in response to a tender offer or other proxy action or corporate event for any such assets, or (ii) direct the Trustee to do so;

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000098

(e)    **Voting Employer Securities.**  To vote Employer Securities in accordance with the following:

(1)    Except as otherwise provided below in this Section 5.2(e), the Trustee shall vote the Employer Securities held in the Trust Fund with respect to all matters, as directed by the Administrator of the Company.  If the Employer Securities is a Registration-Type Class of Securities, each Participant or Beneficiary will be entitled to direct the voting of Employer Securities which are entitled to vote and are allocated to his account under the Plan in accordance with Subsection (2) below.  If the Employer Securities is not a Registration-Type Class of Securities, each Participant or Beneficiary will be entitled to direct the voting of Employer Securities allocated to his account under the Plan in accordance with Subsection (2) below, only with respect to any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets or any similar transaction as provided in regulations issued by the Secretary of the Treasury.

(2)    If a Participant or Beneficiary is entitled to direct the voting of Employer Securities allocated to his account under the above Subsection (1), the following procedures shall apply:

(A)    The Company shall furnish the Trustee, Participants, Beneficiaries and, if appointed pursuant to Section 7.3, the Discretionary Fiduciary, with notices and other information statements when voting or other rights as to Employer Securities are to be exercised.

(B)    A Participant or Beneficiary shall submit a proxy or such other form provided by the Company containing the Participant's or Beneficiary's confidential information as to the manner of voting Employer Securities allocated to his account to (i) an independent third party who will, in turn, instruct the Trustee as to the manner of voting such Employer Securities, or (ii) if appointed pursuant to Section 7.3, the Discretionary Fiduciary or its designees.  The independent third party or the Discretionary Fiduciary, as applicable, shall not disclose the confidential voting directions of any individual Participant or Beneficiary to the Company or the Trustee.

(C)    Whole Employer Securities allocated to accounts for which the Trustee has received instructions from the independent third party on behalf of Participants or Beneficiaries shall be voted in accordance with those instructions.

(D)    The combined fractional shares and fractional rights to Employer Securities held in accounts, if any, shall be voted to the extent possible in

- 13 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000099

the same proportion as whole Employer Securities held in such accounts are directed to be voted by Participants or Beneficiaries.

(E)    If a Participant has the right to direct the Trustee as to the manner in which Employer Securities allocated to his Employer Securities Account are to be voted and such Participant fails or refuses to give the Trustee timely instructions (or instructions are invalidated for any reason) as to how to vote any Employer Securities as to which the Trustee otherwise has the right to vote, the Trustee shall vote such Employer Securities in the same manner and proportion as all other allocated Employer Securities for which instructions were received.

(F)    Shares of Employer Securities, contributions, and dividends not allocated to the account of a Participant shall be voted by the Trustee in the manner directed by the Investment Committee or, if applicable, by the Discretionary Fiduciary.

(f)    **Non-Voting Decisions Affecting Employer Securities.**  Unless the Company appoints a Discretionary Fiduciary pursuant to Section 7.3, to determine all decisions affecting Employer Securities held under the Trust which do not involve voting of such Employer Securities, including, without limitation, decisions to reject or consent to tender or exchange offers and similar decisions in the manner directed by the Investment Committee or its designee(s);

(g)    **Registration of Investments.**  To cause any stock, bond, other security or other property held as part of the Trust to be registered in its own name or in the name of one or more of its nominees; provided, the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(h)    **Borrowing.**  At the direction of the Investment Committee, to borrow or raise money for the purposes of the Trust in such amounts, and upon such terms and conditions, as determined by the Investment Committee; and, for any sum so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging all or any part of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(i)    **Qualified Pooled Investments.**  To transfer, at any time and from time to time, all or any part of the Trust Fund to, or withdraw the same from, any pooled investment fund or group or collective trust, invested in similar types of securities or other investments, maintained by a bank or trust company (including, if applicable, the Trustee) supervised by a state or federal agency, which has been determined by the Internal Revenue Service to be a qualified trust or fund exempt from federal income tax under Code Section 501(a) and which has been established to permit separate pension and profit sharing trusts qualified under Code Section 401(a) to pool some or all of their funds for investment purposes; to the extent the Trust Fund is invested in such a pooled fund or

- 14 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000100

DOL 0009697

group or collective trust, the terms of the instrument establishing such pooled fund or group or collective trust are made a part of this Agreement as fully as if set forth at length herein; the commingling of assets of this Trust with assets of other qualified participating trusts in such pooled funds or group or collective trusts is specifically authorized;

(j) **Purchase of Contracts.** To apply for, purchase, hold, transfer, surrender and exercise all incidents of ownership of any life insurance or annuity contract (but not a contract for a life annuity unless the Plan provides for the distribution of benefits in such form) which the Investment Committee directs it to purchase;

(k) **Execution of Instruments.** To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments, which may be necessary or appropriate to carry out the powers herein granted;

(l) **Settlement of Claims and Debts.** To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Trust, to commence or defend suits or legal or administrative proceedings and to represent the Trust in all suits and legal and administrative proceedings;

(m) **Employment of Agents, Advisers and Counsel.** To employ suitable agents, actuaries, accountants, investment advisers, brokers and counsel, and to pay their reasonable expenses and compensation. Counsel may be counsel to the Company, and such counsel's advice may be sought on any legal matter including the interpretation of this Agreement and the Plan. The Trustee shall be fully protected in acting on advice of counsel to the Company, if such counsel is acting on behalf of the Company; and

(n) **Power to do any Necessary Act.** To do all acts which it may deem necessary or proper and to exercise any and all powers of the Trustee under the Plan and this Agreement upon such terms and conditions as it may deem in the best interests of the Trust.

5.3 **Specific Powers - Discretionary Acts by the Trustee.** Notwithstanding anything to the contrary herein, unless a Discretionary Trustee is appointed by the Administrator, the Trustee shall have all necessary discretionary authority to:

(a) **Investment in Employer Securities.** To invest the Trust in Employer Securities (provided the Trustee does not pay in excess of adequate consideration, as defined by ERISA, for such Employer Securities);

(b) **Sales of Employer Securities.** To sell Employer Securities to any person, including the Company, at a price not less than the fair market value of the shares sold as of the date of the sale, as determined by the Trustee based upon a valuation by an independent appraiser who meets the requirements similar to the requirements of the regulations prescribed under Code Section 170(a)(1);

(c) **Borrowing.**

- 15 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000101

(i)　*Generally.* To borrow or raise money for the purposes of the Trust in such amounts, and upon such terms and conditions, as determined by the Administrator; and, for any sum so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging all or any part of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing; and

(ii)　*Borrowing to Purchase Employer Securities.* The Trustee shall have the power to borrow funds for the purpose of purchasing Employer Securities or for the purpose of repaying all or any portion of any outstanding indebtedness incurred by the Trustee to purchase Employer Securities, provided, that in all events the Exempt Loan shall meet the requirements of Section 7.3 of the Plan.

5.4　**Prohibited Transactions.**

Notwithstanding the provisions of Section 5.2, in no event shall the Trustee knowingly exercise any powers under the Plan or this Agreement in a manner that will constitute a prohibited transaction, as defined in Code Section 4975 or in ERISA Section 406, for which an exemption does not exist.

5.5　**Participant Loans.**

The Administrator has not adopted a loan policy under the Plan. No loans shall be made from the Plan to Participants and/or beneficiaries.

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY　　　　ARGENT_0000102

# ARTICLE VI
# ADMINISTRATION

6.1    **Accounting by Trustee.**

(a)    **Books and Records.**  The Recordkeeper generally shall be responsible for keeping accurate and detailed records of all investments, receipts and disbursements and other transactions hereunder, including such specific records as shall be required by law and such additional records as may be agreed upon in writing between the Administrator or the Investment Committee and the Trustee.  All books and records relating thereto shall be open to inspection and audit at all reasonable times by any person or persons designated by the Administrator, the Company, or the Investment Committee.  The Trustee shall promptly provide copies of such books or records to any persons designated by the Administrator.

(b)    **Accounting.**  Following the close of each Plan year of the Plan, or more frequently as the Trustee and the Administrator may agree, and after the effective date of the removal or resignation of the Trustee, the Trustee shall file with the Administrator and the Investment Committee (and/or their authorized designees) a written statement setting forth all investments, receipts, disbursements and other transactions effected by it during such year or during the period beginning as of the close of the last preceding year to the date of such removal or resignation. The Trustee shall deliver such statement in a timely manner to permit the preparation of Participant statements or to provide for the orderly replacement of the Trustee, as the case may be.  Except as may be required by statute or by regulations published by federal government agencies with respect to reporting and disclosure, as may be required pursuant to the terms of the Plan or this Agreement, or as reasonably may be requested by the Administrator, the Company or the Investment Committee, no person shall have the right to demand or to be entitled to any further or different accounting by the Trustee.

(c)    **Release.**  Except with respect to alleged breaches of fiduciary responsibility under ERISA, upon the expiration of one hundred eighty (180) days from the date of filing such annual or other statement, the Trustee shall forever be released and discharged from any liability or accountability to anyone with respect to the propriety of its acts or transactions shown in such account, except with respect to any acts or transactions as to which the Administrator or Investment Committee, within such 180-day period, shall file with the Trustee its written disapproval.  In the event such disapproval is filed, and unless the matter is compromised by agreement between the Trustee and the Administrator or the Investment Committee, the Trustee shall file its statement covering the period from the date of the last annual statement to which no objection was made in any court of competent jurisdiction for audit or adjudication.  With respect to alleged breaches under ERISA, the Trustee shall be entitled to rely upon the statutes of limitations set forth therein.

- 17 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000103

(d)    **Valuations.**  All valuations of Employer Securities that are not readily tradable on an established securities market with respect to activities carried on by the Plan must be made by an independent appraiser selected by the Trustee.  The Trustee shall be responsible for reviewing and accepting, in accordance with the fiduciary requirements of ERISA, the appraisal prepared by the independent valuation firm and the factors and assumptions relied on by the independent valuation firm in preparing the appraisal.

(e)    **Reliance on Recordkeeper.**   The Trustee shall be entitled to rely on the Recordkeeper and any Custodian, other than the Trustee, for the maintenance and provision of all records (including participant loan records) specified in this Section 6.1.

6.2    **Expenses.**

The expenses incurred by the Trustee in the performance of its duties hereunder, including fees for legal services rendered to the Trustee, compensation of the Trustee and all other proper charges and disbursements of the Trustee, including all personal property taxes, income taxes and other taxes of any and all kinds whatsoever, that may be levied or assessed under existing or future laws upon or in respect of the Trust or any money, property or security forming a part of the Trust Fund, shall be paid by the Trustee from the Trust Fund, and the same shall constitute a charge upon the Trust Fund, unless the Company pays the same or any part thereof. To the extent a Participating Company pays any expenses that are properly payable from the Trust Fund, the Trustee shall reimburse the Participating Company from the Trust Fund if requested to do so by the Participating Company.  The Company agrees that it shall promptly pay for any services required of Trustee that may arise after the resignation or removal of the Trustee based on the Trustee's then prevailing fee schedule.  This provision shall survive the termination of this Agreement.

6.3    **Notice.**

A written notice to the Trustee, to the extent authorized in and given in accordance with the terms and conditions of the Plan, is the notice of the person giving it, and the Trustee may rely upon the notice and the authenticity and genuineness thereof and of the signatures thereon, and the authority of the person or persons executing and delivering it, without making inquiry in regard thereto.  The Trustee is not charged with any notice whatsoever unless given in accordance with the Plan, including, without limitation, notification of any changes in the identity or authority of any fiduciary (other than the Trustee) or any other person acting in regard to the Plan.

6.4    **Authorization to Direct.**

Persons authorized to give directions to the Trustee on behalf of the Administrator shall be identified to the Trustee by written notice from the Company and such notice shall contain specimens of the authorized signatures.  The Trustee shall be entitled to rely upon such written notice as evidence of the written identity and authority of the person(s) appointed until a written cancellation of the appointment is received by the Trustee.

- 18 -

*PHX 331,153527v1*

# ARTICLE VII
# REMOVAL AND RESIGNATION OF TRUSTEE;
# SUCCESSOR TRUSTEE; DISCRETIONARY TRUSTEE

7.1     **Removal and Resignation.**

The Company may remove the Trustee at any time upon sixty (60) days' written notice delivered to the Trustee. The Trustee may resign at any time upon sixty (60) days' written notice delivered to the Company.

7.2     **Final Accounting.**

In any such case, the Company shall notify the Trustee of the appointment of a successor trustee, and the Trustee shall convey and deliver to such successor trustee all of the assets of the Trust Fund.  Within ninety (90) days after any such removal or resignation of the Trustee, the Trustee shall make a final accounting to the Company, the Administrator and the Investment Committee as of the effective date of such removal or resignation pursuant to the terms of Section 7.1.

7.3     **Discretionary Fiduciary.**

As to any and all matters affecting Employer Securities, including, but not limited to, any purchase or sale, tender offer, or exchange of Employer Securities, or the exercise of voting rights of Employer Securities, the Company may appoint an independent, discretionary trustee (the "Discretionary Fiduciary") to act solely in connection with any such transaction or vote.  If the Company appoints a Discretionary Fiduciary pursuant to this Section, the Administrator shall give written notice to the Trustee of such appointment.  The Discretionary Fiduciary shall have such duties, responsibilities, and additional powers as set forth in the engagement letter or other document appointing the Discretionary Fiduciary.  The Trustee may be appointed as a Discretionary Fiduciary pursuant to this Section.

- 19 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                     ARGENT_0000105

DOL 0009702

# ARTICLE VIII
# AMENDMENT OF TRUST; TERMINATION OF PLAN

8:1    **Amendment of Trust.**

    (a)    **Right to Amend.**  The Company and the Trustee may by written agreement amend this Agreement at any time or from time to time, and any such amendment by its terms may be retroactive.

    (b)    **Exclusive Benefit.**  Notwithstanding the foregoing, no amendment shall be made which would authorize or permit any assets of the Trust Fund, other than such assets as are required to pay taxes and administration expenses, to be used for or diverted to purposes other than the exclusive benefit of Participants or their Beneficiaries, except that this Agreement may be amended retroactively and to affect the benefits of Participants and their Beneficiaries if necessary to cause the Plan and Trust to be or remain qualified and exempt from income taxes under the Code.

8.2    **Termination of Plan.**

In the event of termination of the Plan, the Trustee shall continue to hold the Trust, to be applied and distributed in accordance with the terms of the Plan.

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000106

DOL 0009703

# ARTICLE IX
# MISCELLANEOUS

9.1     **Nonalienation of Benefits.**

Except as provided under the provisions of the Plan relating to loans to Participants and to qualified domestic relations orders and to the extent permitted by law, neither the benefits payable from the Trust Fund nor any interest in any of the assets of the Trust Fund shall be subject in any manner to the claim of any creditor of a Participant or Beneficiary, or to any legal process by any creditor of such Participant or Beneficiary; and neither a Participant nor any Beneficiary shall have any right to alienate, commute, anticipate or assign any right to benefits payable from or any interest in the Trust, except as provided in the Plan.

9.2     **Exclusive Benefit.**

Except as otherwise provided in the Plan and this Agreement, no part of the Trust hereunder shall be used for or diverted to any purpose other than for the exclusive benefit of Participants and Beneficiaries or the payment of expenses as herein provided.

9.3     **Effect of Plan.**

The Trustee is not a party to the Plan, and in no event shall the terms of the Plan, either expressly or by implication, be deemed to impose upon the Trustee any power or responsibility other than as set forth in this Agreement. In the event of any conflict between the provisions of the Plan and this Agreement, this Agreement shall be deemed to be incorporated into and be a part of the Plan, and the terms of this Agreement shall control over any inconsistent terms of the Plan. The Trustee shall not be a named fiduciary under the Plan and shall not have the authority to interpret the Plan.

9.4     **Entire Agreement.**

This Agreement constitutes the entire Agreement between the parties hereto with regard to the subject matter hereof, and there are no other agreements or understandings between the parties relating to the subject matter hereof other than those set forth or provided for herein.

9.5     **Approval of the Company.**

The Company, the Administrator and the Investment Committee shall have the right, on behalf of all individuals at any time having any interest in the Trust, to approve any action taken or omitted by the Trustee.

- 21 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000107

DOL 0009704

9.6   **Notices.**

Notices, directions and other communications provided in writing shall be mailed to the parties at the following addresses:

| | |
|---|---|
| If to the Company: | RVR, Inc.<br>11 West Hampton Avenue<br>Mesa, AZ 85210<br>Attention: Eric Bensen |
| If to the Administrator: | RVR, Inc.<br>11 West Hampton Avenue<br>Mesa, AZ 85210<br>Attention: Eric Bensen |
| If to the Trustee: | Reliance Trust Company<br>P.O. Box 28166<br>Atlanta, Georgia 30358<br>Attn: Fiduciary Administration |

9.7   **Liability for Predecessor or Successor.**

Except as required under ERISA, no successor trustee hereunder in any way shall be liable or responsible for any actions or omissions of any prior trustee in the administration of the Trust or the assets comprising the Trust prior to the date such successor trustee assumes its obligations hereunder, nor shall any prior trustee in any way be liable or responsible for any actions or omissions of any successor trustee.

9.8   **Liability for Acts of Others.**

The Trustee shall not be liable for the acts or omissions of the Company, the Recordkeeper, any Custodian other than Trustee, the Administrator, the Investment Committee or any Investment Manager except with respect to any acts or omissions of any such party in which the Trustee participates knowingly or which the Trustee knowingly undertakes to conceal, and which the Trustee knows constitutes a breach of fiduciary responsibility of such party.

9.9   **Indemnification.**

The Company agrees to indemnify Reliance and its directors, employees and officers (individually an "Indemnitee" and collectively the "Indemnitees") against and from any and all claims, damages, expenses, liabilities and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing for, defending, or responding to discovery requests or other requests for information relating to, any government

- 22 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000108

investigations, litigation, arbitration or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to the transaction in which the ESOP acquired all of the issued and outstanding Employer Securities on or before May 28, 2014 (the "Proposed Transaction") or Reliance's duties as Trustee (including all events that occurred prior to Reliance becoming the Trustee or after Reliance's service as Trustee has terminated). However, the indemnification of any Indemnitee shall not apply to any claim, damage, expense, liability or loss that is attributable to their bad faith, breach of fiduciary duty under ERISA, gross negligence, willful misconduct, or a material breach of the terms of this letter or any subsequent agreement.

If Reliance or any Indemnitee receives notice of any government agency action or any other legal proceeding with respect to which indemnification may be sought from the Company pursuant to this Section 9.9 (a "Proceeding"), Reliance or such Indemnitee shall notify the Company of the Proceeding in writing within 30 days of its receipt of notice of the Proceeding. However, the failure by Reliance or the Indemnitee to so notify the Company shall not relieve the Company from any liability for indemnification under this Section 9.9 except to the extent that the failure to notify the Company shall actually have prejudiced the Company's defense of any Proceeding. The Company will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to the Indemnitee(s) or to otherwise participate in the Proceeding. If the Company elects to assume the defense of the Proceeding, it then shall pay all costs of defense.

The Indemnitees shall have the right to employ its own counsel in any Proceeding if any one or more of the following conditions are satisfied:

(a) The Company shall authorize Reliance to retain its own legal counsel;

(b) Legal counsel to Reliance advises Reliance that there may be one or more legal defenses available to Reliance that are in addition to or different from defenses available to the Company and counsel for the Company declines to assert such defenses (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of Reliance); or

(c) Legal counsel to Reliance shall inform Reliance that a potential conflict of interest exists between the Company and Reliance.

Reliance shall not be required to disclose or otherwise share its counsel's advice in order to satisfy either sub-paragraph (b) or (c), above.

The Company shall reimburse the Indemnitees for all reasonable expenses and fees as and when the Indemnitees incur them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable expenses and fees of the experts and legal counsel whom the Indemnitees engage for any Proceeding. Reliance shall return to the Company the amount of such reimbursements that Reliance receives if a court

- 23 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000109

holds that Reliance violated its fiduciary duties described in paragraphs 1 and 2 of that certain Engagement Letter entered into by and between Reliance and the Company on April 15, 2014 (the "Engagement Letter") which is incorporated herein by reference, or otherwise that indemnification would be unavailable under the terms of this Section 9.9.

If an Indemnitee seeks payment from the Company or seeks to enforce the indemnification or agreement to hold harmless pursuant to this Section 9.9, Reliance shall provide the Company all applicable invoices for legal fees and other expenses incurred by Reliance in investigating and/or defending such claims and any supporting documentation as the Company reasonably shall require; provided, however, that Reliance may redact the invoices and documentation or take other measures to preserve the attorney-client privilege, work product doctrine, or other applicable privilege.

9.10    **Controlling Law.**

This Agreement shall be construed according to the laws of the State of Georgia, except to the extent superseded by ERISA or any other federal law.

9.11    **Effective Date.**

This Agreement shall be effective on and after June 1, 2013; provided, however, that the Trustee agreed to serve as directed trustee of the Trust effective as of April 15, 2014.

**Execution in Counterpart.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

- 24 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000110

IN WITNESS WHEREOF, the Company and the Trustee have caused this Agreement to be signed by their duly authorized officers or representatives on this 22nd day of May, 2014.

RVR, INC.

By: *Eric R. Bensen*

Name: *ERIC R. BENSEN*

Title: *Chief Financial Officer*

RELIANCE TRUST COMPANY

By: _____

Name: Stephen A. Martin

Title: Senior Vice President and Fiduciary

Consultant

- 25 -

CHAR2\1447298v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000111

DOL 0009708

**IN WITNESS WHEREOF,** the Company and the Trustee have caused this Agreement to be signed by their duly authorized officers or representatives on this 22nd day of May, 2014.

**RVR, INC.**

By:_____

Name:_____

Title:_____


**RELIANCE TRUST COMPANY**

By:_____

Name: Stephen A. Martin

Title: Senior Vice President and Fiduciary

Consultant

- 25 -

CHAR2\1447298v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT 0000112

# Exhibit 20

**U.S. Department of Labor**          Office of the Solicitor

<u>**Via E-mail**</u>                                                              August 6, 2021

Adrianna Griego Gorton
Greenberg Traurig, LLP
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
gortona@gtlaw.com

Todd D. Wozniak
Holland & Knight LLP
1180 W. Peachtree Street, N.W., Suite 1800
Atlanta, Georgia 30309
Todd.Wozniak@hklaw.com

Lindsey Camp
Holland & Knight LLP
777 South Flagler Drive, Suite 1900, West Tower
West Palm Beach, Florida 33401
Lindsey.Camp@hklaw.com

> Re:  ***Walsh v. Reliance Trust Co., et al.*, No. 2:19-cv-3178-JJT**
>       **Secretary's Response to Defendants' July 19, 2021 Letter**

Dear Counsel:

This letter responds to your June 19, 2021 letter requesting further supplementation of the Secretary's responses to Smalley Jr. Interrogatory No. 4 (misidentified in your letter as No. 3), and Smalley Interrogatory Nos. 3, 4, and 15. Although one of the objections the Secretary initially asserted to these Interrogatories was that discovery was ongoing, the Secretary, nonetheless, thoroughly responded to these Interrogatories and has already supplemented some of his initial responses. Moreover, these are contention interrogatories, which, broadly construed, are asking for counsel's work product. For this reason, courts consistently decline to compel answers to contention interrogatories, such as these, that ask for "all facts" that a party contends support an allegation. <u>See e.g.,</u> <u>Valcor Eng'g Corp. v. Parker Hannifin Corp.</u>, No. 8-16CV00909, 2017 WL 10440700, at *3 (C.D. Cal. Aug. 28, 2017); <u>Lucero v. Valdez</u>, 240 F.R.D. 591, 594 (D.N.M. 2007). Courts do permit contention interrogatories that are limited to the principal facts or primary evidentiary basis for an allegation. <u>See e.g.,</u> <u>Quality Off. Furnishings, Inc. v. Allsteel, Inc.</u>, No. 3:17-CV-41-JEG-HCA, 2018 WL 7076747, at *12–13 (S.D. Iowa Sept. 26, 2018) (collecting authorities); <u>Wilcox v. Changala</u>, No. CV-10-3048-RHW,

2012 WL 12844083, at *2 (E.D. Wash. Jan. 18, 2012) (also finding that a request for "every evidentiary fact" impermissibly "border[s] too closely to protected work-product").

While counsel has made a good faith effort to give Defendants the principal facts and primary evidentiary basis on which it plans to rely to prove its claims, counsel is not required to have put together its entire case at this stage of the proceedings.  We have responded below to the deficiencies you assert (set forth in italics) with respect to the Secretary's responses to Smalley Jr. Interrogatory No. 4 (misidentified in your letter as No. 3), and Smalley Interrogatory Nos. 3, 4, and 15.

<u>Plaintiff's Response To Robert Smalley, Jr.'s First Set of Interrogatories</u>

*Plaintiff objected to Interrogatory No. 3 for several reasons, including that "this Interrogatory is premature because discovery in this case has not been completed."  Given that fact discovery has now been completed, please supplement Plaintiff's response to include, among other things: "the length of time you contend Reliance should have taken in reviewing the fairness of the Transaction and describe in detail all studies, comparisons, or other documents on which you base that contention."*

Defendants misidentify the Interrogatory to which they are referring.  It is Smalley Jr. Interrogatory No. 4, not 3.  The Secretary has thoroughly responded to this Interrogatory and does not believe it is in need of further supplementation.  Further, the Secretary does not contend that there is a specific amount of time that Reliance should have spent reviewing the Transaction.

<u>Plaintiff's Response To Randall Smalley's First Set of Interrogatories</u>

*Plaintiff objected to Interrogatory No. 3 for several reasons, including that "this Interrogatory is premature because discovery in this case has not been completed."  Given that fact discovery has now been completed, please supplement Plaintiff's response to include, among other things: "the due diligence or factual investigation of RVR, RVR's business, or RVR's stock that you allege was not performed but you contend should have been performed by Reliance or Reliance's advisors…in connection with the Transaction."  As you know, Plaintiff's current amended response does not identify a single piece of information regarding RVR, RVR's business or RVR's stock that it contends was not considered in connection with the Transaction. If Plaintiff cannot identify any due diligence or factual investigation regarding RVR, RVR's business or RVR's stock that Plaintiff contends was not considered in connection with the Transaction, please so state.*

*Please note that any supplementation of Interrogatory No. 3 will require supplementation of Interrogatory No. 4, which is related to Interrogatory No. 3.*

The Secretary disagrees with your interpretation of his responses to Smalley Interrogatory Nos. 3 and 4.  Nonetheless, if necessary, the Secretary will supplement his responses by August 20, 2021.

*Plaintiff objected to Interrogatory No. 15 for several reasons, including that "this Interrogatory is premature because discovery in this case has not been completed."  Given that*

*fact discovery has now been completed, please supplement Plaintiff's response to include the basis for denying Request for Admission No. 37. As you know, Request No. 37 asked Plaintiff to admit that the "Selling Shareholders (acting in their capacities as Selling Shareholders as opposed to another capacity) did not select SRR to serve as Reliance's financial advisor in connection with the Transaction." If you cannot identify a basis for the denial, please amend the response to Request for Admission No. 37.*

The Secretary has already identified the basis for his denial of Request for Admission No. 37 in his previous response to Interrogatory No. 15.

<u>Second Supplemental Mandatory Initial Disclosures</u>

*We have reviewed Plaintiff's July 14, 2021 Second Supplemental Mandatory Initial Disclosures. We note that the Second Supplemental Mandatory Initial Disclosures provide that "the Secretary hereby restates and incorporates by reference his original Mandatory Initial Discovery Responses ("MIDR"), served on April 2, 2020, and First Supplemental MIDR, served on January 26, 2021, and further supplements as follows." By incorporating by reference Plaintiff's prior disclosures, Plaintiff has created a conflict as to certain factual allegations. To avoid any misunderstanding as to which "Facts and Legal Theories Underlying Claims" are currently being alleged and how the prior disclosures are intended to impact the Second Supplemental Mandatory Initial Disclosures, we request that Plaintiff submit a single Third Amended Mandatory Initial Disclosures which includes in a single document all operative disclosures.*

The updated section, titled "Updated Facts and Legal Theories Underlying Claims" supersedes the original section titled "Facts and Legal Theories Underlying Claims."

Sincerely,


/s/
Brendan Ballard
Senior Trial Attorney

Eric C. Lund
Senior Trial Attorney

Isidro Mariscal
Katrina Liu
Trial Attorneys

U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914

3

Washington, DC  20013
Lund.Eric@dol.gov
Ballard.Brendan@dol.gov
Mariscal.Isidro@dol.gov
Liu.Katrina.T@dol.gov
Direct: (202) 693-5600
Facsimile: (202) 693-5610

Attorneys for Plaintiff,
Martin J. Walsh, Secretary
of Labor


cc:

W. Bard Brockman (via email Bard.brockman@bclplaw.com)

4

# Exhibit 21

| **From:** | Steve Martin </O=RELICO/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=STEVE MARTINB8A> |
|---|---|
| **To:** | Turley, Erin; Bob Socol; MarkFournier; Matthew Hricko; MikePoteracki; Wilkerson, Allison; Bucky Wright |
| **Sent:** | 5/14/2014 3:43:46 PM |
| **Subject:** | RE: Byway Proposal Response |

All, we have a deal and need to continue to move the ball forward to close on time. We are proposing a committee review for Friday, May 23rd and given the terms have been agreed to it should be relatively straight forward. Allison, I will ask if you will take minutes for the meeting assuming you are available. Please send a copy of your diligence report by the 22nd if possible and Matt will circulate the valuation as well. Let me know preferable times so Bucky can schedule the call. Thanks for everyone's effort in helping craft this deal. It's a great company I think we all agree. Thanks.

**From:** Turley, Erin [mailto:Erin.Turley@klgates.com]
**Sent:** Tuesday, May 13, 2014 4:20 PM
**To:** Steve Martin; Bob Socol; MarkFournier; Matthew Hricko; MikePoteracki; Wilkerson, Allison; Bucky Wright
**Subject:** RE: Byway Proposal Response

Steve we are good with the below subject to:

1) SRR being comfortable
2) Reasonable agreement on our requested changes to all documents including the employment agreements (in particular the employment agreements)

Erin Turley
K&L Gates, LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5428 (direct)
214.939.5849 (fax)
214.766.1313 (cell)
erin.turley@klgates.com
www.klgates.com
To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed within.

**From:** Steve Martin [mailto:smartin@relico.com]
**Sent:** Tuesday, May 13, 2014 2:49 PM
**To:** Bob Socol; MarkFournier; Matthew Hricko; MikePoteracki; Turley, Erin; Wilkerson, Allison; Bucky Wright
**Subject:** RE: Byway Proposal Response

Take a look at the response below and give me your thoughts as soon as you can.

Thanks.

---

**From:** Ted Margarit [mailto:Ted.Margarit@chartwellcapitalsolutions.com]
**Sent:** Tuesday, May 13, 2014 3:41 PM
**To:** Steve Martin; Bob Socol; MarkFournier; Matthew Hricko; MikePoteracki; Erin Turley; Allison.Wilkerson@klgates.com
**Cc:** baludam@gtlaw.com; AguirreM@gtlaw.com; kimja@gtlaw.com; Greg Fresh; Stephanie Geerdes
**Subject:** Byway Proposal Response

Steve and Team,

Attached for your review and consideration is our response to your proposal last Friday.  Following discussions with our client, we are largely in agreement on the key economic issues, but do want to highlight a few areas:

1. We are willing to reduce the interest rate provided on the seller notes to 2.5% cash / 3.25% accrued (not PIK) in return for a strike price on the warrants and those SARs issued in 2014 of $7.50 per share/unit. However, in doing so, we require language in the warrant agreement and SARs plan document mandating the use of SRR's present valuation methodology in all subsequent periods for use in calculating the fair market value of the SARs and warrants.  Such methodology includes the present value of the tax shield created by all projected contributions to the ESOP.
2. We are willing to accept your proposed limits on current year SAR grants and the performance-orientated nature of grants after 2014.  However, we request that all grants subsequent to 2014 require the achievement of to be agreed upon financial targets that are to be established annually by the Board and Trustee.  An annually discussion allows the Company to reward management team members more fairly and effectively given changes in operational, capex, or capital structure/lending strategies that may or may not be well represented by EBITDA.

Once you've had a chance to review, please let me know if you have any questions.

Thanks,
Ted

**Ted Margarit** | Vice President
Chartwell Capital Solutions | **Corporate Finance** ▪ **Strategic Advisory** ▪ **Valuation Services**
33 South Sixth Street | Suite 4750 | Minneapolis, MN 55402
Direct:  612.230.3126 | Main:  612.230.3100 | Mobile:  952.818.4177
ted.margarit@chartwellcapitalsolutions.com | www.chartwellcapitalsolutions.com

This electronic message contains information from the law firm of K&L Gates LLP.  The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this e-mail in error, please contact me at Erin.Turley@klgates.com.

RTC-RVR 0001292

# Exhibit 22

**K&L GATES LLP**
1717 MAIN STREET
SUITE 2800
DALLAS, TX 75201
T +1 214 939 5500   F +1 214 939 5849   klgates.com

**K&L GATES**

May 27, 2014

WELLS FARGO BANK, NATIONAL ASSOCIATION
100 W. Washington Street, 25th Floor
Phoenix, Arizona 85003

**Re:    RVR, Inc.**

Ladies and Gentlemen:

We have acted as counsel to Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust (the "Trust") which has been established and is maintained pursuant to the RVR Employee Stock Ownership Plan (the "Plan," collectively with the Trust, the "ESOP"), in connection with e Stock Purchase Agreement, of even date herewith (the "Stock Purchase Agreement"), executed by RVR, Eric Bensen, the "Survivor's Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Survivor's Trust"), the "Family Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Family Trust"), the "Marital Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Marital Trust"), Robert Smalley, Jr. ("RSJ"), and Reliance Trust Company, solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust dated June 1, 2013 (the "Trust"), established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time (the "Plan" and, together with the Trust, the "ESOP"), pursuant to which the Trust shall purchase all of the issued and outstanding shares of common stock of the Company (the "Company Stock") from the Sellers. To finance the purchase of the shares of Company Stock from the Sellers (the "ESOP Shares"), the Company will make a loan (the "ESOP Loan") to the Trust in the original principal amount of $104,000,000 pursuant to the terms of that certain ESOP Credit Agreement by and between the Company and the Trust (the "ESOP Credit Agreement") and in exchange for a promissory note ("ESOP Note") issued by the Trust in the favor of the Company in the original principal amount of $104,000,000. The ESOP Loan will be secured by a pledge by the Trust to the Company of the ESOP Shares pursuant to the terms of that certain pledge agreement ("ESOP Pledge Agreement") by and between the Company and the Trust (the ESOP Note, ESOP Pledge Agreement, and this ESOP Credit Agreement collectively, the "ESOP Loan Documents").

All capitalized terms not expressly defined herein and defined in the Stock Purchase Agreement shall have the meanings assigned in the Stock Purchase Agreement. Those actions taken pursuant to the Stock Purchase Agreement and the ESOP Loan Documents shall be referred to as the "Transaction". This Opinion Letter is being delivered to you pursuant to that

DA-3337206 v4

klgates.com

RVR34964

# K&L GATES

Wells Fargo Bank, National Association
Page 2
May 27, 2014

certain loan agreement dated May 27, 2014, entered into between the Company and the Bank (the "Loan"). This Opinion Letter has been prepared and should be understood in accordance with the *Legal Opinion Principles*, 53 Bus.Law. 831 (1998), and *Guidelines for the Preparation of Closing Opinions*, 57 Bus.Law. 875 (2002), of the Committee on Legal Opinions, ABA Section of Business Law.

The following documents are, except as otherwise indicated, all dated of even date hereof, except as otherwise indicated, and, other than the Fairness Opinion and Secretary Certificate (as each is defined below) are referred to collectively in this Opinion Letter as the "Documents":

(1)    Plan;

(2)    Trust;

(3)    Stock Purchase Agreement;

(4)    ESOP Credit Agreement;

(5)    ESOP Pledge Agreement;

(6)    ESOP Note;

(7)    Fairness Opinion rendered by Stout Risius Ross, Inc. to the Trustee with respect to the Transaction of even date hereof ("Fairness Opinion");

(8)    Trustee Certificate dated of even date hereof (the "Trustee Certificate"); and

(9)    Secretary's Certificate (the "Secretary Certificate," together with the Trustee Certificate, the "Subject Certificates") of the Company certifying: (a) the Articles of Incorporation of the Company and as being in full force and effect as of the date hereof; (b) the Bylaws of the Company as being in full force and effect as of the date hereof; (c) the incumbency of officers of the Company, (d) the members of the Board of Directors; and (e) the appointment of the Trustee and the resolutions of the Board of Directors of the Company authorizing: (i) the ESOP Credit Agreement; (ii) the ESOP Pledge Agreement; (iii) the ESOP Note; (iv) the Stock Purchase Agreement and related transactions and agreements; (v) the credit documents associated with the Loan; (vi) the Plan; and (vii) the Trust.

As to any facts that are material to the Opinions hereinafter expressed, we have relied without investigation upon the representations of the Trustee and/or the Company contained in the Documents and upon the Subject Certificates. We have made no factual investigation in connection with this Opinion Letter other than our review of the documents described in the preceding paragraphs of this Opinion Letter.

DA-3337206 v4

RVR34965

# K&L GATES

Wells Fargo Bank, National Association
Page 3
May 27, 2014

For the purposes of this Opinion Letter, we have made assumptions that are customary in opinion letters of this kind, including assumptions that each document submitted to us is accurate and complete, that each such document that is an original is authentic, each such document submitted to us as a copy conforms to an authentic original, that all signatures (other than signatures on behalf of the Trustee) on each document are genuine; and that no changes in the facts certified in the Subject Certificates have occurred or will occur after the date of the Subject Certificates. We have further assumed the legal capacity of natural persons, and we have assumed that each party to each Document (other than the Trustee) has the legal capacity and has satisfied all legal requirements that are applicable to that party to the extent necessary to make that Document enforceable against that party. We have assumed that the Documents have been or will be executed and delivered in the forms provided to us. We have assumed the truth and accuracy of the representations and other statements as to all matters of fact (including factual conclusions and characterizations and descriptions of purpose, intention or other states of mind) set forth in: (i) any certificates of officers of the Trustee and/or the Company delivered in connection with the execution and delivery of the Documents or the consummation of the transactions contemplated by the Documents; (ii) the Documents and (iii) the Fairness Opinion. In addition we have made the following additional assumptions:

a.     The independent financial advisor to the Trustee, Stout Risius Ross, Inc. ("SRR"), is an "independent appraiser," as defined in Section 401(a)(28)(C) of the Code and required under Section 3(18) of ERISA.

b.     With respect to the ESOP: (i) the consideration paid for the shares of Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) the interest rate on the ESOP Loan is not in excess of a reasonable interest rate; (iii) the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties; (iv) the transactions contemplated by the Documents are fair to the ESOP from a financial point of view. Based upon the certificate of the Trustee delivered to us, all of the above assumptions in this paragraph b have been addressed in the Fairness Opinion.

c.     The Trustee has entered into the Documents to which it is a party with the care, skill, prudence and diligence under the circumstances prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims and the Transaction: (i) is in the best interests of the participants and beneficiaries of the Trust and (ii) is for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP.

We have not verified any of the foregoing assumptions.

DA-3337206 v4

RVR34966

# K&L GATES

Wells Fargo Bank, National Association
Page 4
May 27, 2014

The opinions expressed in this opinion letter are limited to the federal law of the United States that in our experience is applicable to transactions of the type contemplated by the Documents. We are not opining on, and we assume no responsibility for, the applicability to or effect on any of the matters covered herein of any other laws, the law of any other jurisdiction (including without limitation, the laws of the State of Arizona, Florida or Georgia), or the law of any county, municipality or other political subdivision or local governmental agency or authority. Except as expressly set forth in this opinion letter, we are also not opining on specialized laws that are not customarily covered in opinion letters of this kind, such as insolvency, antitrust, environmental, intellectual property, banking, insurance, labor, health and safety, and securities laws, provided, however, that this exclusion shall not apply to tax, pension and employee benefit laws. We note that the Documents provide that they are to be governed by and construed in accordance with the law of the State of Arizona. We express no opinion with respect to that provision, and do not provide any opinion as to the applicability of the laws of the State of Arizona on the Documents.

1.      Based solely on the representations made by the Trustee in the Trustee's Certificate, the Trustee has the requisite corporate and trustee power and corporate and trustee authority to execute, deliver, and perform the obligations of the Trust under the Documents to which the Trust is a party,. The and the Trustee has taken all actions as required by the Trust and its role as Trustee necessary to authorize the execution, delivery, and performance by the Trust of the Documents to which it is a party.

2.      The acquisition of the ESOP Shares by the Trust pursuant to the Stock Purchase Agreement is exempt from the prohibited-transaction provisions of Section 406 of ERISA and Section 4975(c) of the Code by virtue of Section 408(e) of ERISA and Section 4975(d)(13) of the Code.

3.      The ESOP Loan Documents qualify for exemption from the prohibited-transaction rules of Section 406 of ERISA and Section 4975(d)(3) of the Code.

4.      The loan to be made by the Company to the Trust pursuant to the ESOP Loan Documents will meet the requirements of Section 4975(d)(3) of the Code and Section 408(b)(3) of ERISA and will constitute an "exempt loan" under the provisions of Treasury Regulations Section 54.4975-7(b) and 29 CFR Section 2550.408(b)-3, if the loan is made on the terms set forth in the ESOP Loan Documents.

5.      The execution, delivery and performance by the Trustee of the Documents (including but not limited to the Trust's borrowings under the ESOP Note and the pledge of the ESOP Shares pursuant to the ESOP Stock Pledge Agreement) on behalf of the Trust and the consummation by the Trustee on behalf of the Trust of the Transactions contemplated thereby are within the Trustee's and the Trust's powers and have been duly authorized by all necessary

DA-3337206 v4

RVR34967

# K&L GATES

Wells Fargo Bank, National Association
Page 5
May 27, 2014

action on the part of the Trustee. We note that the Documents provide that they are to be governed by and construed in accordance with the law of the State of Arizona. We express no opinion with respect to that provision, and as noted above these Opinions are limited to the federal laws of the United States. Based on this assumption, each of the Documents constitute legal, valid and binding obligations of the Trust enforceable against the Trust in accordance with their respective terms; provided, that, in rendering this Opinion:

(a)      we express no opinion as to the enforceability of any rights to contribution or indemnification provided for in the Documents which violate the public policy underlying any applicable law, rule or regulation (including any federal or state securities law, rule or regulation), or which are determined by a court or other tribunal to be in an unreasonable amount or to constitute a penalty;

(b)      we express no opinion with respect to the enforceability of: (i) any provisions of the Documents to the extent that they provide that recovery of attorneys' fees is not limited to reasonable attorneys' fees; (ii) any provisions of the Documents to the extent they state that the provisions of the Documents are severable; (iii) any provisions of the Documents purporting to permit advances of funds for the payment of interest without a party's consent or to pay compound interest or interest on overdue interest; and (iv) any provisions of Documents purporting to constitute an agreement as to the jurisdiction or venue of a particular court, to the waiver of the right to jury trial or to be served with process by service upon a designated third party;

(c)      we express no opinion with respect to: (i) the effect on enforceability of the ordinances and statutes, the administrative decisions and orders and the rules and regulations of any municipality, county or special district or other political subdivision of the State Arizona; (ii) the enforceability of any of the waivers or remedies contained in the Documents, whether or not any of the Documents deems any such waiver or remedy commercially reasonable, if such waivers or remedies are determined not to be commercially reasonable within the meaning of the Uniform Commercial Code as in effect in the State of Arizona; and (iii) certain of the provisions contained in the Documents may be limited or rendered unenforceable by applicable laws or judicial decisions governing such provisions or holding their enforcement to be unreasonable under the then-existing circumstances.

6.      The execution and delivery of each of the Documents to which the Trust is a party, and the performance by the Trust of all of its obligations thereunder, including the borrowings by the Trust under the ESOP Note and the pledge of stock under the Stock Pledge and Security Agreement, have been duly authorized by all necessary action, and the Documents to which the Trust is a party have been duly executed and delivered on behalf of the Trust by the Trustee. We note that the Documents provided that they are to be governed by and construed in accordance with the law of the State of Arizona. We express no opinion with respect to that provision, and as noted above these Opinions are limited to the federal laws of the United States.

DA-3337206 v4

RVR34968

# K&L GATES

Wells Fargo Bank, National Association
Page 6
May 27, 2014

Based on this assumption, each of the Documents constitute legal, valid and binding obligations of the Trust, enforceable in accordance with their respective terms but subject to the same qualifications and limitations set out in (a)-(c) in the immediately preceding numbered paragraph 5.

7.     The execution and delivery by the Trustee of, and performance of the Trustee's agreements under the Documents do not (a) violate the Plan or Trust; (b) breach or result in a default under any existing obligation of the Trust under any agreement to which the Trust is a party or by which it is bound, which agreement is listed on Schedule A hereto; (c) breach or otherwise violate any existing obligation of the Trust under any court order binding on the Trust, which order is listed in Schedule B hereto; or (d) violate any provisions of any law applicable to the Trust or the Trustee.

8.     Based solely on the representations made by the Trustee in the Trustee's Certificate, no governmental or third party approvals, authorizations, licenses or consents are required to be obtained in connection with the execution and delivery of the Documents, or the performance by the parties of their obligations in accordance with the Documents, or the consummation of the Transactions contemplated thereby.

The Opinions rendered in this Opinion Letter: (i) are given as of the date hereof; (ii) are necessarily limited to laws now in effect; and (iii) are not intended to cover laws, facts or circumstances in existence as of any other date. We disclaim any undertaking to revise or supplement the Opinions rendered in this Opinion Letter or to advise you of any change in the law, whether by legislative or regulatory action, judicial interpretation or otherwise, or of any change of facts as they presently exist or that may subsequently be brought to our attention.

This Opinion Letter is not, without the written consent of this firm, to be quoted or otherwise referred to in any document or filed with any entity, person or governmental agency, or relied upon by any entity, person or governmental agency, other than the addressees; provided that notwithstanding anything to the contrary, you may disclose this Opinion Letter to (i) successors and assigns of the addressee hereof who acquire all of your rights under the Loan in good faith and for value; (ii) the regulatory entities having jurisdiction over any of such parties; and (iii) pursuant to valid legal process, in each case without our prior consent. Nothing in the preceding sentence, however, shall give any person any greater rights with respect to this Opinion Letter than yours as of the date hereof or shall provide or imply any Opinion being given with respect to an assignee that depends on the identity or characteristics of the named assignee or other circumstances of the original Opinion Letter. This Opinion Letter has been rendered to you solely in connection with the Transaction, and may not be relied upon for any other purpose and shall not be relied upon by any other person for any purpose.

We also advise you that as of date of this Opinion Letter we were not engaged by the Trustee to give substantive attention in the form of legal consultation or representation, to any

DA-3337206 v4

RVR34969

# K&L GATES

Wells Fargo Bank, National Association
Page 7
May 27, 2014

action or proceeding pending before any court, governmental agency, or arbitrator, or overtly threatened in writing, against the Trust or the ESOP that seeks to enjoin the performance or affect the enforceability of the Stock Purchase Agreement or the consummation of the transactions thereunder.

Our Opinion in numbered paragraph 1 above is subject to the effect of bankruptcy, receivership, rehabilitation, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of the rights and remedies of creditors and secured parties generally (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Our Opinions are also subject to (a) the effect of general rules of contract law limiting the recovery of damages to the extent the aggrieved party could have avoided damages by reasonable effort and (b) the context rule of interpretation of contracts under the laws of the State of Arizona. Under such context rule of interpretation of contracts, even though terms of a contract may be ambiguous, courts will admit extrinsic evidence to interpret the contract. Our Opinions are subject to general principles of equity (regardless of whether considered in a proceeding in equity or at law) and the exercise of equitable powers by a court of competent jurisdiction (and no Opinion is expressed herein as to any specific or equitable relief of any kind or as to the availability of equitable remedies). Our Opinions are subject to applicable state and Federal laws that limit the enforceability of certain types of contracts or provisions thereof, or relating to fraudulent conveyances.

The Opinions rendered in this Opinion Letter should not be construed to provide any opinion regarding the validity, binding effect or enforceability of: (i) provisions to the effect that failure to exercise, or delay in exercising, rights or remedies will not operate as a waiver of any such right or remedy; or (ii) disclaimers, liability limitations with respect to third parties, releases, legal or equitable discharge of defenses, liquidated damages provisions, provisions purporting to waive the benefit of statutory or common law rights, provisions which purport to establish evidentiary standards, provisions regarding choice of law or provisions releasing a party from, or indemnifying a party against, liability for its own wrongful or grossly negligent acts.

The Opinions set forth above are also subject to the following qualifications: (a) insofar as provisions contained in the Documents provide for indemnification or a limitation of liability, the enforceability thereof may be limited by public policy considerations; (b) the availability of a decree for specific performance or an injunction is subject to the discretion of the court requested to issue any such decree or injunction; (c) we express no opinion herein as to subject matter jurisdiction of the Arizona or Federal courts to adjudicate any controversy related to the Documents or any waiver of an improper or inconvenient venue or forum; (d) we express no opinion with respect to the enforceability of any provision of any of the Documents that purports to waive or modify a party's obligation of good faith, fair dealing, diligence, reasonableness, or due notice, to waive equitable rights or remedies or to preclude modification thereof through

DA-3337206 v4

RVR34970

# K&L GATES

Wells Fargo Bank, National Association
Page 8
May 27, 2014

custom or course of conduct;  (e) we express no opinion with respect to limitations on the enforceability of a requirement that provisions of a document may only be amended or waived in writing; and (f) we express no opinion on the status of any shares of capital stock of the Company, other than the ESOP Shares.

We are furnishing this Opinion Letter solely for the benefit of the Bank in connection with the transactions consummated on the date hereof pursuant to the Stock Purchase Agreement.  You may not rely on this Opinion Letter in any other connection without our specific prior written consent.  This Opinion Letter may not be relied upon in any manner by any other person and may not be disclosed, quoted, filed with a governmental agency or otherwise referred to without our prior written consent.

The foregoing Opinions are rendered as of the date of this letter.  We assume no obligation to update or supplement any of such Opinions to reflect any changes of law or fact that may occur.

### IRS Circular 230 Disclosure

To ensure compliance with the requirements imposed by the Internal Revenue Service, we inform you that any U.S. federal tax advice contained herein does not deal with a taxpayer's particular circumstances.  Further, it was not written in support of the promotion, marketing or recommending of the transaction or matter described herein.  This Opinion Letter was not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code.  Taxpayers should consult their own tax advisors regarding the tax consequences to them of their own particular circumstances.

Very truly yours,

K&L Gates LLP

DA-3337206 v4

RVR34971

# K&L GATES

Wells Fargo Bank, National Association
Page 9
May 27, 2014

Schedule A

None

DA-3337206 v4

RVR34972

# K&L GATES

Wells Fargo Bank, National Association
Page 10
May 27, 2014

Schedule B

None

DA-3337206 v4

RVR34973

# Exhibit 23

DOL 0085485

| | |
|---|---|
| **From:** | Steve Martin </O=RELICO/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=STEVE MARTINB8A> |
| **To:** | Greg Fresh |
| **Sent:** | 5/23/2014 1:35:03 PM |
| **Subject:** | RE: contracts |

We will likely get a tentative approval today as the Legal due diligence memo was just received late last night and we have not had time to review before the committee meeting shortly.   So we probably will have some further discussion on that part today and through the weekend I imagine.  So just so you are prepared we probably get a tentative approval subject to further legal discussion.  This is all about their comp plan issues with respect to trying to block the sale of the company.  If the company has a blocking right then the ESOP should not pay control according  to the DOL and Bob also raised this point.  So I will follow up with more later.  Thanks.

---

**From:** Greg Fresh [mailto:Greg.Fresh@chartwellcapitalsolutions.com]
**Sent:** Friday, May 23, 2014 7:39 AM
**To:** Steve Martin
**Subject:** Re: contracts

Thank you Steve-

Appreciate your willingness to get us there on this client important issue.

Please call when you have committee approval to proceed.

Regards,

Greg

Sent from my iPhone, apologies for any unintended typos and the like. If you wish connect live, please dial me at 1 312 550 7524. Thank you.

On May 22, 2014, at 11:00 PM, "Steve Martin" <smartin@relico.com> wrote:

I agree.  That is what I thought.

Stephen A Martin
Reliance Trust Company
1100 Abernathy Road, Suite 400
Atlanta, Ga. 30328
Phone - 678-274-1785 Cell 404-226-6599

On May 22, 2014, at 11:39 PM, "Greg Fresh" <Greg.Fresh@chartwellcapitalsolutions.com> wrote:

Thank for the update.

In speaking with Marc moments ago, apparently the issue has been resolved and Allison and Erin agree with Marc's solution.

Please let me know if you have a different understanding.

Thanks,

Greg

Sent from my iPhone, apologies for any unintended typos and the like. If you wish connect live, please dial me at 1

**EXHIBIT**

PI 36 – (G. Fresh 02/16/21)

exhibitsticker.com

DOL 0085486

312 550 7524. Thank you.

On May 22, 2014, at 5:55 PM, "Steve Martin" <smartin@relico.com> wrote:

Greg their concern that we would sell the company without their support and decision is simply ridiculous. I spoke to Allison so I understand she and Marc may have a solution. But their position was one that would put u all in hot water with the DOL. And if counsel does not support a position you likely can't get committee sign off without counsel assurance the position taken is supportable. We are working hard to find a position both sides can live with but the client is being unreasonable and even their lawyers agree with that. Allison is talking to Marc now and hopefully we have this resolved shortly. Thanks pal. Keep the faith.

Stephen A Martin
Reliance Trust Company
1100 Abernathy Road, Suite 400
Atlanta, Ga. 30328
Phone - 678-274-1785 Cell 404-226-6599

On May 22, 2014, at 1:48 PM, "Greg Fresh" <Greg.Fresh@chartwellcapitalsolutions.com> wrote:

Please call me. Thx.

Sent from my iPhone, apologies for any unintended typos and the like. If you wish connect live, please dial me at 1 312 550 7524. Thank you.

Begin forwarded message:

**From:** Eric Bensen <EBensen@CruiseAmerica.com>
**Date:** May 22, 2014 at 11:34:39 AM PDT
**To:** "Greg Fresh (Greg.Fresh@chartwellcapitalsolutions.com)" <Greg.Fresh@chartwellcapitalsolutions.com>
**Subject: contracts**

Greg,
They are pushing back on the change of control provisions again.
I thought this was settled yesterday.
Eric

CONFIDENTIAL    RTC-RVR 0002486

# Exhibit 24

**From:**      Steve Martin </O=RELICO/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=STEVE MARTINB8A>
**To:**        Ted Margarit
**Sent:**      5/23/2014 11:06:59 PM
**Subject:**   Eric

I need your help in keeping Eric from continuing to come back to the plate to bat again and again on the comp issues.    He is going to blow this deal if he keeps it up.    They have gotten almost everything they asked for so far and to keep at the comp plan is only creating heartburn which  I rarely get over transactions.    I still believe at the end of the day when this deal is audited by DOL, they will be required to modify some of these provisions or risk an action.    Pigs get fat and Hogs get slaughtered.  I know you have heard that before.  Have a good holiday.

**EXHIBIT**

**PI 52 – (T. Margarit 02/18/21)**

CONFIDENTIAL

RTC-RVR 0012944

# Exhibit 25

Execution Version

# STOCK PURCHASE AGREEMENT

## among

### RVR EMPLOYEE STOCK OWNERSHIP TRUST
as the Buyer

RVR, INC.
as the Company

and

ROBERT SMALLEY, JR.,
ERIC BENSEN,
and
the FAMILY TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004,
the MARITAL TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004,
and
the SURVIVOR'S TRUST CREATED UNDER THE SMALLEY REVOCABLE TRUST DATED JULY 8, 2004
as the Selling Stockholders

MAY 28, 2014

**EXHIBIT**

PI 53 – (K. Wright 03/25/21)

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000568

DOL 0010165

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS**................................................................................................................... 2
    Section 1.1    Definitions.................................................................................................... 2

**ARTICLE II PURCHASE AND SALE**.................................................................................................. 6
    Section 2.1    Agreement to Purchase and Sell................................................................. 6
    Section 2.2    Purchase Price ............................................................................................ 7
    Section 2.3    Payment of the Purchase Price.................................................................... 7
    Section 2.4    Time and Place of Closing .......................................................................... 7

**ARTICLE III REPRESENTATIONS AND WARRANTIES** .................................................................. 7
    Section 3.1    General Statement ...................................................................................... 7
    Section 3.2    Representations and Warranties of the Selling Stockholders....................... 7
    Section 3.3    Representations and Warranties of the Company ........................................ 8
    Section 3.4    Representations and Warranties of the ESOP............................................ 18

**ARTICLE IV CLOSING**....................................................................................................................20
    Section 4.1    Conditions to Closing; Form of Documents................................................. 20
    Section 4.2    Conditions to Obligations of the Selling Stockholders................................. 20
    Section 4.3    Conditions to Obligations of the Company .................................................. 20
    Section 4.4    Conditions to Obligations of the ESOP ...................................................... 21
    Section 4.5    Closing Deliveries...................................................................................... 21

**ARTICLE V POST-CLOSING COVENANTS** .................................................................................. 22
    Section 5.1    Maintenance of the ESOP's Tax Qualified Status....................................... 22
    Section 5.2    Reporting and Disclosure ........................................................................... 22
    Section 5.3    Insurance................................................................................................... 22
    Section 5.4    Taxes........................................................................................................ 23
    Section 5.5    Charter Protections.................................................................................... 23
    Section 5.6    No Avoidance of Claims ............................................................................. 23
    Section 5.7    General...................................................................................................... 23
    Section 5.8    Notification of Governmental Audit.............................................................. 23
    Section 5.9    Corporate Governance and ESOP Loan...................................................... 23
    Section 5.10    Section 1042 Election................................................................................. 24

**ARTICLE VI INDEMNIFICATION**.................................................................................................... 24
    Section 6.1    Indemnification Obligations ........................................................................ 24
    Section 6.2    Claims....................................................................................................... 25
    Section 6.3    Limitation on Rights to Indemnification ....................................................... 26
    Section 6.4    Survival..................................................................................................... 27
    Section 6.5    Setoff ........................................................................................................ 27
    Section 6.6    Insurance................................................................................................... 27
    Section 6.7    Tax Benefits............................................................................................... 28
    Section 6.8    No Right of Contribution ............................................................................. 28

**ARTICLE VII MISCELLANEOUS**.................................................................................................... 28
    Section 7.1    Expenses................................................................................................... 28
    Section 7.2    Notices...................................................................................................... 28
    Section 7.3    Successors and Assigns ............................................................................ 29
    Section 7.4    Action Taken as Trustee ............................................................................ 29
    Section 7.5    Entire Agreement; Amendment................................................................... 30
    Section 7.6    Waiver, Discharge, etc ............................................................................... 30
    Section 7.7    Governing Law .......................................................................................... 30
    Section 7.8    Jurisdiction; Waiver of Jury Trial ................................................................ 30
    Section 7.9    Counterparts; Facsimile Signature.............................................................. 30
    Section 7.10    Severability............................................................................................... 30

i

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000569

Section 7.11   Headings; General Interpretive Principles.................................................................. 30
Section 7.12   Further Assurances ....................................................................................................... 31
Section 7.13   Consent of Spouse......................................................................................................... 31

Schedule I – Schedule of Selling Stockholders and Allocation of Purchase Price
Exhibit A – Form of Employment Contract
Exhibit B – Investor Rights Agreement
Exhibit C – Subordinated Note and Warrant Purchase Agreement
Exhibit D – Spousal Consent

ii

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000570

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is dated as of May 28, 2014, and is made by and among  Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust, as amended from time to time (the "Trust"), established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time (the "Plan" and, together with the Trust, the "ESOP"), RVR, Inc., a Florida corporation (the "Company"), and the Family Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Family Trust"), the Marital Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Marital Trust"), the Survivor's Trust created under the Smalley Revocable Trust dated July 8, 2004 (the "Survivor's Trust" and, collectively with the Family Trust and the Marital Trust, the "Smalley Trusts"), Robert Smalley, Jr. and Eric Bensen (collectively, the "Selling Stockholders").

## RECITALS

WHEREAS, the Selling Stockholders collectively own an aggregate of 1,000,000 shares of the Company's common stock, par value $0.001 per share (the "Common Stock"), which constitutes all of the issued and outstanding capital stock of the Company (collectively, the "Shares");

WHEREAS, the ESOP desires to purchase, and the Selling Stockholders desire to sell, all of the Shares held by the Selling Stockholders (the "ESOP Transaction");

WHEREAS, to finance the ESOP Transaction, in addition to cash on hand, the Company has obtained the following financing under terms and conditions acceptable to the Company and Wells Fargo Bank, N.A., as the senior lender (the "Senior Lender"): (a) that certain senior revolving line of credit in the maximum amount of $75,000,000 pursuant to a revolving loan agreement (the "Senior Credit Facility"); and (b) that certain bridge loan in the amount of $87,000,000 pursuant to a bridge loan note (the "Bridge Loan" and, together with the Senior Credit Facility, the "Bank Loans");

WHEREAS, the Company will utilize a majority of the proceeds of the Bank Loans to make a loan to the ESOP in the amount of $104,401,014.94 (the "ESOP Loan") for the ESOP's purchase of a certain portion of the Shares from the Selling Stockholders (the "Financed Shares"), evidenced by a non-recourse promissory note issued by the ESOP in the favor of the Company in the amount $104,401,014.94 (the "ESOP Note"), which obligations under the ESOP Note shall be secured by a pledge of the Financed Shares pursuant to a loan and pledge agreement by and between the Company and the ESOP dated as of the date hereof (the "ESOP Loan and Pledge Agreement" and, collectively with the ESOP Note, the "ESOP Loan Documents");

WHEREAS, the ESOP will use a contribution made by the Company to the ESOP in the amount of $598,985.06 (the "Contribution") to purchase the remaining Shares from the Selling Stockholders pursuant to this Agreement; and

WHEREAS, the Trust has received an opinion from its independent financial advisor reflecting that:  (i) the consideration paid for the shares of Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) the interest rate on the ESOP Loan is not in excess of a reasonable interest rate; (iii) the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties; (iv) the exercise price of the Warrants issued to the Selling Stockholders is at least equal to ninety percent (90%) of the fair market value at the time of issuance of one share of Common Stock; (iii) the interest rate on the Seller Notes is not in excess of a reasonable rate of interest; and (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view.

1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000571

DOL 0010168

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements and representations contained in this Agreement, the ESOP, the Selling Stockholders and the Company agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     Definitions.  As used in this Agreement, the terms below have the meanings set forth in this Article.  Any of such terms, unless the context otherwise requires, may be used in the singular or plural.

"Agreement" shall have the meaning set forth in the first paragraph of this Agreement.

"Affiliate" shall mean, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition, the terms "controls," "is controlled by" and "under common control with" mean possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and, in the case of Robert Smalley, Jr. and Eric Bensen, in their individual capacities, and in the case of the Smalley Trusts, in their trustee's capacity.

"Audited Financial Statements" shall have the meaning set forth in Section 3.3(e).

"Bank Loans" shall have the meaning set forth in the recitals to this Agreement.

"Benefit Plan" shall mean any bonus, severance, change in control, deferred compensation, hospitalization, or other medical, stock option, stock purchase, pension, life or other insurance, profit-sharing or retirement plan, program, policy, or arrangement and each other employee benefit plan, program, policy, or arrangement of the RVR Companies with respect to which any of the RVR Companies reasonably expects to incur any direct or indirect material liability, whether contingent or otherwise.

"Blue Sky Laws" shall have the meaning set forth in Section 3.4(i).

"Bridge Loan" shall have the meaning set forth in the recitals to this Agreement.

"Closing" shall mean the actual transfer of the Shares and payment of the Purchase Price therefor, as set forth in Section 2.3 and in accordance with this Agreement.

"Closing Date" shall have the meaning set forth in Section 2.4.

"Closing Payment" shall have the meaning set forth in Section 2.3.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Stock" shall have the meaning set forth in the recitals to this Agreement.

"Company" shall have the meaning set forth in the first paragraph of this Agreement.

"Contribution" shall have the meaning set forth in the recitals to this Agreement.

"Damages" shall mean all demands, claims, actions or causes of action, assessments, losses, actual damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense or investigation of any claim, but excluding punitive, exemplary, consequential, incidental, special, or similar losses or damages.

2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000572

"Disclosure Schedule" shall have the meaning set forth in Section 3.1.

"Employment and Labor Laws" shall mean any federal, state or local laws, statutes, regulations, ordinances, rules, standards or common law, or any judgment, order, writ, notice, decree, permit, license, approval or injunction relating to employment, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health and plant closing, including, without limitation, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act of 1967, Title II of the Civil Rights Act of 1964, the Equal Pay Act, the Americans with Disabilities Act, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993 and their applicable state law counterparts, each as they have been amended from time to time.

"Employment Contracts" shall mean employment contracts for each of Randall Smalley, Robert Smalley, Jr. and Eric Bensen, in substantially the forms attached hereto as Exhibit A.

"Encumbrance" shall mean any claim, demand, lien, pledge, option, encumbrance, defect in title, security interest, voting, trust or proxy agreement, restriction on transfer or use, tax, warrant, purchase right, right of first refusal, preemptive right, commitment, contract or other restriction in law or in equity, whether arising voluntarily or by operation of law, including any agreement to provide for any of the foregoing in the future.

"Environment" shall mean any environmental medium, including soil, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, land, stream sediments, land surface or subsurface strata and ambient air.

"Environmental Laws" shall mean any laws, statutes, regulations, ordinances, rules or common law and standards, or any judgment, order, writ, notice, decree, permit, license, approval or injunction relating to pollution or protection of human health or the Environment and including, without limitation, the Release of Hazardous Substances into the Environment, as well as the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, Releases or threatened Releases of pollutants, contaminants or chemical, industrial, hazardous or toxic materials or hazardous wastes into the Environment as well as, without limitation, the Clean Air Act, the Toxic Substance Control Act, the Clean Water Act, the Oil Pollution Act of 1990, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act and the Occupational Safety and Health Act of 1970, and their applicable state law counterparts, each as they have been amended from time to time.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ESOP" shall have the meaning set forth in the first paragraph of this Agreement.

"ESOP Indemnified Parties" shall have the meaning set forth in Section 6.1(a).

"ESOP Loan" shall have the meaning set forth in the recitals to this Agreement.

"ESOP Loan and Pledge Agreement" shall have the meaning set forth in the recitals to this Agreement.

"ESOP Loan Documents" shall have the meaning set forth in the recitals to this Agreement.

"ESOP Note" shall have the meaning set forth in the recitals to this Agreement.

"ESOP Transaction" shall have the meaning set forth in the recitals to this Agreement.

3

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000573

"Fairness Opinion" shall mean a written opinion from the Independent Financial Advisor, dated as of the Closing Date, to the effect that: (i) the consideration paid for the shares of Common Stock under the terms of this Agreement is not greater than the fair market value of such shares as such term is used in determining adequate consideration pursuant to Section 3(18) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) the interest rate on the ESOP Loan is not in excess of a reasonable interest rate; (iii) the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties; (iv) the exercise price of the Warrants issued to the Selling Stockholders is at least equal to ninety percent (90%) of the fair market value at the time of issuance of one share of Common Stock; (iii) the interest rate on the Seller Notes is not in excess of a reasonable rate of interest; and (vi) the terms and conditions of the transactions contemplated by the Transaction Documents, taken as a whole, are fair to the ESOP from a financial point of view.

"Financed Shares" shall have the meaning set forth in the recitals to this Agreement.

"Financial Statements" shall mean collectively, the Audited Financial Statements and the Interim Financial Statements.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" shall mean any federal, state, local, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Government Contract" shall mean any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, pricing agreement, letter contract, contract awarded under the Federal Supply Schedule program, purchase order, task order or delivery order or other contract or similar arrangement of any kind, and all amendments, modifications or supplements thereto, between the Company or any of its Subsidiaries and (a) any Governmental Authority, (b) any prime contractor of a Governmental Authority in its capacity as a prime contractor, or (c) any subcontractor (or lower tier subcontractor) with respect to any contract of a type described in clauses (a) or (b) above.

"Hazardous Substances" shall mean any substances defined, regulated or listed as hazardous, dangerous or toxic, or potentially hazardous, dangerous or toxic, or defined as hazardous waste, pollutants or contaminants under the Environmental Laws, including, without limitation, any substance within the meaning of §101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601, et seq., as amended, or defined or listed as "hazardous waste," "hazardous substances," "hazardous materials," "toxic substances," "oil," "contaminant" or "pollutant" under any other Environmental Laws.

"Indemnifying Stockholders" shall have the meaning set forth in Section 6.1(b).

"Independent Financial Advisor" shall mean Stout Risius Ross, Inc. or such other independent financial advisor as the ESOP may engage.

"Interim Financial Statements" shall have the meaning set forth in Section 3.3(e).

"Investor Rights Agreement" shall mean the Investor Rights Agreement, dated as of even date herewith, among the Company, the ESOP and certain of the Selling Stockholders, the form of which is attached hereto as Exhibit B.

"Key Employees" shall mean Randall Smalley, Robert Smalley, Jr. and Eric Bensen.

4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000574

"Knowledge" shall mean actual knowledge, after reasonable inquiry, with respect to the matter or matters as to which the word "Knowledge" is used in this Agreement. "Knowledge" as to the Company shall mean the actual knowledge, after reasonable inquiry, of any of the Key Employees with respect to the matter in question.

"Laws" shall mean any federal, state, local, municipal, foreign, international, multinational or other administrative order, constitution, law, ordinance, principle of common law, regulation, rule, statute or treaty.

"Leased Real Property" shall have the meaning set forth in Section 3.3(g).

"Licenses and Permits" shall mean material licenses, permits, franchises, authorizations, registrations, approvals and certificates of occupancy (or their equivalent) issued or granted to the Company or its Subsidiaries with respect to its business (by the government of the United States or of any state, city, municipality, county or town thereof, or of any foreign jurisdiction, or any department, agency, board division, subdivision, audit group or procuring office, commission, bureau or instrumentality of any of the foregoing) and all pending applications therefor.

"Material Adverse Effect" shall mean any change, circumstance, fact, event, condition or effect that is, or would reasonably be expected to result in a change adverse to the business, prospects, financial condition, assets or results of operations of the Company and its Subsidiaries, taken as a whole, in excess of $1,500,000; provided, however, that none of the following events, either alone or in combination, will be considered a Material Adverse Effect: (a) any change, circumstance, fact, effect, event or condition impacting the economy in general, or (b) any change, circumstance, fact, effect, event or condition impacting the industry in which the Company operates (so long as, in each case, the Company is not disproportionately affected by such effect, event or condition as compared to industry peers).

"Material Contract" shall have the meaning set forth in Section 3.3(f).

"Owned Real Property" shall have the meaning set forth in Section 3.3(g).

"Person" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization of any kind or character, including a governmental department, authority or agency or subdivision thereof.

"Purchase Price" shall have the meaning set forth in Section 2.2.

"Release" shall mean the release, deposit, discharge, emissions, leaking, spilling, seeping, migrating, injection, pumping, pouring, emptying, escaping, dumping, disposing or other movement of any Hazardous Substance into the Environment.

"Required Consents" shall have the meaning set forth in Section 3.3(d).

"RVR Companies" shall mean the Company and its Subsidiaries.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Seller Indebtedness" means all current indebtedness, evidenced by those certain Non-Negotiable Junior Unsecured Subordinated Promissory Notes, held by each of Robert Smalley, Jr., Randall Smalley and Eric Bensen, and that certain Promissory Note, held by Eric Bensen, to the Company or any of its Subsidiaries.

5

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000575

"Seller Indemnified Parties" shall have the meaning set forth in Section 6.1(c).

"Seller Notes" shall mean those certain notes issued by the Company pursuant to that certain Subordinated Note and Warrant Purchase Agreement to each of the Family Trust, in the principal amount of $20,055,000, the Marital Trust, in the principal amount of $3,570,000, the Survivor's Trust, in the principal amount of $24,315,000, and Robert Smalley, Jr., in the principal amount of $47,940,000.

"Selling Stockholders" shall have the meaning set forth in the first paragraph of this Agreement.

"Senior Credit Facility" shall have the meaning set forth in the recitals to this Agreement.

"Senior Lender" shall have the meaning set forth in the recitals to this Agreement.

"Shares" shall have the meaning set forth in the recitals to this Agreement.

"Subordinated Note and Warrant Purchase Agreement" shall mean the Subordinated Note and Warrant Purchase Agreement, dated as of even date herewith, among the Company and certain of the Selling Stockholders, the form of which is attached hereto as Exhibit C.

"Subsidiary" and "Subsidiaries" shall mean Cruise America, Inc., a Florida corporation, Cruise Canada, Inc., a corporation organized under the laws of British Columbia, Canada, and American Land Cruisers of California, Incorporated, a California corporation.

"Tax" or "Taxes" shall mean all taxes or other similar assessments or liabilities in the nature of a tax, including income, gross receipts, ad valorem, premium, value-added, excise, real property, personal property, sales, use, services, transfer, withholding, employment, payroll, franchise, escheat and fringe benefits taxes or other taxes of any kind or sort imposed by the United States of America or any state, local or foreign government, or any agency thereof, or other political subdivision thereof, and any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax or any contest or dispute thereof.

"Tax Returns" shall mean all reports, returns or similar statements required to be filed with any Tax authority in connection with Taxes, including any claim, refund or amendment thereof.

"Transaction Documents" shall mean this Agreement, the Bank Loans, the ESOP Loan Documents, the Seller Notes, the Warrants, the Subordinated Note and Warrant Purchase Agreement and the Investor Rights Agreement and all other documents or instruments executed by the parties thereto in connection with any of the foregoing.

"Trust" shall have the meaning set forth in the first paragraph of this Agreement.

"Trustee" shall mean Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee of the ESOP, and any other successor trustee as may be duly appointed and acting under the ESOP.

"Warrants" shall mean those warrants to purchase an aggregate of 666,667 shares of Common Stock of the Company, issued by the Company to certain Warrant holders pursuant to the Subordinated Note and Warrant Purchase Agreement.

**ARTICLE II**
**PURCHASE AND SALE**

Section 2.1    Agreement to Purchase and Sell.  Upon the terms contained herein and subject to the conditions set forth herein, on the Closing Date, each of the Selling Stockholders will severally sell

6

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000576

and transfer to the Trustee, on behalf of the Trust, and the Trustee, on behalf of the Trust, will purchase from each of the Selling Stockholders, such Selling Stockholders' respective Shares.

Section 2.2    Purchase Price. As payment in full for the Shares being acquired by the Trust hereunder, the Trust shall pay, in the manner set forth in Section 2.3 hereof, the aggregate purchase price of $105,000,000 in cash (the "Purchase Price").

Section 2.3    Payment of the Purchase Price. At the Closing, the ESOP shall deliver to the account or accounts designated in writing by the Selling Stockholders at least two (2) Business Days prior to the Closing Date, an amount equal to the Purchase Price, in accordance with the allocation as set forth on Schedule I attached hereto (the "Closing Payment").

Section 2.4    Time and Place of Closing. The transactions contemplated by this Agreement shall be consummated (the "Closing") at the offices of Greenberg Traurig, LLP, 2375 E. Camelback Road, Suite 700, Phoenix, Arizona 85016, on May 28, 2014 or on such other date (the "Closing Date") or at such other place as shall be mutually agreed upon by the parties.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1    General Statement. All representations and warranties contained in Article III are made subject to the exceptions noted in the disclosure schedule attached hereto (the "Disclosure Schedule"). The Disclosure Schedule shall be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Agreement to which each such exception expressly applies. Any exception or qualification set forth in the Disclosure Schedule with respect to a particular representation or warranty contained in Article III of this Agreement shall be deemed to be an exception or qualification with respect to all other applicable representations and warranties contained in Article III of this Agreement to which such exception or qualification is reasonably apparent on its face to be applicable, whether or not such exception or qualification is so numbered.

Section 3.2    Representations and Warranties of the Selling Stockholders. Each Selling Stockholder for himself or itself only, severally and not jointly, represents and warrants to the ESOP that, except as set forth in the Disclosure Schedule:

(a)    Enforceability. This Agreement has been duly executed and delivered by such Selling Stockholder and constitutes such Selling Stockholder's legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity. Except as previously obtained, such Selling Stockholder does not need to give any notice to, make any filing with or obtain any authorization, consent or approval of any court, Governmental Authority or third person in order to consummate the transactions contemplated by this Agreement.

(b)    No Conflicts. The sale of Shares held by such Selling Stockholder hereunder will not (i) violate any Laws or other restriction of any Governmental Authority or court or arbitrator to which such Selling Stockholder is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material agreement, contract, lease, license, instrument or other arrangement to which such Selling Stockholder is a party or by which such Selling Stockholder is bound or to which the Shares are subject.

(c)    Ownership of Shares. Such Selling Stockholder is the record owner of the Shares to be sold by such Selling Stockholder and holds such Shares free and clear of any Encumbrances. Except for this Agreement, such Selling Stockholder is not a party to any option, warrant,

7

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000577

DOL 0010174

purchase right or other contract or commitment that could require such Selling Stockholder to sell, transfer, pledge or otherwise dispose of his or its Shares or any other capital stock of the Company.

(d)     Capacity.  Such Selling Stockholder has full legal power, right, capacity and authority and all authorizations and approvals required by Law to enter into and perform this Agreement and the other Transaction Documents and to sell, transfer and deliver good and valid title to such Selling Stockholder's Shares free and clear of any Encumbrances in accordance with the terms of this Agreement.

(e)     Title.  Upon consummation of the transactions contemplated by this Agreement and in accordance with the terms hereof, such Selling Stockholder will convey to the Trust, and the Trust will acquire good and valid title to the Shares to be sold hereunder by such Selling Stockholder free and clear of all Encumbrances, except for beneficial interests accruing to ESOP participants and beneficiaries.

(f)     No Commission.   No broker, finder or investment banker or other Person has been paid or is directly or indirectly entitled to any brokerage, finder's or other contingent fee or commission or any similar charge in connection with the transactions contemplated by this Agreement.

(g)     Permitted Consideration.  Such Selling Stockholder has not received, and will not receive for the transactions contemplated herein, any consideration of the type described in ERISA section 406(b)(3) or Code section 4975(c)(1)(F), except consideration expressly permitted to be received by ERISA section 408(c)(2) and Code section 4975(d)(10).

(h)     Community Property.  If any of the Shares are owned as community property with a spouse, the sale of such Shares under this Agreement shall include the Selling Stockholder's interest and the community property interest of such Selling Stockholder's spouse and such spouse shall join in this Agreement, as evidenced by her signature hereto, to acknowledge his or her consent to this Agreement and to the sale of any community property interest such Shares.

Section 3.3     Representations and Warranties of the Company.  For purposes of this Section 3.3, except where context dictates otherwise, all representations and warranties of the Company are representations and warranties of the Company and each of its Subsidiaries. The Company represents and warrants to the ESOP that, except as set forth in the Disclosure Schedule, the following representations are true and correct:

(a)     Organization.  The Company and each of its Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the state or other jurisdiction of its incorporation.  The Company and each of its Subsidiaries is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the failure to so qualify would not have a Material Adverse Effect. The Company and each of its Subsidiaries has full corporate power and authority and all material Licenses and Permits necessary to carry on the businesses in which it is engaged.  The Company and each of its Subsidiaries has delivered to the Trustee or its legal and/or Independent Financial Advisor copies of the charter and all amendments thereto, together with copies of the bylaws of the Company and each of its Subsidiaries and all amendments thereto. Neither the Company nor any of its Subsidiaries are in material default under or in violation of any provision of its charter or its bylaws.

(b)     Capitalization.

(i)     The Company has an authorized capitalization consisting of 10,000,000 shares of Common Stock, 1,000,000 of which are issued and outstanding. The Selling Stockholders are the owners of all of the Shares.  The Shares have been duly authorized and are validly issued, fully paid, nonassessable and free of preemptive rights or other rights to acquire any shares of the capital stock of the Company. The Disclosure Schedule lists all outstanding or authorized options, securities and other obligations, if any, that are convertible into shares of capital stock of the Company, warrants, purchase

8

ARGENT_0000578

rights, preemptive rights, rights of first refusal, subscription rights, conversion rights, exchange rights, take-along or co-sale rights, or other contracts or commitments that could require the Company to issue, sell or purchase any of its capital stock. There are no voting trusts, side agreements, proxies, shareholders agreements, buy-sell or similar agreements or other agreements or understandings with respect to the voting of the capital stock of the Company.

(ii)     The Company directly or indirectly owns all of the outstanding securities of the Subsidiaries set forth in the Disclosure Schedule.  Except with respect to its Subsidiaries, the Company does not control, directly or indirectly, or have any direct or indirect equity participation in, any other limited liability company, corporation, partnership, trust or other business association.

(c)     Enforceability.  The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by the Company, and this Agreement constitutes a legal, valid and binding obligation of the Company, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(d)     No Conflicts.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) conflict with or violate any provision of the organizational documents of the Company or its Subsidiaries, (ii) violate any Law, or other restriction of any Governmental Authority or court or arbitrator to which the Company or its Subsidiaries or any of their properties or assets are subject or any provision of their respective governing documents, (iii) conflict with, or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material agreement, contract, lease, license, instrument or other arrangement to which the Company or its Subsidiaries is a party or by which it is bound or to which any of their assets are subject (or result in the imposition of any security interest upon any of its assets), other than any documents as are contemplated by the Bank Loans, or (iv) result in the creation of a lien on any properties or assets of the Company or its Subsidiaries other than such Encumbrances as are contemplated by this Agreement and the ESOP Loan Documents, or the Bank Loans.  Except as previously obtained, neither the Company nor its Subsidiaries is required to give notice to, make any filing with or obtain any authorization, consent or approval of any Governmental Authority or, with respect to any Material Contract, any third party for the parties to consummate the transactions contemplated by this Agreement or the other Transaction Documents. Such notices, filings, authorizations, consents, or approvals are to be referred to as the "Required Consents."

(e)     Financial Information.

(i)     The consolidated audited financial statements of the RVR Companies for the years ended December 31, 2011, 2012 and 2013 (the "Audited Financial Statements") provided by the Company to the Independent Financial Advisor have been prepared on a consistent basis and present fairly in all material respects (A) the financial position of the Company and its Subsidiaries as of such dates, and (B) the results of operations of the Company and its Subsidiaries for the years ended on such dates. The Audited Financial Statements have been prepared in accordance with GAAP, consistently applied throughout and among the periods indicated.  The consolidated unaudited interim financial statements of the RVR Companies dated March 31, 2014 (the "Interim Financial Statements") provided by the Company to the Independent Financial Advisor present fairly in all material respects (1) the financial position of the Company and its Subsidiaries as of such date, and (2) the results of the operations of the Company and its Subsidiaries, for the 3 month period ended on such date. The Interim Financial Statements have been prepared in accordance with GAAP, consistently applied throughout and among the periods indicated; provided, that they do not contain footnotes required by GAAP or changes of the type that are normal and recurring resulting from year-end adjustments (including tax adjustments).

(ii)     Since the date of the Interim Financial Statements, there has not been any event or condition of any character that has or would be reasonably expected to have a Material

9

Adverse Effect. Without limiting the generality of the foregoing, except as contemplated by this Agreement, since the date of the Interim Financial Statements:

(A)    no material asset of the Company or its Subsidiaries has been sold, leased, transferred or assigned, other than for fair consideration in the ordinary course of business;

(B)    except for the Bank Loans, the agreements and instruments contemplated therein and the agreements and instruments contemplated under this Agreement, neither the Company nor any of its Subsidiaries has entered into an agreement, contract, lease or license outside the ordinary course of business requiring payment by the Company or its Subsidiaries in excess of $100,000, or otherwise accrued or incurred any material liability;

(C)    except in connection with the transactions contemplated by the Agreement, neither the Company nor any of its Subsidiaries has made any material capital expenditure outside the ordinary course of business requiring payment by the Company or its Subsidiaries in excess of $100,000;

(D)    neither the Company nor any of its Subsidiaries has issued, sold or otherwise disposed of any of its capital stock, or granted any options, warrants or other rights to purchase, obtain, sell or put (including upon conversion, exchange or exercise), any of its capital stock (except as contemplated by this Agreement);

(E)    other than dividends or distributions consistent with past practice, neither the Company nor any of its Subsidiaries has declared, set aside or paid any dividend or made any distribution with respect to its capital stock (whether in cash or in kind) or redeemed, purchased or otherwise acquired any of its capital stock requiring payment by the Company or its Subsidiaries (except as contemplated by this Agreement);

(F)    except for the ESOP Loan and the Contribution, neither the Company nor any of its Subsidiaries has made any material loan to, or entered into any other transaction with, any of their respective shareholders, members, managers, directors, officers or employees outside the ordinary course of business;

(G)    except for the Employment Contracts, neither the Company nor any of its Subsidiaries has entered into an employment contract or agreement, or materially modified the terms of any existing written employment contract or agreement, requiring payment by the Company in excess of $50,000;

(H)    except in the ordinary course of business or as contemplated by this Agreement, neither the Company nor any of its Subsidiaries has granted any material increase in the base compensation of any of its directors or officers, or has granted any material increase in the base compensation of its employees, except for customary increases;

(I)    except for compensation changes in the ordinary course of business or as contemplated by this Agreement, neither the Company nor any of its Subsidiaries has adopted, amended, modified or terminated any bonus, profit-sharing, incentive, severance or other plan, contract or commitment for the benefit of any of its directors, officers and employees;

(J)    neither the Company nor any of its Subsidiaries has incurred any debt, liability or obligation of any nature, whether accrued, absolute, contingent or

10

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000580

otherwise, and whether due or to become due, which (individually or in the aggregate) would have a Material Adverse Effect, except (1) as is included in the Interim Financial Statements, (2) for ordinary trade obligations that may have been incurred after the date of such balance sheet in the normal course of business or expenses incurred in connection with the transactions contemplated by this Agreement, (3) debts, liabilities and obligations of the type set forth in the Interim Financial Statements incurred after the date of such Audited Financial Statements that were incurred in the ordinary course of business and are usual and normal in amount, both individually and in the aggregate, and (4) future obligations under contracts to which the Company or any of its Subsidiaries is a party; and

(K)     In the last 12 months, the Company has not delayed or postponed the payment of material accounts payable and other liabilities outside the ordinary course of business.

(f)     Material Contracts.     The Disclosure Schedule lists each of the following contracts, agreements, leases, mortgages, notes and any other obligations or commitments of the Company or its Subsidiaries currently in effect (the "Material Contracts") (other than this Agreement and any agreements, obligations and commitments relating to the transaction contemplated hereby, or any documents contemplated by the Bank Loans):

(i)     any severance agreement, non-competition agreement or similar agreement with former employees;

(ii)     any guaranty of a debt or obligation of a third party;

(iii)     any loan agreement or loan document (other than accounts receivable incurred in the ordinary course of business) for monies borrowed or loaned;

(iv)     any lease for real property;

(v)     any contract or agreement for employment of any person who serves as an officer or director of the Company or any of its Subsidiaries;

(vi)     any contract or agreement pursuant to which the Company or its Subsidiaries has any obligations of noncompetition, noninterference, nonparticipation or exclusivity;

(vii)     any material Government Contract; or

(viii)     any other contract or agreement to which the Company or any of its Subsidiaries are a party and which requires a party to such Contract to make or receive payments of at least $100,000 in the last 12 months.

The Company has made available to the ESOP a correct and complete copy of each Material Contract listed in the Disclosure Schedule, and, except as otherwise set forth in the Disclosure Schedule, with respect to each such Material Contract: (1) (assuming the due authorization, execution and delivery by the other parties to such Material Contract) the agreement is legal, valid, binding, enforceable (except as limited by applicable bankruptcy, insolvency or other similar Laws relating to creditors' rights generally now or hereafter in effect, and general principles of equity) and in full force and effect against the Company or its Subsidiaries, as the case may be; (2) (assuming the due authorization, execution and delivery by the other parties to such Material Contract) the agreement will continue to be legal, valid, binding, enforceable (except as limited by applicable bankruptcy, insolvency or other similar Laws relating to creditors' rights generally now or hereafter in effect, and general principles of equity) and in full force and effect on identical terms, in all material respects, as of the consummation of the transactions contemplated hereby; (3) neither the Company nor any of its Subsidiaries, as the case may be, is in

11

breach or default under such Material Contract, and, to the Knowledge of the Company, no event has occurred which, with notice or lapse of time, would constitute a material breach or default by the Company or such Subsidiary, or permit the termination, modification or acceleration under such Material Contract by the counterparty thereto if such breaches, defaults, terminations, modifications or accelerations, individually or in the aggregate, would result in a Material Adverse Effect; and (4) to the Knowledge of the Company, no party has repudiated any material provision of such Material Contract.

(g)     Property.  The Disclosure Schedule sets forth a list of all real property owned by the Company or any of its Subsidiaries ("Owned Real Property") and all real property leased or subleased by the Company or any of its Subsidiaries (the "Leased Real Property"). With regard to the Owned Real Properties and Leased Real Properties:

(i)     there are no pending, or, to the Knowledge of the Company, any threatened condemnation proceedings, lawsuits or administrative actions relating to the Owned Real Property or other matters affecting adversely the current use, occupancy or value thereof;

(ii)     each of the Company and its Subsidiaries has good and valid title to all of its fee, leasehold interests and personal property, free and clear of all Encumbrances, except (A) mortgages and liens securing debt that is reflected as a liability on the Financial Statements, (B) liens for current taxes not yet due and assessments not in default, (C) easements, landlord's, mechanics', carriers', workmen's, repairmen's and other similar liens, rights of way, building or other restrictions, exceptions, variances, reservations and other limitations that are not substantial in amount, do not materially interfere with the present use of any of the properties subject thereto or affected thereby or otherwise materially impair the business operations conducted by the Company and its Subsidiaries, and all of which have arisen in or been incurred only in the ordinary course of business and consistent with past practice, (D) Encumbrances in favor of the Senior Lender and (E) as set forth in the Disclosure Schedule;

(iii)     each of the Company and its Subsidiaries enjoys quiet possession under any of its of Owned Real Property or any of its leases of Leased Real Property and no real property under any such lease is subject to any Encumbrance, easement, right-of-way, building or use restriction, exception, variance, reservation or limitation, as might, in any material respect, interfere with or impair the present and continued use thereof by the Company or its Subsidiaries in the usual and normal conduct of the business of the Company;

(iv)     all material items of personal property owned or used by the Company in the conduct of its business are fit in all material respects for their intended purpose and are in reasonable operating condition (subject to normal maintenance and repair and ordinary wear and tear), and the Company has not received notice of any material violation (which has not been cured) of any building, zoning or other Law in respect of such properties or structures for the Company's use thereof;

(v)     all leases related to the Leased Properties are valid and binding and in full force and effect and enforceable, in accordance with their terms, against the Company or its Subsidiary as applicable, and against each other party thereto, except as the same may be limited by applicable bankruptcy, insolvency, reorganization or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity; there are no material defaults thereunder by the Company or, to the Knowledge of the Company, by any other party thereto, and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a material default thereunder by the Company or, to the Knowledge of the Company, by any other party thereto; and

(vi)     all facilities located on the Owned Real Properties or Leased Real Properties have received all material approvals of Governmental Authorities (including Licenses and Permits) required in connection with the ownership or operation of the Company's business conducted thereon and have been operated and maintained in accordance with all applicable Laws.

12

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000582

(h)    Litigation.  (A) Neither the Company nor any of its Subsidiaries is (1) subject to any outstanding injunction, judgment, order, decree, ruling or charge or (2) a party to any action, suit, proceeding, hearing, or to the Company's Knowledge, investigation of, in or before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator involving an amount in controversy in excess of $100,000; (B) the Company has no Knowledge that any such action, suit, proceeding, hearing or investigation may be brought or threatened against the Company or any of its Subsidiaries involving an amount in controversy in excess of $100,000; and (C) there is no claim, legal action, suit, arbitration, or to the Knowledge of the Company, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment, in progress, pending, in effect or, to the Knowledge of the Company, threatened relating to this Agreement or the transactions contemplated by this Agreement, and the Company has no Knowledge of any reasonable basis for the same.

(i)    Environmental.

(i)    The Company and its Subsidiaries are in compliance in all material respects with all applicable Environmental Laws, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries alleging any material failure to comply with any Environmental Law. The Company and its Subsidiaries have not disposed of, or arranged to dispose of, a Hazardous Substance in a manner or to a location that could reasonably be expected to result in liability to the Company or its Subsidiaries under or relating to Environmental Laws. The Company and its Subsidiaries have no environmental audits, reports or other material environmental documents relating to the Company's or its Subsidiaries' past or current properties, facilities or operations;

(ii)    the Company and its Subsidiaries have obtained, and currently is, and to the Knowledge of the Company, in the prior five (5) years has been, in compliance in all material respects with, all of the terms and conditions of all permits, licenses, approvals, registrations and other authorizations that are required under any Environmental Law in the conduct of the business of the Company and its Subsidiaries, and has complied in all material respects with all other limitations, conditions, standards, restrictions, prohibitions, requirements, obligations, schedules and timetables in all Environmental Laws;

(iii)    the Company and its Subsidiaries have not received written notice of any past or present claim of liability or non-compliance under any applicable Environmental Law, and there are, to the Knowledge of the Company, no circumstances that are reasonably likely to interfere with or prevent compliance by the Company or its Subsidiaries in all material respects in the conduct of the business with any applicable Environmental Laws;

(iv)    (A) the Company and its Subsidiaries are not a party to any civil, criminal or administrative action, suit, order, demand, claim, hearing, investigation, request or demand for information, notice or demand letter, or notice of violation under any Environmental Law, (B) no proceeding is pending or, to the Knowledge of the Company, threatened against the Company or its Subsidiaries arising under any Environmental Law, and (C) to the Knowledge of the Company, the Company and its Subsidiaries have no actual liability under any Environmental Laws and, to the Knowledge of the Company, there are no currently existing facts, circumstances or activities that would reasonably be expected to result in potential liability under any Environmental Laws;

(v)    the Company and its Subsidiaries have not (A) generated, stored, treated, handled or disposed of any Hazardous Substance in violation of any Environmental Law or in any manner that could give rise to liability or non-compliance under any Environmental Law, (B) arranged for the disposal of any Hazardous Substance in violation of any Environmental Law or in any manner that could give rise to liability or non-compliance under any Environmental Law or (C) exposed any employee or other individual to any Hazardous Substance in violation of any Environmental Law or condition that could reasonably be expected to form the basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand for damage to, or for investigation and remediation of,

13

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000583

DOL 0010180

any site, location or body of water (surface or subsurface) or any illness of or personal injury to any employee or other individual;

(vi)    to the Knowledge of the Company, there are no currently existing facts, circumstances or activities arising out of or relating to the Leased Real Property, or the use, operation, control or occupancy by the Company or its Subsidiaries of any of the Leased Real Property, that reasonably could be expected to result in (A) any obligation of the Company to file any report or notice, to conduct any investigation, sampling or monitoring or to effect any environmental cleanup or remediation, or (B) liability, either to Governmental Authorities or third parties, for damages, cleanup costs or remedial costs of any kind or nature, related to the operation or control of the Leased Real Property;

(vii)    no Governmental Authority has obtained, asserted or, to the Knowledge of the Company, threatened a lien upon the Leased Property or any tangible personal property as a result of any Release, use or cleanup of any Hazardous Substances for which the Company or any of its Subsidiaries is legally responsible;

(viii)    there has been no Release of Hazardous Substances in contravention of Environmental Law with respect to the business or assets of the Company or any real property currently or formerly owned, operated or leased by the Company, and neither the Company nor or any Subsidiary has received notice that any real property currently or formerly owned, operated or leased in connection with the business of the Company (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which could reasonably be expected to result in (A) any obligation of the Company to file any report or notice, to conduct any investigation, sampling or monitoring or to effect any environmental cleanup or remediation, or (B) liability, either to Governmental Authorities or third parties, for damages, cleanup costs or remedial costs of any kind or nature, related to the operation or control of the Owned Real Property or Leased Real Property;

(ix)    neither the Company nor any of its Subsidiaries is a party to any oral or written agreements, including, but not limited to, indemnity or cleanup agreements, relating to Environmental Laws with any third parties; and

(x)    there is not now nor, to the Knowledge of the Company, has there ever been located on the Leased Real Property any drum storage areas, surface impoundments, incinerators, landfills, tanks, lagoons, ponds, waste piles or deep well injection systems used or intended for the treatment, storage or disposal of Hazardous Substances.

(j)    No Brokers. No broker, finder or investment banker or other Person has been paid or is directly or indirectly entitled to any brokerage, finder's or other contingent fee or commission or any similar charge in connection with the transactions contemplated by this Agreement.

(k)    Assets Sufficient for Operation. The Company and its Subsidiaries own, lease or have use of all of the assets, properties and rights of every type and description (real, personal, tangible and intangible) necessary in all material respects for the continued conduct of the business of the Company and its Subsidiaries as currently conducted.

(l)    Condition of Assets. Other than machinery, tools, equipment or other personal property that have been disposed of or replaced in the ordinary course of business, all material items of machinery, tools, equipment and other tangible personal property included in the Interim Financial Statements currently are used by or useful to the Company or its Subsidiaries in the ordinary course of business and are in reasonably good operating condition and in a state of reasonable maintenance and repair (ordinary wear and tear excepted).

(m)    Compliance with Laws. Neither the Company nor any of its Subsidiaries is in violation of any applicable Laws that individually or in aggregate would have a Material Adverse Effect.

14

DOL 0010181

Neither the Company nor any of its Subsidiaries has received written notice of nor, to the Knowledge of the Company, is there any action, suit, proceeding, hearing, investigation, complaint or demand pending by any Governmental Authority against the Company or any of its Subsidiaries alleging any failure to comply with any applicable Law.

(n)   Tax Matters:

(i)   The Company and its Subsidiaries have filed or caused to be filed all Tax Returns each is required to have filed prior to the date hereof. All such Tax Returns were correct and complete in all material respects. All Taxes owed by the Company and its Subsidiaries (whether or not shown on any Tax Return) have been paid or properly accrued. In the past six years, no claim for unpaid Taxes has been made within the applicable statute of limitations period by an authority in a jurisdiction where the Company or its Subsidiaries do not file Tax Returns that the Company or its Subsidiaries are or may be subject to taxation by that jurisdiction. There are no current Encumbrances on any of the assets of the Company or its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any tax.

(ii)   The Company and its Subsidiaries have paid or accrued all Taxes each is required to pay in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, interest holder or other third party.

(iii)   Neither the Company nor any of its Subsidiaries has received notice of any assessment of any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax liability of the Company or any of its Subsidiaries either claimed or raised by any authority in writing or as to which the Company has Knowledge based upon personal contact with any agent of such authority.

(iv)   Neither the Company nor any of its Subsidiaries has waived any statute of limitations period with respect to a Tax assessment or deficiency.

(v)   Neither the Company nor any of its Subsidiaries has made any payments, nor is any of them obligated to make any payments, nor is any of them a party to any agreement that under certain circumstances could obligate them to make any payments, that will not be deductible under Code section 280G.

(vi)   Any unpaid Taxes of the Company and its Subsidiaries, as the case may be: (A) did not, as of the date of the most recent Financial Statements, exceed the reserve for Tax liability (other than any reserve for deferred Taxes established to reflect timing differences between book and tax income) set forth on the face of the balance sheet (rather than in any notes thereto) included with the most recent Financial Statements; and (B) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company and its Subsidiaries, as the case may be, in filing Tax Returns.

(vii)   No material deficiencies for Taxes have been claimed, proposed or assessed against the Company or any of its Subsidiaries. There is no audit, investigation, claim or assessment pending or, to the Company's Knowledge, threatened against the Company or its Subsidiaries for any alleged deficiency in any Tax.

(viii)   None of the assets of the Company or any of its Subsidiaries (A) is property that is required to be treated as being owned by any other person in accordance with the provisions of former Section 168(f)(8) of the Code, or (B) is "tax-exempt use property" within the meaning of Section 168(h) and Section 470(c)(2) of the Code.

(ix)   All monies required to be withheld by the RVR Companies for income Taxes, social security and other payroll Taxes have been collected or withheld and have been paid to the

15

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY   ARGENT_0000585

respective Governmental Authorities, set aside in accounts for such purpose or accrued, reserved against and entered upon its books, and neither the Company has received notice of, and to the Company's Knowledge, is not liable for, any Taxes or penalties for failure to comply with any of the foregoing. No material deficiencies for Taxes have been claimed, proposed or assessed. There is no audit, investigation, claim or assessment pending or, to the Knowledge of the Company, threatened against the Company for any alleged deficiency in any Tax.

(o)    Insurance Coverage. The Disclosure Schedule sets forth all existing policies of insurance (including policies providing property, casualty, liability and workers' compensation coverage and bond and surety arrangements) to which the Company or any of its Subsidiaries is a party, a named insured or otherwise the beneficiary of coverage (including the name of the carrier, period of coverage, type of coverage and policy limits) and the individual claims under such policies for the previous twelve months where the amount in controversy for each such claim exceeded $100,000. The insurance policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Company and are sufficient for compliance with all applicable Laws and Contracts to which the Company is a party or by which it is bound. With respect to such policies: (i) the transactions contemplated by this Agreement and the Transaction Documents will not cause a default under the policy and such policy shall remain in full force and effect following the Closing; (ii) neither the Company nor any of its Subsidiaries is, and to the Knowledge of the Company, no other party to the policy is, in breach or default (including with respect to the payment of premiums or the giving of notices), and to the Knowledge of the Company, no event has occurred which, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification or acceleration under the policy; and (iii) to the Knowledge of the Company, no party to the policy has repudiated any provision thereof. All premiums due on any insurance policy(ies) maintained by the Company or any Subsidiary have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each policy. All such insurance policies (a) are valid and binding in accordance with their terms; (b) are, to the Knowledge of the Company, provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. There are no claims related to the business of the Company pending under any such insurance policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither the Company nor any Subsidiary is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such insurance policy.

(p)    Employee Matters.

(i)    The Company has delivered a true and complete list to the Trustee on behalf of the Trust of (A) all employees of the Company and its Subsidiaries as of May 3, 2014, and (B) the rate of all current annual compensation payable, if applicable, to each such employee who received more than $100,000 in 2013, including any estimated bonus (discretionary or otherwise), contingent or deferred compensation for 2014.

(ii)    The Company and its Subsidiaries are in compliance in all material respects with all applicable Employment and Labor Laws.

(iii)    No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice has been filed or commenced against the Company or any of its Subsidiaries and neither the Company nor any of its Subsidiaries has received any written notice alleging any failure to comply with any Employment and Labor Laws. There is no unfair labor practice complaint or charge of employment discrimination pending against the Company or its Subsidiaries or, to the Company's Knowledge, threatened with respect to any current or former employee before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Fair Employment and Housing or any other federal, state, local or foreign court or Governmental Authority.

(iv)    The Company has delivered complete and accurate copies of all Benefit Plans to the Trustee on behalf of the Trust. Neither the Company nor any of its Subsidiaries has a written plan or commitment to create any additional Benefit Plans or to materially change any existing Benefit

16

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000586

Plan, except as contemplated in connection with the transactions related to this Agreement. Each of the Benefit Plans has been administered in compliance (both in form and operation) with its terms and all filing, reporting, disclosure and other requirements of ERISA and all applicable regulations thereunder. Each of the Benefit Plans has complied with the terms and provisions of the Code and ERISA. Neither the Company nor any of its Subsidiaries currently maintains or contributes to, nor has it ever maintained or contributed to, a "multiemployer plan" as that term is defined in section 3(37) of ERISA. Neither the Company nor any of its Subsidiaries currently has, nor has it ever had, any withdrawal liability with respect to any multiemployer plan. Neither the Company nor any of its Subsidiaries maintains or has any current obligation under any defined contribution plan or employee defined benefit pension plan. Each of the Benefit Plans and any trusts under such Benefit Plans that are intended to be qualified under section 401(a) of the Code either are qualified and thus exempt from taxation under sections 401(a) and 501(a) of the Code or will be qualified by a submission of such Benefit Plan for an Internal Revenue Service determination in a timely fashion and such amendments as may be required as a condition of a favorable determination will be timely made. Neither the Company nor any of its Subsidiaries contributes, nor has any current obligation to contribute, to any employee welfare benefit plan providing medical, health or life insurance or other welfare-type benefits for retired or terminated employees, their spouses or their dependents (other than in accordance with Code section 4980B). Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or other labor union or similar agreement.

(v)    To the Knowledge of the Company, the Plan and the trust documents of the ESOP contain such provisions as are necessary to comply with Part 4 of Title 1 of ERISA given the nature of the Plan and the transactions herein described. The Plan is a leveraged employee stock ownership plan, within the meaning of ERISA sections 408(b)(3) and 407(d)(6), Code sections 4975(d)(3) and (e)(7), and Treasury Regulations sections 54.4975-7 and -11. The Trust has been duly established and in combination with the Plan, shall be an exempt trust pursuant to Code section 501(a). The Trustee has been duly and properly appointed and granted full authority to act as Trustee of the Trust and exercise trust powers thereunder, and the Trustee has been authorized to exercise such authority and powers and shall have full power and authority to perform the Trust's obligations under this Agreement and to carry out the transactions herein contemplated. Except as expressly described herein or as necessary to fulfill applicable reporting and disclosure requirements under ERISA and the Code, the Trustee shall not need to give any notice to, make any filing with or obtain any authorization, consent or approval of any Governmental Authority in order to consummate the transactions contemplated by this Agreement.

(q)    Intellectual Property. The Company or its Subsidiaries own or use the respective patents, trademarks, copyrights and trade names and applications and registrations therefor as specified in the Disclosure Schedule (collectively, the "Intellectual Property"), and have not granted any licenses to use any Intellectual Property, and no other patents, trademarks, copyrights or trade names are owned or used by the Company or its Subsidiaries. The Company or one or more of its Subsidiaries owns or has valid rights to use all Intellectual Property, other technology or know-how and processes with respect to which the Company or its Subsidiaries require a grant of right and which are used in or necessary for the conduct of their business as presently conducted; no claims have been asserted or are pending with respect to the use of any Intellectual Property owned by the Company or one or more of its Subsidiaries, and the Company has no Knowledge of any valid basis for any such claim. The use of such Intellectual Property by the Company or its Subsidiaries does not infringe on the rights of any person, and there are no infringements of any Intellectual Property of the Company or its Subsidiaries. All licenses and other agreements granting the Company or any of its Subsidiaries the right to use trademarks, copyrights, trade names or trade secrets are legal, valid, binding and enforceable (except as limited by applicable bankruptcy, insolvency or other similar Laws relating to creditors' rights generally now or hereafter in effect, and general principles of equity) against the other parties thereto.

(r)    Government Contracts. The Disclosure Schedule contains a list of (i) all contracts to which any of the RVR Companies and any Governmental Entity is a party, (ii) any related contracts with vendors or subcontractors, and (iii) to the Knowledge of the Company, any contracts pursuant to which any of the RVR Companies acts as a vendor or a subcontractor for a party having a contract with a Governmental Entity, the loss of which would result in Material Adverse Effect (each such contract, a

17

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000587

"Governmental Contract"). None of the RVR Companies nor, to the Knowledge of the Company, any other party to any Governmental Contract is currently in violation, breach or default under any such contract or, with or without notice or lapse of time or both, would be in violation or breach of or default under any such contract. The Company has made available to the ESOP a correct copy of each Governmental Contract.

(s)    Agreements with Affiliates. Except as contemplated by this Agreement, neither the Company nor any of its Subsidiaries is a party to or bound by any contract, commitment or understanding that imposes an obligation on the Company or any of its Subsidiaries greater than $50,000 in any calendar year with any stockholders, directors or officers, managers or members of the Company or any of its Subsidiaries, or any Affiliate of the foregoing individuals, and none of such stockholders, directors, officers, managers, members or other persons owns or otherwise has any rights to or interests in any asset, tangible or intangible, which constitutes a part of the assets used in or related to the respective business of the Company or any of its Subsidiaries.

(t)    Licenses and Permits. Each of the Company and its Subsidiaries owns or possesses all right, title and interest in all Licenses and Permits required to own its assets and conduct its business as now being conducted. Each of such Licenses and Permits are valid and in full force and effect and the Company and its Subsidiaries, as applicable; are in full compliance with the terms and conditions of such Licenses and Permits. To the Knowledge of the Company, no loss, revocation, cancellation, suspension, termination or expiration of any Permit is pending or threatened (including as a result of the transactions contemplated hereby) other than expiration or termination in accordance with the terms thereof, which terms do not expire as a result of the consummation of the transactions contemplated hereby.

(u)    Not Registered. The purchase of the Shares by the ESOP hereunder will not require registration under the Securities Act provided that the representations of the ESOP in Section 3.4 are true and correct as of the date hereof and as of the Closing Date.

Section 3.4    Representations and Warranties of the ESOP. The ESOP represents and warrants to the Selling Stockholders and the Company that:

(a)    Authority. In reliance on the representation set forth in Section 3.3(p)(v), the Trust and the Trustee, on behalf of the Trust; each have the requisite power and authority to execute and deliver this Agreement, the ESOP Loan Documents and the Investor Rights Agreement and to consummate the transactions contemplated hereby and thereby.

(b)    Enforceability. The execution, delivery and performance of this Agreement, the ESOP Loan Documents and the Investor Rights Agreement, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by the ESOP, and this Agreement, the ESOP Loan Documents and the Investor Rights Agreement constitute legal, valid and binding obligations, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights generally, now or hereafter in effect, and general principles of equity.

(c)    Required Consents. Neither the execution nor the delivery of this Agreement, the ESOP Loan Documents and the Investor Rights Agreement, nor the consummation of the transactions contemplated hereby or thereby, will violate any Law or other restriction of any Governmental Authority or court to which the ESOP is subject. The Trustee, on behalf of the Trust, is not required to give notice to, make any filing with or obtain any authorization, consent or approval of any Governmental Authority in order for the parties to consummate the transactions contemplated by this Agreement, the ESOP Loan Documents and the Investor Rights Agreement.

(d)    No Commission or Transaction Fee. Except for the fee payable to the Trustee by the Company, which is not contingent on Closing, the Trust has not received a transaction fee or paid a commission as a result of the transactions contemplated hereby.

18

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000588

(e)    Reliance by the ESOP on Independent Advisor. The Trustee has entered into this Agreement after analyzing, reviewing, and approving the Fairness Opinion and the accompanying report and other materials dated as of May 28, 2014, prepared by the Independent Financial Advisor.

(f)    Legal Advice. The Trustee, on behalf of the ESOP, has retained independent legal counsel to advise the Trustee with respect to matters regarding ERISA, and the rules and regulations promulgated thereunder and the Code, as such statutes relate to this Agreement and the transactions contemplated hereby and is relying on that advice.

(g)    Exclusive Benefit. The ESOP is purchasing the Shares exclusively for the benefit of the ESOP participants and beneficiaries and is using the ESOP Loan as a means of financing the purchase of the Financed Shares and the Contribution as a means of financing the purchase of the remaining portion of the Shares.

(h)    No Conflicts. Neither the execution nor the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any Laws to which the ESOP is subject or any provision of the trust documents of the ESOP or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the ESOP is a party or by which the ESOP is bound.

(i)    Investment Intent.  The Shares to be acquired by the ESOP pursuant to this Agreement are being or shall be acquired for its own account and without a view or intention of distributing or reselling such Shares or any part thereof in any transaction that would be in violation of the securities laws of the United States, or any state, without prejudice, however, to its right at all times to sell or otherwise dispose of all or any part of its Shares under an effective registration statement under the Securities Act, and applicable state securities laws, or under an exemption from such registration available under the Securities Act, and subject, nevertheless, to the disposition of its property being at all times within its control. The ESOP acknowledges that the Shares are not registered under applicable state securities laws (the "Blue Sky Laws") or the Securities Act and that the Shares cannot be sold or otherwise disposed of unless they are subsequently registered under the Blue Sky Laws and the Securities Act or are sold or otherwise disposed of in a transaction exempt from such registration requirements.  The ESOP acknowledges that the Selling Stockholders and the Company are under no obligation to register the Shares under any applicable securities laws or to make available to the ESOP the benefit of any exemption from registration available under the applicable securities laws.  The ESOP agrees that the certificates evidencing the Shares will bear, in addition to any legend required by applicable Law or by written agreement of the Company, restrictive legends in substantially the form set forth below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES LAWS. NEITHER THESE SECURITIES NOR ANY PORTION HEREOF OR INTEREST HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THE SAME IS REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE AND THE COMPANY SHALL HAVE RECEIVED EVIDENCE OF SUCH EXEMPTION REASONABLY SATISFACTORY TO THE COMPANY (WHICH MAY INCLUDE, AMONG OTHER THINGS, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY).

19

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000589

DOL 0010186

**ARTICLE IV**
**CLOSING**

Section 4.1    Conditions to Closing; Form of Documents.

(a)    The obligations of the parties hereto to consummate the purchase and sale of Shares contemplated by this Agreement shall be subject to satisfaction of the delivery obligations below in this Article IV and the following:

(i)    There shall be no order, decree or injunction of a court or other Governmental Authority that prevents or that threatens to prevent the consummation of the transactions contemplated by this Agreement; and

(ii)    No party hereto shall have received from any Governmental Authority any notice of any pending or threatened investigation concerning the propriety or legality of the transactions contemplated by this Agreement.

(b)    At the Closing, the parties shall deliver the documents and perform the acts set forth in this Article. All documents to be delivered shall be in form and substance reasonably satisfactory to the party to whom such documents are to be delivered.

Section 4.2    Conditions to Obligations of the Selling Stockholders. The obligations of the Selling Stockholders to carry out the transactions contemplated by this Agreement are subject, at the option of the Selling Stockholders, to the satisfaction or waiver of the following conditions:

(a)    All representations and warranties of the ESOP contained in this Agreement shall be true and correct in all material respects at and as of the Closing, and the ESOP shall have performed and satisfied in all material respects all covenants and agreements required by this Agreement to be performed and satisfied by the ESOP at or prior to the Closing.

(b)    The ESOP shall have furnished the Selling Stockholders with a certified copy of all necessary Trustee action on its behalf approving its execution, delivery and performance of this Agreement.

(c)    The ESOP shall have executed and delivered to the Selling Stockholders an executed counterpart of this Agreement and any other related agreements to which the ESOP and the Selling Stockholders are parties thereto.

(d)    The Company shall have executed and delivered to each of the Selling Stockholders an executed counterpart of their respective Employment Contract.

Section 4.3    Conditions to Obligations of the Company. The obligations of the Company to carry out the transactions contemplated by this Agreement are subject, at the option of the Company, to the satisfaction or waiver of the following conditions:

(a)    All representations and warranties of the ESOP contained in this Agreement shall be true and correct in all material respects at and as of the Closing, and the ESOP shall have performed and satisfied in all material respects all covenants and agreements required by this Agreement to be performed and satisfied by the ESOP at or prior to the Closing.

(b)    The ESOP shall have furnished the Company with a certified copy of all necessary Trustee action on their behalf approving their execution, delivery and performance of this Agreement.

20

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000590

(c)    The ESOP shall have executed and delivered to the Company executed counterparts of this Agreement, the ESOP Loan and Pledge Agreement, the ESOP Note and any other related agreements to which the ESOP and the Company are parties thereto.

(d)    The Independent Financial Advisor shall have delivered or caused to be delivered the Fairness Opinion to the Company.

(e)    Each of the Selling Stockholders shall have executed and delivered to the Company an executed counterpart of their respective Employment Contracts.

(f)    The ESOP shall have executed a shareholder consent as the sole shareholder of the Company, to be effective immediately at Closing, confirming the election of each of Eric Bensen, Randall Smalley and Robert Smalley, Jr. to serve on the Company's Board of Directors after the Closing.

Section 4.4    Conditions to Obligations of the ESOP.  The obligations of the ESOP to carry out the transactions contemplated by this Agreement are subject, at the option of the ESOP, to the satisfaction or waiver of the following conditions:

(a)    All representations and warranties of the Company and the Selling Stockholders contained in this Agreement shall be true and correct in all material respects at and as of the Closing (except to the extent such representations and warranties expressly relate to an earlier date or time (in which case such representations and warranties shall be true and correct in all respects, or in all material respects, as appropriate, on and as of such earlier date)), and the Company and the Selling Stockholders shall have performed and satisfied in all material respects all agreements and covenants required by this Agreement to be performed and satisfied by them at or prior to the Closing, including without limitation the repayment of all outstanding Seller Indebtedness.

(b)    The Company shall have furnished the ESOP with a certified copy of all necessary corporate action on its behalf approving the Company's execution, delivery and performance of this Agreement.

(c)    The ESOP shall have received any and all Required Consents from the Company and the third parties thereto.

(d)    The Selling Stockholders shall have executed and delivered to the ESOP an executed counterpart of this Agreement and any other related agreements to which the ESOP and the Selling Stockholders are parties thereto.

(e)    The Company shall have executed and delivered to the ESOP an executed counterpart of this Agreement, the ESOP Loan and Pledge Agreement, the ESOP Note and any other related agreements to which the ESOP and the Company are parties thereto.

Section 4.5    Closing Deliveries.

(a)    Deliveries by the Selling Stockholders. At or prior to the Closing, each of the Selling Stockholders shall deliver or cause to be delivered to the ESOP certificates for their respective Shares duly endorsed by such Selling Stockholder to the ESOP or otherwise accompanied by a stock power duly executed in blank.

(b)    Deliveries by the Company. At or prior to the Closing, the Company shall deliver or cause to be delivered to the ESOP:

(i)    a certificate of good standing for each of the Company and the Subsidiaries from the Secretary of State (or similar body) of the respective entity's state or jurisdiction of incorporation or organization, dated no more than thirty (30) days prior to the Closing Date;

21

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000591

(ii)    a certificate of the Secretary of the Company attesting to the incumbency of certain officers of the Company and certifying the following deliveries to be made by the Company:

1)    a true and correct copy of the Certificate of Incorporation of the Company, together with all amendments thereto, in effect as of the date hereof, certified by the Secretary of State of the State of Florida;

2)    a true and correct copy of the bylaws of the Company, together with all amendments thereto, in effect as of the Closing Date;

3)    a true and correct copy of the resolutions of the Company's Board of Directors (A) authorizing the execution, delivery and performance of this Agreement, the Transaction Documents, and all other agreements, documents and instruments to be executed, delivered and performed by the Company in connection therewith;

4)    a true and correct copy of the ESOP plan documents, together with all amendments thereto, in effect as of the Closing Date;

(iii)    such financial and other information concerning the Company and other persons as the ESOP reasonably deems necessary or appropriate to discharge its duties under ERISA with respect to the transactions herein described, including the most recently completed interim financial statements for the Company prepared after the Interim Financial Statements, if any; and

(iv)    any other instruments that the ESOP may reasonably deem necessary to effect or evidence the ESOP Transaction.

(c)    Deliveries by the ESOP. At or prior to the Closing, the ESOP shall deliver or cause to be delivered to the Company:

(i)    a certificate of authority and incumbency of the Trustee demonstrating the authority of the undersigned to act on behalf of the Trustee, reasonably acceptable to the Company;

(ii)    written documentation with respect to the Trustee's acceptance of its appointment as trustee of the ESOP and its fiduciary status under ERISA as of the Closing and as of the Closing Date; and

(iii)    any other instruments that the Company may reasonably deem necessary to effect or evidence the ESOP Transaction.

## ARTICLE V
## POST-CLOSING COVENANTS

Section 5.1    Maintenance of the ESOP's Tax Qualified Status.  Subsequent to Closing, the Company shall take such actions as may be necessary to (a) maintain the tax-qualified status of the ESOP and the tax exempt status of the ESOP under the Code, including applying for a determination letter from the Internal Revenue Service, and (b) assure that the ESOP complies with all applicable ERISA and Code requirements.

Section 5.2    Reporting and Disclosure. Subsequent to Closing, the Company shall make all commercially reasonable efforts to timely satisfy all reporting and disclosure requirements under ERISA and the Code relating to the ESOP, the ESOP and the transactions herein described.  The Company shall maintain reasonable and appropriate records of ownership and transfers of the Shares.

Section 5.3    Insurance.  For so long as any amounts remain outstanding under the ESOP Loan subsequent to Closing, the Company and its Subsidiaries shall keep in full force and effect

22

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000592

substantially similar coverage as is provided for in the insurance policies, contracts or similar arrangements of the Company and its Subsidiaries in force as of the Closing Date.

Section 5.4    Taxes.  Subsequent to Closing, the ESOP and the Selling Stockholders shall reasonably cooperate in the filing of any Tax Returns, to the extent such filing requires providing each other with necessary records and documents relating to the businesses of the Company and its Subsidiaries or providing access to employees on a mutually convenient basis.  The ESOP and the Selling Stockholders shall reasonably cooperate in the same manner in defending or resolving any Tax audit, examination or Tax-related litigation. Each party hereto agrees (i) to retain all books and records with respect to Tax matters relating to any taxable period beginning before the Closing until the expiration of the statute of limitations for the applicable taxable period, and (ii) to give the other Parties hereto reasonable written notice prior to destroying or discarding any such books and records. Any information obtained under this Section 5.4 shall be kept confidential, except as may be otherwise necessary in connection with dealing with a Governmental Entity.

Section 5.5    Charter Protections.  Subsequent to Closing, the Company and the ESOP shall maintain all rights to indemnification for acts or omissions occurring through the Closing now existing in favor of the Selling Stockholders who are individuals (or the trustees of the Selling Stockholders that are trusts) in their capacities, as applicable, as directors or officers of the Company or any of its Subsidiaries, as provided under applicable Law, in the respective certificates of incorporation, bylaws or other organizational documents of the Company or any of its Subsidiaries, or by written contract, if applicable, and such rights shall continue in full force and effect in accordance with their terms; provided, however, each Selling Stockholder acknowledges and agrees that he or its trustee(s) will not be entitled to such indemnification with respect to any indemnification claim against the Selling Stockholders under Article VI by any ESOP Indemnified Party.

Section 5.6    No Avoidance of Claims. Subsequent to Closing, the Selling Stockholders agree not to seek indemnification with respect to any claim against them by reason of the fact that a Selling Stockholder was a shareholder, officer, board member or agent of the Company, or was serving at the request of the Company as an agent, officer, or board member of another entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses or otherwise and whether such claim is pursuant to any statute, charter, document, bylaw, agreement or otherwise) with respect to any action, suit, proceeding, complaint, claim or demand brought by the ESOP against the Selling Stockholders under Section 6.1(a) and 6.1(b) of this Agreement.  The Selling Stockholders shall not be entitled to seek indemnification from the Trustee, the ESOP or the Company if the Selling Stockholders are required to indemnify the Trustee or the ESOP hereunder.

Section 5.7    General.  Subsequent to Closing, the Company shall not amend its Articles of Incorporation or bylaws without the prior written consent of the Trustee, which will not be unreasonably withheld, conditioned or delayed.

Section 5.8    Notification of Governmental Audit.  The Company shall timely notify the Trustee, in writing, of any governmental or other third party audit, investigation, or request for information (other than routine claims for benefits by participants under the Plan) relating to the Plan or the transactions herein described and explain the general nature of such audit, investigation or claim for information. Such notification shall be in addition to the requirements of Article VII regarding the provision of notice of claims as therein described.

Section 5.9    Corporate Governance and ESOP Loan.  The Company covenants and agrees that following the Closing, and for so long as the Trustee, on behalf of the Trust, holds shares of Common Stock:

    (a)    The Company shall annually call, notice and conduct shareholder meetings in accordance with applicable law and the Company's by-laws; and

23

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000593

(b)       The Company shall contribute or declare and pay dividends or distributions to the Plan each year in an amount which is at least equal to the amount required to discharge the current obligations of the ESOP Loan regardless of whether the Company has net profits or whether some or all of such contributions and dividends may qualify for income tax deductions. The Company acknowledges that any failure of the ESOP to repay indebtedness pursuant to the ESOP Loan as the result of the Company's failure to contribute, declare or otherwise pay amounts sufficient for the ESOP to repay the ESOP Loan shall not be cause for the Company to declare a default under the terms of the ESOP Loan.

Section 5.10       Section 1042 Election.

(a)       The Company covenants and agrees that if any of the Selling Stockholders make the election described in Code section 1042(a)(1) with respect to the ESOP's purchase of the Shares, the Company shall provide a written statement consenting to the application of Code sections 4978 and 4979A with respect to it; and

(b)       If any of the Selling Stockholders make an election under Code section 1042(a)(1) with respect to the Shares sold by such Selling Stockholder pursuant to this Agreement, that Selling Stockholder shall timely notify the Company and the ESOP of such election.

## ARTICLE VI
## INDEMNIFICATION

Section 6.1       Indemnification Obligations.

(a)       Subject to the terms and conditions hereof, from and after the Closing, each Selling Stockholder shall, severally and not jointly, defend, indemnify, save and keep harmless the ESOP and the Trustee and their respective representatives, officers, directors, agents, beneficiaries, employees, successors and assigns (the ESOP, Trustee and such other Persons are sometimes referred to as the "ESOP Indemnified Parties") against and from all Damages (it being agreed that, for purposes of this Section 6.1(a), all qualifications and exceptions relating to materiality, Material Adverse Effect or words of similar import (but not specific dollar thresholds) shall be disregarded when calculating Damages hereunder), sustained or incurred by any of them, resulting from or arising out of or by virtue of any inaccuracy in or breach of any representation or warranty made by such Selling Stockholder in Section 3.2, and any breach or non-fulfillment by such Selling Stockholder on or prior to the Closing of any of such Selling Stockholders' covenants or obligations under this Agreement or any document contemplated by this Agreement to be performed prior to Closing.

(b)       Subject to the terms and conditions hereof, from and after the Closing, each of the Smalley Trusts and Robert Smalley, Jr. (the "Indemnifying Stockholders") shall, jointly and severally, defend, indemnify, save and keep harmless the ESOP Indemnified Parties against and from all Damages (it being agreed that, for purposes of this Section 6.1(b), all qualifications and exceptions relating to materiality, Material Adverse Effect or words of similar import (but not specific dollar thresholds) shall be disregarded when calculating Damages hereunder), sustained or incurred by any of them, resulting from or arising out of or by virtue of any inaccuracy in or breach of any representation or warranty made by the Company in Section 3.3 of this Agreement, and any breach or non-fulfillment by the Company on or prior to the Closing of any of its covenants or obligations under this Agreement or any document contemplated by this Agreement to be performed prior to Closing.

(c)       Subject to the terms and conditions hereof, from and after the Closing, the ESOP shall defend, indemnify, save and keep harmless the Selling Stockholders and their respective representatives, officers, directors, agents, employees, successors and assigns (the Selling Stockholders and such other Persons are sometimes referred to as the "Seller Indemnified Parties") against and from all Damages (it being agreed that, for purposes of this Section 6.1(c), all qualifications and exceptions relating to materiality, Material Adverse Effect or words of similar import (but not specific dollar thresholds) shall be disregarded when calculating Damages hereunder), sustained or incurred by any of them, resulting from or arising out of or by virtue of any inaccuracy in or breach of any representation or

24

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000594

warranty made by the ESOP in Section 3.4 of this Agreement, and any breach or non-fulfillment by the ESOP on or prior to the Closing of any of its covenants or obligations under this Agreement or any document contemplated by this Agreement to be performed prior to Closing.

(d)    Subject to the terms and conditions hereof, from and after the Closing, the Company shall defend, indemnify, save and keep harmless the Selling Stockholders and the ESOP and their respective representatives, officers, directors, agents, employees, successors and assigns against and from all Damages (it being agreed that, for purposes of this Section 6.1(d), all qualifications and exceptions relating to materiality, Material Adverse Effect or words of similar import (but not specific dollar thresholds) shall be disregarded when calculating Damages hereunder), sustained or incurred by any of them, resulting from or arising out of or by virtue of any breach or non-fulfillment by the Company subsequent to the Closing of any of its covenants or obligations under this Agreement or any document contemplated by this Agreement to be performed subsequent to Closing.

For the avoidance of doubt, "Damages" is understood to refer only to the actual dollar amount of loss suffered by the indemnified party, and not to the dollar amount of any breach by the indemnifying party that gave rise to the Damages.

Section 6.2    Claims.

(a)    The parties hereto intend that all indemnification claims be made as promptly as practicable by the indemnified party. Whenever any claim shall arise for indemnification hereunder, the indemnified party shall promptly notify the indemnifying parties with a reasonably detailed statement of the claim in writing, specifying the nature of such claim and the facts constituting the basis for such claim, if known (including a copy of such claim if such claim is in writing). With respect to claims made by third parties, the indemnifying parties shall be entitled to assume control of the defense of such action or claim with counsel reasonably satisfactory to the indemnified party; provided, however, that: (i) the indemnified party shall be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim; (ii) the indemnifying parties shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to the indemnified party a release from all liability in respect of such claim if, pursuant to or as a result of such consent or settlement, injunctive or other equitable relief would be imposed against the indemnified party or such judgment or settlement could materially interfere with the business, operations or assets of the indemnified party; and (iii) if the indemnifying parties do not assume control of the defense of such claim in accordance with the foregoing provisions within fifteen (15) days after receipt of notice of the claim, the indemnified party shall have the right to defend such claim in good faith in such manner as it may deem appropriate at the cost and expense of the indemnifying parties, and the indemnifying parties will promptly reimburse the indemnified party for such cost and expense, provided, however, the indemnified party shall not enter into any settlement without the indemnifying parties' consent, which consent shall not be unreasonably withheld, delayed or conditioned.

(b)    The parties agree to cooperate in defending such third party claims and the indemnified party shall provide such cooperation and such access to its books, records and properties as the indemnifying party shall reasonably request with respect to any matter for which indemnification is sought hereunder; and the parties hereto agree to cooperate with each other in order to ensure the proper and adequate defense thereof.

(c)    With regard to claims of third parties for which indemnification is payable hereunder, such indemnification shall be paid by the indemnifying party upon the earlier to occur of: (i) the entry of a judgment against the indemnified party and the expiration of any applicable appeal period, or if earlier, five (5) days prior to the date that the judgment creditor has the right to execute the judgment; (ii) the entry of a final determination (to which no timely appeal has been taken) against the indemnified party; or (iii) a written settlement of the claim.

(d)    With regard to claims for which indemnification may be payable hereunder which do not involve a claim being sought to be collected by a third party, the indemnified party shall with

25

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000595

reasonable promptness notify the indemnifying party of such claim, specifying the nature of such claim and the amount or the estimated amount thereof to the extent then reasonably feasible. If the indemnifying party either accepts such claim, or does not notify the indemnified party within thirty (30) days after the date of receipt of the claim notice that the indemnifying party disputes such claim, with a reasonably detailed statement of the basis of such position, the amount of such claim shall be conclusively deemed a liability of the indemnifying party hereunder and the Damages arising from such indemnification claim shall be paid promptly by the indemnifying party. If an objection is made in writing in accordance with this Section 6.2(d), the indemnified party shall respond in a written statement to the objection within twenty (20) days and, for forty (40) days thereafter, the parties shall attempt in good faith to agree upon the rights of the respective parties with respect to such claim (and, if the parties should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties). If no agreement is reached in accordance with the foregoing sentence, said controversy or claim shall be settled by binding arbitration in Maricopa County, Arizona, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on any award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Section 6.3    Limitation on Rights to Indemnification. The obligations to indemnify pursuant to this Article are subject to the following limitations, in addition to the other limitations under this Article VI:

(a)    the indemnified party shall not be entitled to recover for Damages incurred by the indemnified party unless a claim for such Damages has been asserted promptly by written notice, and in in no event later than thirty (30) days after the date the indemnified party became aware of such claim, specifying the details of the alleged claim, and delivered to the indemnifying parties; provided that the applicable survival period for such indemnification obligation as set forth in Section 6.4 has not expired;

(b)    the indemnification obligation of any indemnifying party in this Article shall not be affected by the failure of the indemnified party to give notice in accordance herewith unless the indemnifying party is materially prejudiced thereby, in which case the indemnifying party's liability shall be reduced by and to the extent of any actual prejudice; provided that the applicable survival period for such indemnification obligation as set forth in Section 6.4 has not expired;

(c)    notwithstanding anything else to the contrary in Sections 6.3(a) and 6.3(b), the parties acknowledge and agree that:

(i)    the indemnification provisions in this Article VI are the exclusive remedy for the ESOP Indemnified Parties with respect to any breach of representations, warranties and covenants by the Selling Stockholders and the Company in this Agreement, except in the case of fraud by an indemnifying party as established by the ESOP Indemnified Parties in accordance with the applicable burden of proof;

(ii)    neither the Selling Stockholders nor the Company will have any liability for any Damages to the extent such Damages: (i) have been actually recovered by the ESOP or its Affiliates (including the Company after the Closing) under any policy of insurance or from a third party; (ii) arose out of the failure of the ESOP or its Affiliates (including the Company after the Closing) to use all reasonable commercial efforts to mitigate all Losses that could reasonably be subject to an indemnification claim against any Selling Stockholder hereunder; or (iii) represents or constitutes punitive, incidental, consequential, indirect or special damages (except to the extent owed to a third party);

(iii)    any indemnification obligations hereunder with respect to Damages resulting from (A) a breach of a representation or warranty of a Selling Stockholder contained in Section 3.2 or (B) a breach or nonfulfillment by a Selling Stockholder of any of its covenants or obligations under this Agreement, shall be the sole obligation of such breaching or nonfulfilling Selling Stockholder;

(iv)    no claims for indemnification shall be made by any ESOP Indemnified Party against either the Selling Stockholders or the Company until the aggregate amount of Damages for which all such indemnification claims are made by the ESOP Indemnified Parties hereunder equals or

26

exceeds $1,000,000 (which amount shall include only Damages recoverable in accordance with clause (ii) above but for the limitation in this clause (iv)), at which time the ESOP Indemnified Parties shall be entitled to recover the entire amount of such Damages in excess of $1,000,000 subject to the cap in clause (v) below and the other provisions of this Section 6.3(c); and

(v)    except in the case of fraud, the aggregate indemnity liability of the Indemnifying Stockholders pursuant to Section 6.1(b) shall not collectively exceed 18% of the Purchase Price, or a total of $18,900,000. In the event of a claim for indemnification against the Indemnifying Stockholders pursuant to Section 6.1(b), the ESOP Indemnified Parties' sole and exclusive source of recovery shall be to offset such claims against the amounts otherwise payable by the ESOP to the Indemnifying Stockholders pursuant to the Seller Notes, and in no event shall any Selling Stockholder be liable for any amounts in excess of such amount.

Section 6.4    Survival.  All covenants and agreements of each party set forth herein requiring performance after the Closing shall survive the Closing and shall remain in effect until performed or waived. Further, all representations and warranties in this Agreement or in the exhibits, schedules or certificates delivered pursuant hereto, including, without limitation, the Disclosure Schedule, and any claims related to fraud, and the rights to indemnification hereunder, shall survive the Closing, except as otherwise set forth in this Section 6.4, shall remain in effect until the later of (i) 18 months after Closing, and (ii) ninety (90) calendar days after the date on which the reviewed financial statements for the period ending May 30, 2016 are provided to the Trustee and Independent Financial Advisor, and not thereafter. Each representation and warranty set forth in Sections 3.2(a) through 3.2(e), and Sections 3.3(a) through 3.3(d) shall survive forever, and each representation and warranty in Sections 3.3(i), 3.3(n) and 3.3(p) shall survive Closing until the conclusion of the applicable statute of limitations. The survival period with respect to any indemnification claim timely asserted by the indemnified party shall extend beyond the survival period stated herein and shall continue until such claim is resolved.

Section 6.5    Setoff.  In accordance with Section 6.3(c)(v) above, in the event that a court of competent jurisdiction renders a final determination (from which no timely appeal is taken or which appeal right has expired) that the Indemnifying Stockholders are liable to the ESOP for Damages under this Article VI, then the ESOP shall be required to first setoff and withhold any portion of such Damages (in lieu of payment of such Damages by the Indemnifying Stockholders to the ESOP) against any and all payments due under the respective Indemnifying Stockholder's Seller Note. Any amount satisfied and deducted and otherwise offset from the Seller Notes pursuant to this Section 6.5 shall be allocated between the Seller Notes on a pro rata basis.

Section 6.6    Insurance.  The amount of any claims or Damages subject to indemnification under this Article VI shall be calculated net of any amounts recovered by the ESOP or its Affiliates (including the Company after the Closing) under applicable insurance policies (but taking into account any deductible or retention and premium increase resulting therefrom) held by the ESOP or its Affiliates (including the Company after the Closing). The ESOP agrees to make or cause to be made commercially reasonable claims for insurance under such policies that may be applicable to the matter giving rise to the indemnification claim hereunder; provided that the availability of insurance shall not in any way affect the ESOP's indemnification remedies hereunder.

Section 6.7    Tax Benefits.  The amount of any Damages incurred by an indemnified party shall be calculated net of any tax benefits which have been actually realized by the indemnified party as a result thereof which are reasonably probable of realization by the indemnified party in subsequent tax years. In computing the amount of any such tax benefits, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any items arising from the receipt or accrual of any indemnity payment hereunder or the incurrence or payment of any indemnified Damages for which indemnification is provided hereunder. For purposes of this Agreement, the indemnified party shall be deemed to have "actually realized" a net tax benefit to the extent that, and at such time as, the amount of taxes payable by the indemnified party (disregarding the benefit of any then available NOLs) is reduced below the amount of Taxes that the indemnified party would have been required to pay but for the receipt or accrual of the indemnity payment or the incurrence or payment of

27

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000597

such Damages for which indemnification is provided hereunder<u>No Right of Contribution</u>.  The Selling Stockholders will have no right to seek contribution from the ESOP or the Company with respect to all or any part of the Selling Stockholders' indemnification obligations under this Article VI.

**ARTICLE VII**
**<u>MISCELLANEOUS</u>**

Section 7.1    <u>Expenses</u>.    The Company shall pay all of the Selling Stockholders' and the ESOP's reasonable expenses, in connection with the authorization, preparation, execution and performance of this Agreement, including without limitation, all fees and expenses of agents, representatives, counsel, accountants and consultants.

Section 7.2    <u>Notices</u>.    All notices, requests, demands and other communications provided for hereunder shall be in writing and directed to each applicable party at the address set forth hereafter or at such other address as to which such party may inform the other parties in writing in compliance with the terms of this Section:

| | |
|---|---|
| To the ESOP: | RVR Employee Stock Ownership Trust<br>c/o Reliance Trust Company<br>1100 Abernathy Road, Suite 400<br>Atlanta, GA 30328<br>Attention: Steve Martin<br>Email: smartin@relico.com |
| Copy to:<br>(which shall not<br>constitute notice) | K&L Gates<br>171 Main Street, Suite 2800<br>Dallas, TX 75201<br>Attention: Erin Turley<br>Email: erin.turley@klgates.com |
| To the Company: | RVR, Inc.<br>11 West Hampton Avenue<br>Mesa, AZ 85210<br>Attention: Eric Bensen<br>Email: ebensen@cruiseamerica.com |
| Copy to:<br>(which shall not<br>constitute notice) | Greenberg Traurig, LLP<br>2375 East Camelback Road, Suite 700<br>Phoenix, AZ 85016<br>Attention: Bruce E. Macdonough<br>Email: macdonoughb@gtlaw.com |
| Copy to:<br>(which shall not<br>constitute notice) | Chartwell Capital Solutions<br>33 South 6th Street, Suite 4750<br>Minneapolis, MN 55402<br>Attention: Greg Fresh<br>Email: greg.fresh@chartwellcapitalsolutions.com |

28

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000598

To each of the
Selling Stockholders:

Family Trust created under the Smalley Revocable Trust, dated July 8, 2004
Marital Trust created under the Smalley Revocable Trust, dated July 8, 2004
Survivor's Trust created under the Smalley Revocable Trust, dated July 8, 2004
c/o Randall Smalley, Trustee
11 W. Hampton Ave.
Mesa, AZ 85210
Email: rsmalley@cruiseamerica.com

Robert Smalley, Jr.
11 W. Hampton Ave.
Mesa, AZ 85210
Email: bsmalley@cruiseamerica.com

Eric Bensen
11 W. Hampton Ave.
Mesa, AZ 85210
Email: ebensen@cruiseamerica.com

Copy to:
(which shall not
constitute notice)

Weiss Brown PLLC
6263 N. Scottsdale Road, Suite 340
Scottsdale, AZ 85250
Attention: Scott K. Weiss
Email: scott.weiss@weissbrown.com

or to such other address as any party shall have specified by notice given to the other parties in the manner specified herein. Notices shall be deemed properly delivered and received when (a) if personally delivered, upon receipt thereof, (b) if sent via email, only if such notice is also delivered by hand, or deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, on or before two business days after its delivery by email, (c) if sent by a commercial overnight courier for delivery on the next business day, on the first business day after deposit with such courier for delivery, or (d) if sent by registered or certified mail, return receipt requested, five business days after deposit thereof in the United States mail.

Section 7.3    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. No party shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of all of the other parties hereto; provided, however, that the Company may collaterally assign its rights under this Agreement and all related documents to any third party financial institution to secure a secured credit facility and their successors and assigns.

Section 7.4    Action Taken as Trustee. The Trustee has executed and delivered this Agreement and related documents, not in its corporate capacity, but solely as trustee of the Trust. The performance of this Agreement and the related documents by the Trustee and any and all duties, obligations and liabilities of the Trustee hereunder will be effected by it only as trustee and not in its corporate capacity. The Trustee does not undertake nor shall it have any personal liability or obligation of any nature whatsoever by virtue of the execution and delivery of this Agreement and the related documents or the representations, covenants or warranties contained herein.

Section 7.5    Entire Agreement; Amendment. This Agreement, including the Disclosure Schedule, exhibits and other documents referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof and shall supersede all previous negotiations,

29

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000599

commitments and writings.  The parties may not amend, modify or supplement this Agreement, except in such manner as may be agreed upon in writing signed by all parties hereto.

Section 7.6    Waiver, Discharge, etc.  This Agreement may not be released, discharged or modified except by an instrument in writing signed by or on behalf of each of the parties hereto.  The failure of a party to enforce any provision of this Agreement shall not be deemed a waiver by such party of any other provision or subsequent breach of the same or any other obligation hereunder.

Section 7.7    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER, THE LAW OF THE STATE OF ARIZONA APPLICABLE TO AGREEMENTS OR INSTRUMENTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH STATE.

Section 7.8    Jurisdiction; Waiver of Jury Trial.

(a)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 6.2(d) HEREOF, ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY HEREIN, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF THE STATE OF ARIZONA THAT ARE LOCATED IN MARICOPA COUNTY, ARIZONA AND NOT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY.  EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO SUCH PARTY'S ADDRESS SET FORTH IN SECTION 7.2, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING.

(b)    EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES TO THE EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT.

Section 7.9    Counterparts; Facsimile Signature.  Telefacsimile or "PDF" transmissions of any executed original document and/or retransmission of any executed telefacsimile or "PDF" transmission shall be deemed to be the same as the delivery of an executed original.  At the request of any party hereto, the other party hereto shall confirm telefacsimile or "PDF" transmissions by executing duplicate original documents and delivering the same to the requesting party.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

Section 7.10    Severability.  Any portion of this Agreement that a court of competent jurisdiction shall determine to be void or unenforceable for being against public policy, or for any other reason, shall be deemed to be severable from this Agreement and shall have no effect on the other covenants or provisions in this Agreement.  It is agreed that such court shall be empowered to reform and construe any provision which would otherwise be void or unenforceable in a manner that will be valid and enforceable to the maximum extent permitted by Law.

Section 7.11    Headings; General Interpretive Principles.  The headings in the sections of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect the meaning or interpretation hereof.  Whenever used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders.

30

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000600

Section 7.12    Further Assurances.  Each of the parties shall execute and deliver such other documents and take such other or further action as any other party may reasonably request so as to consummate the transactions contemplated hereby more effectively.

Section 7.13    Consent of Spouse.  Each Selling Stockholder who is a natural person shall cause such Selling Stockholder's spouse to execute and deliver a separate acknowledgment and consent in substantially the form attached hereto as Exhibit D (the "Spousal Consent").  The signature of such Selling Stockholder's spouse on the Spousal Consent shall not be construed as making such spouse a party to this Agreement.

[Remainder of page intentionally left blank]

31

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                          ARGENT 0000601

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

COMPANY:

RVR, INC.

By: _____
Eric Bensen, Chief Financial Officer

SELLING STOCKHOLDERS:

_____
Eric Bensen

_____
Robert Smalley, Jr.

FAMILY TRUST CREATED UNDER THE SMALLEY
REVOCABLE TRUST dated July 8, 2004

By: _____
Randall S. Smalley, Trustee

MARITAL TRUST CREATED UNDER THE SMALLEY
REVOCABLE TRUST dated July 8, 2004

By: _____
Randall S. Smalley, Trustee

SURVIVOR'S TRUST CREATED UNDER THE
SMALLEY REVOCABLE TRUST dated July 8, 2004

By: _____
Randall S. Smalley, Trustee

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000602

DOL 0010199

RVR EMPLOYEE STOCK OWNERSHIP TRUST

By:    Reliance Trust Company, not in its corporate capacity
       but solely in its capacity as the trustee of the RVR
       Employee Stock Ownership Trust

By:    _____
       Stephen A. Martin, Senior Vice President

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT 0000603

DOL 0010200

**Schedule I**
**Schedule of Selling Stockholders and Allocation of Purchase Price**

| Selling Stockholder | Cash Payment |
|---|---|
| Family Trust created under the Smalley Revocable Trust dated July 8, 2004 | $20,055.000.00 |
| Marital Trust created under the Smalley Revocable Trust dated July 8, 2004 | $3,570,000.00 |
| Survivor's Trust created under the Smalley Revocable Trust dated July 8, 2004 | $27,125,000.01 |
| Robert Smalley, Jr. | $50,750,000.01 |
| Eric Bensen | $3,499,999.99 |
| **TOTAL:** | **$105,000,000.00** |

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY  ARGENT 0000604

DOL 0010201

Exhibit A

Form of Employment Contract

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT 0000605

DOL 0010202

Exhibit B

Investor Rights Agreement

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000606

DOL 0010203

Exhibit C

Subordinated Note and Warrant Purchase Agreement

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000607

Exhibit D

Spousal Consent

I understand that my spouse is entering into a Stock Purchase Agreement (the "Agreement") with Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee of the RVR Employee Stock Ownership Trust, as amended from time to time, established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time, RVR, Inc., a Florida corporation, and the other Selling Stockholders.

I hereby consent to and agree to the terms and provisions of the Agreement insofar as my consent and agreement is necessary pursuant to applicable marital property laws in order to make the Agreement binding and effective as it relates to my spouse.

This Consent of Spouse shall be effective as of the date of the Agreement. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Name: _____

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

DOL 0010205

Spousal Consent

I understand that my spouse is entering into a Stock Purchase Agreement (the "Agreement") with Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee of the RVR Employee Stock Ownership Trust, as amended from time to time, established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time, RVR, Inc., a Florida corporation, and the other Selling Stockholders.

I hereby consent to and agree to the terms and provisions of the Agreement insofar as my consent and agreement is necessary pursuant to applicable marital property laws in order to make the Agreement binding and effective as it relates to my spouse.

[Remainder of Page Intentionally Left Blank]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000609

This Consent of Spouse shall be effective as of the date of the Agreement. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Name: Jill Smalley

Spousal Consent

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000610

Spousal Consent

I understand that my spouse is entering into a Stock Purchase Agreement (the "Agreement") with Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee of the RVR Employee Stock Ownership Trust, as amended from time to time, established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time, RVR, Inc., a Florida corporation, and the other Selling Stockholders.

I hereby consent to and agree to the terms and provisions of the Agreement insofar as my consent and agreement is necessary pursuant to applicable marital property laws in order to make the Agreement binding and effective as it relates to my spouse.

[Remainder of Page Intentionally Left Blank]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000611

This Consent of Spouse shall be effective as of the date of the Agreement. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Name: Chesley K. Bensen

Spousal Consent

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000612

DOL 0010209

Spousal Consent

I understand that my spouse is entering into a Stock Purchase Agreement (the "Agreement") with Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee of the RVR Employee Stock Ownership Trust, as amended from time to time, established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time, RVR, Inc., a Florida corporation, and the other Selling Stockholders.

I hereby consent to and agree to the terms and provisions of the Agreement insofar as my consent and agreement is necessary pursuant to applicable marital property laws in order to make the Agreement binding and effective as it relates to my spouse.

[Remainder of Page Intentionally Left Blank]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000613

This Consent of Spouse shall be effective as of the date of the Agreement.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Name: Paula K. Smalley

Spousal Consent

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000614

# Exhibit 26

DOL 0009601

Execution Version

# RVR EMPLOYEE STOCK OWNERSHIP PLAN

**Effective Date:  June 1, 2013**

**EXHIBIT**

PI 155 – (Bensen 06/08/21)

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY     ARGENT  0000005

## Table of Contents

Article 1 ................................................................................................................................. - 1 -
Definitions ............................................................................................................................ - 1 -
    1.1       Administrator ............................................................................................. - 1 -
    1.2       Adopting Employer ..................................................................................... - 1 -
    1.3       Affiliated Employer..................................................................................... - 1 -
    1.4       Age ............................................................................................................ - 1 -
    1.5       Allocation Period........................................................................................ - 1 -
    1.6       Annual Additions........................................................................................ - 1 -
    1.7       Annuity Starting Date................................................................................. - 2 -
    1.8       Beneficiary................................................................................................. - 2 -
    1.9       Benefiting Participant................................................................................. - 2 -
    1.10    Break in Service ........................................................................................ - 2 -
    1.11    Code........................................................................................................... - 2 -
    1.12    Code §401(a)(17) Compensation Limit...................................................... - 2 -
    1.13    Code §415(c)(3) Compensation ................................................................ - 3 -
    1.14    Committee .................................................................................................. - 3 -
    1.15    Compensation ........................................................................................... - 3 -
    1.16    Compensation Determination Period......................................................... - 4 -
    1.17    Counting of Hours Method......................................................................... - 4 -
    1.18    Current Obligations.................................................................................... - 4 -
    1.19    Deemed Code §125 Compensation .......................................................... - 4 -
    1.20    Deemed Reemployment............................................................................. - 4 -
    1.21    Determination Date.................................................................................... - 4 -
    1.22    Differential Wage Payment........................................................................ - 4 -
    1.23    Disability .................................................................................................... - 4 -
    1.24    Distribution Calendar Year ........................................................................ - 4 -
    1.25    Eligibility Computation Period .................................................................... - 4 -
    1.26    Eligible Employee ...................................................................................... - 5 -
    1.27    Employment Commencement Date............................................................ - 5 -
    1.28    Employee ................................................................................................... - 5 -
    1.29    Employer ................................................................................................... - 5 -
    1.30    Employer Securities................................................................................... - 5 -
    1.31    Employer Securities Account..................................................................... - 5 -
    1.32    Exempt Loan ............................................................................................. - 5 -
    1.33    Forfeiture .................................................................................................. - 6 -
    1.34    Form W-2 Compensation .......................................................................... - 6 -
    1.35    HCE........................................................................................................... - 6 -
    1.36    Highly Compensated Employee ................................................................ - 6 -
    1.37    Hour of Service.......................................................................................... - 6 -
    1.38    Immediately Distributable .......................................................................... - 7 -
    1.39    Key Employee ........................................................................................... - 7 -
    1.40    Leased Employee ...................................................................................... - 7 -
    1.41    Life Expectancy ......................................................................................... - 7 -
    1.42    Limitation Year........................................................................................... - 7 -
    1.43    Maternity or Paternity Leave...................................................................... - 7 -
    1.44    Named Fiduciary ....................................................................................... - 7 -
    1.45    NHCE ........................................................................................................ - 8 -
    1.46    Non-Highly Compensated Employee......................................................... - 8 -
    1.47    Non-Key Employee.................................................................................... - 8 -
    1.48    Non-Spouse Designated Beneficiary......................................................... - 8 -
    1.49    Normal Retirement Age ............................................................................. - 8 -
    1.50    Normal Retirement Date............................................................................ - 8 -
    1.51    Notice/Form ............................................................................................... - 8 -
    1.52    Other Investments Account ....................................................................... - 8 -
    1.53    Participant ................................................................................................. - 8 -
    1.54    Participant's Account ................................................................................. - 8 -
    1.55    Participant's Account Balance ................................................................... - 8 -
    1.56    Participant Election.................................................................................... - 8 -
    1.57    Permissive Aggregation Group.................................................................. - 9 -
    1.58    Plan ........................................................................................................... - 9 -
    1.59    Plan Year................................................................................................... - 9 -
    1.60    Post-Severance Compensation ................................................................ - 9 -
    1.61    Qualified Domestic Relations Orders or QDRO......................................... - 9 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

| 1.62 | Qualified Military Service | - 9 - |
| 1.63 | Qualified Reservist | - 9 - |
| 1.64 | Readily Tradable on an Established Securities Market | - 9 - |
| 1.65 | Recipient | - 9 - |
| 1.66 | Required Aggregation Group | - 9 - |
| 1.67 | Required Beginning Date | - 10 - |
| 1.68 | Regulation | - 10 - |
| 1.69 | Rollover Contribution (or Rollover) | - 10 - |
| 1.70 | Rule of Parity | - 10 - |
| 1.71 | S Corporation | - 10 - |
| 1.72 | S Corporation Distribution | - 10 - |
| 1.73 | Sponsoring Employer | - 10 - |
| 1.74 | Spouse | - 10 - |
| 1.75 | Terminated (or Terminates) Employment | - 10 - |
| 1.76 | Terminated Participant | - 10 - |
| 1.77 | Termination of Employment | - 10 - |
| 1.78 | Top Heavy | - 10 - |
| 1.79 | Top Heavy Minimum Allocation | - 11 - |
| 1.80 | Top Heavy Ratio | - 11 - |
| 1.81 | Transfer Contribution | - 12 - |
| 1.82 | Transfer Contribution Account | - 12 - |
| 1.83 | Trustee | - 12 - |
| 1.84 | Trust | - 12 - |
| 1.85 | Trust Fund | - 12 - |
| 1.86 | Unallocated Employer Securities Account | - 12 - |
| 1.87 | USERRA | - 12 - |
| 1.88 | USERRA Reemployment Rights | - 12 - |
| 1.89 | Valuation Calendar Year | - 12 - |
| 1.90 | Valuation Date | - 13 - |
| 1.91 | Vested Aggregate Account | - 13 - |
| 1.92 | Vested, Vested Interest or Vesting | - 13 - |
| 1.93 | Vesting Computation Period | - 13 - |
| 1.94 | Year of Service | - 13 - |

| **Article 2** | | **- 16 -** |
| **Plan Participation** | | **- 16 -** |
| 2.1 | Eligibility and Entry Date Requirements | - 16 - |
| 2.2 | Waiver of Participation | - 16 - |
| 2.3 | Reemployment After Termination | - 16 - |

| **Article 3** | | **- 17 -** |
| **Contributions and Allocations** | | **- 17 -** |
| 3.1 | Employer Contributions | - 17 - |
| 3.2 | Earnings and Losses | - 18 - |
| 3.3 | Forfeitures and Their Usage | - 19 - |
| 3.4 | Top Heavy Minimum Allocation | - 19 - |
| 3.5 | Failsafe Allocation | - 20 - |
| 3.6 | Rollover Contributions | - 21 - |
| 3.7 | Transactions Involving Employer Securities | - 21 - |

| **Article 4** | | **- 28 -** |
| **Plan Benefits** | | **- 28 -** |
| 4.1 | Benefit Upon Normal Retirement | - 28 - |
| 4.2 | Benefit Upon Late Retirement | - 28 - |
| 4.3 | Benefit Upon Death | - 28 - |
| 4.4 | Benefit Upon Disability | - 28 - |
| 4.5 | Benefit Upon Termination of Employment | - 28 - |
| 4.6 | Determination of Vested Interest | - 28 - |

| **Article 5** | | **- 30 -** |
| **Distribution of Benefits** | | **- 30 -** |
| 5.1 | Distribution of Benefit Upon Retirement | - 30 - |
| 5.2 | Distribution of Benefit Upon Death | - 30 - |
| 5.3 | Distribution of Benefit Upon Disability | - 31 - |
| 5.4 | Distribution of Benefit Upon Termination of Employment | - 31 - |
| 5.5 | Mandatory Cash-Out of Benefits | - 32 - |
| 5.6 | Restrictions on Immediate Distributions | - 32 - |

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000007

| 5.7 | Accounts of Rehired Participants | - 33 - |
| 5.8 | Spousal Consent Requirements | - 35 - |
| 5.9 | Required Minimum Distributions | - 35 - |
| 5.10 | Statutory Commencement of Benefits | - 37 - |
| 5.11 | Post-Termination Earnings | - 37 - |
| 5.12 | Distribution in the Event of Legal Incapacity | - 37 - |
| 5.13 | Missing Payees and Unclaimed Benefits | - 37 - |
| 5.14 | Direct Rollovers | - 38 - |
| 5.15 | Distributions of Stock | - 39 - |
| 5.16 | Cash Dividends on Employer Securities | - 40 - |
| 5.17 | Right of First Refusal | - 40 - |
| 5.18 | Put Option | - 41 - |
| 5.19 | Non-Terminable Rights and Protections | - 42 - |
| 5.20 | Mandatory Repurchase for Distributions Made by Certain Corporations | - 42 - |
| 5.21 | Financial Hardship Distributions | - 42 - |
| 5.22 | Pre-Retirement Distributions | - 42 - |
| 5.23 | Distribution of Transfer Contributions | - 42 - |
| 5.24 | Transfers to Nonqualified Foreign Trusts | - 42 - |

**Article 6** ... - 43 -
**Code § 415 Limitations** ... - 43 -

| 6.1 | Maximum Annual Additions | - 43 - |
| 6.2 | Adjustments to Maximum Annual Addition | - 43 - |
| 6.3 | Aggregation of Plans | - 43 - |
| 6.4 | No Allocations in Excess of Annual Addition Limits | - 45 - |
| 6.5 | Adjustment for Excessive Annual Additions | - 45 - |

**Article 7** ... - 46 -
**Employer Securities, Loans, Insurance and Directed Investments** ... - 46 -

| 7.1 | Voting Employer Securities | - 46 - |
| 7.2 | Restrictions on Employer Securities Transactions | - 46 - |
| 7.3 | Exempt Loans | - 46 - |
| 7.4 | Diversification Rights of Qualified Participants | - 47 - |
| 7.5 | Loans to Participants | - 48 - |
| 7.6 | Insurance on Participants | - 48 - |
| 7.7 | Directed Investment Accounts | - 48 - |

**Article 8** ... - 49 -
**Duties of the Administrator** ... - 49 -

| 8.1 | Appointment, Resignation, Removal and Succession | - 49 - |
| 8.2 | General Powers and Duties | - 49 - |
| 8.3 | Functions of Committee | - 49 - |
| 8.4 | Multiple Administrators | - 49 - |
| 8.5 | Correcting Administrative Errors | - 49 - |
| 8.6 | Promulgating Notices and Procedures | - 49 - |
| 8.7 | Employment of Agents and Counsel | - 50 - |
| 8.8 | Compensation and Expenses | - 50 - |
| 8.9 | Claims Procedures | - 50 - |
| 8.10 | Qualified Domestic Relations Orders | - 50 - |
| 8.11 | Appointment of Investment Manager | - 50 - |

**Article 9** ... - 52 -
**Trustee Provisions** ... - 52 -

| 9.1 | Appointment, Resignation, Removal and Succession | - 52 - |
| 9.2 | Investment Alternatives of the Trustee | - 52 - |
| 9.3 | Valuation of the Trust | - 52 - |
| 9.4 | Compensation and Expenses | - 52 - |
| 9.5 | Payments From the Trust Fund | - 53 - |
| 9.6 | Payment of Taxes | - 53 - |
| 9.7 | Accounts, Records and Reports | - 53 - |
| 9.8 | Employment of Agents and Counsel | - 53 - |
| 9.9 | Division of Duties | - 53 - |
| 9.10 | Investment Manager | - 54 - |
| 9.11 | Exclusive Benefit Rule | - 54 - |
| 9.12 | Application of Cash | - 54 - |

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000008

| | | |
|---|---|---|
| **Article 10**............................................................................................................................................ | | **- 55 -** |
| **Adopting Employer Provisions**.................................................................................................. | | **- 55 -** |
| 10.1 | Plan Contributions ................................................................................................ | - 55 - |
| 10.2 | Plan Amendments ................................................................................................. | - 55 - |
| 10.3 | Plan Expenses........................................................................................................ | - 55 - |
| 10.4 | Employee Transfers ............................................................................................. | - 55 - |
| 10.5 | Multiple Employer Provisions Under Code §413(c) ....................................... | - 55 - |
| 10.6 | Termination of Adoption ..................................................................................... | - 55 - |
| | | |
| **Article 11**............................................................................................................................................ | | **- 57 -** |
| **Amendment, Termination, Merger and Transfers** ............................................................. | | **- 57 -** |
| 11.1 | Plan Amendment .................................................................................................. | - 57 - |
| 11.2 | Termination By Sponsoring Employer ............................................................. | - 57 - |
| 11.3 | Merger or Consolidation ..................................................................................... | - 58 - |
| 11.4 | Plan-to Plan Transfers......................................................................................... | - 58 - |
| 11.5 | Transfer of Plan Sponsorship ........................................................................... | - 59 - |
| | | |
| **Article 12**............................................................................................................................................ | | **- 60 -** |
| **Miscellaneous Provisions** ........................................................................................................ | | **- 60 -** |
| 12.1 | No Contract of Employment .............................................................................. | - 60 - |
| 12.2 | Title to Assets ........................................................................................................ | - 60 - |
| 12.3 | Fiduciaries and Bonding ..................................................................................... | - 60 - |
| 12.4 | Severability of Provisions.................................................................................... | - 60 - |
| 12.5 | Interpretation of the Plan .................................................................................... | - 60 - |
| 12.6 | Legal Action............................................................................................................ | - 61 - |
| 12.7 | Qualified Plan Status ........................................................................................... | - 61 - |
| 12.8 | Mailing of Notices to Administrator, Employer or Trustee............................ | - 61 - |
| 12.9 | Participant Notices and Waivers of Notices ................................................... | - 61 - |
| 12.10 | No Duplication of Benefits .................................................................................. | - 61 - |
| 12.11 | Evidence Furnished Conclusive ....................................................................... | - 61 - |
| 12.12 | Release of Claims ................................................................................................ | - 61 - |
| 12.13 | Multiple Copies of Plan And/or Trust ............................................................... | - 61 - |
| 12.14 | Limitation of Liability and Indemnification ...................................................... | - 61 - |
| 12.15 | Written Elections and Forms............................................................................... | - 61 - |
| 12.16 | Assignment and Alienation of Benefits ............................................................ | - 61 - |
| 12.17 | Exclusive Benefit Rule......................................................................................... | - 62 - |
| 12.18 | Notice and Consent Requirements................................................................... | - 62 - |
| 12.19 | Coordination With USERRA ............................................................................... | - 64 - |
| 12.20 | Dual and Multiple Trusts...................................................................................... | - 64 - |

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000009

# RVR
## Employee Stock Ownership Plan

**This Agreement** is made as of the 22nd day of May, 2014, by **RVR, Inc.** (hereafter the "Sponsoring Employer").

## Introduction

The Sponsoring Employer wishes to establish an employee stock ownership plan designed to invest primarily in qualifying Employer Securities as provided under Code §4975(e)(7). Therefore, effective June 1, 2013, the Sponsoring Employer establishes this plan (hereafter, the "Plan") intended to comply with the requirements of the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code of 1986, both as amended by subsequent legislation, and intended to comply with all applicable rulings and Regulations thereunder.

## Article 1
## Definitions

**1.1** **Administrator.** The term "Administrator" means the Sponsoring Employer unless a Committee or another Administrator is appointed under Section 8.1. The term "Administrator" also means a Qualified Termination Administrator ("QTA") charged with the task of holding the assets of an orphan plan as permitted by the Department of Labor. A QTA must be an eligible custodian such as a bank, mutual fund house, or insurance company.

**1.2** **Adopting Employer.** The term "Adopting Employer" means an Affiliated Employer which adopts this Plan with the consent of the Sponsoring Employer. In addition to all the other terms and conditions set forth in the Plan, an Adopting Employer will also be subject to the terms and conditions set forth in Article 10. An Affiliated Employer is not considered an Adopting Employer unless it has specifically adopted the Plan.

**1.3** **Affiliated Employer.** The term "Affiliated Employer" means any of the following: (1) a controlled group of corporations as defined in Code §414(b) that includes the Sponsoring Employer; (2) a trade or business (whether or not incorporated) under common control as described in Code §414(c) with the Sponsoring Employer; (3) any organization (whether or not incorporated) which is a member of an affiliated service group as described in Code §414(m) with the Sponsoring Employer; and (4) any other entity required to be aggregated as described in Code §414(o) with the Sponsoring Employer.

**1.4** **Age.** The term "Age" means a Participant's actual attained age unless otherwise specified under the terms of the Plan.

**1.5** **Allocation Period.** The term "Allocation Period" means a period of 12 consecutive months or less, as determined by the Administrator, for which (a) a contribution is made by an Employer and allocated under the terms of the Plan; (b) Forfeitures are allocated under the terms of the Plan; or (c) earnings and losses are allocated under the terms of the Plan.

**1.6** **Annual Additions.** The term "Annual Additions" means the sum of the following amounts credited on a Participant's behalf for any Limitation Year: (a) Employer contributions, even if such contributions are excess aggregate contributions (as described in Code §401(m)(6)(B)), or such excess aggregate contributions are corrected through distribution; (b) employee contributions, including voluntary employee contributions, but excluding any rollover contributions (as described in §415(c)(2)); (c) Forfeitures; (d) contributions allocated to any individual medical account, as defined in Code §415(l)(2), which is part of a pension or annuity plan established pursuant to Code §401(h) and maintained by the Employer; (e) amounts attributable to post-retirement medical benefits allocated to a separate account for a Key Employee, maintained by the Employer; and (f) the difference between the value of any assets transferred to the Plan and the consideration, where an Employee or the Employer transfers assets to the Plan in exchange for consideration that is less than the fair market value of the assets transferred to the Plan. Except to the extent required under Code §415, no other amounts credited to a Participant's Account for a Limitation Year are considered Annual Additions.

- 1 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000010

1.7     **Annuity Starting Date.** The term "Annuity Starting Date" means the first day of the first period for which a benefit is paid as an annuity, or in the case of a benefit not payable as an annuity, the first day all events have occurred which entitle the Participant to the benefit. The first day of the first period for which a benefit is payable because of Disability will be treated as the Annuity Starting Date only if it is not an auxiliary benefit.

1.8     **Beneficiary.** The term "Beneficiary" means the recipient designated by a Participant to receive the benefit payable upon the Participant's death, or the recipient designated by a Beneficiary to receive any benefit payable in the event of the Beneficiary's death prior to receiving the entire death benefit to which the Beneficiary is entitled. All Beneficiary designations will be made subject to the following provisions:

   (a)     **Beneficiary Designations By a Participant.** Subject to the provisions of Section 5.8 regarding the rights of a Participant's Spouse, each Participant may designate a Beneficiary in writing with the Administrator. If a Participant designates his or her Spouse and the Participant and his or her Spouse are legally divorced subsequent to the date of the designation, then the designation of such Spouse as a Beneficiary hereunder will be deemed null and void unless the Participant, subsequent to the legal divorce, reaffirms the designation in writing. In the absence of any other designation, the Participant will be deemed to have designated the following Beneficiaries in the following order, provided however, that with respect to clauses (1) and (2) following, such Beneficiaries are then living: (1) the Participant's Spouse, (2) the Participant's issue per stirpes; and (3) the Participant's estate.

   (b)     **Beneficiary Designations By a Beneficiary.** In the absence of a Beneficiary designation or other directive from a Participant to the contrary, any Beneficiary may name his or her own Beneficiary in accordance with Section 5.2(d) to receive any benefits payable in the event of the Beneficiary's death prior to the receipt of all the Participant's death benefits to which the Beneficiary was entitled.

   (c)     **Beneficiaries Considered Contingent Until the Death of the Participant.** Notwithstanding any provision in this Section to the contrary, any Beneficiary named hereunder will be considered a contingent Beneficiary until the death of the Participant (or Beneficiary, as the case may be), and until such time will have no rights granted to Beneficiaries under the Plan.

1.9     **Benefiting Participant.** The term "Benefiting Participant" means a Participant who is eligible to receive an allocation of Employer contributions or Forfeitures as of the last day of an Allocation Period. The requirements to be a Benefiting Participant are set forth in Section 3.1(c).

1.10     **Break in Service.** The term *Break in Service* means (a) in determining eligibility under Section 2.1, an Eligibility Computation Period during which an Employee is not credited with more than 500 Hours of Service; and (b) in determining Vesting under Section 4.6, a Vesting Computation Period during which an Employee is not credited with more than 500 Hours of Service. If any computation period is less than 12 months, then the Hours of Service threshold set forth in the preceding sentence will be proportionately reduced if the Hours of Service threshold is greater than one. Notwithstanding the foregoing, an Employee who is reemployed under USERRA will not be treated as having incurred a Break in Service with respect to the period of his or her Qualified Military Service.

1.11     **Code.** The term "Code" means the Internal Revenue Code of 1986, as amended, and the Regulations and rulings promulgated thereunder by the Department of Treasury, or its agency thereunder. All citations to sections of the Code and Regulations are to such sections as they may from time to time be amended or renumbered.

1.12     **Code §401(a)(17) Compensation Limit.** The term "Code §401(a)(17) Compensation Limit" means the statutory limit that applies to each Participant's annual Compensation for a specific Compensation Determination Period which is taken into account under the Plan; such annual Compensation will not exceed $255,000. However, the $255,000 statutory limit on annual Compensation will be adjusted for cost-of-living increases in accordance with Code §401(a)(17)(B). The cost-of-living adjustment in effect for a calendar year applies to annual Compensation for the Compensation Determination Period that begins with or within such calendar year. If a Compensation Determination Period is less than 12 consecutive months, then the Code §401(a)(17) Compensation Limit will be multiplied by a fraction, the numerator of which is the number of months in the Compensation Determination Period, and the denominator of which is 12. If Compensation for any prior Compensation Determination Period is used in determining a Participant's Plan benefits for the current Plan Year, then the annual Compensation for such prior Compensation Determination Period is

- 2 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000011

DOL 0009608

subject to the applicable Code §401(a)(17) Compensation Limit as in effect for that prior Compensation Determination Period.

1.13    **Code §415(c)(3) Compensation.** The term "Code §415(c)(3) Compensation" means the following:

(a)    **Top Heavy and Key Employee Determinations.** In determining Top Heavy Minimum Allocations and if a Employee is a Key Employee, the term Code §415(c)(3) Compensation means Form W-2 Compensation during the entire Compensation Determination Period that statutorily applies.

(b)    **Code §415 Limitations.** In determining a Participant's Code §415 limitation for any Limitation Year, Code §415(c)(3) Compensation means Form W-2 Compensation during the entire Compensation Determination Period that statutorily applies.

(c)    **Highly Compensated Employee Determinations.** In determining if a Participant is a Highly Compensated Employee (or for any other statutory determination not described in paragraphs (a) and (b) above), Code §415(c)(3) Compensation means Form W-2 Compensation during the entire Compensation Determination Period that statutorily applies.

(d)    **Exclusions to Compensation Do Not Apply.** For all purposes, Code §415(c)(3) Compensation includes any amounts that are excluded from Compensation under Section 1.15.

(e)    **Inclusion of Certain Amounts.** For all purposes, Code §415(c)(3) Compensation includes (1) elective deferrals as defined in Code §402(g)(3) and amounts contributed or deferred by the Employer at the election of the Employee which are not includible in gross income under Code §125 (including Deemed Code §125 Compensation), Code §132(f)(4), or Code §457; (2) Post-Severance Compensation; and (3) Differential Wage Payments, but only to the extent such payments do not exceed the amounts the individual would have received from the Employer if the individual had continued to perform services for the Employer.

(f)    **Code §401(a)(17) Compensation Limit.** For all purposes, Code §415(c)(3) Compensation for any Limitation Year will not exceed the Code §401(a)(17) Compensation Limit that applies to that Limitation Year. If the Limitation Year is not the calendar year, then the Code §401(a)(17) Compensation Limit that applies to such Limitation Year is the Code §401(a)(17) Compensation Limit in effect for the respective calendar year in which such Limitation Year begins.

1.14    **Committee.** The term "Committee" means the administrative/advisory group that the Sponsoring Employer may establish, to which the Sponsoring Employer may appoint as Administrator or delegate certain of the Sponsoring Employer's responsibilities as Administrator. The Sponsoring Employer is permitted to select another name for such administrative/advisory group. The Sponsoring Employer may appoint one or more members to the Committee. Members of the Committee need not be Participants or Beneficiaries, and officers and directors of the Sponsoring Employer are not precluded from serving as members of the Committee.

1.15    **Compensation.** The term Compensation means amounts received by an Employee from the Employer during a Compensation Determination Period, determined in accordance with the following provisions:

(a)    **Compensation Used to Determine Employer Contributions.** In determining Employer contributions, the term Compensation means a Participant's Form W-2 Compensation received during the Compensation Determination Period. For purposes of this paragraph, (1) the Compensation Determination Period is the Plan Year; and (2) any elective deferrals as defined under Code §402(g) and any amount contributed or deferred by the Employer at the election of the Employee which is not includible in gross income by reason of Code §125, Code §132(f)(4) or Code §457, will be included in Compensation.

(b)    **Treatment of Differential Wage Payments as Compensation.** Any amount received by an individual as a Differential Wage Payment will not be treated as Compensation, and the Plan's definition of Compensation will not fail to satisfy Code §414(s) merely because such payments are excluded.

- 3 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000012

(c)  **Code §401(a)(17) Compensation Limit.** Notwithstanding any provision of this Section to the contrary, Compensation for any Compensation Determination Period (or Plan Year) will not exceed the applicable Code §401(a)(17) Compensation Limit.

**1.16  Compensation Determination Period.** The term "Compensation Determination Period" means the Plan Year, unless otherwise specifically set forth in the Plan with respect to a particular component or type of contribution. However, for purposes of a specific statutory determination (e.g. whether an Employee is a Highly Compensated Employee), the term "Compensation Determination Period" means the period stated in the Plan.

**1.17  Counting of Hours Method.** The term "Counting of Hours Method" means a method for crediting service for eligibility, for Vesting, for determining a Participant's allocation, and/or for applying the allocation conditions for an Employer contribution or Forfeiture. Under the Counting of Hours Method, an Employee is credited with the number of Hours of Service for which the Employee is paid or entitled to payment (or such other circumstances for which Hours of Service are credited), pursuant to the definition of Hour of Service.

**1.18  Current Obligations.** The term "Current Obligations" means obligations of the Trust Fund arising from the extension of credit to the Trust Fund and which are payable in cash within one year from the date an Employer contribution is made to the Plan.

**1.19  Deemed Code §125 Compensation.** The term "Deemed §125 Compensation" means an excludable amount that is not available to an Employee in cash in lieu of group health coverage under a Code §125 arrangement because that Employee is not able to certify that he or she has other health coverage. An amount is permitted to be treated as Deemed Code §125 Compensation only if the Employer does not request or collect information about the Employee's other health coverage as part of the enrollment process for the health plan.

**1.20  Deemed Reemployment.** The term "Deemed Reemployment" means, with respect to a Participant who is performing Qualified Military Service, that such Participant is deemed to have resumed employment with the Employer in accordance with the Participant's USERRA reemployment rights on the day preceding his or her death and to have Terminated Employment on the actual date of such death.

**1.21  Determination Date.** The term "Determination Date" means, for any Plan Year subsequent to the first Plan Year of the Plan, the last day of the preceding Plan Year. For the first Plan Year of the Plan, the term "Determination Date" means the last day of that first Plan Year.

**1.22  Differential Wage Payment.** The term "Differential Wage Payment" means any payment (as defined in Code §3401(h)) which (a) is made by the Employer to an individual with respect to any period during which the individual is performing service in the uniformed services (as defined in chapter 43, title 38, United States Code) while on active duty for a period of more than 30 days, and (b) represents all or a portion of the wages the individual would have received from the Employer if the individual were performing service for the Employer.

**1.23  Disability.** The term "Disability" means a physical or mental condition arising after an Employee has become a Participant which qualifies the Participant for benefits under an Employer-sponsored long-term disability plan which is administered by an independent third party.

**1.24  Distribution Calendar Year.** The term "Distribution Calendar Year" means, for purposes of required minimum distributions under Section 5.9, a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year that contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under Section 5.9(b)(2)(B). The required minimum distribution for the Participant's first Distribution Calendar Year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that Distribution Calendar Year.

**1.25  Eligibility Computation Period.** The term "Eligibility Computation Period" means a period of 12 consecutive months which is used for purposes of determining eligibility to participate in the Plan (or a component of the

- 4 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000013

Plan). An Employee's initial Eligibility Computation Period will begin on his or her Employment Commencement Date. The second Eligibility Computation Period will begin on the first day of the Plan Year which begins prior to the first anniversary of the Employee's Employment Commencement Date (regardless of whether the Employee is credited with a specific number of Hours of Service during the initial Eligibility Computation Period) and each subsequent Eligibility Computation Period will consist of each subsequent Plan Year.

1.26    **Eligible Employee.** The term "Eligible Employee" means any Employee, on or after the effective date of the Plan, who is a member of an eligible class of Employees and who is not excluded from participating in the Plan. If the Plan utilizes the failsafe allocation provisions of Section 3.5, then the term "Eligible Employee" means any Employee who receives a failsafe allocation, even if such Employee was previously excluded from participating in the Plan. Furthermore, the Sponsoring Employer may elect at any time to reclassify any Employee who had been excluded from participating in the Plan (or a component of the Plan) to be an Eligible Employee through a Plan amendment that is retroactively applied for one or more prior Plan Years because the Plan (or a component of the Plan) failed to satisfy for such Plan Year one of the tests set forth in Code §410(b)(1)(A), (B) or (C), or for any other reason the Sponsoring Employer deems it to be required to maintain the tax exempt status of the Plan. The term "Eligible Employee" shall not include any Employees who are employed by an Affiliated Employer that is not an Adopting Employer.

1.27    **Employment Commencement Date.** The term "Employment Commencement Date" means the first day that an Employee is credited with an Hour of Service by an Employer or an Affiliated Employer.

1.28    **Employee.** The term "Employee" means (a) any person who is reported on the payroll records of the Sponsoring Employer as an employee who is deemed by the Sponsoring Employer to be a common law employee; (b) any person that is reported on the payroll records of an Affiliated Employer as an employee who is deemed by the Affiliated Employer to be a common law employee (even if the Affiliated Employer is not an Adopting Employer); (c) any person who is classified as a Leased Employee by either the Sponsoring Employer or an Affiliated Employer but who (1) is not covered by a plan described in Code §414(n)(5), or (2) is covered by a plan described in Code §414(n)(5) but Leased Employees constitute more than 20% of the Employer's non-highly compensated workforce; and (d) any individual who is receiving Differential Wage Payments from the Sponsoring Employer or an Affiliated Employer. However, the term "Employee" will not include any person classified by the Sponsoring Employer or Affiliated Employer as an independent contractor. If an independent contractor is later determined by the Sponsoring Employer, an Affiliated Employer, a court, or governmental agency to be an Employee or to have been an Employee, and so long as such individual is an Eligible Employee, then such individual will only be eligible for Plan participation prospectively and will participate in the Plan as of the later of (a) the date that such determination is made, or (b) the entry date set forth in Section 2.1(c) that coincides with or next follows such determination and after such individual has satisfied any eligibility requirements set forth in Section 2.1(b).

1.29    **Employer.** The term "Employer" means the Sponsoring Employer and any Adopting Employer.

1.30    **Employer Securities.** The term "Employer Securities" means common stock issued by the Sponsoring Employer having a combination of voting power and dividend rights equal to or in excess of: (1) that class of common stock of the Employer having the greatest voting power; and (2) that class of common stock of the Employer having the greatest dividend rights. Noncallable preferred stock shall also be treated as "Employer Securities" if such stock is convertible at any time into stock which meets the qualifications above, and if such conversion is at a conversion price which (at the date of the acquisition by the Trust) is reasonable. For purposes of the preceding sentence, preferred stock shall be treated as noncallable if after the call there will be a reasonable opportunity for a conversion which meets such requirements. The term "Employer Securities" means the definition as defined in this Section but shall not be construed to include more than one class of stock if the Company is operating as an S Corporation.

1.31    **Employer Securities Account.** The term "Employer Securities Account" means the account to which is credited a Participant's share of Employer Securities contributed to or acquired by the Plan.

1.32    **Exempt Loan.** The term "Exempt Loan" means a loan made to the Plan by a disqualified person or that is guaranteed by a disqualified person and which satisfies the requirements of Regulation §54.4975-7(b) and Department of Labor regulation §2550.408b-3. The proceeds of an Exempt Loan can only be used (a) to purchase Employer Securities; (b) to repay such Exempt Loan; or (c) to repay a prior Exempt Loan.

- 5 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000014

**1.33**  **Forfeiture.** The term "Forfeiture" means generally the amount by which a Participant's Account balance attributable to Employer contributions exceeds his or her Vested Interest in the Participant's Account balance attributable to Employer contributions as determined at the time set forth in Section 3.3. The term "Forfeiture" also means any amount that is removed from a Participant's Account pursuant to any Employee Plans Compliance Resolution System (EPCRS) program or any other correction guidance that is issued by the Internal Revenue Service. However, no Forfeitures will occur solely because a Participant transfers employment from an Employer to an Affiliated Employer (or vice versa).

**1.34**  **Form W-2 Compensation.** The term "Form W-2 Compensation" means wages within the meaning of Code §3401(a) and all other payments of compensation actually paid or made available in gross income to an employee by an employer in the course of the employer's trade or business for which the employer is required to furnish the employee a Form W-2 under Code §6041(d), §6051(a)(3) and §6052. Form W-2 Compensation must be determined without regard to rules limiting remuneration included in wages based on the nature or location of employment or services performed (like the exception for agricultural labor in Code §3401(a)(2)).

**1.35**  **HCE.** The term "HCE" means a Highly Compensated Employee.

**1.36**  **Highly Compensated Employee.** The term "Highly Compensated Employee" means any Employee who (a) was a 5% owner as defined in Code §416(i)(1)(B)(i) at any time during the Plan Year or during the look-back year. In determining whether an Employee is a Highly Compensated Employee based on his or her status as a 5% owner, the look-back year will be the 12-month period immediately preceding the Plan Year for which the determination is being made; or (b) for the look-back year, had Code §415(c)(3) Compensation in excess of $80,000 as adjusted under Code §415(d) (except that the base period will be the calendar quarter ending September 30, 1996). In determining if an Employee is a Highly Compensated Employee based on Code §415(c)(3) Compensation, the look-back year will be the 12-month period immediately preceding the Plan Year for which the determination is being made, and the top paid group election in Code §414(q)(3) will be applied. In determining if an individual is a highly compensated former Employee, the rules for determining which Employees are Highly Compensated Employees for the Plan Year for which the determination is being made (in accordance with Temporary Regulation §1.414(q)-1T, A-4 and Notice 97-45) will be applied. If the Employer maintains more than one qualified retirement plan, this Section will be applied in a uniform, consistent manner to all plans.

**1.37**  **Hour of Service.** With respect to any provision of the Plan in which service is determined under the Counting of Hours Method, the meaning of the term "Hour of Service" will be determined in accordance with the following provisions:

(a)  **Determination of Hours.** The term Hour of Service means (1) each hour an Employee is paid, or entitled to payment, for the performance of duties for the Employer or an Affiliated Employer, which will be credited to the Employee for the computation period in which the duties are performed; (2) each hour for which an Employee is paid, or entitled to payment, by the Employer or an Affiliated Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence, except that no more than 501 Hours of Service will be credited under this clause (2) for any single continuous period (whether or not such period occurs in a single computation period); and (3) each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Employer, except that the same hours will not be credited both under clause (1) or clause (2) and under this clause (3), and these hours will be credited for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made. Hours of Service will be calculated and credited pursuant to DOL Regulation §§2530.200b-2(b) and (c), which are incorporated in this Plan by reference.

- 6 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000015

(b) **Maternity or Paternity Leave.** In determining if a Break in Service for participation and Vesting has occurred in a computation period, an individual on Maternity or Paternity Leave will receive credit for up to 501 Hours of Service which would otherwise have been credited but for such absence, or in any case in which such Hours of Service cannot be determined, 8 hours per day of such absence. Hours of Service credited for Maternity of Paternity Leave will be credited in the computation period in which the absence begins if the crediting is necessary to prevent a Break in Service in that period, or in all other cases, in the following computation period.

(c) **Use of Equivalencies.** Notwithstanding paragraph (a), the Administrator may elect for all Employees or for one or more different classifications of Employees (provided such classifications are reasonable and are consistently applied) to apply one or more of the following equivalency methods in determining the Hours of Service of an Employee. Under such equivalency methods, an Employee will be credited with (1) 190 Hours of Service for each month he or she is paid or entitled to payment for at least one Hour of Service; or (2) 95 Hours of Service for each semi-monthly period in which he or she is paid or entitled to payment for at least one Hour of Service; or (3) 45 Hours of Service for each week he or she is paid or entitled to payment for at least one Hour of Service; or (4) 10 Hours of Service for each day he or she is paid or entitled to payment for at least one Hour of Service.

**1.38 Immediately Distributable.** The term "Immediately Distributable" means any part of the Participant's benefit that could be distributed to the Participant (or the Participant's surviving Spouse) before the Participant reaches (or would have reached if not deceased) the later of his or her Normal Retirement Age or Age 62.

**1.39 Key Employee.** The term "Key Employee" means any Employee, former Employee or deceased Employee who at any time during the Plan Year that includes the Determination Date was (a) an officer of the Employer having annual Compensation greater than the dollar amount set forth in Code §416(i)(1), as adjusted; (b) a 5% owner as defined in Code §416(i)(1)(B)(I); or (c) a 1% owner as defined in Code §416(i)(1)(B)(ii) whose annual Compensation is more than $150,000. The determination of who is a Key Employee will be made in accordance with Code §416(i)(1).

**1.40 Leased Employee.** The term "Leased Employee" means any person within the meaning of Code §414(n)(2) and §414(o) who is not reported on the payroll records of the Employer as a common law employee and who provides services to the Employer if (a) the services are provided under an agreement between the Employer and a leasing organization; (b) the person has performed services for the Employer or for the Employer and related persons as determined under Code §414(n)(6) on a substantially full time basis for a period of at least one year; and (c) the services are performed under the primary direction or control of the Employer. Contributions or benefits provided to a Leased Employee by the leasing organization which are attributable to services performed for the Employer will be treated as provided by the Employer. A Leased Employee will not be considered an Employee of the recipient if he or she is covered by a money purchase plan providing (a) a non-integrated Employer contribution rate of at least 10% of Code §415 Compensation, including amounts contributed by the Employer pursuant to a salary deferral agreement which are excludible from the Leased Employee's gross income under a cafeteria plan covered by Code §125 (including Deemed Code §125 Compensation), a cash or deferred plan under Code §401(k), a SEP under Code §408(k) or a tax-deferred annuity under Code §403(b), and also including any elective amounts that are not includible in the gross income of the Leased Employee because of Code §132(f)(4); (b) immediate participation; and (c) full and immediate vesting. This exclusion is only available if Leased Employees do not constitute more than 20% of the recipient's non-highly compensated work force.

**1.41 Life Expectancy.** The term "Life Expectancy" means, for purposes of required minimum distributions under Section 5.9, life expectancy as computed by use of the Single Life Table in Regulation §1.401(a)(9)-9.

**1.42 Limitation Year.** The term "Limitation Year" means the Plan Year.

**1.43 Maternity or Paternity Leave.** The term "Maternity or Paternity Leave" means that an Employee is absent from work because of the Employee's pregnancy; the birth of the Employee's child; the placement of a child with the Employee in connection with the adoption of such child by the Employee; or the need to care for such child for a period beginning immediately following the child's birth or placement as set forth above.

**1.44 Named Fiduciary.** The term "Named Fiduciary" means the Administrator or other fiduciary named by the Administrator to control and manage the operation and administration of the Plan. To the extent authorized

- 7 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000016

by the Administrator, a Named Fiduciary may delegate its responsibilities to a third party or parties. The Employer will also be a Named Fiduciary.

**1.45    NHCE.** The term "NHCE" means a Non-Highly Compensated Employee.

**1.46    Non-Highly Compensated Employee.** The term "Non-Highly Compensated Employee" means any Employee who is not a Highly Compensated Employee.

**1.47    Non-Key Employee.** The term "Non-Key Employee" means any Employee who is not a Key Employee, including former Key Employees. In making the allocation in Section 3.4, Non-Key Employee means a Non-Key Employee who either is a Participant or would be a Participant but for the reasons in Section 3.4(a).

**1.48    Non-Spouse Designated Beneficiary.** The term "Non-Spouse Designated Beneficiary" means a Beneficiary who is other than the Participant's Spouse and is a Designated Beneficiary under Code §401(a)(9)(E).

**1.49    Normal Retirement Age.** The term "Normal Retirement Age" means the later of Age 65 or the fifth anniversary of the date the Participant commenced participation in the Plan. There is no mandatory retirement Age under the terms of the Plan.

**1.50    Normal Retirement Date.** The term "Normal Retirement Date" means the first day of the month coinciding with or next following the date a Participant reaches Normal Retirement Age.

**1.51    Notice/Form.** The term "Notice/Form" means any notice, report, statement, or other document required to be provided to a Recipient under this Plan.

**1.52    Other Investments Account.** The term "Other Investments Account" means the aggregate value of all of a Participant's accounts other than the Employer Securities Account.

**1.53    Participant.** The term "Participant" means anyone who has met the eligibility and participation requirements under Article 2. In addition, if the Plan utilizes the failsafe allocation provisions of Section 3.5, then the term Participant means any Employee who receives a failsafe allocation, even if such Employee is not an Eligible Employee and/or has not satisfied the eligibility and participation requirements of the Plan. Furthermore, the Sponsoring Employer may· elect at any time to reclassify any Employee who had been excluded from participating in the Plan (or a component of the Plan) to be a Participant through a Plan amendment that is retroactively applied for one or more prior Plan Years because the Plan (or a component of the Plan) failed to satisfy for such Plan Year one of the tests set forth in Code §410(b)(1)(A), (B) or (C), or for any other reason the Sponsoring Employer deems it to be required to maintain the tax exempt status of the Plan. However, an individual who is no longer an Employee will cease to be a·Participant if his or her entire Plan benefit (a) is fully guaranteed by an insurance company and legally enforceable at the sole choice of such individual against such insurance company, provided that a contract, policy, or certificate describing the individual's Plan benefits has been issued to such individual; (b) is paid in a lump sum distribution which represents such individual's entire interest in the Plan; or (c) is paid in some other form of distribution and the final payment thereunder has been made.

**1.54    Participant's Account.** The term "Participant's Account" means the aggregate balance in a Participant's Employer Securities Account and Other Investments Account and any other accounts that the Administrator may determine necessary from time.

**1.55    Participant's Account Balance.** The term "Participant's Account Balance" means, for required minimum distributions purposes under Section 5.9, the balance of the Participant's Account as of the last Valuation Date in the Valuation Calendar Year, increased by contributions made and allocated or forfeitures allocated to the Account as of dates in the Valuation Calendar Year after the Valuation Date and decreased by distributions made in the Valuation Calendar Year after the Valuation Date. The Participant's Account Balance for the Valuation Calendar Year includes any amounts rolled over or transferred to the Plan in the Valuation Calendar Year or the Distribution Calendar Year if distributed or transferred in the Valuation Calendar Year.

**1.56    Participant Election.** The term "Participant Election" includes any consent, election, request, agreement, or similar communication made by or from a Participant, Beneficiary, alternate payee, or an individual entitled to benefits under the Plan.

- 8 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000017

**1.57** **Permissive Aggregation Group.** The term "Permissive Aggregation Group" means a Required Aggregation Group plus any Employer plan or plans which when considered as a group with the Required Aggregation Group would continue to satisfy the requirements of Code §401(a)(4) and §410.

**1.58** **Plan.** The term "Plan" means the RVR Employee Stock Ownership Plan, established by the Sponsoring Employer, and as amended from time to time.

**1.59** **Plan Year.** The term Plan Year means the Plan's twelve month accounting year beginning June 1st and ending the following the following May 31st. If the Plan Year is changed, a short Plan Year will be established beginning the day after the last day of the Plan Year in effect before the change and ending on the last day of the new Plan Year.

**1.60** **Post-Severance Compensation.** The term "Post-Severance Compensation" means the following amount(s) that would have been included in the definitions of Compensation and Code §415(c)(3) Compensation, as applicable, if the amounts were paid prior to the Employee's Termination of Employment with the Employer and that are paid to the Employee by the later of 2½ months after the Employee's date of Termination of Employment with the Employer or the end of the Limitation Year that includes the Employee's date of Termination of Employment with the Employer:  Regular pay after Termination of Employment will be considered Post-Severance Compensation if (1) the payment is regular compensation for services during the Employee's regular working hours, or compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and (2) the payment would have been paid to the Employee prior to Termination of Employment if the Employee had continued in employment with the Employer.

**1.61** **Qualified Domestic Relations Orders or QDRO.** The term "Qualified Domestic Relations Order" or "QDRO" is a signed domestic relations order issued by a State Court which creates, recognizes or assigns to an alternate payee(s) right to receive all or part of a Participant's Plan benefit. An alternate payee is a Spouse, former Spouse, child, or other dependent of a Participant who is treated as a Beneficiary under the Plan as a result of the QDRO. The term "Qualified Domestic Relations Order" also includes (a) an order that is issued with respect to another domestic relations order ("DRO") or QDRO, including an order that revises or amends a prior order; (b) an order issued after the participant's annuity starting date or death; or (c) an order that names as the alternate payee a person deemed financially dependent upon the participant, provided that the other requirements for a QDRO as set forth in the Plan's QDRO procedure and/or as defined in Code §414(p) are satisfied.

**1.62** **Qualified Military Service.** The term "Qualified Military Service" means any service in the uniformed services (as defined in chapter 43 of title 38, United States Code) by any individual if such individual is entitled to USERRA Reemployment Rights under such chapter with respect to such service.

**1.63** **Qualified Reservist.** The term "Qualified Reservist" means an individual who is a member of a reserve component (as defined in §101 of title 37, United States Code) and who is ordered or called to active duty after September 11, 2001 either for a period in excess of 179 days or for an indefinite period.

**1.64** **Readily Tradable on an Established Securities Market.** The term "Readily Tradable on an Established Securities Market" means Employer Securities that are readily tradable on an established securities market within the meaning of Regulation §1.401(a)(35)-1(f)(5) for purposes of Code §401(a)(22), §401(a)(28)(C), §409(h)(1)(B), §409(l) and §1042(c)(1)(A).

**1.65** **Recipient.** The term "Recipient" means a Plan Participant, Beneficiary, Employee, alternate payee, or any other person to whom a Notice/Form is to be provided.

**1.66** **Required Aggregation Group.** The term "Required Aggregation Group" means (1) each Employer qualified deferred compensation plan in which at least one Key Employee participates or participated at any time during the Plan Year containing the Determination Date or any of the four preceding Plan Years (regardless of whether the plan has terminated); and (2) any other Employer qualified deferred compensation plan that enables a plan described in (1) to satisfy Code §401(a)(4) or §410.

- 9 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000018

**1.67** **Required Beginning Date.** The term "Required Beginning Date" means the later of Age 70½ or actual retirement. However, for a Participant who is a 5% owner, the term Required Beginning Date means April 1st of the calendar year following the later of the calendar year in which the Participant reaches Age 70½.

**1.68** **Regulation.** The term "Regulation" means regulations as promulgated by the Secretary of the Treasury, the Secretary of the Department of Labor, or their delegates, as amended and/or renumbered from time to time.

**1.69** **Rollover Contribution (or Rollover).** The terms "Rollover Contribution" and "Rollover" mean an amount eligible for tax free rollover treatment which is transferred to a retirement plan.

**1.70** **Rule of Parity.** The term "Rule of Parity" means a rule that is used for purposes of determining an Employee's eligibility to participate in the Plan, Vesting, and benefit accrual/allocation (if applicable) to determine the Years of Service (or 1-Year Periods of Service) of a non-Vested Employee who Terminates Employment and is subsequently reemployed by the Employer or an Affiliated Employer after incurring a Break in Service, determined as follows: Years of Service (or 1-Year Periods of Service), as applicable, completed prior to the Employee's Breaks in Service will not be counted if the Employee's total number of consecutive Breaks in Service equals or exceeds the greater of five or the Employee's aggregate number of Years of Service (or 1-Year Periods of Service) credited prior to incurring the Breaks in Service. In computing an Employee's aggregate number of Years of Service (or 1-Year Periods of Service) under this Section, Years of Service (or 1-Year Periods of Service) previously disregarded under prior applications of the Rule of Parity will not be counted.

**1.71** **S Corporation.** The term "S Corporation" means an Employer which, with the consent of its shareholders, properly made the election under Code §1361(a) to be treated as such for federal income tax purposes.

**1.72** **S Corporation Distribution.** The term "S Corporation Distribution" means mean any distribution of cash by an S Corporation to this Plan in the amount determined by its Board of Directors from time to time and/or the income of an S Corporation as passed through to its shareholders under the principles of Code §1366.

**1.73** **Sponsoring Employer.** The term "Sponsoring Employer" means RVR, Inc. (and any successor thereto that elects to assume sponsorship of this Plan). The Sponsoring Employer is a C Corporation.

**1.74** **Spouse.** The term "Spouse" means the person to whom a Participant is legally married. Furthermore, a former Spouse will be treated as the Participant's Spouse or surviving Spouse to the extent provided under a Qualified Domestic Relations Order.

**1.75** **Terminated (or Terminates) Employment.** The term "Terminated Employment" and the term "Terminates Employment" mean that a person has incurred a Termination of Employment. A Participant who dies while performing Qualified Military Service will be deemed to have resumed employment with the Employer on the day preceding the date of his or her death and will be deemed to have Terminated Employment on the actual date of his or her death.

**1.76** **Terminated Participant.** The term "Terminated Participant" means a Participant who has ceased to be an Employee for reasons other than retirement occurring on or after Normal Retirement Age, death or Disability.

**1.77** **Termination of Employment.** The term "Termination of Employment" means that a person ceases to be an Employee with the Employer or an Affiliated Employer, taking into account the following: (1) whether the person's new employer has been substituted as the sponsor of the Plan (or a spun-off portion of the Plan); and (2) whether there has been a transfer of Plan assets and liabilities of the person's benefits from this Plan to a plan sponsored by the person's new employer.

**1.78** **Top Heavy.** The term "Top Heavy" means for any Plan Year that (1) the Top Heavy Ratio exceeds 60% and the Plan is not part of a Required Aggregation Group or Permissive Aggregation Group; or (2) the Plan is a part of a Required Aggregation Group but not a Permissive Aggregation Group and the Top Heavy Ratio for the group exceeds 60%; or (3) the Plan is a part of a Required Aggregation Group and a Permissive Aggregation Group and the Top Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000019

**1.79** **Top Heavy Minimum Allocation.** The term "Top Heavy Minimum Allocation" means an amount of Employer contributions and Forfeitures in the Plan that is subject to the following rules: (a) if a defined benefit plan is not part of a Required Aggregation Group or a Permissive Aggregation Group with this Plan, then the Top Heavy Minimum Allocation equals an Employee's Code §415(c)(3) Compensation multiplied by the lesser of (1) 3% or (2) the largest percentage of Employer contributions (including any Elective Deferrals made on behalf of a Key Employee to a 401(k) Plan maintained by the Employer) and Forfeitures that are allocated to the Participant's Account of a Key Employee for that Plan Year, expressed as a percentage of such Key Employee's Code §415(c)(3) Compensation; (b) elective deferrals that are made on behalf of a Participant to a 401(k) Plan cannot be used to satisfy the Top Heavy Minimum Allocation; (c) Social Security contributions or benefits pursuant to Code §416(e) are disregarded; and (d) to the extent required to be nonforfeitable under Code §416(b)), the Top Heavy Minimum Allocation may not be forfeited under Code §411(a)(3)(B) or §411(a)(3)(D).

**1.80** **Top Heavy Ratio.** In determining if this Plan is Top Heavy, the "Top Heavy Ratio" will be determined in accordance with the following provisions:

(a) **Employer Only Maintains DC Plans.** If the Employer maintains one or more defined contribution plans (including any Simplified Employee Pension Plan) and the Employer has not maintained any defined benefit plan which during the 5-year period ending on the Determination Date(s) has or has had accrued benefits, then the Top Heavy Ratio for this Plan alone, for the Required Aggregation Group, or for the Permissive Aggregation Group as appropriate is a fraction, the numerator of which is the sum of the Participant's Account balances of all Key Employees as of the Determination Date(s) (including any part of any Participant's Account balance distributed during the 1-year period ending on the Determination Date(s); however, including any part of any Participant's Account balance distributed during the 5-year period ending on the Determination Date in the case of a distribution made for a reason other than termination from employment, death, or Disability), and the denominator of which is the sum of all Participant's Account balances (including any part of any Participant's Account balance distributed in the 1-year period ending on the Determination Date(s); however, including any part of any Participant's Account balance distributed during the 5-year period ending on the Determination Date in the case of a distribution made for a reason other than termination from employment, death, or Disability), both computed in accordance with Code §416 and the Regulations thereunder. Both the numerator and denominator of the Top Heavy Ratio are increased to reflect any contribution that is not actually made as of the Determination Date, but which is required to be taken into account on that Determination Date under Code §416 and the Regulations thereunder.

(b) **Employer Maintains Both DC and DB Plans.** If the Employer maintains one or more defined contribution plans (including any Simplified Employee Pension Plan) and the Employer maintains or has maintained one or more defined benefit plans which during the 5-year period ending on the Determination Date(s) has or has had any accrued benefits, then the Top Heavy Ratio for any Required Aggregation Group or for any Permissive Aggregation Group as appropriate is a fraction, the numerator of which is the sum of the Participant's Account balances under the aggregated defined contribution plan or plans for all Key Employees, determined in accordance with paragraph (a) above, and the present value of accrued benefits under the aggregated defined benefit plan or plans for all Key Employees as of the Determination Date(s), and the denominator of which is the sum of the Participant's Account balances under the aggregated defined contribution plan or plans for all Participants, determined in accordance with paragraph (a) above, and the present value of accrued benefits under the defined benefit plan or plans for all Participants as of the Determination Date(s), all determined in accordance with Code §416 and the Regulations thereunder. The accrued benefits under a defined benefit plan in both the numerator and denominator of the Top Heavy Ratio are increased for any distribution of an accrued benefit made in the 1-year period ending on the Determination Date (or the 5-year period ending on the Determination Date in the case of a distribution made for a reason other than termination from employment, death, or Disability).

(c) **Value of Participant's Account Balances and the Present Value of Accrued Benefits.** For purposes of paragraphs (a) and (b), the value of the Participant's Account balances and the present value of accrued benefits will be determined as of the most recent Valuation Date that falls within or ends with the 12-month period ending on the Determination Date, except as provided in Code §416 and the Regulations for the first and second Plan Years of a defined benefit plan. The Participant's Account

- 11 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000020

balances and accrued benefits will be disregarded for a Participant (1) who is not a Key Employee during the 12-month period ending on the Determination Date but was a Key Employee in a prior year, or (2) who has not been credited with at least one Hour of Service with any Employer maintaining the Plan at any time during the 1-year period ending on the Determination Date. The calculation of the Top Heavy Ratio and the extent to which distributions and Transfer Contributions are taken into account will be made in accordance with Code §416 and the Regulations thereunder. Deductible employee contributions will not be taken into account in computing the Top Heavy Ratio. When aggregating plans, the value of the Participant's Account balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar-year. The accrued benefit of a Participant other than a Key Employee will be determined under (1) the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the Employer; or (2) if there is no such method, then as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Code §411(b)(1)(C).

(d)    **Computing Present Values.** In establishing the present value of accrued benefits to compute the Top Heavy Ratio, benefits not in pay status are handled on the basis that retirement occurs on the automatic vesting date or, if later, the date of reference. Benefits are discounted only for interest and mortality.

**1.81**    **Transfer Contribution.** The term "Transfer Contribution" means a non-taxable transfer of a Participant's benefit directly or indirectly from another qualified plan to this Plan. Transfer Contributions include assets transferred to this Plan from another plan as a result of a merger or similar transaction involving this Plan and the other plan. No direct or indirect transfer as defined in Code §401(a)(11) of assets from a defined benefit plan, a money purchase plan, a target benefit plan, a stock bonus plan, or a profit sharing plan that provided for a life annuity form of payment to the Participant will be permitted. Elective deferrals (including qualified matching contributions, qualified matching contributions, and 401(k) safe harbor contributions) which are transferred to this Plan in a direct or indirect trustee-to-trustee transfer from another qualified plan and which remain subject to the limitations in Regulation §1.401(k)-1(d) will be considered a Transfer Contribution. The assets that are transferred from another qualified plan in a plan-to-plan elective transfer pursuant to Section 11.4 will also be considered a Transfer Contribution.

**1.82**    **Transfer Contribution Account.** The term "Transfer Contribution Account" means the account to which a Participant's Transfer Contributions, if any, are allocated.

**1.83**    **Trustee.** The term "Trustee" means the persons or entity named as trustee or trustees of the Trust. The term Trustee will also mean custodian if a custodian is appointed by the Sponsoring Employer.

**1.84**    **Trust.** The term "Trust" means the RVR Employee Stock Ownership Trust.

**1.85**    **Trust Fund.** The term "Trust Fund" means all the property of every kind held or acquired by the Trustee pursuant to the Trust.

**1.86**    **Unallocated Employer Securities Account.** The term "Unallocated Employer Securities Account" means an account containing Employer Securities acquired with the proceeds of an Exempt Loan and which has not been allocated to the Participants' Employer Securities Accounts.

**1.87**    **USERRA.** The term "USERRA" means the Uniformed Services Employment and Reemployment Rights Act of 1994.

**1.88**    **USERRA Reemployment Rights.** The term "USERRA Reemployment Rights" means the rights and benefits to which an individual covered under USERRA is entitled upon his or her return from Qualified Military Service. An individual will not be entitled to USERRA Reemployment Rights if (a) he or she did not provide advance notice of his or her military service to the Employer; or (b) he or she had more than five years of cumulative Qualified Military Service measured from his or her date of hire to his or her date of return to employment with the Employer.

**1.89**    **Valuation Calendar Year.** The term "Valuation Calendar Year" means, for purposes of required minimum distributions under Section 5.9, the calendar year immediately preceding a Distribution Calendar Year.

**- 12 -**

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000021

**1.90    Valuation Date.** The term "Valuation Date" means the date when the Trustee determines the value of the Trust Fund. A Valuation Date of the Trust Fund must occur as of the last day of each Plan Year. However, the Administrator can value all or any portion of the assets of the Trust Fund more frequently, including, but not limited to, semi-annually, quarterly, monthly, or daily; the Administrator may implement any additional Valuation Dates for any reason. For purposes of calculating the Top Heavy Ratio, the term "Valuation Date" means the date when the Participant's Account balances or accrued benefits are valued.

**1.91    Vested Aggregate Account.** The term Vested Aggregate Account means a Participant's Vested Interest in the aggregate value of his or her Participant's Account.

**1.92    Vested, Vested Interest or Vesting.** The term "Vested," "Vested Interest" or "Vesting" means a Participant's nonforfeitable percentage in an account maintained on his or her behalf under the Plan. A Participant's Vested Interest in his or her Participant's Account will be determined in accordance with Section 4.6.

**1.93    Vesting Computation Period.** The term "Vesting Computation Period" means a period of twelve consecutive months which is used for purposes of determining a Participant's Vested Interest in the Plan (or a component of the Plan). Each Vesting Computation Period will consist of each Plan Year.

**1.94    Year of Service.** The term "Year of Service" means, with respect to any provision of the Plan in which service is determined by the Counting of Hours Method, a 12-consecutive month computation period during which an Employee is credited with at least a specified number of Hours of Service with the Employer, an Affiliated Employer, or an Adopting Employer, determined in accordance with the following provisions:

(a)    **Year of Service for Eligibility.** For any Plan Year in which the eligibility requirements under Section 2.1 are based on Years of Service, a Year of Service is an Eligibility Computation Period during which an Employee is credited with at least 1,000 Hours of Service. An Employee's initial Eligibility Computation Period will begin on his or her Employment Commencement Date. If the Employee is credited with at least 1,000 Hours of Service in both the initial Eligibility Computation Period and the second Eligibility Computation Period, the Employee will be credited with two Years of Service for eligibility purposes. If any Eligibility Computation Period is less than 12 consecutive months, the Hours of Service requirement set forth herein will be proportionately reduced (if it is greater than one) in determining whether an Employee is credited with a Year of Service during such short Eligibility Computation Period. In determining the eligibility requirements and the applicable entry date under Section 2.1, an Employee will be deemed to have completed a Year of Service on the last day of the applicable Eligibility Computation Period during which the Employee is credited with the required Hours of Service.

(b)    **Year of Service for Vesting.** For any Plan Year in which a Participant's Vested Interest under Section 4.6 is based on Years of Service, a Year of Service is a Vesting Computation Period during which an Employee is credited with at least 1,000 Hours of Service. If a Vesting Computation Period is less than 12 consecutive months, the Hours of Service requirement set forth herein will be proportionately reduced (if it is greater than one) in determining whether an Employee is credited with a Year of Service during such short Vesting Computation Period. Alternatively, with respect to a short Vesting Computation Period, an Employee will be credited with a Year of Service pursuant to Department of Labor Regulation §2530.203 2(c). In addition, each period of Qualified Military Service of a Participant who dies while performing Qualified Military Service will, upon his or her Deemed Reemployment, be considered in determining such Participant's Years of Service for purposes of this paragraph.

(c)    **Prior Service Credit.** If an Employer maintains (or has ever maintained) any plan of a predecessor employer, then service during the existence of such predecessor plan with such predecessor employer will not be credited as Years of Service with the Employer other than for purposes of determining eligibility under paragraph (a), above.

(d)    **Reemployment of an Employee Before a Break In Service and Before Eligibility Requirements Are Satisfied.** If an Employee Terminates Employment prior to satisfying the eligibility requirements in Section 2.1 and the Employee is subsequently reemployed by the Employer before incurring a Break in Service, then (1) the Employee's pre-termination Years of Service (and Hours of Service during any computation period) will be counted in determining the satisfaction of such eligibility requirements,

- 13 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000022

and for all other purposes, and (2) the Eligibility Computation Period, Vesting Computation Period, and/or benefit accrual computation period will remain unchanged.

(e)   **Reemployment of an Employee Before a Break In Service and After Eligibility Requirements Are Satisfied.** If an Employee Terminates Employment prior to the Employee's Entry Date in Section 2.1, the Employee had satisfied the eligibility requirements in Section 2.1 as of the Employee's Termination of Employment, and the Employee is subsequently reemployed by the Employer before incurring a Break in Service, then (1) the Employee will become a Participant as of the later of (A) the date that the Employee would enter the Plan had he or she not Terminated Employment, or (B) the Employee's Reemployment Commencement Date, (2) the Employee's pre-termination Years of Service (and Hours of Service during any computation period) will be counted for all purposes, and (3) the Vesting Computation Period and/or benefit accrual computation period will remain unchanged.

(f)   **Reemployment of a Participant Before a Break In Service.** If an Employee Terminates Employment after becoming a Participant and is subsequently reemployed by the Employer before incurring a Break in Service, then (1) the reemployed Employee will reenter the Plan as of the Employee's Reemployment Commencement Date, (2) the Employee's pre-termination Years of Service (and Hours of Service during any computation period) will be counted for all purposes, and (3) the Vesting Computation Period and/or benefit accrual computation period will remain unchanged.

(g)   **Reemployment of an Employee After a Break In Service and Before the Entry Date.** If an Employee Terminates Employment either prior to or after satisfying the eligibility requirements in Section 2.1 (but before the Employee's Entry Date in Section 2.1) and the Employee is subsequently reemployed by the Employer after incurring a Break in Service, then the Employee's Years of Service that were completed prior to the Break in Service will be recognized, subject to the following provisions:

(1)   **Determination of Years of Service for Eligibility Using the Rule of Parity.** Any Years of Service completed prior to an Employee's Break(s) in Service will not be counted in determining an Employee's eligibility to participate in the Plan if those Years of Service are disregarded pursuant to the Rule of Parity. If such former Employee's Years of Service are disregarded under the Rule of Parity, then (A) the reemployed Employee will be treated as a new Employee for purposes of Section 2.1 and (B) the Employee's Eligibility Computation Period will commence on the Employee's Reemployment Commencement Date and subsequent Eligibility Computation Periods will be based upon the provisions of the definition of Eligibility Computation Period (with the Reemployment Commencement Date substituted for the Employment Commencement Date, if applicable). If the Employee has not satisfied the eligibility requirements in Section 2.1 as of the Employee's Reemployment Commencement Date and such former Employee's Years of Service are not disregarded under the Rule of Parity, then the Eligibility Computation Periods will remain unchanged. If the Employee has satisfied the eligibility requirements in Section 2.1 as of the Employee's Reemployment Commencement Date and such former Employee's Years of Service are not disregarded under the Rule of Parity, the reemployed Employee will enter the Plan as of the Employee's Reemployment Commencement Date.

(2)   **Determination of Years of Service for Vesting.** Any Years of Service completed prior to an Employee's Break(s) in Service will not be counted in determining an Employee's Vesting Interest in the Participant's Account balance if those Years of Service are disregarded pursuant to the Rule of Parity. If such former Employee's Years of Service are not disregarded under the Rule of Parity, then the Vesting Computation Periods will remain unchanged.

(3)   **Determination of Years of Service for Benefit Accrual/Allocation Purposes.** Any Years of Service completed prior to an Employee's Break in Service will not be counted for benefit accrual or allocation purposes if those Years of Service are disregarded pursuant to the Rule of Parity.

(h)   **Reemployment of a Participant After a Break In Service.** If an Employee (1) was a Participant in the Plan, (2) Terminates Employment, and (3) is subsequently reemployed by the Employer or an

- 14 -

PHX 331137249v4

Affiliated Employer after incurring a Break in Service, then the Employee's Year(s) of Service that were completed prior to the Break in Service will be recognized, subject to the following provisions:

(1)     **Determination of Years of Service for Eligibility Purposes.** Any Years of Service completed prior to an Employee's Break in Service will not be counted in determining an Employee's eligibility to participate in the Plan if those Years of Service are disregarded pursuant to the Rule of Parity. If such Employee's Years of Service are disregarded under the Rule of Parity, then (A) the reemployed Employee will be treated as a new Employee for purposes of Section 2.1 and (B) the Employee's Eligibility Computation Period will commence on the Employee's Reemployment Commencement Date and subsequent Eligibility Computation Periods will be based upon the provisions of the definition of Eligibility Computation Period (with the Reemployment Commencement Date substituted for the Employment Commencement Date, if applicable). If such former Employee's Year(s) of Service are not disregarded under the Rule of Parity, then the reemployed Employee will reenter the Plan as of the Employee's Reemployment Commencement Date.

(2)     **Determination of Years of Service for Vesting Purposes.** Any Years of Service that were completed prior to an Employee's Break in Service will not be counted for purposes of determining an Employee's Vesting Interest in the Participant's Account balance if those Years of Service are disregarded pursuant to the Rule of Parity. If such former Employee's Years of Service are not disregarded under the Rule of Parity, then the Vesting Computation Periods will remain unchanged.

(3)     **Determination of Years of Service for Benefit Accrual/Allocation Purposes.** Any Year(s) of Service that were completed prior to an Employee's Break(s) in Service will not be counted for benefit accrual or allocation purposes if those Year(s) of Service are disregarded pursuant to the Rule of Parity.

- 15 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000024

## Article 2
## Plan Participation

**2.1    Eligibility and Entry Date Requirements.** An Eligible Employee will become eligible to enter the Plan as a Participant in accordance with the following provisions:

(a)    **Eligible Employees.** For purposes of this Plan, all Employees are Eligible Employees except for the following ineligible classes of Employees: (1) Employees whose employment is governed by a collective bargaining agreement between Employee representatives and the Employer in which retirement benefits were the subject of good faith bargaining unless such collective bargaining agreement expressly provides for the inclusion of such Employees as Participants; (2) Employees who are non-resident aliens who do not receive earned income (within the meaning of Code §911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code §861(a)(3)); (3) any person who is considered a Leased Employee but who (A) is not covered by a plan described in Code §414(n)(5), or (B) is covered by a plan described in Code §414(n)(5) but Leased Employees constitute more than 20% of the Employer's non-highly compensated workforce; and (4) Employees who are employed by an Affiliated Employer which is not an Adopting Employer.

(b)    **Age and Service Requirements.** An Eligible Employee described in Section 2.1(a) will be eligible to enter the Plan as a Participant on the applicable entry date described in Section 2.1(c) upon reaching Age 21 and being credited with 1 Year of Service.

(c)    **Entry Date.** An Eligible Employee described in Section 2.1(a) who has satisfied the eligibility requirements in Section 2.1(b) will enter the Plan as a Participant on the June 1st or the December 1st coincident with or following the date such requirements are satisfied.

(d)    **Participation By Employees Whose Status Changes.** If an Employee who is not an Eligible Employee becomes an Eligible Employee, then the Employee will participate in the Plan immediately so long as (1) the Employee has satisfied the minimum age and service requirements and (2) the Employee would have previously become a Participant had the Employee always been an Eligible Employee. The participation of a Participant who is no longer an Eligible Employee will be suspended and such Participant will be entitled to an allocation (and any applicable Forfeitures) for the Allocation Period only to the extent of any applicable Hours of Service completed while an Eligible Employee. Upon again becoming an Eligible Employee, a suspended Participant will immediately resume eligibility. Years of Service while an Employee is not an Eligible Employee will be recognized for purposes of determining the Vested Interest of such Employee in accordance with Section 4.6.

**2.2    Waiver of Participation.** Employees who have satisfied any of the eligibility requirements set forth in Section 2.1 are not permitted to waive participation in the Plan.

**2.3    Reemployment After Termination.** If an Employee Terminates Employment and is subsequently reemployed by an Employer or an Affiliated Employer, such Employee's Years of Service for purposes of eligibility (as well as the time such Employee enters or reenters the Plan as a Participant) will be determined in accordance with the rules described in the definition of Year of Service in Section 1.94 provided that the Employee is an Eligible Employee.

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000025

## Article 3
## Contributions and Allocations

3.1   **Employer Contributions.** The Sponsoring Employer intends to make contributions to the Plan. The Employer does not guarantee either the making of the contributions or the payment of the benefits under the Plan, except in amount sufficient for the Plan to make its required Exempt Loan payments as they become due. The Employer reserves the right to reduce, suspend or discontinue contributions for any reason at any time, but if the Plan is deemed to be terminated as a result of such reduction, suspension or discontinuance, the provisions of Article 11 will become effective. All contributions will be determined in accordance with the following provisions:

   (a)   **Amount of Contribution.** The Sponsoring Employer in its sole discretion may make a contribution to the Plan. The amount will be determined by the Sponsoring Employer.

   (b)   **Allocation of Contribution.** Subject to of Section 6.4, Employer contributions which are not made to repay an Exempt Loan will be allocated to each Benefiting Participant's Account in the ratio that the Compensation of each Benefiting Participant for the Allocation Period bears to the total Compensation of all Benefiting Participants for the Allocation Period. Any Employer contributions that are not allocated due to application of either Section 3.7(f)(7) or Section 6.4, will be further allocated among and credited to the Accounts of the remaining Participants who are Non-Highly Compensated Employees who are entitled to share in an allocation of such contributions for the Allocation Period, in the ratio that the Compensation of each Benefiting Participant who is a Non-Highly Compensated Employee eligible for additional allocations under such Section for the Allocation Period bears to the total Compensation of all Benefiting Participants who are Non-Highly Compensated Employees eligible for additional allocations under such Section for the Allocation Period, without exceeding the maximum allocation permitted by Section 6.4.  Any additional unallocated amounts shall be allocated, and reallocated as necessary, in accordance with the previous sentence until all amounts have been allocated. With respect to any Employer contributions which are made and used to repay an Exempt Loan, any Employer Securities released from the Unallocated Employer Securities Account with respect to these contributions will be allocated in accordance with the provisions of Section 3.7(d)(4).

   (c)   **Benefiting Participants.** A Participant who is an Employee on any day of an Allocation Period and who on that date is in an eligible class of Employees as set forth in Section 2.1(a) will be a Benefiting Participant for such Allocation Period regardless of whether the Participant is an Employee on the last day of the Allocation Period or the number of Hours of Service with which he or she is credited with during the Allocation Period.

   (d)   **Limitations on Contributions.** Notwithstanding any provision of this Article, no Employer contribution will be made for any Participant who is not a Benefiting Participant for an Allocation Period unless otherwise required by the Top Heavy Minimum Allocation provisions in Section 3.4.

   (e)   **Allocation Period.** Any contribution made under the terms of the Plan may, at the election of the Sponsoring Employer, be contributed (1) each payroll period; (2) each month; (3) each Plan quarter; (4) on an annual basis; or (5) on any other less than annual Allocation Period basis as determined by the Employer, provided such Allocation Period does not discriminate in favor of HCEs. Contributions will be allocated to Benefiting Participants as of the last day of the Allocation Period.

   (f)   **Form of Contribution.** To the extent the Employer's contribution is not used to reduce an obligation or liability of an Employer to the Plan, and the contribution is unencumbered and discretionary, then the contribution may consist of (1) Employer Securities; (2) cash; (3) cash equivalencies; (4) qualifying employer real property and/or qualifying employer securities as defined in ERISA §407(d)(4) and ERISA §407(d)(5), provided the acquisition of such qualifying employer real property and/or qualifying employer securities satisfies the requirements of ERISA §408(e); or (5) any other property that is not prohibited under Code §4975 and is acceptable to the Trustee. To the extent the Employer's contribution is used to reduce an obligation or liability of an Employer to the Plan, or if the contribution is mandatory, then the contribution may only consist of cash or cash equivalencies.

   (g)   **USERRA Contributions.** With respect to a Participant who is reemployed by the Employer after a period of Qualified Military Service, the Employer will make a contribution to the Plan on behalf of

- 17 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000026

DOL 0009623

such Participant which is equal to the amount that would have been contributed during the Participant's period of Qualified Military Service had such Participant remained employed with the Employer. Such contribution will be determined using the same rate of Compensation the Participant would have received from the Employer during his or her period of Qualified Military Service. However, if such rate of Compensation is not reasonably certain, this contribution can be determined using such Participant's average Compensation during the 12-month period immediately preceding his or her period of Qualified Military Service. Such contributions will also be made to the Plan with respect to a Participant who dies while performing Qualified Military Service or who suffers a Disability while performing Qualified Military Service. A Participant who dies or becomes Disabled while performing Qualified Military Service shall not be Deemed Reemployed or treated as a Benefiting Participant for purposes of receiving an allocation of Employer contributions

(h)    **Refund of Contributions for All Plans.** Contributions made to the Plan by the Employer can only be returned to the Employer in accordance with the following provisions:

    (1)    **Failure of Plan to Initially Qualify.** If the Plan fails to initially satisfy the requirements of Code §401(a) and the Employer declines to amend the Plan to satisfy such requirements, contributions made prior to the date such qualification is denied must be returned to the Employer within 1 year of the date of such denial, but only if the application for the qualification is made by the time prescribed by law for filing the Employer's tax return for the taxable year in which the Plan is adopted, or by such later date as the Secretary of the Treasury may prescribe.

    (2)    **Contributions Made Under a Mistake of Fact.** If a contribution is attributable in whole or in part to a good faith mistake of fact, including a good faith mistake in determining the deductibility of the contribution under Code §404, an amount may be returned to the Employer equal to the excess of the amount contributed over the amount that would have been contributed had the mistake not occurred. Earnings attributable to any such excess contribution will not be returned, but losses attributable to any such excess contribution will reduce the amount so returned. Such amount will be returned within one year of the date the contribution was made or the deduction disallowed, as the case may be.

**3.2    Earnings and Losses.** As of each Valuation Date, amounts in Participants' accounts which have not been segregated from the general Trust Fund for investment purposes and which have not been distributed since the prior Valuation Date will have the net income of the Trust Fund that has been earned since the prior Valuation Date allocated in accordance with such rules and procedures as established by the Administrator and applied in a uniform and nondiscriminatory manner based upon the investments of the Trust Fund and the Participants' Accounts to which the net income is allocated. Participants' accounts which have been segregated from the general Trust Fund for investment purposes, will only have the net income earned thereon allocated thereto. For purposes of this Section, the term "net income" means the net of any interest, dividends, unrealized appreciation and depreciation (other than the unrealized appreciation or depreciation of the Employer Securities allocated to the Participants' Employer Securities Accounts), capital gains and losses, and investment and administrative expenses of the Trust Fund as determined on each Valuation Date. Net income does not include (1) the interest paid under any installment contract for the purchase of Employer Securities by the Plan or the interest paid on any loan used by the Plan to purchase Employer Securities; or (2) income received by the Trust Fund with respect to Employer Securities acquired with an Exempt Loan to the extent such income is used to repay the loan. All income received by the Trust Fund from Employer Securities acquired with the proceeds of an Exempt Loan may, at the discretion of the Administrator, be used to repay such loan.

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000027

3.3    **Forfeitures and Their Usage.** Forfeitures will be determined and applied in accordance with the following:

(a)    **When Forfeitures Occur.** The date upon which a Forfeiture occurs is the earlier of (1) the date that the Participant who Terminated Employment receives a distribution of his or her Vested Interest under Article 5; or (2) the date that the Participant incurs five consecutive Breaks in Service after Termination of Employment. However, if a Participant's Vested Interest in the entire Participant's Account balance attributable to Employer contributions is zero on the date that the Participant Terminates Employment, then the Participant will be deemed to have received a distribution of such Vested Interest on the last day of the Plan Year following the date of such Termination of Employment and a Forfeiture of the Participant's Account balance attributable to Employer contributions will occur pursuant to the provisions of this paragraph on the date of such deemed distribution.

(b)    **Employer Securities Account.** If a portion of a Participant's Account is forfeited, such Forfeitures must come from the Participant's Other Investments Account before Forfeitures are taken from the Participant's Employer Securities Account. If interests in more than one class of Employer Securities have been allocated to the Participant's Employer Securities Account, the Participant must be treated as forfeiting the same proportion of each such class of Employer Securities.

(c)    **Usage and Allocation of Forfeitures.** The Administrator may elect to use all or any portion of the Forfeiture Account to pay administrative expenses incurred by the Plan. The portion of the Forfeiture Account that is not used to pay administrative expenses will be used first to restore previous Forfeitures of Participants' Accounts pursuant to Section 5.7 and/or to restore missing Participants' Accounts pursuant to Section 5.13. The portion of the Forfeiture Account that is not used to pay administrative expenses and is not used to satisfy the provisions of the previous sentence will then be allocated, subject to the application of Section 6.4, to the Participant's Account of each Benefiting Participant (as determined under Section 3.1(c)) in the ratio that each Benefiting Participant's Compensation bears to the total Compensation of all Benefiting Participants. Any forfeitures that are not allocated due to application of Section 6.4, will be further allocated among and credited to the Accounts of the remaining Participants who are Non-Highly Compensated Employees who are entitled to share in an allocation of such contributions for the Allocation Period, in the ratio that the Compensation of each Benefiting Participant who is a Non-Highly Compensated Employee eligible for additional allocations under Section 6.4 for the Allocation Period bears to the total Compensation of all Benefiting Participants who are Non-Highly Compensated Employees eligible for additional allocations under Section 6.4 for the Allocation Period, without exceeding the maximum allocation permitted by Section 6.4. Any additional unallocated amounts shall be allocated, and reallocated as necessary, in accordance with the previous sentence until all amounts have been allocated.

3.4    **Top Heavy Minimum Allocation.** In any Top Heavy Plan Year in which a Key Employee receives an allocation of Employer contributions or Forfeitures, each Employee who is described in paragraph (a) below will receive the Top Heavy Minimum Allocation, determined in accordance with the following provisions:

(a)    **Participants Who Must Receive the Top Heavy Minimum Allocation.** The Top Heavy Minimum Allocation, or such lesser amount as may be permitted under paragraph (b), will be made for each Participant who is a Non-Key Employee and who is employed by an Employer on the last day of the Plan Year, even if such Participant (1) fails to complete any minimum Hours of Service or any minimum period of service required to receive an allocation of Employer contributions or Forfeitures for the Plan Year; or (2) fails to make Elective Deferrals in the case of a 401(k) plan.

(b)    **Participation in Multiple Defined Contribution Plans.** If (1) this Plan is not part of a Required Aggregation Group or a Permissive Aggregation Group with a defined benefit plan, (2) this Plan is part of a Required Aggregation Group or a Permissive Aggregation Group with one or more defined contribution plans, (3) a Participant who is described in paragraph (a) participates in this Plan and in one or more defined contribution plans that are part of the Required Aggregation Group or the Permissive Aggregation Group, and (4) the allocation of Employer contributions and Forfeitures of each plan that is part of the Required Aggregation Group or the Permissive Aggregation Group (when each plan is considered separately) is insufficient to satisfy the Top Heavy Minimum Allocation requirement with respect to such Participant, the Top Heavy Minimum Allocation requirement will nevertheless be satisfied if the aggregate allocation of Employer contributions and Forfeitures that are made on behalf of such Participant under this Plan and all other defined contribution plans that are part

- 19 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000028

of the Required Aggregation Group or the Permissive Aggregation Group (and any other defined contribution plan that is sponsored by the Employer) is sufficient to satisfy the Top Heavy Minimum Allocation requirement. However, if the aggregate allocation of Employer contributions and Forfeitures that are made on behalf of a Participant under this Plan and all other defined contribution plans that are part of the Required Aggregation Group or the Permissive Aggregation Group (and any other defined contribution plan that is sponsored by the Employer) is not sufficient to satisfy the Top Heavy Minimum Allocation requirement, then the Employer will make an additional contribution on behalf of such Participant to this Plan and/or to one or more defined contribution plans that are part of the Required Aggregation Group or the Permissive Aggregation Group (or any other defined contribution plan that is sponsored by the Employer) in order that the aggregate allocation of Employer contributions and Forfeitures that are made on behalf of such Participant under this Plan and all defined contribution plans that are part of the Required Aggregation Group or the Permissive Aggregation Group (and any other defined contribution plan that is sponsored by the Employer) satisfies the Top Heavy Minimum Allocation requirement.

(c)    **DB Plan Part of Required Aggregation Group or Permissive Aggregation Group.** If this Plan is part of a Required Aggregation Group or a Permissive Aggregation Group with a defined benefit plan, the Sponsoring Employer may, in its discretion and in a uniform non-discriminatory manner which is intended to satisfy the requirements of Code §416(f) regarding the preclusion of required duplication and inappropriate omission of Top Heavy minimum benefits or Top Heavy Minimum Allocations, determine to satisfy the requirements of Code §416 with respect to each Participant described in paragraph (a) who participates in this Plan and in the defined benefit plan which is part of the Required Aggregation Group or the Permissive Aggregation Group, by any of the following methods:

(1)    **Defined Benefit Minimum Benefit.** A defined benefit minimum, which is an accrued benefit at any point in time equal to at least the product of (A) an Employee's average annual Code §415(c)(3) Compensation for the period of consecutive years (not exceeding five) when the Employee had the highest aggregate Code §415(c)(3) Compensation from the Employer and (B) the lesser of 2% per Year of Service or 1-Year period of service, as applicable, with the Employer or 20%, subject to the rules of Code §416 and the Regulations thereunder.

(2)    **Floor Offset Arrangement.** A floor offset approach, pursuant to Revenue Ruling 76-259, under which the defined benefit minimum of the defined benefit plan that is provided pursuant to paragraph (c)(1) is offset by the benefits provided under the defined contribution plan.

(3)    **Using Comparability.** A demonstration, using a comparability analysis pursuant to Revenue Ruling 81-202, that the plans are providing benefits at least equal to the defined benefit minimum that is provided pursuant to paragraph (c)(1).

(4)    **5% Defined Contribution Allocation.** An allocation of Employer contributions and Forfeitures that are made on behalf of such Participant under this Plan (or under any Employer-sponsored defined contribution plan) equal to 5% of an Employee's Code §415(c)(3) Compensation for each Plan Year that the Required Aggregation Group or the Permissive Aggregation Group is Top Heavy.

(d)    **Frozen DB Plan.** In determining Top Heavy benefits or Top Heavy Minimum Allocations, a defined benefit plan in which no Key Employee and former Key Employee benefits (within the meaning of Code §410(b)) during a Plan Year will be disregarded in determining whether the defined benefit plan is part of a Required Aggregation Group or a Permissive Aggregation Group with this Plan.

(e)    **Contributions That Can Be Used to Satisfy Top Heavy Minimum.** All Employer contributions to this Plan will used in determining if the Employer has satisfied the Top Heavy minimum benefit and/or Top Heavy Minimum Allocation requirements of this Section. Employer contributions that are made on behalf of a Participant to a 401(k) plan by the Employer may also be used.

3.5    **Failsafe Allocation.** If the Plan (or a component of the Plan) for any Plan Year fails to satisfy the nondiscriminatory classification test of Code §410(b)(2)(A)(i) and Regulation §1.410(b)-4 and/or the average benefit percentage test of Code §410(b)(2)(A)(ii) and Regulation §1.410(b)-5, then certain allocations will be made under this Section only to the extent necessary to insure that the Plan (or such component of the Plan)

- 20 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000029

for such Plan Year satisfies one of the tests set forth in either Code §410(b)(1)(A) (in which the Plan initially fails to benefit at least 70% of the non-excludable NHCEs), or Code §410(b)(1)(B) (in which the Plan initially fails to benefit a percentage of the non-excludable NHCEs that is at least 70% of the percentage of the non-excludable HCEs), pursuant to the following rules:

(a) **Order of Accrual Groups.** To satisfy one of the above tests for such Plan Year, an allocation may be made to certain Employees in the following groups (hereafter known as "Accrual Groups") in the following order: (1) first, an allocation may be made to that group of Employees who were Participants for the Plan Year but who did not receive an allocation for the Plan Year; (2) next, an allocation may be made to that group of Employees who have not yet satisfied the eligibility requirements of Section 2.1 and who are Eligible Employees; (3) next, an allocation may be made to that group of Employees who have satisfied the eligibility requirements of Section 2.1 and who are not Eligible Employees; and (4) finally, an allocation may be made to that group of Employees who have not yet satisfied the eligibility requirements of Section 2.1 and who are not Eligible Employees.

(b) **Priority of Allocation Within Each Group.** To determine each Employee's priority within an Accrual Group, Employees will first be ranked by their Hours of Service beginning with the highest number. However, before an allocation is made, the Participants in paragraph (a) will be further ranked beginning with those who are employed on the last day of Plan Year.

(c) **Employees Who Share and the Amount of Allocation.** Only Employees who are required to benefit under the Plan (or the component of the Plan) for the Plan Year in order to satisfy one of the above tests will be entitled to an allocation, even if the number of Employees who are required to benefit is less than the total number of Employees within a specific Accrual Group. Such allocation will be made on the same basis as, and using the same allocation formula and method as, the allocation that is made to each Participant who is an otherwise Benefiting Participant for such Plan Year with respect to the Plan (or such component of the Plan). The right of an Employee who is eligible to receive an allocation under this Section for a Plan Year will be fixed as of the last day of such Plan Year.

**3.6** **Rollover Contributions.** Rollover Contributions are not permitted.

**3.7** **Transactions Involving Employer Securities.** Employer Securities allocable to a Benefiting Participant's Employer Securities Account, or Employer Securities released from the Unallocated Employer Securities Account during an Allocation Period, will be allocated in accordance with the following provisions:

(a) **Employer Securities Account.** A Benefiting Participant's Employer Securities Account will be credited with his or her allocable share of (1) Employer Securities (including fractional shares) purchased and paid for by this Plan and designated by the Employer to be held in a Participant's Employer Securities Account; (2) Employer Securities contributed in kind and designated by the Employer to be held in a Participant's Employer Securities Account; (3) in-kind (stock) Dividends and/or S Corporation Distributions; (4) Forfeitures of Employer Securities; (4) Employer Securities purchased by the Trustee using Employer contributions; and (5) Employer Securities released from the Unallocated Employer Securities Account under paragraph (d). Credits of Employer Securities will be recorded in whole and fractional shares, and fractional shares will be computed at least to the nearest 1/100th of a share.

(b) **In-Kind Dividends and S Corporation Distributions.** In-kind (stock) dividends and/or S Corporation Distributions will be allocated to the Account which held the Employer Securities that earned the in-kind Dividend and/or S Corporation Distribution.

(c) **Cash Dividends and S Corporation Distributions.** Cash Dividends and/or S Corporation Distributions on Employer Securities in a Participant's Employer Securities Account or in the Unallocated Employer Securities Account will first be used to repay Current Obligations. To the extent no Current Obligation exists or cash Dividends and/or S Corporation Distributions are not used to purchase Employer Securities or to satisfy general Plan obligations, they will be allocated to Participants' Other Investments Accounts. If cash Dividends and/or S Corporation Distributions are used to repay Current Obligations of the Plan, Employer Securities released from the Unallocated Employer Securities Suspense Account attributable to cash Dividends and/or S Corporation

- 21 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000030

DOL 0009627

Distributions will be allocated first to each Participant's Employer Securities Account such that Employer Securities so allocated will have a fair market value not less than the amount of cash Dividends and/or S Corporation Distributions which would have been allocated to such Participant's Other Investments Account for the Allocation Period. Any Employer Securities released from the Unallocated Employer Securities Suspense Account attributable to cash Dividends and/or S Corporation Distributions remaining after application of the preceding sentence will be allocated in accordance with the provisions of Section 3.7(d)(4).

(d) **Unallocated Employer Securities Account.** Employer Securities acquired with an Exempt Loan must initially be allocated to the Unallocated Employer Securities Account and will only be withdrawn and allocated to Participants' Employer Securities Accounts in accordance with the following provisions:

(1) **Method of Withdrawing Securities.** For each Allocation Period during the duration of an Exempt Loan, the number of shares of Employer Securities released from the Unallocated Employer Securities Account will equal the number of shares held therein immediately before release for the current Allocation Period multiplied by a fraction, the numerator of which is the amount of principal and interest paid on the Exempt Loan for the Allocation Period and the denominator of which is the sum of the numerator plus the principal and interest to be paid on the Exempt Loan for all future Allocation Periods. The number of future Allocation Periods must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods. If the interest rate under the Exempt Loan is variable, the interest to be paid in future Allocation Periods must be computed using the interest rate applicable as of the end of the Allocation Period.

(2) **Alternative Method of Withdrawing Securities.** Except as specifically provided for in the Exempt Loan, the number of shares of Employer Securities released from the Unallocated Employer Securities Account may be determined in the same manner described in subparagraph (1) except that the number will be based solely on the amount of principal paid for the Allocation Period in relation to the sum of such amount plus the principal to be paid for all future Allocation Periods, provided that (1) the Exempt Loan must provide for annual payments of principal and interest at a cumulative rate that is not less rapid at any time than level annual payments of such amounts for 10 years; (2) interest in any payment is disregarded only to the extent it would be determined to be interest under standard loan amortization tables; and (3) the alternative described in this subparagraph is not applicable from the time that, by reason of a renewal, extension or refinancing, the sum of the expired duration of the Exempt Loan, the renewal period, the extension period, and the duration of a new Exempt Loan exceeds 10 years.

(3) **Limitation on Method for Withdrawing Securities.** Notwithstanding subparagraphs (1) and (2) above, once a method of withdrawing Employer Securities from the Unallocated Employer Securities Account has been elected by the Employer with respect to an Exempt Loan, no other method will be applied with respect to such Exempt Loan.

(4) **Method of Allocating Withdrawn Stock.** The Plan must consistently allocate to each Benefiting Participant's Employer Securities Account non-monetary units (shares and fractional shares of Employer Securities) representing each Participant's interest in Employer Securities withdrawn from the Unallocated Employer Securities Suspense Account. Except as limited in the provisions of Section 3.7(f) and Section 6.4, below, after applying allocations required for cash Dividends and/or S Corporation Distributions used to repay Current Obligations of the Plan pursuant to Section 3.7(c), above, any remaining Employer Securities released from the Unallocated Employer Securities Suspense Account will be allocated in the ratio that each Benefiting Participant's Compensation for the Allocation Period bears to the total Compensation of all Benefiting Participants for the Allocation Period. Any Employer Securities released from the Unallocated Employer Securities Account that are not allocated due to application of Section 6.4, will be further allocated among and credited to the Accounts of the remaining Participants who are Non-Highly Compensated Employees who are entitled to share in an allocation of such contributions for the Allocation Period, in the ratio that the Compensation of each Benefiting Participant who is a Non-Highly Compensated Employee eligible for additional allocations under Section 6.4 for the Allocation Period bears to the total Compensation of all Benefiting Participants who are Non-Highly Compensated Employees eligible for additional allocations

- 22 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY     ARGENT 0000031

under Section 6.4 for the Allocation Period, without exceeding the maximum allocation permitted by Section 6.4. Any additional unallocated amounts shall be allocated, and reallocated as necessary, in accordance with the previous sentence until all amounts have been allocated.

(e) **Code §1042 Stock.** Notwithstanding the foregoing to the contrary, when any portion of the Plan's assets that are attributable to (or allocable in lieu of) Employer Securities acquired by the Plan in a sale to which Code §1042 or Code §2057 applies will be allocated in accordance with the following provisions:

(1) **No Allocation Permitted to Certain Participants.** No portion of any such assets may be allocated directly or indirectly under this Plan or any other qualified plan of an Employer or Affiliated Employer (A) during the Non-Allocation Period for the benefit of any taxpayer who makes an election under Code §1042(a) with respect to Employer Securities or any decedent if the executor of the estate of such decedent makes a qualified sale to which Code §2057 applies or for the benefit of any individual who is related to the taxpayer or the decedent within the meaning of Code §267(b); or (B) for the benefit of any other person who owns, after applying Code §318(a), more than 25% of any class of outstanding stock of the Employer or of any corporation which is a member of the same controlled group of corporations within the meaning of Code §409(l)(4) as the Employer; or the total value of any class of outstanding stock of the Employer. For purposes hereof, Code §318(a) will be applied without regard to the employee trust exception in Code §318(a)(2)(B)(i); and a person will be treated as failing to meet the stock ownership limitation set forth herein if such person fails such limitation at any time during the 1-year period ending on the date of sale of qualified securities to the Plan, or on the date as of which such qualified securities are allocated to Participants in the Plan.

(2) **Exception for Certain Lineal Descendants.** The restrictions set forth in subparagraph (1) will not apply to any individual who is a lineal descendant of the taxpayer if the aggregate amount allocated to the benefit of all lineal descendants during the Non-Allocation Period does not exceed more than 5% of the Employer Securities (or amounts allocated in lieu thereof) held by the Plan which are attributable to a sale to the Plan by any person related to such descendants within the meaning of Code §267(c)(4) in a transaction to which Code §1042 applied.

(3) **Definition of Non-Allocation Period.** The term "Non-Allocation Period" means the 10-year period beginning on the later of the date of the sale of the qualified securities or the date of the allocation attributable to the final payment of acquisition indebtedness incurred in connection with such sale.

(f) **Prohibited Allocation of Employer Securities of an S Corporation.** Notwithstanding any provision of this Plan to the contrary, no assets of the Plan attributable to (or allocable in lieu of) Employer Securities issued by an S Corporation may, during a Nonallocation Year (as defined subparagraph (1) below), be allocated directly or indirectly for the benefit of any Disqualified Person (as defined in subparagraph (2) below) or under any other qualified plan of the Employer, subject to the following provisions:

(1) **Nonallocation Year.** The term "Nonallocation Year" means any Plan Year in which (A) the Plan holds Employer Securities of an S Corporation, and (B) Disqualified Persons own at least 50% of such Employer Securities. In determining ownership under clause (B) of the subparagraph (1), the rules of Code §318(a) will apply, except that in applying Code §318(a)(1), the members of an individual's family will include members of the family described in subparagraph (4) below, and Code §318(a)(4) will not apply. In addition, notwithstanding the employee trust exception in Code §318(a)(2)(B)(i), an individual will be treated as owning deemed-owned shares of the individual, and solely for purposes of applying subparagraph (6) below, this subparagraph will be applied after the attribution rules of subparagraph (6) have been applied.

A person shall be treated as owning stock if the person has an exercisable right to acquire such stock, the stock is both issued and outstanding and the stock is held by persons other than the Plan, the S Corporation, or a related entity, and such ownership shall result in a Nonallocation Year.

- 23 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000032

The prior sentence shall not apply for purposes of determining ownership of Deemed-Owned Shares or whether an interest constitutes Synthetic Equity. Further, this paragraph shall not apply to a right to acquire stock of an S corporation held by a shareholder that is subject to federal income tax that, under Regulation §1.1361-1(l)(2)(iii)(A) or (l)(4)(iii)(C), that would not be taken into account in determining if an S corporation has a second class of stock, provided that a principal purpose of the right is not the avoidance or evasion of Code §409(p).

(2)    **Disqualified Person.** The term "Disqualified Person" means any person whose number of Deemed-Owned Shares in the S Corporation is at least 10% of the corporation's Deemed-Owned Shares, or whose number of Deemed-Owned Shares in the S Corporation, when aggregated with the Deemed-Owned Shares of his or her family members, is at least 20% of the Deemed-Owned Shares of stock in the S Corporation. Any member of a disqualified person's family with Deemed-Owned Shares will be treated as a Disqualified Person if not otherwise treated as a Disqualified Person hereunder.

(3)    **Deemed-Owned Shares.** The term "Deemed-Owned Shares" means, with respect to any person, (A) Employer Securities of the S corporation allocated to such person under the Plan, and (B) the person's share of such Employer Securities which is held by the Plan but is not allocated to Participants. A person's share of unallocated S Corporation Employer Securities held by the Plan is the amount of such unallocated Employer Securities which would be allocated to him or her if such unallocated Employer Securities were allocated to all Participants in the same proportion as the most recent Employer Securities allocation under the Plan.

(4)    **Member of the Family.** The term "Member of the Family" means, with respect to any individual, (A) the spouse of the individual; (B) an ancestor or lineal descendant of the individual or the individual's spouse; (C) a brother or sister of the individual or his or her spouse and any lineal descendant of the brother or sister; and (D) the spouse of any individual described in clause (B) or (C). However, a spouse who is legally separated from such individual under a decree of divorce or separate maintenance will not be treated as such individual's spouse.

(5)    **Prohibited Allocation.** For purposes of this Section, the term "prohibited allocation" means either an "Impermissible Accrual" or an "Impermissible Allocation" as defined below:

(A)    **Impermissible Accrual.** An Impermissible Accrual occurs to the extent that Employer Securities in an S Corporation owned by the Plan and assets attributable thereto are held under the Plan for the benefit of a Disqualified Person during a Nonallocation Year. For this purpose, assets attributable to such Employer Securities include any distributions, within the meaning of Code §1368, made on S Corporation stock held in a Disqualified Person's Employer Securities Account (including earnings thereon), plus any proceeds from the sale of such Employer Securities (including any earnings thereon). Thus, in the event of a Nonallocation Year, all such Employer Securities and all other Plan assets attributable thereto, including distributions, sales proceeds, and earnings on either distributions or proceeds, held for the account of such Disqualified Person in the Plan during that year are an Impermissible Accrual for the benefit of that person, whether attributable to contributions in the current year or in prior years.

(B)    **Impermissible Allocation.** An Impermissible Allocation occurs during a Nonallocation Year to the extent that a contribution or other Annual Addition is made to the account of a Disqualified Person, or the Disqualified Person otherwise accrues additional benefits, directly or indirectly under this Plan or any other plan of the Sponsoring Employer qualified under Code §401(a) (including a release and allocation of assets from a suspense account, as described in Regulation §54.4975–11(c) and (d)) that, for the Nonallocation Year, would have been added to the account hereunder of the Disqualified Person and invested in Employer Securities in an S corporation owned by the Plan but for a Plan provision that precludes such addition to the account of the Disqualified Person and investment in Employer Securities during a Nonallocation Year.

(6)    **Synthetic Equity.**

- 24 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000033

(A)    In General.  For purposes of subparagraphs (1) and (2), in the case of a person who owns Synthetic Equity, except to the extent otherwise provided in the Regulations, the stock on which the Synthetic Equity is based will be treated as outstanding stock in the S Corporation and the Deemed-Owned Shares of such person if the treatment of Synthetic Equity of one or more such persons results in (A) the treatment of any person as a Disqualified Person, or (B) the treatment of any year as a Nonallocation Year. For purposes hereof, Synthetic Equity is treated as owned by a person in the same manner as stock is treated as owned by a person under Code §318(a)(2) and (3). If, without regard to this subparagraph, a person is treated as a Disqualified Person or a year is treated as a Nonallocation Year, this subparagraph will not be construed to result in the person or year not being so treated. For purposes of this Section, the term "synthetic equity" means any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the S corporation in the future. Except to the extent provided in regulations, synthetic equity also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value, and also includes nonqualified deferred compensation within the meaning of Regulation §1.409(p)-1(f).

(B)    **Synthetic Equity Determined by Reference to Employer Securities.**  In the case of Synthetic Equity that is determined by reference to Employer Securities, the person who is entitled to the Synthetic Equity is treated as owning the number of shares of Employer Securities deliverable pursuant to such Synthetic Equity. In the case of Synthetic Equity that is determined by reference to shares of stock (or similar interests) in a related entity, the person who is entitled to the Synthetic Equity is treated as owning Employer Securities with the same aggregate value as the number of shares of stock (or similar interests) of the related entity.

(C)    **Synthetic Equity Not Determined by Reference to Employer Securities.**  With respect to Synthetic Equity that is not determined by reference to Employer Securities or by reference to shares in a related entity, the person who is entitled to the Synthetic Equity is treated as owning on any date a number of shares of Employer Securities equal to the present value (on that date) of the Synthetic Equity (with such value determined without regard to any lapse restriction as defined at Regulation §1.83-3(i)) divided by the fair market value of a share of the Employer Securities as of that date.  The number of shares of Employer Securities treated as owned by a person who is entitled to Synthetic Equity will be determined on a "determination date," and the number of shares of Synthetic Equity shall be fixed from that determination date through the third anniversary of the determination date. The number of shares of Synthetic Equity will be re-determined every three Plan Years, based on the Employer Securities value on a determination date that is the third anniversary of each determination date and the aggregate present value of the Synthetic Equity (including all grants made during the three-year period) on that determination date.  However, additional accruals, allocations, or grants that are made during such three-year period are taken into account on the anniversary of each determination date during that period, based on the number of Synthetic Equity shares resulting from the additional accrual, allocation, or grant (determined as of the determination date on or next following the date of the accrual, allocation, or grant).

(7)    **Limitation of Allocations to Avoid Nonallocation Years.** No portion of any allocation that otherwise would be made pursuant to the terms of this Article (including, but not limited to, any contributions, dividends, S Corporation distributions, release of unallocated Employer Securities, earnings, losses or forfeitures) shall be made to the extent that the Administrator determines such allocation would cause a Nonallocation Year to occur.  Allocations to Participants shall be limited by reducing the amount of any allocation otherwise intended for any Participant who is a Disqualified Person, or would be treated as a Disqualified Person if the intended allocation were to be made, in the amount necessary in order to avoid the occurrence of a Nonallocation Year.  However, to the extent a smaller allocation reduction would cause any such Participant to no longer be classified as a Disqualified Person, the reduction of the intended allocation for that Participant shall be limited to the amount that would cause that Participant to

- 25 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000034

no longer be classified as a Disqualified Person. Any amount not allocated as a result of this paragraph shall be further allocated among and credited to the Accounts of the remaining Participants who are not Disqualified Persons and who are Non-Highly Compensated Employees otherwise entitled to share in the type of allocation that was limited. This paragraph shall only limit the allocation of a Non-Highly Compensated Employee if such allocation limitation would be considered nondiscriminatory under Code §401(a)(4).

(8). **Code §409(p) Transfers to Non-ESOP Portion of Plan.**

(A) **Non-ESOP Portion.** Assets held under the Plan in accordance with this Section are held under a portion of the Plan that is not an employee stock ownership plan (ESOP), within the meaning of Code §4975(e)(7). Amounts held in the portion of the Plan that is not an ESOP (the "Non-ESOP Portion") shall be held in accounts that are separate from the accounts for the amounts held in the remainder of the Plan (the "ESOP Portion"). Any statements provided to Participants and/or Beneficiaries to show their interest in the Plan shall separately identify the amounts held in each such portion. Except as specifically set forth in this Section, all of the terms of the Plan apply to any amount held under the Non-ESOP Portion of the Plan in the same manner and to the same extent as an amount held under the ESOP Portion of the Plan.

(B) **Transfers from ESOP Portion to Non-ESOP Portion of Plan to Avoid Nonallocation Years.**

(i) In the case of any event that the Administrator determines would otherwise cause a Nonallocation Year to occur (referred herein as a "nonallocation event"), shares of employer stock held under the Plan before the date of the nonallocation event shall be transferred from the ESOP portion of the Plan to the Non-ESOP portion of the Plan as provided in this paragraph. Events that may cause a Nonallocation Year, include, but are not limited to, a contribution to the Plan in the form of shares of employer stock, a distribution from the Plan in the form of shares of employer stock, a change of investment within a Plan account of a Disqualified Person that alters the number of shares of employer stock held in the account of the Disqualified Person, or the issuance by the employer of synthetic equity as defined by Code §409(p)(6)(C) and Regulation §1.409(p)-1(f). A nonallocation event occurs only if (i) the total number of shares of employer stock that, held in the Employer Securities Account in the ESOP Portion of the Plan for those Participants who are or who would be Disqualified Persons after taking into account the Participant's synthetic equity and the nonallocation event exceeds (ii) the number of shares of employer stock equal to 49.9% of the total number of shares of employer stock outstanding after taking the nonallocation event into account (causing a Nonallocation Year to occur). The amount transferred under this Section shall be the amount that the Administrator determines to be the minimum amount that is necessary to ensure that a Nonallocation Year does not occur, but in no event is the amount so transferred to be less than the excess of (i) over (ii). The Administrator shall take steps to ensure that all actions necessary to implement the transfer are taken before the nonallocation event occurs.

(ii) A. Except as provided for in paragraph (B), below, at the date of the transfer, the total number of shares transferred, as provided for in paragraph (i), above, shall be charged against the accounts of Participants who are Disqualified Persons (i) by first reducing the Employer Securities Account in the ESOP portion of the Plan for the Participant who is a Disqualified Person whose account has the largest number of shares (with the addition of synthetic equity shares) and (ii) thereafter by reducing the Employer Securities Account in the ESOP Portion of the Plan for each succeeding Participant who is a Disqualified Person who has the largest number of shares in his or her account (with the addition of synthetic equity shares). Immediately following the transfer, the number of transferred shares charged against any Participant's account in the ESOP portion of the Plan shall be credited to an account established for that Participant in the Non-ESOP portion of the Plan.

- 26 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000035

B.  Notwithstanding paragraph (A), above, the number of shares transferred shall be charged against the accounts of Participants who are Disqualified Persons (1) by first reducing the account of the Participant with the fewest shares (including synthetic equity shares) who is a Disqualified Person and who is a Highly Compensated Employee to cause the Participant not to be a Disqualified Person, and (2) thereafter reducing the account of each other Participant who is a Disqualified Persons and a Highly Compensated Employee, in order of who has the fewest ESOP shares (including synthetic equity shares). A transfer under this paragraph only applies to the extent that the transfer results in fewer shares being transferred than in a transfer under paragraph (A), above.

(iii) A.  If two or more Participants described in paragraph 3.7(f)(8)(B) have the same number of shares, the account of the Participant with the longest service shall be reduced first.

B.  Beneficiaries of the Plan are treated as Plan Participants for purposes of this Section.

(C)  **Income Taxes.** If the Trust owes income taxes as a result of unrelated business taxable income under Code §512(e), or any similar tax imposed by a state or local taxing authority, with respect to shares of employer stock held in the Non-ESOP portion of the Plan, the income tax payments made by the Trustee shall be charged against the accounts of each Participant or Beneficiary who has an account in the Non-ESOP portion of the Plan in proportion to the ratio of the shares of employer stock in such Participant's or Beneficiary's account in the non-ESOP portion of the Plan to the total shares of employer stock in the non-ESOP portion of the Plan. The Employer shall purchase shares of employer stock from the Trustee with cash (based on the fair market value of the shares so purchased) from each such account to the extent cash is not otherwise available to make the income tax payments from the Participant's or Beneficiary's Other Investments Account in the Plan or his or her other defined contribution plan accounts.

(9)  This Section 3.7(f) is intended to satisfy the provisions under Code §409(p) and the Regulations promulgated and in effect thereunder. To the extent that any provision of this Section 3.7(f) is inconsistent with Code §409(p) or the related Regulations, such provision shall be operated in accordance with the Code and Regulations.

- 27 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000036

## Article 4
## Plan Benefits

**4.1    Benefit Upon Normal Retirement.** Every Participant who has a Termination of Employment with an Employer coinciding with or next following attainment of Normal Retirement Age will be entitled upon such Termination of Employment to receive his or her Vested Aggregate Account balance determined as of the most recent Valuation Date coinciding with or immediately preceding the date of distribution. Distribution will be made in accordance with Section 5.1.

**4.2    Benefit Upon Late Retirement.** A Participant who has reached Normal Retirement Age may elect to remain employed and retire at a later date. Such Participant will continue to participate in the Plan and his or her Participant's Account will continue to receive allocations under Article 3. Upon actual retirement, the Participant will be entitled to his or her Vested Aggregate Account balance determined as of the most recent Valuation Date coinciding with or immediately preceding the date of distribution. Distribution will be made in accordance with Section 5.1.

**4.3    Benefit Upon Death.** Upon the death of a Participant prior to Termination of Employment, or upon the death of a Terminated Participant prior to distribution of his or her Vested Aggregate Account, his or her Beneficiary will be entitled to the Participant's Vested Aggregate Account balance determined as of the most recent Valuation Date coinciding with or immediately preceding the date of distribution. If any Beneficiary who is living on the date of the Participant's death dies prior to receiving his or her entire death benefit, the portion of such death benefit will be paid to the estate of such deceased Beneficiary. The Administrator's determination that a Participant has died and that a particular person has a right to receive a death benefit will be final. Distribution under this Section will be made in accordance with Section 5.2.

**4.4    Benefit Upon Disability.** If a Participant suffers a Disability prior to Termination of Employment, or if a Terminated Participant suffers a Disability prior to distribution of his or her Vested Aggregate Account balance, he or she will be entitled to his or her Vested Aggregate Account balance determined as of the most recent Valuation Date coinciding with or immediately preceding the date of distribution. Distribution under this Section will be made in accordance with Section 5.3.

**4.5    Benefit Upon Termination of Employment.** A Terminated Participant will be entitled to his or her Vested Aggregate Account balance as of the most recent Valuation Date coinciding with or immediately preceding the date of distribution. Distribution to a Terminated Participant who does not die prior to distribution or who does not suffer a Disability prior to distribution will be made under Section 5.4.

**4.6    Determination of Vested Interest.** A Participant's Vested Interest in his or her Participant's Account will be determined in accordance with the following provisions:

(a)    **100% Vesting Upon Retirement, Death and Disability.** A Participant will have a 100% Vested Interest in his or her Participant's Account upon reaching Normal Retirement Age at or prior to Termination of Employment. A Participant will also have a 100% Vested Interest therein upon his or her Disability at or prior to Termination of Employment; and upon his or her death at or prior to Termination of Employment.

- 28 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000037

(b)  **Vesting of Employer Contributions.** Except as otherwise provided in paragraph (a) above, a Participant's Vested Interest in his or her Participant's Account will be determined at any time by the vesting schedule following this paragraph based on the Participant's credited Years of Service on the date the determination is made. No Years of Service will be counted in determining a Participant's Vested Interest under this paragraph that are credited prior to the date a Participant reaches Age 18 or are credited during any period for which the Employer did not maintain this Plan or a predecessor plan (as that term is defined for purposes of Code §411(a)(4)(C) and Regulation §1.411(a)-5(b)(3)(i)).

> 1 Year of Service ...............0% Vested
> 2 Years of Service ...........20% Vested
> 3 Years of Service ...........40% Vested
> 4 Years of Service ...........60% Vested
> 5 Years of Service ...........80% Vested
> 6 Years of Service .........100% Vested

(c)  **Amendments to the Vesting Schedule.** No amendment to the Plan may directly or indirectly reduce a Participant's Vested Interest in his or her Participant's Account. If the Plan is amended in any way that directly or indirectly affects the computation of a Participant's Vested Interest in his or her Participant's Account, or the Plan is deemed amended by an automatic change to or from a Top Heavy Vesting schedule, then the following provisions will apply:

(1)  **Participant Election.** Any Participant with at least three Years of Service for eligibility purposes may, by filing a written request with the Administrator, elect to have the Vested Interest in his or her Participant's Account computed by the Vesting schedule in effect prior to the amendment. A Participant who fails to make an election will have the Vested Interest computed under the new schedule. The period in which the election may be made will begin on the date the amendment is adopted or is deemed to be made and will end on the latest of (A) 60 days after the amendment is adopted; (B) 60 days after the amendment becomes effective; or (C) 60 days after the Participant is issued written notice of the amendment by the Employer or Administrator.

(2)  **Preservation of Vested Interest.** Notwithstanding the foregoing to the contrary, if the vesting schedule is amended, then in the case of an Employee who is a Participant as of the later of the date such amendment is adopted or the date it becomes effective, the Vested Interest in his or her Participant's Account determined as of such date will not be less than his or her Vested Interest computed under the Plan without regard to such amendment.

- 29 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000038

## Article 5
## Distribution of Benefits

5.1    **Distribution of Benefit Upon Retirement.** Unless a cash-out occurs under Section 5.5, the retirement benefit a Participant is entitled to receive under Section 4.1 or 4.2 will be distributed in the following manner:

(a)    **Form of Distribution.** Unless a faster form of distribution is provided for in a distribution policy that is promulgated under Section 8.6 by the Administrator, a Participant's benefit will be distributed in substantially equal installments over a 5-year period (unless the Participant elects a longer period). If the Participant's Account balance exceeds $1,050,000, the 5-year period will be extended 1 additional year (but not more than 5 additional years) for each $210,000 or fraction thereof by which the Participant's Account balance exceeds $1,050,000. These dollar limits will be adjusted at the same time and in the same manner as provided in Code §415(d).

(b)    **Partial Distributions.** If a Participant receives a distribution of less than 100% of his or her Vested Aggregate Account balance, the Administrator will determine the portion (including zero) of the distribution that will be made from each of the Participant's sub-accounts, provided that any such determination is made in a uniform nondiscriminatory manner.

(c)    **Time of Distribution.** Distribution will be made within a reasonable time after the close of the Plan Year in which Participant Terminates Employment on or after his or her Normal Retirement Date, but distribution must begin no later than the Required Beginning Date. Notwithstanding the foregoing, distribution of a Participant's Employer Securities Account will begin no later than one year after the close of the Plan Year in which the Participant Terminates Employment on or after his or her Normal Retirement Date unless the Participant otherwise elects a later distribution date.

5.2    **Distribution of Benefit Upon Death.** Unless a cash-out occurs under Section 5.5, the benefit a deceased Participant's Beneficiary is entitled to receive under Section 4.3 will be distributed in the following manner:

(a)    **Surviving Spouse.** If a Participant is married on the date of his or her death, the Participant's surviving Spouse will be entitled to receive a death benefit determined in accordance with the following:

(1)    **Form of Distribution.** Notwithstanding any other Beneficiary designation by a Participant, if a Participant is married on the date of death, the surviving Spouse will be entitled to receive 100% of the Participant's death benefit unless the surviving Spouse has waived that right under Section 5.8. Unless a faster form of distribution is provided for in a distribution policy that is promulgated under Section 8.6 by the Administrator, the benefit will be distributed in substantially equal installments over a 5-year period (unless the surviving Spouse elects a longer period). If the Participant's Account balance exceeds $1,050,000, the 5-year period will be extended 1 additional year (but not more than 5 additional years) for each $210,000 or fraction thereof by which the Participant's Account balance exceeds $1,050,000. These dollar limits will be adjusted at the same time and in the same manner as provided in Code §415(d).

(2)    **Time of Distribution.** The surviving Spouse may elect (1) to have any death benefit to which he or she is entitled distributed within a reasonable time after the close of the Plan Year in which the Participant dies; or (2) to defer distribution of the benefit, but distribution may not be deferred beyond December 31st of the calendar year in which the deceased Participant would have attained Age 70½. Notwithstanding the foregoing, distribution of a Participant's Employer Securities Account will begin no later than one year after the close of the Plan Year in which the Participant dies unless the Spouse otherwise elects a later distribution date. If the surviving Spouse dies before distribution begins, distribution will be made as if the surviving Spouse were the Participant. Distribution will be considered as having commenced when the deceased Participant would have reached Age 70½ even if payments have been made to the surviving Spouse before that date.

(b)    **Non-Spouse Beneficiary.** Unless a faster form of distribution is provided for in a distribution policy that is promulgated under Section 8.6 by the Administrator, any death benefit a non-Spouse Beneficiary is entitled to receive will be distributed in substantially equal installments over a 5-year period (unless the surviving Spouse elects a longer period). If the Participant's Account balance

- 30 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000039

exceeds $1,050,000, the 5-year period will be extended 1 additional year (but not more than 5 additional years) for each $210,000 or fraction thereof by which the Participant's Account balance exceeds $1,050,000. These dollar limits will be adjusted at the same time and in the same manner as provided in Code §415(d). Distribution of a Participant's Employer Securities Account will begin no later than one year after the close of the Plan Year in which the Participant dies unless the Beneficiary otherwise elects a later distribution date.

(c)    **Distribution If the Participant or Other Payee Is in Pay Status.** If a Participant or Beneficiary who has begun receiving distribution of a benefit dies before the entire benefit is distributed, the balance will be distributed to the Participant's Beneficiary (or Beneficiary's beneficiary) at least as rapidly as under the method of distribution being used on the date of the Participant's or Beneficiary's death.

(d)    **Payments to a Beneficiary.** In the absence of a Beneficiary designation or other directive from the deceased Participant to the contrary, any Beneficiary may name his or her own Beneficiary to receive any benefits payable in the event of the Beneficiary's death prior to receiving the entire death benefit to which the Beneficiary is entitled; and if a Beneficiary has not named his or her own Beneficiary, the Beneficiary's estate will be the Beneficiary. If any benefit is payable under this paragraph to a Beneficiary of the deceased Participant's Beneficiary or to the estate of the deceased Participant's Beneficiary, or to any other Beneficiary or the estate thereof, subject to the limitations regarding the latest dates for benefit payment in paragraphs (a) and (c) above, the Administrator may (1) continue to pay the remaining value of such benefits in the amount and form already commenced, or pay such benefits in any other manner permitted under the Plan for a Participant or Beneficiary, and (2) if payments have not already commenced, pay such benefits in any other manner permitted under the Plan. Distribution to the Beneficiary of a Beneficiary must begin no later than the date distribution would have been made to the Participant's Beneficiary. The Administrator's determination under this paragraph will be final and will be applied in a non-discriminatory manner that does not discriminate in favor of Participants who are Highly Compensated Employees.

(e)    **Partial Distributions.** If a Participant's Beneficiary receives a distribution of less than 100% of the Participant's Vested Aggregate Account balance, the Administrator will determine the portion (including zero) of the distribution that will be made from each of the Participant's sub-accounts, provided that any such determination is made in a uniform nondiscriminatory manner.

5.3    **Distribution of Benefit Upon Disability.** Unless a cash-out occurs under Section 5.5, the Disability benefit a Participant is entitled to receive under Section 4.4 will be distributed in the following manner:

(a)    **Form of Distribution.** Unless a faster form of distribution is provided for in a distribution policy that is promulgated under Section 8.6 by the Administrator, a Participant's benefit will be distributed in substantially equal installments over a 5-year period (unless the Participant elects a longer period). If the Participant's Account balance exceeds $1,050,000, the 5-year period will be extended 1 additional year (but not more than 5 additional years) for each $210,000 or fraction thereof by which the Participant's Account balance exceeds $1,050,000. These dollar limits will be adjusted at the same time and in the same manner as provided in Code §415(d).

(b)    **Partial Distributions.** If a Participant receives a distribution of less than 100% of his or her Vested Aggregate Account balance, the Administrator will determine the portion (including zero) of the distribution that will be made from each of the Participant's sub-accounts, provided that any such determination is made in a uniform nondiscriminatory manner.

(c)    **Time of Distribution.** Distribution will be made within an administratively reasonable time after the close of the first Plan Year following the Plan Year in which the Participant Terminates Employment because of the Disability unless the Participant otherwise elects a later distribution date.

5.4    **Distribution of Benefit Upon Termination of Employment.** Unless a cash-out occurs under Section 5.5 or a prior distribution has been made under Section 5.2 or 5.3, the benefit a Terminated Participant is entitled to receive under Section 4.5 will be distributed in the following manner:

(a)    **Form of Distribution.** Unless a faster form of distribution is provided for in a distribution policy that is promulgated under Section 8.6 by the Administrator, a Participant's benefit will be distributed in

- 31 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000040

substantially equal installments over a 5-year period (unless the Participant elects a longer period). If the Participant's Account balance exceeds $1,050,000, the 5-year period will be extended 1 additional year (but not more than 5 additional years) for each $210,000 or fraction thereof by which the Participant's Account balance exceeds $1,050,000. These dollar limits will be adjusted at the same time and in the same manner as provided in Code §415(d). .

(b)     **Partial Distributions.** If a Participant receives a distribution of less than 100% of his or her Vested Aggregate Account balance, the Administrator will determine the portion (including zero) of the distribution that will be made from each of the Participant's sub-accounts, provided that any such determination is made in a uniform nondiscriminatory manner.

(c)     **Time of Distribution.** Distribution will be made to the Terminated Participant within an administratively reasonable time after the close of the fifth Plan Year following the Plan Year of his or her Termination of Employment, but not later than one year after the close of the fifth Plan Year following the Plan Year in which the Participant incurs his or her Termination of Employment, unless the Participant elects a later distribution date. If a Terminated Participant is reemployed by the Employer as of the last day of the fifth Plan Year following the Plan Year of such Termination of Employment, distribution of his or her Employer Securities Account will be postponed until the Participant is otherwise entitled to a distribution under the Plan.

5.5     **Mandatory Cash-Out of Benefits.** The Vested Aggregate Account of a Terminated Participant who satisfies the requirements of this Section will be mandatorily distributed (a "cash-out") without the Participant's consent in accordance with the following provisions:

(a)     **Cashout Threshold.** The Administrator can only make a distribution under this Section if a Participant's Vested Aggregate Account on the date of distribution does not exceed $5,000 (such amount hereafter referred to as the "Cashout Threshold"). If a Participant would have received a distribution under the preceding sentence but for the fact that the Participant's Vested Aggregate Account exceeded the Cashout Threshold when the Participant Terminated Employment, and if at a later time the Participant's Vested Aggregate Account is reduced to an amount not greater than the Cash-out Threshold in effect at that later time, then the Administrator will distribute such amount or remaining amount in a lump sum without the Participant's consent. Any portion of the Participant's Account which is not Vested will be treated as a Forfeiture.

(b)     **Time and Form of Distribution.** Any distribution under this Section will be made as soon as administratively feasible after the Plan Year in which the Participant Terminates Employment (or, if applicable, as soon as administratively feasible after a Terminated Participant's Vested Aggregate Account no longer exceeds the Cash-out Threshold). Distribution will, at the election of the Participant, be made in the form of a lump sum cash payment or as a direct rollover under Section 5.14. However, if the Participant fails to make a timely election, and the amount of the distribution is $1,000 or less, distribution will made in the form of a lump sum cash payment not less than 30 days and not more than 90 days (or such other time as permitted by law) after the Code §402(f) notice is provided to the Participant. If the Participant fails to make a timely election and the amount of the distribution exceeds $1,000, the Administrator will pay the distribution in an automatic direct rollover to an individual retirement plan designated by the Administrator. Such individual retirement plan, as defined in Code §7701(a)(37), may be either an individual retirement account within the meaning of Code §408(a) or an individual retirement annuity within the meaning of Code §408(b) (either of which is hereafter referred to as an IRA). The Administrator will establish the IRA at a qualified financial institution by selecting an IRA trustee, custodian or issuer that is unrelated to the Employer or the Administrator, and will make the initial investment choices for the IRA. Any automatic direct rollover will occur not less than 30 days and not more than 90 days (or such other time as permitted by law) after the Code §402(f) notice with the explanation of the automatic direct rollover is provided to the Participant.

5.6     **Restrictions on Immediate Distributions.** If a Participant's Vested Aggregate Account balance exceeds the amount set forth in paragraph (a) of this Section and is Immediately Distributable, such account can only be distributed in accordance with the following provisions:

- 32 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000041

(a) **General Rule.** If (1) the Vested Aggregate Account balance of a Terminated Participant exceeds $5,000, or if there are remaining payments to be made with respect to a particular distribution option that previously commenced, and (2) such amount is Immediately Distributable, then the Participant must consent to any distribution of such amount. If (1) the Vested Aggregate Account balance of a Terminated Participant does not exceed $5,000, but (if applicable) exceeds the cash-out threshold set forth in Section 5.5(a), and (2) such amount is Immediately Distributable, then only the Participant (or where the Participant has died, the Participant's Spouse or Beneficiary) must consent to any distribution of such amount.

(b) **Consent Requirement.** The consent of the Participant to any benefit that is Immediately Distributable must be obtained in writing within the 180-day period ending on the Annuity Starting Date. The Participant is not required to consent to a distribution that is required by Code §401(a)(9) or §415.

(c) **Notification Requirement.** The Administrator must notify the Participant of the right to defer any distribution until it is no longer Immediately Distributable. Notification will include a general explanation of the material features and relative values of the optional forms of benefit available in a manner that would satisfy the notice requirements of Code §417(a)(3); and will be provided no less than 30 days or more than 180 days prior to the Annuity Starting Date. However, distribution of a Participant's benefit may begin less than 30 days after the such notice is given if (1) the Administrator clearly informs the Participant that the Participant has a right to a period of at least 30 days after receiving notice to consider the decision of whether or not to elect a distribution; (2) the Participant, after receiving the notice, affirmatively elects a distribution or a particular distribution option.

(d) **Consent Not Needed on Plan Termination.** If upon Plan termination neither the Employer nor an Affiliated Employer maintains another defined contribution plan (other than an employee stock ownership plan as defined in Code §4975(e)(7)), then the Participant's benefit will, without the Participant's consent, be distributed to the Participant. If the Employer or an Affiliated Employer maintains another defined contribution plan (other than an employee stock ownership plan), then the Participant's benefit will, without the Participant's consent, be transferred to the other plan if the Participant does not consent to an immediate distribution under this Section.

5.7 **Accounts of Rehired Participants.** If a Participant who is not 100% Vested in his or her Participant's Account Terminates Employment, a Forfeiture of all or a portion of the Participant's Account of the Terminated Participant may have occurred, and the Participant is subsequently reemployed by the Employer, then his or her Participant's Account will be administered in accordance with the following:

(a) **Reemployment of a Participant After 5 Consecutive Breaks in Service.** If the Participant is reemployed by the Employer after incurring five consecutive Breaks in Service, then any previous Forfeiture of the Participant's Account will not be restored under the terms of this Plan.

(b) **Reemployment of a Non-Vested Participant Before 5 Consecutive Breaks in Service.** If a Participant's Vested Interest in the entire Participant's Account balance attributable to Employer contributions is 0% on the date that the Participant Terminates Employment, the Participant is deemed to have received a distribution of such Vested Interest on the date of such Termination of Employment pursuant to the Section 3.3(a)(1), a Forfeiture of the Participant's Account balance attributable to Employer contributions occurs on the date of such Termination of Employment pursuant to Section 3.3(a)(1), and the Participant is subsequently reemployed by the Employer before incurring five consecutive Breaks in Service, then the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will be restored, calculated as of the date that the Forfeiture occurred (unadjusted by subsequent gains and losses). Such restoration of the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will occur in the Plan Year that such Participant is reemployed by the Employer.

(c) **Reemployment of a Vested Participant Before 5 Consecutive Breaks in Service.** If a Participant's Vested Interest in the Participant's Account balance attributable to Employer contributions is less than a 100% (but greater than 0%) on the date that the Participant Terminates Employment, a Forfeiture of the non-Vested portion of the Participant's Account balance attributable to Employer contributions of the Terminated Participant may have occurred, and the Participant is subsequently reemployed by the Employer before incurring five consecutive Breaks in Service, then the following provisions apply:

- 33 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000042

(1) **Distribution Has Occurred But No Forfeiture Has Occurred.** If a Forfeiture of the non-Vested portion of the Participant's Account balance attributable to Employer contributions has not occurred but a distribution of all or a portion of the Participant's Account of the Terminated Participant has occurred, then a separate bookkeeping account will be established for the Participant's Account at the time of distribution; the Participant's Vested Interest in the separate bookkeeping account at any relevant time will be an amount ("X") determined according to the following formula: $X = P(AB + (R \times D)) - (R \times D)$. In applying the formula, "P" is the Vested Interest at the relevant time, "AB" is the respective account balance at the relevant time, "D" is the amount of the distribution, and "R" is the ratio of the respective account balance at the relevant time to the respective account balance after the distribution.

(2) **No Distribution Has Occurred But Forfeiture Has Occurred.** If a Forfeiture of the non-Vested portion of the Participant's Account balance attributable to Employer contributions has occurred and the Terminated Participant is reemployed by the Sponsoring Employer or an Affiliated Employer before incurring five consecutive Breaks in Service and before receiving a distribution of the Vested Interest in his or her Participant's Account balance attributable to Employer contributions, then the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will be restored, calculated as of the date that the Forfeiture occurred (unadjusted by subsequent gains and losses). Such restoration of the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will occur in the Plan Year that such Participant is reemployed by the Employer.

(3) **Both Distribution and Forfeiture Have Occurred.** If a distribution of all or a portion of the Vested Interest in the Participant's Account of a Terminated Participant has occurred and a Forfeiture of the non-Vested portion of the Participant's Account attributable to Employer contributions has occurred (which may not necessarily occur at the same time that the distribution occurs), then the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will be restored, calculated as of the date the Forfeiture occurred (unadjusted by subsequent gains and losses) and based upon the Sponsoring Employer's decision whether the Participant is required to repay the full amount of all distributions attributable to Employer contributions. With respect to such decision of the Sponsoring Employer whether the Participant is required to repay to the Plan the full amount of all distributions attributable to Employer contributions, in order to have the previous Forfeiture of such Participant's Account balance attributable to Employer contributions be restored, the following provisions will apply:

(A) **Precedent Established.** Once such a decision by the Sponsoring Employer is made, it will establish precedence for the Plan and cannot be changed, altered or modified.

(B) **Time of Restoration If Repayment Is Not Required.** If, based upon the Sponsoring Employer's decision, the Participant is not required to repay to the Plan the full amount of all distributions which were attributable to Employer contributions in order to have the previous Forfeiture of such Participant's Account balance attributable to Employer contributions be restored, then such restoration will occur in the Plan Year in which the Participant is reemployed by the Employer.

(C) **Time of Restoration If Repayment Is Required.** If, based upon the Sponsoring Employer's decision, the Participant is required to repay to the Plan the full amount of all distributions which were attributable to Employer contributions in order to have the previous Forfeiture of such Participant's Account attributable to Employer contributions be restored, then such repayment by the Participant must be made before the earlier of (i) five years after the Participant's Reemployment Commencement Date, or (ii) the date on which the Participant incurs five consecutive Breaks in Service following the date of distribution of either the entire or the remaining Vested Interest in the Participant's Account. Such restoration of the previous Forfeiture of such Participant's Account balance attributable to Employer contributions will occur in the Plan Year that the Participant repays to the Plan the full (or any remaining) amount of the distribution which was attributable to Employer contributions.

- 34 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000043

(d)     **Sources for Restoration.** The sources to restore a previous Forfeiture of the non-Vested portion of the Participant's Account balance attributable to Employer contributions pursuant to this Section will be made first by using available Forfeitures to restore the previous Forfeiture and, if such available Forfeitures are insufficient to restore the previous Forfeiture, by the Employer making a special Employer contribution to the Plan to the extent necessary to restore the previous Forfeiture.

5.8     **Spousal Consent Requirements.** A surviving Spouse's election not to receive a death benefit under Section 5.2 will not be effective unless (1) the election is in writing; (2) the election designates a specific Beneficiary or form of benefit that cannot be changed without spousal consent (or the Spouse's consent expressly permits designations by the Participant without any requirement of further spousal consent); and (3) the Spouse's consent acknowledges the effect of the election and is witnessed by the Administrator or a notary public.

5.9     **Required Minimum Distributions.** All distributions will be determined and made in accordance with the final Regulations under Code §401(a)(9), including the incidental death benefit rules of Code §401(a)(9)(G). Pursuant to those Regulations, all distributions will be determined in accordance with the following:

(a)     **General Rules.** All distributions hereunder will be made in accordance with these general rules: (1) the requirements of this Section will take precedence over any inconsistent Plan provisions; and (2) all distributions required under this Section will be determined and made in accordance with the Regulations under Code §401(a)(9).

(b)     **Time and Manner of Distribution.** All required minimum distributions will be made from the Plan in the following time and in the following manner:

(1)     **Required Beginning Date.** The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(2)     **Death of Participant Before Distributions Begin.** If the Participant dies before distribution begins, the Participant's entire interest will be distributed (or begin to be distributed) not later than set forth in the following provisions:

(A)     **5-Year Rule Applies to All Distributions to Designated Beneficiaries.** If the Participant dies before distributions begin and there is a Designated Beneficiary, the Participant's entire interest will be distributed to the Designated Beneficiary by December 31 of the calendar year containing the fifth anniversary of the Participant's death. If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary and the surviving Spouse dies after the Participant but before distributions to either the Participant or the surviving Spouse begin, this subparagraph will apply as if the surviving Spouse were the Participant. This subparagraph also applies to all distributions.

(B)     **Date Distributions Are Deemed To Begin.** For purposes of this subparagraph (b)(2) and paragraph (d), unless subparagraph (b)(2)(B)(iv) above applies, distributions are considered to begin on the Participant's Required Beginning Date. If subparagraph (b)(2)(B)(iv) above applies, distributions are considered to begin on the date distributions are required to begin to the surviving Spouse under subparagraph (b)(2)(B)(i) above. If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving Spouse before the date distributions are required to begin to the surviving Spouse under subparagraph (b)(2)(B)(i)), then the date distributions are considered to begin is the date distributions actually commence.

(3)     **Forms of Distribution.** Unless the Participant's interest is distributed as an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first Distribution Calendar Year distributions will be made in accordance with paragraphs (c) and (d). If the Participant's interest is distributed as an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code §401(a)(9) and the Regulations.

- 35 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000044

(c)   **Required Minimum Distributions During the Participant's Lifetime.** The amount of required minimum distributions during a Participant's lifetime will be determined as follows:

(1)   **Amount of Required Distribution Each Distribution Calendar Year.** During the Participant's lifetime, the minimum amount that will be distributed each Distribution Calendar Year is the lesser of (A) the quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in Regulation §1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or (B) if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's Spouse, then the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in Regulation §1.401(a)(9)-9, using the Participant's and Spouse's attained ages as of the Participant's and Spouse's birthdays in the Distribution Calendar Year.

(2)   **Required Minimum Distributions Continue Through Year of Participant's Death.** Required minimum distributions will be determined under this paragraph (c) beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

(d)   **Required Minimum Distributions After the Participant's Death.** Required minimum distributions will be made after a Participant's death in accordance with the following provisions:

(1)   **Death On or After Distributions Begins.** If a Participant dies on or after the date distribution begins, then the amount of a required minimum distribution will be determined as follows:

(A)   **Participant Survived by Designated Beneficiary.** If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, then the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Designated Beneficiary, determined in accordance with the following:

(i)   **Calculation of Participant's Remaining Life Expectancy.** The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(ii)   **Surviving Spouse Is Sole Designated Beneficiary.** If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, then the remaining Life Expectancy of the surviving Spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the surviving Spouse's age as of the Spouse's birthday in that Distribution Calendar Year. For Distribution Calendar Years after the year of the surviving Spouse's death, the remaining Life Expectancy of the surviving Spouse is calculated using the age of the surviving Spouse as of the Spouse's birthday in the calendar year of the Spouse's death, reduced by one for each subsequent calendar year.

(iii)   **Surviving Spouse Is Not Sole Designated Beneficiary.** If the Participant's surviving Spouse is not the Participant's sole Designated Beneficiary, then the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent calendar year.

(B)   **No Beneficiary Is Designated.** If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, then the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one each subsequent year.

- 36 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000045

(2)     **Death Before the Date Distribution Begins.** If a Participant dies before the date distribution begins, then the amount of a required minimum distribution will be determined as follows:

(A)     **Participant Survived by Designated Beneficiary.** If (i) a Participant (or, if no election is made by the Participant prior to the Participant's death, then the Participant's Designated Beneficiary) is permitted to elect the Life Expectancy rule of subparagraph (b)(2)(B); (ii) the Participant dies before the date distributions begin; and (iii) there is a Designated Beneficiary, then the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in subparagraph (d)(1).

(B)     **No Beneficiary Is Designated.** If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, then distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

5.10     **Statutory Commencement of Benefits.** Unless the Participant otherwise elects, distribution of a Participant's benefit must begin no later than the 60th day after the latest of the close of the Plan Year in which the Participant (1) reaches the earlier of Age 65 or Normal Retirement Age; (2) reaches the 10th anniversary of the year he or she began Plan participation; or (3) Terminates Employment. However, the failure of a Participant to consent to a distribution while a benefit is Immediately Distributable will be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this Section.

5.11     **Post-Termination Earnings.** As of the Valuation Date coinciding with or next following the date a Participant Terminates Employment for any reason, the Administrator will, until a distribution is made to the Participant or the Participant's Beneficiary in accordance with Sections 5.1, 5.2, 5.3, 5.4, or 5.5, direct the Trustee in a uniform nondiscriminatory manner to either (a) invest the Participant's Account balance determined as of such Valuation Date in a separate interest bearing account; or (b) leave the Participant's Account balance as part of the general Trust Fund. If the Participant's Account balance remains as part of the general Trust Fund, then such account will either (a) share in the allocation of net earnings and losses under Section 3.2 as a non-segregated account, or (b) be granted interest at a rate consistent with the interest bearing investments of the Trust Fund.

5.12     **Distribution in the Event of Legal Incapacity.** If any person entitled to benefits (the "Payee") is under any legal incapacity by virtue of age or mental condition, payments may be made in one or more of the following ways as directed by the Administrator: (a) to the Payee directly; (b) to a court-appointed guardian of the Payee; (c) to the person or entity holding a valid power of attorney of the Payee or the Payee's estate; (d) any other person or entity authorized under State (or Commonwealth) law to receive benefits on behalf of the Payee; or (e) if the Payee is a minor, to the authorized person or entity of the Payee (e.g., custodian or guardian) under any Uniform Transfers to Minors Act or Uniform Gifts to Minors Act.

5.13     **Missing Payees and Unclaimed Benefits.** With respect to a Participant or Beneficiary who has not claimed any benefit (the "missing payee") to which such missing payee is entitled, and with respect to any Participant or Beneficiary who has not satisfied the administrative requirements for benefit payment, the Administrator may elect to either (1) to segregate the benefit into an interest bearing account, in which event an annual maintenance fee as may be set from time to time in a written administrative policy established by the Sponsoring Employer may be assessed against the segregated account; (2) subject to a written administrative policy established by the Administrator, distribute the benefit at any time in any manner which is sanctioned by the Internal Revenue Service and/or the Department of Labor; or (3) treat the entire benefit as a Forfeiture. If a missing payee whose benefit has been forfeited is located, or if a payee whose benefit has been forfeited for failure to satisfy the administrative requirements for benefit payment subsequently satisfies such administrative requirements and claims his or her benefit, and if the Plan has not terminated (or if the Plan has terminated, all benefits have not yet been paid), then the benefit will be restored. The Administrator, on a case by case basis, may elect to restore the benefit by the use of earnings from non-segregated assets of the Fund, by Employer contributions, or by any combination thereof. However, if any such payee has not been located

- 37 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000046

(or satisfied the administrative requirements for benefit payment) by the time the Plan terminates and all benefits have been distributed from the Plan, the Forfeiture of such unpaid benefit will be irrevocable.

5.14    **Direct Rollovers.** Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election, a Distributee may elect, at the time and in the manner prescribed by the Plan, to have any portion of an eligible rollover distribution that is equal to at least $500 paid directly to an Eligible Retirement Plan specified by the Distributee in a direct rollover. If an eligible rollover distribution is less than $500, then a Distributee may not make the election in the preceding sentence to rollover a portion of the eligible rollover distribution.

(a)    **Definitions.** As used in this Section, the following words and phrases have the following meanings:

(1)    **Direct Rollover.** The term "Direct Rollover" means a payment by the Plan to the Eligible Retirement Plan that is specified by the Distributee.

(2)    **Distributee.** The term "Distributee" means an Employee or former Employee. An Employee's or former Employee's surviving Spouse and an Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a qualified domestic relations order as defined in Code §414(p) are also Distributees with regard to the interest of the Spouse or former Spouse.

(3)    **Eligible Retirement Plan.** The term "Eligible Retirement Plan" means (A) an individual retirement account described in Code §408(a); (B) an individual retirement annuity described in Code §408(b); (C) an annuity plan described in Code §403(a); (D) an annuity contract described in Code §403(b); (E) a qualified trust described in Code §401(a); (F) an eligible deferred compensation plan under Code §457(b) maintained by a State (or Commonwealth), a political subdivision of a State (or Commonwealth), or any agency or instrumentality of a State (or Commonwealth) or political subdivision of a State (or Commonwealth); and which agrees to separately account for amounts transferred therein from this Plan; or (G) a Roth individual retirement account as described in Code §408A(b). This definition of Eligible Retirement Plan will also apply in the case of a distribution to a surviving Spouse, or to a Spouse or former Spouse who is the alternate payee under a qualified domestic relation order under Code §414(p); such distribution will be made in the same manner as if the Spouse was the Employee. If any portion of an Eligible Rollover Distribution is attributable to distributions from an individual's Roth Elective Deferral Account, then an Eligible Retirement Plan with respect to such portion will only be another plan's designated Roth account of the individual from whose account the payments or distributions were made, or such individual's Roth individual retirement account as described in Code §408A(b).

(4)    **Eligible Rollover Distribution.** The term "Eligible Rollover Distribution" means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: (A) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; (B) any distribution to the extent that such distribution is a required minimum distribution under Code §401(a)(9); (C) if applicable to the Plan, the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to Employer securities); (D) if applicable to the Plan, corrective distributions of: (i) Excess Deferrals as described in Regulation §1.402(g)–1(e)(3) including any income allocable to such corrective distributions; (ii) Excess Contributions under a 401(k) Plan described in Regulation §1.401(k)–1(f)(4) including any income allocable to such corrective distributions; and (iii) Excess Aggregate Contributions described in Regulation §1.401(m)–2(b)(2) including any income allocable to such distributions; (E) if applicable to the Plan, loans that are treated as deemed distributions pursuant to Code §72(p) (F) if applicable to the Plan, dividends paid on Employer securities as described in Code §404(k); (G) if applicable to the Plan, the costs of life insurance coverage (P.S. 58 costs); (H) if applicable to the Plan, prohibited allocations that are treated as deemed distributions pursuant to Code §409(p); (I) if applicable to the Plan, the portion of any distribution which is attributable to a financial hardship distribution; (J) if applicable to the Plan, a distribution that is a permissible withdrawal from an eligible

- 38 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000047

automatic contribution arrangement within the meaning of Code §414(w); and (K) any other distribution that is reasonably expected to total less than $200 during a year.

(b) **Direct Rollover By a Non-Spouse Beneficiary.** A Beneficiary who (a) is other than the Participant's Spouse and (b) is considered to be a Designated Beneficiary under Code §401(a)(9)(E) (known as a "Non-Spouse Designated Beneficiary") may establish an individual retirement account under Code §408(a) or an individual retirement annuity under Code §408(b) (known as an "Inherited IRA") into which all or a portion of a death benefit (to which such Non-Spouse Designated Beneficiary is entitled) can be transferred in a direct trustee-to trustee transfer (a direct rollover). Notwithstanding the above, any amount payable to a Non-Spouse Designated Beneficiary that is deemed to be a required minimum distribution pursuant to Code §401(a)(9) may not be transferred into such Inherited IRA. The Non-Spouse Designated Beneficiary may deposit into such Inherited IRA all or any portion of the death benefit that is deemed to be an eligible rollover distribution (but for the fact that the distribution is not an eligible rollover distribution because the distribution is being paid to a Non-Spouse Designated Beneficiary). In determining the portion of such death benefit that is considered to be a required minimum distribution that must be made from the Inherited IRA, the Non-Spouse Designated Beneficiary may elect to use either the 5-year rule or the life expectancy rule, pursuant to Regulation §1.401(a)(9)-3, Q&A-4(c). Any distribution made pursuant to this Section is not subject to the direct rollover requirements of Code §401(a)(31), the notice requirements of Code §402(f), or the mandatory withholding requirements of Code §3405(c). If a Non-Spouse Designated Beneficiary receives a distribution from the Plan, then the distribution is not eligible for the "60-day" rollover rule. If the Participant's Non-Spouse Designated Beneficiary is a trust, then the Plan may make a direct rollover to an individual retirement account on behalf of the trust, provided the trust satisfies the requirements to be a Designated Beneficiary within the meaning of Code §401(a)(9)(E). In order to be able to roll over the distribution, the distribution otherwise must satisfy the definition of an eligible rollover distribution. Any such distribution is not subject to the direct rollover requirements of Code §401(a)(31) (including Code §401(a)(31)(B), the notice requirements of Code §402(f) or the mandatory withholding requirements of Code §3405(c)).

5.15 **Distributions of Stock.** All distributions made under the other provisions of this Article 5 will be in the form of cash or Employer Securities, or both, subject to the following provisions:

(a) **Participant May Demand Employer Securities.** Prior to a distribution, the Administrator will advise a Participant or Beneficiary in writing of his or her right to demand that benefits be distributed solely in Employer Securities. If the Participant or Beneficiary fails to make such demand in writing within 90 days after receipt of such written notice, the Participant's Vested Aggregate Account will be distributed in the form of Employer Securities to the extent they are allocated to the Participant's Employer Securities Account, and the balance of the Vested Aggregate Account will be distributed in cash. Notwithstanding any other provision of the Plan to the contrary, if the Employer is an S Corporation as defined in Code §1361, or if the charter or by-laws of the Employer restrict the ownership of substantially all outstanding Employer Securities to Employees or the Trust, then the Administrator may restrict distributions made under this Article 5 to be in the form of cash or the Administrator may permit partial or full distributions in the form of Employer Securities subject to requirements of Section 5.20.

(b) **Stock Must Be Distributed In Whole Shares.** If a Participant or Beneficiary demands that benefits be distributed solely in Employer Securities, distribution will be made entirely in whole shares of Employer Securities. Any balance in a Participant's Account not attributable to Employer Securities will be applied by the Trustee to acquire for distribution the maximum number of whole shares of Employer Securities at the then fair market value. Any unexpended balance in the Participant's Account will be distributed in cash. If the Trustee is unable to purchase the Employer Securities required for the distribution, the Trustee will make distribution in cash within one year after the date the distribution was to have been made, except in the case of a retirement distribution which must be made within 60 days after the close of the Plan Year in which retirement occurs.

- 39 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000048

(c) **Restrictions on Distributed Employer Securities.** Except as provided herein, distributed Employer Securities may be restricted as to sale or transfer by the by-laws or articles of incorporation of the Employer if the restrictions are applicable to all Employer Securities of the same class. If a Participant is required to offer the sale of his or her Employer Securities to the Employer before offering them to a third party, the Employer may not pay a price that is less than that which is offered to the Distributee by another potential buyer making a bona fide offer, and the Trustee may not pay a price that is less than the fair market value of the Employer Securities.

(d) **Multiple Classes of Employer Securities Acquired With Exempt Loan.** If Employer Securities which were acquired with an Exempt Loan and which are available for distribution consist of more than one class of security, a Participant's or Beneficiary's distribution must receive substantially the same proportion of each such class of such security.

5.16 **Cash Dividends on Employer Securities.** At the discretion of the Administrator, cash dividends received on Employer Securities allocated to Participants' Employer Securities Accounts may be distributed currently (or within 90 days after the end of the Plan Year in which such dividends are paid to the Plan) in cash to such Participants on a nondiscriminatory basis. Any such distribution of cash dividends will be limited to Participants who are still Employees, and will be further limited to dividends on shares of Employer Securities in which each such Participant has a Vested Interest.

5.17 **Right of First Refusal.** If Employer Securities that are not Readily Tradable on an Established Securities Market are distributed, then except as otherwise provided in this Section, if any Participant, Beneficiary, or any other person to whom such securities are distributed (the "Selling Participant") at any time desires to sell some or all of such securities (the "Offered Securities") to a third party (the "Third Party"), then the Selling Participant must give written notice thereof to the Employer and Administrator, subject to the following:

(a) **Requirements of Written Notice.** The written notice required to be given hereunder must contain the number of shares offered for sale, the proposed terms of the sale, and the names and addresses of both the Selling Participant and the Third Party.

(b) **Trust Fund and Employer.** Both the Plan and Employer will have the right of first refusal for a period of 14 days from the date the Selling Participant gives written notice to the Employer and Administrator (such 14 day period to run concurrently against the Plan and the Employer) to acquire the Offered Securities. As between the Plan and Employer, the Plan has priority to acquire the shares pursuant to the right of first refusal. The selling price and terms will be the same as offered by the Third Party.

(c) **Third Parties.** If the Plan and the Employer do not exercise their respective rights of first refusal within the required 14 day period provided above, the Selling Participant will have the right, at any time following the expiration of such 14 day period, to dispose of the Offered Securities to the Third Party, provided, however, that no disposition will be made to the Third Party on terms more favorable to the Third Party than those set forth in the written notice delivered by the Selling Participant. If a Third Party is offered terms more favorable than those set forth in the written notice delivered to the Plan and the Employer, then the Offered Securities will again be subject to the right of first refusal.

(d) **Time of Closing.** The closing pursuant to the exercise of the right of first refusal will take place at such place as is agreed upon between the Administrator and the Selling Participant, but not later than 10 days after the Employer or the Plan has notified the Selling Participant of the exercise of the right of first refusal. At closing, the Selling Participant will deliver certificates representing the Offered Securities duly endorsed in blank for transfer, or with stock powers attached duly executed in blank with all required transfer tax stamps attached or provided for, and the Employer or the Trustee will deliver the purchase price, or an appropriate portion thereof, to the Selling Participant.

(e) **Employer Securities Acquired With an Exempt Loan.** Notwithstanding the foregoing, Employer Securities acquired with an Exempt Loan will be subject to a right of first refusal only for so long as such stock is not publicly traded on an established securities market. The selling price and other terms under the right of first refusal must not be less favorable to the seller than the greater of (1) the value of the Employer Securities as determined under regulation §54.4975-11(d)(5), or (2) the purchase price of the Employer Securities and other terms offered by a buyer (other than the Employer or the Plan)

- 40 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000049

making a good faith offer to purchase such stock. The right of first refusal must lapse no later than 14 days after the Selling Participant gives written notice to the Administrator and Employer that an offer from a Third Party has been received for the Offered Securities. The right of first refusal will comply with paragraphs (a) through (c) above, except to the extent they conflict with this paragraph.

5.18    **Put Option.** If Employer Securities which are not Readily Tradable on an Established Securities Market are distributed to a Participant, he or she will have a right to require the Employer to repurchase such Employer Securities under a fair valuation formula, subject to the following provisions:

(a)    **Stock Acquired With an Exempt Loan.** Employer Securities acquired with an Exempt Loan will be subject to a put option if such securities (1) are not Readily Tradable on an Established Securities Market, or (2) are subject to a trading limitation when distributed. A trading limitation is a restriction under any federal or state securities law, or an agreement, not prohibited by this Section, which would make such stock not as freely tradable as stock not subject to such restriction.

(b)    **Conditions of Exercise.** The put option may only be exercised by a Participant, by the Participant's donees, or by a person (including an estate or its distributee) to whom the Employer Securities passes upon a Participant's death. The put option must permit a Participant to put the Employer Securities to the Employer. Under no circumstances may the put option bind the Plan, but it must grant the Plan an option to assume the rights and obligations of the Employer at the time the put option is exercised. If it is known at the time a loan is made that federal or state law will be violated by the Employer's honoring such put option, the put option must permit the Employer Securities to be put, in a manner consistent with law, to a third party (for example, an affiliate of the Employer or a shareholder other than the Plan) that has substantial net worth at the time the Exempt Loan is made and whose net worth is reasonably expected to remain substantial.

(c)    **Duration of Put Option.** The put option will begin as of the day following the date the Employer Securities are distributed and end 60 days thereafter. If not exercised within the 60-day period, an additional 60 day-period will begin on the first day after the new determination of the value of the Employer Securities by the Trustee in the following Plan Year. The period during which a put option is exercisable does not include any time when a distributee is unable to exercise it because the party bound by the option is prohibited from honoring it by federal or state law.

(d)    **Manner of Exercise.** The put option will be exercised by the holder notifying the Employer in writing that the put option is being exercised. The notice will state the name and address of the holder and the number of shares to be sold.

(e)    **Terms of Payment.** The price at which a put option must be exercised is the value of the Employer Securities determined by an independent appraiser as of the Valuation Date coinciding with or immediately preceding the date the put option is exercised. Payment must be reasonable. The deferral of payment is reasonable if adequate security and reasonable interest are provided for any credit extended and if the cumulative payments at any time are not less than the aggregate of reasonable periodic payments as of such time. Periodic payments are reasonable if annual installments, beginning 30 days after the date the put option is exercised, are substantially equal. The payment period may generally not be more than 5 years after the date the put option is exercised, but it may be extended to a date no later than the earlier of 10 years from the date the put option is exercised or the date the proceeds of the loan used by the Plan to acquire the Employer Securities subject to the put option are entirely repaid.

(f)    **Payment Restrictions.** Payment under a put option cannot be restricted by the provisions of a loan or any other arrangement, including the terms of the Employer's articles of incorporation or bylaws, unless so required under applicable state law. An arrangement involving the Plan that creates a put option cannot provide for the issuance of put options other than provided for under this Section. The Plan cannot otherwise obligate itself to acquire Employer Securities from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder.

(g)    **Payment Requirements for Total Distributions.** Notwithstanding the foregoing, if a distribution of such stock constitutes a Total Distribution, payment of the fair market value of a Participant's

- 41 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000050

Employer Securities Account will be made in 5 substantially equal annual payments. The first installment will be paid not later than 30 days after the Participant exercises the put option. The Plan will pay a reasonable rate of interest and provide adequate security on amounts not paid after 30 days. For purposes of this Section, the term Total Distribution means the distribution with one taxable year to the recipient of the balance of his Employer Securities Account.

(h)     **Payment Requirements for Installment Distributions.** Notwithstanding paragraph (g) above, if the distribution does not constitute a Total Distribution, the Plan will pay the Participant an amount equal to the fair market value of the Employer Securities repurchased no later than 30 days after the Participant exercises the put option.

5.19    **Non-Terminable Rights and Protections.** Except as otherwise provided in Sections 5.17 and 5.18, no Employer Securities acquired with an Exempt Loan may be subject to a put, call, or other option, or buy-sell or similar arrangement when held by and distributed from the Plan, whether or not the Plan is then an Employee Stock Ownership Plan. The rights and protections granted in this Section and in Sections 5.17 and 5.18 are non-terminable and will continue to exist under the terms of the Plan as long as any Employer Securities acquired with an Exempt Loan is held by the Plan or by any Participant or any other person for whose benefit such protections and rights have been created, and neither the repayment of such loan nor the failure of the Plan to be an Employee Stock Ownership Plan, nor any amendment of the Plan, will cause a termination of the protections and rights.

5.20    **Mandatory Repurchase for Distributions Made by Certain Corporations.** Notwithstanding any other provision of the Plan to the contrary, if the Employer is an S Corporation as defined in Code §1361, or if the charter or by-laws of the Employer restrict the ownership of substantially all outstanding Employer Securities to Employees or the Trust, then upon any distribution (including a direct rollover) of a Participant's Vested Interest in his or her Employer Securities Account, the Employer must repurchase such Employer Securities contemporaneously with, and effective on the same day as, the distribution occurs. If any such distribution is made as a direct rollover to a Participant's individual retirement account, no income (including tax-exempt income), loss, deduction, or credit attributable to the distributed Employer Securities under Code §1366 can be allocated to Participant's individual retirement account.

5.21    **Financial Hardship Distributions.** Hardship distributions are not permitted.

5.22    **Pre-Retirement Distributions.** No distributions are permitted before a Participant Terminates Employment.

5.23    **Distribution of Transfer Contributions.** A Participant's Transfer Contribution Account will be distributed from the Plan at the same time and in the same manner as the Participant's Account is distributed under Section 5.1, 5.2, 5.3, or 5.4; provided, however, that if the Transfer Contributions are elective contributions as defined in Regulation §1.401(k)-1(g)(3) (including any qualified non-elective contributions, qualified matching contributions, and ADP safe harbor contributions) which are transferred to this Plan in a direct or indirect trustee-to-trustee transfer from another qualified plan and which are subject to the limitations in Regulation §1.401(k)-1(d), then the distribution of such Transfer Contributions (including post-transfer earnings thereon) will be subject to the limitations in Regulation §1.401(k)-1(d).

5.24    **Transfers to Nonqualified Foreign Trusts.** Notwithstanding anything contained in the Plan, a transfer from this Plan to a nonqualified foreign trust is treated as a distribution. In the case of a transfer to an ERISA §1022(i)(1) plan, the transfer is not treated as a distribution from the transferor plan and the transfer will not be treated as causing the transferor plan to fail to satisfy the requirements of Code §401(a).

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000051

**Article 6**
**Code § 415 Limitations**

6.1     **Maximum Annual Additions.** The maximum Annual Addition made to a Participant's various accounts maintained under the Plan for any Limitation Year will not exceed the lesser of the Dollar Limitation in Section 6.1(a) or the Compensation Limitation Section 6.1(b) below, as follows:

(a)     **Dollar Limitation.** The Dollar Limitation is $52,000 as adjusted in accordance with Code §415(d).

(b)     **Compensation Limitation.** The Compensation Limitation is an amount equal to 100% of the Participant's Compensation for the Limitation Year. However, this limitation will not apply to any contribution made for medical benefits within the meaning of Code §401(h) or Code §419A(f)(2) after Termination of Employment which is otherwise treated as an Annual Addition under Code §415(l)(1) or Code §419A(d)(2).

(c)     **Special ESOP Rules.** For purposes of this Section, (1) in determining the amount of the Employer's contribution for purposes of paragraph (a) and (b) above, the amount of Employer contributions will be determined based upon the lesser of (A) the fair market value of the Employer Securities allocated to the Participant's Account from Employer contributions to the Plan (determined at the time of the contribution by the most recent valuation) plus any contributions which are not used to purchase Employer Securities or pay on an Exempt Loan; and (B) the amount of the Employer's cash contribution to the Plan; and (2) in any Plan Year in which the Employer is not an S Corporation as defined in Code §1361, if no more than one-third of Employer contributions for that Plan Year that are deductible under Code §404(a)(9) are allocated to HCEs, the limitations of this Section will not apply to Forfeitures of Employer Securities acquired with an Exempt Loan or to Employer contributions that are deductible under Code §404(a)(9)(B) and are charged against a Participant's Account.

6.2     **Adjustments to Maximum Annual Addition.** In applying the limitation on Annual Additions set forth in Section 6.1 the following adjustments must be made:

(a)     **Short Limitation Year.** In a Limitation Year of less than 12 months, the Defined Contribution Dollar Limitation in Section 6.1(a) will be adjusted by multiplying it by the ratio that the number of months in the short Limitation Year bears to 12.

(b)     **Participation in Multiple Employer-Sponsored Defined Contribution Plans.** If a Participant participates in multiple defined contribution plans sponsored by an Employer or Affiliated Employer which have different Limitation Years, the maximum Annual Addition in this Plan for the Limitation Year for this Plan will be reduced by the Annual Additions credited to the Participant's accounts in the other defined contribution plans during the Limitation Year for this Plan. If a Participant participates in multiple defined contribution plans sponsored by an Employer or Affiliated Employer which have the same Limitation Year, then (1) if only one of the plans is subject to Code §412, Annual Additions will first be credited to the Participant's accounts in the plan subject to Code §412; and (2) if none of the plans are subject to Code §412, the maximum Annual Addition in this Plan for a given Limitation Year will either (A) equal the product of (i) the maximum Annual Addition for such Limitation Year minus any other Annual Additions previously credited to the Participant's account(s), multiplied by (ii) a fraction, the numerator of which is the Annual Additions which would be credited to a Participant's accounts hereunder without regard to the Annual Additions limitation of Section 6.1 and the denominator of which is the Annual Additions for all plans described in this paragraph, or (B) be reduced by the Annual Additions credited to the Participant's accounts in the other defined contribution plans for such Limitation Year.

6.3     **Aggregation of Plans.** All defined benefit plans (whether terminated or not) sponsored by an Employer or Affiliated Employer will be treated as one defined benefit plan, all defined contribution plans (whether terminated or not) sponsored by an Employer or Affiliated Employer will be treated as one defined contribution plan, and all Employers and Affiliated Employers will be considered a single Employer, determined in accordance with the following provisions:

- 43 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000052

(a) **General Rule.** Except as provided in this Section and Regulation §1.415(f)-1, for purposes of applying the limitations of this Section and Code §415(c) applicable to a Participant for a particular Limitation Year all defined contribution plans (without regard to whether a plan has been terminated) ever maintained by an Employer or Affiliated Employer (or a predecessor Employer) under which the Participant receives Annual Additions are treated as one defined contribution plan.

(b) **Affiliated Employers and Leased Employees.** All Employees of all Affiliated Employers are treated as employed by a single Employer for Code §415 purposes. Any defined contribution plan maintained by any Affiliated Employer is deemed maintained by all Affiliated Employers. Furthermore, under Code §414(n), with respect to any recipient for whom a Leased Employee performs services, the Leased Employee is treated as an Employee of the recipient, but contributions or benefits provided by the leasing organization that are attributable to services performed for the recipient are treated as provided under the plan maintained by the recipient. However, under Code §414(n)(5), the rule of the previous sentence does not apply to a Leased Employee with respect to services performed for a recipient if (A) the Leased Employee is covered by a plan that is maintained by the leasing organization and that meets the requirements of Code §414(n)(5)(B); and (B) Leased Employees do not constitute more than 20% of the recipient's non-highly compensated workforce.

(c) **Formerly Affiliated Plan of an Employer.** A Formerly Affiliated Plan of an Employer is taken into account in applying the aggregation rules of this Section, but the Formerly Affiliated Plan of an Employer is treated as if it had terminated immediately prior to the cessation of affiliation, and had purchased annuities to provide benefits. For purposes of this paragraph, the term "Formerly Affiliated Plan of an Employer" means a plan that, immediately prior to the Cessation of Affiliation, was actually maintained by one or more of the entities that constitute the Employer (as determined under the employer affiliation rules described in Regulation §1.415(a)-1(f)(1) and (2)), and immediately after the Cessation of Affiliation, is not actually maintained by any of the entities that constitute the Employer (as determined under the employer affiliation rules described in Regulation §1.415(a)-1(f)(1) and (2)). For purposes of this paragraph, the term "Cessation of Affiliation" means the event that causes an entity to no longer be aggregated with one or more other entities as a single Employer under the employer affiliation rules described in Regulation §1.415(a)-1(f)(1) and (2) (such as the sale of a subsidiary outside a controlled group), or that causes a plan to not actually be maintained by any of the entities that constitute the Employer under the employer affiliation rules of Regulation §1.415(a)-1(f)(1) and (2) (such as a transfer of plan sponsorship outside of a controlled group).

(d) **Predecessor Employer.** For purposes of Code §415 and Regulations thereunder, a former employer is a predecessor employer with respect to a Participant in the Plan maintained by the Employer if the Employer maintains the Plan under which the Participant had accrued a benefit while performing services for the former employer (for example, the Employer assumed sponsorship of the former employer's plan, or the Plan received a transfer of benefits from the former employer's plan), but only if that benefit is provided under the Plan maintained by the Employer. In applying the limitations of Code §415 to a Participant in the Plan maintained by the Employer, the Plan must take into account benefits provided to the Participant under plans that are maintained by the predecessor employer and that are not maintained by the Employer; the Employer and predecessor employer constituted a single Employer under the rules described in Regulation §1.415(a)-1(f)(1) and (2) immediately prior to the cessation of affiliation (as if they constituted two, unrelated employers under the rules described in Regulation §1.415(a)-1(f)(1) and (2) immediately after the cessation of affiliation) and cessation of affiliation was the event that gives rise to the predecessor employer relationship, such as a transfer of benefits or plan sponsorship. However, with respect to the Employer of the Participant, a former entity that antedates the Employer is a predecessor employer with respect to the Participant if, under the facts and circumstances, the Employer constitutes a continuation of all or a portion of the trade or business of the former entity. This occurs where formation of the Employer constitutes a mere formal or technical change in the employment relationship and continuity otherwise exists in the substance and administration of the business operations of the former entity and the Employer.

(e) **Nonduplication.** In applying the limitations of Code §415 to the Plan maintained by an Employer, if the Plan is aggregated with another plan pursuant to the aggregation rules of this Section, then a Participant's benefits are not counted more than once in determining the Participant's aggregate Annual Additions, pursuant to the rules of Regulation §1.415(f)-1(d)(1).

- 44 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000053

DOL 0009650

(f) **Previously Unaggregated Plans.** The following rule applies to situations in which two or more existing plans, which previously were not required to be aggregated pursuant to Code §415(f), are aggregated during a particular Limitation Year and, as a result, the limitations of Code §415(b) or (c) are exceeded for that Limitation Year. Two or more defined contribution plans that are not required to be aggregated pursuant to Code §415(f) as of the first day of a Limitation Year satisfy the requirements of Code §415 with respect to a Participant for the Limitation Year if they are aggregated later in that Limitation Year, provided that no Annual Additions are credited to the Participant's Account after the date on which the plans are required to be aggregated.

(g) **Multiple Plan Fraction.** The provisions of Code §415(e) shall not apply to this Plan.

6.4 **No Allocations in Excess of Annual Addition Limits.** Subject to the limitations of this Article, no allocation will be made for any portion of any Employer contributions, Employer Securities released from the Unallocated Employer Securities Account or any forfeitures which would have been allocated to a Participant under this Plan for a Limitation Year, but which cause a Participant to exceed the limitations imposed by this Article. Instead, such unallocated Employer contributions, Employer Securities released from the Unallocated Employer Securities Account or forfeitures shall instead be further allocated among and credited to the Accounts of the remaining Participants who are Non-Highly Compensated Employees who are entitled to share in the allocation of Employer contributions, Employer Securities released from the Unallocated Employer Securities Account and forfeitures for that year, in accordance with the terms of Sections 3.1(b), 3.7(d)(4) and 3.3(c), without exceeding the limitations of this Article for any of these Participants until all unallocated Employer contributions, Employer Securities released from the Unallocated Employer Securities Account and forfeitures have been fully allocated.

6.5 **Adjustment for Excessive Annual Additions.** If the Annual Additions allocated to a Participant's Account, after application of Section 6.4, exceeds the maximum Annual Addition permitted under this Section, then the Sponsoring Employer will follow the rules of any Employee Plans Compliance Resolution System (EPCRS) or similar successor program that is issued by the Internal Revenue Service, making corrections first from this Plan and then from all other defined contribution plans sponsored by the Employer and Affiliated Employers treated as a single Employer for Code §415 purposes after corrections are made for this Plan.

- 45 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000054

DOL 0009651

## Article 7
## Employer Securities, Loans, Insurance and Directed Investments

7.1  **Voting Employer Securities.** The Trustee will vote all Employer Securities held by it at such time and in such manner as the Administrator decides, subject to the following provisions:

(a)  **Employer Securities Pledged As Security.** If any agreement entered into by the Trustee provides for voting of any Employer Securities pledged as security for any obligation of the Plan, such Employer Securities will be voted in accordance with such agreement.

(b)  **Non-Registration-Type Stock.** With respect to Employer Securities that are not registration-type securities, each Participant may direct the Trustee as to the manner in which Employer Securities allocated to his or her Employer Securities Account are to be voted on any corporate matter which involves the voting of such securities with respect to the approval or disapproval of a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as may be prescribed in Treasury regulations.

(c)  **Failure of Participant to Give Directions.** If a Participant has the right to direct the Trustee as to the manner in which Employer Securities allocated to his Employer Securities Account are to be voted and such Participant fails or refuses to give the Trustee timely instructions (or instructions are invalidated for any reason) as to how to vote any Employer Securities as to which the Trustee otherwise has the right to vote, the Trustee shall vote such Employer Securities in the same manner and proportion as all other allocated Employer Securities for which instructions were received.

7.2  **Restrictions on Employer Securities Transactions.** The Plan may not obligate itself to acquire Employer Securities from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder. Furthermore, the Plan may not obligate itself to acquire Employer Securities under a put option binding upon the Plan. However, the Plan may be given an option to assume, at the time a put option is exercised, the rights and obligations of the Employer under a put option binding upon the Employer. In addition, all purchases of Employer Securities will be made at a price which, in the judgment of the Administrator, does not exceed the fair market value thereof. All sales of Employer Securities will be made at a price which, in the judgment of the Administrator, is not less than the fair market value thereof.

7.3  **Exempt Loans.** All loans to the Plan made or guaranteed by a disqualified person must satisfy all requirements applicable to Exempt Loans under Regulation §54.4975-7(b)(4) to §54.4975-7(b)(7), Regulation §54.4975-7(b)(13), Department of Labor Regulation §2550.408b-3, and all provisions of those regulations applicable to Employer Securities purchased with the proceeds of an Exempt Loan or used as collateral for an Exempt Loan must be complied with, including, but not limited to, the following provisions:

(a)  **Definition of "Disqualified Person."** For purposes of this Section, a "disqualified person" is any person who is a disqualified person under Code §4975 or a party in interest under ERISA.

(b)  **Types of Loans and Guarantees.** A loan for purposes of this Section includes a direct loan of cash, a purchase-money transaction, or an assumption of the obligation of the Trust. A guarantee for purposes of this Section includes an unsecured guarantee and the use of assets of a disqualified person as collateral for a loan, even though the use of assets may not be a guarantee under applicable state law.

(c)  **Term of Loan.** An Exempt Loan must be for a specific term. Such loan may not be payable at the demand of any person, except in the case of default, but only to the extent of any late payments and interest thereon.

(d)  **Interest Rate.** An Exempt Loan must provide for a reasonable rate of interest. However, the interest rate and the price of the Employer Securities purchased with the proceeds of an Exempt Loan must not be such that Plan assets can be drained off.

(e)  **Loan Must Primarily Benefit Participants and Beneficiaries.** An Exempt Loan must primarily be for the benefit of Plan Participants and their Beneficiaries.

- 46 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000055

(f)  **Use of Proceeds.** The proceeds of an Exempt Loan must be used within a reasonable time to acquire Employer Securities, to repay the Exempt Loan, or to repay prior Exempt Loans. The proceeds of a new loan used to repay a prior Exempt Loan must also satisfy the other requirements of this Section.

(g)  **Put Option.** Except for the put option described in Section 5.18 of the Plan, no Employer Securities acquired with the proceeds of an Exempt Loan may be subject to a put, call or other option, or a buy-sell or other arrangement while held by, or when distributed, from the Plan, whether or not the Plan has continued to operate as an employee stock ownership plan.

(h)  **Collateral for Loan.** An Exempt Loan must be without recourse against the Plan. Furthermore, the only assets of the Plan that can be given as collateral on an Exempt Loan are either Employer Securities which are acquired with the proceeds of the Exempt Loan or Employer Securities which were used as collateral on a prior Exempt Loan repaid with the proceeds of the current Exempt Loan.

(i)  **Liability of Plan to Loan Payee.** No person who is entitled to payment under an Exempt Loan will have any right to (1) the assets of the Plan, other than to the collateral given for the Exempt Loan; (2) any contributions, other than contributions of Employer Securities, made to the Plan to repay the Exempt Loan; and (3) earnings attributable to such collateral and the investment of such contributions.

(j)  **Maximum Annual Repayment.** Payments made during the Plan Year with respect to an Exempt Loan cannot exceed an amount equal to the sum of the contributions and earnings received during or prior to the Plan Year, less such payments made in prior Plan Years. In addition, such contributions and earnings must be accounted for separately until such time as the Exempt Loan is repaid in full.

(k)  **Default.** In the event of a default on an Exempt Loan, the value of Plan assets transferred in satisfaction of the loan cannot exceed the amount of default. If a lender is a "disqualified person," an Exempt Loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the loan. For purposes hereof, the making of a guarantee does not make a person a lender.

7.4  **Diversification Rights of Qualified Participants.** Notwithstanding any provision in the Plan to the contrary, a Qualified Participant will be permitted to direct the Trustee as to the investment of amounts credited to his or her Employer Securities Account in accordance with the following provisions:

(a)  **Definitions.** For purposes of this Section, the term Qualified Election Period means the six-Plan Year period beginning with the Plan Year in which the Participant first becomes a Qualified Participant; and the term Qualified Participant means an Employee who has attained at least Age 55 and has completed at least 10 Years of Service in the Plan. A Year of Service, for this purpose, shall be calculated in the same manner as a Year of Service defined in Section 1.94(b) for determining a Participant's Vested Interest in his or her Participant's Account for which such Year of Service is credited under Section 4.6(b).

(b)  **Method of Direction.** The Participant's direction will be provided to the Administrator in writing, and will be effective no later than 180 days after the close of the Plan Year to which the direction applies.

(c)  **Amount Subject to Diversification.** A Qualified Participant may elect within 90 days after the close of each Plan Year in the Qualified Election Period to direct the Trustee as to the investment of 25% of the total number of shares of Employer Securities that have ever been allocated to the Qualified Participant's Employer Securities Account on or before the end of the most recent Allocation Period less the number shares of Employer Securities previously distributed (other than through diversification), transferred, or delivered pursuant to a prior diversification election under this paragraph. Within 90 days after the close of the last Plan Year in a Participant's Qualified Election Period, a Qualified Participant may direct the investment of 50% of the total number of shares of Employer Securities that have ever been allocated to the Qualified Participant's Employer Securities Account on or before the end of the most recent Allocation Period less the number shares of Employer Securities previously distributed (other than through diversification), transferred, or delivered pursuant to a prior diversification election under this paragraph.

- 47 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                     ARGENT 0000056

(d)    **Small Account Exception.** Notwithstanding paragraph (b), if the fair market value of a Qualified Participant's Employer Securities Account is $500 or less on the Valuation Date immediately preceding the first day the Qualified Election Period, such Employer Securities Account will not be subject to diversification hereunder. In determining if the fair market value exceeds $500, Employer Securities held in all employee stock ownership plans and tax credit employee stock ownership plans maintained by the Employer or an Affiliated Employer will be considered as held by the Plan.

(e)    **Investment Options.** Subject to a written policy adopted the Administrator, the portion of a Qualified Participant's Employer Securities Account covered by the diversification election herein will either (1) be distributed to the Qualified Participant within 90 days after the last day of the period in which the election can be made, but any part of such distribution consisting of Employer Securities will be subject to the put option requirements of the Plan, and the entire such distribution, if it is in excess of $5,000, will be subject to the consent requirements under Section 5.8; (2) be transferred no later than 90 days after the last day of the period in which the election can be made to another qualified defined contribution plan of the Employer that accepts such transfers, provided such plan permits Employee-directed investments in at least three distinct investment options and does not invest in Employer Securities to a substantial degree; or (3) be invested, at the election of the Qualified Participant, in one or more alternative investments, provided that if the Administrator elects to offer this option as part of the written policy adopted hereunder, the Plan must provide at least three distinct investment options.

7.5    **Loans to Participants.** Loans to Participants are not permitted.

7.6    **Insurance on Participants.** The purchase of a life insurance policy or annuity contract is not permitted.

7.7    **Directed Investment Accounts.** Participants are not permitted to direct the investment of any portion of their accounts under the Plan.

- 48 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000057

## Article 8
### Duties of the Administrator

8.1 **Appointment, Resignation, Removal and Succession.** The Sponsoring Employer will serve as the Administrator unless the Sponsoring Employer elects to appoint a Committee or another Administrator. Each Administrator that is appointed will continue until his death, resignation, or removal, and any Administrator may resign by giving 30 days written notice to the Sponsoring Employer. If an Administrator dies, resigns, or is removed, his successor will be appointed as promptly as possible, and such appointment will become effective upon its acceptance in writing by such successor. Pending the appointment and acceptance of any successor Administrator, any then acting or remaining Administrator will have full power to act.

8.2 **General Powers and Duties.** The discretionary powers and duties of the Administrator will include (a) appointing the Plan's attorney, accountant, actuary, or any other party needed to administer the Plan; (b) directing the Trustees with respect to payments from the Trust Fund; (c) deciding if a Participant is entitled to a benefit; (d) communicating with Employees regarding their Plan participation and benefits, including the administration of all claims procedures; (e) filing any returns and reports with the Internal Revenue Service, Department of Labor, or other governmental agency; (f) reviewing and approving any financial reports, investment reviews, or other reports prepared by any party under (e) above; (g) establishing a funding policy and investment objectives consistent with the purposes of the Plan and ERISA; (h) construing and resolving any question of Plan interpretation; and (i) making any findings of fact the Administrator deems necessary to proper Plan administration. Notwithstanding any contrary provision of this Plan, benefits under this Plan will be paid only if the Administrator decides in its discretion that the applicant is entitled to them. The Administrator's interpretation of Plan provisions, and any findings of fact, including eligibility to participate and eligibility for benefits, are final and will not be subject to "de novo" review unless shown to be arbitrary and capricious.

8.3 **Functions of Committee.** If a Committee is established, a member of the Committee will serve until his or her death, disability, removal by the Sponsoring Employer, or resignation. If a vacancy arises from the death, disability, removal, or resignation of a member of the Committee, the Sponsoring Employer may, but is not required to, appoint a successor to serve in his or her place. The Committee will select a chairman and secretary from among its members. Members of the Committee will serve without compensation. The Committee will act by majority vote. The proper expenses of the Committee, and the compensation of its agents, if any, that are appointed pursuant to Section 8.7, will be paid directly by the Employer.

8.4 **Multiple Administrators.** If more than one Administrator has been appointed by the Sponsoring Employer, the Administrators may delegate specific responsibilities among themselves, including the authority to execute documents unless the Sponsoring Employer revokes such delegation. The Sponsoring Employer and Trustee will be notified in writing of any such delegation of responsibilities, and the Trustee thereafter may rely upon any documents executed by the appropriate Administrator.

8.5 **Correcting Administrative Errors.** The Administrator will take such steps as it considers necessary and appropriate to remedy administrative or operational errors, including, but not be limited to, the following: (a) any action pursuant to (1) any Employee Plans Compliance Resolution System (EPCRS) that is issued by the Internal Revenue Service, (2) any asset management or fiduciary conduct error correction program that is issued by the Department of Labor, (3) the Regulations, or (4) any other correction program issued by any Department or governmental agency; (b) a reallocation of Plan assets; (c) an adjustment in the amount of future payments to any Participant, Beneficiary or Alternate Payee; and (d) the institution, prosecution, and/or settlement of legal actions to recover benefit payments made in error or on the basis of incorrect or incomplete information.

8.6 **Promulgating Notices and Procedures.** The Sponsoring Employer and Administrator are given the power and responsibility to promulgate certain written notices, policies and/or procedures under the terms of the Plan and disseminate them to Participants, and the Administrator may satisfy such responsibility by the preparation of any such notice, policy and/or procedure in a written form which can be published and communicated to a Participant in one or more of the following ways: (a) by distribution in hard copy; (b) through distribution of a summary plan description or summary of material modifications thereto which sets forth the policy or procedure with respect to a right, benefit or feature offered under the Plan; (c) by e-mail, either to a Participant's personal e-mail address or his or her Employer-maintained e-mail address; and (d) by

- 49 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000058

publication on a web-site accessible by the Participant, provided the Participant is notified of said web-site publication. Any notice, policy and/or procedure provided through an electronic medium will only be valid if the electronic medium which is used is reasonably designed to provide the notice, policy and/or procedure in a manner no less understandable to the Participant than a written document, and under such medium, at the time the notice, policy and/or procedure is provided, the Employee may request and receive the notice, policy and/or procedure on a written paper document at no charge.

**8.7**    **Employment of Agents and Counsel.** The Administrator may appoint actuaries, accountants, custodians, counsel, agents, consultants, service companies and other persons deemed necessary or desirable in the administration and operation of the Plan. Any person or company so appointed will exercise no discretionary authority over investments or the disposition of Trust assets, and their services and duties will be ministerial only and will be to provide the Plan with those things required by law or by the terms of the Plan without in any way exercising any fiduciary authority or responsibility under the Plan. The duties of a third party Administrator will be to safe-keep the records for all Participants and to prepare all required actuarial services and disclosure forms under the supervision of the Administrator and any fiduciaries of the Plan. It is expressly stated that the third party Administrator's services are only ministerial in nature and that under no circumstances will such third party Administrator (a) exercise any discretionary authority whatsoever over Plan Participants, Plan investments, or Plan benefits; or (b) be given any authority or discretion concerning the management and operation of the Plan that would cause them to become fiduciaries of the Plan.

**8.8**    **Compensation and Expenses.** The Administrator may receive such compensation as agreed upon between the Sponsoring Employer and the Administrator, but any person who already receives full-time pay from the Employer may not receive any fees from the Plan for services to the Plan as Administrator or in any other capacity, except for reimbursement for expenses actually and properly incurred. The Sponsoring Employer will pay all "settlor" expenses (as described in DOL Advisory Opinion 2001-01-A) incurred by the Administrator, the Committee or any party appointed under Section 8.7 in the performance of their duties. The Sponsoring Employer may, but is not required to pay, all "non-settlor" expenses incurred by the Administrator, the Committee, or any party appointed under Section 8.7 in the performance of their duties. Any "non-settlor" expenses incurred by the Administrator, the Committee or any party appointed under Section 8.7 that the Sponsoring Employer elects not to pay will be reimbursed from Trust Fund assets. Any expenses paid from the Trust Fund will be charged to each Adopting Employer in the ratio that each Adopting Employer's Participants' Accounts bears to the total of all the Participants' Accounts maintained by this Plan, or in any other reasonable method elected by the Administrator.

**8.9**    **Claims Procedures.** The claims procedure required under ERISA §503 and Department of Labor Regulations thereunder is set forth in an administrative policy regarding claims procedures that is promulgated by the Administrator. The terms of such administrative policy are incorporated as part of the Plan by reference. Such administrative policy will be the sole and exclusive remedy for an Employee, Participant or Beneficiary (each a "Claimant") to make a claim for benefits under the Plan. No civil action for benefits under the Plan will be brought unless and until the aggrieved person has (a) submitted a timely claim for benefits in accordance with the provisions of the claims procedure policy; (b) been notified by the Administrator that the claim has been denied (or such claim is deemed denied); (c) filed a written request for a review of the claim in accordance with the claims procedure policy; and (d) been notified in writing of an adverse benefit determination on review. Any civil action by an aggrieved person will be based solely on the contentions advanced by the aggrieved person in the administrative review process, and the judicial review will be limited to the Plan document and the record developed during the administrative review process.

**8.10**    **Qualified Domestic Relations Orders.** The Administrator will determine if a domestic relations order (DRO) received by the Plan is a Qualified Domestic Relations Order (QDRO) based on an administrative policy regarding Qualified Domestic Relations Orders that is promulgated under Section 8.6 by the Administrator.

**8.11**    **Appointment of Investment Manager.** The Administrator, with the consent of the Employer, may appoint an Investment Manager to manage and control the investment of all or any portion of the Trust. Each Investment Manager will be a person (other than the Trustee) who (a) has the power to manage, acquire, or dispose of Plan assets, (b) is an investment adviser, a bank, or an insurance company as described in ERISA §3(38)(B), and (c) acknowledges fiduciary responsibility to the Plan in writing. The Administrator will enter into an agreement with the Investment Manager specifying the duties and compensation of the Investment Manager and specifying any other terms and conditions under which the Investment Manager will be retained. The

- 50 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                                    ARGENT 0000059

Trustee is not liable for any act or omission of an Investment Manager and is not liable for following an Investment Manager's advice with respect to duties delegated by the Administrator to the Investment Manager. The Administrator can determine the portion of the Plan's assets to be invested by a designated Investment Manager and can establish investment objectives and guidelines for the Investment Manager to follow.

- 51 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000060

## Article 9
## Trustee Provisions

If any Trust assets are invested in a separate trust or custodial account maintained by a Trustee or custodian, the provisions of the separate Trust or custodial agreement will supersede all provisions of this Article with respect to such assets except, in the absence of a specific provision in such separate Trust or custodial agreement regarding (i) the valuation of securities held by the Trust under Section 9.3, (ii) the exclusive benefit rule under Section 9.11 and (iii) the application of cash provisions under Section 9.12. If such separate trust or custodial account should for any reason fail, be found invalid or terminate prior to the termination of this Plan and the distribution of all the assets hereof, this will be deemed to have again become effective immediately prior to such failure, invalidity or termination.

9.1   **Appointment, Resignation, Removal and Succession.** This Plan will have one or more individual Trustees, a corporate Trustee, or any combination thereof, appointed as follows:

(a)   **Appointment.** Each Trustee will be appointed and will serve until a successor has been named or until such Trustee's resignation, death, incapacity, or removal, in which event the Sponsoring Employer will name a successor Trustee. The term Trustee will include the original and any successor Trustees.

(b)   **Resignation.** A Trustee may resign at any time by giving written notice to the Sponsoring Employer, unless such notice is waived by the Sponsoring Employer. The Sponsoring Employer may remove a Trustee at any time by giving such Trustee 30 days (or such longer period as set forth in the agreement governing the Trust) written notice. Such removal may be with or without cause. Unless waived in writing by the Sponsor, if any Trustee who is an Employee or an elected or appointed official resigns or Terminates Employment with the Sponsoring Employer or an Adopting Employer, such termination will constitute an immediate resignation as a Trustee of the Plan.

(c)   **Successor Trustee.** Each successor Trustee will succeed to the title to the Trust by accepting the appointment in writing and by filing such acceptance with the former Trustee and the Sponsoring Employer. The former Trustee, upon receipt of such acceptance, will execute all documents and perform all acts necessary to vest the Trust Fund's title of record in any successor Trustee. No successor Trustee will be personally liable for any act or failure to act of any predecessor Trustee. If the Sponsoring Employer fails to timely name a successor Trust, the Administrator shall be the successor Trustee.

(d)   **Merger.** If a corporate Trustee, before or after qualification, changes its name, consolidates or merges with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such Trustee will become a Trustee hereunder in lieu of such corporate Trustee.

9.2   **Investment Alternatives of the Trustee.** The Trustee will implement an investment program designed to invest primarily in Employer Securities and to accomplish the Employer's other investment objectives. In addition to powers given by law, the Trustee will have the rights and authorities described in the Trust.

9.3   **Valuation of the Trust.** On each Valuation Date, the Trustee will determine the net worth of the Trust Fund. All valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. In the case of a transaction between the Plan and a disqualified person, value must be determined as of the date of the transaction. For all other purposes, value must be determined as of the most recent Valuation Date. An independent appraisal will not in itself be a good faith determination of value in the case of a transaction between a Plan and a disqualified person. However, in other cases, a determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any part to a transaction under Regulation §1.4975-7(b)(9) and (12) will be deemed to be a good faith determination of value.

9.4   **Compensation and Expenses.** The Trustee will be reimbursed for all of its expenses, either from the Trust Fund or the Sponsoring Employer, and will be paid reasonable compensation as agreed upon from time to time with the Sponsoring Employer; but no person who receives full-time pay from the Employer will receive any fees for services to the Plan as Trustee or in any other capacity, except for reimbursement of expenses properly and actually incurred. Any expenses paid from the Trust will be charged to each Adopting Employer

- 52 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                                                    ARGENT_0000061

in the ratio that each Adopting Employer's Participants' Accounts bears to the total of all the Participants' Accounts maintained by this Plan, or in any other reasonable method elected by the Administrator.

**9.5    Payments From the Trust Fund.** The Trustee will pay Plan benefits and other payments as the Administrator directs, and the Trustee will not be responsible for the propriety of such payments. Any payment made to a Participant, or a Participant's legal representative or Beneficiary in accordance with the terms of the Plan will, to the extent of such payment, be in full satisfaction of all claims arising against the Trust, the Trustee, the Employer, and the Administrator. Any payment or distribution made from the Trust is contingent on the recipient executing a receipt and release acceptable to the Trustee, Administrator, or Employer.

**9.6    Payment of Taxes.** The Trustee will pay all taxes of the Trust Fund, including property, income, transfer and other taxes which may be levied or assessed upon or in respect of the Trust Fund or any money, property or securities forming a part of the Trust Fund. The Trustee may withhold from distributions to any payee such sum as the Trustee may reasonably estimate as necessary to cover federal and state taxes for which the Trustee may be liable, which are, or may be, assessed with regard to the amount distributable to such payee. Prior to making any payment, the Trustee may require such releases or other documents from any lawful taxing authority and may require such indemnity from a payee or distributee as the Trustee deems necessary.

**9.7    Accounts, Records and Reports.** The Trustee will keep accurate records reflecting its administration of the Trust and will make them available to the Administrator for review and audit. At the request of the Administrator, the Trustee will, within 90 days of such request, file with the Administrator an accounting of its administration during such period or periods as the Administrator determines. The Administrator will review the accounting and notify the Trustee within 90 days if the report is disapproved, providing the Trustee with a written description of the items in question. The Trustees will have 60 days to provide the Administrator with a written explanation of the items in question. If the Administrator again disapproves of the report, the Trustee will file its accounting in a court of competent jurisdiction for audit and adjudication.

**9.8    Employment of Agents and Counsel.** The Trustee may employ such agents, counsel, consultants, or service companies as it deems necessary and may pay their reasonable expenses and compensation. The Trustee will not be liable for any action taken or omitted by the Trustee in good faith pursuant to the advice of such agents and counsel. Any agent, counsel, consultant, service company and/or its successors will exercise no discretionary authority over investments or the disposition of Trust assets, and their services and duties will be ministerial only and will be to provide the Plan with those things required by law or by the terms of the Plan without in any way exercising any fiduciary authority or responsibility under the Plan.

**9.9    Division of Duties.** The division of duties of the Trustees of this Plan will be governed by the following provisions:

(a)    **No Guarantee Against Loss.** The Trustees will have the authority and discretion to manage and control the Trust Fund to the extent provided in this instrument, but they do not guarantee the Trust Fund in any manner against investment loss or depreciation in asset value, or guarantee the adequacy of the Fund to meet and discharge all or any liabilities of the Plan. Furthermore, the Trustees will not be liable for the making, retention or sale of any investment or reinvestment made by it, as herein provided, or for any loss to or diminution of the Trust Fund, or for any other loss or damage which may result from the discharge of its duties hereunder, except to the extent it is judicially determined that the Trustees have failed to exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims.

(b)    **Representations of the Sponsoring Employer.** The Sponsoring Employer warrants that all directions issued to the Trustees by it or the Administrator will be in accordance with the terms of the Plan.

(c)    **Directions by Others.** The Trustees are not answerable for an action taken pursuant to any direction, consent, certificate, or other paper or document on the belief that the same is genuine and signed by the proper person. All directions by the Sponsoring Employer, a Participant or Administrator must be in writing. The Administrator will deliver to the Trustee (1) certificates evidencing the individual or individuals authorized to act as the Administrator and (2) specimens of their signatures.

- 53 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000062

(d) **Duties and Obligations Limited by the Plan.** The duties and obligations of the Trustee are limited to those expressly imposed upon it by the Plan or subsequently agreed upon by the parties. Responsibility for administrative duties required under the Plan or applicable law not expressly imposed upon or agreed to by the Trustee, will rest solely with the Sponsoring Employer and Administrator.

(e) **Trustees Not Responsible for Application of Payments.** The Trustees will not be responsible in any way for the application of any payments it is directed to make or for the adequacy of the Fund to meet and discharge any and all liabilities under the Plan.

(f) **Multiple Trustees.** If more than one Trustee is appointed, any single Trustee may act independently in undertaking any act and/or transaction on behalf of the Trustees, including signing documents or checks, unless the Sponsoring Employer requires that all acts and/or transactions taken on behalf of the Trust, including signing documents or checks, must have the consent of a majority of the Trustees. The Sponsoring Employer may from time to time also place other restrictions on the Trustees.

(g) **Trustees as Participants or Beneficiaries.** Trustees will not be prevented from receiving any benefits to which they may be entitled as Participants or Beneficiaries as long as the benefits are computed and paid on a basis consistent with the terms of the Plan as applied to other Participants and Beneficiaries.

(h) **Limitation of Liability.** No Trustee will be liable for the act of any other Trustee or fiduciary unless the Trustee has knowledge of such act.

(i) **No Self-Dealing.** The Trustees will not (1) deal with the assets of the Trust in their own interest or for their own account; (2) in their individual or in any other capacity, act in any transaction involving the Trust on behalf of a party (or represent a party) whose interests are adverse to the interests of the Plan, or its Participants or Beneficiaries; or (3) receive any consideration for their own personal accounts from any party dealing with the Plan in connection with a transaction involving assets of the Trust.

**9.10 Investment Manager.** The Trustee is not liable for acts or omissions of an Investment Manager appointed by the Administrator under Section 8.11, and the Trustee is not liable for following the advice of an Investment Manager with respect to any duties delegated by the Administrator to the Investment Manager.

**9.11 Exclusive Benefit Rule.** All contributions made by the Employer to the Trust Fund will be used for the exclusive benefit of the Participants and their Beneficiaries and will not be used for nor diverted to any other purpose except the payment of the costs of maintaining the Plan.

**9.12 Application of Cash.** Employer contributions made to the Plan in cash and other cash received by the Trustee will first be applied to pay Current Obligations. To the extent the Plan holds any additional cash after satisfying its Current Obligations, any such available funds shall be consistently applied in manner described below:

(a) Cash shall first be used, if necessary, to diversify the Accounts of any Qualified Participants, as provided in Section 7.4.

(b) If there is cash in the Plan beyond the needs of (a), above, then such cash shall be used to diversify the Employer Securities Accounts of any Terminated Participants by exchanging Employer Securities in said Employer Securities Accounts for property other than Employer Securities, as provided in Section 5.11.

(c) If there is cash in the Plan beyond the needs of (a) and (b), above, then the Administrator may direct the Trustee to use such cash to fund the purchase of any Employer Securities distributed pursuant to a put option as provided in Section 5.18.

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000063

## Article 10
### Adopting Employer Provisions

10.1 **Plan Contributions.** Unless otherwise agreed to by the parties, or unless otherwise required by law, no Employer will have any obligation to make contributions to this Plan for or on behalf of the Employees of any other Employer. If any Employer is unable to make a contribution for any Plan Year, any Employer which is an Affiliated Employer of such Employer may make an additional contribution to the Plan on behalf of any Employee of the non-contributing Employer.

10.2 **Plan Amendments.** Any amendment to this Plan that is adopted by the Sponsoring Employer, at any time, will be deemed to be accepted by any Adopting Employer.

10.3 **Plan Expenses.** Any expenses paid from the Trust will be charged to each Adopting Employer in the ratio that each Adopting Employer's Participants' Accounts bears to the total of all the Participants' Accounts maintained by this Plan, or in any other reasonable method elected by the Administrator.

10.4 **Employee Transfers.** An Employee's transfer to or from the Sponsoring Employer to an Adopting Employer (or vice versa) will not affect his or her Participant's Account balance and total Years of Service or Periods of Service. With respect to an Employee who transfers from the Sponsoring Employer or an Adopting Employer to an Affiliated Employer that is not an Adopting Employer (or vice versa), the rules described in Section 2.1(d) shall determine the Employee's status as an Eligible Employee under the Plan.

10.5 **Multiple Employer Provisions Under Code §413(c).** Notwithstanding any other provision in the Plan, unless the Plan is a collectively bargained plan under Regulation §1.413-1(a), the following provisions apply to any Adopting Employer that is not also an Affiliated Employer:

   (a) **Instances of Separate Employer Testing.** Employees of any such Adopting Employer will be treated separately for testing under Code §401(a)(4), §401(k), §401(m) and, if the Sponsoring Employer and the Adopting Employer do not share Employees, Code §416. Furthermore, the terms of Code §410(b) will be applied separately on an employer-by-employer basis by the Sponsoring Employer (and the Adopting Employers which are part of the Affiliated Group which includes the Sponsoring Employer) and each Adopting Employer that is not an Affiliated Employer of the Sponsoring Employer, taking into account the generally applicable rules described in Code §401(a)(5), §414(b) and §414(c).

   (b) **Instances of Single Employer Testing.** Employees of the Adopting Employer will be treated as part of a single Employer plan for purposes of eligibility to participate under Article 2 and under the provisions of Code §410(a). Furthermore, the terms of Code §411 relating to Vesting will be applied as if all Employees of all such Adopting Employers and the Sponsoring Employer were employed by a single Employer, except that the rules regarding Breaks in Service will be applied under such Regulations as may be prescribed by the Secretary of Labor.

   (c) **Common Provisions.** Contributions made by any Adopting Employer will be held in a common Trust Fund with contributions made by the Sponsoring Employer, and all contributions will be available to pay benefits of any Participant who is an Employee of the Sponsoring Employer or any such Adopting Employer. Failure of the Sponsoring Employer or an Adopting Employer to satisfy the qualification requirements under the provisions of Code §401(a), as modified by the provisions of Code §413(c), will result in the disqualification of the Plan for all such Employers maintaining the Plan.

10.6 **Termination of Adoption.** An Adopting Employer may terminate adoption of the Plan by delivering written notice to the Sponsoring Employer, to the Administrator and to the Trustee. Upon such termination, the Adopting Employer may request a transfer of Trust Fund assets attributable to its Employees to a successor qualified retirement plan maintained by the Adopting Employer or its successor. If such request is not made by the Adopting Employer, or if the Administrator refuses to make the transfer because in its opinion a transfer would operate to the detriment of any Participant, would jeopardize the continued qualification of the Plan, or would not comply with any requirements of the Code, Regulations, or rules promulgated by the Department of Treasury or Internal Revenue Service, then termination of adoption by an Adopting Employer as described herein will not be considered a distributable event; distribution of a Participant's Account of an Employee of the Adopting Employer will be made in accordance with the provisions of Article 5 upon the

**- 55 -**

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000064

death, retirement, Disability, or the Termination of Employment from the Adopting Employer or former Adopting Employer, as if termination of adoption by the Adopting Employer had not occurred.

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000065

## Article 11
## Amendment, Termination, Merger and Transfers

**11.1    Plan Amendment.** The Plan can be amended at any time in accordance with the following provisions:

(a)    **General Requirements.** An amendment must be in writing. However, no amendment or modification (1) can increase the responsibilities of the Trustee or Administrator without their written consent; (2) can deprive any Participant or Beneficiary of the benefits to which he is entitled from the Plan; (3) can result in a decrease in the amount of any Participant's Account except as may be permitted under the terms of Code §412(d)(2) if applicable; or (4) can, except as otherwise provided, permit any part of the Trust Fund (other than as required to pay taxes and administration expenses) to be used for or diverted to purposes other than the exclusive benefit of the Participants or their Beneficiaries, or cause or permit any portion of the Trust Fund to revert to or become the property of the Employer. In addition, unless the provisions of paragraph (e) are satisfied, no amendment to the Plan will have the effect of eliminating or restricting the ability of a Participant or other payee to receive payment of his or her Account balance or benefit entitlement under a particular optional form of benefit provided under the Plan. Any amendment to the Plan by the Sponsoring Employer under this Section also applies to any Affiliated Employer that participates under the Plan as an Adopting Employer. The Sponsoring Employer's amendment of the Plan from one type of defined contribution plan (e.g., an employee stock ownership plan) into another type of defined contribution plan (e.g., a profit sharing plan) will not result in a partial termination or any other event that would require full vesting of some or all Plan Participants.

(b)    **Elimination of Optional Forms of Benefit.** No Plan amendment will be effective to eliminate or restrict an optional form of benefit. However, the preceding sentence will not apply to a Plan amendment that eliminates or restricts the ability of a Participant to receive payment of the Participant's Account under a particular optional form of benefit (including installments) if the amendment provides a single-sum distribution form that is otherwise identical to the optional form of benefit being eliminated or restricted. For this purpose, a single-sum distribution form is otherwise identical only if the single-sum distribution form is identical in all respects to the eliminated or restricted optional form of benefit (or would be identical except that it provides greater rights to the Participant) except with respect to the timing of payments after commencement.

(c)    **Certain Corrective Amendments.** In order to satisfy the minimum coverage requirements of Code §410(b), the nondiscriminatory amount requirement of Regulation §1.401(a)(4)-1(b)(2) or the nondiscriminatory plan amendment requirement of Regulation §1.401(a)(4)-1(b)(4), a corrective amendment or change of the choice of options in the Plan may retroactively increase allocations for Employees who benefited under the Plan during the Plan Year being corrected, or may grant allocations to Employees who did not benefit under the Plan during the Plan Year being corrected. To satisfy the nondiscriminatory current availability requirement of Regulation §1.401(a)(4)-4(b) for benefits, rights or features, a corrective amendment or change of the choice of options in Plan may make a benefit, right or feature available to Employees to whom it was previously not available. A corrective amendment or change of the choice of options in the Plan will not be effective prior to the date of adoption unless it satisfies the applicable requirements of Regulation §1.401(a)(4)-11(g)(3)(ii) through (vii), including the requirement that, in order to be effective for the preceding Plan Year, such amendment or change of the choice of options in the Plan must be adopted by the 15th day of the 10th month after the close of the preceding Plan Year.

**11.2    Termination By Sponsoring Employer.** The Sponsoring Employer at any time can terminate the Plan and Trust in whole or in part in accordance with the following provisions:

(a)    **Termination of Plan.** The Sponsoring Employer can terminate the Plan and Trust by filing written notice thereof with the Administrator and Trustee and by completely discontinuing contributions to the Plan. Upon any such termination, the Trust Fund will continue to be administered until complete distribution has been made to the Participants and other payees, which distribution must occur as soon as administratively feasible after the termination of the Plan, and must be made in accordance with the provisions of Article 5 of the Plan. However, the Administrator may elect not to distribute the Accounts of Participants and other payees upon termination of the Plan but instead to transfer the

- 57 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000066

entire Trust Fund assets and liabilities attributable to this terminated Plan to another qualified plan maintained by the Employer or its successor.

(b) **Vesting Requirement Upon Plan Termination.** Upon a complete termination of the Plan or upon a complete discontinuance of contributions under the Plan, the following Participants will have a 100% Vested Interest in their Participants' Accounts: (1) employed Participants who are affected by such complete termination or, if applicable, such complete discontinuance of contributions; (2) Participants who have not Terminated Employment with the Employers; and (3) Participants who have Terminated Employment with the Employer and who (A) have not incurred five consecutive Breaks in Service or (B) have not received a complete distribution of their Vested Aggregate Account balance.

(c) **Vesting Requirement Upon Partial Termination.** Upon partial termination of the Plan, only a Participant who has Terminated Employment because of the event which causes the partial termination but who has not incurred five consecutive Breaks in Service will have a 100% Vested Interest in his or her unpaid Participant's Account as of the date of partial termination.

(d) **Discontinuance of Contributions.** The Sponsoring Employer may at any time completely discontinue contributions to the Plan but continue the Plan in operation in all other respects, in which event the Trust will continue to be administered until eventual distribution of all benefits has been made to the Participants and other payees in accordance with Article 5 after their retirement, death, Disability or Termination of Employment. Any discontinuance of contributions without a notice of termination from the Sponsoring Employer to the Administrator and Trustee will not constitute a Plan termination.

**11.3** **Merger or Consolidation.** This Plan and Trust may not be merged or consolidated with, nor may any of its assets or liabilities be transferred to, any other plan, unless the benefits payable to each Participant if the Plan was terminated immediately after such action would be equal to or greater than the benefits to which such Participant would have been entitled if this Plan had been terminated immediately before such action. If the Employer acquires another company in a "Section 410(b)(6)(c) transaction, employees of the acquired company may be excluded from this Plan regardless of the provisions of Section 2.1 of the Plan during the period beginning on the date of the transaction and ending on the last day of the Plan Year beginning after the date of the Transaction. A Section 410(b)(6)(c) transaction is an asset or stock acquisition, merger, or similar transaction involving a change in the employer of the employees of a business.

**11.4** **Plan-to Plan Transfers.** To permit Participants to consolidate all qualified defined contribution plan accounts into a single plan for investments, distributions, loans and other administrative purposes, the Sponsoring Employer may permit Participants to transfer amounts to and from this Plan under the following rules:

(a) **Transfers to This Plan.** If permitted by the Sponsoring Employer and subject to the provisions of this Section, then a Participant may request that such Participant's entire account balance (both the vested interest and the non-vested interest) in another qualified defined contribution plan maintained by the Sponsoring Employer (or an Adopting Employer) be transferred in cash or in property into this Plan. Such transferred amount into this Plan will be considered a Transfer Contribution.

(b) **Transfers From This Plan.** If permitted by the Sponsoring Employer, then a Participant may request that such Participant's Account balance (both the Vested Interest and the Non-Vested Interest) in this Plan be transferred in cash or in property into another qualified defined contribution plan of the Sponsoring Employer (or an Adopting Employer).

(c) **Limitation on Transfer.** A transfer under this Section is only permitted if the Participant is ineligible to actively participate at the same time in the Sponsoring Employer's (or an Adopting Employer's) plan from which the transfer is being made (the transferor plan) and the Sponsoring Employer's (or an Adopting Employer's) plan into which the transfer is being made (the transferee plan).

(d) **Plan Accounts.** Transfer Contributions from another qualified defined contribution plan into this Plan will maintain all attributes with which such contributions were imbued in the other defined contribution plan (including the distribution limitations described in Regulation §1.401(k)-1(d)). Such Transfer Contributions will be accounted for separately in this Plan.

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000067

(e) **Protected Benefits.** Any Transfer Contributions into this Plan that have benefits, rights and features (including certain optional forms of benefit payments, such as annuities) required to be preserved by Code §411(d)(6) will continue to be preserved and protected in this Plan to the extent required by Code §411(d)(6). The Sponsoring Employer (or an Adopting Employer) reserves the right to eliminate any benefits, rights and features (including certain optional forms of benefit payments) of any Transfer Contributions into this Plan, to the extent permitted under Code §411(d)(6).

(f) **Vesting.** Transfer Contributions must Vest at least as rapidly under this Plan (the transferee plan) as they would Vest under the plan from which the transfer is being made (the transferor plan), as if the transfer had not occurred. If this Plan is the transferee plan and the Vesting schedule under the transferor plan is less favorable than the Vesting schedule under this Plan, the Administrator may apply, in a non-discriminatory manner, the Vesting schedule of this Plan to the Transfer Contributions.

(g) **Transfer Requests Subject to Administrative Approval.** Any transfer under this Section must be in cash or property acceptable to the Trustee. Any benefits, rights and features of a Transfer Contribution required to be protected by Code §411(d)(6) must be acceptable to and approved by the Administrator.

(h) **Application of this Section.** The provisions of this Section will apply to all Transfer Contributions, regardless of whether a Transfer Contribution was an elective transfer initiated by the Participant.

**11.5 Transfer of Plan Sponsorship.** The sponsorship of the Plan cannot be transferred from the Sponsoring Employer or any Adopting Employer to an unrelated taxpayer unless the transfer is in connection with a transfer of business assets or operations from the Employer to the unrelated taxpayer. Any transfer of Plan sponsorship which does not satisfy the requirements of this Section will be deemed a violation of the exclusive benefit requirements set forth in Section 12.17 of the Plan.

- 59 -

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY        ARGENT 0000068

**Article 12**
**Miscellaneous Provisions**

**12.1** **No Contract of Employment.** Except as otherwise provided by law, none of the establishment of this Plan, any modification hereto, the creation of any fund or account, nor the payment of any benefits, will be construed as giving any Participant or other person any legal or equitable rights against the Employer, any officer or Employee thereof, or the Trustee, except as herein provided. Further, under no circumstances will the terms of employment of any Participant be modified or otherwise affected by this Plan.

**12.2** **Title to Assets.** No Participant or Beneficiary will have any right to, or any interest in, any assets of the Trust upon separation of employment with the Employer, Affiliated Employer, or Adopting Employer, except as otherwise provided by the terms of the Plan.

**12.3** **Fiduciaries and Bonding.** Plan fiduciaries will have only those powers and duties that are specifically given to them under the terms of the Plan and Trust. Every Plan fiduciary other than a bank, an insurance company, a broker-dealer who is registered under the Securities Exchange Act of 1934 §15(b) and who is subject to the fidelity bond requirements of a self-regulatory organization as defined in ERISA §412(a) as amended by the Pension Protection Act of 2006, or a Plan fiduciary of a Sponsoring Employer that has no common-law employees, will be bonded in an amount that is not less than 10% of the amount of funds under such fiduciary's direct or indirect control; however, such bond will not be less than $1,000 nor more than $1,000,000 (or such other amount as may be required by law). The bond will provide protection to the Plan against any loss for acts of fraud or dishonesty by a fiduciary acting alone or in concert with others. The cost of such bond will be an expense of either the Sponsoring Employer or the Plan, at the election of the Sponsoring Employer.

**12.4** **Severability of Provisions.** If any Plan provision is held invalid or unenforceable, such invalidity or unenforceability will not affect any other provision of this Plan, and this Plan will be construed and enforced as if such provision had not been included.

**12.5** **Interpretation of the Plan.** The following provisions apply to the interpretation of the Plan and Trust:

(a) **Names.** Names that are used in this Plan should be used consistently in any appendixes, policies, procedures, and/or any other documents which are legally binding upon the Plan. However, in documents that are not considered to be part of this Plan, appendixes, policies or procedures that are not legally binding upon the Plan; and that may be distributed to individuals (such as the SPDs, SMMs, notices, and election forms), names may use plain English terms.

(b) **Gender.** Words that are used in the masculine gender may be construed as though they are also used in the feminine or neuter gender, where applicable (and vice versa).

(c) **Number.** Words that are used in the singular form may be construed as though they are also used in the plural form, where applicable (and vice versa).

(d) **Headings and Subheadings.** Headings and subheadings are inserted for convenience of reference. Headings and subheadings constitute no part of this Plan and are not to be considered in its construction or interpretation.

(e) **Single Subparagraphs.** This Plan may have Sections and/or paragraphs that contain a single subparagraph; such document construction will not constitute a Scrivener's error.

(f) **Effective Dates.** This Plan contains various effective dates, which include, but are not limited to: (1) the effective date of the Plan and, if applicable, the effective date of the amended and restated Plan; and (2) the effective dates of legally required or permitted provisions.

(g) **Application of Law.** This Plan will be construed and interpreted in accordance with the Code and ERISA. However, if the Plan needs to be construed and interpreted according to a State's or Commonwealth's laws (to the extent that such laws are not preempted by the provisions of the Code and ERISA), then this Plan will be construed and interpreted according to the laws of the State or Commonwealth in which the Sponsoring Employer maintains its principal place of business.

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000069

**12.6    Legal Action.** Unless otherwise prohibited by law, either the Sponsoring Employer or the Trust, in the sole discretion of the Sponsoring Employer, will reimburse the Trustee and/or the Administrator for all costs, attorneys fees and other expenses associated with any such claim, suit or proceeding.

**12.7    Qualified Plan Status.** This Plan is intended to be a qualified retirement plan under the provisions of Code §401(a), while the Trust is intended to be a tax exempt trust under Code §501(a).

**12.8    Mailing of Notices to Administrator, Employer or Trustee.** Notices, documents or forms required to be given to or filed with the Administrator, Employer or Committee will be either hand delivered or mailed by first class mail, postage prepaid, to the Committee or the Employer, at the Employer's principal place of business. Any notices, documents or forms required to be given to or filed with the Trustee will be either be hand delivered or mailed by first class mail, postage prepaid, to the Trustee at its principal place of business.

**12.9    Participant Notices and Waivers of Notices.** Whenever written notice is required to be given under the terms of this Plan, it will be deemed to be given on the date such written notice is either hand delivered to the recipient or deposited at a United States Postal Service Station, first class mail, postage paid. Notice may be waived by any party entitled to receive written notice concerning any matter under the terms of this Plan.

**12.10    No Duplication of Benefits.** There will be no duplication of benefits under the Plan because of employment by more than one participating Employer or Affiliated Employer.

**12.11    Evidence Furnished Conclusive.** Anyone required to give evidence under the terms of the Plan may do so by certificate, affidavit, document or other information that the person to act in reliance may consider pertinent, reliable and genuine, and to have been signed, made or presented by the proper party or parties. The Plan fiduciaries will be fully protected in acting and relying upon any evidence described under this Section.

**12.12    Release of Claims.** A payment to a Participant or Beneficiary, his or her legal representative, or to a guardian or committee appointed for such Participant or Beneficiary, will, to the extent thereof, be in full satisfaction of all claims hereunder against the Administrator and Trustee, either of whom may require such Participant, legal representative, Beneficiary, guardian or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as determined by the Administrator.

**12.13    Multiple Copies of Plan And/or Trust.** This Plan, the related Trust Agreement and the related may be executed in any number of counterparts, each of which will be deemed an original, but all of which will constitute one and the same Agreement or Trust Agreement, as the case may be, and will be binding on the respective successors and assigns of the Employer and all other parties.

**12.14    Limitation of Liability and Indemnification.** In addition to and in furtherance of any other limitations provided in the Plan, and to the extent permitted by applicable law, the Employer will indemnify and hold harmless its board of directors (collectively and individually), if any, the Committee (collectively and individually), if any, and its officers, Employees, and agents against and with respect to any and all expenses, losses, liabilities, costs, and claims, including legal fees to defend against such liabilities and claims, arising out of their good-faith discharge of responsibilities under or incident to the Plan, excepting only expenses and liabilities resulting from willful misconduct. This indemnity will not preclude such further indemnities as may be available under insurance purchased by the Employer or as may be provided by the Employer under any by-law, agreement, vote of shareholders or disinterested directors, or otherwise, as such indemnities are permitted under state law. Payments with respect to any indemnity and payment of expenses or fees under this Section will be made only from assets of the Employer, and will not be made directly or indirectly from assets of the Trust.

**12.15    Written Elections and Forms.** Whenever the word "written" or the words "in writing" are used, such words will include any method of communication permitted by the Department of Labor with respect to such documentation. In a similar manner, the word "form" will include any other method of election permitted under current law. Such alternative methods will include, but not be limited to, electronic modes to the extent permitted by law.

**12.16    Assignment and Alienation of Benefits.** Except as may otherwise be permitted under Code §401(a)(13)(C), or as may otherwise be permitted under a Qualified Domestic Relations Order as provided in Section 8.10, no right or claim to, or interest in, any part of the Trust Fund, or any payment therefrom, will be assignable,

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT 0000070

DOL 0009667

transferable, or subject to sale, mortgage, pledge, hypothecation, commutation, anticipation, garnishment, attachment, execution, or levy of any kind, and the Trustees will not recognize any attempt to assign, transfer, sell, mortgage, pledge, hypothecate, commute, or anticipate the same, except to the extent required by law.

**12.17 Exclusive Benefit Rule.** All contributions made by an Employer to the Trust Fund will be used for the exclusive benefit of the Participants who are Employees of the Employer or Adopting Employer and for their Beneficiaries and will not be used for nor diverted to any other purpose except the payment of the costs of maintaining the Plan. All contributions made by an Adopting Employer who is not an Affiliated Employer will be used for the exclusive benefit of the Participants who are Employees of the Adopting Employer and for their Beneficiaries and will not be used for nor diverted to any other purpose except the payment of the Adopting Employers' proportionate costs of maintaining the Plan.

**12.18 Notice and Consent Requirements.** This Section applies to any Notices/Forms and Participant Elections under the Plan:

(a) **Right to Defer Distribution.** Notices/Forms that relate to distributions will include a description of a Participant's right (if any) to defer receipt of a distribution and will describe the consequences of failing to defer receipt of the distribution, pursuant to the Regulations and other guidance provided by the Treasury and/or Labor. Notices/Forms that are delivered to Participants before the 90th day after the issuance of Regulations (unless future guidance requires otherwise) will include at a minimum: (1) a description indicating the investment options available under the Plan (including fees) that will be available if the Participant defers distribution; and (2) the portion of the summary plan description that contains any special rules that might materially affect a Participant's decision to defer.

(b) **Electronic Notice and Consent.** The use of an electronic medium to provide Notices/Forms and to make Participant Elections with respect to the Plan is permitted pursuant to the rules of this Section.

    (1) **Requirements of Electronic System.** The following rules relate to the design of an electronic system used to deliver Forms/Notices and to make Participant Elections: (A) the electronic system must be reasonably designed to provide the information in the Form/Notice to a Recipient in a manner that is no less understandable to the Recipient than a written paper document; and (B) the electronic system must be designed to alert the Recipient, at the time that a Form/Notice is provided, to the significance of the information in the Form/Notice (including identification of the subject matter of the Form/Notice), and provide any instructions needed to access the Form/Notice, in a manner that is readily understandable.

    (2) **Consumer Consent Requirements.** With respect to a Notice/Form, the following consumer consent requirements must be satisfied and, pursuant to E-SIGN §101(c)(6), the Notice/Form is not provided through an oral communication or a recording of an oral communication:

        (A) **Consent to Electronic Delivery.** The Recipient must affirmatively consent to the delivery of the Notice/Form using an electronic medium. This consent must be either (i) made electronically in a manner that reasonably demonstrates that the Recipient can access the Notice/Form in the electronic medium in the form that will be used to provide the notice; or (ii) made using a written paper document (or any other permitted form under the Regulations), but only if the Recipient confirms the consent electronically in a manner that reasonably demonstrates that the Recipient can access the Notice/Form in the electronic medium in the form that will be used to provide the notice.

        (B) **Withdrawal of Consumer Consent.** The consent under paragraph (A) to receive electronic delivery of Notices/Forms may be withdrawn by the Recipient at any time, and subsequent Notices/Forms cannot be delivered electronically.

        (C) **Required Disclosure Statement.** The Recipient, prior to consenting under subparagraph (A), must be provided with a clear and conspicuous statement containing the following disclosures: (i) the statement informs the Recipient [a] of any right to have the Notice/Form provided using a written paper document or other non-electronic form; and [b] how, after having provided consent to receive the Notice/Form electronically, the Recipient may, upon request, obtain a paper copy of the Notice/Form and whether any

- 62 -

*PHX 331137249v4*

fee will be charged for such copy; (ii) the statement informs the Recipient of the right to withdraw consent to receive electronic delivery of a Notice/Form on a prospective basis at any time and explains the procedures for withdrawing that consent and any conditions, consequences, or fees in the event of the withdrawal; (iii) the statement informs the Recipient whether the consent to receive electronic delivery of a Notice/Form applies only to the particular transaction that gave rise to the Notice/Form or to other identified transactions that may be provided or made available during the course of the parties' relationship. The statement may provide that a Recipient's consent to receive electronic delivery will apply to all future Forms/Notices of the Recipient relating to the Plan until the Recipient is no longer a Participant in the Plan (or withdraws the consent); (iv) the statement describes the procedures to update information needed to contact the Recipient electronically; and (v) the statement describes the hardware and software requirements needed to access and retain the Notice/Form.

(D)    **Post-Consent Change in Hardware or Software Requirements.** If there is a change in the hardware or software requirements needed to access or retain the Notice/Form after a Recipient provides consent to receive electronic delivery and such change creates a material risk that the Recipient will not be able to access or retain the Notice/Form in electronic format, then (i) the Recipient must receive a statement of [a] the revised hardware or software requirements for access to and retention of the Notice/Form; and [b] the right to withdraw consent to receive electronic delivery without the imposition of any fees for the withdrawal and without the imposition of any condition or consequence that was not previously disclosed in paragraph (C); and (ii) the Recipient must reaffirm consent to receive electronic delivery in accordance with subparagraph (A).

(E)    **Exemption from Consumer Consent Requirements.** If the requirements of this paragraph (E) are satisfied, then the other requirements of paragraph (2) do not apply. This paragraph (E) constitutes an exemption from the Consumer Consent Requirements of E-SIGN §101(c). The electronic medium used to provide a Notice/Form must be a medium that the Recipient has the effective ability to access. At the time that the Notice/Form is provided, the Recipient must be advised that he or she may request and receive the Notice/Form in writing on paper at no charge, and, upon request, that Notice/Form must be provided to the Recipient at no charge.

(3)    **Participant Elections via Electronic Delivery.** Participant Elections may be made electronically, subject to the following rules:

(A)    **Effective Ability to Access.** The electronic medium used to make a Participant Election must be a medium that the person eligible to make the election is effectively able to access. If the appropriate individual is not effectively able to access the electronic medium for making the Participant Election, then the Participant Election will not be treated as made available to that individual.

(B)    **Authentication.** The electronic system used in making Participant Elections must be reasonably designed to preclude any person other than the appropriate individual from making the election, based upon the facts and circumstances, including, but not limited to, whether the Participant Election has the potential for a conflict of interest between the individuals involved in the election.

(C)    **Opportunity to Review.** The electronic system used in making Participant Elections must provide the person making the election with a reasonable opportunity to review, confirm, modify, or rescind the terms of the election before the election becomes effective.

(D)    **Confirmation of Action.** The person making the Participant Election must receive, within a reasonable time, a confirmation of the effect of the election through a written paper document or an electronic medium under a system that satisfies the requirements of subparagraph (2) above.

- 63 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000072

(E) **Witnessing by a Plan Representative or Notary Public.** If a Participant Election is required to be witnessed by a Plan representative or a notary public (such as a spousal consent under Code §417), the signature of the individual making the Participant Election must be witnessed in the physical presence of a Plan representative or a notary public. An electronic notarization acknowledging a signature (in accordance with E-SIGN §101(g) and state law applicable to notary publics) will be given legal effect if the signature of the individual is witnessed in the physical presence of a notary public. Future guidance by the Treasury will apply hereto without the necessity of amending this paragraph.

(4) **Non-applicability of Rules.** The rules of this Section do not apply to any notice, election, consent, disclosure, or obligation required under the provisions of Title I or IV of ERISA, over which the Department of Labor or the Pension Benefit Guaranty Corporation has interpretative and enforcement authority. The rules in this Section also do not apply to Code §411(a)(3)(B) (relating to suspension of benefits) or any other Code provision over which Department of Labor or the Pension Benefit Guaranty Corporation has similar interpretative authority.

(5) **Retention of Electronic Records.** If an electronic record of a Notice/Form or a Participant Election is not maintained in a form that is capable of being retained and accurately reproduced for later reference, then the legal effect, validity, or enforceability of such electronic record may be denied, pursuant to E-SIGN §101(e).

(c) **Notification Period.** With respect to any Notice/Form that describes the Normal Form of Distribution and/or the Optional Forms of Distribution, and any Participant Election with respect to any distribution delivered to a Participant, the window for giving such Notice/Forms and Participant Elections will begin not later than 180 days and not earlier than 30 days prior to the Annuity Starting Date (unless future guidance requires/permits otherwise). Notwithstanding anything in this Section to the contrary, distribution of a benefit may begin less than 30 days after such Notice/Form and/or Participant Election is given if (1) the Administrator clearly informs the Participant that he or she has a right to a period of at least 30 days after receiving such Notice/Form and/or Participant Election to consider the decision of whether or not to elect a distribution; (2) the Participant, after receiving such Notice/Form and/or Participant Election, affirmatively elects a distribution (or a particular distribution option); and (3) if the Plan is a money purchase plan or the Normal Form of Distribution is a Qualified Joint and Survivor Annuity, the Participant does not revoke the election at any time prior to the expiration of the 7-day period that begins on the date such Notice/Form and/or Participant Election is given.

**12.19 Coordination With USERRA.** Notwithstanding any other provision of the Plan, contributions, benefits and service credit with respect to Qualified Military Service will be provided in accordance with the requirements of USERRA and with Code §414(u).

**12.20 Dual and Multiple Trusts.** Plan assets may be held in two or more separate trusts, or in trust and by an insurance company or by a trust and under a custodial agreement. Assets may also be held in a common trust.

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000073

DOL 0009670

**This Plan** has been executed by the Sponsoring Employer as of the day, month and year set forth on page 1 of this Agreement.

RVR, Inc.

By: _Eric R. Bensen_____

Name:    Eric Bensen
Title:    Chief Financial Officer

[Signature Page to the RVR Employee Stock Ownership Plan]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000074

DOL 0009671

**RVR Employee Stock Ownership Plan**
**Additional Employer Adoption Agreement**

**This Agreement** is made and entered into as of the date below between **RVR, Inc.** (the Sponsor) and **Cruise America, Inc.** (the Adopting Employer).

<u>Introduction</u>

- The Sponsor previously established the RVR Employee Stock Ownership Plan (hereafter called the Plan) which the Adopting Employer wishes to adopt;

- Effective June 1, 2013, the Adopting Employer hereby adopts the Plan subject to the following conditions:

  (1) The Adopting Employer agrees to abide by such rules and procedures as the Administrator deems necessary for the proper administration of the Plan.

  (2) Employees of the Adopting Employer will be given credit for all Years of Service or Periods of Service earned with the Employer and other Adopting Employers.

  (3) Employees of the Employer and other Adopting Employers will be given credit for all Years of Service or Periods of Service earned with the Adopting Employer.

**This Agreement** is hereby executed by the parties hereto this <u>22nd</u> day of May, 2014.

**RVR, Inc.**

By _Eric R. Bensen_

Name:    Eric Bensen
Title:    Chief Financial Officer

**Cruise America, Inc.**

By _Eric R. Bensen_

Name:    Eric Bensen
Title:    Chief Financial Officer

[Adoption Agreement for the RVR Employee Stock Ownership Plan]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000075

**RVR Employee Stock Ownership Plan**
**Additional Employer Adoption Agreement**

**This Agreement** is made and entered into as of the date below between **RVR, Inc.** (the Sponsor) and **American Land Cruisers of California, Incorporated** (the Adopting Employer).

### Introduction

- The Sponsor previously established the RVR Employee Stock Ownership Plan (hereafter called the Plan) which the Adopting Employer wishes to adopt;

- Effective June 1, 2013, the Adopting Employer hereby adopts the Plan subject to the following conditions:

  (1) The Adopting Employer agrees to abide by such rules and procedures as the Administrator deems necessary for the proper administration of the Plan.

  (2) Employees of the Adopting Employer will be given credit for all Years of Service or Periods of Service earned with the Employer and other Adopting Employers.

  (3) Employees of the Employer and other Adopting Employers will be given credit for all Years of Service or Periods of Service earned with the Adopting Employer.

**This Agreement** is hereby executed by the parties hereto this 22nd day of May, 2014.

**RVR, Inc.**

By _Eric R Bensen_

Name:    Eric Bensen
Title:    Chief Financial Officer

**American Land Cruisers of California, Incorporated**

By _Eric R. Bensen_

Name:    Eric Bensen
Title:    Chief Financial Officer

[Adoption Agreement for the RVR Employee Stock Ownership Plan]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000076

## RVR EMPLOYEE STOCK OWNERSHIP PLAN
### ADMINISTRATIVE POLICY REGARDING THE CLAIMS PROCEDURE

In accordance with Section 8.9 of the RVR Employee Stock Ownership Plan (the "Plan"), the rules and procedures set forth below (hereafter called the "Policy") govern claims for benefits under the Plan. This Policy is the sole and exclusive remedy for an Employee, Participant or Beneficiary (each a "Claimant") to make a claim for benefits, and this Policy will be administered and interpreted in a manner consistent with the requirements of ERISA §503 and the regulations in effect thereunder. All claims determinations made by the Administrator, by the Appropriate Named Fiduciary, and/or by the Committee (if one is appointed under Section 8.3 of the Plan) will be made in accordance with this Policy and will be applied consistently to similarly situated Claimants.

### DEFINITIONS

In applying the terms of this Policy, any terms used herein which are also used in the Plan will have the same meaning ascribed to them under this Policy as ascribed to them under the terms of the Plan except as may otherwise be provided in this Policy. In addition, the following terms specific to this Policy will have the following meanings:

APPROPRIATE NAMED FIDUCIARY. For purposes of this Policy, the term "Appropriate Named Fiduciary" means (a) if a Committee has been appointed by the Sponsoring Employer under Section 8.3 of the Plan, the Committee; or (b) if a Committee has not been appointed pursuant to Section 8.3 of the Plan, the Administrator (and if a Committee has not been appointed, any reference to Committee will be considered a reference to the Administrator).

### INITIAL DETERMINATION OF A CLAIM

A Claimant (or the Claimant's authorized representative) may file a claim for a Plan benefit to which the Claimant believes he or she is entitled. Claims must be filed in writing with the Administrator. The Administrator, in its sole and complete discretion, will make all initial determinations as to the right of any person to benefits. If the claim is denied in whole or in part, the Administrator will send the Claimant a written or electronic notice (which electronic notice must comply with the standards imposed by Department of Labor Regulation §2520.104b-1(c)(1)(i), (iii), and (iv)) informing the Claimant of the denial. The notice of denial will be given as provided in the next section below.

### NOTICE OF A CLAIM DENIAL

The written or electronic notice of the denial will be given within a reasonable period of time (but no later than 90 days) from the date the Administrator receives the written claim, unless special circumstances require an extension of time for processing the claim. In no event may the extension exceed 90 days from the end of the initial 90-day period. If an extension is necessary, the Administrator will send the Claimant a written notice prior to the expiration of the initial 90-day period in which the Administrator indicates the special circumstances requiring an extension and the date by which the Administrator expects to render a decision. The notice must be written in a manner calculated to be understood by the Claimant and must contain the following information: (a) the specific reason or reasons for the denial; (b) reference to the specific plan provisions on which the denial is based; (c) a description of any additional material or information necessary for the Claimant to perfect the claim and an explanation of why such material or information is necessary; (d) a description of the Plan's review (i.e., appeal) procedures and the time limits applicable to such procedures; and (e) a description of the Claimant's right to bring a civil action under ERISA §502(a) following an adverse benefit determination on review.

### APPEALING THE DENIAL OF A CLAIM

If the Administrator denies a claim in whole or in part, the Claimant may elect to appeal the denial. If the Claimant does not appeal the denial pursuant to the procedures set forth in this Policy, the denial will be final, binding and unappealable. Appeals will be filed in accordance with, and will be determined subject to, the following provisions:

(a) WHEN THE APPEAL MUST BE FILED. The written request for appeal must be filed by the Claimant (or by the Claimant's authorized representative) with the Appropriate Named Fiduciary within 60 days after the date on which the Claimant receives the Administrator's notice of denial.

(b) REVIEW OF THE CLAIM FOLLOWING AN APPEAL. If a request for an appeal is timely filed, the Appropriate Named Fiduciary will conduct a full and fair review of the claim and the denial. As part of this review, the Claimant may submit written comments, documents, records, and other information relating to the claim, and the review will take into account all such comments, documents, records, or other information submitted by the Claimant,

- 1 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000077

without regard to whether such information was submitted or considered in the Administrator's initial benefit determination. The Claimant also may obtain, free of charge and upon request, records and other information relevant to the claim, without regard to whether such information was relied upon by the Administrator in making the initial benefit determination. As a result of this review, the Appropriate Named Fiduciary will, in its sole and complete discretion, determine whether to uphold all or part of the initial claim denial.

(c) **NOTICE OF DENIAL OF THE CLAIM.** If the Appropriate Named Fiduciary determines pursuant the review under paragraph (b) above that all or part of the initial denial should be upheld, the Administrator will send the Claimant a written or electronic notice informing the Claimant of its decision to uphold all or part of the initial denial. The notice of denial must be written in a manner calculated to be understood by the Claimant and must contain (a) the specific reason or reasons for the denial; (b) a specific reference to pertinent Plan provisions on which the denial is based; (c) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents and other information relevant to the claim; and (d) an explanation of the Claimant's right to request arbitration and the applicable time limits for doing so; and (e) a description of the Claimant's right to bring a cause of action under ERISA §502(a).

(d) **WHEN THE NOTICE MUST BE GIVEN.** If the Administrator is serving as the Appropriate Named Fiduciary, the notice will be given within a reasonable period of time (but no later than 60 days) after the date the Appropriate Named Fiduciary receives the request for appeal, unless special circumstances require an extension of time for reviewing the claim. In no event may the extension exceed 60 days from the end of the initial 60-day period. If an extension is necessary, prior to the expiration of the initial 60-day period, the Administrator will send the Claimant a written notice, indicating the special circumstances requiring an extension and the date by which the Appropriate Named Fiduciary expects to render a decision. However, if the Committee is serving as the Appropriate Named Fiduciary and the Committee holds regularly scheduled meetings on a quarterly or more frequent basis, notice will be given at the next regularly scheduled meeting if the Committee receives the written request for appeal more than 30 days prior to its next regularly scheduled meeting, or at the regularly scheduled meeting immediately following the next regularly scheduled meeting if the Committee receives the written request for appeal within 30 days of the next regularly scheduled meeting. If special circumstances require an extension, the decision may be postponed to the third regularly scheduled meeting following the Committee's receipt of the written request for appeal if, prior to the expiration of the initial time period for review, the Claimant is provided with written notice indicating the special circumstances requiring an extension and the date by which the Committee expects to render a decision. If the extension is required because the Claimant has not provided information that is necessary to decide the claim, the Committee may suspend the review period from the date on which notice of the extension is sent to the Claimant until the date the Claimant responds to the request for additional information. The Committee must notify the Claimant of its decision as soon as possible, but not later than 5 days after the decision is made.

## VOLUNTARY ARBITRATION

If (a) a Claimant wishes to contest a final decision of the Appropriate Named Fiduciary, and (b) the Claimant voluntarily chooses not to bring a civil action under ERISA §502(a) following an adverse benefit determination on appeal, then the Claimant and the Appropriate Named Fiduciary may agree to arbitration. If a Claimant agrees to arbitration, then a written request for arbitration must be filed by the Claimant (or the Claimant's authorized representative) with the Administrator within 60 days (or such additional time as the Administrator may deem appropriate) after the date the Claimant receives the written decision of the Appropriate Named Fiduciary. The Claimant and the Administrator will each name an arbitrator within 20 days after the Administrator receives the Claimant's written request for arbitration. The two arbitrators will jointly name a third arbitrator within 15 days after their appointment. If either party fails to select an arbitrator within the 20 day period, or if the two arbitrators fail to select a third arbitrator within 15 days after their appointment, then the Administrator will determine that either (a) the arbitration will cease, or (b) the presiding judge of the county court (or its equivalent) in the county in which the principal office of the Sponsoring Employer is located will appoint the other arbitrator or arbitrators. The arbitrators will render a decision within 60 days after the appointment of the third arbitrator and will conduct all proceedings pursuant to the laws of the state in which the Sponsoring Employer's principal place of business is located and the

DOL 0009675

## RVR EMPLOYEE STOCK OWNERSHIP PLAN
## ADMINISTRATIVE POLICY REGARDING QUALIFIED DOMESTIC RELATIONS ORDERS

In accordance with Section 8.10 of the RVR Employee Stock Ownership Plan (the "Plan"), Code §414(p)(6)(B), and ERISA §206(d)(3)(G)(ii), the rules and procedures set forth below (hereafter called the "Policy") govern the determination of whether a Domestic Relations Order constitutes a Qualified Domestic Relations Order, and the distribution of benefits to Alternate Payees under a Qualified Domestic Relations Order. This Policy will be administered and interpreted in a manner consistent with the requirements of ERISA §206(d)(3) and the regulations thereunder, as well as Code §414(p) and the regulations in effect thereunder. All determinations made by the Administrator and/or by the Committee (if one has been appointed under Section 8.3 of the Plan) will be made in accordance with this Policy.

### DEFINITIONS

In applying this Policy, any terms used herein which are also used in the Plan will have the same meaning ascribed to them under this Policy as are ascribed to them under the terms of the Plan except as may otherwise be provided in this Policy. In addition, the following terms that are specific to this Policy will have the following meanings:

1. **ALTERNATE PAYEE.** The term "Alternate Payee" means any Spouse, former Spouse, child or other dependent of a Participant who is recognized by a Domestic Relations Order as having a right to receive all, or a portion of, the benefits payable under the Plan with respect to a Participant. The Administrator is not required by ERISA §206(d)(3) or any other ERISA provision to review the correctness of a determination by a competent State (or Commonwealth) authority that an individual is in fact a Spouse, former Spouse, child, other dependent, or surviving Spouse of the Participant under a State's (or Commonwealth's) domestic relations law.

2. **DOMESTIC RELATIONS ORDER.** The term "Domestic Relations Order" means any judgment, decree, or order (including approval of a property settlement agreement) within the meaning of ERISA §206(d)(3)(B)(ii) which (a) relates to the provision of child support, alimony payments, or marital property rights to a Spouse, former Spouse, child, or other dependent of a Participant; and (b) is made pursuant to a State's (or Commonwealth's) domestic relations law (including a community property law) by a State (or Commonwealth) authority with jurisdiction over such matters. Such State (or Commonwealth) must be part of the United States of America. A Domestic Relations Order will not affect a Participant's benefits unless it is determined to be a Qualified Domestic Relations Order.

3. **EARLIEST RETIREMENT AGE.** The term "Earliest Retirement Age" means the earlier of (a) the date on which the Participant is entitled to a distribution under this Plan; or (b) the later of (1) the date the Participant attains age 50, or (2) the earliest date on which the Participant could receive benefits under this Plan if the Participant Terminated Employment with the Employer.

4. **EIGHTEEN-MONTH PERIOD.** The term "Eighteen-Month Period" means a period of eighteen (18) months during which the Administrator must preserve the Segregated Amounts for the benefit of an Alternate Payee. The Eighteen-Month Period begins as of the later of (a) the date upon which the Plan receives the Domestic Relations Order, or (b) the QDRO Distribution Starting Date.

5. **QDRO DISTRIBUTION STARTING DATE.** The term "QDRO Distribution Starting Date" means either (a) the date on which the benefit payment is required to be made to an Alternative Payee pursuant to a Qualified Domestic Relations Order; or (b) the date on which the commencement of benefit payments is required to begin to an Alternative Payee pursuant to a Qualified Domestic Relations Order. For purposes of the QDRO Distribution Starting Date, this Policy establishes that a Qualified Domestic Relations Order may provide for the benefit payment (or the commencement of benefit payments) to an Alternative Payee prior to the time that a Participant has Terminated Employment., but only if such benefit payment (or the commencement of benefit payments) is to be made on or after the date that the Participant reaches or would have reached the Participant's Earliest Retirement Age.

6. **QUALIFIED DOMESTIC RELATIONS ORDER (OR QDRO).** The terms "Qualified Domestic Relations Order" and "QDRO" mean a Domestic Relations Order that (a) the Administrator (or Committee, if applicable) deems to be qualified under the requirements of ERISA §206(d)(3)(B)(i); (b) creates or recognizes the existence of an Alternate Payee's right, or assigns to an Alternate Payee the right, to receive all or a portion of the benefits payable with respect to a Participant; and (c) satisfies the following:

-1-

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000079

(a) DOMESTIC RELATIONS ORDER MUST CLEARLY SPECIFY CERTAIN FACTS. A Domestic Relations Order satisfies the requirements of this subparagraph only if the Domestic Relations Order clearly specifies (1) the name and the last known mailing address (if any) of the Participant and the name and mailing address of each Alternate Payee covered by the Domestic Relations Order; (b) the amount or percentage of the Participant's benefits to be paid by the Plan to each such Alternate Payee, or the manner in which such amount or percentage is to be determined; (c) the number of payments or period to which such Domestic Relations Order applies; and (d) each plan (including, if applicable, this Plan) to which such Domestic Relations Order applies.

(b) DOMESTIC RELATIONS ORDER MUST NOT ALTER AMOUNT OR FORM OF BENEFITS. A Domestic Relations Order satisfies the requirements of this paragraph only if it (1) does not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan; (2) does not require the Plan to provide increased benefits (determined on the basis of actuarial value); (3) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another Domestic Relations Order previously determined to be a QDRO; and (4) does not require the benefit payment (or the commencement of benefit payments) be made to an Alternative Payee prior to the QDRO Distribution Starting Date.

7.  SEGREGATED AMOUNTS. The term "Segregated Amounts" means, if the QDRO Distribution Starting Date occurs prior to the determination that the Domestic Relations Order is a QDRO (or such other event(s) that would cause a distribution to be made to a Participant (or such other person) prior to a distribution to be made an Alternate Payee), the amounts that would be payable to an Alternate Payee under the terms of the Domestic Relations Order during the Eighteen-Month Period (if the Domestic Relations Order had been determined to be a Qualified Domestic Relations Order). During the Eighteen-Month Period, the Administrator will take steps to ensure that the Segregated Amounts that would be payable to the Alternate Payee are not distributed to the Participant or any other person.

## RIGHTS AND RESPONSIBILITIES

In addition to any rights of an Alternate Payee and any responsibilities of the Administrator that may be set forth elsewhere in this Policy, an Alternate Payee has the following rights and the Administrator has the following responsibilities:

1.  ALTERNATE PAYEE MAY DESIGNATE A REPRESENTATIVE. An Alternate Payee has the right to designate a representative to receive copies of notices and information sent to the Alternate Payee regarding a Domestic Relations Order.

2.  ADMINISTRATOR WILL SUPPLY INFORMATION TO ALTERNATE PAYEE. The Administrator will promptly supply to an Alternate Payee (including a prospective Alternate Payee):

    (a) EXPLANATION OF PLAN AND BENEFITS. An explanation of the Plan and a Participant's benefits that are available to assist a prospective Alternate Payee in preparing a Qualified Domestic Relations Order, such as a Summary Plan Description (SPD), plan document, individual benefit and/or account statements, and any model Qualified Domestic Relations Orders that have been developed for use by the Plan.

    (b) TIME LIMITS. A description of any time limits set by the Administrator for making determinations.

    (c) PROTECTION OF PENSION BENEFITS. A description of the steps that the Administrator will take to protect and preserve pension assets or benefits upon receipt of a Domestic Relations Order (for example, a description of when and under what circumstances Plan assets will become Segregated Amounts or benefit payments will be delayed, will be suspended, or will become Segregated Amounts).

    (d) REVIEW PROCESS. A copy of the Plan's Administrative Policy Regarding the Claims Procedure, for obtaining a review of the Administrator's determination as to whether a Domestic Relations Order is a QDRO.

3.  DISCLOSURE RIGHTS TO ALTERNATE PAYEE. An Alternate Payee under a QDRO generally will be considered a beneficiary under the Plan. Accordingly, the Alternate Payee must be furnished, upon written request, copies of a variety of documents, including the latest Summary Plan Description (SPD), the latest annual report, any final annual report, and the bargaining agreement, trust agreement, contract, or other instrument under which the Plan is established or operated. The Administrator may impose a reasonable charge to cover the cost of furnishing such copies. When benefit payments to the Alternate Payee commence under the Qualified Domestic Relations Order, the Alternate Payee will be treated as a "beneficiary receiving benefits under the Plan" and will be furnished automatically and free of charge the Summary Plan Description (SPD), summaries of material Plan changes, and the Plan's summary annual report.

-2-

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000080

4. **ADMINISTRATOR'S DUTY TO ACCOUNT FOR AND PROTECT ALTERNATE PAYEE INTEREST UNDER A QDRO.** If the Domestic Relations Order is determined to be a QDRO prior to the QDRO Distribution Starting Date, then the Administrator has a continuing duty to account for and to protect the Alternate Payee's interest in the Plan to the same extent that the Administrator is obliged to account for and to protect the interests of the Participant.

5. **ADMINISTRATOR MAY SEND MATERIALS IN WRITING OR ELECTRONICALLY.** With respect to any notices, SPDs, summaries of material Plan changes, summary annual reports, and any other required disclosures, the Administrator will send such materials either in writing or electronically (so long as such materials (a) are not prohibited from being delivered electronically, and (b) comply with the standards imposed by Labor Regulation §2520.104b-1(c)).

## DETERMINATION PROCEDURE

1. **DETERMINE IF A COURT ORDER IS A DOMESTIC RELATIONS ORDER.** The Administrator will review any court judgment, decree, or order presented to the Plan to ascertain whether the judgment, decree, or order is a Domestic Relations Order. No judgment, decree, or order will constitute a Domestic Relations Order unless (a) it relates to child support, alimony payments, or marital property rights to a Spouse, former Spouse, child, or other dependent of a Participant, and (b) it is made pursuant to a State (or Commonwealth) domestic relations law (including a community property law) by a State (or Commonwealth) authority with jurisdiction over such matters. A foreign (non-U.S.) court judgment, decree, or order will not constitute a Domestic Relations Order. However, a Domestic Relations Order will not affect a Participant's benefits unless it is determined to be a Qualified Domestic Relations Order.

2. **NOTIFY THE AFFECTED PARTIES THAT A DOMESTIC RELATIONS ORDER HAS BEEN RECEIVED.** If the Administrator determines that the court judgment, decree, or order that the Plan has received is a Domestic Relations Order, then the Administrator must promptly notify the Participant and each Alternate Payee of the receipt of such Domestic Relations Order. The Administrator must also promptly supply the Participant and each Alternate Payee with a copy of this Policy, for determining whether the Domestic Relations Order is a Qualified Domestic Relations Order.

3. **DETERMINE IF THE DOMESTIC RELATIONS ORDER IS ALSO A QUALIFIED DOMESTIC RELATIONS ORDER.** A Domestic Relations Order will only affect a Participant's benefits if the Administrator determines it is a Qualified Domestic Relations Order as defined in the Definition section of this policy, subject to the following provisions:

   (a) **ADMINISTRATOR MAY SUPPLEMENT A DOMESTIC RELATIONS ORDER WITH FACTUAL IDENTIFYING INFORMATION.** If a Domestic Relations Order fails to specify factual identifying information that is easily obtainable by the Administrator, then the Administrator will supplement the Domestic Relations Order with the appropriate identifying information rather than rejecting the Domestic Relations Order as not being a QDRO. For instance, a Domestic Relations Order will not fail to be Qualified Domestic Relations Order if the Domestic Relations Order misstates/misspells the Plan's name or the names of a Participant or Alternate Payees (and the Administrator can clearly determine the correct names), or a Domestic Relations Order omits the addresses of the Participant and/or the Alternate Payees (and the Administrator's records include this information).

   (b) **ADMINISTRATOR MAY MAKE PRELIMINARY REVIEW AND POSTPONE FINAL DETERMINATION.** The Administrator may establish a process for providing preliminary or interim review of a Domestic Relations Order, and for postponing a final determination whether a Domestic Relations Order is a QDRO for a limited period, to permit a prospective Alternate Payee to correct defects prior to or within the Eighteen-Month Period.

   (c) **ADMINISTRATOR MAY SUBMIT QUESTION TO COURT.** If the Administrator is unable to reach a determination whether the Domestic Relations Order constitutes a QDRO (with the advice of counsel), then the Administrator will submit the question to a court of competent jurisdiction for a determination whether the Domestic Relations Order is a QDRO.

4. **NOTIFY AFFECTED PARTIES.** The Administrator will promptly notify the Participant and each Alternate Payee of the determination as to whether the Domestic Relations Order constitutes a QDRO. The notice of the Administrator's determination should be written in a manner that can be easily understood by the parties. If the Administrator rejects the Domestic Relations Order as a QDRO, then the rejection notice will provide (a) the reasons why the Domestic Relations Order is not a QDRO; (b) references to the Plan provisions upon which the Administrator's determination is based; (c) an explanation of any time limits that apply to rights available to the parties under the Plan (such as the duration of any protective actions that the Administrator will take); and (d) a description of any additional material, information, or modifications necessary for the Domestic Relations Order to constitute a QDRO and an explanation of why such material, information, or modifications are necessary.

- 3 -

PHX 331137249v4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000081

### INTERIM PROCEDURES FOR PARTICIPANTS IN PAY STATUS

Regarding any Participant whose benefits are in pay status during any period in which a determination is being made whether a Domestic Relations Order constitutes a QDRO (either by the Administrator or a court of competent jurisdiction), the Administrator will separately account for the Segregated Amounts which would otherwise be payable to the Alternate Payee during the determination period (as if the Domestic Relations Order had been found to constitute a QDRO). Furthermore, the Administrator will take steps to ensure that the Segregated Amounts that would be payable to the Alternate Payee are not distributed to the Participant or any other person.

### DISTRIBUTION

**WITHIN AND AFTER THE EIGHTEEN-MONTH PERIOD.** If it is determined that a Domestic Relations Order constitutes a QDRO within the Eighteen-Month Period, the Administrator will pay the Segregated Amounts to the entitled Alternate Payee. The distribution of the Segregated Amounts may be made in one lump sum payment (even if the Plan does not permit any lump sum distributions, so long as the lump sum distribution of the Segregated Amounts is made in accordance with the QDRO). However, if (a) it is determined that a Domestic Relations Order does not constitute a QDRO within the Eighteen-Month Period, or the issue as to whether the Domestic Relations Order is a QDRO has not been resolved by the end of the Eighteen-Month Period, and (b) the Participant (or such other person) is entitled to a distribution from the Plan, the Administrator will pay the Segregated Amounts to the Participant (or such other person) who would have been entitled to the distribution of the Segregated Amounts (if there had not been a Domestic Relations Order). Distribution of the Segregated Amounts may be made in one lump sum payment at the election of the Participant (or such other person) even if the Plan does not permit lump sum distributions. If it is later determined that the Domestic Relations Order constitutes a QDRO after the Eighteen-Month Period, the QDRO will only be applied on a prospective basis and the Alternate Payee will not be entitled to any Segregated Amounts.

*PHX 331137249v4*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000082

# Exhibit 27

DOL 0062336

Confidential

CW-RVR_00040903



**CHARTWELL CAPITAL SOLUTIONS**

Corporate Finance | Strategic Advisory | Valuation Services

# Project Byway

Presentation to Reliance Trust Company as Trustee of the to be formed ESOP

STRICTLY PRIVATE & CONFIDENTIAL
APRIL 21, 2014

DOL 0062337

Confidential

# Notice to Recipient

*These materials have been prepared by CCS Transactions, LLC (also known as "Chartwell") for a Chartwell client or potential client to whom materials are directly addressed and delivered (the "Company") in connection with an actual or potential engagement, and may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Chartwell.  These materials are based on information which Chartwell considers to be reliable. Chartwell assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company, other potential transaction participants or obtained from public sources, Chartwell has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management (or, with respect to estimates and forecasts obtained from public sources, represent reasonable estimates).  No representation or warranty, express or implied, is made as to the accuracy or completeness of such information; and nothing contained herein is, or may be relied upon as, a representation, whether as to the past, the present, or the future.*

*These materials were designed for use by specific persons familiar with the business and affairs of the Company and are being furnished and should be considered only in connection with other information, oral or written, being provided by Chartwell in connection herewith. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter.  These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Chartwell (or any affiliate) to provide or arrange any financing for any transaction or to purchase any security in connection therewith.  Chartwell assumes no obligation to update or otherwise revise these materials.  These materials have not been prepared with a view toward public disclosure under state or federal securities laws or otherwise, are intended for the benefit and use of the Company, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Chartwell.  All materials herein are copyright protected.  Upon the request of Chartwell, these materials, and any distributed copies thereof, are to be returned to Chartwell.*

*Chartwell and its affiliates do not provide tax advice.  Accordingly, any statements contained herein as to tax matters were neither written nor intended by Chartwell or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer.  Tax treatment is subject to change by law in the future and may have retroactive effect.  You are strongly urged to consult with your tax advisors regarding any potential strategy, investment, or transaction.  All securities affected and offered through Chartwell affiliate CCS Transactions, LLC, a FINRA member.*

CW-RVR_00040904

DOL 0062338

Confidential

# Table of Contents

I.   Executive Overview

II.  Pro Forma ESOP Equity Valuation

III. Pro Forma Transaction Structure

IV.  Next Steps – Schedule to Closing

Appendix: Comparable Public Company Descriptions

CW-RVR_00040905

**CHARTWELL CAPITAL SOLUTIONS**
**Corporate Finance | Strategic Advisory | Valuation Services**
Page **3**

DOL 0062339

Confidential

# I. Executive Overview

CW-RVR_00040906

DOL 0062340

Confidential

# Executive Overview of the ESOP Transaction

| | |
|---|---|
| **Role of Chartwell** | ▪ Chartwell Capital Solutions, LLC ("Chartwell") has been retained by RVR, Inc. ("Cruise America", "Byway", and/or the "Company"), to advise on the sale of all of the outstanding stock of Byway to a newly formed Employee Stock Ownership Plan (the "ESOP Transaction") |

| | |
|---|---|
| **Purpose of this Presentation** | ▪ The purpose of this presentation is to provide Reliance Trust Company, the Trustee of the to be formed Byway Employee Stock Ownership Plan (the "Trustee"), and the Trustee's advisors the following information regarding the ESOP Transaction: |

- The rationale for establishing the ESOP and pursuing this transaction

- An analysis of the valuation methodologies supporting the equity offer price

- Details on the ESOP Transaction structure

- Pro forma capital structure and form of consideration

- Terms of the Sellers' retained (reinvested) capital

- The intent to establish a Stock Appreciation Rights (SARs) program for key management

- A schedule and timeline of action items to be completed by the targeted closing date of May 27, 2014

CW-RVR_00040907

**CHARTWELL CAPITAL SOLUTIONS**
**Corporate Finance | Strategic Advisory | Valuation Services**

DOL 0062341

Confidential

# Key Highlights of the ESOP Transaction

**Proposed Transaction Summary**

- The Shareholders are pursuing a 100% sale of their equity interests in the existing C-Corporation company, RVR, Inc. and its subsidiaries to provide liquidity to Shareholders and create a meaningful retirement benefit for employees
- The actual ESOP Transaction structure (e.g., direct ESOP purchase and 1042 election) is further detailed in Section III herein
- The ESOP Transaction will be "levered", and shares will be released over time as governed by the terms of the ESOP loan
- Senior financing in the form of a revolver and short-term bridge loan will be utilized to fund the Company's loan to the ESOP, and the sellers will transact directly with the ESOP; immediately after the equity sale, sellers will loan a portion of their proceeds back to the Company in the form of sellers notes with detachable warrants
  - The Company will utilize the seller note funds to repay the short-term bridge loan
- Stock Appreciation Rights ("SARs") will be made available to key management subject to the Board of Directors' determination as appropriate (as further detailed herein)
- Management and its advisors are taking the necessary steps to fully comply with all ERISA and IRC tax laws

**Transaction Motivation**

- The Transaction is motivated by the following key objectives:
  - Establish a sustainable ESOP benefit plan that provides a meaningful benefit to the employees
  - Provide liquidity to the selling Shareholders, while maintaining company independence and creating a lasting legacy
  - Create a tax benefit for the Company
  - Create a stock appreciation rights (SARs) plan to further incentivize management

CW-RVR_00040908

DOL 0062342

Confidential

# II. Pro Forma ESOP Equity Valuation

CW-RVR_00040909

DOL 0062343

Confidential

# Historical and Projected Financial Summary (Does Not Reflect the Proposed Transaction)

*For bank underwriting, cash flow modeling, and valuation purposes, the Byway team used conservative and achievable projections provided by Management*

| | | Actual 2013 | Jan. - May 2014 | Jun. - Dec. 2014 | Full Year 2014 | 2015 | 2016 | 2017 | 2018 | Projected 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement Metrics** | Total Revenue | $91,761 | $22,685 | $72,351 | $95,036 | $96,354 | $98,217 | $100,102 | $102,010 | $103,940 | $105,894 | $107,871 | $109,872 | $111,898 |
| | *% Growth* | *3.8%* | *NA* | *NA* | *3.6%* | *1.4%* | *1.9%* | *1.9%* | *1.9%* | *1.9%* | *1.9%* | *1.9%* | *1.9%* | *1.8%* |
| | Gross Profit | 44,111 | 4,645 | 40,449 | 45,094 | 45,749 | 46,834 | 47,934 | 49,051 | 50,184 | 51,334 | 52,499 | 53,682 | 54,883 |
| | *% Margin* | *48.1%* | *20.5%* | *55.9%* | *47.4%* | *47.5%* | *47.7%* | *47.9%* | *48.1%* | *48.3%* | *48.5%* | *48.7%* | *48.9%* | *49.0%* |
| | Operating Expenses | 30,765 | 12,507 | 23,445 | 35,952 | 36,564 | 37,190 | 37,827 | 38,477 | 39,141 | 39,817 | 40,507 | 41,211 | 41,929 |
| | *% of Total Revenue* | *33.5%* | *55.1%* | *32.4%* | *37.8%* | *37.9%* | *37.9%* | *37.8%* | *37.7%* | *37.7%* | *37.6%* | *37.6%* | *37.5%* | *37.5%* |
| | **EBITDA** | **32,539** | **(906)** | **33,966** | **33,060** | **33,381** | **33,951** | **34,525** | **35,103** | **35,683** | **36,268** | **36,854** | **37,444** | **38,038** |
| | *% Margin* | *35.5%* | *-4.0%* | *46.9%* | *34.8%* | *34.6%* | *34.6%* | *34.5%* | *34.4%* | *34.3%* | *34.2%* | *34.2%* | *34.1%* | *34.0%* |
| | **EBIT** | 13,653 | (7,862) | 21,868 | 14,006 | 14,049 | 14,508 | 14,971 | 15,438 | 15,907 | 16,381 | 16,856 | 17,335 | 17,818 |
| | *% Margin* | *14.9%* | *-34.7%* | *30.2%* | *14.7%* | *14.6%* | *14.8%* | *15.0%* | *15.1%* | *15.3%* | *15.5%* | *15.6%* | *15.8%* | *15.9%* |
| **Cash Flow Items** | Depreciation & Amortization | 18,886 | 6,956 | 12,148 | 19,104 | 19,382 | 19,493 | 19,604 | 19,715 | 19,776 | 19,887 | 19,998 | 20,109 | 20,220 |
| | Capital Expenditures | 33,338 | 25,050 | 8,350 | 33,400 | 30,400 | 31,400 | 32,400 | 33,400 | 34,400 | 35,400 | 36,400 | 37,400 | 38,400 |
| | Change in Net Working Capital | (652) | 9,851 | (9,734) | 117 | 122 | 122 | 126 | 127 | 131 | 133 | 136 | 138 | 140 |

$ in thousands

- The majority of the Company's rental revenue is generated in the summer months, from May through October

- As a result of this seasonality, Byway typically experiences losses from November through March, as illustrated in the year-to-date projection above

CW-RVR_00040910

Confidential

# Standard of Value – ESOP Equity Valuations

| Two Regulatory Agencies |
| --- |

**Internal Revenue Service**

- Revenue Ruling 59-60 and Internal Revenue Manual §4.72.8.4

- IRS Standard of Value is Fair Market Value (FMV)

**Department of Labor (DOL)**

- DOL Standard of Value is adequate consideration (generally FMV determined in good faith)

- Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i))

- The term **"fair market value"** is defined as the price at which an asset would change hands under the following conditions:

   - **Between a willing buyer and willing seller**, when neither party is under any compulsion to buy or sell

   - Both parties are able and willing to trade and are **well informed** about the asset and the market for the asset

| Factors to Consider in Estimating Fair Market Value |
| --- |

- Nature of the business and history of the business enterprise

- General economic outlook and the specific industry condition and outlook

- Book value of the stock and the financial condition of the Company

- Whether the enterprise has goodwill or other intangible value

- Earnings capacity of the Company

- Dividend-paying capacity **(Discounted Cash Flow Analysis, or "DCF")** of the Company

- Sales of stock and the size of the block to be valued **(Comparable M&A Transaction Analysis)**

- The market price of corporate common stocks for companies engaged in the same or similar lines of business **(Comparable Public Company Analysis)**

DOL 0062345

Confidential

# Valuation Fairness – "Fairness"

| **Absolute Fairness** | **Relative Fairness** |
|---|---|

### Absolute Fairness

- The ESOP may not pay more than fair market value for its stock

- Similarly, the ESOP must receive fair market value when selling shares

- Premiums or discounts are factored in based on type of transaction

### Relative Fairness

- The ESOP must receive terms that are fair in relation to the terms given to other investors

- Must consider what the ESOP is contributing and what it is receiving, relative to others

- Should address the risk as well as the return on the ESOP's investment

- Is the transaction structured on "market" terms

**CHARTWELL CAPITAL SOLUTIONS**
**Corporate Finance | Strategic Advisory | Valuation Services**
Page 10

DOL 0062346

Confidential

# Summary of ESOP Valuation Methodologies



CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 11

DOL 0062347

Confidential

## Summary of Comparable Public Company Methodology



- The Comparable Public Company Analysis technique estimates the value of a company by comparing it to similar public companies

  - Criteria or comparability in the selection of publicly traded companies include operational characteristics, growth patterns, earnings trends, markets served, and risk characteristics

  - Each potential comparable company should be within a reasonable range of the Company's characteristics to make comparisons relevant

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services

Confidential

# Comparable Public Company Analysis Summary

*While there are no relevant domestic publicly traded RV rental companies useful for comparison to Byway, companies renting other vehicles may be used for comparison*

- Chartwell identified four publicly traded companies operating in the (car, truck, and RV) rental industry that we considered to be comparable to Byway

| Company | Enterprise Value | Equity Value | Revenue | | EBIT | | EBITDA | | Revenue Growth | | EBITDA Margin | | EV / Revenue | | EV / EBITDA | | EV / EBIT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 |
| *Car Rental* | | | | | | | | | | | | | | | | | | |
| Hertz Global Holdings, Inc. | 27,988 | 12,253 | 10,772 | 11,428 | 1,549 | 1,859 | 1,876 | 2,205 | 13.4% | 6.1% | 17.4% | 19.3% | 2.60x | 2.45x | 14.92x | 12.69x | 18.07x | 15.05x |
| Avis Budget Group, Inc. | 15,559 | 5,520 | 7,937 | 8,393 | 881 | 1,259 | 997 | 875 | 6.9% | 5.7% | 12.6% | 10.4% | 1.96x | 1.85x | 15.61x | 17.79x | 17.66x | 12.36x |
| **Average** | **21,774** | **8,887** | **9,354** | **9,910** | **1,215** | **1,559** | **1,437** | **1,540** | **10.2%** | **5.9%** | **15.0%** | **14.9%** | **2.28x** | **2.15x** | **15.3x** | **15.2x** | **17.9x** | **13.7x** |
| *Truck & RV Rental* | | | | | | | | | | | | | | | | | | |
| Ryder System, Inc. | 8,404 | 4,276 | 6,419 | 6,745 | 513 | 589 | 1,462 | 1,572 | 2.2% | 5.1% | 22.8% | 23.3% | 1.31x | 1.25x | 5.75x | 5.35x | 16.39x | 14.28x |
| AMERCO | 5,981 | 4,836 | 2,789 | 2,960 | 620 | 690 | 846 | 965 | 9.0% | 6.1% | 30.3% | 32.6% | 2.14x | 2.02x | 7.07x | 6.20x | 9.64x | 8.66x |
| Tourism Holdings Limited | 194 | 110 | 188 | NA | 14 | NA | 46 | NA | 9.7% | NA | 24.6% | NA | 1.03x | NA | 4.18x | NA | 14.28x | NA |
| **Average** | **4,860** | **3,074** | **3,132** | **4,853** | **382** | **639** | **785** | **1,268** | **6.9%** | **5.6%** | **25.9%** | **28.0%** | **1.49x** | **1.63x** | **5.7x** | **5.8x** | **13.4x** | **11.5x** |
| Project Byway | | | 92 | 95 | 14 | 7 | 33 | 26 | 3.8% | 3.6% | 35.5% | 27.5% | | | | | | |

- RV rental company Canadream Corp, which is one Byway's Canadian competitors, is publicly traded on the Toronto Stock Exchange but was considered to be too small and too thinly traded to serve as a basis for comparison to Byway

  - Canadream's LTM revenue as of January 31, 2014 was $25.9 million

  - As of April 16, 2014 Canadream was trading at an EV/LTM EBITDA multiple of 10.4x

- Byway is more profitable than both the car rental companies and the truck and RV rental companies, with EBITDA margins of 30.0% to 35.0%

- In terms of growth, profitability, and operations Byway is more comparable to the truck and RV rental companies than the car rental companies

$ in millions
Source: CapitalIQ; as of 04/16/2014

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

CW-RVR_00040915

Confidential

# Public Company Valuation Considerations

▪ Based on a review of profitability, growth, and operational characteristics, Chartwell determined the truck and RV rental companies, Ryder System, AMERCO (U-Haul), and Tourism Holdings Limited were more comparable to Byway than the car rental companies, Hertz and Avis Budget

▪ Chartwell applied revenue, EBITDA, and EBIT multiples from the truck rental companies to Byway's 2013 EBITDA, after making adjustments for a 20% control premium and a 5% size discount

▪ Based on 2013 revenue, EBITDA, and EBIT, Byway's indicated enterprise value range was $147.2 million to $226.5 million, or approximately 4.5x to 7.0x 2013 EBITDA

| Relevant Financial Measures | | Selected Multiple Range | | | Indicated Enterprise Value Range | | |
|---|---|---|---|---|---|---|---|
| **Comparable Revenue Multiple** | | | 1.49x | | | | |
| *Plus: 20% Control Premium* | | | 0.30x | | | | |
| *Less: 5% Size Discount* | | | -0.09x | | | | |
| **2013 Revenue** | 91,761 | 1.60x | 1.70x | 1.80x | 147,188 | 156,365 | 165,541 |
| **Comparable EBITDA Multiple** | | | 5.67x | | | | |
| *Plus: 20% Control Premium* | | | 1.13x | | | | |
| *Less: 5% Size Discount* | | | -0.34x | | | | |
| **2013 EBITDA** | 32,539 | 5.96x | 6.46x | 6.96x | 193,970 | 210,240 | 226,509 |
| **Comparable EBIT Multiple** | | | 13.44x | | | | |
| *Plus: 20% Control Premium* | | | 2.69x | | | | |
| *Less: 5% Size Discount* | | | -0.81x | | | | |
| **2013 EBIT** | 13,653 | 14.82x | 15.32x | 15.82x | 202,283 | 209,109 | 215,936 |
| **Pro Forma Enterprise Value Range** | | | | | $147,200 | to | $226,500 |
| *Implied 2013 EBITDA Multiple* | | | | | 4.52x | to | 6.96x |

$ in millions

CW-RVR_00040916

DOL 0062350

Confidential

# Summary of Comparable M&A Transaction Methodology



- ▪ The primary focus of the Comparable M&A Transaction Analysis is to examine the transaction prices found in mergers and acquisitions of companies similar to Byway

- ▪ When searching for relevant transactions to Byway, Chartwell used the following criteria:

    - • Transactions in the U.S. and Canada

    - • Sales of majority interest in the identified company that have occurred since Budget acquired Byway in 1998

    - • Companies manufacturing, renting, or selling recreational vehicles or motor homes

    - • Transactions with publicly disclosed financial information

Confidential

# Comparable M&A Analysis Summary

*In our analysis, Chartwell identified 18 transactions since 1998 with disclosed financial details that involved companies in related lines of business to Byway*

- The most relevant comparable transactions for Project Byway are transactions involving the subject company, highlighted in the table below

- Of the 18 identified transactions, only five provided sufficient information on which to base an analysis

| Date | Acquirer Name | Target Name | Target Description | Transaction Enterprise Value | EV Multiples | | |
|---|---|---|---|---|---|---|---|
| | | | | | Revenue | EBITDA | EBIT |
| 07/15/13 | Avis Budget Group, Inc. | Payless Car Rental System | Car rental services | $50 | 0.6x | NA | NA |
| 03/14/13 | Avis Budget Group | Zipcar | Car sharing network | 561 | 2.0x | 12.1x | *91.9x |
| 11/16/12 | Hertz Global Holdings | Dollar Thrifty Automotive Group | Car rental services | 3,609 | 2.3x | 9.1x | 9.5x |
| 09/03/12 | Tourism Holdings | KEA Campers (New Zealand) | Rents and sells camper vans and motor homes | 55 | NA | NA | NA |
| 09/01/11 | The Hertz Corporation | Donlen Corporation | Fleet leasing services | 947 | 2.7x | NA | NA |
| 04/01/11 | Lazy Days' R.V. Center | Beaudry RV Company | New and used RV dealer in the Southwest | 10 | NA | NA | NA |
| 12/31/10 | Tourism Holdings | JJ Motorcars | Rents and sells motor homes | 16 | NA | NA | NA |
| 07/17/09 | American Industrial Partners | Fleetwood Enterprises, Motor Home Bus. | Motor home manufacturing and service facilities | 52 | NA | NA | NA |
| 04/08/09 | Hertz Global Holdings | Southwest Tex Leasing | Car rental services | 33 | 0.2x | NA | NA |
| 12/26/08 | Forest River | Coachmen Industries Subsidiary | Manufacturer and marketer of RVs | 41 | NA | NA | NA |
| 11/18/05 | Monaco Coach | R-Vision | Manufactures and sells RVs | 60 | NA | NA | NA |
| 05/14/04 | Bruckmann, Rosser, Sherrill & Co. | Lazy Days' R.V. Center | New and used RV dealer | 206 | NA | NA | NA |
| 09/02/03 | Thor Industries | Thor Motor Coach | Manufactures and sells motor homes | 46 | 0.2x | NA | NA |
| 11/09/01 | Thor Industries | Keystone RV Company | Manufactures towable RVs | 217 | 0.6x | 8.3x | 8.5x |
| 08/06/01 | Monaco Coach | SMC Corporation | Manufactures Class A and C motor coaches | 33 | 0.2x | NA | NA |
| **10/26/00** | **Management group** | **Cruise America** | **Rents and sells motor homes** | **131** | **3.8x*** | **19.3x*** | **37.3*** |
| 11/11/99 | Holiday RV Superstores | County Line Select Cars and RVs | Chain of RV dealerships in Florida | 19 | 0.3x | 7.4x | 7.7x |
| **01/28/98** | **Budget Group** | **Cruise America** | **Rents and sells motor homes** | **133** | **1.2x** | **5.0x** | **10.9x** |
| | | | Average | 345 | 1.0x | 8.4x | 9.2x |
| | | | Median | 53 | 0.6x | 8.3x | 9.0x |

$ in millions
Source: CapitalIQ
*Denotes an outlier multiple; not included in the average and median calculations

CW-RVR_00040918

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 16

DOL 0062352

Confidential

# Comparable M&A Valuation Considerations

- Chartwell applied the median EBITDA multiple from the five identified, comparable transactions to Byway's 2013 EBITDA , after making adjustments to remove strategic premiums of 25.0%

- Based on 2013 EBITDA, Byway's indicated enterprise value range was $179.0 million to $212.0 million, or approximately 5.5x to 6.5x 2013 EBITDA

| Relevant Financial Measures | | Selected Multiple Range | | | Indicated Enterprise Value Range | | |
|---|---|---|---|---|---|---|---|
| Comparable EBITDA Multiple | | | 8.00x | | | | |
| Less: 25% Strategic Premium | | | -2.00x | | | | |
| LTM Adjusted EBITDA | 32,539 | 5.50x | 6.00x | 6.50x | 178,965 | 195,234 | 211,504 |
| Indicated Enterprise Value Range | | | | | $179,000 | to | $212,000 |
| Implied 2013 EBITDA Multiple | | | | | 5.50x | to | 6.52x |

$ in millions

CW-RVR_00040919

DOL 0062353

Confidential

# Summary of Discounted Cash Flow ("DCF") Methodology



- The Discounted Cash Flow Analysis values a company based on the present value of its expected future cash flows plus a terminal value, assuming a sale of the company in the last year of projected cash flows

- The application of the Discounted Cash Flow Method is meaningful with respect to the valuation of the Company

  - Byway is an operating entity that will have a value beyond the projected five-year cash flow

  - In our DCF analysis, Chartwell adjusted projected cash flows to reflect a normalized level of capital expenditures, which is more in line with historical investments in revenue-earning vehicles

CW-RVR_00040920

DOL 0062354

Confidential

# Adjustment to Reflect Normalized Capital Expenditures

*Due to the variable and flexible nature of the Company's capital expenditure requirements, it is important to analyze the Company's enterprise value based on a normalized, historical analysis*

- The average annual capex investment, based on the subsequent 12 months' revenue, was 27.0% for the years 2006 to 2013
  - Comparing capex to next year's revenue is relevant due to the Company's ability to accurately determine necessary investment levels given projected revenue
- In the projection created by management, capex averaged 30.0% of next year's revenue from 2014 to 2018, or an average annual expenditure of $32.2 million

| | Historical | | | | | | | | Projected | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Total Sales (Pre-Insurance Adjustment) | $77,666 | $89,477 | $89,613 | $77,635 | $86,572 | $90,218 | $95,507 | $99,211 | $102,480 | $103,789 | $105,642 | $107,515 | $109,408 |
| Historical & Projected Capex | 26,796 | 33,479 | 8,691 | 17,134 | 26,918 | 24,953 | 28,854 | 33,338 | 33,400 | 30,400 | 31,400 | 32,400 | 33,400 |
| Capex - Vehicles | 26,515 | 33,238 | 8,603 | 17,039 | 26,659 | 24,574 | 28,365 | 28,794 | 33,000 | 30,000 | 31,000 | 32,000 | 33,000 |
| Total Capex % of Current Year Total Sales | 34.5% | 37.4% | 9.7% | 22.1% | 31.1% | 27.7% | 30.2% | 33.6% | 32.6% | 29.3% | 29.7% | 30.1% | 30.5% |
| Total Capex % of NTM Total Sales | 29.9% | 37.4% | 11.2% | 19.8% | 29.8% | 26.1% | 29.1% | 32.5% | 32.2% | 28.8% | 29.2% | 29.6% | 30.0% |
| Average Total Capex % of Current Year Total Sales (Actual 2006 through 2013) | | | | | | | | 28.3% | | | | | |
| Average Total Capex % of NTM Total Sales (Actual 2006 through 2013) | | | | | | | | 27.0% | | | | | |
| Average Total Capex % of Current Year Total Sales (Projected 2014 through 2018) | | | | | | | | | | | | | 30.5% |
| Average Total Capex % of NTM Total Sales (Projected 2014 to 2018) | | | | | | | | | | | | | 30.0% |
| **Normalized Projected Total Capex at 27.0% of NTM Total Sales** | | | | | | | | | $28,006 | $28,506 | $29,012 | $29,523 | $30,039 |
| *Variance* | | | | | | | | | ($5,394) | ($1,894) | ($2,388) | ($2,877) | ($3,361) |

*These adjusted capital expenditure projections are used for valuation purposes only*

$ in thousands

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 19

# Discounted Cash Flow Analysis

- Chartwell utilized an estimated terminal EBITDA multiple range of 6.0x to 7.0x, based on a review of the publicly traded companies, and an estimated weighted average cost of capital (WACC) range of 9.5% to 11.5%

- For the DCF analysis, Chartwell adjusted projected capital expenditures to 27.0% of the next fiscal year's net revenues, based on historical averages for 2006 through 2013

- Based on the DCF methodology, the midpoint enterprise value indication for Byway was $173.5 million

| | Jun. - Dec. 2014 | Projected 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Adjusted EBIT | 21,868 | 14,049 | 14,508 | 14,971 | 15,438 |
| Income Taxes | (8,644) | (5,553) | (5,735) | (5,918) | (6,103) |
| Net Operating Profit After Tax | 13,224 | 8,496 | 8,773 | 9,053 | 9,335 |
| Depreciation & Amortization | 12,148 | 19,382 | 19,493 | 19,604 | 19,715 |
| Capital Expenditures (Normalized)[1] | (7,002) | (28,506) | (29,012) | (29,523) | (30,039) |
| Proceeds from Sale of Vehicles, Net of Gain[2] | 4,101 | 7,975 | 8,250 | 8,525 | 8,800 |
| Net Working Capital Change | (9,734) | 122 | 122 | 126 | 127 |
| Total Debt-Free Cash Flow | 12,737 | 7,468 | 7,626 | 7,786 | 7,938 |
| PV of Debt-Free Cash Flow at 10.5% | 12,117 | 6,429 | 5,942 | 5,489 | 5,065 |
| [a] Sum of PV: Period Cash Flow | 35,043 | | | | |

| Terminal Value | |
|---|---|
| Terminal EBITDA | 35,103 |
| Terminal Multiple | 6.5x |
| Terminal Value | 228,170 |
| [b] PV of Terminal Value at 10.5% | 138,499 |

| Enterprise Value Calculation | |
|---|---|
| [a] Sum of PV: Period Cash Flow | 35,043 |
| [b] PV of Terminal Value | 138,499 |
| Enterprise Value Indication | 173,542 |

| Distribution of Value | |
|---|---|
| Period Cash Flow | 20.2% |
| Terminal Cash Flow | 79.8% |
| Total | 100.0% |

|  | WACC Range | | |
|---|---|---|---|
|  | 11.5% | 10.5% | 9.5% |
| Terminal EBITDA Multiple Range 7.0x | 176,981 | 184,195 | 191,801 |
| 6.5x | 166,797 | 173,542 | 180,652 |
| 6.0x | 156,612 | 162,888 | 169,502 |

| Indicated Enterprise Value Range | $157,000 | to | $192,000 |
|---|---|---|---|

$ in thousands
1. Capex has been normalized throughout the period to reflect historical levels of spending
2. Does not include the impact of any contingent tax liabilities triggered upon asset dispositions

Confidential

# Seasonality of Financing

### The Company's debt balance varies significantly from month to month based on timing of vehicle purchases

- Byway typically places orders for new vehicles in the fall based on anticipated demand for the following fiscal year
- The Company takes delivery of the new vehicles from its supplier Thor Industries in the spring and pays for the vehicles upon delivery
- This timing allows the new vehicles to be in the Company's fleet in advance of the peak rental season, which begins in June
- The Company utilizes capacity in its revolving credit facility to finance these vehicle purchases
- Typically, the revolver balance is highest at the end of May, and the Company pays down its debt throughout the rest of the year using cash flows generated during its profitable months

**Historical Monthly Revolver Balance for Vehicle Financing[1]**



$ in millions
1. Most recent available 2014 balance sheet is dated 2/28/14; Management expects the revolver balance to be $59.0 million by the end of May 2014

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 21

CW-RVR_00040923

DOL 0062357

Confidential

# ESOP Equity Valuation Summary

*Based on the discounted cash flow analysis, comparable M&A analysis, and comparable public company analysis, Chartwell arrived at an enterprise value (assuming a credit for capex spent in the YTD period) for Project Byway of $170.0 million.*

*As highlighted on the prior page, the majority of capital expenditures are made each spring to support revenues throughout the Company's busy season (June through October). Because of this seasonality, the ESOP will receive the cash flows generated by investments made prior to its purchase of the Company. For this reason, Chartwell considers year-to-date capital expenditures to be an add-back to the equity purchase price.*

| Conclusion of Equity Value Summary | |
| --- | --- |
| **Byway** | **Value Reconciliation**<br>**Pro Forma**<br>**May 27, 2014** |
| | **Enterprise Value** |
| Discounted Cash Flow | $175,000 |
| Merger & Acquisition | $195,000 |
| Guideline Public Company | $185,000 |
| **Selected Enterprise Value (Assuming a Credit for Capex)** | **$170,000** |
| Add: Cash and Marketable Securities | 16,618 |
| Subtract: Interest Bearing Debt | (61,952) |
| Add: YTD Capex | 25,050 |
| Control Value From Operations | $149,716 |
| Add: Notes Receivable from Officers | 1,725 |
| Control Equity Value | $151,441 |
| Subtract: Discount for Lack of Marketability at 5% | (7,572) |
| **Fair Market Value of Equity (Rounded)** | **$143,900** |

$ in thousands

CW-RVR_00040924

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

DOL 0062358

Confidential

# III. Pro Forma Transaction Structure

CW-RVR_00040925

Confidential

# Pro Forma ESOP Transaction Assumptions

**ESOP Transaction Overview:**

- The ESOP will purchase all outstanding shares in the Company from the Shareholders

- Upon sale, the Shareholders will elect 1042 to defer capital gains taxes

- The Company will elect S-Corp status immediately post-closing

- Following a bridge loan structure, the Shareholders will receive notes of $133.6 million and warrants, as well as $8.6 million in cash at closing

**Pro Forma ESOP Transaction Value:**

- Equity purchase price of $143.9 million

- Total pro forma transaction value is assumed to be $205.0 million, including refinancing of existing debt and transaction costs and financing fees

**Equity Allocation and Time Horizon:**

- 32.49% of equity value attributable to seller note warrants and 17.49% allocation to Stock Appreciation Rights (SARs)

- Levered ESOP note ("Internal Loan") amounting to $143.9 million (less an amount contributed – half in cash pre-closing and half in principal forgiveness – to the ESOP equal to 50% of the qualified compensation for the period of January 1, 2014, through the closing date), with a 40-year amortization and bearing interest at a 3.75% rate (or the then current applicable AFR)

DOL 0062360

Confidential

# Pro Forma Transaction Funding Sources

***The Company will use the following funding sources to finance the transaction:***

- Excess Balance Sheet Cash of $4.0 million

    - Pro forma balance sheet cash at the date of the transaction is $16.6 million, of which only $4.0 million will be used

- Revolving Credit Facility of $75.0 million, $67.3 million drawn at close

- Bridge Term Loan of $133.6 million

- Seller Notes of $133.6 million, loaned to the Company post-equity sale and used by the Company to repay the Bridge Term Loan

CW-RVR_00040927

Confidential

# Levered 100% C-Corp ESOP Transaction Pro Forma Illustration

*For illustration purposes, below is the proposed capital structure to finance the ESOP transaction*

### 2014 Transaction Sources and Uses

**Sources**

*Scenario: 100% S-Corp ESOP*

| Detail | Amount | % | EBITDA Multiples[1] 2013 | 2014 |
|---|---|---|---|---|
| Excess Cash on Hand | $4,000 | 2.0% | 0.12x | 0.12x |
| Revolving Credit Facility | 67,342 | 32.9% | 2.07x | 2.04x |
| Bridge Term Loan/Seller Notes | 133,625 | 65.2% | 4.11x | 4.04x |
| **Total Transaction Sources** | **$204,967** | **100.0%** | **6.30x** | **6.20x** |

**Uses**

| Detail | Amount | % |
|---|---|---|
| Equity Sale | $143,900 | 70.2% |
| Refinance Existing Debt | 59,000 | 28.8% |
| Transaction Costs | 1,723 | 0.8% |
| Financing Fees | 344 | 0.2% |
| **Total Transaction Uses** | **$204,967** | **100.0%** |

$ in thousands

1. Based on 2013 and 2014 Adj. EBITDA of $32.5 million and $33.1 million, respectively

**Cash to Selling Shareholders**

| | |
|---|---|
| Equity Sale | $143,900 |
| Less: Note Payable (Robert) | (310) |
| Less: Note Payable (Randall) | (310) |
| Less: Notes Payable (Eric) | (1,105) |
| Less: Seller Notes | (133,625) |
| **Total Cash at Close** | **$8,550** |

CW-RVR_00040928

DOL 0062362

Confidential

# Preliminary Features of the Bank Financing – Revolving Credit Facilities

| Senior Revolving Credit Facilities | |
|---|---|
| **Issuer** | RVR, Inc. and Cruise America, Inc. as co-borrowers |
| **Amounts** | $75.0 million commitment to Cruise America, with $67.3 million drawn at closing |
| **Term** | 5 years from close |
| **Rate** | LIBOR + 200 bps; 4.13% fixed interest rate swap for 50% of funding at close |
| **Amortization** | Outstanding principal due at maturity |
| **Covenants** | Minimum cash flow leverage, minimum net profit before tax, excess cash flow recapture, minimum fixed charge coverage |
| **Collateral** | First priority security interest on all assets of the Company |
| **Interest Payments** | Monthly |
| **Prepayments** | No penalty |
| **Advance Rates** | 85% of net book value of eligible inventory (income earning vehicles) |
| **Repayment** | Annual free cash flow sweep of $3.0 million |
| **Upfront Fee** | 1% of incremental commitment |
| **Unused Commitment Fee** | 25 bps paid quarterly in arrears |

CW-RVR_00040929

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

DOL 0062363

Confidential

# Preliminary Features of the Bank Financing – Bridge Term Loan

| Bridge Term Loan |
|---|

| | |
|---|---|
| **Issuer** | RVR, Inc. and Cruise America, Inc. as co-borrowers |
| **Amounts** | $133.6 million |
| **Term** | 5 days from close |
| **Rate** | LIBOR + 100 bps |
| **Amortization** | Outstanding principal due at maturity |
| **Collateral** | First priority security interest on all assets of the Company |
| **Interest Payments** | Due at maturity |
| **Upfront Fee** | 7 bps (total fee of $94,000) |

CW-RVR_00040930

DOL 0062364

Confidential

# Preliminary Features of the Seller Notes

| Seller Notes | |
|---|---|
| **Issuer** | RVR, Inc. |
| **Amounts** | $133.6 million |
| **Term** | 15 years from close |
| **Rate** | 4.0% cash, 6.0% accrued |
| **Amortization** | None, bullet due at maturity |
| **Covenants/Governance** | Customary for facilities of this type |
| **Collateral** | Unsecured |
| **Interest Payments** | Interest will be payable quarterly in arrears on the last day of each quarter |
| **Prepayments** | Prepayments to be allowed in limited circumstances, with additional yield protection requirements TBD |
| **Detachable Warrants** | See following slides |
| **Excess Cash Flow** | None |

CW-RVR_0004093

DOL 0062365

Confidential

# Preliminary Features of the Warrants

| Detachable Warrants |
|---|
| **Issuer** — RVR, Inc. |
| **Amounts** — 32.49% of the fully diluted shares outstanding at close |
| **Expiration/Maturity** — 15 years from close |
| **Strike Price** — $4,000.00/share, but are expected to be out of the money at closing |
| **Call/Put Provision** — TBD, but contemplating provisions to protect the S-Corp election and tax efficient nature of the proposed structure |

CW-RVR_00040932

DOL 0062366

Confidential

# Stock Appreciation Rights – Equity Incentive to Key Management

| Stock Appreciation Rights (SARs) |
| --- |

- We have preliminarily modeled a SARs pool of 17.49% of the Company's equity

- Chartwell anticipates the SARs will be exercisable at intervals to be determined by the Board of Directors

- It is management's intent that the SARs will be an "evergreen" pool that will be available for new individuals that are brought into management positions

- This SARs pool is being modeled in addition to other compensation plans that may stay in place after the Transaction

- Other specifics regarding this SARs pool are being formulated and an update will be provided to the Trustee prior to closing

CW-RVR_0004093

DOL 0062367

Confidential

# ESOP Transaction Steps

*Below are the proposed transaction steps for the "one day" loan 100% S-Corp transaction with a 1042 election. These steps are described in detail on the following slides:*

**Day of Closing:**

1. Wells Fargo loans the Company funds via a short-term bridge loan

2. Wells Fargo also loans the Company funds via a revolver draw

3. The Company loans these funds from Wells Fargo to the ESOP Trust ("ESOT") via an Internal Loan

   - The Internal Loan will be equal to the equity price of $143.9 million, less an amount contributed – half in cash pre-closing and half in principal forgiveness – to the ESOP equal to 50% of the qualified compensation for the period of January 1, 2014, through the closing date

4. Using funds loaned from the Company, the ESOT purchases the shares from Sellers

**Day After Closing:**

5. The Sellers loan funds back to the Company via Seller Notes

6. Using these funds from the Seller Notes, the Company repays the bridge loan from Wells Fargo

CW-RVR_00040934

DOL 0062368

Confidential

## Post-Closing Summary

*Below is an illustration of the Company's relationship with Wells Fargo, the Sellers, and the ESOT after the ESOP transaction closes*



CW-RVR_00040935

| | |
|---|---|
| Movement of Funds | ⟶ |
| Debt | ⟶ |
| Movement of Shares | ⟶ |

CHARTWELL CAPITAL SOLUTIONS

**Corporate Finance   Strategic Advisory   Valuation Services**

33

DOL 0062369

Confidential

# Wells Fargo Provides the Company Two Loans: Bridge Loan and Revolver

| Step 1 (Day of Closing) – Bridge Loan | Description |
|---|---|
|  | Wells Fargo makes a bridge loan to the Company in the amount of the Seller Note ($133.6 million) |

$133.6 million cash

Debt: Bridge loan

| Step 2 (Day of Closing) – Revolver Loan | Description |
|---|---|
|  | Wells Fargo also loans the Company $67.3 million in the form of a revolver draw |
| | This credit facility is separate from the bridge loan and has a five-year maturity |

$67.3 million cash

Debt: Revolver

**Movement of Funds**
**Debt**
**Movement of Shares**

CHARTWELL CAPITAL SOLUTIONS



Corporate Finance   Strategic Advisory   Valuation Services

CW-RVR_00040936

Confidential

# Company Loans ESOT Funds



### Step 3 (Day of Closing)

**Company**

Promissory Note (Internal Loan)

$143.9 million (less previously discussed pre-closing contribution) cash from two loans:
1) $133.6 million from one-day loan
2) $10.3 million from revolver

**ESOT**

### Description

— Using the funds from the Wells Fargo bridge loan and the revolver, the Company loans $143.9 million (the equity purchase price) to the ESOT

 — The principal balance will be reduced by the previously discussed pre-closing contribution

— This loan becomes the Internal Loan between the ESOT and the Company and has a tenor of 40 years

### Step 4 (Day of Closing)

**Sellers**

$143.9 million cash purchase

shares

**ESOT**

### Description

• The ESOT uses cash received from Company to purchase shares directly from the Sellers

• By transacting directly with the ESOT, Sellers can elect 1042 to defer capital gains taxes

Movement of Funds
Debt
Movement of Shares

**CHARDWELL CAPITAL SOLUTIONS**
Corporate Finance   Strategic Advisory   Valuation Services
35

CW-RVR_0004093

Confidential

# Sellers Loan Funds Back to Company & Company Repays Bridge Loan

| Steps 5 & 6 (Day After Closing) | Description |
|---|---|



- Sellers loan $133.6 million of the proceeds back to the Company in the form of Seller Notes with a tenor of 15 years

- Company uses proceeds from the $133.6 million Seller Notes to pay back the bridge loan from Wells Fargo

Movement of Funds
Debt
Movement of Shares

CHARTWELL CAPITAL SOLUTIONS

**Corporate Finance   Strategic Advisory   Valuation Services**

36

Confidential

# Bridge Loan Summary: Flow of Funds

## Loan Summary



(d)
$133.6 million cash loan (Seller Note)

(e)
$133.6 million cash repayment of one-day loan

**Sellers**

Company

Wells Fargo

(a)
$133.6 million cash loan

(b) $133.6 cash loan (a portion of the total $143.9 million Internal Loan[1])

(c)
$133.6 million cash purchase of shares (a portion of the total $143.9 million total equity purchase price)

**ESOT**

## Description

A one-day loan structure is used to provide the ESOT with enough cash to purchase all shares directly from the Sellers and allow the Seller Note to exist between the Sellers and the Company (rather than with the ESOT):

**Day of Closing:**

a — Wells Fargo loans funds to the Company

b — The Company loans those funds to the ESOT in exchange for an Internal Loan[1]

c — The ESOT purchases shares directly from the Sellers in exchange for cash

**Day After Closing:**

d — The Sellers loan a portion of their cash proceeds back to the Company as a Seller Note

e — Using the Seller Note funds, the Company repays the one-day loan from Wells Fargo

After the one-day loan is repaid, the Company still owes Wells Fargo $67.3 million in the form of the revolver draw

---

Movement of Funds ⟶
Debt ⟶
Movement of Shares ⟶

(1) To be reduced by the previously discussed pre-closing contribution


**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance   Strategic Advisory   Valuation Services
37

DOL 0062373

Confidential

# IV. Next Steps – Schedule to Closing

CW-RVR_00040940

DOL 0062374

Confidential

# Next Steps

| | |
|---|---|
| April 21 | Chartwell to deliver term sheet presentation to ESOP Trustee, et al |
| May 5 | Trustee team provides formal response on price, terms and conditions<br>Company legal counsel to issue closing checklist and begin drafting legal documents |
| May 12 | Finalize negotiations with Trustee on price, terms, and conditions |
| May 19 | Finalize legal documentation |
| May 21 | Board of Directors approve final transaction, price, terms, and conditions |
| May 27 | Transaction closes |
| May 31 | Company makes S-Corp election |

CW-RVR_00040941

DOL 0062375

Confidential

# Project Timeline

| April 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 21 | 24 | 21 | 26 |
| 27 | 28 | 29 | 30 | | | |

| May 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

*Note: Bob and Randy on vacation 4/28 – 5/5; Eric on vacation 5/1 – 5/5*

- Milestone
- Weekends
- In-person meeting

| Estimated Dates | Process Steps | Roles/Attendees |
|---|---|---|
| Apr. 17th | ▫ Open data room to ESOP Trustee team | CCS |
| Apr. 21st | ▫ Chartwell to present proposed equity valuation and transaction structure, terms, and conditions to the ESOP Trustee team via conference call | CCS, MT, ET, ETC, TFA, CEC |
| | ▫ Wells Fargo to provide commitment letter | L |
| Apr. 23rd | ▫ Company counsel to provide initial thoughts on dealer licensing agreements | CEC |
| Apr. 25th | ▫ Identify leases that require landlord consent to change of control | CEC |
| May 2nd | ▫ Approach affected landlords | CEC |
| May 5th | ▫ ESOP Trustee responds to price, terms, and conditions with their counter proposal | ET, ETC, TFA |
| | ▫ Commencement of legal documentation | CEC, ETC, LC |
| | ▫ Initiate Wells Fargo diligence process and closing checklist | CCS, MT, L |
| May 12th | ▫ Finalize negotiations on price, terms, and conditions with ESOP Trustee | CCS, CEC, ET, ETC, TFA |
| May 15th | ▫ Shareholders meet with wealth advisor to discuss 1042 election | SH, SWA |
| May 19th | ▫ Finalize all legal documentation; complete ESOP Trustee and lender diligence | CEC, ETC, LC |
| May 21st | ▫ Receive consents to change of control from all affected landlords | CEC |
| | ▫ BOD approval of final transaction price, terms, and conditions | BOD |
| May 27th | ▫ Closing of the transaction | CCS, SH, MT, L, CEC, ETC, LC |
| | ▫ ESOP implementation and communications | |
| May 31st | ▫ Company makes S-Corp election | MT, CEC, ACC |

SH: Shareholders
BOD: Board of Directors
CCS: Chartwell Capital Solutions
MT: Management Team
TPA: ESOP Plan Administrator
CEC: Company ESOP Counsel (Greenburg Traurig)
ETC: ESOP Trustee Counsel

ET: ESOP Trustee
TFA: ESOP Trustee Financial Advisor
L: Lenders (Wells Fargo)
LC: Lender Counsel
SWA: Shareholders' Wealth Advisor
ACC: Company's Accounting & Tax Advisors

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 40

CW-RVR_00040942

DOL 0062376

Confidential

# Appendix: Comparable Public Company Descriptions

CW-RVR_00040943

DOL 0062377

Confidential

CW-RVR_00040944

# Hertz Global Holdings

## Hertz Global Holdings, Inc.                                                                                           NYSE:HTZ

### Business Description

Hertz Global Holdings, Inc., through its subsidiaries, is engaged in the car and equipment rental businesses worldwide. It operates through four segments: U.S. Car Rental, International Car Rental, Worldwide Equipment Rental, and All Other Operations. The company rents and leases various car models on an hourly, daily, weekend, weekly, monthly, or multi-month basis; crossovers; and light trucks under the Hertz, Dollar, Thrifty, and Firefly brands. The company was founded in 1918 and is headquartered in Park Ridge, New Jersey.

### Performance vs. S&P S00



| Financial Summary | FY 08A | FY 09A | FY 10A | FY 11A | FY 12A | FY 13A | Market Summary | 04/16/14 |
|---|---|---|---|---|---|---|---|---|
| **Financial Statement Summary:** | | | | | | | **Market Value:** | |
| Revenue | $8,051 | $7,198 | $7,682 | $8,479 | $9,496 | $10,772 | Closing Stock Price | $27.37 |
| Growth | NA | -10.6% | 6.7% | 10.4% | 12.0% | 13.4% | Shares Outstanding | 447.69 |
| EBIT | 670 | 483 | 873 | 1,175 | 1,308 | 1,549 | **Market Capitalization** | **$12,253** |
| Margin | 8.3% | 6.7% | 11.4% | 13.9% | 13.8% | 14.4% | Plus: Total Debt | 16318 |
| | | | | | | | Plus: Preferred Stock | NA |
| EBITDA | 904 | 711 | 1,090 | 1,412 | 1,583 | 1,876 | Plus: Minority Interest | NA |
| Margin | 11.2% | 9.9% | 14.2% | 16.7% | 16.7% | 17.4% | Less: Cash & Equivalents | -583 |
| NWC % of Revenue | -2.3% | -2.8% | -3.7% | -39.9% | -16.2% | 0.1% | **Enterprise Value** | **$27,988** |
| Capital Expenditures % of Revenue | 0.8% | 38.6% | 10.1% | 26.8% | 33.5% | 31.1% | | |
| **Capitalization Summary:** | | | | | | | **Market Performance:** | |
| Total Assets | 14,686 | 16,278 | 16,828 | 18,280 | 24,076 | 24,588 | 52 Week Return | 17.7% |
| Total Equity | 1,308 | 1,940 | 2,035 | 2,205 | 2,037 | 2,771 | 52 Week Volume | 8,696 |
| Debt/EBITDA | 10.7x | 14.6x | 9.9x | 8.1x | 10.3x | 8.7x | 52 Week High | $29.81 |
| Debt/Equity | 7.4x | 5.4x | 5.3x | 5.2x | 8.0x | 5.9x | 52 Week Low | $19.73 |
| Debt/Enterprise Value | 75.6% | 72.9% | 67.5% | 69.8% | 67.4% | 58.3% | Float | 99.08% |
| **Enterprise Value and Multiples:** | | | | | | | **Historical Levered Beta:** | |
| Enterprise Value | $11,801 | $13,506 | $15,418 | $16,628 | $23,786 | $29,308 | 1 Year Beta | 1.42 |
| Enterprise Value/Revenue | 1.47x | 1.88x | 2.01x | 1.96x | 2.50x | 2.72x | 2 Year Beta | 1.57 |
| Enterprise Value/EBITDA | 13.1x | 19.0x | 14.1x | 11.8x | 15.0x | 15.6x | 5 Year Beta | 2.89 |

$ and shares outstanding in millions

Confidential

# Avis Budget Group

## Avis Budget Group, Inc.                                                    NasdaqGS:CAR

### Business Description

Avis Budget Group, Inc., together with its subsidiaries, provides car and truck rentals, car sharing, and ancillary services to businesses and consumers worldwide. The company has three segments: North America, International, and Truck Rental. It operates the Avis car rental system, which supplies rental cars to the premium commercial and leisure segments of the travel industry; the Budget vehicle rental system, which serves the value-conscious segments of the industry; Zipcar, a membership-based car sharing network; and the Payless brand, as well as operates Apex brand primarily in the deep-value segment of the car rental industry. The company also operates local and one-way truck rental businesses Avis Budget Group, Inc. was founded in 1946 and is headquartered in Parsippany, New Jersey.

### Performance vs. S&P 500



| Financial Summary | FY 08A | FY 09A | FY 10A | FY 11A | FY 12A | FY 13A |
|---|---|---|---|---|---|---|
| **Financial Statement Summary:** | | | | | | |
| Revenue | $5,733 | $5,090 | $5,267 | $6,288 | $7,425 | $7,937 |
| Growth | NA | -11.2% | 3.5% | 19.4% | 18.1% | 6.9% |
| EBIT | 343 | 487 | 656 | 839 | 967 | 881 |
| Margin | 6.0% | 9.6% | 12.5% | 13.3% | 13.0% | 11.1% |
| EBITDA | 408 | 558 | 718 | 917 | 1,064 | 997 |
| Margin | 7.1% | 11.0% | 13.6% | 14.6% | 14.3% | 12.6% |
| NWC % of Revenue | -37.5% | -33.6% | -30.0% | -4.4% | -2.6% | -1.4% |
| Capital Expenditures % of Revenue | -5.1% | 0.0% | 37.4% | 25.4% | 24.4% | 20.7% |
| **Capitalization Summary:** | | | | | | |
| Total Assets | 10,255 | 10,257 | 11,040 | 14,187 | 16,557 | 16,284 |
| Total Equity | 44 | 226 | 438 | 435 | 694 | 771 |
| Debt/EBITDA | 16.7x | 12.1x | 10.6x | 10.6x | 10.2x | 10.8x |
| Debt/Equity | 154.6x | 29.9x | 17.4x | 22.4x | 15.6x | 13.9x |
| Debt/Enterprise Value | 88.2% | 90.0% | 94.6% | 102.0% | 89.2% | 69.0% |
| **Enterprise Value and Multiples:** | | | | | | |
| Enterprise Value | $7,657 | $7,235 | $7,990 | $9,731 | $12,113 | $15,765 |
| EV/Revenue | 1.34x | 1.42x | 1.52x | 1.55x | 1.63x | 1.99x |
| EV/EBITDA | 18.8x | 13.0x | 11.1x | 10.6x | 11.4x | 15.8x |

| Market Summary | 04/16/14 |
|---|---|
| **Market Value:** | |
| Closing Stock Price | $51.97 |
| Shares Outstanding | 106.22 |
| **Market Capitalization** | **$5,520** |
| Plus: Total Debt | 10732 |
| Plus: Preferred Stock | NA |
| Plus: Minority Interest | NA |
| Less: Cash & Equivalents | -693 |
| **Enterprise Value** | **$15,559** |
| **Market Performance:** | |
| 52 Week Return | 85.4% |
| 52 Week Volume | 1,829 |
| 52 Week High | $52.31 |
| 52 Week Low | $25.74 |
| Float | 77.98% |
| **Historical Beta:** | |
| 1 Year Beta | 2.03 |
| 2 Year Beta | 1.87 |
| 5 Year Beta | 4.48 |

$ and shares outstanding in millions

CHARTWELL CAPITAL SOLUTIONS
Corporate Finance | Strategic Advisory | Valuation Services
Page 43

Confidential

# Ryder System, Inc.

## Ryder System, Inc.                                                                                        NYSE:R

### Business Description

Ryder System, Inc. provides transportation and supply chain management solutions to small businesses and large enterprises worldwide. It operates in two segments, Fleet Management Solutions (FMS) and Supply Chain Solutions (SCS). The FMS segment provides vehicles, vehicle maintenance services, supplies, and related equipment for operation of the vehicles; commercial rental of vehicles on a short-term basis; contract maintenance services; contract-related maintenance services; access to diesel fuel, as well as fuel services, such as fuel planning, fuel tax reporting, centralized billing, fuel cards, and fuel monitoring services; and used vehicles. The SCS segment provides dedicated services, which comprise equipment, maintenance, and administrative services of a full service lease with drivers, as well as additional services. Ryder System, Inc. was founded in 1933 and is based in Miami, Florida.

### Performance vs. S&P 500



| Financial Summary | FY 08A | FY 09A | FY 10A | FY 11A | FY 12A | FY 13A | Market Summary | 04/16/14 |
|---|---|---|---|---|---|---|---|---|
| **Financial Statement Summary:** | | | | | | | **Market Value:** | |
| Revenue | $5,630 | $4,933 | $5,342 | $6,161 | $6,284 | $6,419 | Closing Stock Price | $80.60 |
| Growth | NA | -12.4% | 8.3% | 15.3% | 2.0% | 2.2% | Shares Outstanding | 53.06 |
| EBIT | 524 | 346 | 356 | 422 | 481 | 513 | **Market Capitalization** | **$4,276** |
| Margin | 9.3% | 7.0% | 6.7% | 6.9% | 7.6% | 8.0% | Plus: Total Debt | 4189 |
| | | | | | | | Plus: Preferred Stock | NA |
| EBITDA | 1,340 | 1,181 | 1,159 | 1,316 | 1,419 | 1,462 | Plus: Minority Interest | NA |
| Margin | 23.8% | 23.9% | 21.7% | 21.4% | 22.6% | 22.8% | Less: Cash & Equivalents | -62 |
| NWC % of Revenue | 1.9% | 1.0% | -0.4% | -2.8% | 1.2% | 0.5% | **Enterprise Value** | **$8,404** |
| Capital Expenditures % of Revenue | 17.4% | 7.8% | 17.7% | 25.0% | 26.4% | 26.4% | | |
| **Capitalization Summary:** | | | | | | | **Market Performance:** | |
| Total Assets | 6,570 | 6,263 | 6,982 | 8,149 | 8,392 | 9,104 | 52 Week Return | 40.3% |
| Total Equity | 1,328 | 1,408 | 1,440 | 1,371 | 1,491 | 1,897 | 52 Week Volume | 571 |
| Debt/EBITDA | 2.1x | 2.1x | 2.4x | 2.7x | 2.7x | 2.9x | 52 Week High | $82.46 |
| Debt/Equity | 2.1x | 1.7x | 2.0x | 2.6x | 2.6x | 2.2x | 52 Week Low | $52.58 |
| Debt/Enterprise Value | 68.8% | 51.5% | 54.4% | 61.6% | 56.6% | 49.8% | Float | 98.68% |
| **Enterprise Value and Multiples:** | | | | | | | **Historical Beta:** | |
| Enterprise Value | $4,325 | $4,463 | $5,144 | $5,978 | $6,853 | $7,842 | 1 Year Beta | 1.44 |
| EV/Revenue | 0.77x | 0.90x | 0.96x | 0.97x | 1.09x | 1.22x | 2 Year Beta | 1.62 |
| EV/EBITDA | 3.2x | 3.8x | 4.4x | 4.5x | 4.8x | 5.4x | 5 Year Beta | 1.54 |

$ and shares outstanding in millions

CW-RVR_00040946

Confidential

# Amerco (U-Haul)

## AMERCO                                                                    NasdaqGS:UHAL

### Business Description

AMERCO operates as a do-it-yourself moving and storage operator for household and commercial goods in the United States and Canada. Its Moving and Storage segment engages in the rental of trucks, trailers, portable storage boxes, specialty rental items, and self-storage spaces primarily to the household movers; and sale of moving supplies, towing accessories, and propane. This segment rents its trucks and trailers, as well as offers self-storage rooms through a network of approximately 1,490 company operated retail moving centers and 16,400 independent U-Haul dealers. The Property and Casualty Insurance segment provides loss adjusting and claims handling services, as well as underwrites moving and storage protection packages. AMERCO was founded in 1945 and is based in Reno, Nevada.

### Performance vs. S&P 500



| Financial Summary | FY 08A | FY 09A | FY 10A | FY 11A | FY 12A | FY 13A | Market Summary | 04/16/14 |
|---|---|---|---|---|---|---|---|---|
| **Financial Statement Summary:** | | | | | | | **Market Value:** | |
| Revenue | $1,992 | $2,002 | $2,251 | $2,512 | $2,559 | $2,789 | Closing Stock Price | $246.64 |
| Growth | NA | 0.5% | 12.5% | 11.6% | 1.9% | 9.0% | Shares Outstanding | 19.61 |
| EBIT | 121 | 194 | 378 | 416 | 499 | 620 | **Market Capitalization** | **$4,836** |
| Margin | 6.1% | 9.7% | 16.8% | 16.6% | 19.5% | 22.2% | Plus: Total Debt | 1898 |
| | | | | | | | Plus: Preferred Stock | -152 |
| EBITDA | 314 | 374 | 545 | 591 | 703 | 846 | Plus: Minority Interest | NA |
| Margin | 15.7% | 18.7% | 24.2% | 23.5% | 27.5% | 30.3% | Less: Cash & Equivalents | -602 |
| NWC % of Revenue | 21.0% | 20.9% | 17.2% | 17.5% | 9.8% | 6.9% | **Enterprise Value** | **$5,981** |
| Capital Expenditures % of Revenue | 19.9% | 13.0% | 21.3% | 23.5% | 25.6% | 33.1% | | |
| **Capitalization Summary:** | | | | | | | **Market Performance:** | |
| Total Assets | 3,825 | 3,762 | 4,191 | 4,654 | 5,307 | 5,874 | 52 Week Return | 57.7% |
| Total Equity | 718 | 813 | 993 | 1,036 | 1,229 | 1,494 | 52 Week Volume | 42 |
| Debt/EBITDA | 5.2x | 3.7x | 2.7x | 2.6x | 2.4x | 2.2x | 52 Week High | $247.72 |
| Debt/Equity | 2.3x | 1.7x | 1.5x | 1.5x | 1.4x | 1.3x | 52 Week Low | $150.24 |
| Debt/Enterprise Value | 81.0% | 58.9% | 49.0% | 51.8% | 42.2% | 31.7% | Float | 30.29% |
| **Enterprise Value and Multiples:** | | | | | | | **Historical Beta:** | |
| Enterprise Value | $1,906 | $2,242 | $2,972 | $3,050 | $4,388 | $5,647 | 1 Year Beta | 1.11 |
| EV/Revenue | 0.96x | 1.12x | 1.32x | 1.21x | 1.71x | 2.02x | 2 Year Beta | 1.27 |
| EV/EBITDA | 6.1x | 6.0x | 5.5x | 5.2x | 6.2x | 6.7x | 5 Year Beta | 1.47 |

$ and shares outstanding in millions

CW-RVR_00040947

DOL 0062381

Confidential

CW-RVR_00040948

# Tourism Holdings Limited

| Tourism Holdings Limited | NZSE:THL |
|---|---|

**Business Description**

Tourism Holdings Limited, together with its subsidiaries, operates as a tourism company in New Zealand, Australia, and the United States. The company is involved in the manufacture, rental, and sale of motor homes, campervans, and cars; and other tourism-related activities. The company provides its vehicles under the Maui, Britz, Mighty, KEA Australia, and Motek Vehicle sales brands; and Road Bear RV rentals and sales brand. It also operates hop on and hop off buses for independent travelers under the Kiwi Experience name; and offers interactive walking tours through the Waitomo Glowworm, Ruakuri, and Aranui caves for thrill seekers, as well as adventure tours. The company was formerly known as The Helicopter Line and changed its name to Tourism Holdings Limited in 1996. Tourism Holdings Limited is headquartered in Auckland, New Zealand.

**Performance vs. S&P 500**



— Tourism Holdings Limited   — S&P 500

| Financial Summary | FY 08A | FY 09A | FY 10A | FY 11A | FY 12A | FY 13A |
|---|---|---|---|---|---|---|
| **Financial Statement Summary:** | | | | | | |
| Revenue | $97 | $131 | $136 | $157 | $172 | $188 |
| Growth | NA | 35.0% | 3.8% | 15.3% | 9.1% | 9.7% |
| EBIT | 1 | 6 | 5 | 12 | 8 | 14 |
| Margin | 1.3% | 4.7% | 3.9% | 7.5% | 4.9% | 7.2% |
| EBITDA | 21 | 37 | 36 | 47 | 44 | 46 |
| Margin | 21.3% | 27.8% | 26.4% | 30.2% | 25.4% | 24.6% |
| NWC % of Revenue | 10.8% | 2.9% | 3.5% | 7.3% | 10.8% | 4.1% |
| Capital Expenditures % of Revenue | 8.2% | 2.9% | 5.9% | 5.7% | 1.3% | 0.6% |
| **Capitalization Summary:** | | | | | | |
| Total Assets | 171 | 203 | 262 | 245 | 290 | 257 |
| Total Equity | 102 | 133 | 141 | 125 | 133 | 129 |
| Debt/EBITDA | 2.1x | 1.2x | 2.1x | 1.8x | 2.7x | 1.9x |
| Debt/Equity | 0.4x | 0.3x | 0.5x | 0.7x | 0.9x | 0.7x |
| Debt/Enterprise Value | 64.9% | 43.8% | 58.9% | 64.5% | 67.8% | 46.3% |
| **Enterprise Value and Multiples:** | | | | | | |
| Enterprise Value | $66 | $98 | $128 | $134 | $174 | $194 |
| Enterprise Value/Revenue | 0.68x | 0.74x | 0.94x | 0.85x | 1.01x | 1.03x |
| Enterprise Value/EBITDA | 3.2x | 2.7x | 3.5x | 2.8x | 4.0x | 4.2x |

| Market Summary | 04/16/14 |
|---|---|
| **Market Value:** | |
| Closing Stock Price | $0.98 |
| Shares Outstanding | 111.80 |
| **Market Capitalization** | **$110** |
| Plus: Total Debt | 90 |
| Plus: Preferred Stock | NA |
| Plus: Minority Interest | NA |
| Less: Cash & Equivalents | (9) |
| **Enterprise Value** | **$194** |
| **Market Performance:** | |
| 52 Week Return | 102.6% |
| 52 Week Volume | 143 |
| 52 Week High | $1.03 |
| 52 Week Low | $0.50 |
| Float | 58.09% |
| **Historical Levered Beta:** | |
| 1 Year Beta | 0.03 |
| 2 Year Beta | 0.21 |
| 5 Year Beta | 0.80 |

$ and shares outstanding in millions

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002145



# Project Byway

Potential ESOP Trustee Introduction Materials

STRICTLY PRIVATE & CONFIDENTIAL

MARCH 2014

**EXHIBIT**

PI 131 - (S. Martin 05/13/21)

exhibitsticker.com

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

## Notice to Recipient

*These materials have been prepared by Chartwell Business Valuation, LLC (also known as "Chartwell") for a Chartwell client or potential client to whom materials are directly addressed and delivered (the "Company") in connection with an actual or potential engagement, and may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Chartwell. These materials are based on information which Chartwell considers to be reliable. Chartwell assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company, other potential transaction participants or obtained from public sources, Chartwell has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management (or, with respect to estimates and forecasts obtained from public sources, represent reasonable estimates). No representation or warranty, express or implied, is made as to the accuracy or completeness of such information; and nothing contained herein is, or may be relied upon as, a representation, whether as to the past, the present, or the future.*

*These materials were designed for use by specific persons familiar with the business and affairs of the Company and are being furnished and should be considered only in connection with other information, oral or written, being provided by Chartwell in connection herewith. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Chartwell (or any affiliate) to provide or arrange any financing for any transaction or to purchase any security in connection therewith. Chartwell assumes no obligation to update or otherwise revise these materials. These materials have not been prepared with a view toward public disclosure under state or federal securities laws or otherwise, are intended for the benefit and use of the Company, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Chartwell. All materials herein are copyright protected. Upon the request of Chartwell, these materials, and any distributed copies thereof, are to be returned to Chartwell.*

*Chartwell and its affiliates do not provide tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Chartwell or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. Tax treatment is subject to change by law in the future and may have retroactive effect. You are strongly urged to consult with your tax advisors regarding any potential strategy, investment, or transaction. All securities affected and offered through Chartwell affiliate CCS Transactions, LLC, a FINRA member.*

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 2

ARGENT_0002146

DOL 0011743

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

# Chartwell Contact List

**Byway ESOP Structuring and Execution Team**

**Byway ESOP Execution Team**

**Greg Fresh**
Managing Director
T: 612-230-3125
C: 312-550-7524
E: greg.fresh@
chartwellcapitalsolutions.com

**Will Bloom**
Principal
T: 312-803-4820
C: 312-371-8884
E: will.bloom@
chartwellcapitalsolutions.com

**Ted Margarit**
Vice President
T: 612-230-3126
C: 952-818-4177
E: ted.margarit@
chartwellcapitalsolutions.com

**Stephanie Geerdes**
Analyst
T: 612-230-3135
C: 763-772-2284
E: stephanie.geerdes@
chartwellcapitalsolutions.com

*Please contact Greg Fresh or Ted Margarit with any questions.*

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 3

ARGENT_0002147

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002148

# Transaction Overview

- Chartwell was engaged by Cruise America, Inc. ( "Byway" or the "Company") and its shareholders to assist in the execution of the sale of the Company to a newly formed Employee Stock Ownership Plan

  - Cruise America is the industry leader in the rental and sales of recreational vehicles across the United States and Canada

    - Annual revenues are approximately $100 million annually

    - The Company generates EBITDA of approximately $30 million annually    *Seasonal*

  - Currently, the Company is taxed as a C-Corporation for income tax purposes

  - The transaction (herein after the "ESOP Transaction") will result in 100% of the shares outstanding being held by the ESOP. The ESOP Transaction will be structured as a direct purchase of Company stock by the ESOP to enable the sellers to pursue a 1042 rollover

  - Subsequently, immediately post closing the Company's will elect to be taxed as an S-Corporation, thereby effectively exempting the Company from federal and state income tax due to the ESOP's qualification as a "qualified retirement plan"

- Chartwell is also assisting in arranging a new financing facility to be provided by Wells Fargo, to be used to provide some liquidity (~33%) at closing, though the selling shareholders will receive a substantial portion (~66%) of their proceeds in seller notes, which will include warrants (<40%)

- The client is proposing a new SARs pool to also be established to incent and reward key employees    *Very important to us*

- The objectives of the selling shareholders include, but are not limited to, the following:

  - Effect a sale to the employees that will provide both a long-term benefit and a means of attracting and retaining team members;

  - Provide a fair purchase price to the selling shareholders;

  - Create liquidity for the selling shareholders and attractive market returns on retained capital; and

  - Increase free cash flows, via the tax benefits, to de-leverage and reinvest in growth opportunities

  - ***The ESOP Transaction is scheduled to close on, or prior to, May 27, 2014***

DOL 0011745

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

# ESOP Trustee Questionnaire – General Experience

| Questions | Responses |
|---|---|

1. Describe your business?

   REDACTED

   a) What businesses are you engaged in besides ESOP trustee services?

   b) What percentage of your revenues are derived from ESOP trustee fees?

   REDACTED

   c) What percentage of revenue is transaction vs. ongoing?

2. How long has your company been providing ESOP trustee services?

   REDACTED

   a) As individuals, how long have you been providing ESOP trustee services?

3. How many people work on ESOP transactions at your firm? 7

4. Do you have a fiduciary committee? Yes - Busily to describe

   a) How many people serve on the committee?

   b) What are the backgrounds of the committee members?

   c) How often does the fiduciary committee meet during a transaction? As needed to keep informed thu due diligence so no

   d) How much time does your committee spend reviewing any particular transaction? 2 hours at the end + prior DD surprises before closing

   e) What are the issues that your committee tends to focus on? Valuation, business, projection

5. How many ESOP transactions have you worked on where you served as the trustee? REDACTED

6. For how many ESOP companies are you currently serving as trustee, both for specific transactions and ongoing supervision? REDACTED

ARGENT_0002149

REDACTED

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

Page 5

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002150

# ESOP Trustee Questionnaire – General Experience (Continued)

| Questions | Responses |
|---|---|

7. What is the range of ESOP transactions on which you have worked, from largest to smallest? REDACTED    REDACTED

   a) In what size range are you most comfortable?

   b) Where does the proposed transaction fit within your experience? *sweet spot*

   c) Do you have experience in our industry or in any similar industries? *Rental Car Industry*

8. Have you worked on transactions similar to the proposed transaction? *Many very common*

9. Do you have issues with a one-time engagement for a transaction and/or do you have a requirement for on-going engagements as trustee? *We view as separate engagmts*

10. Are you experienced with transactions involving synthetic equity attached to seller notes? *Virtually every deal*

   a) If so, how do you evaluate these transactions? *We look at total IRR mainly*

   b) What is your stance on the use of warrants in seller financed transactions? *virtually every seller deal has warrant*

   c) Is there a range of warrant issuances you have seen in transactions? *varies based on IRR for seller*

11. Do you have experience with the inclusion of SARs in transactions? *Yes*

   a) What level of SARs do you see most frequently in your transactions, both on an aggregate and per management team member basis? *10% is kind of market but it can vary*

   b) What are your general opinions on their use, structure, granting, vesting, etc.? *Big Proponents*

12. How do you evaluate the various forms of synthetic equity in terms of relative fairness to the ESOP? Do you consider market returns for similar investments available more broadly? *We have clients with only SAR's, SARs Phantom, Stock Options*

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services

Page 6

*All the above, DOL view*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

# ESOP Trustee Questionnaire – General Experience (Continued)

| Questions | Responses |
|---|---|

13. What do you view as your competitive advantages as compared to other ESOP trustees? *Committee structure, Busin Approach, No litigation*

14. What level of indemnification do you request? REDACTED

15. Have you (or any client of yours) ever been named as a party in any ESOP litigation? If so, please describe. REDACTED

16. Has your trust company been audited by the Department of Labor ("DOL")? If so, please describe. *No*

17. Describe your working relationship with the DOL with respect to ESOPs. *Daub's committee*

18. What are the typical deal indemnification terms you see in your transactions?
    a) Time allowed to bring claims. REDACTED
    b) Caps on total liability. REDACTED
    c) Tipping/Non-tipping baskets and their size and coverage. *Varies all over the map*

19. How "definite" do you typical see SAR plans in your transaction? Ideally, what information would you want to negotiate in a typical transaction's SAR plan? *Virtually every client negotiate Award formula. + Payout form. We want it to be an incentive but achievable.*

ARGENT_0002151

DOL 0011748

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002152

# ESOP Trustee Questionnaire – Transaction Experience

| Questions | Responses |
|---|---|

1. How would you describe your role?   *Point Person with Bucky*

2. How would you undertake your due diligence investigation?

3. Who would you want to interview?   *Mgt team*

4. What documents would you want to review?   *Financials mainly, Business Plan*

5. What other information would you want?   *Due Diligence list with counsel + FA*

6. How long would your due diligence take?   *1 to 1½ days initially*

7. What role would you play in negotiating the terms of the transaction vis-à-vis that of your advisors (financial advisor and legal advisor)?   *— Point*

8. How much negotiating authority do you have vis-à-vis your committee?   *We work together to avoid surprise + issues*

9. How do you select a financial advisor, and what are the factors in determining the selection?   *We prefer SRR & they are approved by the Committee*

10. How do you select a legal advisor, and what are the factors in determining the selection?

   *- K+L Gates*
   *- McDermott*
   *- Bryan Cave + other*

DOL 0011749

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002153

# ESOP Trustee Questionnaire – Transaction Experience (Continued)

| Questions | Responses |
|---|---|
| 10. What are your internal approval procedures? *Present to Mgt Committee* | |
| 11. Based on what you know about the Company and the proposed transaction, what concerns do you have that would need to be addressed? *none* | |
| 12. What is your insurance coverage and/or what do you require for indemnification purposes? REDACTED | REDACTED |
| 13. Considering that the transaction will be executed on an abbreviated time table, do you have sufficient capacity and resources to expeditiously serve the needs of the ESOP in this transaction? *Perfect timing* | |

**CHARTWELL CAPITAL SOLUTIONS**
Corporate Finance | Strategic Advisory | Valuation Services
Page 9

DOL 0011750

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0002154

# ESOP Trustee Questionnaire – Fees and Expenses

| Questions | Responses |
|---|---|
| 1.  How do you set your fees?           REDACTED | |
| 2.  What would you estimate your fees to be for the proposed ESOP transaction?          REDACTED | REDACTED |
| 3.  What expenses would you anticipate incurring? | |
| 4.  For what kinds of services do you charge additional fees? | |
| 5.  What would be your fee estimate for annual (post-closing) services?          REDACTED | |

# Exhibit 29

**K&L GATES LLP**
1717 MAIN STREET
SUITE 2800
DALLAS, TX 75201
T +1 214 939 5500   F +1 214 939 5849  klgates.com

**K&L GATES**

April 15, 2014

Erin Turley
Erin.turley@klgates.com

T +1 214.939.5428
F +1 214.939.5849

Stephen A. Martin
Senior Vice President, ERISA Fiduciary Services
Reliance Trust Company
1100 Abernathy Road, Suite 400
Atlanta, Georgia 30328

Re:     **Confirmation of Engagement**

Dear Steve:

Thank you for asking K&L Gates LLP (the "Firm" or "K&L Gates") to represent Reliance Trust Company ("Reliance Trust") in your capacity as trustee of the Cruise America, Inc. Employee Stock Ownership Plan ("ESOP"). We welcome this opportunity and look forward to working with you on this engagement.

I enclose our Terms of Engagement for Legal Services (the "Terms") which supplement this letter and include additional information regarding our legal services, our relations with our clients, our billing and payment arrangements, potential conflicts, and other matters. These Terms will apply to all matters on which we may represent you, except as you and we may otherwise expressly agree.

Please review this letter and the Terms carefully. If they are not consistent with your understanding of our engagement in any respect or if you have any questions concerning the nature and terms of our engagement, please contact me as soon as possible so that we can promptly address your concerns.

**The Scope of Our Engagement**

The Firm is being engaged to act as counsel solely for Reliance Trust and not for any affiliated entity (including parents and subsidiaries), shareholder, partner, member, manager, director, officer or employee not specifically identified herein.

We further understand that we are to assist and advise you on your duties as trustee of the ESOP ("Trustee") and to address those additional matters for which the Firm expressly agrees to provide representation.

DA-3332315 v2

klgates.com

RVR33915



Page 2
April 15, 2014

## Our Charges

Our statements for professional services will be substantially based upon the amount of time spent by lawyers, paralegals, and other professionals who perform services on your behalf and their respective hourly rates as then in effect. Those hourly rates vary by office across the Firm, take into account the timekeepers' experience in particular areas, and are adjusted periodically. Our charges for fees, disbursements, and other charges and the basis for our invoices are addressed in more detail in the enclosed Terms. It is anticipated that our fees will generally range from $150,000 to $175,000 for services described in the Scope of Our Engagement section above; provided, however, that such fees may increase if the Scope of Engagement changes but any additional fees shall be negotiated separately and in advance of any increase.

## Our Billing and Payment Arrangements

We will generally render statements for professional services and related charges on a monthly basis and expect payment to be made within 30 days of your receipt of our statement, without regard to the consummation or outcome of the matter for which we have been engaged. In the event our statements are not timely paid, we reserve the right to suspend our services until satisfactory payment arrangements are made or to terminate our services if such arrangements are not made and if such termination is otherwise appropriate. You may, of course, terminate our services at any time.

We also understand that some or all of our fees and expenses may be paid by Cruise America, Inc. ("Company") pursuant to agreements you have with the Company. This is to confirm that we are not undertaking to represent the Company, and that no lawyer-client relationship will arise between us and the Company by virtue of our representation of you or by virtue of the services we provide in this matter regardless of who pays for our services and expenses. We can accept payment for our services to you from the Company, only if you and we believe that there will be no impairment of our ability to exercise independent professional judgment as your counsel. Also, we will provide redacted invoices (as needed) to the Company for payment in order to preserve any client confidences protected by the Rules of Professional Conduct. Our consent to this billing arrangement is expressly conditioned upon the Company's express agreement to pay us directly for our services. In the event that the Company does not pay us for our services, then you will remain responsible for payment of any amounts billed by the Firm and not paid by the Company.



Page 3
April 15, 2014

## Our Staffing of Your Engagement and Communications with You

I will be your principal contact with respect to the Firm's representation of Reliance Trust. My current hourly rate for this matter is <sup>REDACTED</sup> Allison Wilkerson will be assisting in this matter. Her current hourly rate is <sup>REDACTED</sup>

Our representation of you will be staffed by other partners, associates and other professional staff as may be appropriate under the circumstances. We will endeavor to keep you apprised of significant developments in the course of our engagement, to consult with you about our work on an ongoing basis and to obtain your direction on critical issues.

You should contact me with any questions you may have about our work or any other aspect of our representation of you. You can reach me at the office (214-939-5428) or on my mobile telephone (214-766-1313) at your convenience.

## Conflicts of Interest

We have searched the Firm's conflicts database and have disclosed to you any ethical conflicts of interest, as defined by the applicable rules of professional conduct, that existed at the time. Such conflicts, if any, have been resolved to your and to our satisfaction. With respect to conflicts of interest that may arise in the future during our engagement by you, the Terms includes a Conflict of Interest section in which you agree to a limited, prospective waiver. This means that, if all the conditions set forth therein are met, including that the matter is not substantially related to the matters we handled or are handling for you, the Firm 1) may represent another client in a matter in which its interests are adverse to your interests, and 2) may represent as a client any individual or entity that is or has been adverse to you. Please review this section, as well as all other sections of the Terms, in detail.

## Our Agreement

In providing legal services to you, absent timely advice from you to the contrary, we will act in reliance upon the understanding that this letter and the enclosed Terms constitute our mutual understanding with respect to the terms of our retention. In order that we may each have a fully-executed copy for our files, please sign and return to me the enclosed copy of this letter.

On behalf of K&L Gates, I thank you for the opportunity to represent Reliance Trust Company. We look forward to serving you.

DA-3332315 v2

klgates.com

RVR33917



Page 4
April 15, 2014

Sincerely,

Erin Turley

Enclosure: Terms of Engagement for Legal Services

I/we confirm my/our engagement of K&L Gates LLP as set forth herein and in the enclosed Terms of Engagement.

Reliance Trust Company

Stephen A. Martin
Senior Vice President, ERISA Fiduciary Services

Date: _____

DA-3332315 v2

RVR33918



Page 5
April 15, 2014

As you know, Reliance Trust Company ("Reliance") has asked this Firm to represent it in its capacity as Trustee of the ESOP. Pursuant to your agreement with Reliance you have agreed to pay its legal counsel fees. Accordingly, this confirms your agreement to pay our Firm's invoices for reasonable and necessary fees and expenses related to our representation of Reliance in its capacity as Trustee of the ESOP. In order to preserve any applicable duties of confidentiality owed to Reliance, the regular invoices which will be sent to you for our services may be redacted. It is our understanding that you will pay our invoices for such services in a timely fashion according to the payment terms stated in such invoices. If you should have any questions regarding our invoices, please do not hesitate to contact me. This will also confirm your understanding that our Firm represents Reliance in these matters and does not undertake to directly represent the Company. This letter and agreement does not establish an attorney client relationship between the Company and our Firm. By this letter, you agree that our Firm will exercise its independent professional judgment and render advice solely to Reliance. If you are in agreement with the terms of this letter, please have an authorized representative countersign at the space indicated below and return it to my attention in the enclosed, self addressed stamped envelope. Thank your for your consideration.

Acknowledged and Accepted:

Cruise America, Inc.

By: _____

Name: _ERIC R. BENSEN____

Title: _CFO_____

Date: _4-16-14_____

DA-3332315 v2

RVR33919

# K&L GATES LLP

## TERMS OF ENGAGEMENT FOR LEGAL SERVICES

Thank you for selecting K&L Gates LLP ("K&L Gates") to represent you and to provide legal services as described in our engagement letter. These Terms of Engagement for Legal Services (the "Terms"), together with our engagement letter, set forth the basis upon which K&L Gates will provide legal services to you. Absent a contrary agreement between us, we will understand that our engagement letter and these Terms supersede any prior oral understandings between us and together form the contract ("Engagement Contract") for our initial engagement and any subsequent assignments upon which you and we may mutually agree.

We believe it is important to establish clearly the basic terms of our engagement at the outset. Accordingly, if you have any questions concerning these Terms, please contact the lawyer responsible for your engagement so that your questions or concerns may be addressed and resolved promptly.

### INTRODUCTION

K&L Gates comprises multiple affiliated entities: a limited liability partnership named K&L Gates LLP qualified in Delaware ("K&L Gates-US," the "Firm," or "we" or "us" as the context requires) and maintaining offices in certain states throughout the United States and in Beijing ("K&L Gates LLP Beijing Representative Office"), Berlin, Doha, Dubai, Frankfurt, Seoul ("K&L Gates LLP Seoul Foreign Legal Consultant Office"), Shanghai ("K&L Gates LLP Shanghai Representative Office"), and Singapore; an Australian multi-disciplinary partnership maintaining offices in Brisbane, Melbourne, Perth and Sydney ("K&L Gates-AUS"); a limited liability partnership (also named K&L Gates LLP); incorporated in England and Wales and maintaining offices in London and Paris ("K&L Gates-UK"); a Delaware general partnership ("K&L Gates Belgium") maintaining an office in Brussels; a Hong Kong general partnership ("K&L Gates, Solicitors") maintaining an office in Hong Kong; a professional association established and organized under the laws of Italy named Studio Legale Associato with an office in Milan; a Delaware limited liability company ("K&L Gates Holdings LLC") maintaining an office in Moscow; a general partnership organized under the laws of Brazil named K&L Gates LLP – Consultores em Direito Entrangeiro/Direito Norte-Americano, with an office in São Paulo; a Taiwan general partnership ("K&L Gates") maintaining an office in Taipei; a joint enterprise formed in accordance with Japanese regulations ("K&L Gates Gaikokuho Joint Enterprise") maintaining an office in Tokyo; and a Polish limited partnership ("K&L Gates Jamka sp.k") maintaining an office in Warsaw.

### OTHER K&L GATES ENTITIES

You agree that, as your agent, we may engage other K&L Gates entities to assist us in carrying out our engagement, where appropriate and with notice to you. In that event, each K&L Gates entity will operate under its Terms, a copy of which will be supplied to you at the time the other K&L Gates entity is engaged.

You agree that you will not be a client of another K&L Gates entity unless we have so engaged it on your behalf, as described above, or unless you directly engage it to provide legal services to you.

Numerous countries in which our offices are located have enacted Anti-Money Laundering ("AML") laws. If K&L Gates lawyers in any of these offices are engaged to assist you in matters within the scope of our engagement, it will be necessary to comply with the applicable AML laws. In connection therewith, we or lawyers from the appropriate office may be required to obtain additional, specific evidence of client identity from you and/or to report certain transactions to the authorities. If these AML requirements are applicable, you will be informed of the details needed for compliance.

### OUR LAWYER-CLIENT RELATIONSHIP

The Firm has been engaged to represent only the client(s) named in our engagement letter ("you" or the "Client"), even if someone other than you, including an insurer, is responsible for paying, or has agreed to pay, our statements. Accordingly, absent a specific, separate engagement to represent such other persons or entities, (1) if our Client is an individual, the Firm has not agreed to represent, and is not representing, any other person or any affiliated entity; (2) if our Client is a corporation, partnership, joint venture or other entity, the Firm has not agreed to represent, and is not representing, any of your constituents, including directors, officers, employees, managing agents, partners, members, shareholders, affiliates (including parents and subsidiaries) or other persons associated with you; and, (3) if our Client is a trade association or other member organization, the Firm has not agreed to represent, and is not representing, any director, officer, member of or other entity represented by you or any of your other constituents.

In addition, the Firm's engagement to represent you is limited to the matter(s) described in our engagement letter and to any additional matters for which the Firm expressly agrees to provide legal representation.

You acknowledge that the Firm has not provided you with legal advice concerning the terms and conditions of our Engagement Contract.

Terms - 1

DA-3332315 v2

RVR33920

## OUR CHARGES FOR LEGAL SERVICES

### A.    Legal Fees

Our statements for professional services will be substantially based upon the time spent by professionals, including lawyers, paralegals and other staff members operating under the supervision of lawyers, who perform services on your behalf.   The hourly rates for those individuals are based upon their experience and vary by office across the Firm.   Time spent on your matters will include meetings with you and others; traveling; considering, preparing and working on documents, pleadings and other papers; written and electronic correspondence; and, making and receiving telephone calls. Whether or not a matter proceeds to completion, our statements will include all work done and all expenses incurred, unless otherwise agreed.

Our hourly rates are periodically reviewed and adjusted.   In preparing our statements for professional services, we will use our hourly rates in effect when our services were rendered.

Information regarding standard hourly rates and other charges established by the Firm is proprietary to the Firm.  You agree not to disclose such information to third parties without the Firm's prior written consent.   In the event that you are served with a demand or legal process that you believe requires you to disclose such information, you agree to notify the Firm immediately of such demand or process, and to reasonably cooperate with the Firm in protecting the Firm's proprietary information from disclosure without the Firm's consent.

Where requested, we may provide you an estimate of the overall costs that may be incurred in connection with a particular engagement.   Any such estimate is necessarily based on a number of uncertain factors and future developments and may be influenced by your decisions and by the actions of third parties. Accordingly, any estimate we provide shall not constitute a promise or agreement that we will render the necessary services within a specific time or for a specific amount. The Firm's statements for professional services will be based on the Firm's billing policies, as set forth herein, and the charges reflected in such statements may vary from any estimates previously given.

### B.    Disbursements

You will be billed for disbursements and other charges relating to our professional services. With respect to disbursements incurred on your behalf to vendors and other third parties for incidental expenses (such as filing fees and travel expenses), you will be billed at our invoiced cost.   With respect to internally-generated and other charges (such as photocopying and facsimile transmissions), you will be billed in accordance with our Schedule of Standard Charges in effect when the charge is incurred.  Our current Schedule is attached to these Terms.

Where the nature of our engagement requires the retention of third parties (e.g., expert witnesses, accountants, actuaries or other consultants, mediators or arbitrators), we will obtain your approval for such retention, and we will forward their statements for services and expenses directly to you for payment.

### C.    Other K&L Gates Entities Charges

Where, with notice to you, we have engaged another K&L Gates entity to assist us in our representation of you, we will include their charges in our statement for professional services unless you ask us to arrange for the other K&L Gates entity to invoice you separately.

## OUR BILLING AND PAYMENT ARRANGEMENTS

### A.    Billing

It is our general practice to render statements for professional services and related charges on a monthly basis.  We will send a final statement after completion of our work.

### B.    Payment

We will expect payment to be made within thirty days after your receipt of our statement, without regard to the consummation of any proposed transaction or the outcome of any matter.  Payment should be made by you in the full amount of our statement and you will be responsible also for any withholding tax or other deduction that may be chargeable to you by the relevant taxing authorities or by a governmental entity.  In the event our statements are not paid in a timely manner, we reserve the right to defer further work on your account and, where such arrearage is not resolved after notice of delinquency is given to you, to terminate our representation of you.  Under such circumstances, you agree to consent to, and not oppose, such termination and to sign a substitution of counsel and/or such other document as may be reasonably necessary to effect the Firm's termination of our lawyer-client relationship, including the Firm's withdrawal of its prior appearance in any court or other litigated proceeding. The termination of our lawyer-client relationship shall not affect your ongoing responsibility for any fees or other charges incurred as of the date of our notice of termination.

### C.    Third Party Payment Responsibility

If a third party (including an insurer) undertakes to pay any portion of the Firm's bills, 1) you will remain responsible for payment of any amounts billed by the Firm and not paid by that third party, 2) you hereby consent to the application of those funds to the outstanding balance of your account with the Firm and waive any right you might otherwise have to direct us to pay or apply those funds in any other fashion, and 3) to the extent any such third party makes payment to us on your behalf accompanied by directions as to what portion of outstanding fees and expenses are to be covered by such payment, you hereby

Terms - 2

DA-3332315 v2

RVR33921

consent to us adhering to those directions and waive any right you might otherwise have to direct us to pay or apply those funds in any other fashion. If you are awarded legal fees or costs by a court or other party, you will remain responsible for payment of the Firm's billed fees and other charges, even if the award to you is less than the amounts we have billed you. Where we have agreed to represent multiple clients in a matter, each client will be jointly and severally responsible for payment of the Firm's statements.

**D.    Questions**

If you have any questions about any statement that we submit to you, you should contact the lawyer responsible for your engagement as soon as you receive it so that we may understand and address your concerns promptly.

**TERMINATION**

**A.    Your Right to Terminate**

You may terminate our engagement on any or all matters at any time, with or without cause. Your termination of our services will not affect your responsibility to pay for billed and unbilled legal services rendered or other charges incurred as of the date of termination and, where appropriate, for such expenses as we may incur in effecting an orderly transition to successor lawyers of your choice.

**B.    Our Right to Terminate**

Subject to any applicable ethical rule or legal requirement, the Firm reserves the right to terminate its representation of you, subject to such permission from any court or tribunal as may be required under the circumstances. In such event, we will provide you with reasonable notice of our decision to terminate and afford you a reasonable opportunity to arrange for successor lawyers, and we will assist you and your successor lawyers in effecting a transition of the engagement. Reasons for the Firm's termination may include your breach of our Engagement Contract including, without limitation, failure to pay outstanding statements in a timely manner as set forth above, the risk that continued representation may result in our violation of applicable rules of professional conduct or legal standards or of our obligations to any tribunal or third parties, your failure to give us clear or proper direction as to how we are to proceed or to cooperate in our representation of your interests, or other good cause.

**C.    Termination Upon Conclusion**

Unless it is previously terminated, our representation of you, and our lawyer-client relationship with you, will be deemed to have been terminated upon the conclusion of our services and our delivery of our final statement for the services described in our engagement

letter and any additional matters for which the Firm has expressly agreed to provide representation.

**D.    Post-Engagement Matters**

After the conclusion or termination of our representation of you as described in our engagement letter and these Terms, changes in relevant laws, regulations or decisional authorities may affect your rights and obligations. Unless you engage the Firm to provide future services and to advise you with respect to any issues that may arise in the future as a result of such changes, we will have no continuing obligation to advise you with respect to future legal developments.

**OUR COMMUNICATIONS WITH CLIENTS**

The Firm's lawyers strive to keep our clients reasonably informed about the status of our engagements and promptly to comply with reasonable requests for information. To enable us to provide effective representation, you agree to be truthful and to cooperate with us in the course of the engagement and to keep us reasonably informed of material developments.

If there are particular limitations on how you would like us to communicate with you, please advise us in advance about your preferences. Unless you advise us to the contrary, however, we will assume that communication by e-mail and fax is acceptable to you. Absent special arrangements, we do not employ encryption technologies in our electronic communications.

**CONFIDENTIALITY**

**A.    Confidentiality and Disclosure**

We owe a duty of confidentiality to all our clients. Accordingly, you acknowledge that we will not be required to disclose to you, or use on your behalf, any documents or information in our possession with respect to which we owe a duty of confidentiality to another client or former client.

**B.    Disclosure to Certain Third Parties**

You agree that we may, when required by our insurers, auditors or other advisers, provide details to them of any matter or matters on which we have represented you.

**C.    Disclosure to Other K&L Gates Entities**

You agree that we may disclose confidential information relating to you, or any matters on which we are representing you, to other K&L Gates entities.

**D.    Data Protection**

•    Any information, including personal data, that K&L Gates collects in our global legal practice

Terms - 3

DA-3332315 v2

RVR33922

may be controlled, stored and processed in, and transferred among, any of our offices and with such contractors as we engage to assist us in our practice, and may be transferred to and through any country, including countries that may not have privacy (data protection) legislation and regulations comparable, for example, to countries in the European Economic area. The location of our offices and of such contractors may change from time to time, and we may acquire offices and engage contractors in other countries at any time. We understand that, in engaging the Firm, you expressly consent to all such control, storage, processing and transfers.

## CONFLICTS OF INTEREST

The Firm's lawyers, acting in a variety of practice areas and in multiple jurisdictions, provide and will provide legal services to thousands of current clients and future clients. Those clients may be competitors, customers, suppliers or have other business dealings and relationships inter se. As a result, those clients may have matters in which their interests are actually or potentially adverse to one another.

In these circumstances, the Firm's ability 1) to represent you in any matter involving, directly or indirectly, another client, and 2) to represent as a client any individual or entity that is or has been adverse to you will be governed exclusively by applicable rules of professional conduct, unless otherwise agreed to by you and the Firm and, as appropriate, any other Firm client. To allow the Firm to represent both you and other current and future clients in pending or future matters to the fullest extent consistent with applicable ethical restrictions, we request our clients to agree to a limited waiver of certain actual or potential conflicts of interest.

Specifically, by this engagement, (1) you agree that the Firm can represent other clients whose interests are actually or potentially adverse to you and can represent as a client any individual or entity that is or has been adverse to you, provided that: (a) the matter is not substantially related to any current or concluded matter in which the Firm has represented you; (b) in carrying out any such other representation, the Firm shall not violate the duty of confidentiality that we owe to you; and, (c) prior to undertaking the other representation, the Firm has reasonably concluded, in the existing circumstances, including this consent, that the Firm can provide competent and diligent representation to you and each other affected client and that the other representation complies with applicable ethical standards; and, (2) you agree that you will not seek to disqualify us from representing other clients with respect to any matters where such provisos are satisfied.

You further agree that, if you choose to withdraw your consent to the Firm's representation of another client in any such other representation, you will, at our request, engage other counsel, and, after any brief and reasonably necessary transition period (for which we will not bill you), you will permit us to terminate our representation of you unless any

rule or statute or tribunal with jurisdiction precludes us from doing so.

We have a large and diverse transactional patent practice. You agree that no conflict of interest is presented when, on behalf of other Firm clients, we render patentability, infringement and validity opinions regarding, and advance patentability arguments over, patents and/or patent applications owned, licensed or controlled by you, but not handled by our law firm.

We also have a large and diverse transactional trademark practice. You agree that no conflict of interest is presented when, on behalf of other Firm clients, we render registrability, infringement and validity opinions regarding, and advance registrability arguments over, registered or unregistered trademarks and/or trademark registration applications owned, licensed or controlled by you, but not handled by our law firm.

Finally, you agree that, for the purposes of determining whether any conflict may exist, only the client(s) identified in our engagement letter, and not any affiliated entity or person, shall be considered our client.

## OPPOSING LAWYERS

In addition to our representation of business and not-for-profit entities as well as individuals, we also regularly serve as legal counsel to lawyers and law firms. From time to time, we engage other lawyers and law firms to represent us. As a result, opposing lawyers in a matter may be a lawyer or law firm that we represent now or may represent in the future. Likewise, opposing lawyers in a matter may represent us now or in the future. Further, we have professional and personal relationships with many other lawyers, often because of our participation in professional organizations. Collectively, these situations are common in the legal field. We believe that these relationships with other lawyers will not adversely affect our ability to represent you.

## DOCUMENT RETENTION

Your original hard copy documents and property, described further below, will be returned to you upon conclusion of our representation of you on a particular matter (unless they are relevant to another matter on which we continue to represent you) and, upon our receipt of payment for outstanding fees and other charges, subject to applicable Rules of Professional Conduct. At that time, you will also have the opportunity to accept the remainder of your entire client file, including lawyer work product. Some K&L Gates offices maintain files in a digital image format. If you request your file from any of those offices, we will provide it in an electronic format on a CD, DVD or other medium. Should you decide not to accept your remaining file at that time, you authorize us to destroy your files at our discretion. If you do not request the return of your file at the time your matter is concluded, we may retain or destroy the file without further notice to you.

Terms - 4

DA-3332315 v2

RVR33923

Original documents and property, if not returned to you for any reason, will be designated for permanent retention and will not be destroyed without your prior approval. Such items include, but are not limited to, money orders, travelers checks, stocks and bonds, final executed releases, settlement agreements, contracts and sale or purchase agreements, judgments, deeds, titles, easements, wills and trusts, powers of attorney and all other dispositive estate planning documents.

You agree that our drafts of documents, notes, internal working papers, internal e-mail and electronic databases shall be and remain the property of K&L Gates LLP and shall not be considered part of your client file.

The Firm retains the right to make copies of your file, at our expense, for our own information and retention purposes.

**FIRM LAWYERS' PRIVILEGE**

We believe it is in your interest as well as the Firm's interest that, in the event ethical or other legal issues arise during our representation of you, including conflict of interest issues or potential disputes between us, the Firm lawyers working on your behalf are able to receive informed, confidential advice regarding their obligations. Accordingly, if we determine in our discretion that it is necessary or advisable for Firm lawyers to consult with our internal or outside counsel, you agree that they may do so and that you recognize the Firm has a lawyer-client privilege protecting the communications between the Firm lawyers working on your behalf and the Firm's internal or outside counsel.

**NEW YORK FEE DISPUTE PROCESS**

If any of our New York licensed lawyers work on this matter and if a material portion of the legal services we provide to you takes place in New York, you may have an option to invoke arbitration should a fee dispute arise between you and us during or at the conclusion of this engagement. Specifically, in any civil matter where the fee dispute involves a sum of up to $50,000, you may have a right to compel resolution by binding arbitration. In addition, whether or not binding arbitration is available, both you and we are encouraged to seek resolution of lawyer-client disputes, including fee disputes, through mediation, and the New York Courts and Bar have established a program for mediation of such disputes by an impartial mediator. In the event that any fee dispute should arise in this engagement which is not promptly and satisfactorily resolved between us, we shall furnish you with further details concerning the procedures and effects of arbitration and mediation, so that you can make an informed decision as to how to proceed in the circumstances.

**CLIENT RESPONSIBILITIES**

It is possible that you may have insurance policies relating to the matter that is the subject of our engagement. You should carefully check the insurance policies you have purchased and, if coverage may be available, you should provide notice to all insurers that may provide such coverage as soon as possible. Although we will be pleased to assist you in assessing the potential for coverage under any policies you may have, our engagement will not include advising you with respect to the existence or availability of insurance coverage for matters within the scope of our engagement unless you supply us with copies of your insurance policies and expressly request our advice on the potential coverage available under such policies.

**SEVERANCE OF TERMS**

If all or any part of our Engagement Contract is or becomes illegal, invalid or unenforceable in any respect, then the remainder will remain valid and enforceable.

**THIRD PARTY RIGHTS**

No provision of our Engagement Contract is intended to be enforceable by any third party. Accordingly, no third party shall have any right to enforce or rely on any provision of our Engagement Contract.

**ASSIGNMENT**

A.      **Permitted Assignment**

We may assign the benefit of our Engagement Contract to any partnership or corporate entity that carries on the business of K&L Gates-US in succession to us and you will accept the performance by such assignee of the Engagement Contract in substitution for our performance. References in these Terms (other than in this paragraph) and in any relevant engagement letter to the Firm or to K&L Gates-US shall include any such assignee.

B.      **Other Assignment**

Subject to the foregoing paragraph, neither you nor we shall have the right to assign or transfer the benefit or burden of our Engagement Contract without the written consent of the other party.

**DEFINITIONS**

In these Terms a reference to a **"matter"** is to a transaction, case or other matter as to which at any time you have engaged us to represent you; and, any reference to **"our services"** is to the legal services to be provided by us to you as described in our engagement letter and any other legal services provided by us to you at any time in relation to a matter.

**INCONSISTENCIES**

In the event of any inconsistency between our engagement letter and these Terms, the engagement letter shall prevail.

Terms - 5

RVR33924

## RESOLVING PROBLEMS AND DISPUTES

If you have any complaints or concerns about our work for you, please raise these in the first instance with the lawyer responsible for your engagement or with the Firm's Chairman and Global Managing Partner (Peter J. Kalis: 412-355-6562 or 212-536-4828). We will investigate your complaint promptly and carefully and do what we reasonably can to resolve the difficulties to your satisfaction.

## APPLICATION OF TERMS

These Terms supersede any earlier terms of business we may have agreed with you and, in the absence of express agreement to the contrary, will apply to the services referred to in any engagement letter accompanying these Terms and all subsequent legal services we provide to you.

Terms - 6

DA-3332315 v2

RVR33925

# K&L GATES LLP

## SCHEDULE OF STANDARD CHARGES

### 2014

| DESCRIPTION OF CHARGE: | STANDARD CHARGE | UNIT BASIS |
|---|---|---|
| Photocopying/Image Printing | $0.20 | Each copy |
| Color Copying/Printing | $1.00 | Each copy |
| Facsimile | $0.75 | Each outgoing transmitted page, plus cost of telephone line usage |
| CD Burning | $25.00 | Per CD |

Legal Research: The Firm pays for Lexis and Westlaw under monthly fixed fee contracts. The actual, monthly fixed fee is allocated to all users of the database each month, and client charges for such usage are directly proportional to the actual research conducted on their behalf.

Long Distance Telephone Calls: The charge for long distance calls is based on the actual time length of the call placed at rates that reasonably approximate our costs.

Secretarial Overtime: As required by client specific circumstances, secretarial overtime will be charged at the Firm's average hourly rate for secretarial overtime.

The following are examples of items that will be charged at their out-of-pocket cost to K&L Gates:

Courier (Federal Express, UPS, etc)

Business Meals

Off-site Storage Retrieval

DA-3332315 v2

RVR33926

# Exhibit 30

## TRUSTEE CERTIFICATE

The undersigned, Reliance Trust Company, not in its corporate capacity but solely in its capacity as the trustee ("Trustee") of the RVR Employee Stock Ownership Trust ("Trust"), which forms a part of the RVR Employee Stock Ownership Plan (the "Plan" together with the Trust collectively referred to as the "ESOP"), hereby gives this Trustee Certificate (this "Certificate") in connection with the Stock Purchase Agreement by and among RVR, Inc. (the "Company"), the Trustee, not in its corporate capacity but solely in its capacity as the Trustee on behalf of the ESOP, and the selling shareholders thereunder dated May 28, 2014 (the "Agreement"). All capitalized terms used herein shall have the meaning given to them in the Agreement, to the extent not defined herein.

The undersigned hereby certifies to the following:

1. Reliance Trust Company acknowledges appointment as Trustee on behalf of the ESOP and is a "named" fiduciary under the Employee Retirement Income Security Act of 1974 as amended, with respect to the Trust.

2. Stout Risius Ross ("Financial Advisor") is the financial advisor to the Trustee.

3. The Trust is validly organized as a trust under the laws of the state of Georgia.

4. The Trustee possesses the requisite power and authority to execute and deliver the Agreement and to perform the obligations of Trustee thereunder.

5. All necessary action has been taken by the Trustee to execute and deliver the Agreement and to perform the obligations of the Trustee thereunder. Reference is made to that certain Consent of the Trust Committee attached hereto as Exhibit A.

6. The Agreement has been duly executed and delivered by the Trustee. Attached hereto as Exhibit B is the Certificate of Incumbency identifying those persons who are qualified to act for the Trustee, on behalf of the Trust, and their respective specimen signatures which are, as set forth on Exhibit B, genuine.

7. The Trustee has entered into the Agreement in the best interest of the participants and beneficiaries of the ESOP for the exclusive purpose of providing benefits to the participants and beneficiaries of the ESOP, and with the care, skill, prudence and diligence that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like arms.

8. Attached as Exhibit C is a true and correct copy of the fairness opinion of Financial Advisor date as of the date of this Certificate.

9. The Trust is a trust validly existing under the laws of the State of Georgia.

10. There are no judgments outstanding against or affecting the Trust.

DB1/ 79072673.4

**EXHIBIT**

PI 125 - (D. Williams 05/06/21)

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

11. There are no proceedings before any court or governmental agency involving the Trustee now pending or threatened which, if adversely determined, would have a material adverse effect on the Trust or on the Trustee's ability to perform its obligations under the Trust or the ESOP Loan Documents.

12. Neither the Trust nor the Trustee is in default with respect to any order, writ, injunction, or decree of any court.

13. Neither the Trust nor the Trustee is in default in any material respect under any applicable law, order, regulation, or demand of any governmental agency or instrumentality relating to the Trust.

14. There is no default by the Trust or by the Trustee under any agreement relating to the Trust.

DB1/ 79072673.4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000937

DOL 0010534

IN WITNESS WHEREOF, the undersigned has executed this Certificate and caused this Certificate to be delivered this 28 day of May, 2014.

RVR EMPLOYEE STOCK OWNERSHIP TRUST

By: Reliance Trust Company, not in its corporate capacity but solely in its capacity as Trustee of the RVR Employee Stock Ownership Trust

By: _____
Name:    Stephen A. Martin
Its:     Senior Vice President

[Signature Page to Trustee Certificate]

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000938

Exhibit A

Consent of the Trust Committee

DB1/ 79072673.4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

DOL 0010536

### Resolutions of the Reliance Trust Company
### ESOP Trust Committee

### Approval of the Transaction to Acquire
### All Shares of Company Stock of RVR, Inc.

WHEREAS, Reliance Trust Company was duly appointed as the trustee (the "Trustee") of the RVR Employee Stock Ownership Trust (the "Trust") which implements and forms a part of the RVR Employee Stock Ownership Plan (the "Plan," together with the Trust, the "ESOP") to be effective April 15, 2014;

WHEREAS, the ESOP is designed to invest primarily in the stock of the Company;

WHEREAS, the Reliance Trust Company ESOP Trust Committee (the "Committee") is reviewing the Trust's acquisition of all of the issued and outstanding shares of RVR, Inc. common stock ("Company Stock") pursuant to the terms of that certain Stock Purchase Agreement by and among RVR, Inc. (the "Company"), the Trustee, not in its corporate capacity but solely in its capacity as the Trustee on behalf of the ESOP, and the selling shareholders thereunder dated May 28, 2014 (the "Stock Purchase Agreement"). All capitalized terms used herein shall have the meaning given to them in the Stock Purchase Agreement, to the extent not defined herein;

WHEREAS, in connection with the transactions to be undertaken pursuant to the Stock Purchase Agreement, the Committee is contemplating a transaction whereby:

- RVR, Inc. (the "Company") shall contribute $598,985.06 in cash to the Trust;

- The Company and the Trustee, on behalf of the Trust, shall enter into that certain ESOP Loan in the aggregate amount of $104,401,014.94, in exchange for a non-recourse promissory note issued by the ESOP in favor of the Company in the amount of $104,401,014.94 (the "ESOP Note"), which shall be secured by a pledge of the shares of Company Stock purchased with the proceeds of the ESOP Note;

- Shortly following the purchase by the ESOP of all of the outstanding shares of Company Stock, each of Robert Smalley, Jr., the Family Trust created under the Smalley Revocable Trust, dated July 8, 2004, the Marital Trust created under the Smalley Revocable Trust, dated July 8, 2004, and the Survivor's Trust created under the Smalley Revocable Trust dated July 8, 2004 (collectively, the "Junior Noteholders"), will make an aggregate loan of $95,880,000 to the Company (the "Junior Loan"), which shall be evidenced by notes issued by the Company to the Junior Noteholders (the "Sub Notes") in accordance with the terms and conditions of that certain Subordinated Note and Warrant Purchase Agreement;

- In connection with the terms of the Seller Loan, the Junior Noteholders will receive an aggregate of 666,667 warrants for the purchase of shares of Company Stock;

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000940

- The Company will establish that certain Management Incentive Plan to provide for the issuance of Stock Appreciation Rights to certain key employees in accordance with the terms thereof.

WHEREAS, the Trust has received an opinion from its independent financial advisor, Stout Risius Ross, Inc., stating that

- the consideration to be paid by the ESOP for the shares of Company Stock to be purchased pursuant to the terms of the Stock Purchase Agreement is not greater than the Fair Market Value of such shares. For purposes of this opinion, pursuant to the Department of Labor Proposed Regulation Section 2510.3-18(b)(2), "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties are able, as well as willing, to trade and are well informed about the asset and the market for that asset.

- the interest rate on the ESOP Loan is not in excess of a reasonable interest rate;

- the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

- the exercise price of the Warrants is equal to at least 90.0% of the Fair Market Value of the underlying common stock of the Company, on the date of issuance;

- the interest rate on the Sub Notes between the Company and the Junior Noteholders is not in excess of a reasonable rate; and

- the terms and conditions of the Transaction (as defined in the Stock Purchase Agreement and ancillary documents), taken as a whole, are fair to the ESOP from a financial point of view.

WHEREAS, the Trustee has determined that it is purchasing the ESOP Stock exclusively for the benefit of the participants and beneficiaries of the Plan using the ESOP Loan as a means of financing the purchase of certain of the shares of Company Stock; and

WHEREAS, the Committee now desires to:

- acknowledge its appointment as Trustee on behalf of the ESOP and its role a "named" fiduciary under ERISA with respect to the Trust;

- approve the consummation of those transactions which shall occur in connection with the terms of the Stock Purchase Agreement and ESOP Loan Documents;

- acknowledge that Reliance Trust Company, acting in its Trustee capacity only, has the requisite authority to perform the obligations of the Trustee under the

- 2 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000941

Trust and enter into the Stock Purchase Agreement and the ESOP Loan Documents; and

- delegate the requisite power and authority to Stephen A. Martin, Senior Vice President, to finalize any remaining negotiations with respect to the terms of the transaction (as described herein) and to execute all necessary documents to effectuate the transactions on behalf of the Trust.

NOW THEREFORE, BE IT RESOLVED, that effective as of the date provided above, the Committee hereby approves, ratifies, and acknowledges:

- Reliance Trust Company has been duly appointed to act as Trustee on behalf of the ESOP and is a "named" fiduciary under ERISA with respect to the Trust;

- the consummation of those transactions which shall occur in connection with the transactions described herein, including without limitation, the execution of the Stock Purchase Agreement and the ESOP Loan Documents;

- Reliance Trust Company, acting in its Trustee capacity only, has the requisite authority to perform the obligations of the Trustee under the Trust and enter into the Stock Purchase Agreement and the ESOP Loan Documents and other ancillary documents; and

- the delegation of the requisite power and authority to Stephen A. Martin, Senior Vice President, to finalize any remaining negotiations with respect to the terms of the transaction (as described herein) and to execute all necessary documents to effectuate the transactions on behalf of the Trust.

RESOLVED FURTHER, that the Committee hereby approves, authorizes and ratifies any action taken by the Committee or any officer of Reliance Trust Company, for and on behalf of Reliance Trust Company, acting in its Trustee capacity, in furtherance of these resolutions, and authorizes any officer of Reliance Trust Company to do any and all acts and things that the Committee and one or more of the authorized officers of Reliance Trust Company deem in the exercise of his sole discretion, necessary, desirable or appropriate in connection with the final execution and adoption of the Stock Purchase Agreement and ESOP Loan Documents and the delegation of certain duties to Stephen A. Martin.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

The undersigned, Stephen A. Martin, hereby certifies on behalf of the Committee that these Resolutions represent and true and correct copy of the resolutions of the Committee regarding the actions to be taken by the Trustee with respect to the transaction and were formally adopted and passed by the Committee to be effective May 28, 2014.

- 3 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000942

IN WITNESS WHEREOF, the undersigned has executed this certification as to these Resolutions and caused such certification to be delivered this 28 day of May, 2014.

Stephen A. Martin, Senior Vice President

Signature Page - Resolutions of the Trust Committee

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

Exhibit B

Certificate of Incumbency

DB1/ 79072673.4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000944

## TRUSTEE INCUMBENCY CERTIFICATE

### May 28, 2014

The undersigned, on behalf of Reliance Trust Company, not in its corporate capacity but solely in its capacity as the trustee ("Trustee") of the RVR Employee Stock Ownership Trust ("Trust"), which forms a part of the RVR Employee Stock Ownership Plan (the "Plan" together with the Trust collectively referred to as the "ESOP") hereby gives this Trustee Incumbency Certificate (this "Certificate") in connection with the Stock Purchase Agreement by and among RVR, Inc. (the "Company"), the Trustee, not in its corporate capacity but solely in its capacity as the Trustee on behalf of the ESOP, and the selling shareholders thereunder dated May___, 2014 (the "Agreement"). All capitalized terms used herein shall have the meaning given to them in the Agreement, to the extent not defined herein.

The undersigned hereby certifies that the statements set forth below are true and correct.

The following named persons are duly serving on the Reliance Trust Company ESOP Trust Committee (the "Trust Committee") and have been duly appointed to their position and are validly acting on behalf of the Trustee, and their respective specimen signatures set forth below are genuine:

DA-3331330 v1

1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000945

DOL 0010542

| Name | Title | Signature |
|------|-------|-----------|
| Stephen A. Martin | Senior Vice President and Fiduciary Consultant | |
| Kelly R. Wright | Vice President | |
| David Williams | Senior Vice President | |

- Remainder of Page Intentionally left blank -
(Signature Pages Follow)

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000946

IN WITNESS WHEREOF:    I hereby certify that I am personally familiar with the facts set forth herein and I have caused this Certificate to be executed as of the date first written above.

By: _____
Name: Stephen A. Martin
Title: Senior Vice President

DA-3331330 v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000947

Exhibit C

Fairness Opinion

DB1/ 79072673.4

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

DOL 0010545



May 28, 2014

Reliance Trust Company, as Trustee
  of the RVR Employee Stock Ownership Trust
1100 Abernathy Road
500 Northpark, Suite 400
Atlanta, GA  30328

Dear Trustee:

Stout Risius Ross, Inc. ("SRR") has been retained by Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust (the "Trust"), which forms a part of and implements the RVR Employee Stock Ownership Plan (the "Plan," together with the Trust are collectively referred to herein as the "ESOP"), to act as the Trustee's independent financial advisor in connection with the Transaction (as defined below) and to evaluate the opinions set forth below.

Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Stock Purchase Agreement ("Stock Purchase Agreement") by and among the Trustee, on behalf of the Trust, as buyer, RVR, Inc. (referred to herein as "RVR" or the "Company"), the Family Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Family Trust"), the Marital Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Marital Trust"), the Survivor's Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Survivor's Trust" and, collectively with the Family Trust and the Marital Trust, the "Smalley Trusts"), Robert Smalley, Jr. and Eric Bensen (collectively, the "Sellers"), dated May 28, 2014 (the "Transaction Date").

- The ESOP will purchase 100%, or 1,000,000 shares, of the Company's common stock (the "ESOP Shares") from the Sellers for aggregate consideration of $105.0 million (the "ESOP Purchase").

- The ESOP will finance the ESOP Purchase with a $104,401,014.94 loan from the Company (the "ESOP Loan") and a $598,985.06 contribution from the Company to the ESOP immediately prior to the ESOP Purchase (the "ESOP Contribution"). The ESOP Loan will have a term of 40 years and bear interest at a rate of 3.27% per year (long-term applicable federal rate for May 2014).

- The Company will fund the ESOP Loan on the Transaction Date using (1) existing cash; (2) a draw from the Company's revolving line of credit facility with Well Fargo Bank, N.A. (the "Revolver"); and (3) proceeds from a bridge term loan of $87.0 million from Wells Fargo Bank, N.A. (the "Bridge Loan").

- Within five days from the Transaction Date, the Sellers will loan $95.9 million of proceeds received by the Sellers from the ESOP Purchase to the Company in return for the issuance of certain junior subordinated notes (the "Seller Notes"). The Seller Notes will (1) bear cash interest at 2.5% per annum, (2) accrue payment-in-kind ("PIK") interest at 1.0% per annum, (3) accrue non-compounding interest at 2.15% per annum, and (4) include warrants to purchase 666,667 shares of common stock of the Company at an exercise price of $7.50 per share (the "Warrants").

- The Company will utilize the proceeds from the Seller Notes to repay the Bridge Loan and a portion of the Revolver.

- The Company will establish a management incentive plan (the "MIP") whereby 238,095 stock appreciation rights ("SARs"), representing 12.5% of the Company's fully-diluted equity, may be granted to eligible employees. Eligible employees will exclude Randall Smalley and Robert Smalley Jr. and the grants in fiscal 2014 shall be limited to 100,000 SARs. Grants of remaining 138,095 SARs will be contingent upon the Company meeting financial targets agreed upon annually by the Company's Board of Directors and the Trustee. Additionally, all SARs under the term of the MIP shall be issued with an exercise price equal to the Fair Market Value (as defined below) of the common stock at the time of grant.

The above referenced transactions are collectively referred to herein as the "Transaction."

One South Wacker Drive, 38th Floor
Chicago, IL 60606
  ph. +1.312.857.9000
  fax +1.312.857.9001
www.srr.com

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000949

DOL 0010546

**SRR**
STOUT | RISIUS | ROSS

Reliance Trust Company, as Trustee
  of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 2

In connection with the Transaction, you have requested that we render a written opinion (the "Opinion") as of the Transaction Date, as to whether:

- the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares;

- the interest rate on the ESOP Loan is not in excess of a reasonable interest rate;

- the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

- the exercise price of the Warrants is equal to at least 90.0% of the Fair Market Value at the time of issuance of the underlying common stock of the Company;

- the interest rate on the Seller Notes between the Company and the note holders is not in excess of a reasonable rate; and

- the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view.

In undertaking our engagement, our focus was directed to the valuation issues arising under ERISA Section 3(18) which defines the term "adequate consideration" as the Fair Market Value of an asset determined by a fiduciary in good faith. Pursuant to the Department of Labor Proposed Regulation Section 2510.3-18(b)(2), "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties are able, as well as willing, to trade and are well informed about the asset and the market for that asset.

The predecessor to RVR was founded in 1971 as Cruise America. RVR is engaged in the rental of custom-built Class C recreational vehicles ("RVs") in the United States and Canada. Additionally, following a full reconditioning, the Company sells used RVs from its rental fleet rebranded under the Majestic brand name. The Company is headquartered in Mesa, Arizona and has approximately 300 employees (comprised of both full-time and seasonal employees).

SRR is a leading financial advisory services firm specializing in business valuation and investment banking. SRR's business valuation practice provides valuations of privately held businesses and business interests for all purposes, including estate tax and regulatory filings, employee stock ownership plans and ERISA advisory services, fairness opinions and solvency opinions, and shareholder disputes. SRR has provided financial advisory services for more than 300 employee stock ownership plan and other employee benefit plan clients. SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the U.S. Department of Labor and section 401(a)(28)(C) of the Internal Revenue Code of 1986, as amended.

Our analysis takes into consideration Revenue Ruling 59-60, 1959-1 C.B. 237, which outlines and reviews the general approaches, methods, and factors to be considered in the valuation of the capital stock of closely held companies and thinly traded corporations. In addition, our analysis was conducted under the premise of value in continued use, as a going concern. This premise assumes the Company will continue to operate as an income producing entity. It further assumes that the shareholders and management of the Company will act rationally and will employ financial and operational strategies that will maximize its value.

In connection with our Opinion, we made such reviews, analyses, and inquiries as we deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- RVR's audited financial statements for the years ended December 31, 2009 through December 31, 2013;

- RVR's internally prepared interim financial statements for the three-month periods ended March 31, 2013 and March 31, 2014;

- financial projections prepared by Company management for the fiscal years ending December 31, 2014 through December 31, 2018;

- the Stock Purchase Agreement;

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000950

DOL 0010547



Reliance Trust Company, as Trustee
  of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 3

- the form of the Investor Rights Agreement by and among RVR, the Trustee, on behalf of the Trust, the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr. (the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr. shall be referred to herein as the "Investors");

- the form of the Seller Notes by and between the Company and each of the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr.;

- the form of the Warrant Agreements issued by the Company to each of the Investors;

- the form of the Subordinated Note and Warrant Purchase Agreement by and between the Company and each of the Investors;

- the ESOP Company Loan and Pledge Agreement by and between the Company and the Trustee, on behalf of the Trust, dated May 28, 2014;

- the ESOP Note issued by the Trustee in favor of the Company, dated May 28, 2014;

- the ESOP, effective June 1, 2013;

- the Trust, effective June 1, 2013;

- the term sheet setting forth the preliminary features of the MIP dated May 28, 2014;

- the First Amendment to the Bylaws of RVR, Inc.;

- Amended and Restated Employment Agreement by and between the Company and Randall Smalley, dated May 28, 2014;

- Amended and Restated Employment Agreement by and between the Company and Robert Smalley, Jr., dated May 28, 2014;

- Amended and Restated Employment Agreement by and between the Company and Eric Bensen, dated May 28, 2014;

- the Management Presentation prepared by Company management and Chartwell Capital Solutions, dated April 16, 2014;

- a letter from Eric Bensen, as Chief Financial Officer of the Company, containing, among other things, representations regarding the accuracy of the information, data, and other materials (financial or otherwise) provided by or on behalf of the Company;

- a fixed asset schedule illustrating the age and type of the Company's rental fleet;

- a site visit at the Company's headquarters located in Mesa, Arizona;

- discussions with certain members of the senior management of Cruise America regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;

- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- other information, studies, and investigations that we deemed appropriate.

In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and we have relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance therein with respect to the information. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we have exercised our independent judgment in evaluating the information that we received from the Company and/or its representatives, and we have not relied on information that we know to be inadequate or incomplete. Our analysis is based upon market, economic, and other considerations as they existed on and could be evaluated as of the Transaction Date.

Management has represented to us that there have been no material changes in the business, financial position, or results of operations of the Company since March 31, 2014, the date of the most recent financial statements made available to us.

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY



Reliance Trust Company, as Trustee
   of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 4

Based on all of the foregoing, it is our Opinion, as of the date hereof, that:

- the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares;

- the interest rate on the ESOP Loan is not in excess of a reasonable interest rate;

- the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

- the exercise price of the Warrants is equal to at least 90.0% of the Fair Market Value at the time of issuance of the underlying common stock;

- the interest rate on the Seller Notes between the Company and the note holders is not in excess of a reasonable rate; and

- the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view.

This Opinion is solely for the use and benefit of the Trustee and any summary of or reference to the Opinion or any other reference to SRR by the Company in connection with the Transaction will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld; provided, however, that the law firm of K&L Gates is granted permission to rely on the Opinion solely in connection with the legal opinion it is rendering with respect to the Transaction. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

In accordance with recognized professional ethics, our professional fees for this service are not contingent upon the opinion expressed herein, and neither SRR nor any of its employees has a present or intended financial relationship with or interest in the Company.

Yours very truly,

STOUT RISIUS ROSS, INC.

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000952

# Exhibit 31



May 28, 2014

Reliance Trust Company, as Trustee
    of the RVR Employee Stock Ownership Trust
1100 Abernathy Road
500 Northpark, Suite 400
Atlanta, GA  30328

Dear Trustee:

Stout Risius Ross, Inc. ("SRR") has been retained by Reliance Trust Company, not in its corporate capacity, but solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust (the "Trust"), which forms a part of and implements the RVR Employee Stock Ownership Plan (the "Plan," together with the Trust are collectively referred to herein as the "ESOP"), to act as the Trustee's independent financial advisor in connection with the Transaction (as defined below) and to evaluate the opinions set forth below.

Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Stock Purchase Agreement ("Stock Purchase Agreement") by and among the Trustee, on behalf of the Trust, as buyer, RVR, Inc. (referred to herein as "RVR" or the "Company"), the Family Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Family Trust"), the Marital Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Marital Trust"), the Survivor's Trust created under the Smalley Revocable Trust, dated July 8, 2004 (the "Survivor's Trust" and, collectively with the Family Trust and the Marital Trust, the "Smalley Trusts"), Robert Smalley, Jr. and Eric Bensen (collectively, the "Sellers"), dated May 28, 2014 (the "Transaction Date").

- The ESOP will purchase 100%, or 1,000,000 shares, of the Company's common stock (the "ESOP Shares") from the Sellers for aggregate consideration of $105.0 million (the "ESOP Purchase").

- The ESOP will finance the ESOP Purchase with a $104,401,014.94 loan from the Company (the "ESOP Loan") and a $598,985.06 contribution from the Company to the ESOP immediately prior to the ESOP Purchase (the "ESOP Contribution"). The ESOP Loan will have a term of 40 years and bear interest at a rate of 3.27% per year (long-term applicable federal rate for May 2014).

- The Company will fund the ESOP Loan on the Transaction Date using (1) existing cash; (2) a draw from the Company's revolving line of credit facility with Well Fargo Bank, N.A. (the "Revolver"); and (3) proceeds from a bridge term loan of $87.0 million from Wells Fargo Bank, N.A. (the "Bridge Loan").

- Within five days from the Transaction Date, the Sellers will loan $95.9 million of proceeds received by the Sellers from the ESOP Purchase to the Company in return for the issuance of certain junior subordinated notes (the "Seller Notes"). The Seller Notes will (1) bear cash interest at 2.5% per annum, (2) accrue payment-in-kind ("PIK") interest at 1.0% per annum, (3) accrue non-compounding interest at 2.15% per annum, and (4) include warrants to purchase 666,667 shares of common stock of the Company at an exercise price of $7.50 per share (the "Warrants").

- The Company will utilize the proceeds from the Seller Notes to repay the Bridge Loan and a portion of the Revolver.

- The Company will establish a management incentive plan (the "MIP") whereby 238,095 stock appreciation rights ("SARs"), representing 12.5% of the Company's fully-diluted equity, may be granted to eligible employees. Eligible employees will exclude Randall Smalley and Robert Smalley Jr. and the grants in fiscal 2014 shall be limited to 100,000 SARs. Grants of remaining 138,095 SARs will be contingent upon the Company meeting financial targets agreed upon annually by the Company's Board of Directors and the Trustee. Additionally, all SARs under the term of the MIP shall be issued with an exercise price equal to the Fair Market Value (as defined below) of the common stock at the time of grant.

The above referenced transactions are collectively referred to herein as the "Transaction."



EXHIBIT

PI 102 - (SRR 30(b)(6) 04/21/21)

*One South Wacker Drive, 38th Floor*
*Chicago, IL 60606*
*ph. +1.312.857.9000*
*fax +1.312.857.9001*
*www.srr.com*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0001455



STOUT | RISIUS | ROSS

Reliance Trust Company, as Trustee
  of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 2

In connection with the Transaction, you have requested that we render a written opinion (the "Opinion") as of the Transaction Date, as to whether:

- the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares;

- the interest rate on the ESOP Loan is not in excess of a reasonable interest rate;

- the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

- the exercise price of the Warrants is equal to at least 90.0% of the Fair Market Value at the time of issuance of the underlying common stock of the Company;

- the interest rate on the Seller Notes between the Company and the note holders is not in excess of a reasonable rate; and

- the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view.

In undertaking our engagement, our focus was directed to the valuation issues arising under ERISA Section 3(18) which defines the term "adequate consideration" as the Fair Market Value of an asset determined by a fiduciary in good faith. Pursuant to the Department of Labor Proposed Regulation Section 2510.3-18(b)(2), "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties are able, as well as willing, to trade and are well informed about the asset and the market for that asset.

The predecessor to RVR was founded in 1971 as Cruise America.  RVR is engaged in the rental of custom-built Class C recreational vehicles ("RVs") in the United States and Canada. Additionally, following a full reconditioning, the Company sells used RVs from its rental fleet rebranded under the Majestic brand name. The Company is headquartered in Mesa, Arizona and has approximately 300 employees (comprised of both full-time and seasonal employees).

SRR is a leading financial advisory services firm specializing in business valuation and investment banking. SRR's business valuation practice provides valuations of privately held businesses and business interests for all purposes, including estate tax and regulatory filings, employee stock ownership plans and ERISA advisory services, fairness opinions and solvency opinions, and shareholder disputes. SRR has provided financial advisory services for more than 300 employee stock ownership plan and other employee benefit plan clients. SRR is independent of the parties to the Transaction (other than the ESOP) within the meaning of proposed regulation 29 CFR 2510.3-18(b) issued by the U.S. Department of Labor and section 401(a)(28)(C) of the Internal Revenue Code of 1986, as amended.

Our analysis takes into consideration Revenue Ruling 59-60, 1959-1 C.B. 237, which outlines and reviews the general approaches, methods, and factors to be considered in the valuation of the capital stock of closely held companies and thinly traded corporations. In addition, our analysis was conducted under the premise of value in continued use, as a going concern. This premise assumes the Company will continue to operate as an income producing entity. It further assumes that the shareholders and management of the Company will act rationally and will employ financial and operational strategies that will maximize its value.

In connection with our Opinion, we made such reviews, analyses, and inquiries as we deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- RVR's audited financial statements for the years ended December 31, 2009 through December 31, 2013;

- RVR's internally prepared interim financial statements for the three-month periods ended March 31, 2013 and March 31, 2014;

- financial projections prepared by Company management for the fiscal years ending December 31, 2014 through December 31, 2018;

- the Stock Purchase Agreement;

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY



Reliance Trust Company, as Trustee
of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 3

- the form of the Investor Rights Agreement by and among RVR, the Trustee, on behalf of the Trust, the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr. (the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr. shall be referred to herein as the "Investors");

- the form of the Seller Notes by and between the Company and each of the Family Trust, the Marital Trust, the Survivor's Trust, and Robert Smalley, Jr.;

- the form of the Warrant Agreements issued by the Company to each of the Investors;

- the form of the Subordinated Note and Warrant Purchase Agreement by and between the Company and each of the Investors;

- the ESOP Company Loan and Pledge Agreement by and between the Company and the Trustee, on behalf of the Trust, dated May 28, 2014;

- the ESOP Note issued by the Trustee in favor of the Company, dated May 28, 2014;

- the ESOP, effective June 1, 2013;

- the Trust, effective June 1, 2013;

- the term sheet setting forth the preliminary features of the MIP dated May 28, 2014;

- the First Amendment to the Bylaws of RVR, Inc.;

- Amended and Restated Employment Agreement by and between the Company and Randall Smalley, dated May 28, 2014;

- Amended and Restated Employment Agreement by and between the Company and Robert Smalley, Jr., dated May 28, 2014;

- Amended and Restated Employment Agreement by and between the Company and Eric Bensen, dated May 28, 2014;

- the Management Presentation prepared by Company management and Chartwell Capital Solutions, dated April 16, 2014;

- a letter from Eric Bensen, as Chief Financial Officer of the Company, containing, among other things, representations regarding the accuracy of the information, data, and other materials (financial or otherwise) provided by or on behalf of the Company;

- a fixed asset schedule illustrating the age and type of the Company's rental fleet;

- a site visit at the Company's headquarters located in Mesa, Arizona;

- discussions with certain members of the senior management of Cruise America regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;

- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- other information, studies, and investigations that we deemed appropriate.

In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and we have relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance therein with respect to the information. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we have exercised our independent judgment in evaluating the information that we received from the Company and/or its representatives, and we have not relied on information that we know to be inadequate or incomplete. Our analysis is based upon market, economic, and other considerations as they existed on and could be evaluated as of the Transaction Date.

Management has represented to us that there have been no material changes in the business, financial position, or results of operations of the Company since March 31, 2014, the date of the most recent financial statements made available to us.

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0001457



Reliance Trust Company, as Trustee
  of the RVR Employee Stock Ownership Plan
May 28, 2014
Page 4

Based on all of the foregoing, it is our Opinion, as of the date hereof, that:

- the consideration to be paid by the ESOP for the ESOP Shares purchased pursuant to the terms of the Transaction is not greater than the Fair Market Value of such shares;

- the interest rate on the ESOP Loan is not in excess of a reasonable interest rate;

- the financial terms of the ESOP Loan are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from arm's-length negotiations between independent parties;

- the exercise price of the Warrants is equal to at least 90.0% of the Fair Market Value at the time of issuance of the underlying common stock;

- the interest rate on the Seller Notes between the Company and the note holders is not in excess of a reasonable rate; and

- the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view.

This Opinion is solely for the use and benefit of the Trustee and any summary of or reference to the Opinion or any other reference to SRR by the Company in connection with the Transaction will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld; provided, however, that the law firm of K&L Gates is granted permission to rely on the Opinion solely in connection with the legal opinion it is rendering with respect to the Transaction. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

In accordance with recognized professional ethics, our professional fees for this service are not contingent upon the opinion expressed herein, and neither SRR nor any of its employees has a present or intended financial relationship with or interest in the Company.

Yours very truly,

STOUT RISIUS ROSS, INC.

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                                    ARGENT_0001458

# Exhibit 32

DOL 0010288

# BYLAWS
# OF
# RVR, INC.

### (A Florida corporation)

**EXHIBIT**

PI 150 - (RTC 30(b)(6) 05/18/21)

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000692

DOL 0010289

## RVR, INC.

## BYLAWS

## ARTICLE I

## OFFICES

1. Registered Office. The registered office of RVR, Inc., a Florida corporation (the "Corporation"), shall be located in the City of Mesa, State of Arizona, unless otherwise designated by the Board of Directors.

2. Other Offices. The Corporation may also have offices at such other places, either within or without the State of Florida, as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or as the business of the Corporation may require.

## ARTICLE II

## MEETINGS OF SHAREHOLDERS

1. Place. All annual meetings of shareholders shall be held at such place, within or without the State of Florida, as may be designated by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof. Special meetings of shareholders may be held at such place, within or without the State of Florida, and at such time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

2. Time of Annual Meeting. Annual meetings of shareholders shall be held on such date and at such time fixed, from time to time, by the Board of Directors, provided that there shall be an annual meeting held every year at which the shareholders shall elect a Board of Directors and transact such other business as may properly be brought before the meeting.

3. Call of Special Meetings. Special meetings of the shareholders shall be held if called by the Board of Directors, the President, or if the holders of not less than ten percent (10%) of all the votes entitled to be cast on any issue proposed to be considered at the proposed special meeting sign, date, and deliver to the Secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held.

4. Conduct of Meetings. The Chairman of the Board (or in his absence, the President or such other designee of the Chairman of the Board) shall preside at the annual and special meetings of shareholders and shall be given full discretion in establishing the rules and procedures to be followed in conducting the meetings, except as otherwise provided by law or in these Bylaws.

5. Notice and Waiver of Notice. Except as otherwise provided by law, written or printed notice stating the place, day, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the day of the meeting, either personally or by first-class mail, by or at the direction of the President, the Secretary, or the officer or person calling the meeting, to each shareholder of record entitled to vote at such meeting. If the notice is mailed at least thirty (30) days before the date of the meeting, it may be done by a class of United States mail other than first-class. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at his address as it appears on the stock transfer books of the Corporation, with postage thereon prepaid. If a

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000693

meeting is adjourned to another time and/or place, and if an announcement of the adjourned time and/or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the Board of Directors, after adjournment, fixes a new record date for the adjourned meeting. Whenever any notice is required to be given to any shareholder, a waiver thereof in writing signed by the person or persons entitled to such notice, whether signed before, during or after the time of the meeting stated therein, and delivered to the Corporation for inclusion in the minutes or filing with the corporate records, shall be equivalent to the giving of such notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the shareholders need be specified in any written waiver of notice. Attendance of a person at a meeting shall constitute a waiver of (a) lack of or defective notice of such meeting, unless the person objects at the beginning to the holding of the meeting or the transacting of any business at the meeting, or (b) lack of defective notice of a particular matter at a meeting that is not within the purpose or purposes described in the meeting notice, unless the person objects to considering such matter when it is presented.

6.    Business of Special Meeting.  Business transacted at any special meeting shall be confined to the purposes stated in the notice thereof.

7.    Quorum.  Shares entitled to vote as a separate voting group may take action on a matter at a meeting only if a quorum of these shares exists with respect to that matter.  Except as otherwise provided in the Articles of Incorporation or by law, a majority of the shares entitled to vote on the matter by each voting group, represented in person or by proxy, shall constitute a quorum at any meeting of shareholders, but in no event shall a quorum consist of less than one-third (1/3) of the shares of each voting group entitled to vote.  If less than a majority of outstanding shares entitled to vote are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice.  After a quorum has been established at any shareholders' meeting, the subsequent withdrawal of shareholders, so as to reduce the number of shares entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.  Once a share is represented for any purpose at a meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that adjourned meeting.

8.    Voting Per Share.  Except as otherwise provided in the Articles of Incorporation or by law, each shareholder is entitled to one (1) vote for each outstanding share held by him on each matter voted at a shareholders' meeting.

9.    Voting of Shares.  A shareholder may vote at any meeting of shareholders of the Corporation, either in person or by proxy.  Shares standing in the name of another corporation, domestic or foreign, may be voted by the officer, agent, or proxy designated by the bylaws of such corporate shareholder or, in the absence of any applicable bylaw, by such person or persons as the board of directors of the corporate shareholder may designate.  In the absence of any such designation, or, in case of conflicting designation by the corporate shareholder, the chairman of the board, the president, any vice president, the secretary, and the treasurer of the corporate shareholder, in that order, shall be presumed to be fully authorized to vote such shares.  Shares held by an administrator, executor, guardian, personal representative, or conservator may be voted by him or her, either in person or by proxy, without a transfer of such shares into his or her name. Shares standing in the name of a trustee may be voted by him or her, either in person or by proxy, but no trustee shall be entitled to vote shares held by him or her without a transfer of such shares into his or her name or the name of his or her nominee. Shares held by or under the control of a receiver, a trustee in bankruptcy proceedings, or an assignee for the benefit of creditors may be voted by such person without the transfer thereof into his or her name. If shares stand of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary of the Corporation is given notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, then acts with respect to voting shall have the following effect:  (a) if only one votes, in person or by proxy, his or her act binds all; (b) if

2

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000694

more than one vote, in person or by proxy, the act of the majority so voting binds all; (c) if more than one vote, in person or by proxy, but the vote is evenly split on any particular matter, each faction is entitled to vote the share or shares in question proportionally; or (d) if the instrument or order so filed shows that any such tenancy is held in unequal interest, a majority or a vote evenly split for purposes hereof shall be a majority or a vote evenly split in interest. The principles of this paragraph shall apply, insofar as possible, to execution of proxies, waivers, consents, or objections and for the purpose of ascertaining the presence of a quorum.

10.     Proxies.  Any shareholder of the Corporation, other person entitled to vote on behalf of a shareholder pursuant to law, or attorney-in-fact for such persons may vote the shareholder's shares in person or by proxy.  Any shareholder of the Corporation may appoint a proxy to vote or otherwise act for him by signing an appointment form, either personally or by the shareholder's attorney-in-fact.  An executed telegram or cablegram appearing to have been transmitted by such person, or a photographic, photostatic, or equivalent reproduction of an appointment form, shall be deemed a sufficient appointment form.  Without limiting the manner in which a shareholder may appoint a proxy to vote or otherwise act for the shareholder pursuant hereto, a shareholder may grant such authority by (a) signing an appointment form, or having such form signed by the shareholder's authorized officer, director, employee, or agent by any reasonable means including, but not limited to, facsimile signature, or (b) transmitting or authorizing the transmission of a telegram, cablegram, or other means of electronic transmission to the person who will be the proxy or to a proxy solicitation firm, proxy support service organization, registrar, or agent authorized by the person who will be designated as the proxy to receive such transmission.  However, any telegram, cablegram, or other means of electronic transmission must set forth or be submitted with information from which can be determined that the transmission was authorized by the shareholder.  If it is determined that the transmission is valid, the inspectors of election or, if there are no inspectors, such other persons making that determination shall specify the information upon which they relied.  An appointment of a proxy is effective when received by the Secretary of the Corporation or such other officer or agent which is authorized to tabulate votes, and shall be valid for up to 11 months, unless a longer period is expressly provided in the appointment form.  The death or incapacity of the shareholder appointing a proxy does not affect the right of the Corporation to accept the proxy's authority unless notice of the death or incapacity is received by the secretary or other officer or agent authorized to tabulate votes before the proxy exercises his authority under the appointment.  An appointment of a proxy is revocable by the shareholder unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

11.     Shareholder List.  After fixing a record date for a meeting of shareholders, the Corporation shall prepare an alphabetical list of the names of all its shareholders who are entitled to notice of the meeting, arranged by voting group with the address of, and the number and class and series, if any, of shares held by each.  The shareholders' list must be available for inspection by any shareholder for a period of ten (10) days prior to the meeting or such shorter time as exists between the record date and the meeting and continuing through the meeting at the Corporation's principal office, at a place identified in the meeting notice in the city where the meeting will be held, or at the office of the Corporation's transfer agent or registrar.  Any shareholder of the Corporation or the shareholder's agent or attorney is entitled on written demand to inspect the shareholders' list (subject to the requirements of law), during regular business hours and at his or her expense, during the period it is available for inspection.  The Corporation shall make the shareholders' list available at the meeting of shareholders, and any shareholder or the shareholder's agent or attorney is entitled to inspect the list at any time during the meeting or any adjournment.

12.     Action Without Meeting.  Any action required by law to be taken at a meeting of shareholders, or any action that may be taken at a meeting of shareholders, may be taken without a meeting or notice if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of shareholders taken at such a meeting. In order to be effective the action must be evidenced

3

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000695

DOL 0010292

by one or more written consents describing the action taken, dated and signed by approving shareholders having the requisite number of votes of each voting group entitled to vote thereon, and delivered to the Corporation by delivery to its principal office in this state, its principal place of business, the corporate secretary, or another officer or agent of the Corporation having custody of the book in which proceedings of meetings of shareholders are recorded. No written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the date of the earliest dated consent delivered in the manner required by this section, written consents signed by the number of holders required to take action are delivered to the Corporation by delivery as set forth in this section. Any written consent may be revoked prior to the date that the Corporation receives the required number of consents to authorize the proposed action. No revocation is effective unless in writing and until received by the Corporation at its principal office or received by the corporate secretary or other officer or agent of the Corporation having custody of the book in which proceedings of meetings of shareholders are recorded.

13.   Fixing Record Date. For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purposes, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders, such date in any case to be not more than sixty (60) days, and, in case of a meeting of shareholders, not less than ten (10) days, prior to the date on which the particular action requiring such determination of shareholders is to be taken. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, or shareholders entitled to receive payment of a dividend, the date on which the notice of the meeting is mailed or the date on which the resolutions of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders. When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this Section 13, such determination shall apply to any adjournment thereof, except where the Board of Directors fixes a new record date for the adjourned meeting or as required by law.

14.   Inspectors and Judges. The Board of Directors in advance of any meeting may, but need not, appoint one or more inspectors of election or judges of the vote, as the case may be, to act at the meeting or any adjournment(s) thereof. If any inspector or inspectors, or judge or judges, are not appointed, the person presiding at the meeting may, but need not, appoint one or more inspectors or judges. In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by the Board of Directors in advance of the meeting, or at the meeting by the person presiding thereat. The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots, and consents, hear and determine all challenges and questions arising in connection with the right to vote, count, and tabulate votes, ballots, and consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders. On request of the person presiding at the meeting, the inspector or inspectors or judge or judges, if any, shall make a report in writing of any challenge, question, or matter determined by him or them, and execute a certificate of any fact found by him or them.

15.   Voting for Directors. Unless otherwise provided in the Articles of Incorporation, directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

## ARTICLE III

## DIRECTORS

1.   Number, Election and Term. The number of directors of the Corporation shall be fixed from time to time, within the limits specified by the Articles of Incorporation, by resolution of the Board of Directors; provided, however, no director's term shall be shortened by reason of a resolution reducing the number of directors. The directors shall be elected at the annual meeting of the shareholders, except as

4

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000696

provided in Section 2 of this Article, and each director elected shall hold office for the term for which he is elected and until his successor is elected and qualified or until his earlier resignation, removal from office or death. Directors must be natural persons who are 18 years of age or older but need not be residents of the State of Florida, shareholders of the Corporation, or citizens of the United States. Any director may be removed at any time, with or without cause, at a special meeting of the shareholders called for that purpose.

2.    Vacancies.   A director may resign at any time by delivering written notice to the Corporation, the Board of Directors, or the Chairman of the Board. Such resignation shall take effect when the notice is delivered unless the notice specifies a later effective date, in which event the Board of Directors may fill the pending vacancy before the effective date if they provide that the successor does not take office until the effective date. Any vacancy occurring in the Board of Directors and any directorship to be filled by reason of an increase in the size of the Board of Directors shall be filled by the affirmative vote of a majority of the current directors, though less than a quorum of the Board of Directors, or may be filled by an election at an annual or special meeting of the shareholders called for that purpose, unless otherwise provided by law. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office, or until the next election of one or more directors by shareholders if the vacancy is caused by an increase in the number of directors.

3.    Powers.  Except as provided in the Articles of Incorporation and by law, all corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, its Board of Directors.

4.    Place of Meetings.  Meetings of the Board of Directors, regular or special, may be held either within or without the State of Florida.

5.    Annual Meeting.  The first meeting of each newly elected Board of Directors shall be held, without call or notice, immediately following each annual meeting of shareholders.

6.    Regular Meetings.  Regular meetings of the Board of Directors may also be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

7.    Special Meetings and Notice.  Special meetings of the Board of Directors may be called by the Chairman of the Board or by the President and shall be called by the Secretary on the written request of any two directors. Written notice of special meetings of the Board of Directors shall be given to each director at least forty-eight (48) hours before the meeting. Except as required by law, neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting. Notices to directors shall be in writing and delivered personally or mailed to the directors at their addresses appearing on the books of the Corporation. Notice by mail shall be deemed to be given at the time when the same shall be received. Notice to directors may also be given by telegram, teletype, or other form of electronic communication. Notice of a meeting of the Board of Directors need not be given to any director who signs a written waiver of notice before, during or after the meeting. Attendance of a director at a meeting shall constitute a waiver of notice of such meeting and a waiver of any and all objections to the place of the meeting, the time of the meeting, and the manner in which it has been called or convened, except when a director states, at the beginning of the meeting or promptly upon arrival at the meeting, any objection to the transaction of business because the meeting is not lawfully called or convened.

8.    Quorum; Required Vote; Presumption of Assent.  A majority of the number of directors fixed by, or in the manner provided in, these bylaws shall constitute a quorum for the transaction of business; provided, however, that whenever, for any reason, a vacancy occurs in the Board of Directors, a quorum shall consist of a majority of the remaining directors until the vacancy has been filled. The act of a majority of the directors present at a meeting at which a quorum is present when the vote is taken shall be the act of the Board of Directors. A director of the Corporation who is present at a meeting of the Board of Directors or a committee of the Board of Directors when corporate action is taken shall be

5

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000697

presumed to have assented to the action taken, unless the director (a) objects at the beginning of the meeting, or promptly upon his or her arrival, to holding the meeting or transacting specific business at the meeting, or (b) votes against or abstains from the action taken.

9.　Action Without Meeting. Any action required or permitted to be taken at a meeting of the Board of Directors or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action taken, is signed by all of the members of the Board of Directors or the committee, as the case may be, and such consent shall have the same force and effect as a unanimous vote at a meeting. Action taken under this section is effective when the last director signs the consent, unless the consent specifies a different effective date. A consent signed under this Section 9 shall have the effect of a meeting vote and may be described as such in any document.

10.　Conference Telephone or Similar Communications Equipment Meetings. Members of the Board of Directors may participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time. Participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened.

11.　Committees. The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members an executive committee and one or more other committees, each of which, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the business and affairs of the Corporation except where the action of the full Board of Directors is required by law. Each committee must have two or more members who serve at the pleasure of the Board of Directors. The Board of Directors, by resolution adopted in accordance with this Article, may designate one or more directors as alternate members of any committee, who may act in the place and stead of any absent member or members at any meeting of such committee. Vacancies in the membership of a committee shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. The executive committee shall keep regular minutes of its proceedings and report the same to the Board of Directors when required. The designation of any such committee and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed upon it or him by law.

12.　Compensation of Directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

13.　Chairman of the Board. The Board of Directors may, in its discretion, choose a Chairman of the Board who shall preside at meetings of the shareholders and of the directors and shall be an ex officio member of all standing committees. The Chairman of the Board shall have such other powers and shall perform such other duties as shall be designated by the Board of Directors. The Chairman of the Board shall be a member of the Board of Directors but no other officers of the Corporation need be a director. The Chairman of the Board shall serve until his successor is chosen and qualified, but he may be removed at any time by the affirmative vote of a majority of the Board of Directors.

ARTICLE IV

OFFICERS

1.　Positions. The officers of the Corporation shall consist of a President, a Secretary, and a Treasurer, and, if elected by the Board of Directors by resolution, a Chairman of the Board and/or one or more Vice Presidents. Any two or more offices may be held by the same person.

6

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY　　　　ARGENT_0000698

DOL 0010295

2.     <u>Election of Specified Officers by Board</u>. The Board of Directors at its first meeting after each annual meeting of shareholders shall elect a President, a Secretary, a Treasurer, and may elect one or more Vice Presidents.

3.     <u>Election or Appointment of Other Officers</u>. Such other officers and assistant officers and agents as may be deemed necessary may be elected or appointed by the Board of Directors, or, unless otherwise specified herein, appointed by the President of the Corporation. The Board of Directors shall be advised of appointments by the President at or before the next scheduled Board of Directors meeting.

4.     <u>Salaries</u>. The salaries of all officers of the Corporation to be elected by the Board of Directors pursuant to this <u>Section 2</u> shall be fixed from time to time by the Board of Directors or pursuant to its discretion. The salaries of all other elected or appointed officers of the Corporation shall be fixed from time to time by the President of the Corporation or pursuant to his direction.

5.     <u>Term; Resignation</u>. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer or agent elected or appointed by the Board of Directors or the President of the Corporation may be removed, with or without cause, by the Board of Directors. Any officers or agents appointed by the President of the Corporation pursuant to <u>Section 3</u> of this Article may also be removed from such officer positions by the President, with or without cause. Any vacancy occurring in any office of the Corporation by death, resignation, removal, or otherwise shall be filled by the Board of Directors, or, in the case of an officer appointed by the President of the Corporation, by the President or the Board of Directors. Any officer of the Corporation may resign from his respective office or position by delivering notice to the Corporation. Such resignation is effective when delivered unless the notice specifies a later effective date. If a resignation is made effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date if the Board provides that the successor does not take office until the effective date.

6.     <u>President</u>. The President shall be the Chief Executive Officer of the Corporation, shall have general and active management of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. In the absence of the Chairman of the Board or in the event the Board of Directors shall not have designated a chairman of the board, the President shall preside at meetings of the shareholders and the Board of Directors.

7.     <u>Vice Presidents</u>. The Vice Presidents in the order of their seniority, unless otherwise determined by the Board of Directors, shall, in the absence or disability of the President, perform the duties and exercise the powers of the President. They shall perform such other duties and have such other powers as the Board of Directors shall prescribe or as the President may from time to time delegate.

8.     <u>Secretary</u>. The Secretary shall attend all meetings of the Board of Directors and all meetings of the shareholders and record all the proceedings of the meetings of the shareholders and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. He shall give, or cause to be given, notice of all meetings of the shareholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or President, under whose supervision he shall be. He shall keep in safe custody the seal of the Corporation and, when authorized by the Board of Directors, affix the same to any instrument requiring it.

9.     <u>Treasurer</u>. The Treasurer shall have the custody of corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. He shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors at its regular meetings or when the Board of Directors so requires an account of all his transactions as treasurer and of the financial

7

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY     ARGENT_0000699

condition of the Corporation unless otherwise specified by the Board of Directors, the Treasurer shall be the Corporation's Chief Financial Officer.

10.    Other Officers, Employees, and Agents. Each and every other officer, employee, and agent of the Corporation shall possess, and may exercise, such power and authority, and shall perform such duties, as may from time to time be assigned to him by the Board of Directors, the officer so appointing him and such officer or officers who may from time to time be designated by the Board of Directors to exercise such supervisory authority.

## ARTICLE V

## CERTIFICATES FOR SHARES

1.    Issue of Certificates. The Corporation shall deliver certificates representing all shares to which shareholders are entitled; and such certificates shall be signed by the Chairman of the Board, President, or a Vice President, and by the Secretary or an Assistant Secretary of the Corporation, and may be sealed with the seal of the Corporation or a facsimile thereof.

2.    Legends for Preferences and Restrictions on Transfer. The designations, relative rights, preferences, and limitations applicable to each class of shares and the variations in rights, preferences, and limitations determined for each series within a class (and the authority of the Board of Directors to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate may state conspicuously on its front or back that the Corporation will furnish the shareholder a full statement of this information on request and without charge. Every certificate representing shares that are restricted as to the sale, disposition, or transfer of such shares shall also indicate that such shares are restricted as to transfer and there shall be set forth or fairly summarized upon the certificate, or the certificate shall indicate that the Corporation will furnish to any shareholder upon request and without charge, a full statement of such restrictions. If the Corporation issues any shares that are not registered under the Securities Act of 1933, as amended, and registered or qualified under the applicable state securities laws, the transfer of any such shares shall be restricted substantially in accordance with the following legend:

> "THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME."

3.    Facsimile Signatures. The signatures of the Chairman of the Board, the President or a Vice President and the Secretary or Assistant Secretary upon a certificate may be facsimiles, if the certificate is manually signed by a transfer agent, or registered by a registrar, other than the Corporation itself or an employee of the Corporation. In case any officer who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer at the date of the issuance.

4.    Lost Certificates. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of

8

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000700

such lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

5.    Transfer of Shares.    Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

6.    Registered Shareholders.    The Corporation shall be entitled to recognize the exclusive rights of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law.

7.    Redemption of Control Shares.    As provided by the Florida Business Corporation Act, if a person acquiring control shares of the Corporation does not file an acquiring person statement with the Corporation, the Corporation may redeem the control shares at fair market value at any time during the 60-day period after the last acquisition of such control shares by such acquiring person.  If a person acquiring control shares of the Corporation files an acquiring person statement with the Corporation, the control shares may be redeemed by the Corporation only if such shares are not accorded full voting rights by the shareholders as provided by law.

## ARTICLE VI

## GENERAL PROVISIONS

1.    Dividends.    The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in cash, property, or its own shares pursuant to law and subject to the provisions of the Articles of Incorporation.

2.    Reserves.    The Board of Directors may by resolution create a reserve or reserves out of earned surplus for any proper purpose or purposes, and may abolish any such reserve in the same manner.

3.    Checks.    All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

4.    Fiscal Year.    The fiscal year of the Corporation shall be fixed by the Board of Directors and may be otherwise changed from time to time by resolution of the Board of Directors.

5.    Seal.    The corporate seal shall have inscribed thereon the name and state of incorporation of the Corporation.  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

6.    Gender.    All words used in these Bylaws in the masculine gender shall extend to and shall include the feminine and neuter genders.

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT 0000701

## ARTICLE VII

## AMENDMENTS OF BYLAWS

Unless otherwise provided by law, these Bylaws may be altered, amended, or repealed or new Bylaws may be adopted by action of the Board of Directors.

10

PHX_DOCS:1206007.1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000702

Execution Version

**FIRST AMENDMENT TO THE**
**BY-LAWS**
**OF**
**RVR, INC.**
(A Florida Corporation)

May 28, 2014

**WHEREAS**, pursuant to and in accordance with Article VII of the Bylaws of RVR, Inc. (the "Bylaws"), the Board of Directors (the "Board") and the sole shareholder (the "Shareholder") of RVR, Inc. (the "Company"), each by execution of an Action by Written Consent, dated May 28, 2014, authorized and approved an amendment to the Bylaws, as more particularly set forth in this First Amendment to the Bylaws of RVR, Inc. (this "Amendment").

**NOW, THEREFORE**, the Bylaws shall be amended as follows:

1.      <u>Article III, Section 2</u>. Article III, Section 2 of the Bylaws is amended and restated in its entirety as follows:

"2.      <u>Vacancies</u>. A director may resign at any time by delivering written notice to the Corporation, the Board of Directors, or the Chairman of the Board. Such resignation shall take effect when the notice is delivered unless the notice specifies a later effective date, in which event the Board of Directors may fill the pending vacancy before the effective date if they provide that the successor does not take office until the effective date. Any vacancy occurring in the Board of Directors and any directorship to be filled by reason of an increase in the size of the Board of Directors shall only be filled by the affirmative vote of a majority of the current directors, though less than a quorum of the Board of Directors. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office, or until the next election of one or more directors by shareholders if the vacancy is caused by an increase in the number of directors."

2.      <u>Article III, Section 11</u>. Article III, Section 11 of the Bylaws is amended and restated in its entirety as follows:

"11.      <u>Committees</u>.

(a)      <u>General Provisions; Designation</u>. The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members an executive committee and one or more other committees, each of which, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the business and affairs of the Corporation except where the action of the full Board of Directors is required by law. Each committee must have two or more members who serve at the pleasure of the Board of Directors. The Board of Directors, by resolution adopted in accordance with this Article, may designate one or more directors as alternate members of any committee, who may act in the place and stead of any absent member or members at any meeting of such committee. Vacancies in the membership of a committee shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. The executive committee shall keep regular minutes of its proceedings and report the same to the Board of Directors when required. The designation of any such committee and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed upon it or him by law.

*PHX 331155354v2*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000703

Execution Version

(b)    Nominating Committee.   The Corporation shall have a Nominating Committee, which shall consist of all the members of the Board of Directors (which are initially Robert Smalley, Jr., Randall Smalley and Eric Bensen). The Nominating Committee shall nominate candidates for election to the Board of Directors, and the shareholders shall be entitled to vote their shares in the election of members to the Board of Directors only for such nominees as the Nominating Committee shall designate. If the RVR Employee Stock Ownership Trust (the "Trust") established pursuant to the RVR Employee Stock Ownership Plan (the "Plan," and together with the Trust, the "ESOP") is a shareholder of the Corporation, it shall vote its shares in accordance with the terms of the ESOP, these Bylaws and applicable law."

3.    Article III, Section 14. The following Section 14 shall be added to Article III of the Bylaws:

"14.    Board Procedure for Review of Unsolicited Offers to Acquire the Company. The Board of Directors is responsible for all merger and acquisition ("M&A") activity involving the Corporation's stock or assets. The Board of Directors will review and respond to unsolicited M&A offers that meet the threshold criterion of being a "bona fide offer." A bona fide offer will be limited to offers with the following characteristics: (a) a premium to the Corporation's current or expected equity price, whichever is applicable in light of the circumstances; (b) a fully financed offer not subject to a finance contingency; (c) an offer that does not require an extensive due diligence time period extending beyond 3 months from the time of commencement of the due diligence; and (d) an offer that has a reasonable expectation of closing on price and terms similar to its offer. If the ESOP is a shareholder of the Corporation, prior to execution of any agreement with a party who has made a bona fide offer, the Board of Directors will inform the Trustee of the ESOP (as defined in the ESOP) of the receipt of such offer and provide the Trustee with a copy of the offer documents. If the offer, in the Board of Director's judgment, is not a bona fide offer or is not in the best interest of the shareholders of the Corporation, the Board may choose to disregard the offer."

4.    Capitalized Terms.  Unless otherwise defined herein, each capitalized term used in this First Amendment shall have the same meaning as provided for such capitalized term in the Bylaws.

5.    Ratification.  Except as expressly amended by this First Amendment, the Bylaws shall continue in full force and effect in accordance with their terms, and is hereby confirmed and ratified in all respects.

*[Signature page to follow.]*

*PHX 331155354v2*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000704

DOL 0010301

THE FOREGOING FIRST AMENDMENT TO THE BYLAWS OF RVR, INC. was duly adopted by the Board of Directors and the sole shareholder of the Company pursuant to Article VII of such Bylaws as of May 28th, 2014.

Eric Bensen, Secretary

First Amendment to Bylaws of RVR, Inc.

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000705

# Exhibit 33



May 28, 2014

WELLS FARGO BANK, NATIONAL ASSOCIATION
100 W. Washington Street, 25th Floor
Phoenix, Arizona 85003

RELIANCE TRUST COMPANY
1100 Abernathy Road
Suite 400
Atlanta, GA 30328

Ladies and Gentlemen:

We have acted as counsel to (i) RVR, Inc., a Florida corporation ("RVR"), (ii) Cruise America, Inc., a Florida corporation ("Cruise America), and (iii) Cruise Canada Inc., a corporation organized pursuant to the federal laws of Canada ("Cruise Canada"), in connection with the transactions (collectively, the "Transactions") evidenced by (a) the Stock Purchase Agreement, of even date herewith (the "Stock Purchase Agreement"), executed by RVR, Eric Bensen, the "Survivor's Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Survivor's Trust"), the "Family Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Family Trust"), the "Marital Trust" created under the Smalley Revocable Trust, dated July 8, 2004 (the "Smalley Marital Trust"), Robert Smalley, Jr. ("RSJ"), and Reliance Trust Company, solely in its capacity as trustee (the "Trustee") of the RVR Employee Stock Ownership Trust dated June 1, 2013 (the "Trust"), established pursuant to the RVR Employee Stock Ownership Plan, as amended from time to time (the "Plan" and, together with the Trust, the "ESOP"), (b) the Subordinated Note and Warrant Purchase Agreement, of even date herewith (the "Note and Warrant Purchase Agreement"), executed by RVR and the Smalley Survivors Trust, the Smalley Family Trust, the Smalley Marital Trust, and RSJ, as purchasers (collectively, the "Note and Warrant Purchasers"), (c) the Amended and Restated Credit Agreement, of even date herewith (the "U.S. Credit Agreement"), executed by RVR, Cruise America, and Wells Fargo Bank, National Association (the "Bank"), and (d) the Third Modification to Credit Agreement, of even date herewith (the "Third Modification"), executed by Cruise Canada and the Bank. The Bank and the Trustee have requested our opinion about certain matters pursuant to the Transaction Documents (as defined below). Capitalized terms used and not otherwise defined in this letter shall have the meanings ascribed to them in the U.S. Credit Agreement. RVR, Cruise America, and Cruise Canada are sometimes collectively referred to herein as the "Opinion Parties."

As used in this opinion, the phrase "to our knowledge," or words of similar import, mean, as to matters of fact, that, to the actual knowledge of the attorneys within

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY⁺
MIAMI
MILAN˃
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME˃
SACRAMENTO
SAN FRANCISCO
SEOUL˃
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV˄
TYSONS CORNER
WARSAW˜
WASHINGTON, D.C.
WEST PALM BEACH
WHITE PLAINS

*OPERATES AS
 GREENBERG TRAURIG MAHER LLP
⁺OPERATES AS
 GREENBERG TRAURIG, S.C.
˃STRATEGIC ALLIANCE
˄OPERATES AS
 GREENBERG TRAURIG LLP
 FOREIGN LEGAL CONSULTANT OFFICE
˄A BRANCH OF
 GREENBERG TRAURIG, P.A.,
 FLORIDA, USA
˜OPERATES AS
 GREENBERG TRAURIG GRZESIAK SP.K.

*PHX 331150934v4*

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM
2375 East Camelback Road ▪ Suite 700 ▪ Phoenix, AZ 85016 ▪ Tel 602.445.8000 ▪ Fax 602.445.8100

RVR34895

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 2

our firm principally responsible for the Transactions and after an examination of the Transaction Documents (as defined below), but without any independent factual investigation or verification of any kind, other than inquiries of representatives of the Opinion Parties, such matters are factually correct.

## I.    Transaction Documents and Other Documents Examined

For purposes of this opinion, we have examined such questions of law and fact as we have deemed necessary or appropriate. We also have examined the following documents:

1.    The Trust.

2.    The Plan.

3.    The Stock Purchase Agreement.

4.    ESOP Loan and Pledge Agreement, of even date herewith, executed by RVR and the Trust.

5.    ESOP Note, of even date herewith, in the principal amount of $104,401,014.94, executed by the Trust in favor of RVR.

6.    The Note and Warrant Purchase Agreement.

7.    The U.S. Credit Agreement.

8.    Revolving Line of Credit Note (Substitute Note), of even date herewith, in the maximum principal amount of $75,000,000, executed by RVR and Cruise America in favor of the Bank.

9.    Term Note (Bridge Loan Note), of even date herewith, in the principal amount of $87,000,000, executed by RVR and Cruise America in favor of the Bank.

10.    Securities Pledge Agreement, of even date herewith, executed by RVR, Cruise America and the Bank (the "Pledge Agreement").

11.    Intellectual Property Security Agreement, of even date herewith, executed by RVR, Cruise America, and the Bank (the "IP Security Agreement").

12.    Collateral Assignment of ESOP Documents, of even date herewith, executed by RVR and the Bank, and acknowledged and consented to by the Trust (the "Collateral Assignment" and collectively with the Pledge Agreement and the IP Security Agreement, the "Security Documents").

*PHX 331150934v4*

RVR34896

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 3

13.    Subordination and Intercreditor Agreement, of even date herewith, executed by RVR, Cruise America, Cruise Canada, the Smalley Family Trust, the Smalley Marital Trust, the Smalley Survivor's Trust, RSJ, and the Bank.

14.    The Third Modification.

15.    Revolving Line of Credit Note (Substitute Note), of even date herewith, in the maximum principal amount of $25,000,000, executed by Cruise Canada in favor of the Bank.

16.    The following UCC-1 Financing Statements (collectively, the "Financing Statements"):

    A.    UCC-1 Financing Statement naming Cruise America as debtor, and the Bank as secured party, to be filed with the Florida Secured Transaction Registry.

    B.    UCC-1 Financing Statement naming RVR as debtor, and the Bank as secured party, to be filed with the Florida Secured Transaction Registry.

17.    The following articles of incorporation:

    A.    The Articles of Incorporation of Cruise America, filed with the Secretary of State of the state of Florida on June 30, 1972, as certified by the Secretary of State of the state of Florida on May 20, 2014.

    B.    The Articles of Incorporation of RVR, dated and filed with the Secretary of State of the state of Florida on September 28, 2000, as certified by the Secretary of State of the state of Florida on May 20, 2014.

18.    The following bylaws:

    A.    The Bylaws of Cruise America.

    B.    The Bylaws of RVR.

19.    The following written consents:

    A.    Action by Written Consent of the Board of Directors of Cruise America, dated as of May 28, 2014.

    B.    Action by Written Consent of the Board of Directors of RVR, dated as of May 28, 2014.

PHX 331150934v4

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM

RVR34897

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 4

20.     The following certificates of good standing (collectively, the "Good Standing Certificates"):

A.     Certificate of Good Standing, dated May 19, 2014, issued by the Secretary of State of the state of Florida with respect to Cruise America.

B.     Certificate of Good Standing, dated May 19, 2014, issued by the Secretary of State of the state of Florida with respect to RVR.

21.     The foreign good standing certificates with respect to Cruise America described on Exhibit A (collectively, the "Foreign Good Standing Certificates").

22.     Certificate of the Trustee, executed by Steven Martin, in his capacity as an officer of the Trustee, of even date herewith, and attached hereto as Exhibit B (the "Trustee's Certificate").

23.     The opinion of Stout Risius Ross, Inc. to the Trustee dated of even date herewith (the "SRR Opinion").

24.     Such other corporate records, agreements, instruments, documents, and certificates, including, without limitation, an Officer Certificate, dated as of the date hereof, given by RVR and attached hereto as Exhibit C (the "Officer Certificate"), and such questions of law as we have deemed necessary or appropriate to enable us to render the opinions expressed below

All documents referred to in clauses (1) through (15) are hereinafter referred to as the "Transaction Documents." All documents referred to in clauses (17) and (18) are referred to collectively herein as the "Organizational Documents."

## II.     Opinions

Based on the foregoing, and subject to the assumptions, qualifications, and limitations set forth below, it is our opinion that:

1.     Each of RVR and Cruise America is a corporation duly organized, validly existing, and, based solely upon our review of the Good Standing Certificates, in good standing under the laws of the state of Florida.

2.     Based solely upon our review of the Foreign Good Standing Certificates, Cruise America is qualified to do business in the states described in the applicable Foreign Good Standing Certificate.

3.     The execution, delivery, and performance of the Transaction Documents, as applicable, by each of RVR and Cruise America have been duly authorized by all requisite corporate action on the part of each of RVR and Cruise America.

*PHX 331150934v4*

RVR34898

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 5

4.      The applicable Transaction Documents have been duly executed and delivered by each of RVR and Cruise America.

5.      Each of RVR and Cruise America has the requisite corporate power and corporate authority to: (i) own and operate its properties and assets; (ii) carry out its business as such business is currently being conducted; and (iii) carry out the terms and conditions applicable to it under the Transaction Documents.

6.      Based solely upon our knowledge, there is no litigation, investigation or proceeding of or before any arbitrator or governmental authority pending or threatened by or against Cruise America or RVR, or against any of their respective properties or revenues: (i) with respect to any of the Transaction Documents or the Transactions; or (ii) that could reasonably be expected to have a Material Adverse Effect.

7.      Except for filings required for the perfection of the Bank's security interest, no consent, approval, authorization, or other action by, or filing with, any federal, state, or local governmental authority is required in connection with the execution, and delivery by any of the Opinion Parties of the Transaction Documents and the consummation of the Transaction, or, if any of the foregoing is required, it has been obtained.

8.      The execution, delivery and performance of the Transaction Documents and consummation of the Transaction by each of RVR and Cruise America will not violate the Organizational Documents applicable to such party.

9.      Based solely upon our knowledge, the execution and delivery of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties, as applicable, will not violate any judgment, order, or decree of any court or governmental agency to which such Opinion Party is a party or by which it is bound.

10.     Based solely upon our knowledge, the execution and delivery of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties, as applicable, will not cause a breach or default of any material agreement listed in the Officer's Certificate to which such Opinion Party is a party, the result of which could reasonably be expected to have a Material Adverse Effect.

11.     The execution, delivery and performance of the Transaction Documents and consummation of the Transactions by each of the Opinion Parties party thereto will not violate any applicable law, rule or regulation affecting such Opinion Party.

12.     The Transaction Documents are valid, binding, and enforceable obligations of each of the Opinion Parties party thereto.

13.     The extension of credit under the U.S. Credit Agreement made on the date of this opinion letter and the use of the proceeds thereof in accordance with the

PHX 331150934v4

RVR34899

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 6

provisions of the U.S. Credit Agreement do not violate the provisions of Regulations T, U, or X of the Board of Governors of the Federal Reserve System.

14.    Neither RVR nor Cruise America is an "investment company" within the meaning of, and subject to regulation under, the Investment Company Act of 1940, as amended.

15.    The Plan has been duly and validly established by RVR in accordance with applicable law. The Plan, in form, qualifies as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), which, in form, qualifies under Section 401(a) of the Code. The Trust, in form, qualifies under Section 501(a) of the Code. No action has been or is being taken by or with respect to the Plan which is inconsistent with the "qualified status" of the Plan under Section 401(a) of the Code and Section 4975(e)(7) of the Code or under Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and under the regulations interpreting those laws.

16.    The shares of RVR stock purchased by the Trust pursuant to the Stock Purchase Agreement constitute "employer securities," as that term is defined in Section 409(l) of the Code, and constitute "qualifying employer securities," as that term is defined in Section 407(d)(5) of ERISA.

17.    The Trustee has been duly appointed by RVR to serve as trustee of the Trust.

18.    The Security Documents are sufficient to create in favor of the Bank a security interest in any rights of RVR and Cruise America in the collateral described therein in which a security interest can be created under Article 9 of the Uniform Commercial Code in effect in the state of Arizona (the "AZ UCC").

19.    Each Financing Statement is in proper form for filing with the office of the Florida Secured Transaction Registry and, upon due filing in such office, will perfect a security interest in that collateral described therein as to which a security interest has been duly granted to the Bank and to the extent a security interest can be perfected in such collateral under the Uniform Commercial Code in effect in the state of Florida (the "FL UCC") by the filing of a financing statement.

20.    Assuming that the Bank has taken and is retaining possession in Arizona of the Pledged Equity (as defined in the Pledge Agreement), and assuming that the Bank has taken the Pledged Equity in good faith without notice (actual or constructive) of any adverse claim within the meaning of the AZ UCC, there has been created under the Pledge Agreement, and there has been granted to the Bank a perfected security interest in and lien upon all of the Pledged Equity to the extent that a security interest may be obtained by

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM

RVR34900

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 7

possession under the AZ UCC. As used in this opinion letter, the term "notice of adverse claim" has the meaning set forth in the AZ UCC.

## III.    Assumptions

In rendering the foregoing opinions, we have assumed the following:

a.    The genuineness of signatures not witnessed, the authenticity of documents submitted as originals, and the conformance to originals of documents submitted as copies.

b.    Each person who is a natural person, and who is executing any of the Transaction Documents, possesses the legal competency and capacity necessary for such individual to execute such documents and/or to carry out such individual's role in the transaction contemplated by the Transaction Documents.

c.    The Transaction Documents are valid, binding, and enforceable obligations of the parties thereto (other than RVR, Cruise America, and Cruise Canada) in accordance with their respective terms.

d.    Cruise Canada is a corporation duly organized, validly existing and in good standing under the laws of Canada and the Province of British Columbia. The execution, delivery, and performance of the applicable Transaction Documents by Cruise Canada has been duly authorized by all requisite corporate action on the part of Cruise Canada. The Transaction Documents to which Cruise Canada is a party have been duly executed and delivered by Cruise Canada. Cruise Canada has the requisite corporate power and corporate authority to: (i) own and operate its properties and assets; (ii) carry out its business as such business is currently being conducted; and (iii) carry out the terms and conditions applicable to it under the Transaction Documents.

e.    The Transaction Documents accurately and completely describe and contain the parties' mutual intent, understanding, and business purposes, and there are no oral or written statements, agreements, understandings, or negotiations, nor any usage of trade or course of prior dealing among the parties, that directly or indirectly modify, define, amend, supplement, or vary, or purport to modify, define, amend, supplement, or vary, any of the terms of the Transaction Documents or any of the parties' rights or obligations thereunder, by waiver or otherwise.

f.    The applicable Transaction Documents, immediately after delivery, will be properly filed or recorded in the appropriate governmental offices, the Bank will timely file all necessary continuation statements, and all fees, charges, and taxes due and owing as of this date have been paid.

g.    The result of the application of Arizona law as specified in the Transaction Documents will not be contrary to a fundamental policy of the law of any other state with

*PHX 331150934v4*

RVR34901

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 8

which the parties may have material or relevant contact in connection with the Transaction and as to which there is a materially greater interest in determining an issue of choice of law.

      h.      Neither the Bank, nor the Note and Warrant Purchasers will receive interest, charges, fees, or other benefits or compensation in the nature of interest in connection with the transactions contemplated thereby, other than those that the Opinion Parties have agreed in writing in the applicable Transaction Documents to pay.

      i.      The Opinion Parties have paid all income taxes, fines, jeopardy, or fraud assessments, and interest due from it and payable to the state of Arizona.

      j.      Where tangible personal property is to be acquired after the date hereof, a security interest is created under the after-acquired property clause of any of the Security Documents.

      k.      The Transaction Documents will be duly delivered for value and for the consideration provided for in or contemplated by the Transaction Documents and value has been given for the creation of any security interest.

      l.      Each of the Opinion Parties holds the requisite title and rights to any real or personal property involved in the Transactions or otherwise purported to be owned by it.

      m.      The parties to the Transaction Documents (other than RVR, Cruise America, and Cruise Canada) will act in a commercially reasonable manner in enforcing their respective rights under the Transaction Documents.

      n.      The representations of the Opinion Parties set forth in the Transaction Documents and the Officer Certificate regarding factual issues are true and correct.

      o.      The representations of the Trustee set forth in the Trustee's Certificate are true and correct.

## IV.    Qualifications and Limitations

The opinions set forth above are subject to the following qualifications and limitations:

      a.      Our opinions herein regarding the due execution and delivery of the Transaction Documents are based upon our review of copies of executed signature pages for such Transaction Documents provided to us by others purportedly present at the closing of the Transaction. We did not physically witness the execution or delivery of any Transaction Documents.

*PHX 331150934v4*

RVR34902

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 9

b.      The enforceability of the Transaction Documents may be subject to or limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, and other similar laws relating to or affecting the rights of creditors generally.

c.      The enforceability of the Transaction Documents is subject to general principles of equity.

d.      The enforceability of the Transaction Documents is subject to qualification that certain waivers, procedures, remedies, and other provisions of the Transaction Documents may be unenforceable under or limited by the law of the state of Arizona; however, such possible unenforceability or limitations will not render the Transaction Documents invalid as a whole or substantially prevent the practical realization of the principal benefits and security intended by the Transaction Documents, except (i) for the economic consequences of procedural or other delay, and (ii) that the application of principles of guaranty and suretyship to the acts or omissions of the Bank or the Note and Warrant Purchasers after execution and delivery of any of the Transaction Documents that are in the nature of a guaranty or third party pledge may prevent the practical realization of the benefits intended by any such Transaction Document through a result or discharge of any guarantor or third party pledgor.

e.      Our engagement did not extend to, and we render no opinion about, any federal tax issues (other than the limited scope legal opinions in paragraphs 15 and 16), state tax, securities, environmental, public health, or labor laws, rules or regulations, zoning matters, or applicable building code ordinances, or the effect of such matters, if any, on the opinions expressed herein.

f.      We express no opinion as to matters of title, priority, or perfection of liens or priority or perfection of security interests, except as specifically set forth herein.

g.      We express no opinion with respect to commercial tort claims.

h.      Our opinion as to personal property covers only (i) security interests created under Chapter 9 of the AZ UCC, (ii) UCC collateral or transactions, and (iii) UCC perfection methods that are limited to filing a financing statement.

i.      We express no opinion about the effect on the corporation or the transaction contemplated by the Transaction Documents, if any, of the provisions of Arizona Revised Statutes Section 43-1152 et seq.

j.      While certain members of this firm are admitted to practice in other states, we have not examined the laws of any state other than the states of Arizona and Florida or consulted with members of this firm who are admitted in other jurisdictions with respect to the laws of such jurisdictions. We do not express any opinion concerning any law, other than the law of the states of Arizona and Florida, and applicable federal law.

*PHX 331150934v4*

RVR34903

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 10

k.   The opinions expressed in this letter are based upon the law and facts in effect on the date hereof, and we assume no obligation to update, revise, or supplement this opinion.

In addition to the foregoing, our limited scope legal opinions in paragraphs 15 and 16 are subject to the following assumptions, qualifications, and limitations:

**LIMITED SCOPE OPINION: For federal tax purposes, the opinions in paragraphs 15 and 16 are limited scope legal opinions that address only the issues set forth in those paragraphs. Additional issues may exist that could affect the federal tax treatment of the transaction or matters that is the subject of this legal opinion, and those issues are not considered in this opinion. The opinions in paragraphs 15 and 16 do not consider or provide a conclusion with respect to any additional issues. With respect to any significant federal tax issues outside the scope of the opinions in paragraphs 15 and 16, this opinion letter was not written, and cannot be used, for the purpose of avoiding penalties that may be imposed.**

(i)   With respect to the opinions set forth in paragraph 15, our opinion is based on the following analysis: Section 4975(e)(7) of the Code defines an employee stock ownership plan as a defined contribution plan which is a stock bonus plan which is qualified and is designated to invest in qualifying employer securities. The Plan is a stock bonus plan that is designated to invest in qualifying employer securities. For purposes of our opinion set forth in paragraph 15, we have assumed that the Opinion Parties will apply in a timely manner for and receive a determination letter from the Internal Revenue Service (the "IRS") to the effect that the Plan and the Trust qualify and are exempt from tax under the referenced Code sections and that the Plan satisfies the requirements of Section 4975(e)(7) of the Code, and that the Opinion Parties will adopt any amendments to the Plan or Trust which may be required by the IRS as a condition to issuing a favorable determination letter. The Federal tax opinions set forth in paragraph 15 concern the qualification of a qualified plan and are thus considered excluded advice that is not subject to the covered opinion requirements. With respect to the opinions set forth in paragraph 15, we express no opinion with respect to compliance by the Plan in operation with the requirements of the Code or of ERISA.

(ii)   With respect to paragraph 16, our opinion is based on the following analysis: Code Section 409(l) defines "employer securities" as common stock issued by the employer, or a member of a controlled group, including the employer, that is readily tradable on an established securities market. If such common stock does not exist, employer securities generally means common stock issued by the employer having a combination of voting power and dividend rights equal to or exceeding the class of common stock of the employer having the greatest voting power and the class of stock having the greatest dividend rights. Employer securities also include noncallable preferred stock if such stock is convertible at any time into the qualified common stock described above at a conversion price which (as of the date of acquisition by the ESOP) is

*PHX 331150934v4*

RVR34904

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 11

reasonable. RVR only has one class of stock and its common stock is not readily tradable on an established securities market. Thus, the RVR common stock, as the only class of common stock of RVR, has the greatest combination of voting power and dividend rights of any class of common stock of RVR. RVR does not have any controlled group members whose common stock is readily tradable on an established securities market. ERISA has a broader definition of "employer securities" which is defined in ERISA Section 407(d)(1) as a security issued by an employer of employees covered by the Plan, or by an affiliate of such employer. ERISA Section 407(d)(5) defines "qualifying employer securities" as an employer security which is: (1) stock; (2) a marketable obligation; or (3) an interest in a publicly traded partnership. The shares of RVR stock purchased by the Trust pursuant to the Stock Purchase Agreement are shares of RVR's common stock and RVR's employees are covered by the ESOP.

     (iii)    The Federal tax issues described in paragraphs 15 and 16 have satisfied the elements required under the Code, the existing and proposed Treasury Regulations promulgated thereunder, and such existing cases, rulings, and other authorities. Therefore, the overall Federal tax treatment of the matters analyzed above will be the proper treatment because, and it is also our opinion that the Plan is an employee stock ownership plan that satisfies the requirements of Section 4975(e)(7) of the Code and that shares of RVR stock owned by the Trust constitute "employer securities," as that term is defined in Section 409(l) of the Code.

     (iv)    We express no Federal tax opinion, nor is any Federal tax opinion implied, regarding any tax issue or any other aspect of the transaction described herein relating to Federal tax issues other than those expressly set forth in paragraphs 15 and 16. The limited scope legal opinions in paragraphs 15 and 16 speak only as of the date hereof and we disclaim any obligation to modify or revise this opinion as a result of any change in law or fact on which this opinion is based.

     (v)    Our conclusions as to certain Federal income tax matters are based upon the representations, assumptions and facts described herein. If any of the representations, assumptions or facts stated herein are not complete or accurate or if any of the representations, assumptions or facts change, our opinion may be modified in whole or part.

     (vi)    Our limited scope legal opinions in paragraphs 15 and 16 are limited to the Federal income tax consequences of the transaction described herein. In providing those opinions, we have reviewed ERISA, the current Code, the existing and proposed treasury regulations promulgated thereunder, and such existing cases, rulings, and other authorities as we deemed necessary or appropriate to render our opinions. All of these authorities are subject to change, possibly on a retroactive basis. In certain instances, we have determined that there is no authority directly on point, and in such instances, we have reached an opinion reasoning from such other authority as we believe to be relevant to the issues addressed.

*PHX 331150934v4*

RVR34905

Wells Fargo Bank, National Association
Reliance Trust Company
May 28, 2014
Page 12

(vii)    The limited scope legal opinions in paragraphs 15 and 16 are furnished to the Bank and the Trustee, as applicable, and their respective counsel, solely for the information, benefit and use of those persons in determining the U.S. Federal income tax consequences to the Bank and the Trustee of the transactions described above and may not be relied upon, used, circulated or otherwise referred to for any other purpose or by anyone else without our express written permission. No assurances are or can be given that the IRS will agree with our opinions in whole or in part and should not be considered a representation, warranty, or guaranty that the IRS or the courts will concur with our opinions. We express no opinion, nor is any opinion implied, regarding any tax issue or any other aspect of the transaction described herein, except to the extent expressly set forth herein.

(viii)    The limited scope legal opinions in paragraphs 15 and 16 are not binding upon the IRS or any court. We do not provide, and there is no assurance or guaranty that the IRS, any other taxing authority or any court will accept or agree with the conclusions set forth herein. Instead, our opinions are based upon our interpretation of the Federal tax law as of the date hereof. Any change to the applicable law (for which we shall have no responsibility to advise the Bank or the Trustee) or relevant facts may result in our opinions being rendered invalid or necessitate (upon request by the Bank or the Trustee) a reconsideration.

*    *    *

This opinion letter may be relied upon by the Bank and the Trustee, their respective successors and assigns, and their respective counsel with respect to the Transactions. Accordingly, it may not be published, quoted, delivered to, or relied upon by, any other person or entity, or used for any other purpose, without, in each instance, our prior written consent, except that those persons listed above that are entitled to rely on this opinion may furnish copies of this opinion (i) to their independent auditors, advisors, and attorneys, (ii) to any governmental authority having regulatory jurisdiction over them, (iii) pursuant to any legal process of any court or governmental authority, and (iv) in connection with any legal action to which they are a party arising out of the Transactions.

Very truly yours,

GREENBERG TRAURIG, LLP

PHX 331150934v4

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM

RVR34906

# Exhibit 34

FILED
00 SEP 28 PM 1: 46
SECRETARY OF STATE
TALLAHASSEE FLORIDA

## ARTICLES OF INCORPORATION

### OF

### RVR, INC.

### ARTICLE I

#### Name

The name of the Corporation is RVR, Inc. and the address of the principal office and the mailing office of the Corporation is 11 West Hampton Avenue, Mesa, Arizona 85210.

### ARTICLE II

#### Purposes

The Corporation is formed to engage in any lawful act or activity for which corporations may be organized under the Florida Business Corporation Act, including any amendments thereto.

### ARTICLE III

#### Registered Agent and Office

The address of the initial registered office of the Corporation is 1200 S. Pine Island Road, Plantation, Florida 33324, and the name of its initial registered agent at such office is CT Corporation System.

### ARTICLE IV

#### Capital Stock

The Corporation shall have authority to issue a total of 10,000,000 shares of common stock, $0.001 par value per share.

### ARTICLE V

#### Bylaw Amendment

In furtherance and not in limitation of the powers conferred by the laws of Florida, each of the Board of Directors and shareholders is expressly authorized and empowered to make, alter, amend, and repeal the Bylaws of the Corporation in any respect not inconsistent with the laws of the State of Florida or with these Articles of Incorporation. The shareholders of the Corporation may amend or adopt a bylaw that fixes a greater quorum or voting requirement for shareholders (or voting groups of shareholders) than is required by law.

PHX_DOCS:1205644.1

RVR30224

## ARTICLE VI

### Keeping of Books

The books of the Corporation may be kept at such place within or without the State of Florida as the Bylaws of the Corporation may provide or as may be designated from time to time by the Board of Directors of the Corporation.

## ARTICLE VII

### Directors

The Board of Directors of the Corporation shall consist of at least one director, with the exact number to be fixed from time to time in the manner provided in the Corporation's Bylaws.

## ARTICLE VIII

### Incorporator

The name of the Incorporator is T.L. Bates and the address of the Incorporator is 3225 North Central Avenue, Phoenix, Arizona 85012.

## ARTICLE IX

### Indemnification

A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for violation of a criminal law, unless the director had reasonable cause to believe his conduct was lawful or had no reasonable cause to believe his conduct was unlawful, or (iv) for any transaction from which the director derived an improper personal benefit.

If the Florida Business Corporation Act hereafter is amended to authorize the further elimination or limitation of the liability of directors, then the liability of the Corporation's directors shall be eliminated or limited to the full extent authorized by the Florida Business Corporation Act, as amended.

The Corporation shall indemnify and shall advance expenses on behalf of any officer or director, or any former officer or director, of the Corporation to the fullest extent not prohibited by law in existence either now or hereafter.

Any repeal or modification of this Article shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

RVR30225

## ARTICLE X

### Amendment

The Corporation reserves the right to amend or repeal any provision contained in these Articles of Incorporation, or any amendment thereto, and any right conferred upon the shareholders is subject to this reservation.

IN WITNESS WHEREOF, the undersigned, being the Incorporator named above, for the purpose of forming a corporation pursuant to the Florida Business Corporation Act of the State of Florida has signed these Articles of Incorporation this 28th day of September, 2000, and affirm that the statements made herein are true under the penalties of perjury.

L.M. Earnest, Incorporator

PHX_DOCS:1205644.1

3

RVR30226

## ACCEPTANCE OF APPOINTMENT OF REGISTERED AGENT

The undersigned, having been named the Registered Agent of RVR, Inc. hereby accepts such designation and is familiar with, and accepts, the obligations of such position, as provided in Florida Statutes §607.0505.

**CT CORPORATION SYSTEM**

By Its Agent _Connie Bryan, Special Asst. Secy._

Dated _Sept. 28th_, 2000

FILED
00 SEP 28 PM 1: 47
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

PHX_DOCS:1205644.1

4

RVR30227

# Exhibit 35

DOL 0009679

Execution Version

# RVR EMPLOYEE STOCK OWNERSHIP TRUST

**Reliance Trust Company**
**Trustee**
**1100 Abernathy Road NE, Suite 400**
**Atlanta, GA  30328-5634**
**404-965-7200**

*PHX 331153527v1*

**EXHIBIT**

**PI 143 - (S. Martin 05/13/21)**

exhibitsticker.com

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT  0000083

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .............................................................................................................2
    1.1        Administrator .................................................................................................2
    1.2        Beneficiary ...................................................................................................2
    1.3        Code..............................................................................................................2
    1.4        Custodian......................................................................................................2
    1.5        Company ......................................................................................................2
    1.6        ERISA ..........................................................................................................2
    1.7        Investment Committee..................................................................................2
    1.8        Investment Manager ....................................................................................2
    1.9        Participant.....................................................................................................2
    1.10      Participating Company .................................................................................2
    1.11      Plan...............................................................................................................2
    1.12      Recordkeeper ...............................................................................................3
    1.13      Registration-Type Class of Securities.........................................................3
    1.14      Trust.............................................................................................................3
    1.15      Trust Fund ...................................................................................................3
    1.16      Trustee.........................................................................................................3

ARTICLE II ESTABLISHMENT OF THE TRUST ......................................................................4
    2.1        Trust Established...........................................................................................4
    2.2        Limit of Participating Companies' Interests................................................4
            (a)      No Right To Reversion...................................................................4
            (b)      Return of Contributions..................................................................4
    2.3        Trustee's Conditional Acceptance ...............................................................4
            (a)      Directed Trustee .............................................................................4
            (b)      Compensation..................................................................................5

ARTICLE III DUTIES OF TRUSTEE ...........................................................................................6
    3.1        Duties............................................................................................................6
            (a)      Receipt of Contributions .................................................................6
            (b)      Management of Funds .....................................................................6
            (c)      Distributions...................................................................................6
            (d)      Records  ...........................................................................................7
            (e)      Authorized Acts..............................................................................7
            (f)      Acceptance of Rollovers .................................................................7
    3.2        Maintenance of Participant Accounts ...........................................................7

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY     ARGENT  0000084

ARTICLE IV INVESTMENT OF TRUST ASSETS .................................................................8
    4.1      General Investment Power ...............................................................8
        (a)    Authority of Investment Committee ...................................................8
        (b)    Funding Policy ...........................................................8
        (c)    Trustee Discretion and Responsibility ....................................8
        (d)    Registration of Employer Securities ............................................8
    4.2      Investment Managers.......................................................................8
        (a)    Appointment ............................................................8
        (b)    Contractual Arrangement...............................................9
        (c)    Trustee's Duties.........................................................9
        (d)    Failure to Direct .......................................................9
        (e)    Termination of Appointment ........................................9
    4.3      Authorized Investments....................................................................9
    4.4      Responsibility for Compliance ......................................................10
    4.5      Manner and Effect of Directions.....................................................10
        (a)    Delegation of Authority to Custodian............................10
        (b)    Manner of Direction.....................................................10
        (c)    Liability for Authorized Acts........................................11
    4.6      Authorization of Designee(s) ........................................................11

ARTICLE V POWERS OF TRUSTEE ...............................................................12
    5.1      General Authority ...........................................................................12
    5.2      Specific Powers...............................................................................12
        (a)    Purchase of Property...................................................12
        (b)    Disposition of Property................................................12
        (c)    Retention of Cash.......................................................12
        (d)    Exercise of Owner's Rights..........................................12
        (e)    Voting Employer Securities.........................................13
        (f)    Non-Voting Decisions Affecting Employer Securities ......14
        (g)    Registration of Investments .........................................14
        (h)    Borrowing ...................................................................14
        (i)    Qualified Pooled Investments ......................................14
        (j)    Purchase of Contracts .................................................15
        (k)    Execution of Instruments .............................................15
        (l)    Settlement of Claims and Debts....................................15
        (m)    Employment of Agents, Advisers and Counsel ..............15
        (n)    Power to do any Necessary Act .....................................15
    5.3      Specific Powers - Discretionary Acts by the Trustee.......................15
        (a)    Investment in Employer Securities................................15
        (b)    Sales of Employer Securities ........................................15
        (c)    Borrowing 15
    5.4      Prohibited Transactions ..................................................................16
    5.5      Participant Loans .............................................................................16

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000085

ARTICLE VI ADMINISTRATION ................................................................................17
    6.1      Accounting by Trustee................................................................17
          (a)      Books and Records................................................17
          (b)      Accounting................................................................17
          (c)      Release ................................................................17
          (d)      Valuations................................................................18
          (e)      Reliance on Recordkeeper ................................18
    6.2      Expenses....................................................................................18
    6.3      Notice ........................................................................................18
    6.4      Authorization to Direct............................................................18

ARTICLE VII REMOVAL AND RESIGNATION OF TRUSTEE;  SUCCESSOR
                 TRUSTEE; DISCRETIONARY TRUSTEE ........................................19
    7.1      Removal and Resignation..........................................................19
    7.2      Final Accounting.......................................................................19
    7.3      Discretionary Fiduciary ...........................................................19

ARTICLE VIII AMENDMENT OF TRUST; TERMINATION OF PLAN .....................20
    8.1      Amendment of Trust.................................................................20
          (a)      Right to Amend ................................................20
          (b)      Exclusive Benefit ................................................20
    8.2      Termination of Plan .................................................................20

ARTICLE IX MISCELLANEOUS................................................................................21
    9.1      Nonalienation of Benefits..........................................................21
    9.2      Exclusive Benefit.......................................................................21
    9.3      Effect of Plan............................................................................21
    9.4      Entire Agreement......................................................................21
    9.5      Approval of the Company ........................................................21
    9.6      Notices.......................................................................................22
    9.7      Liability for Predecessor or Successor......................................22
    9.8      Liability for Acts of Others........................................................22
    9.9      Indemnification .........................................................................22
    9.10    Controlling Law.........................................................................24
    9.11    Effective Date............................................................................24

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000086

# TRUST AGREEMENT

**THIS RVR EMPLOYEE STOCK OWNERSHIP TRUST** (this "Agreement") is entered into as of the 15th day of April, 2014 by and between RVR, Inc. (the "Company") and Reliance Trust Company (the "Trustee") with the Trust to be effective as of June 1, 2013.

## WITNESSETH:

**WHEREAS,** the Company maintains, for the benefit of its eligible employees and those of its participating affiliate companies, the RVR Employee Stock Ownership Plan (the "Plan"), which is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and is intended to qualify as an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code;

**WHEREAS,** the Company desires to appoint the Trustee as a directed trustee to hold and administer the assets of the Plan in accordance with this Agreement, provided, that the Trustee shall be a discretionary trustee with respect to the decision to invest in, or remain invested in, Employer Securities, as well as pursuant to Section 5.3 of this Agreement and any decision to enter into an Exempt Loan for the purpose of purchasing Employer Securities;

**WHEREAS,** the Plan is intended to invest primarily in Employer Securities; and

**WHEREAS,** the Trustee has agreed to serve as directed trustee of the trust established under this Agreement effective as of April 15, 2014 and pursuant to the terms herein;

**NOW, THEREFORE,** the Company and the Trustee hereby mutually covenant and agree as follows:

- 1 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000087

# ARTICLE I
# DEFINITIONS

The following words and phrases, when used herein with an initial capital letter, shall have the meanings set forth below unless a different meaning plainly is required by the context. Any reference to a section number shall refer to a section of this Agreement unless otherwise specified. Notwithstanding the preceding, any capitalized term used but not defined herein shall have the meaning provided for in the Plan.

1.1    **Administrator** means the person, committee or entity appointed by the Company to serve as plan administrator of the Plan within the meaning of Code Section 414(g). Unless the Company notifies the Trustee in writing of the appointment of an Administrator, the Company shall be deemed to be the Administrator.

1.2    **Beneficiary** means any person designated under the terms of the Plan to receive benefits payable upon the death of a Participant.

1.3    **Code** means the Internal Revenue Code of 1986, as amended.

1.4    **Custodian** means Reliance Trust Company, which shall also serve as custodian for the Trust Fund. To the extent any assets are held by any custodian other than Reliance Trust, such party shall also be considered a Custodian for the Trust.

1.5    **Company** means RVR, Inc. and its successors that adopt the Plan.

1.6    **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

1.7    **Investment Committee** means the person, committee or entity appointed in accordance with the terms of the Plan to make and effect investment decisions under the Plan and Trust. Unless the Company notifies the Trustee in writing of the appointment of an Investment Committee, the Administrator shall be deemed to be the Investment Committee.

1.8    **Investment Manager** means any person, corporation or other organization or association appointed by the Investment Committee pursuant to the terms of Section 4.2 to manage, acquire or dispose of all or a portion of the assets of the Trust.

1.9    **Participant** means an employee or former employee of a Participating Company who has an account balance under the Plan.

1.10    **Participating Company** means the Company and any of its affiliates that has adopted or hereafter may adopt the Plan for the benefit of its employees and which continue to participate in the Plan.

1.11    **Plan** means RVR Employee Stock Ownership Plan, as such Plan may be amended from time to time.

- 2 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000088

1.12    **Recordkeeper** means the Plan's duly appointed recordkeeper and any of their respective agents or assigns, including processing agents.  The Administrator shall notify the Trustee of the identity of the Recordkeeper and shall promptly notify the Trustee of any change in the identity of the Recordkeeper.

1.13    **Registration-Type Class of Securities** means a class of securities that is required to be registered under Section 12 of the Securities Exchange Act of 1934 or would be required to be so registered except for the exemption from registration provided in Section 12(g)(2)(H) of the Securities Exchange Act of 1934.

1.14    **Trust** means the trust established by this Agreement.

1.15    **Trust Fund** means the total amount of cash and other property held from time to time under this Agreement.

1.16    **Trustee** means Reliance Trust Company.

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT  0000089

# ARTICLE II
# ESTABLISHMENT OF THE TRUST

2.1    **Trust Established.**

The Company hereby establishes with the Trustee, as a funding medium for the Plan, a Trust consisting of the Trust Fund and such earnings, profits, increments, additions and appreciation thereto and thereon as may accrue from time to time.

2.2    **Limit of Participating Companies' Interests.**

(a)    **No Right To Reversion.**  Except as provided in subsection (b) hereof and except as provided by ERISA, the Participating Companies shall not have any right, title, interest, claim or demand whatsoever in or to the funds held by the Trustee, other than the right to a proper application thereof and accounting therefor by the Trustee as provided herein, nor shall any funds revert to any Participating Company, except as permitted by ERISA or required by the Code for qualification of the Plan.

(b)    **Return of Contributions.**  Any other provisions of this Agreement or the Plan notwithstanding, if and to the extent permitted by the Code, ERISA and other applicable laws and regulations thereunder, upon the Company's request, a contribution (i) made to the Plan that initially fails to satisfy the requirements of Code Section 401(a) or (ii) made by a mistake in fact, including a good faith mistake in determining the deductibility of the contribution under Code Section 404, shall be returned to the specified Participating Company within 1 year after the mistaken payment of the contribution or the disallowance of the deduction (to the extent disallowed), whichever is applicable.

2.3    **Trustee's Conditional Acceptance.**

The Trustee accepts the Trust hereby created and agrees to perform the duties hereby required of the Trustee, subject, however, to the following conditions:

(a)    **Directed Trustee.**  Except as otherwise provided for in this Agreement, the parties expressly acknowledge and agree that the Trustee is a directed trustee as described in ERISA Section 403(a).  In the management and control of the Trust Fund, the Trustee shall be subject to the direction of the Administrator, the Investment Committee, and any Investment Managers that may be appointed by the Investment Committee; provided, however, that the Trustee shall only be subject to proper directions which are made in accordance with the terms of this Agreement and are not contrary to ERISA. The Trustee shall be under no obligation to determine if such directions are made in accordance with the terms of the Plan and may rely on the Company, the Administrator, or Investment Manager, to make such determinations.  Except as provided in Section 5.3, the Trustee shall not make any investment review of, consider the propriety of

- 4 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT  0000090

DOL 0009687

holding or selling, or, except as provided in Section 5.2(e), vote any assets held in the Trust Fund. The Trustee shall have no responsibility to review or make recommendations regarding investments made at the direction of the Administrator, Investment Committee, Participant or an Investment Manager. The Administrator, Investment Manager and Investment Committee shall not issue any directions to the Trustee that are in violation of the terms of the Plan or this Agreement or prohibited by ERISA.

(b)     **Compensation.**  The Trustee shall be entitled to compensation for its services under this Agreement at such rates as from time to time the Trustee and the Company shall agree in writing.

The Trustee shall retain for its own account, as additional compensation under this Agreement, earnings (i.e., "float") on amounts received from the Trust Fund before such amounts are invested pursuant to this Agreement and on amounts held pending distribution.

(i)     Contributions and Purchases:  The timing of cash investment is dependent upon the Recordkeeper and their reconciliation of funds received into the Trust.  If Trustee receives payroll contributions by performing an ACH (Automated Clearing House) debit to Company's bank account, this cash will generally be invested within 24 hours. If funds are sent to Trustee via wire, ACH or check, the investment of these funds will generally occur within 36 hours of receipt. Company may review the service contract with the Recordkeeper to identify specific standards concerning the timing of investment purchases.   Trustee will earn Fed Funds income on money received from the date of deposit at Trustee until the date the monies are wired in payment of investment purchases in the account, or settlement date.  Company may monitor and compute the amount of income earned by Trustee by reviewing the date of deposit (as reported on the account statements) versus the settlement date of the purchase(s).

(ii)     Distributions and Sales:  Generally, Trustee will wire funds within 24 hours of the funds becoming available as a result of sale settlements.  In the case of distribution checks or other Trust checks, the Trustee earns income from the date cash is made available in the trust account until the date a check is cashed. Trustee will generally issue checks within 48 hours of receipt of both cash and complete payment instructions.  Company may compute the amount of interest income Trustee earns on cash awaiting distribution by reviewing the trust account and participant distribution activity, i.e., date cash received or made available for distribution, date wired out of the trust or otherwise the date each participant check was cashed, times the per-diem Fed Funds rate.

(iii)     Rate:  The Fed Funds target rate is published in the Wall Street Journal.

- 5 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000091

# ARTICLE III
# DUTIES OF TRUSTEE

### 3.1    Duties.

It shall be the duty of the Trustee hereunder:

(a)    **Receipt of Contributions.**    To receive any contributions paid to it under this Agreement in cash, Employer Securities or in other property acceptable to the Trustee. The Trustee shall not be responsible for the calculation or collection of any contribution required to be paid by a Participating Company to the Trustee under the Plan, but shall be responsible only for property actually received by it pursuant to this Agreement;

(b)    **Management of Funds.**    In accordance with directions received under the terms of this Agreement, to hold, invest, reinvest, manage and administer (except as otherwise provided herein) all contributions so received, together with the income therefrom and any other increment thereon, for the exclusive benefit of Participants and their Beneficiaries in accordance with the terms of this Agreement;

(c)    **Distributions.**    From time to time, on the written direction of the Administrator, or such other means of direction as mutually agreed upon by the Trustee and the Administrator, to make payments or distributions out of the Trust Fund to persons in the manner and amounts as may be specified in the directions of the Administrator, and upon any payments being made, the amount thereof shall no longer constitute a part of the Trust Fund. The Administrator assumes all responsibility with respect to all directions and the application of payments or distributions. The Trustee is under no duty to enforce payments of any contributions to the Trust Fund and is not responsible for the adequacy of the Trust Fund to meet and discharge any or all liabilities arising in connection with the Plan or the Trust.

(i)    Missing Participant: In the event that any payment ordered by the Administrator is mailed by the Trustee to a Participant or his Beneficiary specified in such order to the last known address of such person filed with the Administrator and is then returned to the Trustee because such person cannot be located at such address, the Trustee shall promptly notify the Administrator. Upon the expiration of sixty (60) days after such notification the order shall become void and, unless and until a further order is received from the Administrator by the Trustee with respect to such payment, the Trustee shall thereafter continue to administer the Trust Fund as if the order had not been made by the Administrator. The Trustee shall not be obligated to search for or ascertain the whereabouts of any Participant or his Beneficiary.

- 6 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                                                        ARGENT_0000092

(ii)   Dispute: In the event that any dispute arises as to the persons to whom the payment of any funds or delivery of any assets shall be made by the Trustee, the Trustee may withhold payment or delivery until the dispute has been determined by a court of competent jurisdiction or has been settled by the parties concerned and may, in its sole discretion, submit the dispute to a court of competent jurisdiction.

(d)   **Records.** To keep such accounts and records and make such reports and disclosures as shall be required under this Agreement;

(e)   **Authorized Acts.** To take any action directed by the Investment Committee, an Investment Manager, the Administrator, or their authorized designee(s). The Trustee may rely on any such direction without question and shall not be liable for any failure to act pending receipt of any such direction;

(f)   **Acceptance of Rollovers.** The Plan does not permit Participants to make rollover contributions to this Plan.

## 3.2   Maintenance of Participant Accounts.

The Administrator shall maintain accounts and appropriate subaccounts in accordance with the Plan.

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000093

# ARTICLE IV
# INVESTMENT OF TRUST ASSETS

4.1    **General Investment Power.**

(a)    **Authority of Investment Committee.**    Except as provided in Section 4.2 and Section 5.3, the Investment Committee shall have all authority and responsibility for the management, disposition and investment of the Trust Fund, and the Trustee shall comply with directions of the Investment Committee. The Investment Committee shall not issue any directions that are in violation of the terms of the Plan or this Agreement or prohibited by ERISA.

(b)    **Funding Policy.**    The Trust shall be invested primarily in Employer Securities, to the extent Employer Securities is available; otherwise, the Investment Committee shall establish and carry out a funding policy and method as required under ERISA Section 402(b)(1), consistent with the objectives of the Plan and the requirements of ERISA.

(c)    **Trustee Discretion and Responsibility.**    Except as provided under Section 5.3, the Trustee shall have no discretion with respect to the investment or reinvestment of the Trust Fund and shall not be liable for the assets invested under the direction of the Investment Committee, Administrator, Recordkeeper, Investment Manager (to the extent applicable), Discretionary Fiduciary, or their delegates, or for taking or refraining from taking any action at the direction of the Investment Committee, Administrator, Recordkeeper, Investment Manager (to the extent applicable), Discretionary Fiduciary, or their delegates. Except as provided under Section 5.3 of this Agreement, the Trustee is not responsible for the prudence of and under no duty to make any review of investments acquired for the Plan at the direction or order of the Investment Committee, the Administrator, the Recordkeeper, Discretionary Fiduciary, or their delegates, or, to the extent applicable, the Investment Managers, or to make any recommendation with respect to disposing of or continuing to retain any such investment.

(d)    **Registration of Employer Securities.**    If the Trustee is directed to dispose of Employer Securities held in the Trust Fund under circumstances which require registration of such securities under applicable federal or state securities or banking laws, the Company, at its own expense, will take or cause to be taken any and all such action as may be necessary or appropriate to effect such registration.

4.2    **Investment Managers.**

(a)    **Appointment.**    The Investment Committee may, but shall not be required to, appoint one or more Investment Managers to manage all or a portion of the assets of the Trust Fund. Each such Investment Manager shall be either (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) a bank, as defined in such Act; or (iii) an insurance company qualified to perform the services of Investment Manager

- 8 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000094

under the laws of more than one state. The Investment Committee shall obtain from any Investment Manager so appointed by it a written statement (i) acknowledging that such Investment Manager is or on the effective date of its appointment will become a fiduciary within the meaning of ERISA Section 3(21)(A) with respect to the Trust assets under its management; (ii) certifying that such Investment Manager has the power to manage, acquire or dispose of Trust assets in the manner contemplated by the contract or other written instrument by which its appointment is or will be effected; and (iii) certifying that it is either an investment adviser, a bank or an insurance company which is qualified to be appointed as an Investment Manager under this Agreement.

(b) **Contractual Arrangement.** The Investment Committee shall enter into a written contract or agreement with each such Investment Manager in connection with its appointment as such, and such contract shall be subject to such terms and conditions and shall grant to the Investment Manager such authority and responsibilities in the management of the applicable assets of the Trust as the Investment Committee deems appropriate under the circumstances. Without limiting the generality of the foregoing, such contract may establish investment objectives for the assets of the Trust under the management of the Investment Manager and may limit the types of investments that may be acquired with such Trust assets.

(c) **Trustee's Duties.** With respect to the Trust assets the management of which has been delegated to an Investment Manager, the Trustee shall follow and carry out the instructions of the appointed Investment Manager with respect to the acquisition, disposition and reinvestment of such Trust assets, including instructions relating to the exercise of all ownership rights in such assets, and the Trustee shall not be under any obligation to invest or otherwise manage any assets under the management of the Investment Manager.

(d) **Failure to Direct.** In the event that an appointed Investment Manager shall fail to direct the Trustee with respect to the investment of all or any portion of the assets under its management, the Trustee shall invest such cash only when and as directed by the Investment Committee.

(e) **Termination of Appointment.** Upon the termination of the appointment of an Investment Manager, the Investment Committee shall (i) appoint a successor Investment Manager with respect to the assets formerly under the management of the terminated Investment Manager, (ii) direct the Trustee to merge or combine such assets with other assets managed by another Investment Manager, or (iii) direct the Trustee to invest such assets as the Investment Committee deems appropriate in accordance with the existing funding policy.

4.3    **Authorized Investments.**

"Authorized investment" as used in this Agreement shall mean bonds, debentures, notes or other evidences of indebtedness; stocks (regardless of class) or other evidences of ownership, in any corporation mutual investment fund, investment company, association or business trust;

- 9 -

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000095

annuity contracts (other than life annuity contracts), guaranteed income contracts, and savings accounts and certificates and interest-bearing deposits in any depository institution (including the Trustee or any affiliate of the Trustee); group trusts or collective investment funds permitted for any retirement plans qualified under Code Section 401(a) (including those maintained by the Trustee or its affiliates); any single trust or group trust or collective investment fund which may hold securities issued by the Company or its affiliates; covered call options, put options, and financial futures contracts, irrespective of whether the securities or property are of a character authorized from time to time by applicable state law for trust investments. "Authorized investment" shall include Employer Securities. Notwithstanding the foregoing, "authorized investment" shall not include any securities issued by a Participating Company or any affiliate of a Participating Company unless the securities are "qualifying employer securities" within the meaning of ERISA Section 407(d)(5), nor shall it include any real property leased to or used by a Participating Company or any affiliate of a Participating Company unless the real property is "qualifying employer real property" within the meaning of ERISA Section 407(d)(4).

4.4    **Responsibility for Compliance.**

Except as provided in Section 5.3, the responsibility for determining whether any investment of Trust assets complies with the terms of this Agreement and applicable law shall lie solely with the Investment Committee, and the Trustee shall have no responsibility to ascertain whether any investment made at the direction of the Investment Committee or other authorized person complies with the terms of this Agreement or applicable law.

4.5    **Manner and Effect of Directions.**

(a)    **Delegation of Authority to Custodian.** The Trustee is authorized and directed to serve as the Custodian with the authority and responsibility for receiving and carrying out the directions of the Company, Administrator, the Investment Committee, and any Investment Manager, or their designees. With respect to any assets held by a party other than the Trustee, the Trustee is authorized and directed to delegate to the Custodian the authority and responsibility for receiving and carrying out the directions of the Company, Administrator, the Investment Committee, an Investment Manager, or their designees. The Trustee is authorized and directed to enter into such agreements with another Custodian as are deemed necessary or appropriate to effect such delegation. The Company represents that all directions given by it in any capacity under this Agreement, whether to the Trustee or the Custodian, shall comply with the terms of the Plan, this Agreement, ERISA and other applicable law.

(b)    **Manner of Direction.** Any direction, request or approval of the Company, the Administrator, the Investment Committee, an Investment Manager, or any other party to whom authority to give such directions, requests or approvals is delegated under the powers conferred under this Agreement (including, without limitation, the Recordkeeper and its designees) shall be provided to the Trustee or the Custodian in writing, by automated telephone response system, electronic data transmission (including internet communications) or such other means as is acceptable to the Trustee or the Custodian, as applicable. The Trustee may rely upon the notice and the

- 10 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY

ARGENT_0000096

authenticity and genuineness of the notice and the signatures on such notice, and the authority of the person or persons executing and delivering it, without making inquiry in regard thereto.

(c)    **Liability for Authorized Acts.**  The Trustee shall incur no liability to anyone for any action that it or the Custodian as its delegate takes pursuant to a direction, request or approval given by the Company, the Investment Committee, an Investment Manager, the Administrator, or by any other party (including, without limitation, the Recordkeeper and any of its agents) to whom authority to give such directions, requests or approvals is delegated under the powers conferred upon the Company, the Investment Committee, an Investment Manager, the Administrator, and any of its agents, or such other party under this Agreement.

## 4.6    **Authorization of Designee(s).**

The Administrator and the Investment Committee may each appoint one or more designees to act on their behalf.   If a designee (or designees) is appointed, the appropriate committee shall furnish the Trustee with written documentation of the appointment and a specimen signature of each designee.   The Trustee shall be entitled to rely upon such documentation until the Trustee is notified otherwise in writing.

- 11 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT_0000097

# ARTICLE V
# POWERS OF TRUSTEE

5.1    **General Authority.**

In accordance with the directions of the Investment Committee and any Investment Managers as provided in Article IV, the Trustee shall receive, hold, manage, convert, sell, exchange, invest, reinvest, disburse and otherwise deal with the assets of the Trust, including contributions to the Trust and the income and profits therefrom, without distinction between principal and income and in the manner and for the uses and purposes set forth in the Plan and as hereinafter provided.

5.2    **Specific Powers.**

In the management of the Trust, the Trustee shall have the following powers in addition to the powers customarily vested in trustees by law and in no way in derogation thereof; provided, all such powers shall be exercised only upon and in accordance with the directions of the Investment Committee, the Administrator and, to the extent applicable, any duly appointed Investment Managers:

(a)    **Purchase of Property.** With any cash at any time held by it, to purchase or subscribe for any authorized investment (as defined in Section 4.3) and to retain the same in trust;

(b)    **Disposition of Property.** To sell, exchange, transfer or otherwise dispose of any property at any time held by it;

(c)    **Retention of Cash.** To hold cash without interest in administrative accounts for contribution and distribution processing in such amounts as may be reasonable and necessary for the proper operation of the Plan and the Trust;

(d)    **Exercise of Owner's Rights.** Except as otherwise provided in Subsection (e) below, the Company acknowledges and agrees that the Trustee shall not have the right or power to vote proxies appurtenant to securities that the Trustee holds. The Company acknowledges and agrees that the Trustee shall not make any review of, or consider the propriety of, holding or selling any assets held in the Trust Fund in response to any tender offer, conversion privilege, rights offering, merger, exchange, public offering and/or any proxy action for any such assets. The Company agrees not to issue any directions to the Trustee relating to any corporate event, proxy votes or holding or selling of assets held in the Trust Fund that are contrary to or in violation of the terms of the Plan document or this Agreement or that are prohibited by ERISA or the Code. The Company acknowledges and agrees that, except as provided in Subsection (e) below, the Company hereby designates the Investment Committee, a fiduciary, to (i) vote proxies and decide whether or not to hold or sell assets in the Trust Fund in response to a tender offer or other proxy action or corporate event for any such assets, or (ii) direct the Trustee to do so;

- 12 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000098

(e) **Voting Employer Securities.** To vote Employer Securities in accordance with the following:

(1)    Except as otherwise provided below in this Section 5.2(e), the Trustee shall vote the Employer Securities held in the Trust Fund with respect to all matters, as directed by the Administrator of the Company. If the Employer Securities is a Registration-Type Class of Securities, each Participant or Beneficiary will be entitled to direct the voting of Employer Securities which are entitled to vote and are allocated to his account under the Plan in accordance with Subsection (2) below. If the Employer Securities is not a Registration-Type Class of Securities, each Participant or Beneficiary will be entitled to direct the voting of Employer Securities allocated to his account under the Plan in accordance with Subsection (2) below, only with respect to any corporate matter which involves the voting of such shares with respect to the approval or disapproval of any merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets or any similar transaction as provided in regulations issued by the Secretary of the Treasury.

(2)    If a Participant or Beneficiary is entitled to direct the voting of Employer Securities allocated to his account under the above Subsection (1), the following procedures shall apply:

(A)    The Company shall furnish the Trustee, Participants, Beneficiaries and, if appointed pursuant to Section 7.3, the Discretionary Fiduciary, with notices and other information statements when voting or other rights as to Employer Securities are to be exercised.

(B)    A Participant or Beneficiary shall submit a proxy or such other form provided by the Company containing the Participant's or Beneficiary's confidential information as to the manner of voting Employer Securities allocated to his account to (i) an independent third party who will, in turn, instruct the Trustee as to the manner of voting such Employer Securities, or (ii) if appointed pursuant to Section 7.3, the Discretionary Fiduciary or its designees. The independent third party or the Discretionary Fiduciary, as applicable, shall not disclose the confidential voting directions of any individual Participant or Beneficiary to the Company or the Trustee.

(C)    Whole Employer Securities allocated to accounts for which the Trustee has received instructions from the independent third party on behalf of Participants or Beneficiaries shall be voted in accordance with those instructions.

(D)    The combined fractional shares and fractional rights to Employer Securities held in accounts, if any, shall be voted to the extent possible in

- 13 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000099

the same proportion as whole Employer Securities held in such accounts are directed to be voted by Participants or Beneficiaries.

(E)  If a Participant has the right to direct the Trustee as to the manner in which Employer Securities allocated to his Employer Securities Account are to be voted and such Participant fails or refuses to give the Trustee timely instructions (or instructions are invalidated for any reason) as to how to vote any Employer Securities as to which the Trustee otherwise has the right to vote, the Trustee shall vote such Employer Securities in the same manner and proportion as all other allocated Employer Securities for which instructions were received.

(F)  Shares of Employer Securities, contributions, and dividends not allocated to the account of a Participant shall be voted by the Trustee in the manner directed by the Investment Committee or, if applicable, by the Discretionary Fiduciary.

(f)  **Non-Voting Decisions Affecting Employer Securities.** Unless the Company appoints a Discretionary Fiduciary pursuant to Section 7.3, to determine all decisions affecting Employer Securities held under the Trust which do not involve voting of such Employer Securities, including, without limitation, decisions to reject or consent to tender or exchange offers and similar decisions in the manner directed by the Investment Committee or its designee(s);

(g)  **Registration of Investments.** To cause any stock, bond, other security or other property held as part of the Trust to be registered in its own name or in the name of one or more of its nominees; provided, the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

(h)  **Borrowing.** At the direction of the Investment Committee, to borrow or raise money for the purposes of the Trust in such amounts, and upon such terms and conditions, as determined by the Investment Committee; and, for any sum so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging all or any part of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing;

(i)  **Qualified Pooled Investments.** To transfer, at any time and from time to time, all or any part of the Trust Fund to, or withdraw the same from, any pooled investment fund or group or collective trust, invested in similar types of securities or other investments, maintained by a bank or trust company (including, if applicable, the Trustee) supervised by a state or federal agency, which has been determined by the Internal Revenue Service to be a qualified trust or fund exempt from federal income tax under Code Section 501(a) and which has been established to permit separate pension and profit sharing trusts qualified under Code Section 401(a) to pool some or all of their funds for investment purposes; to the extent the Trust Fund is invested in such a pooled fund or

- 14 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                ARGENT_0000100

group or collective trust, the terms of the instrument establishing such pooled fund or group or collective trust are made a part of this Agreement as fully as if set forth at length herein; the commingling of assets of this Trust with assets of other qualified participating trusts in such pooled funds or group or collective trusts is specifically authorized;

(j) **Purchase of Contracts.** To apply for, purchase, hold, transfer, surrender and exercise all incidents of ownership of any life insurance or annuity contract (but not a contract for a life annuity unless the Plan provides for the distribution of benefits in such form) which the Investment Committee directs it to purchase;

(k) **Execution of Instruments.** To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments, which may be necessary or appropriate to carry out the powers herein granted;

(l) **Settlement of Claims and Debts.** To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Trust, to commence or defend suits or legal or administrative proceedings and to represent the Trust in all suits and legal and administrative proceedings;

(m) **Employment of Agents, Advisers and Counsel.** To employ suitable agents, actuaries, accountants, investment advisers, brokers and counsel, and to pay their reasonable expenses and compensation. Counsel may be counsel to the Company, and such counsel's advice may be sought on any legal matter including the interpretation of this Agreement and the Plan. The Trustee shall be fully protected in acting on advice of counsel to the Company, if such counsel is acting on behalf of the Company; and

(n) **Power to do any Necessary Act.** To do all acts which it may deem necessary or proper and to exercise any and all powers of the Trustee under the Plan and this Agreement upon such terms and conditions as it may deem in the best interests of the Trust.

5.3 **Specific Powers - Discretionary Acts by the Trustee.** Notwithstanding anything to the contrary herein, unless a Discretionary Trustee is appointed by the Administrator, the Trustee shall have all necessary discretionary authority to:

(a) **Investment in Employer Securities.** To invest the Trust in Employer Securities (provided the Trustee does not pay in excess of adequate consideration, as defined by ERISA, for such Employer Securities);

(b) **Sales of Employer Securities.** To sell Employer Securities to any person, including the Company, at a price not less than the fair market value of the shares sold as of the date of the sale, as determined by the Trustee based upon a valuation by an independent appraiser who meets the requirements similar to the requirements of the regulations prescribed under Code Section 170(a)(1);

(c) **Borrowing.**

- 15 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000101

(i)   *Generally.* To borrow or raise money for the purposes of the Trust in such amounts, and upon such terms and conditions, as determined by the Administrator; and, for any sum so borrowed, to issue its promissory note as Trustee and to secure the repayment thereof by pledging all or any part of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency or propriety of any such borrowing; and

(ii)  *Borrowing to Purchase Employer Securities.* The Trustee shall have the power to borrow funds for the purpose of purchasing Employer Securities or for the purpose of repaying all or any portion of any outstanding indebtedness incurred by the Trustee to purchase Employer Securities, provided, that in all events the Exempt Loan shall meet the requirements of Section 7.3 of the Plan.

5.4   **Prohibited Transactions**.

Notwithstanding the provisions of Section 5.2, in no event shall the Trustee knowingly exercise any powers under the Plan or this Agreement in a manner that will constitute a prohibited transaction, as defined in Code Section 4975 or in ERISA Section 406, for which an exemption does not exist.

5.5   **Participant Loans.**

The Administrator has not adopted a loan policy under the Plan. No loans shall be made from the Plan to Participants and/or beneficiaries.

- 16 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000102

# ARTICLE VI
# ADMINISTRATION

6.1    **Accounting by Trustee.**

(a)    **Books and Records.**  The Recordkeeper generally shall be responsible for keeping accurate and detailed records of all investments, receipts and disbursements and other transactions hereunder, including such specific records as shall be required by law and such additional records as may be agreed upon in writing between the Administrator or the Investment Committee and the Trustee.  All books and records relating thereto shall be open to inspection and audit at all reasonable times by any person or persons designated by the Administrator, the Company, or the Investment Committee.  The Trustee shall promptly provide copies of such books or records to any persons designated by the Administrator.

(b)    **Accounting.**  Following the close of each Plan year of the Plan, or more frequently as the Trustee and the Administrator may agree, and after the effective date of the removal or resignation of the Trustee, the Trustee shall file with the Administrator and the Investment Committee (and/or their authorized designees) a written statement setting forth all investments, receipts, disbursements and other transactions effected by it during such year or during the period beginning as of the close of the last preceding year to the date of such removal or resignation. The Trustee shall deliver such statement in a timely manner to permit the preparation of Participant statements or to provide for the orderly replacement of the Trustee, as the case may be.  Except as may be required by statute or by regulations published by federal government agencies with respect to reporting and disclosure, as may be required pursuant to the terms of the Plan or this Agreement, or as reasonably may be requested by the Administrator, the Company or the Investment Committee, no person shall have the right to demand or to be entitled to any further or different accounting by the Trustee.

(c)    **Release.**  Except with respect to alleged breaches of fiduciary responsibility under ERISA, upon the expiration of one hundred eighty (180) days from the date of filing such annual or other statement, the Trustee shall forever be released and discharged from any liability or accountability to anyone with respect to the propriety of its acts or transactions shown in such account, except with respect to any acts or transactions as to which the Administrator or Investment Committee, within such 180-day period, shall file with the Trustee its written disapproval.  In the event such disapproval is filed, and unless the matter is compromised by agreement between the Trustee and the Administrator or the Investment Committee, the Trustee shall file its statement covering the period from the date of the last annual statement to which no objection was made in any court of competent jurisdiction for audit or adjudication.  With respect to alleged breaches under ERISA, the Trustee shall be entitled to rely upon the statutes of limitations set forth therein.

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000103

(d) **Valuations.** All valuations of Employer Securities that are not readily tradable on an established securities market with respect to activities carried on by the Plan must be made by an independent appraiser selected by the Trustee. The Trustee shall be responsible for reviewing and accepting, in accordance with the fiduciary requirements of ERISA, the appraisal prepared by the independent valuation firm and the factors and assumptions relied on by the independent valuation firm in preparing the appraisal.

(e) **Reliance on Recordkeeper.** The Trustee shall be entitled to rely on the Recordkeeper and any Custodian, other than the Trustee, for the maintenance and provision of all records (including participant loan records) specified in this Section 6.1.

6.2 **Expenses.**

The expenses incurred by the Trustee in the performance of its duties hereunder, including fees for legal services rendered to the Trustee, compensation of the Trustee and all other proper charges and disbursements of the Trustee, including all personal property taxes, income taxes and other taxes of any and all kinds whatsoever, that may be levied or assessed under existing or future laws upon or in respect of the Trust or any money, property or security forming a part of the Trust Fund, shall be paid by the Trustee from the Trust Fund, and the same shall constitute a charge upon the Trust Fund, unless the Company pays the same or any part thereof. To the extent a Participating Company pays any expenses that are properly payable from the Trust Fund, the Trustee shall reimburse the Participating Company from the Trust Fund if requested to do so by the Participating Company. The Company agrees that it shall promptly pay for any services required of Trustee that may arise after the resignation or removal of the Trustee based on the Trustee's then prevailing fee schedule. This provision shall survive the termination of this Agreement.

6.3 **Notice.**

A written notice to the Trustee, to the extent authorized in and given in accordance with the terms and conditions of the Plan, is the notice of the person giving it, and the Trustee may rely upon the notice and the authenticity and genuineness thereof and of the signatures thereon, and the authority of the person or persons executing and delivering it, without making inquiry in regard thereto. The Trustee is not charged with any notice whatsoever unless given in accordance with the Plan, including, without limitation, notification of any changes in the identity or authority of any fiduciary (other than the Trustee) or any other person acting in regard to the Plan.

6.4 **Authorization to Direct.**

Persons authorized to give directions to the Trustee on behalf of the Administrator shall be identified to the Trustee by written notice from the Company and such notice shall contain specimens of the authorized signatures. The Trustee shall be entitled to rely upon such written notice as evidence of the written identity and authority of the person(s) appointed until a written cancellation of the appointment is received by the Trustee.

- 18 -

*PHX 331,153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000104

# ARTICLE VII
# REMOVAL AND RESIGNATION OF TRUSTEE;
# SUCCESSOR TRUSTEE; DISCRETIONARY TRUSTEE

7.1    **Removal and Resignation.**

The Company may remove the Trustee at any time upon sixty (60) days' written notice delivered to the Trustee. The Trustee may resign at any time upon sixty (60) days' written notice delivered to the Company.

7.2    **Final Accounting.**

In any such case, the Company shall notify the Trustee of the appointment of a successor trustee, and the Trustee shall convey and deliver to such successor trustee all of the assets of the Trust Fund. Within ninety (90) days after any such removal or resignation of the Trustee, the Trustee shall make a final accounting to the Company, the Administrator and the Investment Committee as of the effective date of such removal or resignation pursuant to the terms of Section 7.1.

7.3    **Discretionary Fiduciary.**

As to any and all matters affecting Employer Securities, including, but not limited to, any purchase or sale, tender offer, or exchange of Employer Securities, or the exercise of voting rights of Employer Securities, the Company may appoint an independent, discretionary trustee (the "Discretionary Fiduciary") to act solely in connection with any such transaction or vote. If the Company appoints a Discretionary Fiduciary pursuant to this Section, the Administrator shall give written notice to the Trustee of such appointment. The Discretionary Fiduciary shall have such duties, responsibilities, and additional powers as set forth in the engagement letter or other document appointing the Discretionary Fiduciary. The Trustee may be appointed as a Discretionary Fiduciary pursuant to this Section.

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000105

DOL 0009702

# ARTICLE VIII
# AMENDMENT OF TRUST; TERMINATION OF PLAN

8.1     **Amendment of Trust.**

(a)     **Right to Amend.**  The Company and the Trustee may by written agreement amend this Agreement at any time or from time to time, and any such amendment by its terms may be retroactive.

(b)     **Exclusive Benefit.**  Notwithstanding the foregoing, no amendment shall be made which would authorize or permit any assets of the Trust Fund, other than such assets as are required to pay taxes and administration expenses, to be used for or diverted to purposes other than the exclusive benefit of Participants or their Beneficiaries, except that this Agreement may be amended retroactively and to affect the benefits of Participants and their Beneficiaries if necessary to cause the Plan and Trust to be or remain qualified and exempt from income taxes under the Code.

8.2     **Termination of Plan.**

In the event of termination of the Plan, the Trustee shall continue to hold the Trust, to be applied and distributed in accordance with the terms of the Plan.

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY     ARGENT_0000106

# ARTICLE IX
# MISCELLANEOUS

9.1    **Nonalienation of Benefits.**

Except as provided under the provisions of the Plan relating to loans to Participants and to qualified domestic relations orders and to the extent permitted by law, neither the benefits payable from the Trust Fund nor any interest in any of the assets of the Trust Fund shall be subject in any manner to the claim of any creditor of a Participant or Beneficiary, or to any legal process by any creditor of such Participant or Beneficiary; and neither a Participant nor any Beneficiary shall have any right to alienate, commute, anticipate or assign any right to benefits payable from or any interest in the Trust, except as provided in the Plan.

9.2    **Exclusive Benefit.**

Except as otherwise provided in the Plan and this Agreement, no part of the Trust hereunder shall be used for or diverted to any purpose other than for the exclusive benefit of Participants and Beneficiaries or the payment of expenses as herein provided.

9.3    **Effect of Plan.**

The Trustee is not a party to the Plan, and in no event shall the terms of the Plan, either expressly or by implication, be deemed to impose upon the Trustee any power or responsibility other than as set forth in this Agreement. In the event of any conflict between the provisions of the Plan and this Agreement, this Agreement shall be deemed to be incorporated into and be a part of the Plan, and the terms of this Agreement shall control over any inconsistent terms of the Plan. The Trustee shall not be a named fiduciary under the Plan and shall not have the authority to interpret the Plan.

9.4    **Entire Agreement.**

This Agreement constitutes the entire Agreement between the parties hereto with regard to the subject matter hereof, and there are no other agreements or understandings between the parties relating to the subject matter hereof other than those set forth or provided for herein.

9.5    **Approval of the Company.**

The Company, the Administrator and the Investment Committee shall have the right, on behalf of all individuals at any time having any interest in the Trust, to approve any action taken or omitted by the Trustee.

- 21 -

*PHX 331153527v1*

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000107

DOL 0009704

9.6    **Notices**.

Notices, directions and other communications provided in writing shall be mailed to the parties at the following addresses:

If to the Company:        RVR, Inc.
                          11 West Hampton Avenue
                          Mesa, AZ 85210
                          Attention: Eric Bensen

If to the Administrator:RVR, Inc.
                          11 West Hampton Avenue
                          Mesa, AZ 85210
                          Attention: Eric Bensen

If to the Trustee:        Reliance Trust Company
                          P.O. Box 28166
                          Atlanta, Georgia 30358
                          Attn: Fiduciary Administration

9.7    **Liability for Predecessor or Successor.**

Except as required under ERISA, no successor trustee hereunder in any way shall be liable or responsible for any actions or omissions of any prior trustee in the administration of the Trust or the assets comprising the Trust prior to the date such successor trustee assumes its obligations hereunder, nor shall any prior trustee in any way be liable or responsible for any actions or omissions of any successor trustee.

9.8    **Liability for Acts of Others.**

The Trustee shall not be liable for the acts or omissions of the Company, the Recordkeeper, any Custodian other than Trustee, the Administrator, the Investment Committee or any Investment Manager except with respect to any acts or omissions of any such party in which the Trustee participates knowingly or which the Trustee knowingly undertakes to conceal, and which the Trustee knows constitutes a breach of fiduciary responsibility of such party.

9.9    **Indemnification.**

The Company agrees to indemnify Reliance and its directors, employees and officers (individually an "Indemnitee" and collectively the "Indemnitees") against and from any and all claims, damages, expenses, liabilities and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing for, defending, or responding to discovery requests or other requests for information relating to, any government

- 22 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY          ARGENT_0000108

investigations, litigation, arbitration or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to the transaction in which the ESOP acquired all of the issued and outstanding Employer Securities on or before May 28, 2014 (the "Proposed Transaction") or Reliance's duties as Trustee (including all events that occurred prior to Reliance becoming the Trustee or after Reliance's service as Trustee has terminated). However, the indemnification of any Indemnitee shall not apply to any claim, damage, expense, liability or loss that is attributable to their bad faith, breach of fiduciary duty under ERISA, gross negligence, willful misconduct, or a material breach of the terms of this letter or any subsequent agreement.

If Reliance or any Indemnitee receives notice of any government agency action or any other legal proceeding with respect to which indemnification may be sought from the Company pursuant to this Section 9.9 (a "Proceeding"), Reliance or such Indemnitee shall notify the Company of the Proceeding in writing within 30 days of its receipt of notice of the Proceeding. However, the failure by Reliance or the Indemnitee to so notify the Company shall not relieve the Company from any liability for indemnification under this Section 9.9 except to the extent that the failure to notify the Company shall actually have prejudiced the Company's defense of any Proceeding. The Company will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to the Indemnitee(s) or to otherwise participate in the Proceeding. If the Company elects to assume the defense of the Proceeding, it then shall pay all costs of defense.

The Indemnitees shall have the right to employ its own counsel in any Proceeding if any one or more of the following conditions are satisfied:

(a) The Company shall authorize Reliance to retain its own legal counsel;

(b) Legal counsel to Reliance advises Reliance that there may be one or more legal defenses available to Reliance that are in addition to or different from defenses available to the Company and counsel for the Company declines to assert such defenses (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of Reliance); or

(c) Legal counsel to Reliance shall inform Reliance that a potential conflict of interest exists between the Company and Reliance.

Reliance shall not be required to disclose or otherwise share its counsel's advice in order to satisfy either sub-paragraph (b) or (c), above.

The Company shall reimburse the Indemnitees for all reasonable expenses and fees as and when the Indemnitees incur them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable expenses and fees of the experts and legal counsel whom the Indemnitees engage for any Proceeding. Reliance shall return to the Company the amount of such reimbursements that Reliance receives if a court

- 23 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY    ARGENT 0000109

holds that Reliance violated its fiduciary duties described in paragraphs 1 and 2 of that certain Engagement Letter entered into by and between Reliance and the Company on April 15, 2014 (the "Engagement Letter") which is incorporated herein by reference, or otherwise that indemnification would be unavailable under the terms of this Section 9.9.

If an Indemnitee seeks payment from the Company or seeks to enforce the indemnification or agreement to hold harmless pursuant to this Section 9.9, Reliance shall provide the Company all applicable invoices for legal fees and other expenses incurred by Reliance in investigating and/or defending such claims and any supporting documentation as the Company reasonably shall require; provided, however, that Reliance may redact the invoices and documentation or take other measures to preserve the attorney-client privilege, work product doctrine, or other applicable privilege.

9.10  **Controlling Law.**

This Agreement shall be construed according to the laws of the State of Georgia, except to the extent superseded by ERISA or any other federal law.

9.11  **Effective Date.**

This Agreement shall be effective on and after June 1, 2013; provided, however, that the Trustee agreed to serve as directed trustee of the Trust effective as of April 15, 2014.

**Execution in Counterpart.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

- 24 -

PHX 331153527v1

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000110

**IN WITNESS WHEREOF**, the Company and the Trustee have caused this Agreement to be signed by their duly authorized officers or representatives on this 22nd day of May, 2014.

**RVR, INC.**

By: *Eric R. Bensen*

Name: *ERIC R. BENSEN*

Title: *Chief Financial Officer*

**RELIANCE TRUST COMPANY**

By: _____

Name: Stephen A. Martin

Title: Senior Vice President and Fiduciary

Consultant

- 25 -

CHAR2\1447298v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT_0000111

**IN WITNESS WHEREOF**, the Company and the Trustee have caused this Agreement to be signed by their duly authorized officers or representatives on this <u>22nd</u> day of May, 2014.

**RVR, INC.**

By:_____

Name:_____

Title:_____

**RELIANCE TRUST COMPANY**

By:_____

Name: <u>Stephen A. Martin</u>

Title: <u>Senior Vice President and Fiduciary</u>

<u>Consultant</u>

- 25 -

CHAR2\1447298v2

CONFIDENTIAL TREATMENT REQUESTED BY ARGENT TRUST COMPANY                    ARGENT 0000112

# Exhibit 36

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Milton Al Stewart, Acting          )
Secretary of Labor,                )
                                   )
            Plaintiff,             )
                                   ) Civil Action No.
v.                                 ) 2:19-CV-03178-JJT
                                   )
Reliance Trust Company, et al.,    )
                                   )
            Defendants.            )
                                   )

DEPOSITION OF GREGORY ALAN FRESH
(TAKEN VIA ZOOM VIDEO CONFERENCE)

February 16, 2021
8:33 a.m. CST
Minneapolis, Minnesota

Glennie Reporting Services        Prepared by:
1555 East Orangewood Avenue       Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275       CRR, CRC
602.266.6535                      Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                    PAGE

GREGORY ALAN FRESH

       Examination by Mr. Lund                               9

INDEX TO EXHIBITS

DESCRIPTION                                               PAGE

Exhibit 1        Stock Purchase Agreement 5/28/14,      24
                 RVR 32533-32579

Exhibit 2        E-mail chain, RE:  Byway call           31
                 meeting notes from 1.13.14,
                 CW-RVR_00062107-00062111

Exhibit 3        E-mail with attachments, RE:            37
                 Project Byway Presentation Materials,
                 CW-RVR_00027541-00027611

Exhibit 4        Handwritten Notes, Byway Call           61
                 1-15-14, CW-RVR_00001067-00001068

Exhibit 5        E-mail, RE:  Project Byway Call         65
                 With Ivan and Eric 2.5.14,
                 CW-RVR_00062616-00062617

Exhibit 6        Project Byway Chartwell Corporate       71
                 ESOP Advisory & Transaction Process
                 Overview, CW-RVR_00061123-00061147

Exhibit 7        Handwritten Notes, Call w/Eric B.       78
                 @ Byway, CW-RVR_00001053-00001054

Exhibit 8        E-mail Re:  Byway recommended           80
                 partners, CW-RVR_99955355

Exhibit 9        E-mail Re:  Project Byway meeting       88
                 on Feb. 18th, CW-RVR_00051118-000051119

3

INDEX TO EXHIBITS CONTINUING

DESCRIPTION                                                        PAGE

Exhibit 10        Project Byway Organizational           90
                  Kick-Off Meeting,
                  CW-RVR_00061148-00061234

Exhibit 11        E-mail, Re:  Available for call        102
                  Re:  Project Byway, CW-RVR_00028363

Exhibit 12        E-mail, Re:  Byway weekly call         103
                  agenda, CW-RVR_00028516

Exhibit 13        Project Byway Weekly Call Agenda       113
                  For March 5, 2014,
                  CW-RVR_00028517-00028839

Exhibit 14        From Stephanie Geerdes, Subject:       115
                  Byway Weekly Call 3-12-14,
                  CW-RVR_00000988-00000990

Exhibit 15        E-mail with attachments, Re:           119
                  Chartwell Project Byway Presentation,
                  CW-RVR_00029293-00029342

Exhibit 16        From Stephanie Geerdes, Subject:       129
                  Byway Call 3-24-14,
                  CW-RVR_00000984-00000985

Exhibit 17        E-mail, Re:  Byway Management          133
                  Presentation Agenda,
                  CW-RVR_00030031-00030032

Exhibit 18        E-mail Re:  Project Byway Due          138
                  Diligence (inclusive of SRR financial
                  requests), CW-RVR_00030231-00030257

Exhibit 19        Project Byway Management               140
                  Presentation to Reliance Trust Company
                  as Trustee to the to-be-formed ESOP
                  April 16, 2014,
                  CW-RVR_00061284-00061329

Exhibit 20        E-mail, RE:  Project Byway Commitment  150
                  Letter, CW-RVR_00030757-00030758

Exhibit 21        E-mail, Re:  Management Comp,          159
                  CW-RVR_00028501-00028502

4

INDEX TO EXHIBITS CONTINUING

DESCRIPTION                                                    PAGE

Exhibit 22        E-mail with attachments, Re:             165
                  Byway Trustee Presentation,
                  CW-RVR_00040902-00040948

Exhibit 23        E-mail with attachments, Re:             172
                  Trustee Proposal Presentation
                  Comments, CW-RVR_00030390-00030436

Exhibit 24        E-mail, RE:  Trustee Proposal            174
                  Presentation Comments,
                  CW-RVR_00030439-00030440

Exhibit 25        E-mail, Subject:  Project Spear,         188
                  Dinner May 5th, RTC-RVR 0000610-0000611

Exhibit 26        E-mail, Re:  Increase in seller note     194
                  rate, CW-RVR_00031199

Exhibit 27        E-mail, Subject:  Re:  West coast        196
                  attorney, RTC-RVR 0000637

Exhibit 28        E-mail string, Re:  Project Byway,       203
                  CW-RVR_00032156-00032160

Exhibit 29        E-mail with attachments, Re:             210
                  Project Byway agenda May 7, 2014,
                  CW-RVR_00032204-00032211

Exhibit 30        From Stephanie Geerdes, Subject:         219
                  Byway weekly call 5-7-14,
                  CW-RVR_00000922

Exhibit 31        E-mail with attachments, RE:             223
                  Project Byway-Revised Transaction
                  Financial Terms (May 8th),
                  CW-RVR_00032307-00032312

Exhibit 32        E-mail, Subject:  Project Byway -        227
                  Trustee 2nd Counter, CW-RVR_00032485

Exhibit 33        Project Byway Response to Company's      231
                  Counter-Proposal-May 9, 2014,
                  CW-RVR_00032486-00033632

5

INDEX TO EXHIBITS CONTINUING

| DESCRIPTION | | PAGE |
|---|---|---|
| Exhibit 34 | From Stephanie Geerdes, Subject: Byway weekly call 5-21-14, CW-RVR_00000904-00000906 | 235 |
| Exhibit 35 | E-mail, Re:  Contracts, CW-RVR_00034335 | 240 |
| Exhibit 36 | E-mail chain, Subject:  RE: Contracts, RTC-RVR 0002485-0002486 | 243 |
| Exhibit 37 | E-mail with attachments, RE: Byways - Additional Ancillaries, CW-RVR_00048538-00048549 | 247 |
| Exhibit 38 | E-mail, Re:  Project Byways, CW-RVR_00061402 | 249 |
| Exhibit 39 | Project Byway - Working Group List May 8, 2014, CW-RVR_00000773-00000779 | 251 |

6

The Deposition of GREGORY ALAN FRESH was taken remotely on February 16, 2021, commencing at 8:33 a.m. CST, via Zoom Video Conference, Minneapolis, Minnesota, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.


APPEARANCES:

For Plaintiff:

U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
ERIC C. LUND, ESQ. (Appearing via Zoom)
BRENDAN BALLARD, ESQ. (Appearing via Zoom)
ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
KATRINA LIU, ESQ. (Appearing via Zoom)
PETER DOLAN, ESQ. (Appearing via Zoom)
P.O. Box 1914
Washington, DC 20013
lund.eric@dol.gov
ballard.brendan@dol.gov
mariscal.isidro@dol.gov
liu.katrina.t@dol.gov
dolan.peter@dol.gov


For Defendant Chartwell Financial Advisory, Inc., and Gregory Alan Fresh:

DORSEY & WHITNEY, LLP
KIRSTEN SCHUBERT, ESQ. (Appearing via Zoom)
MICHAEL J. VOVES, ESQ. (Appearing via Zoom)
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498
schubert.kirsten@dorsey.com
voves.michael@dorsey.com


For Defendant Reliance Trust Company:

BRYAN CAVE LEIGHTON PAISNER, LLP
WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
1201 West Peachtree Street NW, 14th Floor
Atlanta, Georgia 30309

7

For All Other Defendants:

    HOLLAND & KNIGHT, LLP
    TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
    1180 West Peachtree Street, NW, Suite 1800
    Atlanta, Georgia 30309
    todd.wozniak@hklaw.com
              -and-
    HOLLAND & KNIGHT, LLP
    LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
    777 South Flagler Drive, Suite 1900
    West Palm Beach, Florida 33401
    lindsey.camp@hklaw.com


Also present:

    Stephen Teplin, In-House Counsel for FIS
      (Appearing via Zoom)
    Lynn Cravey, In-House Counsel for FIS
      (Appearing via Zoom)
    Kevin Bensen, RVR (Appearing via Zoom)
    Cory Kauffmann, RVR (Appearing via Zoom)
    Tiffany Wu, Investigator with DOL (Appearing via
      Zoom)

8

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Please state your objections now, if any.

MS. SCHUBERT:  No objections.

MR. BROCKMAN:  No objections for Reliance.

MR. WOZNIAK:  No objections from the other defendants.

MR. LUND:  No objections from the Department of Labor, Secretary of Labor.

GREGORY ALAN FRESH, called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. LUND:  My name is Eric Lund.  I represent the plaintiff, the Secretary of Labor of the U.S. Department of Labor.

This deposition is being taken pursuant to Rule 30 of the Federal Rules of Civil Procedure in the case Stewart vs. Reliance Trust Company, No. 2:19-CV-03178-JJT pending in the U.S. District Court for the District of Arizona.

This deposition of Greg Fresh is being conducted remotely via Zoom.  This deposition is being stenographically recorded and transcribed by the court

Gregory Alan Fresh - 02/16/2021

9

reporter.  No other court -- excuse me -- no other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions, documented in this case as Document 85.  That Order has been provided to counsel for Mr. Fresh and the court reporter.

The witness is appearing today pursuant to a subpoena served by the Secretary.

EXAMINATION

BY MR. LUND:

Q.    Have you been sworn, sir?  Mr. Fresh, have you been sworn?

A.    Yes.  Just moments ago.

Q.    Okay.  Is that a yes?

A.    Yes.

Q.    Thank you.

Would you state your full name and address for the record, please?

A.    Gregory Alan Fresh,            REDACTED
REDACTED

Q.    Are you represented by counsel today?

A.    Yes.

Q.    Who is your counsel?

A.    Dorsey & Whitney.

MR. LUND:  Okay.  And could -- could counsel

45

A.    At -- at some point in time, but I couldn't be specific on when I knew that.

Q.    But prior to the closing of the transaction; is that correct?

A.    That's fair, yes.

Q.    If we go back to page 7, please, and that bears the Bates stamp 48990, it says:  Leading national ESOP advisory firm.  That refers to Chartwell?

A.    Yes.

Q.    Okay.  And the second bullet point says: Long-term relationships with leading ESOP trustees, lawyers, financial advisors, consultants, administrators, fiduciaries, and related professionals.

Do you see that?

A.    Yes.

Q.    Why was that information included?

A.    To convey to the point -- to the company, the company being RVR doing business as Cruise America Inc., that we have been in the ESOP community and have working relationships, business relationships with all of the leading other professionals in the ESOP community.

Q.    Why was that important?

A.    It's important to establish that we have credibility and knowledge of how ESOP transactions are executed.

56

Q.    And then:  This enterprise value equates to a controlling interest equity value of 100.7 million.

Is that correct?

A.    That's what it says, yes.

Q.    What are these numbers?

MS. SCHUBERT:  Object to form.

A.    What are -- what are these numbers?  They're as -- as a -- as it states, enterprise value, i.e. the value of the entity before capitalization on a pro forma basis, meaning what if, of 140 million.  And then after adjusting for debt, cash, non-operating assets, and liabilities equal an equity value of 100.7.

Q.    And who calculated these numbers, the -- excuse me.

Who calculated the enterprise value and controlling interest equity value?

A.    We -- we provided an estimate, a pro forma estimate, for illustration purposes.

Q.    Is "we" Chartwell?

A.    We, Chartwell Financial Advisory, Inc.  My team:  Ted Margarit, Stephanie Geerdes, and myself, Greg Fresh.

Q.    Would you turn to page 28, please.  It bears the Bates stamp 49011.

A.    Yes, I have it.

138

Tab 19.  It will be Plaintiff's Exhibit 18.

(Deposition Exhibit 18 was marked for identification.)

Q.    And it is -- Plaintiff's Exhibit 18 bears the Bates stamp DOL 0051664 through 0051690.  Exhibit 18, the front page, is an e-mail from Erin Turley to, amongst others, Greg Fresh.  It's dated April 15, 2014.  It lists as an attachment:  Project Byway Due Diligence.

Do you recognize this document, Mr. Fresh?

A.    I do now.

Q.    What is it?

A.    An e-mail from Erin to Ted, with the subject being Due Diligence Request (inclusive of SRR's financial requests).

Q.    Okay.  And turning to page -- the next page, which is DOL 0051665, do you recognize this as the attachment to the e-mail regarding due diligence requests for Project Byway?

A.    I recognize it, yes.

Q.    The body of the e-mail says:  Good morning, Ted and Greg.  Attached is our combined due diligence request for Project Byway.  Looking forward to seeing you this evening.

Was this the trustee team's initial due diligence request relating to Project Byway transaction?

180

Q.    In fact, it's $43 million higher for the fair market value of equity; is that correct?

A.    Correct.

Q.    Why was this valuation so much higher than the previous valuations done by Chartwell?

MR. WOZNIAK:  Object to form.

You can answer it.

MR. LUND:  I'm sorry.  Was there a -- I didn't real hear the objection.  What was that?

MR. WOZNIAK:  I objected to the form, comparing two different things.  But he can answer it.

MS. SCHUBERT:  Did you hear the question?

A.    I'm sorry.  Eric, could you repeat the question?

Q.    (BY MR. LUND:)  That's all right.

A.    I got lost.

Q.    Why was the fair market value of equity here so much higher than the previous valuations done by Chartwell?

MR. WOZNIAK:  Same objection.

MR. LUND:  Do I have a basis for the objection?

MR. WOZNIAK:  Yeah.  You're comparing apples and oranges, but that's all right.

You can answer the question.

181

A.    Well, I wasn't going to use the apples and oranges comparison; but they are, in fact, two different purposes.

In all of this, our role is to provide an estimate whereby an ESOP transaction may occur.  There's no guarantees.  There's no promises.  It's a forecast based on a replication of looking at the same set of numbers, using the same methodologies, the same regulations with respect to determining value.

The 100.7 referenced earlier, in earlier presentations, was a number that we had a high degree of confidence could be achieved in an ESOP transaction. This number represents the highest possible price using those same methodologies, using those same set of numbers to represent an ask.

We know that the trustee in the -- in the discharge of their duties are going to negotiate to fair market value.  This happens to represent what we believe the high end of fair market value as opposed to the low end of fair market value.

I hope that helps.

Q.    Okay.  So you're saying -- just so I'm clear on this, did Chartwell use the same valuation methodologies and data in deriving the numbers here in this value reconciliation as it did in its previous valuations?

182

A.     In all material respects, yes.  There could have been some nuance changes to numbers, but nothing in a material.  Same methodology, same set of numbers.

Q.     Okay.  And what were -- you said there may have been some nuances or differences.  What were those nuances and differences?

A.     Those -- those could be updates to projections. This is happening over a -- a few months' time frame, so the data that we were working with when we prepared our initial work that -- that resulted in the $100.7 million, I believe there was perhaps -- usually is an updated forecast or an updated set of actual results.

I'm speculating if that happened here, but it normally does.  Numbers are never static.  Companies are never static.  They continue to produce operating results, and we take those into account.

Q.     Do you -- do you have a specific recollection of what differences or nuances, I believe you called them, existed between this value reconciliation and the previous valuations done by Chartwell?

A.     No.  I'm afraid I -- thank you, Eric.

No, I'm afraid don't recall.  If you showed me something, I could -- I could answer it, but I -- I don't recall anything.

Q.     Was offering the -- or presenting a fair market

255

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 1st day of March, 2021.

                        _____
                        Amy L. Zoller
                        Certified Reporter
                        Arizona CR No. 50911

        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 37

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Milton Al Stewart, Acting   )
Secretary of Labor,         )
                            )
          Plaintiff,        )
                            ) Civil Action No.
v.                          ) 2:19-cv-03178-JJT
                            )
Reliance Trust Company, et al.,   )
                            )
          Defendants.       )
                            )

DEPOSITION OF EDWARD JOSEPH MARGARIT

(TAKEN VIA ZOOM VIDEO CONFERENCE)

February 18, 2021
8:30 a.m. CST
Minneapolis, Minnesota

Glennie Reporting Services       Prepared by:
1555 East Orangewood Avenue      Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275      CRR, CRC
602.266.6535                     Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                          PAGE

EDWARD JOSEPH MARGARIT

        Examination by Ms. Ballard                 6


                    INDEX TO EXHIBITS

DESCRIPTION                                      PAGE

Exhibit 43        E-mail, Re:  Byway,              57
                  CW-RVR_00065245-00065246

Exhibit 44        E-mail chain, Subject:  Re:  Follow   76
                  Up, CW-RVR_0012924

Exhibit 45        E-mail, FW:  Byway Management     82
                  Presentation Agenda,
                  CW-RVR_00030105-00030106

Exhibit 46        E-mail with attachments, Summary of   129
                  Proposed Byway Terms,
                  CW-RVR_00030509-00030517

Exhibit 47        E-mail, RE:  Project Byway         140
                  Valuation, CW-RVR_00062029-00062030

Exhibit 48        From Stephanie Geerdes, Subject:   142
                  Internal byway call 4-7-14,
                  CW-RVR_00000972

Exhibit 49        E-mail chain, Re:  Project Byway,   146
                  CW-RVR_00032156-00032160

Exhibit 50        E-mail with attachments, RE:  Board   168
                  of Director Procedure,
                  CW-RVR_00047964-00048038

Exhibit 51        E-mail with attachments, Project   180
                  Byway - transaction documents,
                  CW-RVR_00046867-00047155

Exhibit 52        E-mail, Subject:  Eric,            187
                  RTC-RVR 0012944

3

The Deposition of EDWARD JOSEPH MARGARIT was taken remotely on February 18, 2021, commencing at 8:30 a.m. CST, via Zoom Video Conference, Minneapolis, Minnesota, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

        U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
        BRENDAN BALLARD, ESQ. (Appearing via Zoom)
        ERIC C. LUND, ESQ. (Appearing via Zoom)
        ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
        KATRINA LIU, ESQ. (Appearing via Zoom)
        PETER DOLAN, ESQ. (Appearing via Zoom)
        P.O. Box 1914
        Washington, DC 20013
        lund.eric@dol.gov
        ballard.brendan@dol.gov
        mariscal.isidro@dol.gov
        liu.katrina.t@dol.gov
        dolan.peter@dol.gov


For Defendant Chartwell Financial Advisory, Inc., and
Edward Joseph Margarit:

        DORSEY & WHITNEY, LLP
        KIRSTEN SCHUBERT, ESQ. (Appearing via Zoom)
        MICHAEL J. VOVES, ESQ. (Appearing via Zoom)
        50 South Sixth Street, Suite 1500
        Minneapolis, Minnesota 55402-1498
        schubert.kirsten@dorsey.com
        voves.michael@dorsey.com

4

APPEARANCES CONTINUING:


For Defendant Reliance Trust Company:

        BRYAN CAVE LEIGHTON PAISNER, LLP
        WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
        1201 West Peachtree Street NW, 14th Floor
        Atlanta, Georgia 30309
        bard.brockman@bclplaw.com


For All Other Defendants:

        HOLLAND & KNIGHT, LLP
        TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
        1180 West Peachtree Street, NW, Suite 1800
        Atlanta, Georgia 30309
        todd.wozniak@hklaw.com
                    -and-
        HOLLAND & KNIGHT, LLP
        LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
        777 South Flagler Drive, Suite 1900
        West Palm Beach, Florida 33401
        lindsey.camp@hklaw.com


Also present:

        Stephen Teplin, In-House Counsel for FIS
          (Appearing via Zoom)
        Lynn Cravey, In House Counsel for FIS
          (Appearing via Zoom)
        Kevin Bensen, RVR (Appearing via Zoom)
        Cory Kauffmann, RVR (Appearing via Zoom)
        Dorian Hanzich, Investigator with DOL (Appearing
         via Zoom)

5

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree there is no objection to me swearing in a witness who is not appearing personally before me.

Ms. Ballard, do you have any objection?

MS. BALLARD:  No.

THE COURT REPORTER:  And, Mr. Brockman, any objection?

MR. BROCKMAN:  No objection.

THE COURT REPORTER:  Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

THE COURT REPORTER:  And, Ms. Schubert, any objection?

MS. SCHUBERT:  No objection.

THE WITNESS:  With one clarification, so I go by Ted; but my ID that was just up there is Edward. And just so we're all clear, legally, it's Edward, but I go by Ted.  So...

EDWARD JOSEPH MARGARIT, called as a witness herein, having been first duly sworn, was examined and testified as follows:

MS. BALLARD:  This deposition is being taken pursuant to Federal Rule of Civil Procedure 30 in the case Stewart vs. Reliance Trust Company,

6

No. 2:19-CV-03178-JJT, which is pending in the U.S. District for the District of Arizona.

My name is Brendan Ballard, and I am representing the plaintiff, Secretary of Labor, in this case.

For the record, this deposition is being conducted remotely via Zoom and is being stenographically recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions docketed in this case as Document No. 85.  That Order has been provided to counsel for Mr. Margarit and the court reporter.

The witness is appearing today pursuant to a subpoena issued by the Department of Labor.

EXAMINATION

BY MS. BALLARD:

Q.    Mr. Margarit, good morning.

A.    Good morning.

Q.    Could you please state your full name and address for the record?

A.    Sure.  Edward Joseph Margarit.  My address is

REDACTED

REDACTED

Q.    Are you represented by counsel this morning?

51

A.    No.    What we're saying is that one methodology -- no one methodology is controlling.  This methodology was 90 to 120.  But the other methodologies apparently, based on the prior page, supported a higher value.

Q.    All right.  If you could please turn to page 28 of the presentation, that's Bates-stamped DOL 49011.

Do you see where it states:  For illustration and planning purposes, Chartwell has used a controlling interest enterprise value of $140 million, primarily based on the DCF analysis.  This enterprise value equates to a controlling interest equity value of $100.7 million, which is the equity purchase price we have used in our pro forma 100 percent S-Corp ESOP sale illustration?

A.    Uh-huh.

Q.    Okay.  What is a controlling interest equity value?

MR. WOZNIAK:  Asked and answered.

A.    It's -- it's the value of the equity in a transaction where more than 50 percent of the equity is being sold.

Q.    Were the selling shareholders pleased with the $140 million enterprise value and 100.7 million equity value stated here?

MR. WOZNIAK:  Object to form.

120

Q.    So what's the difference between an initial ask price and a valuation result?

A.    Uh-huh.  So a valuation as a whole is not finite.  The -- the output of a valuation is not a number.  It is a range.

Because back to our discussion on weighted average cost of capital, you may as a buyer think that your cost of equity is higher or lower than another buyer.  That is what determines partly -- other factors obviously are in play as well -- but just to highlight, that is what determines the range, low to high.

And so this 143.9 would have been the high end of our range, which negotiating on behalf of the company is where we would have started with the expectation that we would then negotiate down with the trustee through the process.

Q.    Was 100.7 million equity value the low end of the range?

A.    I don't -- I don't recall offhand what our range was.  I don't -- I didn't see that in prior materials that we looked at.  But I -- I would assume that it was certainly within the range.  And I would tend to think it would be on the lower end of the range. Whether it was the absolute bottom or not, I don't know.

Q.    Did anyone from RVR ask you about the

191

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 3rd day of March, 2021.

_____
Amy L. Zoller
Certified Reporter
Arizona CR No. 50911

        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 38

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of          )
Labor,                                 )
                                       )
              Plaintiff,               )
                                       ) Civil Action No.
v.                                     ) 2:19-cv-03178-JJT
                                       )
Reliance Trust Company, et al.,        )
                                       )
              Defendants.              )
                                       )

DEPOSITION OF ROBERT ARTHUR SMALLEY, JR.

(TAKEN VIA ZOOM VIDEO CONFERENCE)

June 10, 2021
8:01 a.m. MST
Mesa, Arizona

Glennie Reporting Services          Prepared by:
1555 East Orangewood Avenue         Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275         CRR, CRC
602.266.6535                        Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                    PAGE

ROBERT ARTHUR SMALLEY, JR.

     Examination by Mr. Mariscal                             6


INDEX TO EXHIBITS

DESCRIPTION                                                 PAGE
Exhibit 159        E-mail string, Subject:  The deal,        39
                   DOL 0112080-0012081

Exhibit 160        E-mail string with Attachments,           64
                   Subject:  FW:  Calendar,
                   RVR40114-40120

Exhibit 161        E-mail string with Attachments,           81
                   Subject:  FW:  Trustee bio's,
                   RVR40157-40162

Exhibit 162        E-mail with Attachments,                  87
                   Subject:  FW:  ESOP Trustee
                   Proposals, RVR40121-40156

Exhibit 163        Action By Written Consent of the         100
                   Board of Directors of RVR, Inc.,
                   Dated as of May 22, 2014,
                   DOL 0009709-0009985

Exhibit 164        Action By Written Consent of the         110
                   Board of Directors of RVR, Inc.,
                   Dated as of May 28, 2014,
                   DOL 0010043-0010162

Exhibit 165        January 19, 2016 Warrant Purchase        170
                   Agreement, RVR38515-38524

Exhibit 166        January 5, 2018 Warrant Purchase         173
                   Agreement, RVR39346-39354

3

The Deposition of ROBERT ARTHUR SMALLEY, JR., was taken remotely on June 10, 2021, commencing at 8:01 a.m. MST, via Zoom Video Conference, Mesa, Arizona, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

        U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
        ISIDRO MARISCAL, ESQ.  (Appearing via Zoom)
        ERIC C. LUND, ESQ. (Appearing via Zoom)
        BRENDAN BALLARD, ESQ. (Appearing via Zoom)
        KATRINA LIU, ESQ. (Appearing via Zoom)
        PETER DOLAN, ESQ. (Appearing via Zoom)
        P.O. Box 1914
        Washington, DC 20013
        lund.eric@dol.gov
        ballard.brendan@dol.gov
        mariscal.isidro@dol.gov
        liu.katrina.t@dol.gov
        dolan.peter@dol.gov


For Defendant Reliance Trust Company:

        BRYAN CAVE LEIGHTON PAISNER, LLP
        WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
        1201 West Peachtree Street NW, 14th Floor
        Atlanta, Georgia 30309
        bard.brockman@bclplaw.com

4

APPEARANCES CONTINUING:

For All Other Defendants:

    HOLLAND & KNIGHT, LLP
    TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
    1180 West Peachtree Street, NW, Suite 1800
    Atlanta, Georgia 30309
    todd.wozniak@hklaw.com
          -and-
    HOLLAND & KNIGHT, LLP
    LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
    777 South Flagler Drive, Suite 1900
    West Palm Beach, Florida 33401
    lindsey.camp@hklaw.com

Also present:

    Lynn Cravey, In House Counsel for FIS
     (Appearing via Zoom)
    Stephen Teplin, In House Counsel for FIS
     (Appearing via Zoom)
    Cory Kauffmann, RVR (Appearing via Zoom)
    Kevin Bensen, RVR (Appearing via Zoom)
    Randall Smalley, RVR (Appearing via Zoom)
    Tiffany Wu, Investigator with DOL (Appearing
     via Zoom)
    Alexandra Gilewicz, Solicitor's Office,
     Department of Labor (Appearing via Zoom)
    Ngoc Nguyen, DOL (Appearing via Zoom)

5

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Mr. Mariscal, any objection?

MR. MARISCAL:  No objection.

THE COURT REPORTER:  Mr. Brockman, any objection?

MR. BROCKMAN:  None for Reliance.

THE COURT REPORTER:  And Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

ROBERT ARTHUR SMALLEY, JR., called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. MARISCAL:  Good morning, everyone.

This deposition is being taken pursuant to Federal Rule of Civil Procedure 30 in the case of Walsh vs. Reliance Trust Company, No. 2:19-cv-03178-JJT, pending in the U.S. District Court in the District of Arizona.

My name is Isidro Mariscal, and I represent the plaintiff, the Secretary of Labor.

This deposition is being conducted remotely via Zoom.  This deposition is being stenographically

6

recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions docketed in this case as Docket 85. That Order has been provided to counsel for Mr. Smalley and the court reporter.

The witness today -- the witness is appearing here today pursuant to a deposition notice served by the Secretary.

EXAMINATION

BY MR. MARISCAL:

Q.   Mr. Smalley, could you please state your full name for the record.

A.   Robert Arthur Smalley, Jr.

Q.   Thank you.  And are you represented by counsel this morning?

A.   Yes.

Q.   Who is your counsel?

A.   Todd Wozniak.

Q.   Are you represented by any other counsel this morning?

A.   No.

Q.   Okay.  And is Mr. Wozniak there in the room there with you?

A.   Yes.

53

that I agree with it.

Q.   So what -- what part don't you agree with?

A.   The 100.7 million was a figure that they used repeatedly to demonstrate the low end of the valuation range.  They always talked to us about valuation range.

So this pro forma would suggest to me a non-factual, just sort of an outline, you know, which is sort of an educated guess, I suppose.

Q.   You said they always talked to us about this range.  Are you referring to Chartwell?

A.   Yes.  Whenever we spoke, they talked about pricing and it would come in in a range, low to high.

Q.   And is what you just stated what Chartwell stated to you at this meeting on January 27th?

A.   Well, I can't be specific because, you know, like I said, the meeting was mostly verbal.  I don't recall flipping through these booklets.

Q.   Okay.

A.   We get -- that's a boring presentation.  It doesn't -- at least for me.

Q.   So you don't have a specific recollection of Chartwell making that statement that this was an illustration of the low end of the range, as you put it, at this meeting on January 27th; is that correct?

MR. WOZNIAK:  Object to form.  Misrepresents

54

the testimony.

You may answer it.

A.    Yeah, I was going to say I'd have to get you to repeat that, because I got confused.

Q.    (BY MR. MARISCAL:)  Your statement was that Chartwell told you -- or they always told you that the -- that they were presenting an illustration of what the low end of a range would be for a valuation; is that correct?

MR. WOZNIAK:  Object to the form.

You may answer it.

A.    Yes, that's correct.  That number always showed up as part of a value range.  But I can't testify today that I knew that when I -- when this was presented, because I honestly do not recall going over this booklet.

Q.    Okay.  And the number you're saying, that number was 100.7 million?

MR. BROCKMAN:  Object to form.

A.    That's what it says on this page.  And I've seen that number pretty much through this whole transaction when they were talking about the value ranges, low to high.

Q.    Okay.  Can you turn to page 24 of the presentation.

A.    Okay.

Q.    Do you see at the top of the page, it says:

68

A.    My recollection is I don't recall doing that. I very well could have, but I just don't recall it at this point.

Q.    (BY MR. MARISCAL:)  Do you recall reviewing a calendar for the transaction at any point in time?

A.    No.

Q.    Do you remember discussing the timeline for the transaction on or about this date, February 21, 2014?

MR. WOZNIAK:  Object to form.

You can answer it.

A.    Yeah, I'm sure I was informed of the timeline. But like I said, these things are moving targets.  Dates flip around, other commitments come up.  But, yeah, it's kind of a yardstick.

Q.    So who did you discuss the timeline with?

A.    That would have been with my -- my financial officer Eric Bensen and Randy Smalley my brother.

Q.    And when did you have those discussions with Eric and Randy?

A.    Daily.  We would discuss different aspects of the deal in business every day, during the day, many times a day.  Our offices are all right next to each other.  We've interacted that way for many years.

Q.    Did you discuss the timeline after Chartwell made its presentation to you on January 27, 2014?

74

memory.

Q.    I'd ask you to turn to page 5 of the presentation.

A.    Overview.  Right.  Okay.

Q.    Okay.  Do you see this is Executive Overview?

A.    Yes.

Q.    Okay.  And then it states on this page:  Our role:  Chartwell has been engaged by the company to analyze and, if deemed acceptable, execute the sale of all of the company's equity to a newly formed Employee Stock Ownership Plan ("ESOP").

Do you see that?

A.    I do.

Q.    Had Chartwell been engaged at that point by the time of this presentation on March 26, 2014?

A.    Yes.

Q.    When was -- when was Chartwell engaged?

A.    I can't say exactly, but I believe it was in February.

Q.    February.  Okay.

Were you involved in the decision to engage Chartwell for this ESOP transaction?

A.    Yes.

Q.    Who else was part of that decision to engage Chartwell?

75

A.    Well, as I sit here, I know my brother Randy and Eric Bensen, and then I'm sure we had discussed it with counsel.  So those would have been the people.

Q.    And when you refer to counsel, who would that be?

A.    It would be the lawyers from Greenberg Traurig who represented us.

Q.    When you say "they represented us," are you referring to the company or the selling shareholders?

A.    Sorry, repeat that, sir.

Q.    When you say that Greenberg Traurig was representing us, who are you referring to when you say us?

A.    They would be representing the company.

Q.    Okay.  Did you -- was this presentation handed to you at that meeting on March 26, 2014?

A.    You know, I haven't looked at it enough to tell you that, whether I recognize it or not.  I'm sure it was there.  I don't know if we went over it page by page.

Q.    Did you review this presentation at any point in time after that March 26, 2014 meeting with Chartwell?

A.    I just don't recall if I did or not.

Q.    If you could turn to page 12 of the presentation.  And if you see on the left-hand column, it states:  Based on our updated valuation analysis,

76

Chartwell believes the pro forma enterprise value is $140 million, which equates to a controlling interest equity value of $100.7 million.

Do you see that?

A.    I do.

Q.    Earlier you had testified that you kept seeing the $100.7 million figure mentioned by Chartwell; is that correct?

A.    Yes.

Q.    Is this presentation here another instance when Chartwell presented you with the $100.7 million figure?

MR. WOZNIAK:  Object to form.

A.    So the first time I think I saw it was in January on the pro forma.  And then here it is again in March on another pro forma.  And they would have had a lot more information and would --

(Reporter requests clarification.)

A.    Had a lot more information and would have been looking at due diligence at this point.  Yet the number -- by March, the indicators were there that we were actually doing better than -- than January with reservations and revenue coming in, yet the number remained the same, which I think supports my comment that this was the bottom end of a range that they told us would come in in between 100.7 and 140 -- 143,000 -- or

Robert Arthur Smalley, Jr. - 06/10/2021

77

million, I think.

Q.   When you -- you just mentioned a $143 million figure.  Is that something that Chartwell discussed at this presentation on March 26, 2014?

A.   You know, I don't recall that, but I know it's -- it's in one of these later presentations.

Q.   Is that a presentation that you reviewed, something that presented a $143 million figure?

A.   I remember seeing it, yes.

Q.   Do you remember seeing it --

A.   I'm not saying that's the exact figure.  It's roughly.

Q.   Sorry.  Do you remember seeing a presentation with that figure during the transaction?

          MR. WOZNIAK:  Object to form.

          You may answer it.

A.   Yes, it's out there in one of the -- one of the documents, yep.

Q.   My question is:  Do you remember reviewing a document with that figure at the time of the transaction?

          MR. BROCKMAN:  Object to form.

          MR. WOZNIAK:  Object to form.

A.   Yeah, at the time -- you mean on the 28th of May, or before that?

Q.   (BY MR. MARISCAL:)  Before -- before the close

Robert Arthur Smalley, Jr. - 06/10/2021

80

Exhibit 22.

MR. BROCKMAN:  Thank you.

Q.    (BY MR. MARISCAL:)  And do you see here on the bottom right corner, this presentation is dated April 21, 2014?

A.    Me?  Yes.

Q.    Yes.  Okay.  And if we could go to page 22 of the presentation.  And on this page here, this is ESOP Equity Valuation Summary.

Do you see that?

A.    Yes.

Q.    Okay.  And do you see on the right-hand side at the very bottom, the last line, it says:  Fair Market Value of Equity (Rounded).  And do you see the figure there, 143,900,000?

A.    Yes, that's -- that's actually the number I'm referring to.

Q.    Okay.

A.    That would have been -- they characterized to us as the high end of the valuation range.

Q.    So this is the presentation you were referring to just moments ago that you saw; is that correct?

MR. WOZNIAK:  Object to form.

You can answer it.

A.    That's the -- that's where I got that number

Robert Arthur Smalley, Jr. - 06/10/2021

81

from, yes.

Q.     Great.  Thank you.  If I could turn your attention to Tab 55.  And this is Bates stamped at the bottom RVR40157 through RVR40162.  And it's an e-mail with attachments from Eric Bensen to Bob Smalley, Randy Smalley, dated March 28, 2014, with the subject line: FW:  Trustee bio's, and several attachments.

And we'll go ahead and mark this as Plaintiff's Exhibit 161.

(Deposition Exhibit 161 was marked for identification.)

Q.     Okay.  Do you have this exhibit in front of you, Mr. Smalley?

A.     Yes.

Q.     And do you see here in this e-mail that Eric Bensen is forwarding to you and Randall Smalley some trustee bios; is that correct?

A.     Yes.

Q.     And are these bios, which are attached to this e-mail, are these the trustees that you interviewed as part of the RVR ESOP transaction?

A.     I believe they are.

Q.     And how many -- how many potential trustees did you interview for the transaction?

A.     Three.

82

Q.   And which trustees were those?

A.   Reliance, GreatBanc, and Alerus.

Q.   Did you interview any other trustees for the transaction?

A.   We had gone to our experts -- or advisors, I should say, and asked for their advice on securing independent and qualified trustees to look at.  And we chose these three to interview.

Q.   And was one of those advisors that you mentioned that recommended these, was that Chartwell?

A.   You know, I think it was -- I think it was Greenberg, but I can't be positive.

Q.   And did you -- did you end up interviewing these three trustees for the transaction?

A.   Yes.

Q.   Did you review these bios that Eric Bensen forwarded to you in preparation for those interviews?

A.   I believe I did.  They look familiar.

Q.   Did you do anything else to prepare for interviewing these potential trustees?

A.   We -- as I said, we checked with our -- our advisors because we wanted to make sure we had qualified, independent and -- trustee candidates that were recognized as such.  So I -- I imagine we checked with Chartwell.  I can't -- I don't know for certain, but it

seems to me that Greenberg we would have gone through for sure.  And then maybe Chartwell --

Q.   Other -- sorry.  Didn't mean to cut you off.

Other than speaking with your advisors, did you do anything else to prepare for these interviews?

A.   We developed a list of questions for each of them to answer during the interview process with the help of, I believe it was, counsel, Greenberg.

Q.   Did you review any materials other than these bios to prepare for the trustee interviews?

A.   You know, I don't recall if I did or not.  I know that we -- we vetted them with our advisors, though, for sure.

Q.   Okay.  If you could go to Tab 25, and this has previously been marked as Plaintiff's Exhibit 54.  It's titled:  Project Byway Trustee Interview.

Do you have it in front of you?

A.   Yes, I do.

Q.   Okay.  Did the company interview Reliance Trust on March 31 2014?

A.   Yes.

Q.   Were you a part of that interview of Reliance Trust Company?

A.   Yes, I was.

Q.   Who else was in that interview?

84

A.    Eric Bensen, my brother Randy Smalley, Marc Baluda of Greenberg, and then the -- the men from Reliance, Steve Martin and Bucky Wright.  That was the first of the interviews.

Q.    Sorry, did you say this was the first of the interviews?

A.    I believe it was, yes.

Q.    And are you referring to the first of the three interviews of the potential trustees?

A.    Yes.  I'm checking my -- my timeline here. Yes.  Correct.

Q.    Okay.  How long did the interview with Reliance Trust last?

A.    From, first thing, 9 until probably noon, lunchtime.

Q.    And just to be clear, in this exhibit, Exhibit 54, you're not listed as an attendee under Cruise America.  But you state that you were in attendance at this interview; is that correct?

A.    Yes, I was.  Absolutely, I remember being there.  I remember conducting all three interviews, being present at all of them.

Q.    Was this something that you had always planned on -- had you always planned on attending these interviews?

85

MR. WOZNIAK:  Object to --

A.    Yes.

MR. WOZNIAK:  Object to form.

Go ahead.

A.    Yes, I planned on attending all of them.

Q.    (BY MR. MARISCAL:)  Okay.  Can you describe the format of the interview that took place with Reliance Trust?

A.    Well, I'd say, recalling from memory now, and it's over seven years ago, but we met in the morning. You know, greetings, small talk, catching up.  And then we got into the -- the interviews.

And as I said, we had prepared questions that we asked, and they responded.  They also told us a lot about their firm and what they had done and demonstrated to us why we would consider them independent and qualified.

Q.    And how long did you say this interview lasted?

A.    I remember doing the next interview that afternoon.  So I'm saying around lunchtime, around noon, 1 o'clock, perhaps.

Q.    So how many -- how many hours would that have been?

A.    Three hours, anyway.

Q.    How long did your interview with the other

86

potential trustee candidates last?

A.    Well, the next people in were the team from Alerus Financial, and I think they went about a similar time.  I don't know exactly, but say 2 until 4 or 5; 1 until 4; 2 to 5.  Probably three hours.

Q.    And what about the interview with GreatBanc?

A.    So, again, I'm referring to my timeline to be accurate.  And GreatBanc was the next day.  I believe it was the next day.  It might have been in the afternoon. I'm not positive on that.  But it was definitely the next day.

Q.    And how long did that interview last?

A.    Probably a similar amount of time.  Awfully hard for me to be exact.  It was so long ago.  But that's my recollection, anyway.

Q.    Did you discuss the interviews internally with Eric Bensen and Randall Smalley after you completed them?

A.    Yes.

Q.    When did you discuss the interviews?

A.    Well, immediately after each one, I recall us saying, you know, we were impressed with everybody, all three interviews.  Which made the selection discussion lengthy, as we mulled over, you know, each of them.  They all appeared to be very professional, and our counsel from Greenberg was there and assured us once more that

91

you, Randall Smalley, and Eric Bensen decide to hire Reliance as trustee for the transaction?

MR. WOZNIAK:  Object to form.

But you can answer it.

A.    You know, I'm trying to remember how it went down.  It's -- it's a foggy memory.  I can't tell you exactly when we decided, but it was after a lot of -- a lot of the discussion with advisors and amongst ourselves.

Q.    But ultimately you did decide to hire Reliance as trustee for the transaction; is that correct?

A.    Yes, we did.  And I can tell you there was a couple of things that we considered and felt were valuable.  One was that they had on staff a valuation expert.  They pointed that out to us and indicated that that was a valuable asset for them.  And they also had on staff an experienced and known ESOP attorney.  And then the other thing they mentioned to us, which we found compelling, was that they had never been in litigation with the DOL.

Q.    Again, the end result of this was that you hired Reliance Trust as trustee for the transaction; is that correct?

A.    Yes.

Q.    And you made that decision with Randall Smalley

94

MR. WOZNIAK:  Object to form.

You can answer it.

A.    Yeah, I guess specific, no, I can't give you a specific recollection.  I don't have -- it's too long ago.

Q.    (BY MR. MARISCAL:)  If you look at paragraph 2 here on the first page -- sorry, numbered paragraph 2. It says:  Reliance will assume the fiduciary responsibility for determining, in consultation with its advisors, whether the price proposed to be paid for the stock in the proposed transaction is not more than the fair market value thereof, and whether the proposed transaction, including any future management incentive plan adopted at the time of the time of the transaction is fair from a financial viewpoint to the ESOP and its participants.

Do you see that?

A.    I do.

Q.    So was it your understanding at the time when you engaged Reliance as trustee that Reliance had a fiduciary duty to determine that the price it was paying for the stock in the transaction was not more than fair market value?

A.    Yes.

Q.    And was it also your understanding that

95

Reliance had a fiduciary duty to determine that the transaction was fair from a financial viewpoint to the ESOP and its participants?

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Same objection.

You may answer it.

A.   Yes.

Q.   (BY MR. MARISCAL:)  Okay.  Did you do anything to determine whether Reliance Trust was fulfilling its fiduciary duties prior to the close of the transaction?

A.   So there was a -- there's a whole process there where it goes back to us talking to our advisors, asking for their recommendation on qualified independents.  And then we had the obligation to vet those candidates.  And then at that point, the due diligence process begins.  We begin feeding them information from Chartwell, which had been building up information, due diligence information, since -- really since the end of January.  And so all of that information was transferred to Reliance for review.  And then they would ask our -- our team for more, ask us questions, ask for more information, which we provided them everything they asked for.  And then -- and then the good faith arm-length's negotiations began.  That's -- that's how that process works.

Q.   So my question was:  Did you do anything

96

personally to determine that Reliance was fulfilling its fiduciary duties with respect to the transaction?

A.    Yes.  While all that was going on, I was meeting and discussing with my finance people, Eric and Kevin Bensen and Cory Kauffmann, in the production and transmission of all the due diligence materials, making sure that they had everything they wanted and that they -- that they were proceeding with their analysis.  Yes, I did.  We all did.  We all, being Eric, my brother, and myself.  I think the timeline demonstrates our involvement.

Q.    Which timeline are you referring to?

A.    The one I have here.  What is this called again?

MR. WOZNIAK:  It's Exhibit A to the Mandatory Initial Disclosures.

A.    Exhibit A.

Yeah, if you look at it, you'll see that just about every business day, there were things happening with respect to the gathering of due diligence and then discussions back and forth between us and Reliance as they were doing their due diligence.

Q.    And did you do anything at the close of the transaction as well to determine that Reliance Trust had fulfilled its fiduciary duties as trustee?

153

stock.

A.    Correct.

Q.    Okay.  Was it your understanding that the proposed ESOP transaction was for the ESOP to purchase 100 percent of the stock that the selling shareholders owned in RVR, Inc.?

A.    Yes.

Q.    And was it your understanding that the proposed purchase price for 100 percent of that stock was $143.9 million?

A.    That was the first offer submitted.

Q.    Okay.  So was the selling shareholders controlling interest equity purchase price offer to Reliance $143.9 million?

MR. WOZNIAK:  Object to form.

(Reporter requests clarification.)

MR. MARISCAL:  You're breaking up.

THE WITNESS:  Can you hear us?

MR. MARISCAL:  Now, yes.

MR. WOZNIAK:  I don't know who's breaking up, if it's us or you.  But somebody is breaking up.

MR. MARISCAL:  Everyone is coming through okay on my end.  It's -- it's just --

THE WITNESS:  Well, you -- you're going in and out.

Robert Arthur Smalley, Jr. - 06/10/2021

154

MR. MARISCAL:  We may need to -- let's go off the record.

(Recess taken at 2:47 p.m. MST to 2:51 p.m. MST.)

(The pending question was read by the reporter.)

A.    Okay.  Ready for me to answer?

Q.    (BY MR. MARISCAL:)  You can go ahead and answer.

A.    That's sounds correct, yes.

Q.    And you approved this offer; is that correct?

A.    Well, my brother and I would have approved it.

Q.    Okay.

A.    And Eric too.

Q.    Okay.  If you can turn to page 6 of the exhibit -- and I'm sorry, we are still on Exhibit 61, which is Tab 58 for you.

A.    Page?

Q.    Page 6.

A.    Yeah.

Q.    And do you see there in the bottom half, it says:  Preliminary features of the seller note warrants.

Do you see that?

A.    Uh-huh.

Q.    What are -- what are these seller note warrants

155

that are being described here?

MR. WOZNIAK:  Object to form.

You can answer it.

MR. BROCKMAN:  I'll join.

A.    The warrants -- I don't have any warrants anymore; we haven't had any for a long time -- were a feature that helped to compensate for under market interest rate that we were -- that we had assigned to the deal to, I guess, make it more appealing to the -- to the trustee part of the negotiations.  So we lowered the interest rate.  And this was -- it's kind of a complex financial deal.  And I'm not well versed on it.  So either -- I would probably want to get one of the finance people to explain the true nuts and bolts of it.  But that's my overview on it.

Q.    And you said you no longer owned warrants; is that correct?

A.    No, I haven't had any for quite some time.

Q.    Did the company purchase the warrants from you at some point?

A.    Yeah, they -- I'm trying to recall.  And it's -- it's hazy.  But we sold some fairly -- fairly soon after the transaction at a very -- I think they were 7.50 per warrant.  And it was an accommodation, believe it or not, to the company and -- to pay off some of the debt.

Robert Arthur Smalley, Jr. - 06/10/2021

166

MR. WOZNIAK:  Object to form.

A.    This looks like the final.  I think I'd have to -- you know, I'd have to verify it.  I wasn't -- I didn't -- I wasn't on the list.  But I remember hearing all this information.

Q.    And was 105 million, in fact, the final price that was paid in the transaction?

MR. WOZNIAK:  Object to form.

A.    Yes, it was.

Q.    Okay.

A.    It was the low side of the range.

Q.    And did you approve that $105 million purchase price?

A.    Yes.

Q.    And did Randall Smalley approve that price as well?

A.    I would certainly think so, yes.

Q.    And Eric Bensen, did he approve the price as well?

A.    Yes.

Q.    And this was for all of your shares in RVR; is that correct?

A.    Yes.

Q.    If you could go to page 6.  Do you see the bottom section is preliminary features of the seller note

186

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

          BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

          I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

          Pursuant to request, notification was provided that the deposition is available for review and signature.

          Dated this 17th day of June, 2021.

                    _____
                    Amy L. Zoller
                    Certified Reporter
                    Arizona CR No. 50911

          I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 39

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of        )
Labor,                               )
                                     )
            Plaintiff,               )
                                     ) Civil Action No.
v.                                   ) 2:19-cv-03178-JJT
                                     )
Reliance Trust Company, et al.,      )
                                     )
            Defendants.              )
                                     )

DEPOSITION OF RANDALL STEVEN SMALLEY

(TAKEN VIA ZOOM VIDEO CONFERENCE)

June 11, 2021
8:01 a.m. MST
Mesa, Arizona

Glennie Reporting Services        Prepared by:
1555 East Orangewood Avenue       Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275       CRR, CRC
602.266.6535                      Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                              PAGE

RANDALL STEVEN SMALLEY

     Examination by Ms. Ballard                      5

     Examination by Mr. Brockman                   181


INDEX TO EXHIBITS

DESCRIPTION                                          PAGE
Exhibit 167      Trust Agreement of Smalley Family    71
              Revocable Trust, RVR20983-21022

3

The Deposition of RANDALL STEVEN SMALLEY was taken remotely on June 11, 2021, commencing at 8:01 a.m. MST, via Zoom Video Conference, Mesa, Arizona, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

    U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
    BRENDAN BALLARD, ESQ. (Appearing via Zoom)
    ERIC C. LUND, ESQ.  (Appearing via Zoom)
    ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
    KATRINA LIU, ESQ. (Appearing via Zoom)
    PETER DOLAN, ESQ. (Appearing via Zoom)
    P.O. Box 1914
    Washington, DC 20013
    lund.eric@dol.gov
    ballard.brendan@dol.gov
    mariscal.isidro@dol.gov
    liu.katrina.t@dol.gov
    dolan.peter@dol.gov

For Defendant Reliance Trust Company:

    BRYAN CAVE LEIGHTON PAISNER, LLP
    WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
    1201 West Peachtree Street NW, 14th Floor
    Atlanta, Georgia 30309
    bard.brockman@bclplaw.com

4

APPEARANCES CONTINUING:

For All Other Defendants:

     HOLLAND & KNIGHT, LLP
     TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
     1180 West Peachtree Street, NW, Suite 1800
     Atlanta, Georgia 30309
     todd.wozniak@hklaw.com
             -and-
     HOLLAND & KNIGHT, LLP
     LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
     777 South Flagler Drive, Suite 1900
     West Palm Beach, Florida 33401
     lindsey.camp@hklaw.com

Also present:

     Lynn Cravey, In House Counsel for FIS
      (Appearing via Zoom)
     Stephen Teplin, In House Counsel for FIS
      (Appearing via Zoom)
     Cory Kauffmann, RVR (Appearing via Zoom)
     Kevin Bensen, RVR (Appearing via Zoom)
     Eric Bensen, RVR (Appearing via Zoom)
     Dorian Hanzich, Investigator with DOL (Appearing
      via Zoom)
     Alexandra Gilewicz, Solicitor's Office,
      Department of Labor (Appearing via Zoom)

5

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Ms. Ballard, do you have any objections?

MS. BALLARD:  No objection.

THE COURT REPORTER:  And, Mr. Brockman, any objection?

MR. BROCKMAN:  No objection.

THE COURT REPORTER:  And, Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

RANDALL STEVEN SMALLEY, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. BALLARD:

Q.    Mr. Smalley, could you kindly state your full name for the record?

A.    Randall Steven Smalley.

Q.    Good morning.  My name is Brendan Ballard, and I'm an attorney representing the Secretary of Labor.

This deposition is being taken pursuant to the Federal Rules of Civil Procedure 30 in the case of Walsh vs. Reliance Trust Company, which is pending in the

6

United States District Court for the District of Arizona.

This deposition is being conducted remotely via Zoom and is being stenographically recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.  The witness is appearing today pursuant to subpoena served by the Secretary.

Mr. Smalley, have you been sworn?

A.    Yes, ma'am.

Q.    And are you represented by counsel this morning?

A.    I am.

Q.    And who is your counsel?

A.    Todd Wozniak from Holland & Knight.

MS. BALLARD:  And can all other counsel present please identify themselves for the record?  We'll start with the Secretary.

MR. MARISCAL:  Isidro Mariscal for the Secretary of Labor.

MS. LIU:  Katrina Liu for the Secretary.

MR. LUND:  Eric Lund for the Secretary.

MR. DOLAN:  Peter Dolan for the Secretary of Labor.

MS. BALLARD:  Bard, do you want to go ahead?

MR. BROCKMAN:  That's all you've got?

MS. BALLARD:  I know, we're low on

reinforcements today.

MR. BROCKMAN:  Bard Brockman for Reliance Trust.

MR. WOZNIAK:  Todd Wozniak and Lindsey Camp for the non-Reliance Trust defendants.

MS. BALLARD:  Could everyone else present please identify themselves for the record.

MR. HANZICH:  Dorian Hanzich with EBSA.

MS. GILEWICZ:  Alexandra Gilewicz with the Department of labor.

MR. TEPLIN:  Stephen Teplin, FIS.

MR. KAUFFMANN:  Cory Kauffmann with RVR.

MR. KEVIN BENSEN:  Kevin Bensen, RVR.

MR. ERIC BENSEN:  Eric Bensen, RVR.

MS. BALLARD:  If you're not going to be speaking on the record today, if you could please mute your connection and just try to remember to keep it muted.

Q.    (BY MS. BALLARD:)  Mr. Smalley, have you ever had your deposition taken before?

A.    I have.

Q.    And when was that?

A.    Back when I was a young man, and it was in a business case.  About 1990, I believe.

Q.    And was it related to RVR?

32

of the date first written above.  Company, RVR, Inc. by Eric Bensen, chief financial officer; selling stockholders, Eric Bensen, Robert Smalley, Jr.; Family Trust created under the Smalley Revocable Trust dated July 8, 2004 by Randall S. Smalley, trustee; Marital Trust created under the Smalley Revocable Trust dated July 8, 2004 by Randall S. Smalley, trustee; and then Survivor's Trust created under the Smalley Revocable Trust dated July 8, 2004 by Randal S. Smalley, trustee.

          Do you see that?

     A.    Yes.

     Q.    Okay.  So if you will look up to -- back to the line that states:  Family Trust.

     A.    Yes.

     Q.    And then it says:  By Randall S. Smalley, Trustee.

     A.    Yes.

     Q.    Is that your signature?

     A.    It is.

     Q.    And then the same for the Marital Trust, it says:  By Randal S. Smalley.  And then above that, Trustee.  And above that, is that your signature?

     A.    Yes.

     Q.    And then moving down, it says Survivor's Trust; and then:  By Randall S. Smalley, Trustee.  And above

33

that, is that your signature?

A.    It is.

Q.    So were you the sole trustee of the Family Trust as of May 28, 2014?

MR. WOZNIAK:  Object to form.

You may answer it.

A.    Yes.  My wife passed away.

Q.    And were you the sole trustee of the Marital Trust as of May 28, 2014?

A.    Yes.

Q.    And were you the sole trustee of the Survivor's Trust as of May 28, 2014?

A.    Yes.

Q.    As the sole trustee of the Family Trust, the Marital Trust, and the Survivor's Trust, did you cause the trust to sell their RVR stock to the RVR ESOP trust as part of the transaction?

MR. WOZNIAK:  Object to form.

A.    Yes.

Q.    In 2014, I'll say as of -- on May 28, 2014, did you make all the decisions for the Family Trust, the Marital Trust, and the Survivor's Trust?

MR. WOZNIAK:  Object to form.

A.    Yes.

Q.    If you could take a look at Schedule 1, that is

to create an employee benefit and to move the company into a position where the employees who helped build it would -- would benefit from the company.

And I'm not so egotistical to say that Cruise America and RVR were at the point that they were through my sole efforts or my brother's efforts or anybody's. It's a conglomerate. It's, you know, ranging up to 300 people involved. And rather than selling it to some hedge fund that would slice it up, we wanted to give it to the employees.

We had gone through a bad experience with Budget, and we learned from our mistakes. And we viewed this as the best alternative for Cruise America not only in its 50th year next year, but maybe a hundred later on. We had a very good culture here, and we wanted that culture to continue.

(Zoom audio issues; recess taken at 8:54 a.m. MST to 9:00 a.m. MST.)

MS. BALLARD: Let's go back on the record.

Q.   (BY MS. BALLARD:)  And, Mr. Smalley, I'll remind you that you're still under oath.

Prior to taking a break, you had mentioned that the owners of RVR decided to sell their ownership interest to an ESOP; is that correct?

MR. BROCKMAN: Object to form.

41

MR. WOZNIAK:  Object to form.

A.    That is correct.

Q.    Prior to making the decision to sell their ownership interest to an ESOP, did you all consider other potential buyers?

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Same objection.

A.    I'm sorry.  Do you hear this breaking up?  I did not hear the question completely.  Could you restate it?

Q.    Sure.  No, no, no, that is fine.

Prior to deciding to create an ESOP, did the owners of RVR consider other alternatives for selling the company?

MR. WOZNIAK:  Object to form.

A.    The -- sort of, yes.  We discussed other items, but yes.

Q.    What other items did you discuss?

A.    Well, with the experience we had gone through, the deal with Budget, which was very bad, by the way.  We didn't like it.  That's why we bought the company back. So that was not an alternative, so that was dismissed very quickly.

The conversation had come up with actually our bankers, and they had suggested we ought to look at an

Randall Steven Smalley - 06/11/2021

46

A.    I don't remember the names of the folks, but the company was Alerus.  And the other one, I believe, was Grand Bank or GreatBanc or -- Grand Bank?  Is it GreatBanc?  Something-bank.

Q.    And so did you attend the interview of Reliance Trust Company?

A.    Yes.

Q.    And what was the purpose of that interview?

MR. WOZNIAK:  Object to form.

You may answer it.

A.    The duties of -- that we had was to select a competent and independent trustee and -- as part of our duties in the ESOP.  And this was an attempt -- not attempt; it was actually part of the process to interview people who would be prospective trustees.  Reliance was one of the prospective trustees.  They made a presentation to us.  They told us about their strengths, things that they could offer and bring to the table.

Q.    What do you mean by independent trustee?

A.    A trustee has to be an independent person. It's really kind of a fine line; but, you know, they have to be independent of the company.  They have to serve in the best interests of the -- of the ESOP people rather than the best interests of the company.

Q.    And looking back to the document, Plaintiff's

48

preparation for the trustee interviews?

MR. WOZNIAK:  Object to form.

You may answer it.

A.    I'm not certain what you mean by creating the document.  The advisors, including Greenberg Traurig and -- and Chartwell, created a questionnaire which we had an input on what the questions would be.  I don't remember what changes or what we requested.

But they dealt with the -- probably the more technical items and we dealt with maybe the more personal items.  But there was a long list of questions that we asked the three trustees in the interviews.

Q.    All right.  So I'm going to pull up another exhibit.  This is Tab 26, and this has been previously marked as Plaintiff's Exhibit 57.

A.    I think mine says 55.  Is it 57?

Q.    Tab 26.

A.    The bottom, it says PL55.

Q.    Oh, wait.  What is the --

MS. LIU:  You need Tab 26.

Q.    Sorry.  Tab 26.

A.    Yeah.  What was the document?  Yeah, that's the document.

MR. WOZNIAK:  His does say 55.  That's kind of weird.  Mine says 57.

51

A.    Reliance.

Q.    How was that decision ultimately made?

A.    As I recall, it was actually a very difficult decision.  The -- all three of the interviewees were -- were excellent.  We liked them all.

I think ultimately we swang over to Reliance for a few reasons, one of which is they had a -- a valuation expert on staff.  I think it was Bucky White -- or Wright, was his name.  And they also had an in-house attorney who -- who had been -- who had ESOP experience.  I don't remember his name.  And the other firms did not appear to have had that.

And then lastly, we were quite impressed by the fact that they had never been involved in any ESOP litigation.  Those were the three things that swung us that direction.

Q.    Did your advisors attend the interviews for the potential trustee -- the potential trustee candidates?

A.    Yes.

Q.    Did you discuss the different trustees with your advisors?

A.    Yes.

Q.    Did they have recommendations as to which trustee they thought would be the best fit for the RVR ESOP transaction?

52

A.    Of course they did.  They -- they weren't favoring anybody.  I mean, they told us that all three candidates would be good choices.  It was ultimately a decision of ours, and ultimately my brother and my decision because we were RVR.  But, you know, in consultation with our -- you know, the group, we chose them.

Q.    Did Eric Bensen attend the interviews?

A.    Yes.

Q.    And you said he was the company's point person on the RVR ESOP transaction?

A.    Yes.  And also the chief financial officer.

Q.    So was he part of the decision to hire Reliance as the trustee for the RVR ESOP?

MR. WOZNIAK:  Object to form.

A.    His advice was certainly well considered, but it was RVR that hired them.  And then RVR was -- the board of directors was my brother and I only, so it was our -- our decision.

Q.    How did you make the decision?  How did you guys come to the decision to hire RVR -- or sorry -- to hire Reliance?

MR. WOZNIAK:  Objection.

Asked and answer.

A.    I think I already told you.

89

control values.  It's something I've become educated because of this trial, but I don't -- I don't view it that way.  No.

We sold 100 percent of the stock.  They had control.  Plain and simple.  If that's what you're imputing, is that they -- you know, 51 percent is control.

Q.   But just looking here at this particular chart, the way it's written, it says:  Acquirer type, majority owned ESOP.  And that's associated with a control value; is that correct?

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Object to form.  Calling for speculation.

A.   I think it's the way -- it's the way they drew the chart up, but I don't see it that way.  I mean, you know -- no.  It says control to the left.  It says that on the right.  Doesn't mean it's correct.

Q.   So what do you think is incorrect about it?

A.   I have no comment on it.  I didn't write it.  I don't remember talking about it.  And you know, it could say a dozen different things and say the same thing.  I had no understanding of what they were talking about in this thing.

In my mind, as a businessman, somebody says

93

value equates to a controlling interest equity value of 100.7 million.

Do you see that?

A. I do.

Q. And do you recall Chartwell stating that their pro forma valuation equated to a controlling interest equity value of 100.7 million?

MR. WOZNIAK: Object to form.

You can answer.

A. I do not recall in the fashion that you put it.

They told us that there was going to be a range in the values beginning about 100 million up to 140 million. Those weren't exact numbers, obviously. It was 100.7. But those were the ranges that we were talking about. They early on told us expect the ESOP to offer at the low end of the range. They said that these were pro forma numbers, they were their numbers. They were not the financial advisor that they would hire. They would come up with different numbers. But they told us this is what to expect.

If those expectations did not meet our -- our thought pattern, then the whole thing would have been off and it would have been over with. They would have gone home back to Minneapolis, and we would have gone on running our business. So this was a way to institute

whether we had interest.  They gave us a range.  They never varied from that range, 100 to 140 million.  Odd numbers, you know.

Q.    And when you say they told you what to expect, that's consistent with the bullet point above where they said the ESOP trustee's financial advisor would apply similar valuation methods; accordingly, we are presenting value on a preliminary basis that is comparable to what the advisor would likely present to the trustee?

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Object to form.

You may answer it.

A.    It's what the words say, but in similarity.  I don't know about likely in this, but similar.  They said that there would be a separate financial advisor hired by the trustee who would make the determination of the value; would advise the trustee.  The trustee would most likely offer -- get the low end of a range offer.  And you know, eventually somewhere in between, it would be settled.  And that range was somewhere from 100 to 140.  That's what they told us.

Q.    Right.  But they were giving you this pro forma ESOP valuation so that you guys could have a sense of what an ESOP trustee's financial advisor would likely present to the trustee; is that correct?

Randall Steven Smalley - 06/11/2021

101

fair market value, 100.7 million.

Is -- is that 100.7 million the figure you were referring to that Chartwell said would be at the low end of the valuation range?

A.    Okay.  A couple of things.  First of all, you had shareholder receivables, 950 million.  So please correct, it's 950,000.

Q.    Oh, sorry.

A.    And secondly, the per share market value indicates the company is worth a billion dollars there.  That's a -- that's an error as well.  Actually, the -- it says per share market value, 100 million.  You know, the total shares.

Q.    Right.  So the total shares were wrong?

A.    And this was -- this is nothing but the -- the chart or whatever they put together to establish those numbers that were said on the other end.  And again, it was a range.  Bottom range, 100 million, 100,700,000 and 149 million.  So that's what that means.  That's what it says.

Q.    So this was the chart that was put together to explain the text on the left side, which is this enterprise value equates to a controlling equity value of 100.7 million, which is the equity purchase price we have used in our sale -- in our pro forma 100 percent S corp

185

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 22nd day of June, 2021.

_____
Amy L. Zoller
Certified Reporter
Arizona CR No. 50911

        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 40

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Milton Al Stewart, Acting        )
Secretary of Labor,              )
                                 )
            Plaintiff,           )
                                 ) Civil Action No.
v.                               ) 2:19-cv-03178-JJT
                                 )
Reliance Trust Company, et al.,  )
                                 )
            Defendants.          )
                                 )


30(b)(6) DEPOSITION OF RELIANCE TRUST COMPANY
(STEPHEN ALLEN MARTIN)

(TAKEN VIA ZOOM VIDEO CONFERENCE)


May 18, 2021
9:01 a.m. EDT
Atlanta, Georgia


Glennie Reporting Services        Prepared by:
1555 East Orangewood Avenue       Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275       CRR, CRC
602.266.6535                      Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                PAGE

STEPHEN ALLEN MARTIN

        Examination by Mr. Lund                           6

        Examination by Mr. Wozniak                       280

        Further Examination by Mr. Lund                  291

        Examination by Mr. Brockman                      299


                    INDEX TO EXHIBITS

DESCRIPTION                                             PAGE
Exhibit 144        April 15, 2014 Letter to              24
                   Mr. Bensen, Re:  Cruise America,
                   Inc. Employee Stock Ownership Plan,
                   DOL 0009986-0009990

Exhibit 145        E-mail chain, Subject:  Re:  Byway    53
                   Meeting, DOL 0083616-00083617

Exhibit 146        E-mail with Attachment, Subject:     126
                   Employment Agreement Analysis,
                   DOL 0083901-0083905

Exhibit 147        E-mail from Erin Turley,             136
                   Subject:  Project Byway

Exhibit 148        Cruise America - IRA Draft,          143
                   DOL 0054203-0054220

Exhibit 149        E-mail with Attachment, Subject:     149
                   Project Byway revised term sheet,
                   DOL 0084508-0084516

Exhibit 150        Bylaws of RVR, Inc. (A Florida       226
                   corporation), DOL 0010288-0010301

Exhibit 151        Investor Rights Agreement,           247
                   DOL 0010800-0010815

Exhibit 152        Action By Written Consent of Sole    248
                   Shareholder of RVR, Inc., Dated as
                   of May 28, 2014, DOL 0010672-0010677

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

3

The 30(b)(6) Deposition of RELIANCE TRUST COMPANY (STEPHEN ALLEN MARTIN) was taken remotely on May 18, 2021, commencing at 9:01 a.m. EDT, via Zoom Video Conference, Atlanta, Georgia, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

      U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
      ERIC C. LUND, ESQ. (Appearing via Zoom)
      BRENDAN BALLARD, ESQ. (Appearing via Zoom)
      ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
      KATRINA LIU, ESQ. (Appearing via Zoom)
      PETER DOLAN, ESQ. (Appearing via Zoom)
      P.O. Box 1914
      Washington, DC 20013
      lund.eric@dol.gov
      ballard.brendan@dol.gov
      mariscal.isidro@dol.gov
      liu.katrina.t@dol.gov
      dolan.peter@dol.gov

For Defendant Reliance Trust Company:

      BRYAN CAVE LEIGHTON PAISNER, LLP
      WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
      1201 West Peachtree Street NW, 14th Floor
      Atlanta, Georgia 30309
      bard.brockman@bclplaw.com

4

APPEARANCES CONTINUING:

For All Other Defendants:

        HOLLAND & KNIGHT, LLP
        TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
        1180 West Peachtree Street, NW, Suite 1800
        Atlanta, Georgia 30309
        todd.wozniak@hklaw.com
                    -and-
        HOLLAND & KNIGHT, LLP
        LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
        777 South Flagler Drive, Suite 1900
        West Palm Beach, Florida 33401
        lindsey.camp@hklaw.com


Also present:

        Lynn Cravey, In House Counsel for FIS
          (Appearing via Zoom)
        Cory Kauffmann, RVR (Appearing via Zoom)
        Dorian Hanzich, Investigator with DOL (Appearing
          via Zoom)
        Alexandra Gilewicz, Solicitor's Office,
          Department of Labor (Appearing via Zoom)
        Darcie Thompson, Holland & Knight
        Ngoc Nguyen, DOL

5

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Mr. Lund, any objection?

MR. LUND:  No objection.

THE COURT REPORTER:  Mr. Brockman, any objection?

MR. BROCKMAN:  No objection.

THE COURT REPORTER:  And, Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

STEPHEN ALLEN MARTIN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. LUND:  My name is Eric Lund.  I represent the plaintiff, the Secretary of Labor of the United States Department of Labor.

This is the deposition of Reliance Trust, noticed pursuant to Federal Rule of Civil Procedure 30(b)(6).  This deposition is being taken pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure in the case Walsh vs. Reliance Trust Company, No. 2:19-cv-03178-JJT, pending in the U.S. District Court for the District of Arizona.

This deposition is being conducted remotely via Zoom and is being stenographically recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions docketed in this case as Document 85.  That Order was provided to counsel for Reliance Trust Company.

The witness is appearing today pursuant to a subpoena served by the Secretary.

EXAMINATION

BY MR. LUND:

Q.    Sir, have you been sworn?

A.    Yes.

Q.    Please state your full name and the city and state in which you reside.

A.    Steven Allen Martin, Atlanta, Georgia.

Q.    Are you represented by counsel today?

A.    Yes, I am.

Q.    Who is your counsel?

A.    Bard Brockman.

MR. LUND:  Could other counsel enter their appearances and state who they represent.  Let's start with the Department of Labor, please.

MR. MARISCAL:  Isidro Mariscal for the

38

MR. LUND:  Why don't we -- why don't we come back to that, and we'll push on.  And we will certainly be revisiting this topic, so -- at some point during the day.

Q.    (BY MR. LUND:)  Sir, would you go to Tab 37, please.  And Tab 37 contains a document that's previously been marked as Exhibit 18.  Let me know when you're there, sir.

A.    I'm here.

Q.    Exhibit 18 is a multipage document that on its top bears the Bates stamp DOL 00051664.  And the top has an e-mail from Erin Turley to Ted Margarit, amongst others, and CC'ing Steve Martin.  It's dated April 15, 2014 and has attachments, Project Byway due diligence.

Do you recognize this document, sir?

A.    Yes.

Q.    What is it?

A.    This is a due diligence request list for both Stout and K&L Gates for this transaction.

Q.    Would you turn the page, please, to the second page with the Bates stamp DOL 0051665.

A.    Yes.

Q.    Do you recognize this document?

A.    Yes.

Q.    And what is it?

39

A.    This is the due diligence list which I just described.

Q.    Were these SRR's and K&L Gates' first written due diligence requests relating to the RVR transaction?

A.    That's my recollection.

Q.    Had SRR done any due diligence relating to the RVR transaction before this time?

MR. WOZNIAK:  Object to form.

A.    I don't recall if they had.

Q.    Had K&L Gates done any due diligence relating to the transaction prior to this time?

MR. WOZNIAK:  Object to form.

A.    I don't believe so.

Q.    Had SRR done any due diligence relating to the transaction prior to April 15, 2014?

MR. WOZNIAK:  Objection.  Asked and answered.

MR. BROCKMAN:  I'll join.

A.    I don't know if they had or not.

Q.    (BY MR. LUND:)  Had K&L Gates done any due diligence relating to the transaction prior to April 15, 2014?

MR. WOZNIAK:  Objection.  Asked and answered.

MR. BROCKMAN:  Join.

165

A.    Yes.

Q.    And was it still being negotiated at that point?

A.    I think it was still being negotiated, but it was pretty close to being final.

Q.    Okay.  Could we go up one page, please, sir, to 68308.

A.    Sure.

Q.    And do you see where it says subordinated note and warrant purchase agreement?

A.    Yes.

Q.    Was that still in draft form as of May 24, 2014?

A.    Yes.

Q.    Okay.  Was that still being negotiated as of May 24, 2014?

A.    The Smalleys survivor trust note, is that the one you're referring to?

Q.    It says subordinated note and warrant purchase agreement on the very top of that page.  It's 23.

A.    Yes.

Q.    Okay.

A.    But very close to final.

Q.    And if you go down to 27, sir, it's at the bottom of the page, under warrants.

166

A.    Warrants, yes.

Q.    Does that indicate that the warrants were still in draft form as of May 24, 2014?

A.    Yes.

Q.    Okay.  And were they still being negotiated as of May 24, 2014?

A.    Yes, but they were very close to final.

Q.    Could you go to Bates stamp 68304, please.

A.    Okay.

Q.    And do you see in the middle of the page at 11, it says Stock Purchase Agreement?

A.    Yes.

Q.    Was it -- was the Stock Purchase Agreement in draft form as of May 24, 2014?

A.    Yes, but it was also very close to being finalized.

Q.    So it was being negotiated as of 5/24/2014 as well?

A.    Yes.

Q.    And on that same page, there's the ESOP - Company Loan and Pledge.  Do you see that agreement? It's No. 9.

A.    Yes.

Q.    Was that in draft form as of May 24, 2014?

A.    Yes.

Q.   And was it still being negotiated?

A.   Yes.  But it was very close to final, as were the others.

Q.   And finally, just below that, do you see ESOP note?  It's 9.a.

A.   Yes.

Q.   Was that in draft form as of May 24, 2014?

A.   I don't know if as of 2014 -- I don't think it was in draft at that point.

Q.   Oh, I'm sorry.  Maybe I misspoke on that.

Was the ESOP note in draft form as of May 21, 2014?

A.   At that date, it was.

Q.   Okay.  Was it still being negotiated and in draft form as of May 23, 2014?

A.   I don't believe so.

Q.   You had spoken of a final analysis that SRR prepared regarding the RVR transaction that was received sometime after the close of the transaction, correct?

A.   That's correct.

Q.   Would that final analysis -- would it have considered these documents that we went over in their final execution-ready form?

A.   Yes.

Q.   Would you look at, please, it's the third, I

168

guess, block bullet point from the bottom of that list. It says:  Discussions with certain members of the senior management -- oh, I'm sorry.  Let me get -- let me get you back to our exhibit.  It's our Exhibit 75, Tab 53, sir.

A.   Okay.  I got it.

Q.   And we're back on -- we're on page 4 of the analysis, the DOL 0084804.

A.   Yes.

Q.   Okay.  So if you go -- we have the series of kind of block bullet points.  The third one up from the bottom says:  Discussions with certain members of senior management of Cruise America regarding the operations, financial condition, future prospects, and projected operations and performance of the company.

Do you see that?

A.   Yes.

Q.   Did Reliance ask SRR what they were referring to in this particular bullet point?

A.   Yes.  This was just a final discussion with primarily Eric Bensen as to the current operations and financial conditions and projections.

Q.   Now, if this analysis was sent over to Reliance on May 21, 2014, when did this discussion with Eric Bensen occur with SRR?

195

Q.    Thor Industries sells -- designs, manufactures, and sells new RVs, correct?  Or excuse me.  Excuse me.

Thor Industries, Inc. designs, manufactures, and sells new recreational vehicles, correct?

A.    And related parts and accessories.

Q.    Okay.  Did RVR design, manufacture, and sell recreational vehicles in May of 2014?

A.    They did sell their -- they sold a lot of their used recreational vehicles.  After four or five years or based on a certain amount of mileage on a vehicle, it would be put in the selling -- they would sell it in the inventory for sale.

Q.    So RVR sold used RVs?

A.    Yes.

Q.    Did Thor Industries or Winnebago Industries sell used RVs?

A.    I'm fairly certain Winnebago does.

Q.    Does it say that, that they sell used RVs?

A.    Not specifically, but they do.  Their vehicles are used for vacations and the same kind of uses that the RVR vehicles are used for.

Q.    Did Reliance ask SRR why they were including two companies that design, manufacture, and sell new RVs as comparables to RVR?  Did Reliance ask them that question?

283

Q.    Do you know besides an interview process what other due diligence RVR was conducting on trustee candidates?

A.    I do not know of any other -- what they were doing for due diligence.

Q.    Okay.  Now, was Reliance provided with information about RVR and the proposed ESOP transaction, as well as written questions about Reliance and its trustee services after that March 31, 2014 interview?

A.    Yes.  We were given a short PowerPoint with some general facts about -- or facts or statements about the potential transaction and a series of questions that we should be prepared to answer as part of the interview process.

Q.    Okay.  And during that interview process, did you, in fact, answer those questions for Randall Smalley, Bob Smalley, Jr., Eric Bensen, and the others who were present?

A.    Yes, we did.

Q.    Now, during that interview meeting on March 31, 2014, did you all also discuss RVR's business, its history, and its financial performance?

          MR. LUND:  Objection.  Form.

A.    At the interview stage?

Q.    Yes, sir.

284

A.    I don't recall how much we talked about the history of the company at the interview stage.

Q.    Okay.  Do you recall some discussion about the company, its industry, and whether you had conducted transactions similar in nature to RVR?

MR. LUND:  Objection.  Form.  Leading.

A.    Yes.  I believe we did talk about similar kinds of transactions and -- and the industry a little bit, but not a great deal.

Q.    During that March 31, 2014 interview with Randall Smalley, Robert Smalley, Jr., Eric Bensen, and your advisors -- the company's advisors, was there also discussion about advisors that Reliance Trust would want to engage to help assist it?

MR. LUND:  Objection.  Form.

A.    We were asked that question.

Q.    (BY MR. WOZNIAK:)  Okay.  And do you recall how you answered that question?

A.    We answered that we would look at two financial -- typically look at two or three financial advisors and a couple of law firms as potential candidates for working with us on the transaction.

Q.    And did Reliance, in fact, do that?  Did it look at two or three different advisors on the financial side as well as the legal side?

MR. LUND:  Objection.  Form.

A.    We considered two different financial advisors and I believe three different law firms.

Q.    Did you all ask for proposals from those potential advisors?

A.    I did get a proposal from Stout and one from Prairie Capital.  Stout was less expensive, and we had more experience with Stout than Prairie.

Of the law firms, two of them would have been quite a bit more expensive, in my estimation, than K&L Gates.

Q.    Okay.

A.    And we knew the attorneys at K&L Gates as well, and we thought they would do a good job.

Q.    And did you -- did Reliance relay to RVR its selection and how it chose the selection of its advisors?

A.    I believe we did.  I think we indicated that Stout was less expensive than Prairie, and we felt it would do a good job.  And we also indicated that K&L Gates was a top-flight law firm and would do a good job and were less expensive than the other two Chicago firms we considered.

Q.    Do you recall when Reliance was first informed by RVR that RVR had selected Reliance to serve as the trustee for the proposed ESOP?

**30(b)(6) Reliance Trust Company (Stephen Allen Martin) - 05/18/2021**

286

A.    It was shortly after that initial meeting with -- for the interview process --

Q.    Do you think it was --

A.    -- within days --

(Reporter requests clarification.)

A.    I think it was within a few days of that interview process that we were notified.

Q.    Do you think it was as early as April 2, 2014?

MR. LUND: Objection. Leading. Objection to form.

A.    Which day in April did you say? Sorry.

Q.    (BY MR. WOZNIAK:) April the 2nd.

MR. LUND: Objection. Form. Foundation. Leading.

A.    Could have been. I just can't remember at the moment.

Q.    Okay. Now, following that March 31, 2014 meeting, did you have an additional in-person meeting with Randall Smalley, Robert Smalley, Jr., and Eric Bensen on April 15th and 16th?

A.    Yes. After being selected, we attended an on-site meeting with the management team, including the Smalleys and Eric Bensen and probably a couple other people from the company. That was our initial due diligence meeting. It included also representatives from

289

Calls for speculation.

A.    I think we as a group agreed we were able to collect all the information we were looking to obtain during that visit.

Q.    Okay.  Let me ask it this way:  Prior to the closing of the ESOP transaction on May 28, 2014, did RVR and its advisors provide all information requested by Reliance and its advisors?

MR. LUND:  Objection.  Form, foundation, and calls for speculation.

A.    My recollection is that Stout and K&L Gates communicated that they had received everything they were looking for in terms of information.  I was not aware of anything that was withheld from any of their requests.

Q.    (BY MR. WOZNIAK:)  And to your knowledge, was there any requests for interviews of any employees of RVR or its board or the selling shareholders requested that were not given?

MR. LUND:  Objection.  Form, foundation, and also leading and vague.

A.    Not to my recollection.

Q.    Between the date that Reliance was engaged as the trustee for the proposed ESOP and the closing of the transaction on May 28, 2014, how often would you say that Reliance and its advisors communicated with RVR and its

advisors?

A.    Throughout that process, almost daily.  It was a -- I mean, across all the parties, there was almost some daily contact regarding the transaction.

Q.    I think you had also been asked some questions about direct communications between Reliance and Eric Bensen.  Do you recall that?

A.    Yes.

Q.    And how often would you say that Reliance had direct communications with Eric Bensen, either by telephone or in person?

MR. LUND:  Objection. Form.  Foundation.

A.    In -- in the course of the transaction, we only had an in-person contact at the initial interview stage and the on-site due diligence meeting.  Outside of that, there were frequent calls for asking questions and trying to gather additional information; and Eric was sort of the conduit for a lot of that.

Q.    And in your experience, is that unusual that there will be a single point person for the -- the proposed plan sponsor?

MR. LUND:  Objection.  Form and foundation.

A.    You know, in my experience, there's normally a single point of contact; and quite often, it's the CFO.

MR. WOZNIAK:  I think that's all the

291

questions that I have.

MR. LUND:  So would you like us to ask questions now, or would -- I'm just trying to see what the best way to go about this -- or wait until Bard is done?

MR. BROCKMAN:  I think we'd prefer that you ask questions now.

MR. LUND:  Okay.

FURTHER EXAMINATION

BY MR. LUND:

Q.    Sir, you described a meeting that you had on March 31, 2014 with RVR; is that correct?

A.    Yes.

Q.    And did you describe that as an interview?

A.    That was an interview process.

Q.    And was that an interview process for Reliance to become the trustee for the RVR ESOP?

A.    Yes.

Q.    Who was present at that interview?

A.    From Reliance, it was myself and Bucky Wright. And my recollection from the company, it was Randall and Robert Smalley, Jr., Eric Bensen.  There may have been one or two others.  I don't -- I just don't recall the others.

Q.    Do you have a specific recollection of

292

Randall Smalley attending the March 31, 2014 interview?

A.    Yes.

Q.    Do you have a specific recollection of Robert Smalley, Jr. attending the March 31, 2014 interview?

A.    That's my recollection, we saw both of them.

Q.    And do you have a specific recollection of Eric Bensen attending the March 31, 2014 interview?

A.    Yes.

Q.    You also described a -- how long did the interview last?

A.    Maybe a couple hours.

Q.    About two hours; is that right?

A.    That's about right.

Q.    Okay.  And just to make sure, I think counsel asked this, but was this an in-person meeting, this interview?

A.    Yes, it was.

Q.    Did Reliance ask questions at this interview?

A.    We may have asked some, but this was really a chance for the company to ask us questions and complete their due diligence to select a trustee.

Q.    You referred to also an April 15 and 16 meeting; is that correct?

A.    Yes, sir.

# Exhibit 41

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Martin J. Walsh, Secretary of Labor, | ) ) ) |
| Plaintiff, | ) ) Civil Action No. |
| v. | ) 2:19-cv-03178-JJT ) |
| Reliance Trust Company, et al., | ) ) |
| Defendants. | ) ) |

DEPOSITION OF ERIC ROBERT BENSEN

(TAKEN VIA ZOOM VIDEO CONFERENCE)

June 8, 2021
7:59 a.m. MST
Mesa, Arizona

Glennie Reporting Services         Prepared by:
1555 East Orangewood Avenue        Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275        CRR, CRC
602.266.6535                       Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                    PAGE

ERIC ROBERT BENSEN

        Examination by Mr. Lund                              6


                    INDEX TO EXHIBITS

DESCRIPTION                                                PAGE
Exhibit 153     E-mail with Attachments - Draft            101
                Project Byway Presentation,
                DOL 0050646-0050691

Exhibit 154     E-mail string Re:  Draft Project           104
                Byway Presentation,
                DOL 0050714-0050715

Exhibit 155     RVR Employee Stock Ownership Plan,         176
                DOL 0009601-0009678

Exhibit 156     Answer and Defenses to the                 214
                Complaint (ECF No. 5) by Defendants
                RVR, Inc., Eric Bensen, Randall
                Smalley, Robert Smalley, Jr., and
                the Family Trust, Marital Trust, and
                Survivor's Trust Created Under the
                Smalley Revocable Trust dated
                July 8, 2004

Exhibit 157     E-mail from Stephanie Geerdes,             234
                Subject:  Byway final diligence
                call with SRR 5-27-14,
                DOL 0022304-0022305

Exhibit 158     Amended and Restated Employment            239
                Agreement, DOL 0001980-0002009

3

The Deposition of ERIC ROBERT BENSEN was taken remotely on June 8, 2021, commencing at 7:59 a.m. MST, via Zoom Video Conference, Mesa, Arizona, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

     U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
     ERIC C. LUND, ESQ. (Appearing via Zoom)
     BRENDAN BALLARD, ESQ. (Appearing via Zoom)
     ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
     KATRINA LIU, ESQ. (Appearing via Zoom)
     PETER DOLAN, ESQ. (Appearing via Zoom)
     P.O. Box 1914
     Washington, DC 20013
     lund.eric@dol.gov
     ballard.brendan@dol.gov
     mariscal.isidro@dol.gov
     liu.katrina.t@dol.gov
     dolan.peter@dol.gov

For Defendant Reliance Trust Company:

     BRYAN CAVE LEIGHTON PAISNER, LLP
     WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
     BROOKE V. INGOGLIA, ESQ. (Appearing via Zoom)
     1201 West Peachtree Street NW, 14th Floor
     Atlanta, Georgia 30309
     bard.brockman@bclplaw.com
     brooke.ingoglia@bclplaw.com

4

APPEARANCES CONTINUING:

For All Other Defendants:

        HOLLAND & KNIGHT, LLP
        TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
        1180 West Peachtree Street, NW, Suite 1800
        Atlanta, Georgia 30309
        todd.wozniak@hklaw.com
                  -and-
        HOLLAND & KNIGHT, LLP
        LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
        777 South Flagler Drive, Suite 1900
        West Palm Beach, Florida 33401
        lindsey.camp@hklaw.com


Also present:

        Lynn Cravey, In House Counsel for FIS
          (Appearing via Zoom)
        Cory Kauffmann, RVR (Appearing via Zoom)
        Kevin Bensen, RVR (Appearing via Zoom)
        Robert Smalley, Jr., RVR (Appearing via Zoom)
        Randall Smalley, RVR (Appearing via Zoom)
        Dorian Hanzich, Investigator with DOL (Appearing
         via Zoom)
        Alexandra Gilewicz, Solicitor's Office,
         Department of Labor (Appearing via Zoom)
        Ngoc Nguyen, DOL (Appearing via Zoom)

5

THE COURT REPORTER: Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Mr. Lund, any objection?

MR. LUND: No objection.

THE COURT REPORTER: Mr. Wozniak, any objection?

MR. WOZNIAK: No objection.

And, Mr. Brockman, any objection?

MR. BROCKMAN: No objection.

ERIC ROBERT BENSEN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. LUND: My name is Eric Lund. I represent the plaintiff, the Secretary of Labor of the United States Department of Labor.

This deposition is being taken pursuant to Federal Rule of Civil Procedure 30 in the case of Walsh vs. Reliance Trust Company, No. 2:19-cv-03178-JJT, pending in the U.S. District Court for the District of Arizona.

This deposition of Eric Bensen is being conducted remotely via Zoom. This deposition is being stenographically recorded and transcribed by the court

6

reporter.  No other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions docketed in this case as Document 85.  That Order has been provided to counsel for Mr. Bensen and the court reporter.

EXAMINATION

BY MR. LUND:

Q.   Sir, have you been sworn?

A.   Yes.

Q.   Please state your full name and the city and state where you reside.

A.   My name is Eric Robert Bensen.  And I reside in Scottsdale, Arizona.

Q.   Are you represented by counsel today?

A.   Yes, I am.

Q.   Who is your counsel?

A.   Todd Wozniak.

MR. LUND:  Could other counsel enter their appearances and state whom they represent.  And let's start with the Department of Labor, please.

MS. BALLARD:  Brendan Ballard for the Department of Labor.

MS. LIU:  Katrina Liu for the Department of Labor.

40

A.     On January 27th, 2014, I believe we met with them, yes.

Q.     Okay.

A.     By the way, do you mind if I have a -- a -- what do you call it?  It's a calendar of events to help me with dates?

MR. WOZNIAK:  He's got our mandatory initial disclosures with the chronology in front of him, so he can remember dates better if --

A.     Do you mind me referring to that?

Q.     I don't mind that at all.

MR. LUND:  Todd, this is just your mandatory -- your MIDRs, I guess, for short?

MR. WOZNIAK:  Yes.  It's the amended mandatory initial disclosures with the Exhibit A attached, which is the chronology.

MR. LUND:  Okay.

Q.     (BY MR. LUND:)  If you think that will help you, Mr. Bensen, that's fine.

A.     I'm sorry.  There's -- I think there's so many meetings pretty much daily that -- and so many presentations that, you know, it gets confusing.

Q.     No, I understand that.  You were involved in a lot of presentations and discussions at that time.

How long did this meeting last?

54

said?

A.    I don't know the exact words I used.

Q.    Okay.  So in January of 2014, did you have an understanding of what a pro forma equity valuation was?

MR. WOZNIAK:  Objection.  Vague.

But you can answer it.

A.    Before this meeting, not really.  They explained it as they were just sort of showing us what the process might look like and the -- what a trustee might offer us on the low end.

Q.    So they were showing you how the trustee might value the RVR equity in the transaction?

MR. WOZNIAK:  Objection to form.  Misrepresents the testimony.

But you can answer it.

A.    I think it said that they were showing us an illustration pro forma -- I don't even know what that means -- but illustration of what a trustee might offer us and if we'd be at the low end of the value range.

Q.    Would you turn the page, please.  This would be page 18.  It's Bates-stamped DOL 0049001.  It says: Standard of Value - ESOP Equity Valuations.

Do you see that, sir?

A.    Yes.

Q.    And on the right side, it says:  Factors to

59

and then control value above it.

Q.    So the -- so this slide indicates that a control value includes a control premium, correct?

MR. WOZNIAK:  Calls for speculation and a legal conclusion.

MR. BROCKMAN:  Form.

Q.    (BY MR. LUND:)  You can answer it, sir.

A.    It shows that -- a minority marketable value box and it shows control premium with an arrow and control value above that.

Q.    And the control value would then include a control premium to go from the minority level to the control level, correct?

MR. WOZNIAK:  Objection.  Calls for speculation and a legal conclusion.

MR. BROCKMAN:  Join.

Q.    You can answer.

MR. WOZNIAK:  It has also been asked and answered now twice.

A.    This page shows a minority, marketable value box.  It shows an arrow going up, with the words control premium next to it, and then a box above that which says control value.

Q.    What was your understanding of the purpose of this presentation at the time it was made?

80

equates to a controlling interest equity value of $100.7 million, which is -- which is the equity purchase price we have used in our pro forma 100 percent S corp ESOP sale illustration.

Do you see that?

A.    I do.

Q.    Okay.  And looking to the right there, it says fair market value, and it says 100,653,000.

Do you see that?

A.    Yes.

Q.    And then it says approximately $100,700,000; is that correct?

A.    Yes.

Q.    So Chartwell in this presentation was presenting a fair market value of the shares at a controlling interest equity value of $100.7 million; is that correct?

MR. WOZNIAK:  Objection.  Calls for speculation.

A.    Chartwell said they were giving us an illustration of what the low end of the value range would be and would be what a trustee would most likely come in with on their first offer.

Q.    All right, sir.  I'm just asking about this slide right here, and you said this was the discussed.

81

Okay?  The fair market value of $100.653 million, which we then say is approximately $100.7 million.  On the left, they say that's the controlling -- that fair market value is the controlling interest equity value, correct?

MR. WOZNIAK:  Objection.  Calls for speculation.

You can answer it.

A.    That's what it says on the page.

Q.    Okay.  Just so I'm clear, too, so the $100.7 million which they're showing as the fair market value of the shares is listed as controlling interest equity value, correct?

MR. WOZNIAK:  Objection.  Calls for speculation.

Q.    You can answer, sir.

A.    As it said in this illustration of what Chartwell said would be the low end of the range of values, that's what that says.

Q.    No, sir.  What I'm asking you here, when it says fair market value and then it refers to the controlling interest equity value of $100.7 million, do you see those two things?

A.    Yes.

Q.    Do they -- Chartwell in this slide was presenting a fair market value of a controlling interest

82

equity value of $100.7 million, correct?

MR. WOZNIAK:  Object to form.  Calls for speculation.  It's been asked and answered.

A.    Chartwell told us that this was an illustration of the low end of the value range and what a trustee would be expected to offer on their first go-round.

Q.    And that would be for a controlling interest equity value of $100.7 million, correct?

A.    It would be for 100.7 million for the low end of the range.

Q.    And if you look right here, sir, on the left-hand side it says controlling interest equity value of $100.7 million, correct?

A.    That's what's on the page.

Q.    Okay.  And if you look on the right-hand side, it says fair market value of $100.653 million, correct?

A.    That's what it says.

Q.    Then just below that, it says approximately $100.7 million, correct?

A.    That's what it says.

Q.    That $100.7 million fair market value was referring to the controlling equity value, correct?

MR. WOZNIAK:  Objection.  Calls for speculation and a legal conclusion.  It's also been asked and answered.

133

items -- one of the methodologies they looked at.  It's the one that came up with the 185 million above.

Q.    Right.  And that included a 20 percent control premium, correct?

MR. WOZNIAK:  Object to form.

A.    That's correct.

Q.    Would you turn to page 24, please.  Page 24 is DOL 0051847.  It is entitled:  Pro Forma ESOP Transaction Assumptions.  Do you see the Pro Forma ESOP Transaction Value, sir, that heading?

A.    Yes.

Q.    Okay.  And what is the equity purchase price that will be offered to the ESOP trustee?

A.    Under the category Pro Forma ESOP Transaction Value?

Q.    Yep.

A.    There's a bullet that says:  Equity purchase price of 143,900,000.

Q.    That was yours and the Smalleys' opening offer to the ESOP to buy your RVR shares as far as equity purchase price goes?

MR. WOZNIAK:  Object to form.

You can answer it.

A.    That was part of the first-round offer, yes.

Q.    Did the first-round offer also consist of

134

warrants of 32.49 percent of equity value?

A.    I believe so.

Q.    And did the opening offer also include 17.49 percent to stock appreciation rights, or SARs?

A.    I believe so.

Q.    And did you okay this offer to be made to the ESOP trustee by yourself or in consultation with anyone else such as the Smalleys?

A.    Yes.

Q.    Okay.  Can you tell me how that consultation -- when that happened, when you and the Smalleys consulted regarding this opening offer to the ESOP trustee?

A.    I don't have a recollection of the exact wording.

Q.    Okay.  But you and Robert Smalley, Jr. and Randall Smalley, Jr. (sic) consulted and agreed upon an offer of $143.9 million equity purchase price, 32.49 percent warrants, and 17.49 percent SARs; is that correct?

        MR. WOZNIAK:  Object to form.

        You can answer it.

A.    That is correct.

Q.    Okay.  And the 143.9 percent equity that -- excuse me.

        The equity purchase price of $143.9 million

represented a controlling interest value for your RVR stock, correct?

MR. WOZNIAK:  Object to form.

A.    That would be for 100 percent of the stock.

Q.    Sir, could you go to page 40, please.  And page 40 bears the DOL Bates stamp of 0051863 and has the Project Timeline title.

Do you see that, sir?

A.    Yes.

Q.    And did you review this project timeline when you were reviewing this presentation?

A.    I looked at it.

Q.    Did you ask Chartwell why the timeline was different from those that were previously proposed for the transaction?

MR. WOZNIAK:  Object to form.

MR. BROCKMAN:  I'll join.

A.    I don't -- I don't recall that.

Q.    Sir, did you ask Chartwell why your -- yours and the Smalleys' RVR equity was being offered to the ESOP trustee on a controlling-interest basis of $143.9 million while the previous pro forma valuation of the controlling interest equity value of your stock was $100.7 million?

MR. WOZNIAK:  Object to form.

136

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Misrepresents the testimony.

You may answer it.

A.    Chartwell told us that the initial illustration was the low end of the valuation range and was close to what the trustee might offer us on the first one.  It also said that the 143.9 million was at the high end of the valuation range.

Q.    (BY MR. LUND:)  When did Chartwell tell you that?

A.    I don't have the date.

Q.    Do you want to look at your Exhibit A there? Does that list a date?

A.    I don't think it has numbers in it.

Q.    Okay.  Do you recall -- do you have a specific recollection of Chartwell ever telling you other than in this ask presentation that the fair market value for a controlling interest was $143.9 million?

MR. WOZNIAK:  Object to the form.

You may answer it.

A.    I remember that.  I don't -- I can't tell you the date, but I remember that.

Q.    Okay.  Tell me exactly what you remember, in specific detail, about that.

MR. WOZNIAK:  Object to the form.

137

But you may answer it.

A.    I just -- I just did.  That Chartwell told us that the initial presentation was an illustration of the low end of the value range and would be somewhere near what the trustee would offer on the first round from their point of view; and that the high end of the value range would be around 143 -- I don't know if they said 143.9, but it was 143 million.

Q.    And when -- and when -- I would want all your specific recollections of when you heard that, sir.  Was that prior to this -- what is this, the April 21, 2014 presentation?

A.    I believe so, yes.

Q.    And do you recall approximately when this -- was this a discussion?  An e-mail?  Did you actually see a valuation?

A.    This was just Chartwell telling us.

Q.    Where and when did Chartwell tell you that?

A.    I don't know a specific date.

Q.    Okay.  Who at Chartwell told you that?

A.    I don't know exactly, but most likely Greg Fresh or Ted Margarit or both.

Q.    Do you have a specific recollection whether it was Mr. Fresh or Mr. Margarit or both, or are you just guessing?

140

Q.   Did you ask?

A.   I did not.

Q.   What was the final equity purchase price the ESOP agreed to pay in this case -- or in this transaction?  Excuse me.  Was that 105 million?

MR. WOZNIAK:  Object to form.

You can answer.

MR. BROCKMAN:  Object to form.

A.   Yes, it was.

Q.   And that $105 million equity purchase price was the result of the negotiations that followed your and the Smalleys' initial offering of 143.9 million on a controlling basis for your RVR shares?

A.   It was --

MR. WOZNIAK:  Object -- hold on.  Object to form.

You can answer it.

A.   I'm sorry.  Could you repeat that?

Q.   Sure.

So the $105 million equity purchase price that was agreed to by the ESOP trustee to purchase yours and the Smalleys' stock, that was a result of negotiation that started with yours and the Smalleys' $143.9 million on a controlling basis for your shares in RVR?

MR. WOZNIAK:  Object to form.

141

A.     That was the end of -- end result of negotiations that started with us asking -- excuse me -- for 143.9 million for 100 percent of the stock.

MR. WOZNIAK:  Eric, when we get to a breaking point, let's take another break.

MR. LUND:  Okay.  You guys, why don't we go off the record.

(Recess taken at 12:46 p.m. MST to 1:16 p.m. MST.)

MR. LUND:  We can go back on the record, please.

Q.     (BY MR. LUND:)  Mr. Bensen, we're back on the regard, and you are still under oath.

Before our break, we were discussing the equity purchase price for the RVR stock that you, the Smalleys, and the ESOP trustee agreed with.  Do you recall that? Or agreed to, I should say.

MR. WOZNIAK:  Object to form.

A.     Yes.

Q.     And that equity purchase price is for $105 million; is that correct?

A.     That is correct.

Q.     And that $105 million equity purchase price, that was for a controlling interest; is that correct?

MR. WOZNIAK:  Object to form.

208

MR. WOZNIAK:  Hold on.  Hold on.

THE WITNESS:  I'm sorry.

MR. WOZNIAK:  You can talk about any advice Chartwell gave, but let's not get into what Greenberg Traurig's advice might have been.

A.    All right.  Chartwell told us we needed to hire a -- an experienced, capable, independent trustee to represent plan participants in the ESOP and negotiate at arm's-length with RVR.  And so they recommended three potential trustees that they said were experienced and independent for us to interview.

We asked, I think, BDO and our other advisors if they thought they were any good or if they thought somebody was bad.  And everybody thought that all three potential trustee candidates were experienced and independent.  And so we agreed to interview them.

I believe Chartwell had discussions with potential trustees, shared some limited information about the possible transaction at the company, and sent them a list of questions that we were going to ask at the interview.  And we had the interviews.  They all seemed to be qualified.  They all represented that they could do the job, and they had the resources to do it.  They all represented that they were independent.  And we felt they were all good.

220

that they had.  And there was a lot from both their advisors, K&L Gates and SRR, and some individual conversations with Reliance.  So we knew that they were working hard getting this thing going.

We were constantly being updated as to where we were, where they were by Chartwell.  Our legal team was dealing with their legal team, which was dealing with the bank's legal team.  So we had an idea how that was going.  And our accountants as well.

Once we started getting into the negotiation side, there was multiple rounds of negotiation, big negotiations, and then a bunch of negotiations on, you know, what's in the -- the bank documents and all -- and this stuff, how -- we went back and forth on things like price, quantity of warrants, SARs, interest rates, and employment contracts, some -- gosh, some nominating things.

So there's a ton of negotiations going back and forth before we got to a point where everybody signed off, thought it was a fair deal and/or below fair market value.  SRR certified to that.  K&L Gates gave an opinion letter saying that it complied with ERISA requirements.  Our counsel -- excuse me -- gave us -- gave an opinion that it was legal.  Reliance in their -- on the Stock Purchase Agreement, their trust certificate said that it

221

was fair and that they were independent and that we're acting in the interest of the participants.

And we knew that we were just providing them tons of information.  Every time I'd get off a call, I'd keep Randy and Bob abreast.  Our offices are right next to each other.  Yeah, so they were -- they were working hard.  I can't think of anything else right now.

Q.    Okay.  My question was directed to you personally.  You were using the pronoun "we" a lot throughout that.

What I was interested in -- in asking about is did you personally, Eric Bensen, do anything to determine whether the Reliance -- whether Reliance Trust Company was fulfilling its fiduciary duties to the ESOP prior to the close of the RVR transaction?

MR. WOZNIAK:  Object to form.

You may answer it.

A.    Well, everything I just told you was applicable to me.

Q.    K&L Gates' opinion letter, you didn't draft that, correct?

A.    No, I did not.

Q.    And did you do anything to determine whether the -- what was in the K&L Gates opinion letter was accurate?

Eric Robert Bensen - 06/08/2021

235

Q.    Okay.  You will see at the top, it says:  Bob, Matt, Mike, Steph, Eric.  And then the sixth bullet point down says:  From cash perspective, what will cash be?  And then the first bullet point is:  We are just under 13 million - last week of month is when you get money in from tour operators for reservations for next week.  Does that help -- excuse me -- for next month.

Does that help refresh your recollection regarding the May 27, 2014 call?

MR. WOZNIAK:  Object to form.  It's not a proper refreshment of recollection.

Q.    Go ahead, sir.

A.    Well, the last week of the month of each month is when we get money in from overseas tour operators for any rentals that are going to happen in the following month.  So those numbers can be very significant if it's -- depending on what time of year it is.

So I may have talked about that.  I don't have a specific recollection of it.  But it's true that we do get a lot of money in at the end of the month.

Q.    Okay.  Do you have a recollection of telling the people on the Byway final due diligence call on May 27, 2014 that we are just under $13 million for cash?

MR. WOZNIAK:  Object to form.  Asked and answered.

246

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 19th day of June, 2021.

_____
Amy L. Zoller
Certified Reporter
Arizona CR No. 50911

        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 42

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Martin J. Walsh, Secretary of )
Labor, )
 )
           Plaintiff, )
 ) Civil Action No.
v. ) 2:19-CV-03178-JJT
 )
Reliance Trust Company, et al., )
 )
           Defendants. )
 )

DEPOSITION OF STEPHANIE ANN GEERDES
(TAKEN VIA ZOOM VIDEO CONFERENCE)

July 16, 2021
2:41 p.m. CDT
Minneapolis, Minnesota

Glennie Reporting Services       Prepared by:
1555 East Orangewood Avenue      Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275      CRR, CRC
602.266.6535                     Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                    PAGE

STEPHANIE ANN GEERDES

        Examination by Ms. Liu                             5

        Examination by Mr. Wozniak                        77

        Further Examination by Ms. Liu                    88

INDEX TO EXHIBITS

DESCRIPTION                                               PAGE

Exhibit 168      Stephanie Geerdes notes,                29
                 Subject:  Byway Call 2-5-14,
                 DOL0022490

3

The Deposition of STEPHANIE ANN GEERDES was taken remotely on July 16, 2021, commencing at 2:41 p.m. CDT, via Zoom Video Conference, Minneapolis, Minnesota, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

    U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
    KATRINA LIU, ESQ. (APPEARING VIA ZOOM)
    BRENDAN BALLARD, ESQ. (Appearing via Zoom)
    ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
    PETER DOLAN, ESQ. (Appearing via Zoom)
    P.O. Box 1914
    Washington, DC 20013
    ballard.brendan@dol.gov
    mariscal.isidro@dol.gov
    liu.katrina.t@dol.gov
    dolan.peter@dol.gov


For Defendant Reliance Trust Company:

    BRYAN CAVE LEIGHTON PAISNER, LLP
    WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
    1201 West Peachtree Street NW, 14th Floor
    Atlanta, Georgia 30309
    bard.brockman@bclplaw.com


For All Other Defendants:

    HOLLAND & KNIGHT, LLP
    TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
    1180 West Peachtree Street, NW, Suite 1800
    Atlanta, Georgia 30309
    todd.wozniak@hklaw.com
              -and-
    HOLLAND & KNIGHT, LLP
    LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
    777 South Flagler Drive, Suite 1900
    West Palm Beach, Florida 33401
    lindsey.camp@hklaw.com

4

APPEARANCES CONTINUING:

For Defendant Chartwell Financial Advisory, Inc., and
Stephanie Ann Geerdes:

        DORSEY & WHITNEY, LLP
        KIRSTEN SCHUBERT, ESQ. (Appearing via Zoom)
        50 South Sixth Street, Suite 1500
        Minneapolis, Minnesota 55402-1498
        schubert.kirsten@dorsey.com

Also present:

        Dorian Hanzich, Investigator with DOL (Appearing
         via Zoom)
        Alexandra Gilewicz, Solicitor's Office,
         Department of Labor (Appearing via Zoom)
        Kenton DeBouter, Department of Labor (Appearing
         via Zoom)

5

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Ms. Liu, do you have any objection?

MS. LIU:  No objection.

THE COURT REPORTER:  Mr. Brockman, any objection?

MR. BROCKMAN:  No objection.

THE COURT REPORTER:  Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

THE COURT REPORTER:  And, Ms. Schubert, any objection?

MS. SCHUBERT:  No objection.

STEPHANIE ANN GEERDES, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LIU:

Q.    Good afternoon.  My name is Katrina Liu, and I represent the plaintiff, the Secretary of Labor of the United States Department of Labor.

This deposition is being taken pursuant to Federal Rule of Civil Procedure 30 in the case Walsh vs.

Stephanie Ann Geerdes - 07/16/2021

6

Reliance Trust Company, No. 2:19-cv-03178-JJT, pending in the U.S. District Court for the District of Arizona.

This deposition of Stephanie Geerdes is being conducted remotely via Zoom.  This deposition is being stenographically recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.  There is a Court Order governing the conduct of remote depositions docketed in this case as Docket No. 85.  That Order has been provided to counsel for Stephanie Geerdes and the court reporter.

The witness is appearing today pursuant to a subpoena served by the Secretary.

Ms. Geerdes, am I saying your name correctly?

A.    Yes.  Yeah, I think so.  It's Geerdes.

Q.    Ms. Geerdes, have you been sworn in today?

A.    Yes.

Q.    Can you please state your full name and the address where you live?

A.    Stephanie Ann Geerdes,    REDACTED
REDACTED

Q.    And are you represented by counsel today?

A.    Yes.

Q.    Who is your counsel?

A.    Kirsten Schubert.

MS. LIU:  Could other counsel please enter

70

that financial model that Chartwell created -- that Chartwell developed?

A.    Yes.

Q.    In the table, there's a line towards the top that says:  Enterprise Value Indication.

Do you see that?

A.    Yes.

Q.    Is that the -- is that the enterprise value that we had referred to earlier in your notes?

MS. SCHUBERT:  Object to form.

MR. WOZNIAK:  Form.

A.    I don't know.

Q.    Is there a difference between enterprise value and enterprise value indication?

A.    I think enterprise value indication is a more specific description.  But generally when we referred to enterprise value, we meant enterprise value indication.

Q.    Okay.  And is that enterprise value in this table the enterprise value for RVR, Incorporated?

MR. WOZNIAK:  Object to form.

A.    This deck is about RVR.  The model was about RVR.  I would not say that -- I would not characterize that number as the enterprise value of RVR.

Q.    Okay.  How would you characterize that value?

A.    That would be an illustrative potential

71

enterprise value of RVR based on the assumptions that were in our model as of the date of this meeting and based on the information that we had as of the date of this meeting.

Q.    And was that potential -- let me rephrase.

What figure is shown as the enterprise value indication in this table?

A.    140 million.

Q.    About halfway down the table, it says:  Control Equity Value.

Do you see that?

A.    Yes.

Q.    What does equity value mean?

A.    The -- the value of the shares of the company, so the value of the company when you exclude the debt and add the cash.

Q.    And what does a control equity value mean?

MR. WOZNIAK:  Object to form.

A.    I don't remember.

Q.    What does control mean here?

A.    I don't remember.

Q.    Wasn't your testimony that you helped to develop this deck?

A.    Yes.  But it was seven years ago, and I don't work in that field anymore.

92

STATE OF ARIZONA     )
                     )
COUNTY OF MARICOPA   )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 24th day of July, 2021.


                            _____
                            Amy L. Zoller
                            Certified Reporter
                            Arizona CR No. 50911


        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.


_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035

# Exhibit 43

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Milton Al Stewart, Acting )
Secretary of Labor, )
                                    )
            Plaintiff, )
                                    ) Civil Action No.
v.                                  ) 2:19-cv-03178-JJT
                                    )
Reliance Trust Company, et al., )
                                    )
            Defendants. )
                                    )

DEPOSITION OF STEPHEN ALLEN MARTIN
(TAKEN VIA ZOOM VIDEO CONFERENCE)

May 13, 2021
9:02 a.m. EDT
Atlanta, Georgia

Glennie Reporting Services      Prepared by:
1555 East Orangewood Avenue     Amy L. Zoller, RMR,
Phoenix, Arizona 85020-5275     CRR, CRC
602.266.6535                    Arizona CR No. 50911
www.glennie-reporting.com

2

I N D E X

WITNESS                                                    PAGE

STEPHEN ALLEN MARTIN

    Examination by Mr. Lund                                 7


INDEX TO EXHIBITS

DESCRIPTION                                                PAGE

Exhibit 128       E-mail, Subject:  Re:  Call,           32
                  DOL 0083291-0083292

Exhibit 129       E-mail, Re:  Byway follow up,          37
                  DOL 0062288

Exhibit 130       Project Byway Trustee Interview,       41
                  March 31, DOL 0013056

Exhibit 131       Project Byway Potential ESOP           44
                  Trustee Introduction Materials,
                  DOL 0011741-0011750

Exhibit 132       3/31/2014 Handwritten notes,           58
                  Project Byway, DOL 0013083-0013084

Exhibit 133       E-mail, Subject:  Re:  Cruise          66
                  America, DOL 0083341

Exhibit 134       Document from Salesforce.com,          69
                  Cruise America, DOL 0012194-0012196

Exhibit 135       5/5/14 Handwritten notes, Project      89
                  Byway Meeting, DOL 0013062-0013064

Exhibit 136       E-mail, Subject:  RE:  Byway          128
                  Proposal Response, DOL 0018178-0018181

Exhibit 137       E-mail, Subject:  RE:  Byway          135
                  Proposal Response, DOL 0084291-0084292

Exhibit 138       5/22/2014 Handwritten notes,          152
                  Project Byway Call, DOL 0013075

3

INDEX TO EXHIBITS CONTINUING

DESCRIPTION                                                    PAGE
Exhibit 139      5/23/14 Handwritten notes, Project      179
                 Byway Review, DOL 0013058-0013060

Exhibit 140      E-mail, Subject:  Fwd:  Board of        196
                 Director Procedure,
                 DOL 0006253-0006255

Exhibit 141      E-mail, Subject:  Fwd:  Board of        200
                 Director Procedure,
                 DOL 0006253-0006255

Exhibit 142      E-mail, Re:  Board of Director          208
                 Procedure, KLG0004727-0004730

Exhibit 143      RVR Employee Stock Ownership Trust,     236
                 DOL 0009679-0009708

4

The Deposition of STEPHEN ALLEN MARTIN was taken remotely on May 13, 2021, commencing at 9:02 a.m. EDT, via Zoom Video Conference, Atlanta, Georgia, before Amy L. Zoller, a Certified Reporter, Certificate No. 50911, for the State of Arizona.

APPEARANCES:

For Plaintiff:

      U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR
      ERIC C. LUND, ESQ. (Appearing via Zoom)
      BRENDAN BALLARD, ESQ. (Appearing via Zoom)
      ISIDRO MARISCAL, ESQ. (Appearing via Zoom)
      KATRINA LIU, ESQ. (Appearing via Zoom)
      P.O. Box 1914
      Washington, DC 20013
      lund.eric@dol.gov
      ballard.brendan@dol.gov
      mariscal.isidro@dol.gov
      liu.katrina.t@dol.gov

For Defendant Reliance Trust Company:

      BRYAN CAVE LEIGHTON PAISNER, LLP
      WILLIAM BARD BROCKMAN, ESQ. (Appearing via Zoom)
      1201 West Peachtree Street NW, 14th Floor
      Atlanta, Georgia 30309
      bard.brockman@bclplaw.com

5

APPEARANCES CONTINUING:

For All Other Defendants:

      HOLLAND & KNIGHT, LLP
      TODD D. WOZNIAK, ESQ. (Appearing via Zoom)
      1180 West Peachtree Street, NW, Suite 1800
      Atlanta, Georgia 30309
      todd.wozniak@hklaw.com
             -and-
      HOLLAND & KNIGHT, LLP
      LINDSEY R. CAMP, ESQ. (Appearing via Zoom)
      777 South Flagler Drive, Suite 1900
      West Palm Beach, Florida 33401
      lindsey.camp@hklaw.com

For Argent Trust Company:

      O'MELVENY & MYERS, LLP
      NATASHA S. FEDDER, ESQ. (Appearing via Zoom)
      400 South Hoe Street, 18th Floor
      Los Angeles, California 90071
      nfedder@omm.com

Also present:

      Stephen Teplin, In-House Counsel for FIS
       (Appearing via Zoom)
      Lynn Cravey, In House Counsel for FIS
       (Appearing via Zoom)
      Kevin Bensen, RVR (Appearing via Zoom)
      Cory Kauffmann, RVR (Appearing via Zoom)
      Francis Ng, Investigator with DOL (Appearing via
       Zoom)
      Alexandra Gilewicz, Solicitor's Office,
       Department of Labor (Appearing via Zoom)

Stephen Allen Martin - 05/13/2021

6

THE COURT REPORTER:  Before we proceed, I would ask counsel to agree on the record that there is no objection to me swearing in a witness who is not appearing personally before me.

Mr. Lund, do you have any objection?

MR. LUND:  No.

THE COURT REPORTER:  Mr. Wozniak, any objection?

MR. WOZNIAK:  No objection.

THE COURT REPORTER:  Mr. Brockman, any objection?

MR. BROCKMAN:  No objection from Reliance.

THE COURT REPORTER:  And, Ms. Fedder, any objection?

MS. FEDDER:  No objection from Argent. Thank you.

STEPHEN ALLEN MARTIN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. LUND:  Good morning.  My name is Eric Lund.  I represent the plaintiff, the Secretary of Labor of the United States Department of Labor.

This deposition is being taken pursuant to Federal Rule of Civil Procedure 30, in the case Walsh vs. Reliance Trust Company, No. 2:19-cv-03178-JJT, pending in

the U.S. District Court for the District of Arizona.

This deposition of Stephen Martin is being conducted remotely via Zoom.  This deposition is being stenographically recorded and transcribed by the court reporter.  No other recording of this deposition is authorized.

There is a Court Order governing the conduct of remote depositions docketed in this case as Document 85.  That Order has been provided to counsel for Mr. Martin and the court reporter.

The witness is appearing today pursuant to a subpoena served by the Secretary.

EXAMINATION

BY MR. LUND:

Q.    Sir, have you been sworn?

A.    Yes.

Q.    Please state your full name and the city and state where you reside.

A.    Stephen Allen Martin, Atlanta, Georgia.

Q.    Are you represented by counsel today?

A.    Yes.

Q.    Who is your counsel?

A.    Bard Brockman.

MR. LUND:  Could other counsel enter their appearance and state who they represent?  Let's start

Stephen Allen Martin - 05/13/2021

176

MR. WOZNIAK:  Object to form.

A.    We needed to have the bylaws changed to have the nominating committee featured.

Q.    Okay.  And why was that important to the ESOP subcommittee?

A.    Because we felt like it's appropriate from a governance standpoint.

Q.    And why was it appropriate from a governance standpoint?

A.    It's appropriate to have a committee directive as the appropriate committee to nominate directors for the board every year.  So that's all we were trying to create.  That wasn't in place before.

Q.    What was in place at the time of the May 23, 2014 ESOP subcommittee meeting?

A.    I don't recall what -- what was in place at that point, but there wasn't a nominating committee in place.

Q.    Okay.  Who had the right to appoint board of directors members on May 23, 2014?

A.    The current directors.

MR. BROCKMAN:  Object to form.

Q.    Who were the current directors?

A.    It was two -- Randall and Robert Smalley, Jr.

Q.    And they had the right to -- to put up board of

177

director candidates, nominate employee -- or excuse me -- board of director candidates?

MR. BROCKMAN:  Object to form.

MR. WOZNIAK:  Form.

A.    I guess so.  They -- they operated -- they were the ones that operated the company.  They were the board.

Q.    (BY MR. LUND:)  And you also mentioned that the ESOP trustee should have a right to vote its shares as it wanted, not as directed; is that correct?

MR. BROCKMAN:  Object to form.

A.    That is correct.

Q.    Okay.  And when you're referring to that pending change, what are you referring to?

A.    That when directors are nominated, a slate of directors are given to the trustee to consider.  And the trustee can choose to vote their shares for or against each individual nominee.  So the trustee is electing the board from the slate of nominees.

Q.    And who was going to put forth the slate of nominees?

A.    The nominating committee.  That's an internal committee.

Q.    And when you said that the -- so what was the point of the change?  What -- what change exactly did you -- was being contemplated?

A.     There wasn't a nominating committee previously.

Q.     Right.

A.     Without any guidance.  We were putting --

(Reporter requests clarification.)

A.     I said we were trying to put in a good governance process.

Q.     Okay.  In reference to the voting by the trustee, what was being desired or -- or what change was sought to be made?

MR. BROCKMAN:  Object to form.

A.     Again, the nominating committee would present a nomination -- a slate of directors to be nominated through a board resolution.  That would be given to the trustee.  We would consider those nominees and vote our shares as we so choose.

It's no different than a public company when you vote your proxy every year for all the nominating directors of -- for the board.  It's the same governance process.

Q.     Were you saying that the trustee would vote as it wished and not as directed?

A.     That is the point.  Completely independent.

Q.     Okay.  And again considering the May 23, 2014 subcommittee meetings, other than these three changes we just talked about, were there any other changes pending

193

Q.    So it depends whether or not the direction was imprudent whether or not the ESOP trustee would follow it?  Is that your understanding?

A.    I -- I would agree with the first sentence, whether or not the direction was imprudent or not.

Q.    Okay.  What was the second part that you -- that you apparently don't agree with?

A.    Restate your question.

MR. LUND:  Could you read it back, please, Amy?

(The pending question was read by the reporter.)

A.    If the direction -- if the direction --

(Reporter requests clarification.)

A.    If the direction was imprudent, then the trustee should vote in its own judgment as to what the best course of action is.  If it's imprudent, they should vote against it.

Q.    Would you go to the first page of the exhibit, please.

A.    The first page of what?

Q.    Oh, I'm sorry.  It's Exhibit 120.

MR. BROCKMAN:  Tab 27 still.

Q.    (BY MR. LUND:)  Exhibit 120, I think was at Tab 27.

259

STATE OF ARIZONA      )
                      )
COUNTY OF MARICOPA    )

        BE IT KNOWN that I took the foregoing deposition pursuant to Notice; that the witness was duly sworn by me; and that said transcript is a full, true, and accurate record of the proceedings; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have acted in compliance with ACJA 7-206.

        I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

        Pursuant to request, notification was provided that the deposition is available for review and signature.

        Dated this 26th day of May, 2021.

_____
Amy L. Zoller
Certified Reporter
Arizona CR No. 50911

        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has complied with the ethical obligations set forth in ACJA 7-206.

_____
GLENNIE REPORTING SERVICES, LLC
Registered Reporting Firm
Arizona RRF No. R1035