**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Martin J Walsh,

              Plaintiff,

v.

Reliance Trust Company, et al.,

              Defendants.

No. CV-19-03178-PHX-ROS

**ORDER**

      In 2014, RVR, Inc., decided to establish an employee stock ownership plan, a type of pension plan that would allow RVR's employees to own RVR stock.  RVR hired Reliance Trust Company to serve as the trustee and independent fiduciary for that plan. Under Reliance's guidance, the newly formed plan agreed to purchase 100% of RVR's stock for $105 million.  The Secretary of Labor believes that price was too high.  According to the Secretary, the restrictive terms of the stock purchase agreement meant RVR's stock was worth approximately $15 million at the time of the transaction.  The Secretary filed this suit alleging the individuals and entities involved in the purchase of RVR stock committed violations of the Employee Retirement Income Security Act ("ERISA").  After completing discovery, the parties filed cross-motions for summary judgment as well as numerous motions in limine.  There are plenty of disputes of material fact and most of the evidentiary arguments are not well taken.  Therefore, the bulk of the motions will be denied and trial will be set.

# BACKGROUND

There are many factual and legal disputes between the parties but this suit boils down to a dispute over the value of RVR's stock in 2014. If, as the Secretary believes, RVR's stock was not worth anything close to $105 million, the defendants will face significant difficulty in avoiding liability. If, as the defendants believe, RVR's stock was worth $105 million, the Secretary's claims likely will fail. This is a greatly simplified view of things but the basic disagreement about the value of RVR's stock is why there will be a trial.

Despite the obvious factual dispute regarding the correct value of the stock, all parties moved for at least partial summary judgment. Those cross-motions require the Court view the facts differently depending on which motion is being addressed. Considering that requirement, it is difficult to present a concise and accurate version of the facts. The following is a basic outline of the facts. More specific factual details are set forth in the context of resolving particular motions.

Together with their father, brothers Randall Smalley and Robert Smalley, Jr., established a recreation vehicle rental company in 1972. That company, RVR, now does business as Cruise America and Cruise Canada. (Doc. 222-1 at 51). In 2000, Randall and Robert "became the sole shareholders and sole directors of RVR." (Doc. 222-1 at 51). Randall put his RVR stock "in family trusts for which [he is] the trustee." (Doc. 222-1 at 2). Robert kept ownership of his stock. In 2011, one of RVR's longtime employees, Eric Bensen, "was allowed to acquire 3.3% of RVR's stock." (Doc. 222-1 at 2). Thus, as of 2011 and until the 2014 creation of the employee stock ownership plan, Robert owned 48.35% of RVR's stock, the trusts connected to Randall owned 48.35%, and Bensen owned 3.3%.[1]

Sometime in 2013, Robert and Randall claim they "began considering succession planning and the possible transfer of RVR's ownership to RVR's employees." (Doc. 222-1 at 3; 222-1 at 51). In January 2014, Robert, Randall, and Bensen (collectively, the

---

[1] Randall's stock was held in family trusts but for simplicity, and solely for purposes of this Order, the Court will describe Randall's stock as being in his possession.

"Director Defendants") met with employees of Chartwell Financial Advisory, Inc.[2]   The Chartwell employees discussed with the Director Defendants the benefits of employee stock ownership plans ("ESOPs"), "a type of pension plan that invests primarily in the stock of the company that employs the plan participants."   *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014).   The Chartwell employees explained how an ESOP might work should the Director Defendants establish one.   Relying on "preliminary information" regarding RVR's value, the Director Defendants claim Chartwell employees concluded "a preliminary fair market value range for 100% of RVR's stock as of December 31, 2013 was between $100.7 million and $143.9 million."   (Doc. 222-1 at 52).   The presentation from the January 2014 meeting, however, indicates Chartwell's value range reflected a "controlling interest equity value."   (Doc. 222-1 at 305).   As discussed later, the Secretary believes a "controlling interest equity value" often will be much higher than a "non-controlling interest equity value" because having control over the company is worth significantly more.   In any event, using $100.7 million as the expected value, the Chartwell employees "illustrate[d] . . . how a potential ESOP transaction could be financed and structured and how much cash [the Director Defendants] might receive" if the transaction occurred.   (Doc. 222-1 at 52, 307-09).

The Director Defendants viewed the preliminary numbers as sufficient such that they decided to proceed with establishing an ESOP.   The Director Defendants "decided that RVR should retain Chartwell to serve as RVR's financial advisor in connection" with establishing the ESOP.   (Doc. 222-1 at 53).   Once retained, Chartwell instructed the Director Defendants to compile "due diligence materials so that the information could be promptly shared with the to-be-selected independent trustee and its advisors."   (Doc. 222-1 at 53).

During meetings in early 2014, Chartwell recommended the Director Defendants

---

[2] Some documents identify this entity as "Chartwell Financial Services, Inc." (Doc. 222-1 at 3, 20, 52).   It appears the correct name is "Chartwell Financial Advisory, Inc." (Doc. 222-1 at 36).   Numerous entities containing the name "Chartwell" were involved in the transaction but an employee of Chartwell Financial Advisory, Inc., refers to all of the affiliated entities simply as "Chartwell." (Doc. 222-1 at 36).   The Court will do the same.

select Reliance Trust Company as the independent trustee for the ESOP.[3]  In the Secretary's view, the Director Defendants selected Reliance no later than February 25, 2014.  On that date a Chartwell employee sent an email to a Reliance employee indicating Reliance would be selected as the trustee.  (Doc. 250-5 at 15).  Despite that email, the Director Defendants maintain no selection was made in February 2014.  Instead, in March 2014 the Director Defendants claim they began "reviewing the credentials" of Reliance and two other candidates to serve as ESOP trustee.  (Doc. 222-1 at 53).  The Director Defendants indicated to the three candidates that a closing date for the transaction should be no later than May 2014.  The Director Defendants now claim that "was not a hard deadline" but an email between advisors Reliance later hired describes May 27 as a "hard close date."  (Doc. 222-1 at 55; Doc. 251-3 at 30).  All three trustee candidates allegedly stated a closing date in May 2014 "was realistic and achievable."  (Doc. 222-1 at 54).  Assuming Reliance had not already been selected in February 2014, Reliance was in fact selected to serve as trustee after the Director Defendants reviewed the three candidates.

The exact details of who made the decision to retain Reliance and how Reliance was retained are disputed.  In brief, the Director Defendants or possibly only Robert and Randall, selected Reliance "to act as the ESOP's independent, discretionary trustee" and to "negotiate the terms by which the ESOP would purchase 100% of RVR's stock from [the Director Defendants]."  (Doc. 222-1 at 55).  Bensen, allegedly on behalf of RVR, executed a formal retention letter with Reliance.[4]

To perform its duties as the ESOP trustee, Reliance selected its own financial advisor, a firm named Stout Risius Ross ("SRR"), and legal counsel, the law firm K&L Gates.  The Director Defendants claim they "did additional due diligence" regarding SRR and K&L Gates and the research confirmed SRR and K&L Gates "were qualified to serve as Reliance's advisors."  (Doc. 222-1 at 55).  Once Reliance had appropriate advisors, the

---

[3] Reliance Trust Company is a financial services firm that, when hired, agrees to act as trustee and ensure any "transaction is fair from a financial viewpoint to the ESOP and its participants."  (Doc. 222-1 at 343) (engagement letter setting forth duties).
[4] The retention letter states Reliance is being retained to work on the "Cruise America Inc." ESOP.  (Doc. 222-1 at 343).  Bensen signed that letter as "Chief Financial Officer" of "Cruise America Inc."

two sides began negotiations.  The basic setup was the Director Defendants were seeking the highest price for their stock while Reliance was seeking the lowest price.[5]

On April 16, 2014, the Director Defendants and Chartwell met with Reliance and its advisors.  (Doc. 222-1 at 56).  The following day, Chartwell gave Reliance access to RVR's business information.  To be clear, Reliance first gained access to the crucial information necessary to assess RVR's value on April 17, 2014.  Four days later, on April 21, 2014, Chartwell sent Reliance "the initial transaction proposal and term sheet." Chartwell proposed a purchase price of $143.9 million for 100% of RVR's stock.  That proposal included several additional terms, such as granting the Director Defendants the right to purchase shares of RVR after the transaction that would be newly issued after the transaction.  On May 5, 2014, Reliance sent a counteroffer for $100 million.  (Doc. 250-4 at 24).

Reliance first obtained access to the requisite business documents on April 17, meaning its counteroffer to pay $100 million for the RVR stock was sent less than three weeks later.  And that counteroffer did not contain the complete terms.  The counteroffer said Reliance would "want to revisit the employment agreements" for the Director Defendants that would be part of the transaction, but Reliance did not set forth what that "revisit[ing]" would entail.  As set forth in more detail later, the employment agreements with the Director Defendants contained large payouts in the event the Director Defendants were replaced such that, when viewed in the light most favorable to the Secretary, it is suspicious that Reliance could make a plausible offer without having a better idea of the terms of the employment agreements.  Reliance's May 5, 2014, counteroffer also noted Reliance needed to continue its "due diligence on other important issues such as any environmental issues with the paint shop."  (Doc. 250-4 at 24).  Viewed in the light most favorable to the Secretary, offering that much money before significant investigations had been completed is evidence Reliance may not have been acting prudently and solely in the

---

[5] The complicated nature of the transaction meant the total price was only one aspect of their negotiations but, as evidenced by the negotiations, the total final price was the primary focus.

interest of the ESOP's beneficiaries (*i.e.*, RVR's employees).

After Reliance's counteroffer, Chartwell and Reliance exchanged subsequent offers. Eventually they agreed on a purchase price of $105 million for the 1,000,000 shares of RVR.  (Doc. 220 at 21) (chart of offers). There are a few terms of the transaction that need highlighting.  The following is not a complete recital of the final terms but merely some of the terms most crucial for resolving the various motions.

The transaction required the RVR ESOP borrow approximately $105 million from RVR with a 40-year term.  The RVR ESOP then used those funds to purchase all of the RVR stock from the Director Defendants.  (Doc. 222-3 at 60).  So, the Director Defendants, for a moment, had $105 million.  Randall and Robert then loaned RVR $95 million.  In connection with that loan, Randall and Robert received what they refer to as "Seller Notes and warrants."  (Doc. 220 at 25).  The Seller Notes paid a cash interest rate of 2.5% per year as well as "payment in kind interest" of 1.05% (compounding) and 2.15% (non-compounding).  Randall and Robert stress these debts were unsecured and subordinate to RVR's other debts.  (Doc. 222-1 at 11).  The accompanying warrants gave Randall and Robert the right to purchase 666,667 shares of RVR stock at $7.50 per share, $92.50 per share less than what the ESOP paid.  (Doc. 222-1 at 61).  Those warrants were issued shortly after the transaction and were immediately exercisable.

The transaction required RVR establish a "management incentive plan" that allowed 238,095 "stock appreciation rights" to be granted to eligible RVR employees.  (Doc. 213-2 at 19).  Neither Robert nor Randall were eligible under that incentive plan but Bensen was eligible.  Given the existing 1,000,000 shares of RVR stock sold to the ESOP, the 238,095 "stock appreciation rights" that other RVR employees might earn, and the 666,667 shares Randall and Robert were eligible to purchase after the transaction, Randall and Robert could regain ownership of 35% of RVR's outstanding shares immediately after ostensibly selling 100% of the shares.[6]  Because Randall and Robert could purchase those shares almost immediately, within a few days of the transaction, the ESOP's ownership

---

[6] Calculated as 666,667/(1,000,000 shares sold to ESOP + 666,667 shares Randall and Robert might buy + 238,095 shares for management incentive plan).

percentage of RVR could have slid from 100% to 65%. And once the "stock appreciation rights" were earned, particular RVR employees could own 12.5% of RVR's outstanding shares. Thus, despite buying 100% of RVR's equity in 2014, the transaction contemplated the ESOP might own only 52.5% of RVR's equity in the near future.

The final terms of the transaction to outline before discussing particular motions involve additional monetary benefits for the Director Defendants and the amount of control over RVR they retained. The terms of the transaction meant the Director Defendants were entitled to five years of compensation worth a combined total of approximately $8 million. The terms also established the ESOP would agree to elect the Director Defendants to serve on RVR's board of directors. (Doc. 222-3 at 80). The ESOP trust agreement identified RVR as the plan administrator, RVR would serve as the trust's "investment committee," and that committee could appoint an "investment manager." (Doc. 222-3 at 7). In brief, RVR had control over the ESOP and the Director Defendants were the only members of RVR's board of directors. Thus, the Director Defendants retained control over RVR, albeit somewhat indirectly.

