**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Julie A Su,

           Plaintiff,

v.

Eric Bensen, et al.,

           Defendants.

No. CV-19-03178-PHX-ROS

**ORDER**

Plaintiff Julie A. Su, the Acting Secretary of Labor, brought this suit against Defendants Randall Smalley, Robert Smalley, Jr., and Eric Bensen.  According to the Secretary, Defendants violated ERISA through their actions and inactions in connection with the establishment of an Employee Stock Ownership Plan.  In January and February 2024, the Court held a sixteen-day bench trial.  The following are the Court's Findings of Fact and Conclusions of Law.

## I.      Background and Transaction Negotiations

There are few disputes regarding the events leading up to creation of the ESOP. Their disagreements are whether Defendants acts and behavior violated their obligations required by ERISA.  In particular whether Defendants failed to monitor another fiduciary to ensure it did not violate its fiduciary duties; whether defendants knowingly participated in the trustees breaches; and whether Defendants participated in prohibited transactions.

In 1971, Randall Smalley ("Randall"), Robert Smalley, Jr., ("Robert"), and their father formed American Land Cruisers, a company that rented recreational vehicles to the

public.  At the beginning both Randall and Robert were vice presidents.  That company was later known as Cruise America, Inc., but is now known as RVR.  RVR does business as "Cruise America" and RVR's wholly owned subsidiaries are Cruise America, Inc., and Cruise Canada, Inc.  For the sake of simplicity, the relevant company will be referred to as "RVR" throughout this Order.

Randall has an undergraduate degree in business administration from Stetson University.  Robert has an undergraduate degree in political science from St. Leo College.  Bensen has an undergraduate degree in business administration from the University of Miami, as well as a master's degree in accounting.  Bensen was first licensed as a Certified Public Accountant in 1980 and from 1979 to 1984 he worked at a private accounting firm.  In that role, Bensen audited RVR.  In 1984, Bensen began his employment with RVR as Vice President of Finance.

In 1984, RVR went public.  The Smalleys and Bensen (together "Defendants") were involved in the initial public offering.  As a result of going public, the Smalleys went from majority owners to owning approximately 30% of the RVR stock.  (Doc. 406 at 49).  In 1998, the Budget Group purchased all the RVR stock.  Randall testified as part of the sale of RVR to Budget when Budget made the offer "there was a premium" and "Budget paid a premium."  (Doc. 408 at 98-99).   In connection with the purchase, Defendants executed employment agreements with Budget allowing Defendants to continue to run RVR's business.  (Doc. 408 at 149).  Budget's purchase of RVR was not successful.  According to Randall, there were "culture problems" and "while the synergies look great on paper, [RVR] couldn't get anybody at Budget to cooperate."  (Doc. 408 at 145).  Consequently in 2000, the Smalleys bought RVR back from Budget.  (Doc. 408 at 145).  After, the Smalleys each owned 50% of the RVR stock and were the sole directors of RVR.  (Doc. 408 at 150).  Once the Smalleys owned RVR again, Defendants executed employments agreements they had signed with Budget allowing them to continue to run the business.  (Doc. 408 at 149).

From January 2001 to May 28, 2014, Randall was the CEO of RVR, Robert was the President and Chief Operating Officer, and the two of them were the only members of

RVR's Board of Directors.  In 2011, Bensen with approval of the Smalleys acquired 3.3% of RVR's stock.  (Doc. 298 at 10).  Also in 2011, Randall transferred his RVR stock into a trust that includes three sub-trusts.  (Doc. 298 at 11).  Randall is a settlor of the various trusts.  As of 2013, Randall's trusts owned 48.35% of RVR's stock, Robert owned 48.35% of RVR's stock, and Bensen owned 3.3% of RVR's stock.  (Doc. 298 at 11).  From January 2013 to May 28, 2014, Bensen was the Chief Financial Officer of RVR, who agreed he was "intimately familiar with RVR's financial statements," prepared these statements, and reviewed them.  (Doc. 406 at 51).  He was responsible for conducting audits of RVR, dealing with RVR's banks and banking relationships.  And he testified "as the CFO" he was very "involved in the sale of RVR stock to the ESOP."  (Doc. 406 at 52). In fact, he said that "every time (Bensen) got off a call with Chartwell, (Bensen) would update the Smalleys."  Communication was convenient because their "offices are right next to each other."  Bensen and the Smalleys talked "every day about what's going on."  "If there was anything . . . significant, (Defendants) would be talking about it."  (Doc. 406 at 51-52).

Sometime in 2013, Defendants began considering succession planning.  Defendants did not want RVR to go public because legal requirements allegedly "made it too expensive for a company of [RVR's] size to be public."  (Doc. 408 at 161).  Defendants claimed they were looking for a way to "transition [RVR] over to [its] employees and reward the employees that made the company worth what it was."  (Doc. 408 at 162).  Bensen spoke with individuals at Wells Fargo, RVR's long-time corporate bank, about succession planning.  Wells Fargo, along with RVR's counsel from the law firm of Greenberg Traurig, LLP, recommended Defendants meet with financial advisors at the consulting firm Chartwell to discuss establishing an Employee Stock Ownership Plan or ESOP.  (Doc. 407 at 106-07, 150).

Chartwell was a financial consulting and valuation firm that provided services to privately held businesses including creating ESOPs.  Four of Chartwell's employees eventually worked on the RVR transaction: Greg Fresh, a managing director; Edward "Ted" Margarit, a vice president; Stephanie Geerdes, an analyst; and Lindsey Gullickson,

Fresh's executive assistant.  Fresh was responsible for managing staff at Chartwell including Margarit, Geerdes, and Gullickson.  (Doc. 438 at 15).

As of early January 2014, in preparation for a meeting, Defendants gathered financial documents regarding RVR's operations.  Bensen sent Wells Fargo RVR's 10-year financial projections which included consolidated balance sheets, statements of operations, stockholders' equity, and cash flows.  (Doc. 406 at 58; PX 163).  Bensen had reviewed all the information before sending it to Wells Fargo.  (Doc. 406 at 58).  The documents included a "Notes Payable" amount for December 31, 2013, of $47 million.  (Doc. 406 at 59).  "[M]ost of the 47 million" was RVR's line of credit that RVR used to purchase the RVs it rented to the public.  (Doc. 406 at 60).

On January 13 and 15, 2014, Fresh and Geerdes from Chartwell, Bensen, and representatives from Wells Fargo engaged in calls to discuss RVR's "projections and valuations."  (Doc. 438 at 21-24).  During those calls the participants discussed different methods for valuing RVR, such as the Discounted Cash Flow method, the Guideline Company method, and the Mergers and Acquisitions method.  (Doc. 438 at 25-26).  They also discussed the equity value of RVR being $100 million and the notes reflect that Bensen responded "a big number with a lot of debt."  (Doc. 438 at 26-27; Doc. 406 at 63).

On January 27, 2014, Defendants had an in-person meeting with Fresh and Margarit from Chartwell, as well as an individual from Wells Fargo.  (Doc. 408 at 100).  Defendants were told Chartwell claimed "our professionals have comprehensive experience in ESOP-related engagements having represented both shareholders and trustees."  And that "its professionals are nationally recognized market leaders with significant experience advising on a variety of ESOP-related projects and transactions."  (Doc. 406 at 67).  Finally, Chartwell emphasized the advantages of hiring Chartwell was "the ESOP transaction process offers superior timing . . ., certainty of close, ease in negotiating terms." (Doc. 406 at 67).  Also Chartwell gave a written presentation discussing how an ESOP transaction would be structured and the benefits of establishing an ESOP.  Defendants were told one major benefit for establishing an ESOP is the ability for the sellers of the stock to reduce

or eliminate their capital gains taxes that would otherwise be due upon the sale of their stock.  (JX 060.025).  Another benefit explicitly made clear in the presentation was that establishing an ESOP allowed "[s]elling shareholders [to] maintain control of the Company and the Board of Directors."  (Doc. 406 at 68; JX 060.026).  The presentation went on to state "[e]mployees are not granted operating or strategic control."  (Doc. 406 at 68).

Bensen agreed the presentation stressed the ESOP could not pay more than "Fair Market Value" for the stock.  (Doc. 406 at 72).  Chartwell's explanation of "Fair Market Value" was the "price at which an asset would change hands . . . between a willing buyer and willing seller," when both parties were well informed about the asset.  (JX 060.028). There was no explanation in the presentation, or at trial, why Chartwell represented the advantages of an ESOP included "superior timing," "certainty of close," and "ease in negotiating terms" if Chartwell believed Fair Market Value was required.  In other words, Chartwell's promise of "superior timing", "certainty of close" and "ease in negotiating terms" only makes sense in light of the evidence that Chartwell knew and made clear to Defendants it could manipulate the transaction's terms to whatever way Defendants desired.

The presentation explained to Defendants a "minority interest value" would be different than a "controlling interest value."  (Doc. 406 at 68; JX 060.028).  The presentation also explained that control value included a control premium that increased value.  Bensen denied that a control premium was ever "brought up" or "calculated."  (Doc. 406 at 70).  The presentation provided an overview of the various approaches to valuation, such as the Discounted Cash Flow method and Guideline Company method.  (JX 060.034). But Chartwell told Defendants "there were no publicly traded companies that were truly comparable to [RVR]."  (JX 060.034).  Thus, Chartwell decided to base its valuation "primarily" on the Discounted Cash Flow method.  (JX 060.038).

The presentation identified a "preliminary pro forma valuation" for a "control equity value" of $105,950,000.  (Doc. 406 at 77).  A 5% discount for lack of marketability was also appropriate.  Thus, the preliminary "fair market value of RVR's equity" was $100.7

million.  (Doc. 406 at 78; JX 060.038).  That valuation did not include an explicit "control premium" and that a "control premium" applies, which is a central issue in this case.

The parties have different understandings of what the phrase "control premium" means and when it is appropriate to apply.  It is undisputed the term "control premium" refers to an increase in the value of the stock.  (Doc. 406 at 144; 408 at 112).  Defendants contend it is appropriate to apply a "control premium" whenever a buyer is purchasing 100% of a company's stock, even if the buyer will not have operational control over the company.  The Secretary believes the term "control premium" refers to the buyer gaining the ability to control the company.  Thus, the Secretary argues it is inappropriate to apply a "control premium" when the purchaser of 100% of the stock gains no control or only a limited amount of control based on the limitations imposed on the purchaser's authority to control.  The Secretary's position is correct.  It is doubtful that valuation professionals would apply a "control premium" when a purchaser ostensibly owns 100% of the stock but has no ability to exercise any control over the company.  Thus, while the January 27 presentation did not include an explicit "control premium," the presentation did indicate Chartwell was assuming a "control equity value."  Because Defendants knew they would never agree to give up any amount of control, the presentation certainly alerted them that Chartwell's valuation was too high.