Based on these events, the Secretary filed the present suit against Reliance and the Director Defendants.[7] As noted earlier, the Secretary's basic contention is the ESOP paid way too much for the RVR stock considering the other terms of the transaction. The Secretary believes allowing the ESOP to overpay for the RVR stock enriched the Director Defendants at the expense of the ESOP. The Secretary alleged a total of seven claims against Reliance and the Director Defendants:

- Count I: Against Reliance for engaging in what ERISA deems a "prohibited transaction";
- Count II: Against Reliance for breaching its fiduciary duty in approving the transaction's final terms;
- Count III: Against the Director Defendants for breaching their fiduciary

---

[7] The Secretary also named RVR as a defendant but the Secretary explains RVR is named "pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted." (Doc. 182 at 6). RVR's presence can be ignored for purposes of resolving the pending motions.

duties by failing to monitor Reliance;

- Count IV: Against the Director Defendants for "co-fiduciary liability" based on participating in Reliance's breaches;

- Count V: Against the Director Defendants for participating in Reliance's breaches and for participating in a prohibited transaction;

- Count VI: Against Reliance to void indemnification provisions in the plan and trust documents;

- Count VII: Against the Director Defendants to void indemnification provisions in the plan and trust documents.

Reliance and the Director Defendants are represented by separate counsel.  At times, however, Reliance and the Director Defendants have filed documents jointly.  Therefore, the Court will refer to Reliance or the Director Defendants separately and "Defendants" will be used when referring to all of them.  The parties have filed four motions to seal, six evidentiary motions, and three motions for summary judgment.

## ANALYSIS

### I.   Motions to Seal and Stipulation (Doc. 227, 233, 266, 269, 274)

The parties and non-parties have numerous disputes regarding whether certain documents should be filed under seal.  The disputed documents are attached to either motions in limine or summary judgment briefing.  The parties have complied with Local Rule 5.6(d) but there remains significant confusion about the parties' disagreements.

Rule 5.6(d) states "if a party wishes to file a document that has been designated as confidential by another party," the parties must confer and attempt to reach agreement.  If they cannot reach agreement, the filing party must lodge the documents under seal.  At the time of that lodging, the party who wishes to file the documents on the public docket must set forth its position.  After the lodging, the party that believes the documents should remail under seal must file a motion to seal.  Rule 5.6(d) does not allow for a response to a motion to seal.

The process required by Rule 5.6(d) required the Secretary lodge numerous

documents.[8]   That lodging led to numerous motions to seal from Defendants and non-parties (Doc. 227, 233, 266, 269) as well as a stipulation regarding how certain documents should be redacted.   (Doc. 274).   Based on those filings, it is not possible to identify precisely where the parties agree or disagree.   For example, the Secretary lodged under seal a presentation prepared by Chartwell.   (Doc. 258).   That document, labeled Exhibit 14, appears to be the same document as a separately lodged document labeled Exhibit 19. (Doc. 253).   The subsequent motions to seal and stipulation make no reference to Exhibits 14 or 19.   (Doc. 266, 269, 274).   Thus, the parties seem to agree Exhibits 14 and 19 should be filed on the public docket.   But if the parties agree, they should have filed a stipulation as set forth in Rule 5.6(d).

Despite the general confusion based on the manner the parties presented their positions regarding the filing of certain documents, the basic question is whether the Court should seal the documents because they contain confidential business information. The documents, in brief, are the following:

- Reliance and the Director Defendants seek to seal a single page from the reports by expert Jeffrey S. Tarbell.  That page contains "RVR's projected financial results and its actual and adjusted earnings."  (Doc. 227 at 3).  Reliance also seeks to seal the "transaction memorandum" prepared by a law firm advising Reliance on the ESOP transaction.   And Reliance seeks to seal some discovery responses that include compensation information and annual revenues.

- Reliance and SRR seek to seal the valuation reports prepared by SRR.  Those reports contain SRR's "confidential and proprietary processes towards valuation and RVR's confidential financial and business information."  (Doc. 233 at 5).  Those

---

[8] The Secretary lodged the following:
- portions from an expert report and a rebuttal report connected to a motion in limine (Doc. 185);
- valuation reports prepared by SRR as well as additional excerpts from expert reports connected to a motion in limine (Doc. 189);
- other valuation reports prepared by SRR connected to a motion for summary judgment (Doc. 217);
- other transactions documents, including documents that post-date the transaction involving Reliance's agreements with a separate non-party connected to an opposition to a motion for summary judgment (Doc. 252).

reports set forth SRR's practices when determining a company's value and also set forth extensive information about RVR's customer base, suppliers, and financial statements.

Reliance, the Director Defendants, and SRR argue their businesses will suffer harm if the information in the various documents is placed on the public docket. The Secretary argues that not all the information contained in the various documents qualifies as confidential. The Secretary also claims some of this evidence "lie[s] at the heart of the Secretary's claims" and, therefore, "any motion to seal should be denied."[9] (Doc. 252 at 4).

Depending on the type of underlying motion, the Ninth Circuit applies two different standards for filing documents under seal. If "the motion at issue is more than tangentially related to the underlying cause of action," the Court must find "compelling reasons" for placing the documents under seal. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1099 (9th Cir. 2016). For other motions not "tangentially related" to the merits, the Court need only find "good cause" to justify the sealing. *Id.* at 1097. The documents at issue were attached either to a motion in limine or to summary judgment briefing. Such motions or briefing require application of the "compelling reasons" standard. *Id.* at 1099 (noting motions in limine "are strongly correlative to the merits of a case"). The present record does not establish "compelling reasons" to seal the various documents in their entirety.

It appears undisputed the documents contain extensive non-public information about RVR's operations and details of how SRR conducts its valuations. And it is well-established "[t]he disclosure of business information that could create competitive harm is

---

[9] The Secretary argues the protective order granted permission for either party to file on the public docket any document produced in discovery. (Doc. 252 at 2). The Secretary reads the protective order as prohibiting only the use of the disputed documents in unrelated proceedings. In other words, the Secretary believes all documents produced during discovery may be filed on the public docket. That is not correct. The correct reading of the protective order that during discovery any party or non-party is entitled to designate documents as confidential. The side receiving the allegedly confidential documents may then use, but not necessarily file on the public docket, those documents in this litigation. The side producing the documents remains entitled to seek the sealing of the documents.

a compelling reason to seal." *Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO, 2022 WL 17970394, at *2 (N.D. Cal. Dec. 21, 2022) (citing cases).  Therefore, some of the information in the documents may properly be placed under seal.[10]  But the disputed documents cannot be placed under seal in their entirety because significant portions of those documents reflect information that must be placed on the public docket.

The documents contain information that is already part of the public record.  For example, one disputed document includes the following statement: "As part of the ESOP Transaction, Cruise America entered into the Seller Notes in the aggregate amount of $95.9 million."  (Doc. 190 at 23).  That information is already available on the public docket. (Doc. 251-7 at 32).  Page 26 of the same disputed document includes statements regarding how RVR views ESOP expenses.  (Doc. 190 at 26).  And while it is not clear if those statements are already on the public docket, there has not been a sufficient explanation how RVR's view of ESOP expenses can qualify as proprietary business information that would cause harm if disclosed.  These are only two of the many portions of the disputed documents that, at present, have not met the "compelling reasons" standard.  Because statements that are not confidential or that do not disclose any confidential business information cannot be sealed, the motions to seal will be denied without prejudice.

The Director Defendants, Reliance, and SRR will be required to identify those portions of the disputed documents which they believe meet the "compelling reasons" standard for sealing.  The Director Defendants, Reliance, and SRR must then confer with the Secretary to reach an agreement.  If an agreement is reached, the parties must file a stipulation together with the redacted versions of the documents on the public docket.  The complete copies of the documents should be lodged, under seal, as attachments to thestipulation.  If no agreement is reached, the Director Defendants, Reliance, and SRR must file a single joint motion to seal, accompanied by clear indication of the portions of the documents they continue to believe should be sealed and the compelling reasons that support their positions.  The Secretary will then respond and the Director Defendants,

---

[10] This does not resolve how those documents will be handled at trial.

1    Reliance, and SRR will file a single joint reply.  The Court will then resolve the disputed

2    portions and order the parties to file redacted versions.

3    **II.    Evidentiary Motions**

4        The parties have briefed six evidentiary motions.  The Court will analyze each

5    motion separately.

6    **A. Secretary's Motion to Exclude Portion of Expert Opinions (Doc. 184)**

7        The Secretary seeks to exclude any "expert evidence containing legal conclusions."

8    (Doc. 184 at 3).  According to the Secretary, the reports and deposition testimony from

9    three of Defendants' experts contain "impermissible opinion evidence" reflecting the

10   experts' opinion on issues of law, such as the appropriate standard for evaluating the

11   legality of the transaction.[11]  (Doc. 184 at 5).  In their opposition, Defendants agree "that

12   an expert cannot state an opinion as to ultimate legal conclusions."  (Doc. 231 at 2).  But

13   Defendants argue their experts have not done so.

14       The statements to which the Secretary objects include statements that provide some

15   basic background regarding ERISA and ESOPs.  For example, the Secretary believes it is

16   improper for one expert to state "Given the nature of ESOP financing and the relationship

17   between the seller(s) and buyer, it is my understanding that ESOP transactions are

18   generally subject to ERISA's prohibited transaction rules."  (Doc. 184-1 at 4).  The

19   Secretary also objects to statements addressing "industry best practices."  The Secretary

20   reasons the experts' opinions that Defendants' actions were consistent with "industry best

21   practices" contain an "implicit" assertion that Defendants' actions were consistent with

22   ERISA.  (Doc. 184 at 4).

23       The boundary between permissible and impermissible expert testimony regarding

24   issues of law is one where courts routinely struggle to draw meaningful lines.  *See*

25   *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (noting "line between

26

27   ───────────────
     [11] It is unclear if the parties believe the experts' reports will be admitted into evidence.
     Absent an agreement between the parties, those reports may not be admissible.  *See, e.g.*,
28   *Hunt v. City of Portland*, 599 F. App'x 620, 621 (9th Cir. 2013) ("With respect to the
     expert's written report, we conclude that the report is hearsay to which no hearsay
     exception applies.").

admissible and inadmissible expert testimony . . . often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties"). In general, experts may offer testimony "concerning an ultimate issue" but cannot offer testimony "on an ultimate issue of law." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). For example, in an insurance bad faith case, the Ninth Circuit concluded an expert appropriately testified the defendants "deviated from industry standards" but it would have been inappropriate for the expert to testify the defendant "acted in bad faith (i.e., an ultimate issue of law)." *Id.*

The rule prohibiting expert testimony on ultimate issues of law usually is justified on the basis that "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Id. See also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). That issue is not present in bench trials. In fact, the Ninth Circuit has noted expert testimony on "matters of law" might be permissible in some bench trials because there is "no danger that a jury might give too much credence to a legal expert." *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008), *reversed on other grounds*, *Horne v. Flores*, 557 U.S. 433 (2009).

Here, the Court is equipped at trial to assess the admissibility of discrete portions of the experts' testimony. The Court will not require any explanation of the legal background of ERISA or ESOPs and experts will not be allowed to provide such explanations. But it is often "difficult to draw the line between what are questions of law, what are questions of fact, and what are mixed questions." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997). That difficulty is especially pronounced pretrial when the context for the testimony is unknown. An expert referencing a particular provision of ERISA might, in some circumstances, be viewed as an impermissible statement regarding the governing law. But it would be unrealistic to forbid the experts here from referencing the underlying law. Drawing the appropriate line between permissible and impermissible expert testimony is better drawn during trial and not based on snippets from reports and depositions. The Secretary's request to exclude exact portions of the experts' planned

1   testimony will be denied without prejudic.

2       **B.  Secretary's Motion to Exclude Evidence of Stock Performance (Doc. 188)**

3       The Secretary seeks to exclude "evidence and testimony . . . related to the

4   performance of . . . RVR's stock after the May 28, 2014 transaction."  (Doc. 188 at 1).