On February 5, 2014, Bensen participated in a telephone call with Chartwell and Wells Fargo to discuss a different written presentation prepared by Chartwell and the notes of the meeting show Bensen said the Smalleys "want to push forward." That presentation explained Chartwell would represent RVR and its shareholders "in negotiation opposite that of the ESOP Trustee."  (JX 061.005).  The presentation provided "recommended partners" to work on the other side of the transaction that would represent the ESOP. Chartwell recommended Reliance Trust Company as the ESOP Trustee, Stout Risius Ross, as the ESOP's financial advisor, and the law firm of McDermott, Will & Emery as the ESOP's legal counsel.  (JX 061.012).  While recommending appointment of professionals on the opposite side of the transaction, Chartwell represented its "role" would be "to

quarterback the process on both sides of the deal and ensure that the selling shareholders' interests, desired outcomes and timing are achieved."  (JX 061.005).  This representation made clear to Defendants that Chartwell did not view the negotiation process as a truly arms-length negotiation as required by ERISA.  Rather, Chartwell viewed itself, and informed Defendants, as in charge of both sides of the negotiations with the power and intent to "ensure" primarily Defendants "interests, desired outcomes and timing" were achieved.

Based on the preliminary discussions and presentations, Defendants decided to pursue selling their stock to an ESOP.  According to Bensen, by February 18, 2024, Defendants had retained Chartwell to work on the ESOP.  Defendants had also retained the law firm Greenberg Traurig, Wells Fargo Advisors, and Wells Fargo Bank.  (Doc. 407 at 152).  For reasons not explained at trial, Defendants did not execute an engagement letter with Chartwell until February 27, 2014.  (Doc. 406 at 98-99).

Throughout the entire process of negotiating and forming the ESOP, Bensen as the CFO acted as the primary point of contact between Chartwell and Defendants.  During February and March 2014, Chartwell and Bensen had multiple phone calls to discuss the terms Defendants would accept for the sale of their stock to an ESOP.  One of the meetings was held on February 18, when Chartwell presented Project Byway Organizational Kickoff meeting where Defendants were expressly informed "ESOP transactions are regulated by IRS and DOL which do not allow the ESOP to transact at a value greater than the fair market value, and require the ESOP to receive adequate consideration."  (Doc. 406 at 97) But Bensen was asked at trial about the documents that referenced ERISA and whether he knew what they meant, and he said "only generally.  I'm not a lawyer."  (Doc. 407 at 52). Chartwell planned to make another formal presentation to Defendants at a meeting on March 26, 2014.  On March 24 in an email to Bensen, Margarit warranted "not much has changed, but what is there has been confirmed now through more intensive diligence and modeling, both on the transactional side, as well as the financing side."  (Doc. 406 at 124). There was no explanation of what was the intensive diligence and modeling.

In preparing for the March 26 meeting, Chartwell sent a draft presentation to Bensen.  When asked if there was anything else he would like to see in the presentation, Bensen responded "I think everyone has already seen most of this" but "[t]he boys [the Smalleys] will want to hear more on what they get . . . cash, interest, warrants, sars, principal payments."  The evidence, including conversations with and messages from Defendants, shows their concern was their financial welfare. They never discussed with Chartwell/Reliance the fiduciary duties required of them.  Elaborating on what the boys wanted to hear, Bensen said: "[W]ell at this point this is March was still investigating the whole process of the ESOP . . . They're going to sell the company and what do they get." He added "I was concerned as well, because the interest – if there was going to be a high interest rate, that would be concerning to me as the CFO, because the company has to pay it." (Doc 407 at 47). He emphasized "as a selling shareholder, I'd like to get a lot of money. It wasn't a big amount for me after taxes and stuff, but I'm not going to turn it down." and "I'm going to be here for 10 or 15 years beyond this, I want to know is the company going to be able to pay for all this?"  He concluded, "[t]hat was number one important to me." (Doc 407 at 48-49).  Finally, a feature that dominated the decision to create the plan was that, "as with a 100 percent ESOP you can elect to be taxed as an S corporation."  (Doc. 407 at 51).

At the March 26, 2014, meeting, Chartwell gave a formal presentation to Defendants regarding the precise terms of the ESOP transaction.  The purpose was to obtain Defendants' approval to proceed with creating an ESOP.  The presentation stated, in Chartwell's view, RVR's equity had a "controlling interest equity value" of $100.7 million. (JX 070.013).  Again, it was important that the presentation specifically identified "controlling interest equity value" to understand Defendants' later failures to question the final purchase price. And Bensen said it's possible the "control premium increases the value of the stock."  (Doc. 406 at 114) Again, Defendants made clear they would not give up control and knew a "controlling interest equity value" would be too high for what the ESOP would actually purchase. Again at the meeting, Bensen acknowledged the

presentation emphasized "a key transaction objective was to: Provide liquidity to the selling shareholders to allow them to elect 1042 and defer capital gains taxes." (Doc. 406 at 129)

The March 26 presentation again provided an overview of different methods of valuing the RVR equity, such as the Discounted Cash Flow method and the Guideline Company method. The presentation proposed a very short timeline for the entire ESOP transaction to take place. That timeline was:

- April 4, 2014, to formally engage the ESOP trustee;
- April 14, 2014, to upload due diligence information to data room for ESOP trustee and begin answering due diligence questions;
- April 16, 2014, to present [RVR], proposed equity valuation, and transaction structure, terms, and conditions to the ESOP trustee;
- April 30, 2014, for the ESOP trustee to counteroffer on the price, terms, and conditions;
- May 7, 2014, to finalize negotiations on price, terms, and conditions with ESOP trustee;
- May 16, 2014, to finalize all legal documentation; and
- May 27, 2014, closing and funding of the transaction.

(JX 070.027). The ESOP trustee would be retained, and the timeline of the transaction would close approximately only 53 days later. There would be only 41 days between when the ESOP trustee first received the proposed transaction terms and the closing of the transaction. Bensen admitted there was only "a total of three weeks from the ask to finalize negotiations on price terms and conditions." (Doc. 406 at 140). The abbreviated timeline was necessary solely because of Defendants' desire to defer capital gains taxes. For complicated tax reasons, Defendants could defer capital gains taxes on the sale of their stock only if the transaction closed by May 31, 2014. And this narrow timeline was only to ensure Defendants could enjoy the tax benefit. Perhaps realizing the abbreviated timeline was suspicious, at trial Defendants offered a different but unconvincing

1    explanation.

2           According to Defendants at trial, the abbreviated timeline was necessary for the

3    ESOP to reap the benefits of RVR's busy summer season.  (Doc. 408 at 204-05).  In other

4    words, the ESOP transaction needed to close quickly so the ESOP would own the RVR

5    equity during the summer when RVR's income is at the highest.  This explanation is neither

6    credible nor rational.  As the Secretary identifies, RVR's "summer profits were already

7    captured in the annual projections used" to determine the value of Defendants' stock.  (Doc.

8    487 at 17).  *See also Usenko v. MEMC LLC*, 926 F.3d 468, 473 (8th Cir. 2019) ("[A]

9    security's price in an efficient market reflects all publicly available information and

10   represents the market's best estimate of its value in light of its riskiness and the future net

11   income flows that those holding it are likely to receive.").  Thus, ensuring the transaction

12   occurred before the summer profits provided no additional benefit to the ESOP, of which

13   Bensen, a capable, experienced accountant was fully aware.

14          Having decided to proceed with establishing an ESOP, the first step was to hire an

15   independent trustee as Chartwell and Wells Fargo recommended.  (Doc. 407 at 153).

16   Chartwell and Greenberg identified three possible companies to act as trustee: Alerus

17   Financial, Reliance Trust, and GreatBanc Trust.   Defendants claim they seriously

18   considered each company. Defendants, a representative of Chartwell, and individuals from

19   Greenberg interviewed the three trustee candidates and based on those interviews,

20   Defendants selected Reliance to serve as trustee.  Based on information provided by

21   Chartwell and others, Defendants were made aware the Department of Labor might

22   scrutinize the ESOP and Defendants knew ERISA was the primary law regulating ESOPS.

23   A major reason Defendants claimed they selected Reliance was that, as of 2014, Reliance

24   had never been sued by the Department of Labor.  Thus, Defendants were well aware that

25   forming ESOPs required compliance with complicated ERISA laws that are enforced by

26   the Department of Labor.

27          Defendants claim the trustee selection process and interviews were not merely pro

28   forma actions which lead to the formal retention of Reliance. Bensen admitted he never

asked Reliance or Chartwell about their "past business relationships" or their "ongoing business relationships." (Doc. 406 at 159) Bensen was on a call on March 12 where the Trustee candidates were discussed with Chartwell. Andy Gibson, of BDO, was Defendants' advisor regarding the Trustee candidates. It was mentioned that an additional candidate needed to be "put in the mix." The reason as Greg Fresh had "talked to him earlier" and Andy Gibson assured everyone "this guy won't balk at what we want." (Doc. 406 at 149-51; Doc. 408 at 78-80)  On April 16, 2014, Bensen signed the engagement letter with Reliance, however, the record establishes Reliance had been selected months earlier. As already mentioned, a Chartwell presentation to Defendants in February 2014 indicated Chartwell recommended Defendants hire Reliance as the ESOP trustee.  (Doc. 406 at 93). And six weeks before Reliance was engaged, on February 25, 2014, Margarit of Chartwell sent an email to Martin of Reliance stating "I hear we'll be working together in Phoenix this spring."  This email referenced the two companies working together on the RVR transaction.  Defendants argue this email might have been referencing some work other than the RVR transaction.  However, this is not credible.  Accordingly, both Chartwell and Reliance knew long before the interviews of trustee candidates that they would be working together on the RVR transaction.  It is not completely clear how Chartwell convinced Defendants to retain Reliance but as of February, Chartwell knew it would be able to do so.

After Reliance was hired, Reliance engaged Stout Risius Ross (SRR) to serve as financial advisor. Bensen never "asked SRR about its past business relationships with Chartwell." (Doc. 406 at 161-62) His explanation for this failure was "I don't think I needed to." (Doc. 406 at 161-62).  Chartwell told Bensen "each of the Trustees mentioned" had multiple preferred advisors, and "Stout was one of them." (Doc. 161-62) Thus, Chartwell had recommended to Defendants that SRR be selected. Reliance retained the law firm of K&L Gates to serve as its legal advisor.

Bensen admitted Defendants "did not investigate the conflict process Reliance, SRR, or K&L Gates performed, nor did Defendants investigate the extent of the

companies' relationships and incentives to accept Chartwell's positions." (Doc. 408 at 71-72).