5   According to the Secretary, "evidence concerning the performance of RVR or its stock

6   after the Transaction is not relevant to whether the Plan paid 'adequate consideration' for

7   the stock."  (Doc. 188 at 2).  The issue, in the Secretary's opinion, is the reasonableness of

8   the transaction as of May 2014, not "whether the investment ultimately succeeded or

9   failed."  (Doc. 188 at 3).  Defendants respond the post-transaction performance of RVR's

10  stock "is relevant and admissible" to show, among other things, the financial projections

11  used in 2014 were appropriate and the Director Defendants were not "motivated by greed

12  or the desire to secure an unfair or improper benefit" from the sale of their stock to the

13  ESOP.  (Doc. 230 at 2-3).

14      The reasonableness of the May 2014 transaction must be focused on the facts known

15  at that time.  The statutory language itself requires an ERISA fiduciary "discharge his

16  duties . . . with the care, skill, prudence, and diligence under the circumstances then

17  prevailing."  29 U.S.C. § 1104(a)(1).  *See also Fifth Third Bankcorp v. Dudenhoeffer*, 573

18  U.S. 409, 425 (2014) (noting "the content of the duty of prudence turns on the

19  circumstances prevailing at the time the fiduciary acts").  The "circumstances then

20  prevailing" indicate the assessment must be on what the fiduciaries knew at the time.

21  Courts have disagreed on this issue but the rule consistent with the statutory text is to focus

22  on the "circumstances" that existed at the exact time, not developments after the

23  fiduciaries' actions.[12]

24  _____

25  [12] When assessing the admissibility of post-transaction performance, one court held
    "[p]ost-transaction performance is irrelevant to a valuation analysis" and the sole issue is
26  whether "the facts that [were] known or knowable at the time of the transaction."  *Hans v.
    Tharaldson*, 2011 WL 6937598, at *13 (D.N.D. Dec. 23, 2011).  But a different court
27  looked to a company's post-transaction performance when assessing the reasonableness of
    a transaction.  *Walsh v. Bowers*, 561 F. Supp. 3d 973, 990 (D. Haw. 2021).  *See also Allen
28  v. GreatBanc Tr. Co.*, 835 F.3d 670, 680 (7th Cir. 2016) (noting a "post-ESOP transaction
    decline in stock value" is relevant when evaluating plausibility of claims at motion to
    dismiss stage).

While the focus must be on the circumstances at the time of the transaction, it is possible subsequent events will be relevant, such as when assessing damages. The parties do not argue this point but if the ESOP's investment increased in value after the transaction, it is not clear whether the Court can find liability even if Defendants were imprudent. On this point, the Ninth Circuit has held "ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach." *Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir. 1994). *See also Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 361 (4th Cir. 2014) ("[i]f trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund."). Thus, post-transaction events will not be relevant to assessing Defendants' actions leading up to the transaction, but it is possible they will be relevant on other aspects. The motion to exclude post-transactions events entirely will be denied without prejudice.

### C. Reliance's Motion to Exclude a Draft Policy Statement (Doc. 210)

Reliance seeks to exclude any reference to a "draft procedure statement" dated July 2012. The document outlines the policies and procedures Reliance would follow when Reliance was hired to work on ESOP transactions. Reliance describes the document as a "working copy of a policy that was never implemented." (Doc. 210 at 2). The Secretary admits the document was never formally adopted as a policy, but the Secretary seeks to use the document in interpreting other policies that were formally adopted or in proving Reliance's common practices. In particular, the Secretary wishes to use the document to show Reliance acted contrary to other policies or common practices by having only two individuals approve the transaction. (Doc. 226 at 5-6).

At present, the fact that the document does not reflect Reliance's formal policy means it is unlikely to be of significant evidentiary value. However, if the document accurately sets forth what Reliance's employees viewed as existing policies or procedures, it may be relevant to establish the Reliance employees knew the transaction should not proceed. That is, even if the document itself was never formally adopted, it may reflect

other preexisting policies or practices Reliance employees knew existed or followed in other cases.  The document may be used on cross examination to show Reliance employees violated internal policies or deviated from usual practices such that the transaction was flawed.  If the Secretary plans on using the document as direct evidence, it must be supported by proper foundation.  The Court will not exclude all references to the document.

### D. Defendants' Motion to Exclude Expert Opinions (Doc. 213)

Defendants seek to exclude all testimony from two of the Secretary's experts.  The first expert, Charles E. Wert, is expected to offer opinions "regarding whether Defendants' conduct in negotiating the transaction met the appropriate standard of care."  (Doc. 236 at 10).  The second expert, Paul Wazzan, Ph.D., is expected to offer opinions "regarding the fair market value of RVR's equity on May 28, 2014, and, if the [ESOP] overpaid, the amount of damages it suffered."  (Doc. 236 at 12).  According to Defendants, these experts are not qualified to offer their opinions nor are their opinions reliable.  Defendants' arguments are relevant for cross-examination, not for exclusion of the experts' testimony.

The admissibility inquiry under Rule 702 requires a judge "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  The task when determining admissibility is not "deciding whether the expert is right or wrong," but "whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-970.  In the context of a bench trial, the standard for hearing expert testimony is more relaxed than in a jury trial.

"*Daubert* is meant to protect *juries* from being swayed by dubious scientific testimony. When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018).  Thus, a district court may "make its reliability determination during, rather than in advance of trial."  *Id.*  If, after hearing from the experts, the district court determines they do not meet the requirements of Federal Rule of Evidence 702, the district court is free to exclude or disregard the expert

testimony.  *Id.*

**A.  Charles E. Wert**

Wert has "over 50 years of direct hands-on experience in overseeing, managing, and administering employee benefit plans designed specifically to invest in employer stock such as ESOPs."  (Doc. 213-2 at 3).  Wert worked as "an entry level Trust Administrator" but he advanced and eventually was named President and CEO of Evercore Trust Company.  Evercore provides "consulting and Trust services" to numerous large companies, such as General Motors, Chrysler, and Ford Motor Company.  When Wert retired from Evercore in 2017, it held more than $45 billion in company stock in various employee benefit plans, including ESOPs.

During his career, Wert has been involved in 30 to 40 ESOP purchase transactions. Wert was involved in the formation of an "ESOP advocacy organization that has been in existence for more than 40 years."  Wert is a coauthor in a publication titled "The Role of the Independent Fiduciary," which he describes as a reference that is still used today.  Wert is now a principal at Fiduciary Resolutions, Inc., which provides "advice to the ERISA marketplace on various aspects of fiduciary conduct in managing and overseeing retirement plans covered by ERISA."  The Secretary retained Wert to provide opinions on the conduct of Reliance as well as the conduct by the Director Defendants in overseeing Reliance's conduct.

Defendants do not challenge Wert's qualifications to offer opinions regarding the proper conduct by fiduciaries in ESOP transactions.  Instead, Defendants argue Wert is offering improper legal opinions, his opinions are unreliable because he did not personally review every document, his opinions are based on his own improper valuation of RVR's stock, and his statements regarding Defendants' "knowledge and state of mind" are improper.  (Doc. 213 at 14).

As noted earlier, the general rule is that experts may offer testimony "concerning an ultimate issue" but cannot offer testimony "on an ultimate issue of law."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).  Defendants argue Wert

violates this rule.  Wert's opinions evaluate Defendants' behavior under the "standard of care" which Wert defined as "the requirements of ERISA . . . as I understand them."  (Doc. 213-10 at 15).  Thus, when Wert offers his opinion that Defendants' conduct fell below the "standard of care," Defendants believe Wert is offering the impermissible legal opinion that Defendants violated ERISA.  It is not that simple.

Wert's view of the standard of care is derived from his understanding of the requirements of ERISA.  In explaining his opinions, Wert has been clear he was opining on his personal understanding of ERISA and not attempting to provide a definitive legal interpretation of ERISA.  In addition, Wert's deposition illustrated his view of the governing standard of care was based on his own experiences in the industry.  When asked why he did not adopt "industry best practices" as the relevant threshold for evaluating Defendants' behavior, Wert stated he "never believed that industry best practices" were the proper threshold.  According to Wert, there is no agreed upon set of "industry best practices" and it is possible that practices followed throughout the industry might be "incorrect."  (Doc. 213-10 at 15).  Thus, Wert was adamant that "the standard of care is the standard of care," meaning Wert has his own opinion, built on decades of experience, of what the standard of care requires.

Wert's view of appropriate fiduciary conduct, built on decades of experience in the relevant industry, has a sufficiently reliable basis such that it would be helpful to [the finder of fact]."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).  The Secretary should clarify the exact basis for Wert's opinion regarding the applicable standard of care, ensuring Wert is not merely offering a pure legal opinion that Defendants' violated ERISA.  At this stage, however, Wert's opinions appear to be based on his lengthy career in the exact industry about which he will testify.  Wert's opinions will not be excluded as prohibited legal opinions.

Defendants next argue Wert's opinions are not reliable because he conducted only a "limited review of the evidentiary record."  (Doc. 213 at 10).  Rule 702(b) requires an expert's opinion be "based on sufficient facts or data."  This requirement is meant to

exclude "wholly speculative or unfounded testimony." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022). The requirement contemplates there will be a sufficient "foundation" for an opinion, not necessarily that there will be sufficient "corroboration" of that opinion in all portions of the record. *Id.*

Defendants complain Wert's opinions are not based on "sufficient facts or data" because he did not review "thousands of pages" they believe are relevant. (Doc. 213 at 11). They also complain Wert had associates review and identify the relevant documents. Wert would then review those identified documents. Defendants argue an expert's opinion can be excluded if the expert did not personally review every document produced in discovery. Defendants do not cite any authority establishing such a rule and, under the governing standard, Defendants' argument is baseless.

Defendants fail to explain why it was improper for Wert to rely on the work of associates in crafting his opinions. Given the requirements of Rule 703, Wert was free to rely on reliable facts or data provided to him by others. Fed. R. Civ. P. 703 (allowing expert to rely on facts or data he has "been made aware of"). Wert's reliance on associates does not require exclusion of his opinions.

In reaching his opinions Wert reviewed sufficient documents to allow him to craft seventeen single-spaced pages outlining his view of the relevant facts. That section included information about RVR, the negotiations, and the final terms of the transaction. (Doc. 213-2 at 4-21). His opinions set forth on the subsequent seventeen pages of his report cite to underlying documents when Wert believed it was necessary to do so. Defendants argue Wert should have done more by reviewing every document produced in discovery but Defendants do not identify the allegedly crucial documents Wert overlooked. And, based on the present record, Wert reviewed sufficient documents to understand the relevant events and offer his opinion. Thus, Wert's opinions were based on sufficient facts and data.

Defendants argue Wert offers improper opinions regarding the value of RVR's stock. (Doc. 213 at 13). In particular, Defendants complain Wert offers opinions on the

correct valuation of stock that does not reflect a controlling interest in a corporation as well as the allegedly inappropriate number of shares the Director Defendants were entitled to purchase after the transaction.  The Secretary admits Wert is not being offered as an expert regarding the value of obtaining a controlling interest or the value of the stock the Director Defendants could purchase.   (Doc. 236 at 19).   Rather, Wert's opinions go to the reasonableness of Defendants' behavior in completing the transaction.  Thus, Wert will not directly critique the valuation provided to Reliance.  Instead, Wert will explain what an appropriately prudent trustee would have done to ensure that valuation was accurate.  Similarly, Wert will testify about how a prudent trustee would have negotiated with the Director Defendants regarding their entitlement to additional shares of stock after the transaction.  Based on his extensive experience regarding trustees and ESOPs, Wert is entitled to offer opinions regarding how prudent trustees would have acted in the particular circumstances Defendants faced.

Finally, Defendants argue Wert offers improper opinions regarding Defendants' knowledge and state of mind.  In his report, Wert often states the Director Defendants "knew" certain things.  For example, Wert states the Director Defendants "knew that the $105 million purchase price" was calculated under the assumption the buyer would gain control of RVR.  (Doc. 213-2).  Wert also states the Director Defendants "knew" of particular aspects of the transaction's final terms based on the fact the Director Defendants signed the documents containing those terms.  In context, the cited statements regarding knowledge are not a basis for excluding Wert's opinions.

The portions of Wert's report cited by Defendants do not support their interpretation that Wert was attempting to opine on Defendants' subjective state of knowledge.  Rather, Wert described certain things that must have been "known" by Defendants based on certain events.  For example, Wert states the Director Defendants "knew" how the $105 valuation had been calculated because they attended the meeting where the terms of that valuation were discussed.  And Director Defendants "knew" the contents of documents because Director Defendants read and signed the documents.  At present, Wert's statements appear

to be shorthand references to matters Wert believes the Director Defendants "knew or should have known."