As of 2014, it is undisputed that Chartwell, Reliance, and SRR had past and ongoing business relationships. It is well known that "[T]he ESOP community is fairly small" such that companies who work in this area have "all done transactions with one another" and there are "relationships" between the companies. (Doc. 436 at 45). Chartwell was a major player in the ESOP industry so other companies, including Reliance, depended on referrals from Chartwell. Chartwell in its effort to persuade Defendants to hire Reliance said it "has long-term relationships with leading ESOP Trustees." (Doc. 406 at 67). Reliance and Chartwell had previously worked together on opposite sides of ESOP transactions, but they had also worked together on the same side of ESOP transactions. Chartwell's compensation for work on the RVR transaction was based in part on a "Transaction Completion Fee" of $600,000. That fee was payable only if the ESOP transaction closed. Thus, Chartwell had a significant financial incentive to ensure the ESOP transaction closed. Reliance also had a significant financial incentive not to negotiate too hard so that Chartwell would continue referring business to Reliance. Similarly, SRR had a financial interest in ensuring its actions did not threaten its ongoing business and referral relationships with Chartwell and Reliance. In short, the relationships between the three companies meant the negotiation process would be simple and quickly negotiated to any result Chartwell desired. (JX 060.026; Doc. 406 at 7).

Once Reliance was in place as the purportedly independent trustee of the to-be-formed ESOP, Defendants made Chartwell responsible for negotiations with Reliance. There was no direct communication between Defendants and Reliance. Instead, Defendants informed Chartwell of their positions and Chartwell then relayed them to Reliance. (Doc. 407 at 224). As Chartwell represented, Chartwell was the "quarterback."

On April 16, 2014, Chartwell employees and Defendants made an in-person presentation to Reliance, SRR, and K&L Gates. Chartwell and Defendants worked together in creating the written presentation on that date. The Defendants agreed on the "opening

offer." (Doc. 406 at 178). Defendants each presented information about RVR, containing a projection that RVR's line of credit balance would be $59 million by May 31, 2014. The presentation included a timeline that, like the previous timeline, contemplated the ESOP transaction resolving very quickly. First, Chartwell would provide a term sheet to Reliance during the week of April 21. Reliance would then provide a written response "on price, terms and conditions" by May 5. The parties would finalize negotiations by May 12, then finalize all legal documentation by May 19. Board approval would be obtained by May 21 and the transaction would close on May 30. Thus, the timeline contemplated the transaction would close approximately five weeks after Chartwell presented its first offer to Reliance.

In mid-April 2014, Chartwell and Defendants worked together to prepare an initial proposal to send to Reliance. Defendants reviewed and approved the terms of the that proposal. That proposal included a $143.9 million purchase price for 100% of RVR's stock, plus warrants for the Smalleys to receive 32.49% of RVR's equity on a fully diluted basis, and a pool of stock appreciation rights ("SARs") equaling 17.49% of RVR's equity on a fully diluted basis that could be issued to RVR management. (JX 080.025). The proposal also provided the seller notes would have interest at 4% cash and 6% payment in kind (PIK)[1]. Bensen was required to be appointed to the board of directors and, after the transaction, Defendants would be the only members of the board. (JX 084.002).

The proposal included a valuation of the RVR stock using the Guideline Company method. Chartwell used a 20% control premium in this analysis. (JX 080.015). The portion of the proposal titled "ESOP Equity Valuation Summary" included a subtraction for RVR's interest-bearing debt of $61.9 million. (JX 080.023). Notes from a telephone call involving Defendants and Chartwell employees discussing the initial proposal indicate the intent was "to maintain equity value of $100 million." (Doc. 436 at 114). In context, that meant there was a decision to make a high initial offer such that Defendants would have been perceived to have negotiated down to $100 million. The initial offer was sent

---

[1] Payment-in-kind is "basically an interest rate that accrues on the loan, but it's not paid until the loan is paid off at the end." (Doc. 468 at 98).

to Reliance on April 21, 2014.  (Doc. 407 at 193).  On April 26, Bensen, in order to ensure Smalley tax exposure decreased sent an email to Margarit telling him "We need to determine conclusively whether the accrued interest is taxable or not.  The added $400,000 or so per year is significant and must be paid at some point.  We need to get this to 3 percent."  (Doc. 406 at 180).

Based on the timeline set out by Chartwell on April 16, 2014, Reliance had until May 5, 2014, to respond to the proposal, meaning Reliance had two weeks to respond with a counteroffer, not nearly enough time because of the rushed sequence of events.  At some time prior to May 2, 2014, Reliance's financial advisor SRR prepared a draft valuation. That draft used the Discounted Cash Flow method and the Gordon Growth method to estimate a terminal value of $41.2 million and an enterprise value of $67 million.  (PX 197.001).  Chartwell and SRR had a telephone call on May 1, 2014.  (PX 307.028).  The record does not disclose the details of the call, but it is more probable than not that Chartwell convinced SRR it needed to dramatically increase its valuation.  On May 2, 2014, SRR sent a valuation report to Reliance.  In it, SRR said the report was a draft and still needed to undergo additional internal review, but SRR was sending the draft "in the interest of time."  The draft was far from complete, lacking numerous appendices found in later versions, nor discussing valuations methods and premiums or discounts that might apply. The only viable reason for SRR to circulate an incomplete valuation was to comply with Defendants' artificially imposed deadline.

SRR's May 2 valuation calculated the enterprise value of RVR using the Discounted Cash Flow method as well as the Guideline Company method.  For the Discounted Cash Flow method, SRR no longer used the Gordon Growth Method.  Instead, SRR calculated a terminal value using a multiple of 7.5 to forecasted earnings.  This multiple was based on SRR's Guideline Company method analysis that purported to analyze the performance and value of companies similar to RVR.  However, the companies SRR selected as comparable to RVR bore little similarity to RVR.  Among the companies SRR selected were companies that "provided remote workforce accommodations and modular space

solutions and oil field products." (Doc. 466 at 39-40). Other allegedly comparable companies were two that manufactured and sold new RVs. (Doc. 466 at 41). The terminal value under this approach was $67.1 million, significantly higher than the $41.2 million in SRR's earlier draft. The increase in terminal value meant SRR's May 2 valuation claimed an enterprise value of $95,400,000, almost $30 million more than the earlier draft. (JX 093.045).

SRR's May 2 valuation included a 5% discount for lack of marketability. (JX 093.029). The valuation also included a 10% control premium. That premium was incorporated by increasing the stock price of the companies used in the Guideline Company method. (Doc. 464 at 111). According to an SRR employee, a control premium is appropriate when the purchaser of stock gains "certain elements of control beyond what a shareholder of a public company would have." (Doc. 466 at 43). That same employee conceded a control premium would not be appropriate where the purchaser was not gaining "enough control rights or they weren't meaningful enough." (Doc. 466 at 113). In that situation, "a lack of control discount" would be appropriate. (Doc. 466 at 113). At the time SRR prepared its May 2 valuation, the terms of the transaction were still being negotiated. Given that the terms were still being negotiated, SRR's valuation should have been viewed as extremely tentative. In particular, without knowing the terms of the transaction such as the extent of control the purchaser would have, it was not possible or reasonable for SRR to calculate a valuation with an appropriate level of confidence.

Reliance's Investment Policy Committee was responsible for reviewing and approving ESOP transactions. This responsibility was delegated to a subcommittee. The night of Friday, May 2, 2014, Wright forwarded SRR's May 2 valuation to three members of the subcommittee stating, "I know there is a lot going on but we still need to meet on this Monday." (JX 093.001). The subcommittee met on Monday, May 5, 2014, to review the ESOP transaction and SRR's May 2 valuation. (JX 094.001). Wright was the only committee member who reviewed the valuation report before the meeting. Defendants' own expert testified it would have been preferable for the subcommittee members to review

1  the valuation before the meeting.  (Doc. 463 at 43).  The minutes from the meeting do not

2  reflect the subcommittee made any inquiries regarding the application of a control premium

3  or the discount for lack of marketability.

4      K&L Gates presented at the May 5 subcommittee meeting.  K&L Gates noted

5  Defendants' compensation was high and was subject to employment agreements.  Those

6  employment agreements promised Defendants total compensation in the total amount of

7  $8,590,000 each year.  (JX 133.001).  K&L Gates sent Chartwell due diligence requests

8  regarding Defendants' compensation on May 6, 2014.

9      Despite not knowing many crucial details, including the precise contours of

10  Defendants' compensation or the amount of control the ESOP would gain, the Reliance

11  subcommittee approved the counteroffer.  That counteroffer was sent to Chartwell on May

12  5, 2014, which was discussed with Defendants.  (Doc. 406 at 183).  The counteroffer was

13  for $100 million plus warrants equal to 25% of RVR's stock on a fully diluted basis, and

14  SARs equal to 10% of RVR's stock on a fully diluted basis.  Reliance's counteroffer was

15  accompanied by a statement that due diligence would need to continue, including on

16  important matters such as potential environmental damage at an RVR facility.  (JX

17  098.003).  The counteroffer did not address the proposed interest on the seller notes

18  included in Chartwell's initial offer.

19      On May 6, 2014, Martin of Reliance told SRR and K&L Gates they should have a

20  telephone discussion with Chartwell to determine why the parties had reached different

21  valuation numbers.  (JX 097.001).  Martin stated "[t]he call is important to resolve the

22  different accounting approaches which account for the large value disparity.  We need a

23  consensus to be able to get to a deal we can transact with.  Thanks for your help to keep us

24  on schedule."  (JX 097.001).  That telephone call occurred on May 7, 2014, where

25  Chartwell, SRR, Reliance, and K&L Gates discussed SRR's valuation.

26      Chartwell also had a telephone call with Bensen on May 7, 2014.  (JX 099.001).

27  That call was to discuss Reliance's counteroffer.  The notes of the meeting show "Eric

28  thinks the proposed response is good, the likely outcome $4 million extra won't make a

big difference but we can adjust interest rates, et cetera.  If we think it's too high, don't want to stray too far.  Don't want to go over 105."  (Doc. 406 at 193).  During that call Bensen was informed SRR was ignoring RVR's line of credit in its valuation.  (PX 206.001).  Chartwell informed Bensen that during negotiations it would stress that "synthetic is more important than the equity price."  (PX 206.001); (Doc. 406 at 194).  The "synthetic" was referring to warrants.  Thus, Chartwell planned to stress to Reliance that the warrants were more important than the exact purchase price for Defendants' stock.

On May 8, 2014, Defendants acting through Chartwell made a counteroffer to Reliance, which consisted of a lower equity price of $115 million for more warrants of 35% of fully diluted equity value.  (JX 098.002).  Defendants also proposed a lower interest rate on the seller notes.  The following day Reliance responded with its second counteroffer for $105 million for the equity, 35% warrants, and 12.5% SARs.  (JX 099.006).  The interest rate on the seller notes was not addressed.  Chartwell informed Defendants of Reliance's second counteroffer on May 12, 2014.  On May 13, 2014, Defendants responded to Reliance, again through Chartwell, agreeing to the terms of Reliance's second counteroffer.  (JX 107.001).