If the Director Defendants wish to press this point at trial by arguing they did not have the "knowledge" described by Wert, they will be free to do so.  However, arguing they were unaware of how a crucial valuation was being calculated or unaware of material terms of the transaction might undermine their defense.  That is, arguing they did not inquire into matters such that they understood what was happening may be viewed as evidence the Director Defendants were not prudent.  But regardless of what will be argued at trial, Wert's opinions will not be excluded merely because of the way he describes the Director Defendants' knowledge.

**B.  Paul Wazzan, Ph.D.**

Paul Wazzan has a Ph.D. in finance from UCLA.  (Doc. 213-7 at 5).  He is currently a "Senior Managing Director" at FTI Consulting, Inc.  Wazzan also runs Wazzan & Co. Investment, LLC, "a venture capital firm providing seed-level funding to firms specializing in semiconductor . . . and related technologies."  Wazzan has worked as an adjunct professor of business and economics and taught MBA classes at universities in California.

Wazzan describes his specialty as "providing financial, economic, and statistical expertise in the areas of complex damages [and] finance," including valuation and corporate finance.  (Doc. 213-7 at 5).  Wazzan has conducted 30 to 40 valuations of closely held companies for business and tax purposes.  He has also published research in peer-reviewed economic journals and law reviews.  And Wazzan has testified many times as an expert in federal and state courts, including sometimes offering expert opinions regarding valuation.

The Secretary asked Wazzan "to determine the fair market value of RVR's equity as of May 28, 2014."  Wazzan was also asked to calculate the damages suffered by the ESOP, assuming it overpaid for the equity.  Finally, he was asked to evaluate the work of SRR in determining the value of RVR's equity.  (Doc. 213-7 at 8).  Wazzan's report consists of an overview of RVR and its industry, followed by a lengthy discussion of

various methods experts use to arrive at valuations.  Wazzan rejects certain methods for reasons outlined in his report.  Wazzan then explains why he believes the "discounted cash flow" method is appropriate and conducts an analysis of the value of RVR's equity value using that method.  Finally, Wazzan calculates the "damages due to overpayment" and critiques the valuation work performed by SRR.

Defendants argue Wazzan is not qualified to offer any opinion in this case because he "has **no** experience in ERISA or ESOP cases."  (Doc. 213 at 17) (emphasis in original). While not stated explicitly, Defendants appear to believe an expert who has not worked in ERISA or ESOP cases before can never work on such cases.  But even the world's most qualified expert in the areas of ERISA and ESOPs must have, at some point, testified for the first time in an ERISA or ESOP case.  Defendants' argument based on Wazzan's lack of ERISA or ESOP experience is not a sufficient basis to deem him categorically unqualified in this case.

Defendants also argue Wazzan's lack of ERISA and ESOP experience is relevant because Wazzan misunderstands the fundamental "standard for valuation in these types of cases."  (Doc. 213 at 18).  Defendants claim the relevant inquiry for ESOP valuations is identifying the "fair market value."  Defendants seem to believe, although they do not elaborate, that "fair market value" has a unique meaning in ERISA and ESOP cases such that experience in non-ERISA cases is not helpful.  The Secretary responds Defendants are overstating the uniqueness of the "fair market value" inquiry in ESOP cases.  The Secretary points out Defendants agree some of the best guidance for the meaning of "fair market value" in this context is found in a DOL proposed regulation.  That proposed regulation states the term "fair market value" "essentially reflects the well-established meaning of this term in the area of asset valuation."  (Doc. 236 at 26).  That meaning is: "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for that asset."  Proposed Regulation Relating to the Definition of Adequate

Consideration, 53 FR 17632-01.

Under the proposed regulation, as well as available caselaw, "fair market value" in the ESOP context has a very similar definition as "fair market value" used elsewhere. *See Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) (noting "'fair market value' is an imprecise term" but citing proposed regulation). Defendants have not established Wazzan's understanding of "fair market value" is incorrect. Therefore, this is no basis to exclude Wazzan's opinion.

Defendants' final argument regarding Wazzan's lack of experience in ERISA and ESOP cases is he is not qualified because he had to correct certain errors in his expert report once those errors were identified by a separate expert. Defendants attributed those errors to Wazzan's lack of experience in this field. Defendants also argue Wazzan has only a basic understanding of the fiduciary duties present in an ESOP transaction of this sort. The fact that Wazzan corrected errors in his report does not render him unqualified and Defendants do not cite any authority holding the correction of initial errors renders an expert unqualified. And Wazzan is not being offered as an expert regarding fiduciary duties. Thus, his knowledge of ESOP-specific fiduciary duties does not render him unqualified to offer the opinions he plans to offer.

Beyond challenging Wazzan's qualifications, Defendants challenge the reliability of Wazzan's opinions. Defendants first argue Wazzan's valuation opinion is "not predicated on any recognized valuation or appraisal standards." (Doc. 213 at 22). The Secretary responds Wazzan used the widely-known "discounted cash flow" method when reaching his valuation opinion. (Doc. 236 at 28). In their reply, Defendants argue the Secretary is "purposefully conflat[ing] professional valuation ***standards*** . . . with valuation ***methodologies***." (Doc. 239 at 11). According to Defendants, the discounted cash flow method is only a "method" within the general "income approach" of determining valuation. (Doc. 239 at 11 n.8). And if Wazzan were attempting to conduct his valuation using the "income approach," he was required to interview the Director Defendants. Because Wazzan did not conduct such interview, he was not using the "income approach" (or either

1    of the other two methods Defendants identify as legitimate).   Therefore, according to

2    Defendants, Wazzan's "value conclusion [is] unreliable."  (Doc. 239 at 12).

3        The Court will assume there is some crucial nuance to Defendants' argument that is

4    not made sufficiently clear in their briefs.   To the extent Defendants' argument is the

5    "discounted cash flow" method is never an appropriate way to value stock, that would be

6    quite surprising.   There are countless opinions accepting "discounted cash flow" as a

7    legitimate method to determine value.[13]   For example, in a tax case the Sixth Circuit

8    analyzed use of "discounted cash flow" to determine the appropriate value of shares of a

9    closely-held corporation.   *Gross v. Comm'r of Internal Revenue*, 272 F.3d 333, 340 (6th

10   Cir. 2001).   The parties in that case both used "discounted cash flow," but they disagreed

11   how the method should account for tax liabilities.  Neither the parties nor the Sixth Circuit

12   took issue with "discounted cash flow" as an appropriate way to value the shares.

13       The Third Circuit has been even clearer that "discounted cash flow" may be an

14   appropriate approach in cases such as this.  The Third Circuit believes "discounted cash

15   flow" is appropriate for "the extremely difficult task of valuing the stock of a company

16   which is privately owned and not traded on a public exchange."  *Kool, Mann, Coffee & Co.*

17   *v. Coffey*, 300 F.3d 340, 362-63 (3d Cir. 2002).   That is precisely the situation here.

18       Given existing caselaw, Defendants' argument that Wazzan erred by using the

19   discounted cash flow method is not convincing.   Defendants are free to cross-examine

20   Wazzan to attempt to undermine his valuation opinion, but Defendants have not shown

21   Wazzan's opinion based on that approach is so unreliable it must be excluded.

22       Defendants next argue Wazzan's opinions are unreliable because he used some

23   aspects of the analysis conducted by SRR in reaching his opinions.   Defendants argue

24   Wazzan was required to complete "his own valuation from the ground-up" and not "piggy-

25   back on the May 2014 valuation conducted" by SRR.  (Doc. 213 at 24).  It is very difficult

26   to believe Defendants are serious.  Defendants cite no authority that an expert cannot rely

27

28   [13] It gets even more confusing because a few pages after arguing "discounted cash flow" is inappropriate, Defendants note that SRR used "discounted cash flow" in its own valuation. (Doc. 213 at 25).

on the work of others when reaching his conclusion, and experts often do so.  There is no requirement that an expert conduct a valuation "from the ground-up" and Defendants do not define what is "from the ground-up."  Presumably that would require an expert personally visit and determine the value of each piece of real property owned by RVR, review each recreational vehicle used by RVR to determine its value, assess the performance of each employee to determine if the employee's salary was appropriate, assess the condition and value of office furniture, and the list could go on.  No such "ground-up" process is required by law.  To the extent Defendants believe Wazzan did not review crucial information or relied on incorrect aspects of SRR's valuation, they can inquire into those areas during trial.

Finally, Defendants argue Wazzan's opinion regarding the damages suffered by the ESOP is unreliable.  Wazzan calculated the amount the ESOP could have recovered had it paid the appropriate value for the RVR equity and then invested the remaining balance in a diversified stock portfolio.  Defendants argue this opinion is unreliable because the Director Defendants never would have sold their equity for "only" the amount Wazzan determined it was worth (approximately fourteen million).  Defendants also point out that it would have been illegal for RVR to loan the ESOP funds to invest in the stock market. It is not clear why Defendants believe these objections require the exclusion of Wazzan's damages opinion at this stage.

Assuming the Secretary were to prevail on the merits, Ninth Circuit authority requires damages be calculated as "at least the entire cost of the prohibited transaction." *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 887 (9th Cir. 2019).  The "cost" usually will be "the illegal compensation plus the lost opportunity cost."  *Id.*  Given that authority, Defendants have not established Wazzan's opinion is so unreliable that it cannot be considered.

Defendants argue the Director Defendants would not have sold their stock for only fourteen million.  But that appears to be irrelevant at this stage.  Defendants cannot insist they would not have sold their stock for any amount less than $105 million and, therefore,

the ESOP suffered no damages.  Adopting that position would mean no suit of this type could ever succeed.  In addition, while Defendants argue a loan from RVR to the ESOP to invest in stock would have been illegal, Defendants do not explain why it is, per se, inappropriate to calculate opportunity costs in this manner.

In brief, Defendants have not explained how opportunity cost damages should be calculated in cases of this type and why Wazzan's approach is forbidden.  If Defendants believe opportunity cost damages are, as a matter of law, unavailable, they are free to make that argument.  At present, Wazzan will be permitted to offer his damages opinion subject to the Court determining its reliability.

**E.  Director Defendants' Motion to Exclude Notes Taken by Financial Advisor (Doc. 223)**

RVR hired Chartwell "to provide financial advisory and investment banking services to explore the possibility of forming an ESOP." (Doc. 223 at 3).  In working with RVR and the Director Defendants, a Chartwell employee named Stephanie Geerdes "took personal notes of some, but not all, of the communications allegedly made during . . . meetings and phone calls" with RVR personnel and other advisors.  (Doc. 223 at 3).  The notes present an unflattering depiction of the transaction.  For example, one note indicated RVR's stated "growth rate" was "great but not realistic." (Doc. 223-1 at 3).  Another note referenced the expected debt the ESOP would incur as "$100m is a big #--and a lot of debt." (Doc. 223 at 6).  The Director Defendants seek to exclude Geerdes' notes in their entirety, arguing they are inadmissible hearsay.  The Secretary responds the notes are not hearsay and, even if they are, they may be admissible as business records or recorded recollections.

The Secretary argues he may use Geerdes' notes for a nonhearsay purpose, such as proving the Director Defendants' knowledge.  *See United States v. Castro*, 887 F.2d 988, 1000 (9th Cir. 1989) (stating credit reports offered at criminal trial were not hearsay because they were "introduced to show what information was available to [the defendant] at the time he approved loans"); *Kunz v. Utah Power & Light Co.*, 913 F.2d 599, 605 (9th

Cir. 1990) (stating press releases regarding flooding "were not offered to prove their truth, but rather to show that the [plaintiffs] had notice of the potential flooding"). The Director Defendants' motion does not address this possibility. At present, the Court is skeptical the notes will be relevant if they are not being offered for their truth.[14] In any event, at present, the Secretary likely will be required to prove an exception to the hearsay rule should he wish to admit the notes.[15]

The present record shows the notes might qualify for admission under the recorded recollection exception.[16] During her deposition, Geerdes professed a lack of memory regarding the meeting and the notes. And while somewhat ambiguous, she also seemed to admit she did make the notes, the notes were made when the matter was fresh in her memory, and the notes generally were accurate. Fed. R. Evid. 803(5). And forensic evidence might establish they are Geerdes' notes. Thus, the notes likely are admissible under the recorded recollection exception. The Director Defendants' request to exclude the notes pretrial will be denied.