Reaching an agreement on May 13 meant Reliance and Defendants purportedly resolved all issues 22 days after the initial offer.  They reached an agreement despite ongoing due diligence and the transaction documents still being reviewed and changed.  Inexplicably, Reliance reached a deal without first obtaining a final valuation from SRR that analyzed RVR's fair market value considering all the transaction's terms.

While they reached an agreement on May 13, Reliance was still attempting to negotiate the terms of Defendants' employment agreements.  Bensen admitted one term of employment agreement to which Defendants agreed: "if the executive terminated their employment for good reason, they would get five times the bonus in salary following change in control."  (Doc. 407 at 14).  Given the amount of compensation owed to Defendants on an annual basis, Reliance's decision to agree to final terms without first resolving Defendants' compensation was arbitrary and unreasonable.  On May 8, 2014,

K&L Gates sent Martin and SRR some recommended revisions to Defendants' employment agreements.  As of May 18, 2014, Defendants had not provided any response regarding the recommended revisions.  On May 20, K&L Gates emailed Reliance and SRR noting there had been very little discussion on Defendants' agreements.  K&L Gates was also concerned about the terms of the employment agreements and how they would impact the financial fairness of the transaction. K&L Gates noted Bensen was "pushing back somewhat hard" on the employment agreements.  (Doc. 435 at 75).

On May 21, Allison Wilkerson of K&L Gates emailed Martin at Reliance regarding the negotiations of the employment agreements.  Wilkerson stated "I just spoke with Greg [Fresh of Chartwell.  His comment was they aren't willing to make 'any more concessions' but can't tell me what if any concessions have been made."  (Doc. 435 at 78).  Wilkerson then brought four items to Reliance's and SRR's attention she believed were cause for concern: 1) the employment agreements were for five year terms but renewed annually, meaning there was always at least four years left on the agreements; 2) the agreements did not contain non-compete or non-solicitation limitations; 3) involuntary termination or resignation for good cause would result in four years of severance if before a change in control and five years of severance after a change in control; and 4) Defendants would continue to receive benefits during the severance period.  (Doc. 435 at 81).  Martin asked SRR to address these concerns but there is no evidence SRR ever did so.  (PX 223.001). Of note, K&L Gates was expressing its concern on May 21, more than a week after the parties purportedly reached a final agreement on the transaction's terms.  The employment agreements were always a contentious issue as shown by notes stating "To have a negotiated deal and then to push back on employment contracts is pissing off the sellers." (Doc. 437 at 91).

The final valuation report from SRR was produced on May 21, but it was still before the final details of the transaction documents had been agreed upon.  SRR's May 21 valuation report used the Discounted Cash Flow and Guideline Company methods to determine enterprise value.  SRR included a 10% control premium in its Guideline

- 18 -

Company method.  As in prior valuations, SRR still used guideline companies that were not reasonably comparable to RVR.  The May 21 report did not account for RVR's line of credit.  SRR did not make any deduction for the value of warrants but did apply a 5% discount for lack of marketability.

Prior to May 22, 2014, the negotiations over the employment agreements were still ongoing.  On that date Martin and Fresh exchanged emails indicating they had resolved their differences.  Defendants had agreed to remove "change in control" as an automatic trigger for payment of severance benefits in exchange for a sale-or-merger blocking right provision for the warrant holders.  K&L Gates included this agreement in its due diligence memo.

Reliance received K&L Gates' due diligence memo on the evening of May 22, the day before the subcommittee meeting set for May 23, 2014.  Thus, Reliance had less than a day to review that memo before the meeting.  Williams of Reliance testified the short time period was not acceptable and that Reliance should have more time to review the memo. (PX 231.001).  Martin of Reliance responded "We can study and discuss the memo, but we are planning to close Tuesday or Wednesday, just so you know.  This has been a tough deal at the end to get an acceptable solution."  In other words, Reliance's own employees knew there were significant lingering issues and the closing was rushed.  Despite that, Reliance insisted the transaction close on Defendants' timeline, a timeline that did not advantage the ESOP but provided large tax benefits to Defendants.  Given Reliance's decision to close despite ongoing concerns, the K&L Gates memo was merely intended to create a record in case of future litigation. Bensen admitted he received the K&L Gates opinion before the close of the transaction but "doesn't know if he read it prior to the closing."  (Doc. 408 at 80-85) (PX 228). The contents of the K&L Gates memo were not evaluated in any meaningful way by Defendants.

On May 23, the Reliance subcommittee met and accepted SRR's valuation report. Only 2 of the 9 members of the subcommittee were present.  Allowing for decisions to be made with such a limited number of the subcommittee's members was contrary to industry

best practice. The subcommittee made no meaningful attempt to evaluate the soundness of SRR's valuation report. For example, SRR continued to use companies that were not at all comparable to RVR, but the subcommittee engaged in no meaningful exploration of that issue. In addition, the subcommittee did not ask SRR why it had not listed all the documents associated with the transaction (*e.g.*, Trust Agreement) as documents that had been reviewed.

At the May 23 subcommittee meeting SRR expressed concern that the Smalleys still had the right to confirm any sale of RVR and restrict any sale in the absence of such confirmation. (JX 113.005). In effect, this was a "blocking right." SRR also expressed concern that the board of directors would consist only of Defendants. SRR noted the management team (*i.e.*, Defendants) was "a close knit group and it seems inclined to stay that way for the time being." (JX 113.005). In effect, SRR was saying there was no indication the ESOP would gain a seat on the board any time soon. K&L Gates expressed concern that Reliance had not been able to negotiate modifications to Defendants' general employment agreements. (JX 113.004).

Close to the completion of the transaction, Bensen aggressively advanced a compensation increase for the employment agreements with very favorable terms. Bensen participated in a telephone call with Reliance on May 21. The "employment agreements were a big issue." The notes reflected Bensen complained "to have negotiated a deal and then push back on employment contracts is pissing off the sellers." (Doc. 406 at 210). He continued "[w]e have five-year contracts that are evergreen. You always have four years left on the contract. They wanted to go to three years contract, not evergreen, with one-year renewals after that. We have very lucrative contracts, very employee friendly." Bensen then reminded Reliance "we gave in on noncompetes, we assume, for the next 10 to 15 years we [will] get paid this much money. That's that . . . I need to get this off the table. I'm not going back to the boys. There is a chance they will walk." (Doc. 210) As of May 23, Reliance understood the deal was extraordinarily one-sided. On that date Martin of Reliance sent an email to Margarit at Chartwell stating:

> I need your help in keeping [Bensen] from continuing to come back to the plate to bat again and again on the comp issues. He is going to blow this deal if he keeps it up. They have gotten almost everything they asked for so far and to keep at the comp plan is only creating heartburn which I rarely get over transactions. I still believe at the end of the day when this deal is audited by DOL, they will be required to modify some of these provisions or risk an action. Pigs get fat and Hogs get slaughtered. I know you have heard that before.

To be clear, Reliance understood the transaction was so one-sided that if the Department of Labor were to investigate, the transaction could not withstand scrutiny. Despite that, Reliance proceeded with the transaction. Bensen admitted he received representation letters from Reliance and K&L gates on May 28, the day the stock purchase agreement was signed, but he testified because he "was not sure why [we] would," he did not ask questions about "control," "methodologies," or "representations." (Doc. 408 at 80-85) Reliance's conduct establishes it was intent on the transaction closing on the timeline dictated by Defendants no matter what.[2]

The following is a summary of the negotiations regarding the financial terms of the transaction leading up to the final agreement.

| Date | Offer or Counteroffer | Equity Purchase Price | Warrants | SARs | Interest Rate on Seller Notes |
|---|---|---|---|---|---|
| **April 21** | RVR Initial Proposal | $143.9 million | 32.49% | 17.49% | 4% cash, 6% PIK |
| **May 5** | Reliance Counteroffer | $100 million | 25% | 10% | Not addressed (Doc. 406 at 187) |
| **May 8** | RVR First Counteroffer | $115 million | 35% | 12.5% | 3% cash, 5% PIK |
| **May 9** | Reliance Second Counteroffer | $105 million | 35% | 12.5% | 3% cash, 5% PIK |
| **May 13** | Final Agreement | $105 million | 35% | Up to 12.5% | Cash interest at 2.5%, PIK Compounding at 1.05%, PIK noncompounding at 2.15% |

---

[2] And Bensen, on behalf of Defendants, consistently pressed to reap Defendants' financial benefits without any emphasis of ensuring compliance with their fiduciary mandates.

Under the final terms of the transaction, Defendants received $105 million and warrants equal to 35% of RVR stock on a fully diluted basis.  The warrants gave the Smalleys the right to purchase 666,667 shares of RVR stock at $7.50 per share.  The transaction terms also allowed for SARs equal to 12.5% of RVR's stock on a fully diluted basis.  To finance the transaction, the Smalleys lent $95 million to RVR in exchange for seller notes.  The seller notes had a fifteen-year term and bore cash interest at 2.5% per year, interest at 1.0% per year PIK, and accrued non-compounding interest at 2.15% per year. (Doc. 482 at 53).  Thus, the total interest rate was 5.65%.  Beyond financial terms, the transaction contained terms that ensured Defendants retained complete control over RVR.

In connection with the transaction, the RVR board of directors (*i.e.*, the Smalleys), by an action dated May 28, 2014, appointed Bensen as the third member of the board.  Throughout the negotiations, Defendants had insisted they be the only members of the board after the transaction. (Doc. 435 at 71).  Defendants, acting as the board, then adopted the ESOP Committee Charter.  That charter provided the board shall appoint three or more members of the ESOP Committee, but all appointees had to be members of the board.  Thus, Defendants appointed themselves as the sole members of the ESOP Committee.  The ESOP Committee had full power and authority with respect to RVR's responsibilities as administrator of the ESOP.

The transaction required the ESOP trustee vote as directed by the ESOP committee.  In addition, the ESOP trustee could not make, alter, amend, or repeal RVR's bylaws in any respect nor could the trustee expand the board of directors without first obtaining the board's approval.  Thus, vacancies on the board could be filled only by the board, not by the ESOP trustee.  A nominating commission was created that consisted only of board members.  Only the nominating commission could nominate future candidates to the board.  The ESOP trustee could vote on the nominated candidates but, again, the ESOP trustee was required to vote as directed by the ESOP trustee.  While the ESOP trustee appeared to have some level of control, it was illusory because Defendants retained complete control over

1   all aspects of RVR.