### F. Director Defendants' Motion to Exclude Two Emails from Financial Advisors (Doc. 224)

The Director Defendants seek to exclude two emails sent from a Reliance employee to employees of Chartwell. The first email includes statements regarding a "blocking right" the Director Defendants were seeking to have included in the transaction. That

---

[14] The knowledge that someone made these statements would seem to have little importance unless the statements were true. In other words, the Director Defendants' actions taken after these statements are relevant only assuming the statements are true.

[15] It may be possible, with foundation, that Geerdes could qualify as the Director Defendants' agent such that her notes would be nonhearsay under Rule 801(c)(2)(D). Neither the Secretary nor Director Defendants address this possibility.

[16] The Secretary also argues the notes might qualify as business records. The Ninth Circuit has noted business records under Rule 803(6) "includes personal records kept for business reasons." *United States v. Huber*, 772 F.2d 585, 591 n.4 (9th Cir. 1985). Thus, the Ninth Circuit concluded a gun collector's personal inventory of his rifles qualified as a business record. Similarly, the diary of a taxpayer's coworker reflecting the amount received in tips was deemed a business record that could be used to establish how much in tips a taxpayer received. *Keogh v. Comm'r*, 713 F.2d 496, 499 (9th Cir. 1983). Those two cases adopt an exceptionally expansive view of what can qualify as a business record. But even under a much less expansive view, notes taken by a Chartwell employee, of business meetings, at or near the time of the meetings, to help the employee perform her job, might be admissible as business records.

"blocking right" refers to a right the Director Defendants wished to retain such that they could prevent the sale of RVR after the ESOP owned all the stock.  The email indicates the Reliance employee believed the Director Defendants insisting on such a right might put them "in hot water with the DOL."  (Doc. 224-1 at 4).  The second email is from a Reliance employee to a Chartwell employee that indicates Bensen kept going "to the plate to bat again and again on the [compensation] issues," referring to the compensation the Director Defendants would be entitled to receive after the transaction.  The Reliance employee stated the Director Defendants "have gotten almost everything they asked for" and if the "deal [was] audited by DOL," the Director Defendants would have to modify some provisions.   The Reliance employee cautioned that "[p]igs get fat and hogs get slaughtered."  (Doc. 224-1 at 6).

The Secretary believes these emails indicate Reliance had significant concerns with the terms the Director Defendants were pursuing.  Reliance has not moved to exclude the emails.  The Director Defendants, however, argue the emails should be excluded because there is no evidence the Director Defendants were aware of the emails and Chartwell was not acting as their agent at the time the emails were sent.  These arguments do not provide any basis for exclusion.

As best as the Court presently understands, the Director Defendants believe the only basis on which the emails might be introduced is to establish the Director Defendants had knowledge of the contents of the emails.  That is not accurate.  The Secretary points out the emails "are relevant to [his] claims regardless of the [Director Defendants'] knowledge of the emails."  (Doc. 228 at 6).  That is, the emails will be used, among other things, to establish "Reliance's deficient negotiating."  (Doc. 228 at 6).  While it is undisputed the emails may be used at trial against Reliance, precisely how the emails may be used against the Director Defendants is better evaluated during trial when all the facts are presented.  At that point, the exact context for offering the emails will be known.  And in particular, the Director Defendants will have an opportunity to explain, if possible, how Chartwell was not acting as their agent when Chartwell was conducting negotiations on their behalf.  The

Director Defendants' request to exclude the emails will be denied.

### III.   Secretary's Motion for Summary Judgment (Doc. 225)

The Secretary seeks summary judgment regarding four discrete aspects of his various claims. Some of those aspects involve only Reliance while others involve only the Director Defendants. The Court will analyze the four requests separately.

### A.  Reliance Was a Fiduciary

The Secretary requests the Court

> rule as a matter of law that . . . [Reliance] was a fiduciary of the RVR [ESOP] who caused the [ESOP] to engage in a transaction Reliance knew or should have known was a transaction as defined in ERISA sections 406(a)(1)(A) and (D) . . . when it caused the [ESOP] to enter into a May 28, 2014 transaction to purchase 100% of the shares of RVR, Inc. stock.

(Doc. 225 at 7). Reliance responds it "has already admitted that it was a fiduciary in connection with the ESOP Transaction at issue, and that the transaction constituted an (exempt) prohibited transaction under ERISA." (Doc. 244 at 4). While Reliance does not use the exact same language as the Secretary, the Court interprets the Secretary and Reliance as agreeing 1) Reliance was a fiduciary of the RVR ESOP, 2) who caused the ESOP to engage in the May 28, 2014, transaction, and 3) Reliance knew or should have known the transaction qualified as a "prohibited transaction" under ERISA. Because of the special exemption from prohibited transactions for ESOP transactions, these facts do not establish Reliance's liability. Rather, these facts merely establish the foundation on which liability might be predicated. Because Reliance does not oppose the Secretary's request, the Court will grant summary judgment that these facts are established.

### B.  Director Defendants acted as Fiduciaries

The Secretary seeks summary judgment the Director Defendants "acted as Plan fiduciaries . . . when they retained Reliance as the Plan's trustee for the Transaction, and therefore had a duty under ERISA . . . to monitor Reliance's conduct as Plan trustee." (Doc. 225 at 7). The Director Defendants largely agree the Secretary is entitled to this ruling, but they disagree on two minor points.

According to the Director Defendants, Randall Smalley and Robert Smalley, Jr., were acting as plan fiduciaries when, in their positions on the RVR Board of Directors, they caused RVR to retain Reliance.[17]  (Doc. 245 at 19).  The Director Defendants argue, however, Bensen was not a member of the RVR Board of Directors at the relevant time and, therefore, Bensen cannot be deemed a fiduciary at the relevant time.  Untangling Bensen's status is surprisingly difficult because the underlying documents were often executed by Bensen, seemingly establishing he was acting as a fiduciary.  However, the Director Defendants are adamant Bensen never had the authority to act as a fiduciary.  While the Director Defendants have made a valiant effort at obscuring matters, the undisputed documents and governing law establish Bensen was acting in a fiduciary role when he executed the agreement retaining Reliance.

The following facts are undisputed.  On April 15, 2014, Reliance sent Bensen an engagement letter explaining the terms under which Reliance would serve as a trustee and fiduciary for the planned ESOP.  (Doc. 215-5 at 33).  That letter was signed by Bensen, ostensibly in his role as Chief Financial Officer for Cruise America.[18]  (Doc. 215-5 at 36).  On May 22, 2014, Bensen, identified as RVR's Chief Financial Officer, executed the formal Trust Agreement with Reliance.  (Doc. 215-5 at 30).  That agreement purported to supersede the engagement letter.  (Doc. 215-5 at 26).  Finally, on May 22, 2014, RVR's Board of Directors (the Smalleys), ratified the Trust Agreement Bensen had executed with Reliance.  (Doc. 215-9 at 2).

---

[17] The opposition is not entirely clear on this point.  The Smalleys argue RVR, not the Smalleys, "retained Reliance to serve as the ESOP Trustee." (Doc. 245 at 18).  In addition, "only the RVR Board could cause RVR to engage Reliance as a matter of law." (Doc. 245 at 19).  But the Smalleys admit "the only members of the RVR Board were the two Smalleys." (Doc. 245 at 19).  In other words, the Smalleys concede they made the decision to retain Reliance by taking actions as members of RVR's board.  The Smalleys do not explain how these facts could be interpreted other than proving they were acting as fiduciaries.  In any event, the Secretary interprets the Smalleys as having conceded they were fiduciaries and the undisputed facts establish the Smalleys were fiduciaries.

[18] The letter stated the ESOP would be established by Cruise America and be known as the Cruise America ESOP.  The Director Defendants argue that was an error and the letter "should have referenced RVR and the RVR ESOP (rather than Cruise America and the Cruise America ESOP)." (Doc. 246 at 8).  According to Reliance, however, there was no such error.  According to Reliance, it was "engaged by Cruise America, Inc. (an operating subsidiary of RVR) to serve as discretionary trustee in connection with a proposed ESOP transaction." (Doc. 244 at 5).

1    Despite these facts showing Bensen's involvement in the retention of Reliance and

2    execution of the Trust Agreement, the Director Defendants argue Bensen was not acting as

3    a fiduciary when taking those actions.  The Director Defendants explain things this way:

4    Neither the RVR Board of Directors nor the Cruise America,
     Inc. Board of Directors delegated to Eric Bensen the

5    discretionary authority to engage Reliance as the trustee of the
     to-be-formed RVR ESOP; rather, the RVR Board only

6    delegated to Eric Bensen the power to sign the Reliance
     Engagement Letter and Trust Agreement on behalf of RVR.

7

8    (Doc. 246 at 7).  To the extent the Court can understand this argument, the Director

9    Defendants appear to believe Bensen was not acting as a fiduciary because he was merely

10   taking actions that had been delegated to him by RVR.  To the extent this is the Director

11   Defendants' argument, it was rejected long ago.

12   In *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459 (9th Cir. 1995), a pension plan

13   identified the corporation as the "named fiduciary."  Two executives of the corporation

14   involved in the termination of the pension plan, and other transactions, were sued for

15   allegedly breaching their fiduciary duties.  Those executives argued they could not be

16   deemed "fiduciaries because they acted solely on behalf" of the corporation.  *Id.* at 1458.

17   In other words, the executives believed that those "who act on behalf of the corporation do

18   not become individual fiduciaries by virtue of those acts," regardless of the nature of those

19   acts.  *Id.* at 1459.  The Ninth Circuit rejected this argument in straightforward terms: if an

20   individual "exercises any authority or control respecting management or disposition of [a

21   plan's] assets," he will be a fiduciary, regardless whether he was "exercising discretion 'on

22   behalf of a corporation'" or if he had an "individual discretionary role[]."  *Id.* at 1459-60

23   (quoting 29 U.S.C. § 1002(21)).

24   Applying *Kayes* to the present situation is simple.  The Director Defendants concede

25   the execution of the engagement letter was a fiduciary act.  It is undisputed Bensen

26   executed that letter.  Thus, regardless of whether Bensen was acting pursuant to some sort

27   of delegation from RVR or if he was acting in an individual discretionary role of some sort,

28

he can be sued as a fiduciary.[19]  *See CSA 401(K) Plan v. Pension Pros., Inc.*, 195 F.3d 1135, 1138 (9th Cir. 1999) ("A person's actions, not the official designation of his role, determines whether he enjoys fiduciary status, regardless of what his agreed-upon contractual responsibilities may be.").

The only other aspect of the Secretary's request the Director Defendants dispute involves an issue the Secretary did not brief because he does not seek summary judgment on.  According to the Director Defendants, the Secretary has misdescribed the scope of their duty to monitor Reliance.  In particular, the Director Defendants point to the Secretary's statement "the Director Defendants had a fiduciary duty . . . to ensure the Transaction was in the Plan's best interests."  (Doc. 225 at 12).  The Director Defendants claim that is incorrect and their duty to monitor did not require them to ensure the transaction was in the ESOP's best interest.  (Doc. 245 at 22).  Because the Secretary did not seek summary judgment on the scope of the duty to monitor, the Director Defendants' insistence that the Secretary is incorrect is immaterial.

## C. Director Defendants as Co-Fiduciaries with Reliance

The Secretary seeks summary judgment the Director Defendants "were co-fiduciaries with Reliance."  (Doc. 225 at 7).  In particular, the Secretary argues the Director Defendants should be found to have been co-fiduciaries with Reliance based on the Director Defendants' status as ESOP committee members.  This dispute involves a strange issue regarding backdating documents.

According to the underlying documents, the ESOP committee (consisting of the Director Defendants) was formed on May 28, 2013.  Reliance was selected as the trustee in early 2014 and was replaced by another company on June 30, 2014.  (Doc. 245 at 24).  Thus, the Secretary requests a ruling that the Director Defendants were co-fiduciaries with Reliance from May 28, 2013, to June 30, 2014.  The Director Defendants make a limited argument in response.

---

[19] It is possible the Director Defendants are attempting to argue Bensen had no discretion when retaining Reliance such that Bensen cannot qualify as a fiduciary.  But if that is Bensen's position, the opposition does not present clear arguments on this point.  Bensen is free to reurge this at trial if appropriate.