2       The board had the authority to appoint and terminate the ESOP trustee.  Therefore,

3   if Defendants believed the ESOP trustee was not obediently following their directions, they

4   could terminate the trustee.  Under the terms of the governing documents after the ESOP

5   transaction, no rational trustee would act contrary to Defendants' wishes.

6       The governing documents rendered the board responsible for all mergers and

7   acquisitions regarding RVR.  The board had the authority to review all M&A offers and

8   disregard them if the board believed an offer was not bona fide or in the best interests of

9   the shareholders.  Thus, even if a willing buyer of RVR offer to purchase the buyer could

10   only purchase RVR with Defendants' approval.

11       Defendants' employment agreements were also amended as part of the transaction.

12   The new terms only make sense in terms of adopting poison pills meant to ensure

13   Defendants remained in complete control of RVR.  The employment agreements were

14   amended to include a provision that allowed Defendants to terminate their employment

15   and receive severance if Defendants were required to report to a board of directors

16   composed of a majority of members other than Defendants.  Severance would also be due

17   if Defendants were removed from the board.  Then the total amount of severance due would

18   range from approximately $34 million to close to $43 million.  This level of severance

19   guaranteed no other entity would be interested in purchasing RVR and installing new

20   management.

21       Defendants' employment agreements were also amended to provide Defendants'

22   compensation could be increased above the guaranteed amount with the ESOP trustee's

23   approval, and that approval could not "be unreasonably withheld."  In effect, Defendants

24   had employment agreements that promised them levels of compensation deemed "high"

25   by Reliance's SRR advisors and Reliance agreed to give Defendants the power to increase

26   their compensation even more.  The ESOP trustee had to agree to such increased but,

27   because the ESOP trustee was directed by Defendants, there was no limit on Defendants

28   increasing their own compensation whenever they wished.

1    The terms of the ESOP transaction were massively one-sided in Defendants' favor.

2    Viewed as a whole, the ESOP transaction resulted in Defendants selling their equity but

3    retaining their positions and complete control over RVR.   Terms in the governing

4    documents also meant the ESOP trustee had no real possibility to remove Defendants or

5    gain a seat on the RVR board of directors.   Defendants insisted on all these terms and

6    Defendants, as fiduciaries, knew these terms should have resulted in the ESOP paying

7    dramatically less than $105 million.   As established at trial, the fair market value of the

8    RVR equity given the unique terms of this transaction was less than half what the ESOP

9    paid.

10   **II.    Proper Valuation of RVR Equity**

11   The parties presented expert testimony on the proper valuation of the RVR equity

12   purchased by the ESOP.   There was significant overlap between the experts' testimony in

13   that both experts recognized the Discounted Cash Flow method was the best way to

14   determine the value of the RVR equity.   The crucial differences between the two experts

15   do not involve disagreements regarding which general valuation methodology was most

16   appropriate.   Rather the experts disagreed on discrete matters such as how to account for

17   RVR's outstanding debt and whether a control premium was appropriate.   Neither expert

18   was believable on all issues but, in general, the Secretary's expert provided a more

19   convincing valuation.

20   **A.    Dr. Paul C. Wazzan**

21   The Secretary called Dr. Paul C. Wazzan to offer valuation opinions.   Wazzan

22   obtained a Ph.D. in finance from the University of California, Los Angeles, after obtaining

23   a bachelor's degree in economics from the University of California, Berkeley.   Wazzan

24   currently is the managing director at Berkeley Research Group, LLC, as well as president

25   and chief executive officer at Wazzan & Co. Investment LLC.   The latter company is a

26   "venture capital firm providing seed-level funding to firms specializing in semiconductor,

27   optical networking, bio-mechanical, bio-medical, and related technologies."   (Doc. 315-1

28   at 2).   Wazzan has worked as an adjunct assistant professor of business and economics at

California State University, Los Angeles, and has also taught classes at the University of Southern California's business school.

During his career, Wazzan has "conducted dozens of analyses determining the value of both private and public entities."  That valuation work was for litigation, business consulting, tax purposes, and investment guidance.  Wazzan has published in peer-reviewed economics journals, law reviews, and has testified in state and federal courts. Wazzan's education, training, and experience rendered him qualified to offer his opinions regarding the proper valuation of the RVR stock.

Wazzan's experience has involved conducting valuations using "a variety of methods including discounted cash flow, multiples, and arm's length transactions." (Doc. 315-1 at 2).  Those methods are widely recognized and accepted by valuation professionals. In fact, both parties agree that the discounted cash flow valuation method is appropriate and reliable.  The parties merely disagree on the exact mechanics of applying that method to the present facts.  At any rate, Wazzan's opinions were sufficiently reliable to be admitted.

Wazzan concluded the Guideline Company method was not appropriate in this company because there were not firms sufficiently "comparable to RVR." (Doc. 315-1 at 13).  Wazzan's explanation was convincing.  In brief, the various companies identified as potentially comparable to RVR are in different industries, cater to different consumers, operate under different competitive pressures, and are dramatically different in size. Wazzan then rejected other possible valuation methods, such as the Mergers & Acquisitions approach and the cost approach.  His reasons for rejecting those methods were convincing and Defendants did not argue otherwise.  Wazzan's analysis, therefore, focused on the value of RVR's equity using the Discounted Cash Flow ("DCF") method.

In conducting his DCF analysis, Wazzan relied on RVR financial projections for years 2014 to 2018 contained in documents generated by RVR and SRR.  Wazzan then discounted those projected values to present value.  (Doc. 315-1 at 19).  For years after 2019, Wazzan used the Gordon Growth method to calculate a terminal value.  Wazzan

1  added the present value of the 2014-2018 income with the terminal value and arrived at an

2  enterprise value of $72.2 million.  (Wazzan defined enterprise value as "a firm's total value

3  and incorporates all ownership and asset claims from both debt and equity holders.")  (Doc.

4  315-1 at 23).

5          According to Wazzan, to go from enterprise value to equity value requires

6  subtracting debt, adding in cash and cash equivalents, applying discounts or premiums for

7  control and marketability, and accounting for "additional claims on equity, such as

8  outstanding warrants."  (Doc. 315-1 at 23).  The need to subtract debt accounts presented

9  a large difference between Wazzan and Defendants' expert.

10          Wazzan concluded the company debt of $3.0 million related to the purchase of real

11  estate should be subtracted from the enterprise value.  Next, Wazzan concluded RVR's line

12  of credit used to purchase RVs should be deemed "a long-term continuing debt" that must

13  be subtracted from RVR's "enterprise value in calculating equity value."  (Doc. 315-1 at

14  24).  Wazzan offered two basic reasons for this: 1) RVR had never fully paid off the line

15  of credit in recent years; and 2) RVR's "projected cash flows were not adjusted downward

16  to reflect paying off the line of credit."  (Doc. 315-1 at 24).  Wazzan offered a simple

17  hypothetical to illustrate the need to include the line of credit when determining the value

18  of RVR's equity:

19              Assume there are two different companies.  They are identical,
20              except one has an outstanding line of credit for $100,000 with
                5% interest, and the other has no outstanding debt.  The income
21              statements for the two would be identical except for the
                payment of $5,000 in interest expense and they would have the
22              same EBITDA.  However, the one with the outstanding line of
                credit has a $100,000 liability which represents a future cash
23              outflow.  A prospective purchaser would value the two
                companies differently based upon this outstanding line of
24              credit.

25  (Doc. 315-1 at 58).  Wazzan also explained the line of credit using a home mortgage as an

26  example:

27              [The line of credit is] an interest-only loan that has a balloon
                payment after a certain period of time and it literally never gets
28              paid off.  It's like having a mortgage -- like having an interest-
                only mortgage and you push the principal off year after year

1  after year.  But that doesn't mean you get to just eliminate it.
2  That debt still exists.

3  (Doc. 411 at 64).  Here, Wazzan's testimony was convincing.  RVR's line of credit should

4  have been included in determining the value of the RVR's equity.

5    The balance on the line of credit varied over time but it had not gone below $43

6  million in recent years.  Wazzan believed a "conservative position" was to subtract only

7  that smallest balance.  So Wazzan subtracted $43 million for the line of credit and $3

8  million for other debt.

9    Wazzan then added cash holdings and the value of notes from RVR employees.

10  (Doc. 315-1 at 25).  The cash holdings were $16.34 million, and the outstanding notes were

11  $1.7 million.  Wazzan then concluded "the marketable, controlling interest value of RVR's

12  equity" was $44.3 million calculated as: enterprise value of $72.152 million, minus

13  $45.952 million debt, plus $16.343 million cash, plus $1.725 million notes receivable.  But

14  Wazzan's analysis was not finished because of the unique terms of this ESOP transaction.

15    Wazzan believed it necessary to impose a discount for lack of control because the

16  ESOP had little control "over significant corporate decisions and actions."  (Doc. 315-1 at

17  26).  Wazzan accurately identified numerous feature where the ESOP trustee had no

18  meaningful control given Defendants' positions on the board and the ESOP Committee.

19  (Doc. 315-1 at 26-28).  Given the lack of control, Wazzan determined a 17% discount for

20  lack of control was necessary.  (Doc. 315-1 at 28).  Wazzan calculated that figure based on

21  looking to the control premiums paid in other transactions analyzed in a study from 2004

22  to 2013.  (Doc. 315-1 at 28).  That level of discount was compelling.  Wazzan also believed

23  a discount for lack of marketability was appropriate.  Wazzan provided a lengthy

24  explanation that resulted in application of a 10% discount.  (Doc. 315-1 at 30).  Again,

25  Wazzan's testimony regarding the need for and amount of this discount was convincing.

26    Finally, Wazzan believed the warrants issued as part of the transaction should have

27  been included in the valuation.  The warrants gave the Smalleys the option to purchase

28  666,667 shares of RVR stock at an exercise price of $7.50 per share.  Wazzan believed

those warrants had to be viewed as claims on RVR's cash.  (Doc. 315-1 at 31).  In other words, he claimed the warrants impacted the equity value of the RVR stock.  To calculate the warrants' impact, Wazzan used "the standard Black-Scholes option pricing model." (Doc. 315-1 at 32).  Using that model, Wazzan determined the 666,667 warrants had a value of $19.3 million.  Including the value of the warrants in determining the value of the equity was the one aspect of Wazzan's opinion that was not convincing.

Defendants argued the warrants were meant to operate as additional compensation for the Smalleys accepting a below-market interest rate on the seller notes.  Wazzan testified the seller notes already had market rates, but that was not compelling.  The seller notes were "the most subordinated debt in the company" and were "unsecured . . . so there [was] no collateral if there [was] a default on the notes."  (Doc. 468 at 88).  In other words, the seller notes would have commanded a higher interest rate if the warrants had not been included.  While not indisputable, the Court rejects Wazzan's opinion that the warrants should have been subtracted.