According to the Director Defendants, they could not have been co-fiduciaries with Reliance as of May 28, 2013, because "the ESOP Committee was not created until May 28, 2014." (Doc. 245 at 24). The Director Defendants argue the 2013 date was a "typographical error" and the charter should have read "May 28, 2014." (Doc. 246-3 at 3). The Secretary responds, however, that using the 2013 was no mistake. Rather, the Director Defendants used 2013 "to reap the resulting tax benefits for an additional year." (Doc. 271 at 10). As evidence the 2013 date was intentional, the Secretary points out the plan document as well as the trust agreement both stated they were established as of June 1, 2013. (Doc. 246-3 at 20; Doc. 215-5 at 6). Accordingly, the Secretary is correct the use of 2013 on the ESOP Committee Charter was intentional.

The fact the Director Defendants backdated the charter creates a strange temporal problem that may not matter. There is no evidence the Director Defendants took any actions in May 2013 regarding the ESOP transaction. In fact, there is no evidence the Director Defendants were even contemplating an ESOP in May 2013. Therefore, at present, there is no reason to believe their liability will turn on whether the Director Defendants were co-fiduciaries as of 2013. *See Al Stewart v. Saakvitne*, No. CV 18-00155 SOM-WRP, 2021 WL 951590, at *10 (D. Haw. Mar. 12, 2021) ("It is not clear how [the defendants] exercised discretionary authority or discretionary control respecting management of a plan that was not even being considered at the time."). To the extent the Secretary seeks a legal ruling that the Director Defendants were co-fiduciaries as of 2013, that request will be denied. If such a finding is, in fact, needed and supported by the facts, the Secretary may renew this request at trial. *See Al Stewart v. Saakvitne*, No. CV 18-00155 SOM-WRP, 2021 WL 951590, at *11 (D. Haw. Mar. 12, 2021) (noting government had not shown how it "makes any sense" to deem defendants fiduciaries based on date set forth in document when no relevant actions were taken at that time).

The remaining question is whether the Director Defendants should be deemed co-fiduciaries with Reliance as of the important dates in 2014, when the transaction was discussed and executed. The Secretary's motion, however, does not make any arguments

1   other than the backdating of documents.  (Doc. 225 at 18-19).  Because it is unclear whether

2   the backdating of documents is sufficient on its own, the Court will leave for trial the exact

3   date the Director Defendants became co-fiduciaries through other actions beyond

4   backdating documents.

5        **D. Indemnification Provisions**

6          The Secretary seeks summary judgment the "indemnification provisions in the Plan

7   document, Reliance Engagement Letter, and Trust Agreement are void as against public

8   policy."  (Doc. 225 at 19).  In support, the Secretary cites a provision of ERISA which has

9   been interpreted to prohibit any attempt at "indemnification of a fiduciary by the ERISA

10  plan itself." *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009).  The theory behind

11  that provision is that allowing a plan to indemnify a fiduciary "would, in effect, relieve the

12  fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery

13  from the fiduciary for breaches of fiduciary obligations." *Id.*  The Director Defendants

14  respond the indemnification provisions contemplate payments from RVR, not the ESOP.

15  Therefore, the Director Defendants argue indemnification is permissible.  Reliance

16  responds the indemnification provisions are not prohibited by ERISA because they do not

17  apply should Reliance be found liable.  Reliance also argues it would be permissible for

18  RVR to provide indemnification as its assets are distinct from the assets of the ESOP.

19  Based on the present record, the Secretary is not entitled to summary judgment that the

20  provisions are unlawful.

21         There are four indemnification provisions at issue.  The first provision is found at

22  Section 12.6 of the plan document.  (Doc. 215-8 at 3).  That section states

23              **Legal Action**.  Unless otherwise prohibited by law, either

24              [RVR] or the Trust, in the sole discretion of [RVR], will
                reimburse [Reliance] and/or the [ESOP Committee] for all

25              costs, attorneys fees and other expenses associated with any
                such claim, suit or proceeding.

26  The second provision is found at Section 12.14 of the plan document.  That section states

27
                **Limitation of Liability and Indemnification**.  In addition to

28              and in furtherance of any other limitations provided in the Plan,
                and to the extent permitted by applicable law, [RVR] will

1
2
3
4
5

> indemnify and hold harmless its board of directors (collectively and individually), if any, the [ESOP Committee] (collectively and individually), if any, and its officers, Employees, and agents against and with respect to any and all expenses, losses, liabilities, costs, and claims, including legal fees to defend against such liabilities and claims, arising out of their good-faith discharge of responsibilities under or incident to the Plan, excepting only expenses and liabilities resulting from willful misconduct.[20]

6
7
8
9
10
11
12
13
14

The third provision is found in the engagement letter signed by Bensen with Reliance.  That letter included language stating RVR[21] would indemnify Reliance and its employees "from any and all claims, damages, expenses, liabilities, and losses whatsoever" related to Reliance's work as trustee.  But that provision also stated the indemnification would "not apply to any claim, damage, expense, liability, or loss that is attributable to . . . bad faith, breach of fiduciary duty under ERISA, gross negligence, [or] willful misconduct."  (Doc. 215-5 at 34).  The fourth and final indemnification provision is found in the trust document. That provision provides Reliance with the same types of indemnification as found in the engagement letter.  (Doc. 215-5 at 27-28).

15
16
17
18
19
20
21

The Secretary, the Director Defendants, and Reliance have two basic disagreements regarding these provisions.  First, whether the limitations that indemnification will be allowed "unless otherwise prohibited by law," "to the extent permitted by applicable law," and not for "breach of fiduciary duty under ERISA," mean the provisions are lawful.  And second, whether it would be permissible for RVR to provide indemnification given that the ESOP owns 100% of RVR's stock.[22]  The provisions are not, on their face, unlawful and

22
23
24
25
26
27
28

[20] The language of the two plan provisions was changed in 2018.  Those changes do not have any material impact.  And some indemnification may have occurred prior to 2018. Thus, the legality of the stated plan provisions remains a live dispute.

[21] The letter actually identifies Cruise America Inc. as the company that would provide indemnification.

[22] The Secretary has not explained why it wishes to litigate the legality of the indemnification provisions at this time.  It is possible the Secretary believes it is improper for RVR to advance any litigation expense to the Director Defendants or Reliance to defend this suit.  But the Secretary has not established RVR is doing so for the Director Defendants and, while Reliance requested RVR advance funds, RVR has refused to do so.  Assuming the Secretary is concerned with the advancement of litigation expenses for the Director Defendants, the Secretary has not established such advancement would be improper.  In 1977, the Department of Labor stated a contract provision allowing for the advancement of defense costs did not violate ERISA's prohibition on indemnification of fiduciaries. DOL Opinion Letter, 1977 WL 5446.  And the Secretary has not cited any more recent

the legality of RVR providing indemnification should await resolution of the Secretary's claims on their merits.

The provisions prohibit indemnification in the event such indemnification is prohibited by law.  In effect, the provisions remove any possibility indemnification will occur if doing so would violate ERISA.  The Secretary argues the caveats do not render the provisions lawful, but the Secretary does not meaningfully develop this argument.  Instead, the Secretary relies on a case that involved indemnification provisions that did not contain the type of caveats found here.

In *Johnson v. Couturier*, 572 F.3d 1067, 1074 (9th Cir. 2009), the Ninth Circuit addressed provisions that promised indemnification so long as the fiduciaries did not engage in "'deliberate wrongful acts' or 'gross negligence.'"  The Ninth Circuit noted these provisions "effectively limit[ed]" the fiduciaries' "liability under ERISA, because, so long as they do not engage in deliberate wrongful acts or gross negligence, [the fiduciaries would] be indemnified—even if they violated the ERISA 'prudent man' standard of care."  *Id.* at 1078.  Thus, the Ninth Circuit found the indemnification provisions were likely to be found void.  *Id.* at 1080.

Unlike the agreements in *Johnson*, the indemnification provisions here may not indemnify the fiduciaries in the event they are found to have violated ERISA.  That is, the provisions applicable to the Director Defendants are limited to providing indemnification "[u]nless otherwise prohibited by law" and "to the extent permitted by law."  These provisions will not apply if the Director Defendants are found liable under ERISA and the assets of RVR are deemed assets of the ESOP for purposes of indemnification.  As for Reliance, indemnification will not occur if it is "prohibited by law" or it is found liable for "breach of fiduciary duty under ERISA."  Thus, if the assets of RVR are deemed assets of the ESOP, there is no chance Reliance will be indemnified contrary to ERISA.  The indemnification provisions are not void on their face.

The Secretary's second argument regarding the indemnification provisions is that

authority establishing advancement of defense costs is improper in all circumstances.

they are unlawful because payments by RVR would be, in effect, payments by the ESOP. This involves a difficult issue regarding when a company completely owned by an ESOP can indemnify fiduciaries out of ostensibly company assets. There is a strong argument in support of the Secretary's position that RVR cannot provide any indemnification. In *Johnson*, the Ninth Circuit concluded indemnification by a company owned by an ESOP would be improper. *Johnson*, 572 F.3d at 1080-81. But *Johnson* addressed a potentially distinguishable factual situation where the underlying company was being liquidated. *Id.* at 1080. Here, RVR continues to operate and that might be a reason to determine indemnification by RVR would be permissible. This is an issue the Court need only address if the Secretary prevails on the merits.[23] Because the Secretary has not sought to prevent the advancement of defense costs, the legality of indemnification by RVR will await a decision on liability.

## IV.   Reliance's Motion for Summary Judgment (Doc. 211)

Reliance seeks summary judgment on what appears to be a relatively minor aspect of the Secretary's breach of fiduciary duty claim. One of the claims the Secretary is pursuing against Reliance is described in the complaint as a claim that Reliance breached "fiduciary duties of loyalty, prudence, and adherence to plan documents." (Doc. 182 at 15). Reliance seeks summary judgment regarding the "claim for breach of the duty of loyalty." (Doc. 211 at 1). According to Reliance, the Secretary lacks "unique facts . . . supporting any breach of the duty of loyalty." Instead, all the evidence the Secretary has accumulated can only be viewed as potentially supporting a claim for breach of the duty of prudence. The Secretary disagrees, claiming the duties of loyalty and prudence significantly overlap and he has sufficient evidence to establish both types of breaches.

Neither Reliance nor the Secretary has explained why this dispute is worth litigating at summary judgment. At trial, the Secretary plans to present evidence of the many ways

---

[23] If Defendants prevail, it likely will be lawful for RVR to provide indemnification, even assuming RVR's funds should be viewed as plan assets. *See Packer Eng'g, Inc. v. Kratville*, 965 F.2d 174, 176 (7th Cir. 1992) ("How could anyone take seriously the proposition that ERISA forbids the indemnification of fiduciaries wrongly accused of misconduct . . . ?"); *Leigh v. Engle*, 858 F.2d 361, 368 (7th Cir. 1988) (allowing trust to reimburse fiduciaries for successfully defending claims).

he believes Reliance acted contrary to how a faithful fiduciary would have acted. Reliance concedes the Secretary has sufficient evidence to proceed to trial on one subspecies of fiduciary breach (*i.e.*, breach of the duty of prudence), but Reliance believes the Secretary lacks sufficient evidence to proceed to trial on a different subspecies of fiduciary breach (*i.e.*, breach of the duty of loyalty). By statute, however, the same relief will be available regardless of which subspecies of fiduciary breach the Secretary establishes. That is, the statute outlining the available relief does not describe certain relief as available only when a particular type of fiduciary breach is proven. 29 U.S.C. § 1109(a). Therefore, Reliance's decision to seek summary judgment is puzzling and the Court need not wade too far into this issue.

ERISA's duty of prudence "demands that fiduciaries act with the type of 'care, skill, prudence, and diligence under the circumstances' not of a lay person, but of one experienced and knowledgeable with these matters." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1133 (9th Cir. 2013) (quoting 29 U.S.C. § 1104(a)(1)(B)), *vacated on other grounds*, 575 U.S. 523 (2015). ERISA's duty of loyalty demands a fiduciary "'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries' and for the exclusive purpose of 'providing benefits to participants and their beneficiaries' and 'defraying reasonable expenses of administering the plan.'" *California Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1045 (9th Cir. 2001) (quoting 29 U.S.C. § 1104(a)(1)(A)). The Secretary has ample evidence to proceed to trial that Reliance breached the duty of prudence. The Secretary argues much of that same evidence could be viewed as supporting a breach of the duty of loyalty. The Secretary is correct. The following is a brief overview of the evidence supporting a breach of the duty of loyalty, viewed in the light most favorable to the Secretary.