Based on all the additions and subtractions from enterprise value Wazzan claimed appropriate including the warrants, he arrived at fair market value of the equity was $13.7 million.  (Doc. 315-1 at 34).  Because the warrants should not be included, $19.3 million must be added back in for resulting sum a fair market value of $33 million.

**B.      Jeffrey S. Tarbell**

Defendant's valuation expert was Jeffrey S. Tarbell.  He received a bachelor's degree in business administration in 1990 and a Master of Business Administration in 1997.  Currently, Tarbell is a Director at a financial services firm and a member of that firm's Financial and Valuation Advisory Services practice.  (Doc. 324 at 7).  Tarbell is the head of the firm's Employee Stock Ownership Plan valuation practice.  Over the course of his career, he has worked on approximately 1,000 valuation matters, including more than 200 valuations in the specific context of ESOPs.  Tarbell is the member of various professional organizations devoted to ESOPs and valuations.  He also is a contributing author to valuation treatises.  (Doc. 324 at 7-8).  Tarbell's education, training, and experience render

1    him qualified to offer his opinions regarding the proper valuation of the RVR stock.

2        Tarbell used the Guideline Company method and the Discounted Cash Flow method

3    to determine the value of RVR's stock.  Those methods are widely recognized as reliable

4    approaches for assessing valuation and Tarbell's opinions were sufficiently reliable to

5    admit them.

6        For his Guideline Company analysis Tarbell identified six companies as potentially

7    comparable to RVR: AMERCO (Uhaul), Avis Budget Group, Inc., CanaDream Corp.,

8    Hertz Global Holdings, Inc., Ryder System, Inc., Tourism Holdings Limited.  (Doc. 324 at

9    33).  Tarbell admitted these companies "are not *perfectly* comparable to RVR," but he

10    believed they were close enough.  However, as Wazzan noted these companies are starkly

11    different.  For example, RVR had annual revenue of $93 million.  By contrast, Hertz had

12    annual revenue of $10.7 billion.  Thus, Hertz had approximately 115 times more in annual

13    revenue than RVR.  (Doc. 468 at 14).  In addition, Hertz had approximately 11,555

14    locations, approximately 100 times more than RVR.  Hertz operated in 145 countries while

15    RVR operated in two.  (Doc. 466 at 39).  He offered another allegedly comparable

16    company, Avis, that had annual revenue of $8.1 billion and operated in 175 countries.

17    Beyond Hertz and Avis, the other companies Tarbell identified as sufficiently comparable

18    were not remotely close to RVR.  Like Hertz and Avis, those other companies had

19    significantly different revenues and operations from RVR and some of them were involved

20    in very different markets.

21        Tarbell's use of these comparable companies was also contrary to an opinion

22    expressed by Chartwell at one point in time.  In conducting its analysis, Chartwell had

23    considered some of the same companies Tarbell used but Chartwell concluded those

24    companies were not comparable to RVR.  Chartwell determined there was "no publicly

25    traded companies that were truly comparable to [RVR]."  (Doc. 468 at 31).  Based on the

26    vast differences between the companies, Tarbell's use of the Guideline Company method

27    is not worthy of any consideration.

28        As did Wazzan, Tarbell also used the DCF method.  Tarbell followed most of the

same steps as Wazzan.  Tarbell relied on "projected financial results . . . prepared by RVR Management" to project net cash flows for 2014 through 2018.  (Doc. 324 at 39).  Tarbell then identified "RVR's expected net cash flows expected to be received after the end of the projected period (*i.e.*, in 2019 and beyond), commonly referred to as the 'terminal value.'" (Doc. 324 at 41).  To determine the terminal value, Tarbell recognized that appraisers typically use either the Gordon Growth method or the Exit Multiple method.  (Doc. 324 at 41).  Tarbell rejected this method as "not practical" in this case because of "the composition of RVR's net cash flows and RVR's substantial capital expenditures relative to depreciation."  (Doc. 324 at 43).  Thus, Tarbell used the Exit Multiple method.  That method, however, relies on looking to the multiples for the guideline companies Tarbell used in his Guideline Company method and if those companies are not comparable, the Exit Multiple method is not reliable.  (Doc. 468 at 48).  But during Tarbell's cross-examination he admitted if the guideline companies "are not reasonably similar to the company being valued, the multiples derived from those guideline companies would not provide reliable a basis to derive terminal value in a discounted cash flow analysis."  (Doc. 468 at 48).

In fact the guideline companies Tarbell selected bore no meaningful resemblance to RVR.  Thus, using exit multiples from those companies renders the results from the Exit Multiple method little better than random.  But accepting for the moment Tarbell's approach, Tarbell arrived at an equity value of $107.6 million to $122.8 million.  (Doc. 324 at 53).  Tarbell did not subtract "the balance of RVR's revolving line of credit because [he] considered that item to be an operating liability (*i.e.*, working capital) rather than a permanent financing source."  (Doc. 324 at 53).  Tarbell's decision to not include the line of credit requires a further analysis.

Tarbell explained failure to subtract the balance on the revolving line of credit was because the "line of credit has a cost to RVR in the form of interest expense" and Tarbell "deducted that interest expense . . . from the RVR earnings figures" elsewhere in his analysis.  Thus, Tarbell concluded "[i]t would be improperly double counting the impact

of the vehicle line of credit to have also subtracted the line of credit balance from [his] estimate enterprise value range." (Doc. 324 at 53). The sources Tarbell cited for this approach were a very strange mix of documents.

As alleged support for not including the line of credit, Tarbell cited a webinar titled "Valuing Auto Dealerships." (Doc. 467 at 37). Why this webinar should be viewed as authoritative was not explained at trial. Tarbell did not use auto dealerships as potentially comparable companies in conducting his valuation analyses and the methods appropriate for valuing auto dealerships likely differ from those appropriate for a business such as RVR. (Doc. 467 at 45).

Allegedly offering further support for his treatment of the line of credit, Tarbell cited to a document where the accounting firm Deloitte stated it was appropriate to not consider debt as permanent financing. That statement was in the context of Deloitte analyzing a company known as Rocky Mountain Dealerships Inc. Tarbell claimed the company "sells, rents, leases, and provides support services for new and used agricultural and industrial equipment." (Doc. 324 at 18-19). At trial, however, the Secretary pointed out Rocky Mountain had not reported any "revenue form the lease or rental of equipment." (Doc. 467 at 47-48). In addition, Tarbell agreed that Rocky Mountain treated "floor plan financing used to acquire new equipment for sale through Rocky Mountain's dealerships differently than long-term interest-bearing debt." (Doc. 467 at 55). Because the business of Rocky Mountain Dealerships bears no resemblance to the business of RVR, the valuation practices appropriately applied to Rocky Mountain Dealerships has no weight.

Tarbell also cited a statement from a Wall Street research analyst that in determining valuation for the company Hertz, the analysis excluded the vehicle debt. (Doc. 324 at 19). However, as pointed out at trial Hertz's rents its cars for only one year before selling them. (Doc. 467 at 59). That short period allowed for Hertz to assert the cars were "short-term operating assets." By contrast, RVR rents its vehicles for five or six years before selling. While there may be disagreements regarding the definition of "short-term," Tarbell's assertion that assets sold in one year should be treated the same as assets held for six years

1  has no support.

2      Overall, Tarbell's decision to not include the balance on the line of credit was

3  unclear and unreasonable.  Tarbell's approach to the warrants, however, was convincing.

4      Tarbell did not adjust the equity value based on the warrants.  According to Tarbell,

5  the warrants "enabled RVR to obtain a definite lower cash interest rate on the seller notes."

6  (Doc. 324 at 56).  The seller notes had an overall interest rate of 5.65%.  Tarbell claims

7  this rate was far below the market interest rate of 13% and 16%.  (Doc. 324 at 55).  Thus,

8  Tarbell viewed the warrants as "designed to entice the [Smalleys] to provide transaction

9  financing with a low cash interest rate."  (Doc. 324 at 57).  And viewing the warrants as

10  compensating the Smalleys for accepting an allegedly below-market interest rate meant the

11  warrants were simply "a component of the transaction financing."  (Doc. 324 at 56).  As

12  discussed, this approach is more credible than assuming the interest rate was sufficient on

13  its own.  Wazzan presented testimony that 5.65% was higher than the interest rate on

14  corporate junk bonds.  (Doc. 315-1 at 64).  Moreover, the Smalleys retained almost

15  complete control over RVR such that they would have control over "activities which

16  directly bear on the payment of the [seller notes]."  (Doc. 315-1 at 64).  But the seller notes

17  were deeply subordinated and unsecured.  While a close call, the Court accepts Tarbell's

18  view that the warrants should be viewed as supplementing the notes' artificially low

19  interest rate.  Tarbell's next opinion, however, was the least plausible aspect of his entire

20  testimony.

21      Tarbell disputed whether any discount for lack of control was appropriate.  The main

22  support for this was Tarbell's view that "the ESOP had substantial elements of control."

23  (Doc. 324 at 78).  Tarbell's support for this conclusion was nonsensical.  Tarbell claimed

24  that Defendants would be the only members of the board of directors did not mean the

25  ESOP lacked control because "the board composition was agreed upon by Reliance."

26  (Doc. 324 at 80).  Tarbell provided no explanation why merely Reliance's agreement meant

27  the ESOP had control.  Next, Tarbell stated the ESOP trustee had the power to remove

28  board members at any time.  (Doc. 324 at 80).  But that makes no sense.  Merely because

1    the ESOP trustee could remove board members does not equate to control.  Moreover,

2    given the amount of compensation that would be due paid Defendants if removed from the

3    board, it was impossible to remove them.

4         Tarbell also claimed the ESOP trustee had elements of control because it could

5    refuse to approve a candidate nominated to the board of directors.  But the ESOP trustee

6    was a directed trustee so it would be required to vote as directed by the Defendants as

7    members of the ESOP Committee.  And the board of directors had the sole power to

8    nominate candidates.  So the ESOP trustee voted only on candidates nominated by

9    Defendants.  Thus, the ESOP trustee had no real ability to control the composition of the

10   board.

11        Every other aspect of purported control offered were illusory.  (Doc. 324 at 81-83).

12   Defendants insisted that despite selling all their stock, they retained complete control of

13   RVR.[3]  Tarbell admitted that buyers who obtain no meaningful control would not pay a

14   controlling-interest value.  (Doc. 467 at 147).  Tarbell's opinion that no discount for lack

15   of control was not accepted.