The Secretary argues it was in Reliance's interest to ensure the transaction proceeded for two basic reasons. First, Reliance relied on Chartwell for business referrals. Chartwell referred Reliance to RVR and the record does indicate Reliance and Chartwell often worked together. (Doc. 248-4 at 43-44). In addition, Chartwell was promised

$600,000 if the transaction closed but only $75,000 if it did not.  Thus, Reliance knew that preventing the transaction by negotiating too hard would result in a significant loss to Chartwell.  Imposing such a loss on Chartwell reasonably could have led to Chartwell to decline work with Reliance in the future.  If, however, Reliance agreed to terms Chartwell proposed, Reliance could expect future business referrals from Chartwell.  The Secretary argues Reliance had these considerations in mind when approving the transaction and Reliance breached the duty of loyalty.

There is no clear evidence Reliance had the motivation ascribed to it by the Secretary.  But it is certainly unlikely a Reliance employee would admit to a forbidden motivation.  Thus, the Secretary may argue that the motivation can be divined from viewing all of the surrounding circumstances.  At summary judgment, Reliance's questionable behavior in approving the transaction creates a reasonable inference that Reliance was motivated by its own interests.

The second piece of evidence regarding Reliance's breach of the duty of loyalty is that if the transaction closed, Reliance could expect ongoing payments as the ESOP's trustee.  If the transaction failed, no such fees would be paid.  Again, there is no obvious evidence Reliance's behavior was attributable to desire to reap ongoing payment as the trustee for the newly formed ESOP.  But, if the Secretary is correct and the transaction was gravely flawed, there is a reasonable inference that Reliance was acting in its own self-interest instead of solely in the ESOP's interest.  This evidence is sufficient to survive summary judgment on the breach of loyalty claim.

## V.    Director Defendants' Motion for Summary Judgment (Doc. 220)

The Director Defendants seek summary judgment on all the Secretary's claims. This motion should not have been filed as the papers establish there are obvious disputes of material fact regarding the claims against the Director Defendants.

### A. Breach of Fiduciary Duty

The Director Defendants seek summary judgment on the Secretary's breach of fiduciary duty claim.  The Director Defendants argue that, as fiduciaries, they had only a

"narrow" or "limited" duty to monitor Reliance and they claim the record establishes they satisfied that duty.  The Secretary responds the duty is not as limited as the Director Defendants argue it to be.  Moreover, the Secretary argues there were obvious signs a reasonable fiduciary would not have tolerated Reliance completing the transaction under the applicable terms.  The Secretary is correct.

When, as here, "members of an employer's board of directors have responsibility for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention." *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009).  This duty involving selection and especially retention is often described as a "duty to monitor."  The Department of Labor's formal guidance explains one fiduciary's "duty to monitor" the performance of other fiduciaries requires review of the other fiduciaries' performance "[a]t reasonable intervals . . . to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."  The Department of Labor noted "[n]o single procedure will be appropriate in all cases," and fiduciaries with the duty to monitor must consider the particular "facts and circumstances" in determining how best to accomplish the required monitoring.  29 C.F.R. § 2509.75-8(FR-17).

The recognition there is no universally appropriate method of monitoring other fiduciaries has prevented the development of a simple standard by which to assess an appointing fiduciary's performance.  In trying to describe the standard, one court used general language that fiduciaries who appoint other fiduciaries must "act with an appropriate prudence and reasonableness" when monitoring their appointees' behavior. *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984).  Another court concluded the duty to monitor might include the "duty to prevent wrongful conduct."  *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992).  In general, however, courts have not attempted to provide a more concrete formulation of the duty to monitor than what is found in the DOL guidance. Instead, courts cite the DOL guidance and examine the precise details of what the appointing fiduciaries did or did not do.  *See, e.g.*, *Howell v. Motorola, Inc.*, 633 F.3d 552,

573 (7th Cir. 2011).

Despite caselaw not imposing any clear standard, the Director Defendants propose the Court adopt a three-part test to evaluate their duty to monitor in connection with the appointment of the ESOP trustee.  Under the proposed test, appointing fiduciaries must select and appoint an independent trustee, provide that trustee with "all material information relating to the proposed transaction," and investigate any "red flags that indicate that the trustee was not fulfilling its own fiduciary duties."  (Doc. 220 at 28-29).  The Secretary correctly points out no such three-part test exists.  The proper test is whether, under the circumstances, the appointing fiduciaries acted in a reasonable and prudent manner.  That cannot be reduced to a simple three-step analysis.  But for present purposes, even accepting the Director Defendants' test, there were more than enough red flags with this particular transaction to alert any reasonable fiduciary.  In fact, when viewed in the light most favorable to the Secretary, the record contains a remarkable number of red flags.

Before discussing some of the red flags, the Director Defendants make a preliminary argument that they "lacked knowledge as to how private-company stock is valued or what valuation methodologies, premiums, and discounts should be considered."  (Doc. 220 at 38).  The Director Defendants appear to believe they can claim ignorance of valuation methodologies and, therefore, not be held responsible for the valuation used by Reliance.  But the Director Defendants are incorrect.  Professed "lack of knowledge" cannot be the absolute defense the Director Defendants wish it could be.

The Director Defendants were required to act with "the care, skill, prudence, and diligence under the circumstances then prevailing."  29 U.S.C. § 1104(a)(1).  This standard requires individuals who do not understand what is going on take steps to ensure that deficit is remedied before action is taken.  Otherwise, ERISA fiduciaries could always avoid liability by professing ignorance.  In this case, the Director Defendants' professed lack of knowledge regarding proper valuation could be used to excuse their behavior no matter how extreme the valuation from Reliance was.  For example, if Reliance had made an offer to purchase RVR for seven times what was paid, approximately $700 million, the Director

Defendants presumably would have known Reliance was not acting reasonably.  And they would have known that despite lack of detailed knowledge regarding "how private-company stock is valued."

Here, if the Secretary's expert is believed, the appropriate valuation of RVR stock was approximately $14 million.  Yet the Director Defendants allowed Reliance to enter into a transaction with a purchase price of $105 million, more than seven times the actual value.  Thus, lack of precise knowledge of how private-company stock is valued would not be needed to know something was off.  This is not a situation where the competing valuations were close such that the Director Defendants' professed ignorance of proper valuation techniques might be more persuasive at summary judgment.  Rather, if the Secretary is correct, the purchase price itself was a massive red flag that Reliance was behaving unreasonably.

Despite professing ignorance of the intricacies of valuing privately held companies, and assuming the Secretary's evidence is believed, the Director Defendants knew Reliance's valuation was flawed.  The Director Defendants argue they were not aware of the exact valuation method Reliance was using but the record contains evidence the Director Defendants' agent had significant information about how Reliance was calculating value.  There are indications that information reached the Director Defendants, in at least some manner.  (Doc. 250-4 at 20) (conference call notes stating Bensen was present when Chartwell learned the line of credit was being ignored).

At the very least, the Director Defendants were aware Reliance was calculating RVR's value without taking into account RVR's line of credit.  That line of credit had not dipped below $43 million in recent years.  The Director Defendants argue there was a reasonable explanation for the valuation to ignore that line of credit, but the Secretary counters there was not.  For purposes of summary judgment, all that matters is that there is a question of fact whether a reasonable and prudent valuation of RVR would ignore so much debt.  There is no evidence the Director Defendants inquired into why ignoring such a seemingly large amount of debt was proper.  A reasonable and prudent fiduciary likely

1   would have done so.

2       The next possible red flag involving Reliance's valuation was that prior valuations

3   roughly equivalent to Reliance's offer had been for the value of having control over RVR.

4   At the very early stages of considering an ESOP, the Director Defendants were informed

5   by Chartwell that RVR had a "*controlling* interest equity value of $100.7 million."

6   (emphasis added).  Despite that, the Director Defendants allowed Reliance to agree to a

7   very similar transaction price for a *non-controlling* interest.  Viewed in the light most

8   favorable to the Secretary, the same value being used for controlling and non-controlling

9   interests should have been a red flag.

10      There is little dispute the Director Defendants knew the ESOP was not gaining a

11  controlling interest.  Under the terms of the transaction, the ESOP was required to confirm

12  the election of the Director Defendants as the sole members of the RVR board of directors.

13  The Director Defendants then appointed themselves the only members of the ESOP

14  Committee and that committee was responsible for directing the trustee.  The Director

15  Defendants also had the power to remove the trustee.  Perhaps most strikingly, the Director

16  Defendants, as the only members of the board, were responsible for all decisions regarding

17  mergers and acquisitions.  (Doc. 248-6 at 17).  Thus, the Director Defendants could ignore

18  any offer to purchase all of the ESOP's stock if, in the Director Defendants' view, it was

19  not in RVR's best interest.[24]   Viewed in the light most favorable to the Secretary, it is

20  possible a reasonable and prudent fiduciary would have grown concerned that an appointed

21  fiduciary was pursuing a generous purchase price with so little control over RVR.

22      Yet another potential red flag ignored by the Director Defendants was that the

23  transaction was structured to make it extremely expensive for anyone else to take control

24  over RVR.   The transaction contained generous severance provisions in the event the

25  _____

26  [24] The Director Defendants argue there is "no evidence" they "knew or should have known
    where, precisely, the sale of 100% of RVR stock to the Trust falls along the control
27  spectrum." (Doc. 220 at 39).  While they may not have known "precisely" how to quantify
    the measure of control, the Director Defendants likely knew RVR would remain under their
28  control.  Indeed, evidence in the record establishes the Director Defendants were especially
    careful to ensure they retained control after the transaction.

Director Defendants lost any meaningful amount of control or there were any changes to RVR's executive leadership.  Based on the transaction's final terms, the Director Defendants would receive at least four years of severance if there was any "diminution in the nature or status of the Executive's position, authority, duties or responsibilities."  (Doc. 248-5 at 31).  This mandatory severance was even triggered if the Director Defendants were required to report to a board of directors different than what existed as of May 28, 2014.  Given their annual compensation, if an entity wished to purchase RVR's stock and take control of RVR, that entity would be required to pay the Director Defendants a combined total of approximately $40 million dollars.  (Doc. 250-3 at 139).  RVR's entire value was, according to the Director Defendants, $105 million.  Thus, the possibility of $40 million in severance payments was close to half of the value of the company.

There are at least two more potential red flags the Director Defendants ignored.  The Director Defendants knew that, under the terms of the transaction, they would be able to significantly dilute the ESOP's stock.  While the ESOP purchased all the outstanding stock, the Director Defendants ensured the transaction included terms allowing them to purchase or earn more than 35% of the fully diluted post-transaction shares of RVR.  The bulk of those shares would be bought at $7.50 per share.  And those purchases could happen almost immediately.  Thus, the Director Defendants apparently concluded it was not concerning for Reliance to agree to pay $100 dollars per share even though the Director Defendants were entitled, five days later, to buy 35% of RVR at $7.50 per share.

The final potential red flag significant for consideration on summary judgment is the Director Defendants' insistence on a very short period in which to complete the ESOP transaction.  The Director Defendants have not proffered an explanation for moving so quickly.  Given the self-imposed deadline, Reliance had an extremely short period of time to conduct due diligence, formulate a valuation, negotiate, and settle on a final purchase price and terms.  That timeline led to Reliance taking steps that, from a distance, could be described as obviously unreasonable.

The undisputed timeline establishes Reliance offered $100 million dollars for a

company based on an investigation and valuation that had only started a few weeks earlier. Reliance's own offers admitted it still needed to research potentially significant issues, such as environmental liability.  The Director Defendants argue it is normal for business transactions to proceed on multiple tracks and to have areas needing additional discussion while negotiating a final price.  But viewed in the light most favorable to the Secretary, Reliance offering to pay $100 million dollars for a company based on a potentially cursory investigation should have alerted the Director Defendants that Reliance was not behaving prudently.

There are other aspects of the transaction that, when viewed in the light most favorable to the Secretary, may establish the Director Defendants breached their duty to monitor Reliance.  But at least the foregoing red flags create a dispute of fact regarding the Director Defendants' liability for not monitoring Reliance.

**B. Co-Fiduciary Liability with Reliance**

The Director Defendants next seek summary judgment that they cannot be considered co-fiduciaries with Reliance and, even if they were co-fiduciaries, they did not have actual knowledge of the alleged fiduciary breaches by Reliance.  Given the facts outlined regarding the various red flags involving the transaction, the Director Defendants are not entitled to summary judgment on these issues.