16        Tarbell did include a 5% discount for lack of marketability.  His declaration, and

17   this was to account for the fact that RVR's stock "is not registered to trade on any stock

18   market or exchange," meaning it has "limited marketability."  (Doc. 324 at 58).  But on

19   cross-examination Tarbell testified he did not believe a discount was appropriate, but he

20   applied the discount solely because "court guidance suggests that we do."  (Doc. 468 at

21   65).  Tarbell concluded the RVR equity had a value of $102.3 million to $116.6 million.

22   But due to flaws in Tarbell's, Wazzan's valuation establishes fair market value close to the

23   value derived from the convincing portions of his testimony.

24        Tarbell began with an enterprise value range of $91.9 to $107 million.  The Court

25

26   _____
     [3] Defendants also presented testimony from Edward A. Wilusz that a control premium was
27   appropriate because a "100% stockholder always retains the right to receive a controlling
     interest purchase price when the Company is later sold to a third-party buyer."  (Doc. 354
28   at 52).  That statement merely assumes that sale of 100% of the stock will merit a
     "controlling interest purchase price."  But it is implausible a willing buyer would pay such
     a price when the purchase is accompanied by terms that prohibit the buyer from directing
     the company business in any way.

- 33 -

will use the $107 number to show how inflated the purchase price paid by the ESOP was.[4] RVR's cash and notes receivable were $18.7 million, meaning an implied total enterprise value of $125.7 million.  The line of credit and term debt total $46 million, which is subtracted.  Thus, Tarbell's higher number would produce an implied total equity value of approximately $79.7 million.  Then as Tarbell agreed a 5% reduction for lack of marketability would be made bringing reducing the value to $75.7.  But this does not subtract discount for lack of control.  A 17% discount for lack of control was applied, the result would be $62 million.  While clearly more than Wazzan's value, Tarbell's recalculated number is forty three million dollars less than the purchase price paid by the ESOP.  The ESOP paid a substantially inflated purchase price.

### C. Conclusions Regarding Experts and Value

Most of Wazzan opinions regarding RVR's value were convincing Tarbell's were not.  Significantly Wazzan recognized Defendants were not giving up any of RVR.  But Wazzan's opinion that the value of the warrants should have been subtracted is not accepted.  The warrants can be viewed as compensating the Smalleys for the below market rate of return on the seller notes.  Thus, Wazzan's approach is accepted except for the warrants.

The RVR equity purchased by the ESOP had a fair market value of approximately $33 million, calculated as:

Enterprise Value: $72.2 million

Line of Credit Debt and Real Estate Debt: $46 million

Cash and Securities:  $16.34 million

Notes Receivable: $1.7 million

Thus the marketable, controlling interest value is $44.3 million.  The unique features of the transaction, especially the lack of control, requires application of two discounts:

Discount for Lack of Control: 17% or $7.5 million

Discount for Lack of Marketability: 10% or $3.7 million

---

[4] Using the higher number is also supported by the fact that subtracting the line of credit balance likely would have required the interest payments be handled differently.

Application of these discounts results in a fair market value of $33 million.  Accepting the actual fair market value of the RVR equity was $33 million, the equity was not worth anything close to the $105 million Reliance and Defendants expected and agreed upon.

## III.     Analysis of Claims

As set forth in the Pretrial Order, there are four claims against Defendants:

1. Defendants breached their fiduciary duty to monitor Reliance (Doc. 298 at 5);

2. Defendants have co-fiduciary liability for Reliance's violations of ERISA;

3. Defendants, as non-fiduciaries, knowingly participated in Reliance's fiduciary breaches and knowingly participated in a prohibited transaction;

4. Defendants' indemnification agreements are void.

The Secretary's claims depend upon establishing Reliance violated ERISA regarding the RVR transaction, meaning the Court must first analyze Reliance's behavior before the Defendants.  Before doing so, however, there is an initial dispute whether Defendants qualified as fiduciaries.  In particular, whether Bensen qualified as a fiduciary at all relevant times.

The Smalleys were members of the board at the time Reliance was appointed and easily qualify as fiduciaries.  Bensen was not yet a member of the board at that time, but as the facts established he was a very active participant in appointing Reliance.  He actively participated in the selection of Reliance which was a decision made by all three Defendants. In his capacity as Chief Financial Officer of RVR, Bensen signed the Trust Agreement between Reliance and RVR.  Accordingly, Bensen was a fiduciary and all Defendants were fiduciaries responsible for the appointment of Reliance as ESOP Trustee.  (*See also* Doc. 277 at 30-32) (explaining why Bensen's involvement rendered him fiduciary).

### A. Reliance's Breaches

While Reliance is no longer a defendant, Defendants' trial strategy involved attempting to prove Reliance's actions were valid.  However, Reliance clearly breached its duties of loyalty and prudence.  Reliance was required to act "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries."  29 U.S.C. § 1104(a)(1)(A).

1   Reliance was also required to act "with the care, skill, prudence, and diligence under the

2   circumstances then prevailing that a prudent man acting in a like capacity and familiar with

3   such matters would use in the conduct of an enterprise of a like character and with like

4   aims."  29 U.S.C.A. § 1104(a)(1)(B).  The evidence shows Reliance did not act in the

5   participants' interest nor did it act as a "prudent man."

6        Reliance had ongoing relationships with Chartwell and SRR such that none were

7   willing to challenge the other.  Despite clear misgivings about the transaction, Reliance

8   was unwilling to question the insistence by Chartwell and Defendants on certain vital

9   terms.  Moreover, it agreed to an extremely short timeline for closing the transaction.  That

10  timeline meant Reliance was negotiating without adequate information regarding matters

11  that impacted RVR's value.  For example, at the time Reliance was making counteroffers,

12  it had not completed its due diligence regarding environmental issues, had not yet evaluated

13  the terms of Defendants' employment agreements, and did not know what level of control

14  Defendants would insist upon retaining.  Reliance's internal emails show an obsession with

15  closing on Defendants' timeline regardless of concerns. (PX 231.001) ("We can study and

16  discuss the memo, but we are planning to close Tuesday or Wednesday, just so you know.

17  This has been a tough deal at the end to get an acceptable solution.").  A prudent fiduciary

18  would not allow an arbitrary deadline to prevent a complete, fair, and accurate evaluation.

19       Connected to its devotion to close on Defendants' schedule, Reliance did not

20  meaningfully engage with the valuations prepared by SRR.  Because the terms of the

21  transaction were still being negotiated, certain aspects of SRR's work should have been

22  scrutinized with far more care.  For example, SRR used a 10% control premium in its

23  valuations.  Because it was unclear what actual level of control, if any, the ESOP trustee

24  would gain, Reliance had an obligation to inquire why a control premium was being used.

25  Similarly, SRR's Guideline Company used companies not remotely similar to RVR, and

26  Reliance made no inquiry why those companies were chosen.  Reliance also failed to

27  inquire and understand why SRR was ignoring RVR's line of credit.

28       During the RVR transaction Reliance failed to follow its own internal guidelines.

While this does not always establish Reliance breached its fiduciary duty, it illustrates Reliance was intent on the transaction closing no matter what.  The subcommittee members did not prepare in advance of the May 5 meeting.  And for unknown reasons, only two members of the subcommittee were present when it voted to accept SRR's valuation report and approve the transaction.  Reliance viewed the entire process as largely a sham, meant to generate a facially plausible, acceptable record while ensuring Chartwell and its clients received whatever they wished and asked for.

And Reliance failed to meaningfully negotiate the terms beyond the total purchase price.  The record shows Reliance was willing to negotiate only on the financial terms of the transaction.  Thus, there are records of offer and counteroffers.  But Reliance did not care about the specifics beyond the basic financial terms.  Reliance acceded to Defendants' insistence that they be the sole members of the board of directors; Reliance agreed to terms allowing Defendants to review all mergers and acquisition activity; Reliance failed to challenge the high compensation Defendants received under their employment agreements; Reliance agreed Defendants could increase their own compensation levels whenever they wished, subject to a toothless approval requirement by the ESOP trustee; Reliance agreed to terms that would pay out massive severance if Defendants were removed; and Reliance allowed the transaction to proceed despite it knew the Department of Labor would likely step up on learning the terms of the transaction.  Reliance was well aware that Defendants were the beneficiaries of a ludicrous one-sided transaction yet Reliance proceeded in clear breach of its fiduciary duties.

And Reliance violated the obligation to comply with the terms of the ESOP.  ERISA required Reliance comply with the terms of the ESOP's governing documents.  29 U.S.C. § 1104(a)(1)(D).  The relevant ESOP documents required Reliance pay no more than "adequate consideration" for RVR stock and prohibited Reliance from engaging in a prohibited transaction where no exemption applied.  Reliance violated those requirements.

**B.  Defendants' Duty to Monitor**

When, as here, "members of an employer's board of directors have responsibility

- 37 -

for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention." *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009).  This duty involving trustee selection and retention is known as the "duty to monitor."  The Department of Labor has provided little guidance on the scope of this duty.  But the available guidance states a fiduciary's "duty to monitor" the performance of other fiduciaries requires review of the other fiduciaries' performance "[a]t reasonable intervals . . . to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."  29 C.F.R. § 2509.75-8(FR-17).  There is "[n]o single procedure . . . appropriate in all cases," and fiduciaries with the duty to monitor must consider the particular "facts and circumstances" in determining how best to accomplish the necessary monitoring.  *Id.*

In monitoring Reliance, Defendants were required to act with "the care, skill, prudence, and diligence under the circumstances then prevailing."  29 U.S.C. § 1104(a)(1). This required Defendants ensure they knew what was happening and if they did not, they had to take steps to learn.  It is not an excuse that they were not lawyers. As explained by the Ninth Circuit, hiring ostensibly independent experts "is not a complete defense to a charge of imprudence."  *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996).  Even when a fiduciary hires an expert, the fiduciary must "(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances."  *Id.*  And a fiduciary must "more closely scrutinize an expert's advice if red flags indicate[] that the expert's methods might be unsound."  *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 946 (7th Cir. 2024).  *See also Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 773 (4th Cir. 2019) (noting expert advice "is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled").

Defendants have attempted to excuse their behavior by claiming they were not

financial professionals and they lacked "actual knowledge" that something was off with Reliance's behavior.[5]  But the knowledge standard for a duty to monitor claim is "knew or should have known."  To hold otherwise would allow ERISA fiduciaries to "avoid liability by professing ignorance."  (Doc. 277 at 41).  Or as the Fourth Circuit said regarding the claim of to a trustee that had not acted in bad faith: a plaintiff "need not prove that the fiduciary acted in bad faith.  Rather, an ESOP fiduciary is liable . . . if it breached its fiduciary duties, *i.e.*, failed to act *solely* in the interest of the participants with the care, skill, prudence, and diligence used by a prudent man acting in a like capacity." *Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 773 (4th Cir. 2019) (quotation marks and citations omitted).  The appropriate focus is not on the fiduciary's motives or actual knowledge but on whether the fiduciary "engaged in a reasoned decisionmaking process, consistent with that of a prudent man in like capacity." *Id.*  "[A] pure heart and an empty head are not enough" to avoid liability.  *Id.*  Here while Defendants retained professional assistance there were glaring red flags such that Defendants had actual knowledge that Reliance was breaching its duties.

The Court notes, and the evidence shows, Defendants knew they had an obligation to monitor Reliance, but the evidence also shows Defendants did not to do so.  In fact, the evidence established Chartwell repeatedly represented to Defendants that Chartwell and its partners would ensure Defendants would receive all they wanted including the desired price and terms.  Chartwell recommend Reliance and SRR, knowing that they would accede to Chartwell's demands.  From the outset Defendants made no serious inquiries into the nature of the relationship between Chartwell, Reliance, and SRR, and in particular, whether they had conflicts.  If they had, they would have discovered the three companies had referral relationships making it unlikely that the negotiations would qualify as arms-length.

The first major red flag was Defendants' insistence on an abbreviated timeline solely to obtain tax benefits.  Given the amount of money at stake, and the need for careful

---

[5] This is refuted by their business and accounting educations, that they were consistently the only governing officers of RVR and vast experience managing the company.

research into all aspects of RVR's operations, Reliance's agreement to such an abbreviated timeline should have made clear Reliance had gone astray.  Defendants knew negotiations were occurring long before Reliance had sufficient information, and long before the crucial non-financial terms of the transaction were resolved.  The Fourth Circuit concluded a very similar timeline in an ESOP case should have been cause for concern.

In the Fourth Circuit case, the trustee had "completed their due diligence, made pricing decisions, conducted negotiations, and launched a tender offer in less than two months."  *Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 778 (4th Cir. 2019).  The timeline selected was "[t]o maximize the after-tax benefits to the Sellers."  *Id.*  Here, the deadlines were set to maximize Defendants' benefits.  As already noted, Reliance knew it was rushing matters and Reliance appears to have violated its own internal policies to meet the artificial closing deadline insisted by Defendants.  Defendants may not have known Reliance was violating its own policies, but Defendants knew everyone was struggling to meet an artificially imposed deadline.  The Defendants knew the rushed timeline was not sufficient for a prudent fiduciary to act.

The second major red flag was Reliance negotiating the topline number of the transaction at a time when crucial issues that would impact the transaction were either undecided or unknown to Reliance.  For example, Reliance was engaged in negotiations despite not knowing the terms Defendants would finally accept for their employment agreements.  And Defendants aggressively insisted on highly favorable terms. After the transaction, those employment agreements promised almost half the purchase price in severance should the ESOP trustee seek to remove Defendants.  In addition, the transaction granted Defendants the ability to increase their compensation as they wished.   No reasonable trustee would have negotiated the topline price without being certain of the terms of the employment agreements.  Similarly, Defendants always insisted they retain control of RVR even if the trustee would have no control.  It is common sense that Reliance's failing to include a sizeable discount for lack of control was wrong.

The next red flag was Defendants knew Reliance was not including the balance on

the line of credit in its valuation which had a very significant balance at all relevant times. A valuation that did not include the line of credit should have been obvious or prompted Defendants to conduct a serious investigation to determine why that was proper.  The fact that self-described experts were arguing it was proper to not include the line of credit does not excuse Defendants' failure to investigate.  As explained by the Ninth Circuit, if there are "uncertainties" even "after a careful review of the valuation and a discussion with the expert . . . the fiduciary should have a second firm review the valuation." *Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996).  Instead of doing so, Defendants merely accepted the counterintuitive proposition that it was proper to not consider approximately $50 million in debt.

The most glaring red flag was Defendants knew they were retaining complete control over every aspect of RVR despite Reliance paying a purchase price identified as "controlling interest value."  Defendants sold 100% of the stock but they were the sole members of the board of directors, Defendants retained control over RVR's operations given their employment positions, Defendants were members of the ESOP Committee responsible for the appointment and removal of the ESOP trustee, and Defendants knew they could raise their already high salaries to any amount they wished.

Defendants experience with the Budget purchase meant they understood the need to retain control over RVR and they insisted the transaction proceed only under terms that would ensure they retained control.  Despite knowing Reliance would gain no control, Defendants allowed Reliance to act as if equity was worth $105 million, a price Defendants knew had been calculated using a control premium.  It is inconceivable to believe Defendants thought the purchase price was reasonable given the limitations on the ESOP trustee's power.  The Seventh and Fourth Circuits have addressed situations where an ESOP did not gain sufficient control to merit a control premium and the ESOP in the present case gained even less control than the ESOPs in those cases.

In *Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth*, 99 F.4th 928 (7th Cir. 2024), the plaintiff alleged an ESOP fiduciary had not questioned

valuations prepared by one of the same firms involved in the present case: SRR. *Id.* at 946. There, SRR's valuation for the fiduciary "added a 10% control premium to the company's enterprise value to account for the [ESOP's] controlling interest." *Id.* at 946. But that control premium was "not justified by actual control." *Id.* The ESOP trustee had "long ago ceded to [the company's] CEO most of the [ESOP] participants' power over the composition of [the company's] Board, and the [ESOP] participants were allowed to vote only on extraordinary actions by the Board (such as a sale of the company). For all other matters, the trustee was required to vote the [ESOP's] shares as directed by the ESOP Committee." *Id.* The Seventh Circuit concluded allegations that SRR continued to use a control premium was a "red flag" a prudent fiduciary would have investigated. *Id.* at 947.

The Fourth Circuit addressed a finding of liability against an ESOP trustee for breach of fiduciary duty. Once again it was SRR at the heart of the improper valuation. The ESOP trustee had hired SRR "to be the financial advisor on the ESOP's purchase" of company stock. *Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 771 (4th Cir. 2019). The ESOP trustee did not, however, "adequately probe" the reliability of SRR's valuation. *Id.* at 775. One of the trustee's "major failure[s]" was not questioning SRR's application of a 10% control premium. *Id.* at 777. The Fourth Circuit explained "[p]urchasers will generally pay more for rights associated with control of the enterprise." *Id.* And in this context "control" is defined as "an interest which allows the shareholder to unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Id.* Under this definition and the terms of the ESOP transaction, use of a control premium was inappropriate.

The Fourth Circuit concluded there was sufficient evidence establishing "the ESOP essentially had no power to control [the company]." *Id.* Similar to the RVR transaction, the transaction in *Brundle* "was intentionally designed to maintain the sellers' control over [the company] even after selling their shares." *Id.* The sellers in *Brundle* had "retained the power to appoint a majority of the [company's] board, a key indicator of control." *Id.* The

ESOP trustee was also "required . . . to vote its shares as the [company's] board (not the ESOP) directed." *Id.*

The ESOP trustee in *Brundle* made a very similar argument to that of by Defendants regarding 100% ownership of shares.  The *Brundle* trustee claimed application of "a 10% control premium was justified by the fact that the ESOP owned 100% of [the company's] shares and obtained elements of control." *Id.* at 777.  The trustee argued "control premiums are often between 35-40%" and a modest 10% premium was justifiable in that case.  However, the Fourth Circuit concluded the almost complete lack of control granted by the governing documents meant owning 100% of the shares was not sufficient to merit a control premium.  Because the ESOP was not gaining any meaningful control, the ESOP trustee "should have done more to challenge the use of *any* control premium." *Id.*

The RVR transaction was structured such that the ESOP trustee clearly gained no control.  Reliance's failure to probe that issue and properly account for that lack of control should have been obvious to any prudent fiduciary.  In simple terms, it seems obvious Defendants, with their relevant educational backgrounds and vast business experience, must have wondered why Reliance was willing to pay $105 million for the RVR stock but agree to leave every material aspect of control in Defendants' hands.  Entering into such a one-sided transaction, when Defendants knew precisely how one-sided it was, constituted a breach of Defendant's duty to monitor Reliance.

### C. Prohibited Transaction

Reliance was a fiduciary to the ESOP and Defendants were parties in interest pursuant to 29 U.S.C. § 1002(14)(H) because they were employees, officers, directors (or individuals having powers or responsibility to those of officers or directors) of RVR.  Smalleys were also parties in interest under 29 U.S.C. § 1002(14)(H) because they were 10% shareholders directly or indirectly of RVR.  The various trusts were also parties in interest as 10% shareholders directly or indirectly of RVR.

The Court held at summary judgment Reliance had engaged in a "prohibited transaction" under ERISA.  (Doc. 277 at 29).  A defendant wishing to avoid liability for

participating in a prohibited transaction bears the burden of proving one of the exemptions. The relevant exemption here permits "the acquisition or sale by a plan of qualifying employer securities" if the acquisition is for "adequate consideration." 29 U.S.C. § 1108(e). "Adequate consideration" is the "fair market value of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18). The record establishes Reliance did not come close to satisfying its obligation to establishing the fair market value exemption. Thus, Reliance engaged in a prohibited transaction that is not subject to any exemption.

### D.   Indemnification

The Secretary seeks a ruling that Defendants cannot be indemnified by RVR. ERISA prohibited "indemnification of a fiduciary by the ERISA plan itself." *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009). The Ninth Circuit has held indemnification is not appropriate when it would have the effect of "asking ESOP participants to pay for Defendants' defense costs." *Id.* The RVR ESOP owns 100% of the RVR stock and any payment of Defendants' defense costs by RVR has the effect of reducing the value of the ESOP. That is prohibited.

Even if not prohibited by ERISA, the terms of the indemnity provision in the ESOP Plan document and RVR's Articles of Incorporation do not apply if Defendants engaged in "willful misconduct" or "intentional misconduct." Because Defendants knowingly breached their fiduciary duties, they engaged in willful or intentional misconduct. Thus, indemnification is inappropriate under the terms of the Plan document.

### IV.   Motion to Strike

Defendants moved to strike the Secretary's reply regarding the findings of fact and conclusions of law. Defendants argue the reply is one page over the page limit. The Court did not rely on the final page of the Secretary's filing. Therefore, the motion to strike will be denied as moot.

### V.   Additional Proceedings

Having concluded Defendants breached their fiduciary duties and allowed Reliance

to engage in a prohibited transaction, the remaining issues involve available remedies.  At the beginning of this suit, the Court bifurcated liability and remedies.  The parties will be required to confer and file a joint statement outlining what additional discovery, if any, is needed before the Court can obtain briefing regarding the appropriate remedies.

Accordingly,

**IT IS ORDERED** no later than **September 16, 2024**, the parties shall file a joint statement outlining what additional discovery or proceedings are needed.

**IT IS FURTHER ORDERED** the Motion to Strike (Doc. 490) is **DENIED**.

Dated this 15th day of August, 2024.

Honorable Roslyn O. Silver
Senior United States District Judge