The Secretary alleged a claim under 29 U.S.C. § 1105(a)(1)-(3) against the Director Defendants for "co-fiduciary liability" based on participating in Reliance's breaches of fiduciary duty.  The referenced statute provides, in relevant part, a fiduciary "shall be liable for breach of fiduciary responsibility of another fiduciary with respect to the same plan" in three circumstances:

1. If the fiduciary "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";

2. If the fiduciary has, through its own breach of duty, enabled another fiduciary to commit a breach;

3. If the fiduciary "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

Based on these statutory provisions, it is far from obvious what the Director Defendants had in mind when seeking summary judgment on the Secretary § 1105(a) claim.

The Director Defendants were acting as fiduciaries in 2014 when they selected, retained, and monitored Reliance. Despite being fiduciaries in some respects, the Director Defendants argue they "could not have participated as a fiduciary in Reliance's alleged breach of its duty of loyalty or prudence, as Reliance had the ***exclusive responsibility*** of representing the ESOP and the ***sole*** authority to negotiate and execute a stock transaction on behalf of the ESOP." (Doc. 220 at 42) (emphasis in original). The Director Defendants then conclude they "had no authority to, and did not, represent the ESOP in connection with the Transaction at issue and, as such, were not acting as co-fiduciaries with Reliance." (Doc. 220 at 42) (emphasis added). This argument appears to address the prohibition in § 1105(a)(1) regarding knowing participation in another's breach. That is, the Director Defendants argue they had no fiduciary duties regarding the negotiation of the terms of the ESOP transaction. Even if that were true, however, the Director Defendants do not explain why the other sections of § 1105(a) regarding co-fiduciary liability cannot apply.

Section 1105(a)(2) contemplates liability when one fiduciary enables another fiduciary's breach and § 1105(a)(3) contemplates liability when one fiduciary knows of another's breach and fails to remedy it.[25] Reliance did not seek summary judgment on the

---

[25] The parties devote many pages to arguing what type of knowledge is required. The Director Defendants argue "actual knowledge" is required while the Secretary argues it is enough if the Director Defendants "knew or should have known." This is a complicated issue because "co-fiduciary liability under § 1105(a)(2) does not require a plaintiff to prove knowledge." *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 924 (D. Haw. 2019). It is only liability under § 1105(a)(1) and (3) that implicate the type of knowledge issue. In resolving the motions to dismiss in this case, Judge Tuchi stated "actual knowledge" was required. (Doc. 30 at 5). That statement was not accompanied by any analysis and a Supreme Court decision the following week may bear on this issue. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (addressing ERISA's statute of limitations that uses phrase "actual knowledge"). The Secretary has a plausible argument that the absence of the modifier "actual" in the statute's text should have some importance. The Secretary also argues requiring actual knowledge would be contrary to "ERISA's structure and purpose." (Doc. 249 at 42). The Court may not need to resolve this issue. The type of knowledge will only matter if the Court were to conclude Reliance breached its fiduciary duty and the Director Defendants lacked actual knowledge of those breaches but had constructive

Secretary's entire fiduciary breach claim.  Thus, the Court will assume the Secretary may prevail in proving Reliance's breach.  Given that, the Director Defendants do not explain how they could be entitled to summary judgment regarding their actions enabling Reliance to breach its duties or failing to remedy Reliance's breach.  Assuming Reliance was breaching its fiduciary duties, and the Director Defendants were not properly monitoring Reliance, co-fiduciary liability in the present situation would seem to be what § 1105(a) authorizes.  When viewed in the light most favorable to the Secretary, there is ample evidence the Director Defendants enabled Reliance's breach or knew of that breach and did nothing.  Therefore, the Director Defendants are not entitled to summary judgment on the co-fiduciary liability claim.

### C. Non-Fiduciary Participation and Prohibited Transaction

The Director Defendants seek summary judgment on the Secretary's Claim V.  That claim consists of two parts.  First, the Director Defendants allegedly knowingly participated in Reliance's breach of fiduciary duty.  This aspect is brought pursuant to 29 U.S.C. § 1104(a)(1)(A),(B),(D).  Second, the Director Defendants knowingly participated in a prohibited transaction under 29 U.S.C. § 1106(a)(1)(A) and (D).

#### 1. Participation in Reliance's Breach of Fiduciary Duty

The Director Defendants argue there is no liability under ERISA when a non-fiduciary participates in a fiduciary's breach.  (Doc. 220 at 38).  The Director Defendants rely on a Ninth Circuit case that cannot be reconciled with a later Supreme Court opinion.

There are three sections of ERISA relevant to this issue.  First, 29 U.S.C. § 1104 sets forth the applicable fiduciary duties, such as the duty of prudence.  Second, 29 U.S.C. § 1109 imposes personal liability on fiduciaries who breach their duties.  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S. Ct. 1783, 1788, 135 L. Ed. 2d 153 (1996) ("Sections [1104] and [1109] of ERISA impose respectively a duty of care with respect to the management of existing trust funds, along with liability for breach of that duty, upon plan fiduciaries.").  And third, 29 U.S.C. § 1106 prohibits transactions, such as the "lending

knowledge.  If that occurs, the Court will definitively resolve the proper type of knowledge.

of money" or the "furnishing of goods, services, and facilities" between a fiduciary and an ERISA plan.  Certain transactions, including transactions setting up an ESOP, are exempt from these prohibitions.

In 1991, the Ninth Circuit addressed a claim brought by plan participants against an ERISA plan's actuary for "knowing participation in breach of fiduciary duty."  *Mertens v. Hewitt Assocs.*, 948 F.2d 607, 608 (9th Cir. 1991).  The plan participants argued that even if the actuary did not qualify as a fiduciary, it could still be "personally liable to the plan" based on 29 U.S.C. § 1109(a).  *Id.* at 611.  In other words, a non-fiduciary could be liable for participating in a fiduciary's breach.  The Ninth Circuit rejected this position.  According to the Ninth Circuit, a non-fiduciary could not "be liable under [§ 1109] for knowing participation in a breach of fiduciary duty."  *Id.*  The Supreme Court subsequently affirmed the judgment and made comments that indicated the holding regarding nonfiduciary liability was correct.  But the Supreme Court's actual holding in affirming the Ninth Circuit only spoke to the distinct issue whether it was possible to seek "monetary damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993).  In other words, the Supreme Court only issued an opinion regarding the permissible types of relief, not the possibility of liability itself.

In 2000, the Supreme Court addressed whether a nonfiduciary could be sued for engaging in a transaction prohibited by § 1106.  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000).  In that opinion, the Supreme Court went on a complicated tour through various provisions of ERISA.  In doing so, the Supreme Court noted the statements in *Mertens* questioning the viability of imposing liability on nonfiduciaries were "dictum."  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. at 249.  And on the merits of a nonfiduciary's liability for participating in a transaction prohibited by § 1106, the Supreme Court looked to a provision of ERISA authorizing the Secretary of Labor to seek civil penalties against "two classes of defendants, fiduciaries and 'other person[s].'"  *Id.* at 248.  That provision of ERISA explicitly allows penalties

based on "any knowing participation" in a fiduciary breach by the "other person." The Supreme Court noted the provision authorizing penalties applied for any knowing participation in a "violation of . . . part 4" of ERISA. *Id.* "Part 4" of ERISA covers § 1101 to § 1114, the portion dealing with "fiduciary responsibilities."

According to the Supreme Court in *Harris*, the statutory language authorizing penalties as permitting suit against nonfiduciaries had "[t]he plain implication . . . that the Secretary [of Labor] may bring a civil action . . . against an 'other person' who 'knowing[ly] participat[es]' in a fiduciary's violation." *Id.* at 248. This statement was made in the specific context of a claim against a nonfiduciary for participating in a transaction prohibited by § 1106. But the underlying statutory analysis necessarily extends to breaches of fiduciary duty under § 1104 and 1109. That is, §§ 1104, 1106, and 1109 are all found in "part 4" of ERISA. The Supreme Court concluded there was liability for "knowingly participating" in a violation of part 4. Accordingly, there is no longer any basis to distinguish between the various forms of liability regarding nonfiduciaries found in part 4.

The parties cite conflicting district court opinions on this issue, with one court deeming itself bound by the 1991 Ninth Circuit opinion while the other, without discussion of the 1991 Ninth Circuit opinion, concludes a nonfiduciary may be liable for knowing participation in a breach. *Compare Vyas v. Vyas*, 2017 WL 6551110, at *9 (C.D. Cal. May 8, 2017) (relying on 1991 Ninth Circuit opinion) *with Perez v. Brain*, 2015 WL 3505249, at *12 (C.D. Cal. Jan. 30, 2015) ("Neither the Ninth Circuit nor the Supreme Court has addressed the scope of nonfiduciary liability under ERISA § 404."). Based on the reasoning in *Harris*, the 1991 Ninth Circuit opinion is longer good law. A nonfiduciary may be liable for knowing participation in a breach of fiduciary duty.[26] See 8 NO. 3 ERISA Litig. Rep. 12, 16 ("Hard as it may seem to believe, the analysis followed in *Harris Trust* seems to have resurrected the general claim against a nonfiduciary for having participated

---

[26] The Director Defendants cite opinions from the Second and Third Circuits holding, even after *Harris*, there is no liability for a nonfiduciary who participates in a fiduciary breach. Both opinions cite but do not discuss *Harris*. *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323 n.6 (2d Cir. 2003); *Renfro v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011).

in a fiduciary's breach of duty, despite the apparent elimination of that claim in *Mertens*.").

### 2. Participation in Prohibited Transaction

The Director Defendants seek summary judgment there is insufficient evidence they knowingly participated in a prohibited transaction.[27]   (Doc. 220 at 45).   The Director Defendants believe the Secretary "lacks the evidence necessary to create a genuine issue as to a material fact as to whether the [Director Defendants] knew or should have known that the ESOP was purchasing their RVR stock for more than fair market value." (Doc. 273 at 24).   Viewed in the light most favorable to the Secretary, the Director Defendants were told the fair market value of a controlling interest in RVR was as low as approximately $100 million.   The Director Defendants subsequently negotiated the terms of the transaction such that they retained control over RVR yet they still believed the fair market value was $105 million.   The Secretary is entitled to prove at trial that the Director Defendants knew or should have known that stock is worth more when it connotes control versus when it does not.   The Director Defendants' request for summary judgment regarding the prohibited transaction claim will be denied.

Accordingly,

**IT IS ORDERED** the Stipulation re Notice of Confidential Designation (Doc. 274) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motions to Seal (Doc. 227, 233, 266, 269) are **DENIED WITHOUT PREJUDICE**.   The parties and non-parties must confer regarding the appropriate redactions to the disputed documents.   Within fourteen days of this Order the parties and non-parties shall file either 1) a stipulation regarding the appropriate redactions, accompanied by the redacted documents and the complete documents under seal; or 2) a single motion to seal from the parties and non-parties setting forth the

---

[27] The Director Defendants argue Randall Smalley cannot be liable on this claim because he was "not a selling shareholder." (Doc. 220 at 45).  This appears to be a reference to the fact that Randall Smalley's stock was in numerous trusts at the time of the transaction.  It is undisputed, however, Randall Smalley was the trustee of the trusts and he caused the trusts to enter into the transaction.  The Director Defendants do not explain why a trustee in this position cannot be liable for causing the trusts to take the allegedly wrongful actions.  Thus, Randall Smalley is not entitled to summary judgment.  If the trusts, not Randall Smalley, are the relevant defendant, Randall Smalley is free to argue that point at trial.

document or information that should be placed under seal and why, accompanied by the redacted documents on the public docket and the complete documents lodged under seal. If a motion to seal is filed, the Secretary shall respond within fourteen days and a single reply shall be filed within seven days of the response.

**IT IS FURTHER ORDERED** the Motions in Limine (Doc. 184, 188, 210, 223, 224) are **DENIED**.

**IT IS FURTHER ORDERED** the Motion to Exclude Expert Opinion (Doc. 213) is **DENIED**.

**IT IS FURTHER ORDERED** Motions for Partial Summary Judgment (Doc. 211) and Motion for Summary Judgment (Doc. 220) are **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Partial Summary Judgment (Doc. 214) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** the parties shall confer and within seven days of this Order shall file a joint statement setting forth their positions on the number of trial days that will be necessary as well as the dates in April through October all parties and counsel are available for trial.

Dated this 13th day of February, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge